# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY,

DEFENDANT(S).

---

# INDICTMENT

21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances;
21 U.S.C. § 841(a) – Distribution of Controlled Substances;
18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud;
18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice;
18 U.S.C. § 2 – Aiding and Abetting
18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), 21 U.S.C. § 853(a), and
28 U.S.C. § 2461(c) – Forfeiture Allegation

---

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 12th day of

June 2024.

_____
Clerk

Bail, $ No Bail - Arrest Warrants

**FILED**

Jun 12 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

1   MATTHEW M. YELOVICH (CABN 351330)
    Attorney for the United States
2   Acting under Authority Conferred by 28 U.S.C. § 515

3   GLENN S. LEON (NYBN 250785)
    Chief
4   Fraud Section, Criminal Division

5   Attorneys for United States of America

6                   UNITED STATES DISTRICT COURT

7                 NORTHERN DISTRICT OF CALIFORNIA

8                     SAN FRANCISCO DIVISION

9

10  UNITED STATES OF AMERICA,              )   CASE NO.   3:24-cr-00329 CRB
                                           )
11          Plaintiff,                     )
                                           )   VIOLATIONS:
12      v.                                 )   21 U.S.C. § 846 – Conspiracy to Distribute
                                           )   Controlled Substances;
13  RUTHIA HE, A/K/A RUJIA HE, and DAVID   )   21 U.S.C. § 841(a) and (b)(1)(C) – Distribution of
    BRODY,                                 )   Controlled Substances;
14                                         )   18 U.S.C. § 1349 – Conspiracy to Commit Health
            Defendants.                    )   Care Fraud;
15                                         )   18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice;
                                           )   18 U.S.C. § 2 – Aiding and Abetting
16                                         )   18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), 21 U.S.C. §
                                           )   853(a), and 28 U.S.C. § 2461(c) – Forfeiture
17                                         )   Allegation
                                           )
18                                         )   SAN FRANCISCO VENUE
                                           )
19  _____)

20                          I N D I C T M E N T

21          The Grand Jury charges:

22                       **GENERAL ALLEGATIONS**

23          At all times relevant to this Indictment, unless otherwise specified:

24  The Controlled Substances Act

25          1.      The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801 *et*

26  *seq.*, and its implementing regulations governed the manufacture, distribution, and dispensation of

27  controlled substances in the United States.  With limited exceptions for medical professionals, the CSA

28

INDICTMENT                          1

1   made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a

2   controlled substance or conspire to do so.

3         2.      The CSA and its implementing regulations set forth which drugs and other substances

4   were defined by law as "controlled substances," and assigned those controlled substances to one of five

5   schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or

6   psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

7         3.      A controlled substance assigned to Schedule II had a high potential for abuse, was highly

8   addictive, and had a currently accepted medical use in treatment in the United States or a currently

9   accepted medical use with severe restrictions.  Abuse of a Schedule II controlled substance could have

10  led to severe psychological and/or physical dependence.

11        4.      Pursuant to the CSA and its implementing regulations, Amphetamine-

12  dextroamphetamine was classified as a Schedule II controlled substance.  Amphetamine-

13  dextroamphetamine was sold generically and under a variety of brand names, including Adderall.  Other

14  stimulants, including lisdexamfetamine (sometimes sold under the brand name Vyvanse) and

15  methylphenidate (sometimes sold under the brand name Ritalin) (collectively, "stimulants"), were

16  classified as Schedule II controlled substances.

17        5.      Medical practitioners, such as nurse practitioners and physicians, who were authorized to

18  prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine,

19  were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were

20  registered with the Attorney General of the United States.  21 U.S.C. § 822(b); 21 C.F.R. § 1306.03.

21  Medical practitioners were required to register with the Drug Enforcement Administration ("DEA") in

22  order to prescribe controlled substances.  The DEA issued registration numbers to qualifying

23  practitioners, including nurse practitioners, which permitted them to dispense Schedule II, III, IV, and V

24  controlled substances consistent with the terms of that registration.  21 U.S.C. § 822.  The registration of

25  mid-level practitioners, such as nurse practitioners, was contingent upon the authority granted by the

26  state in which they were licensed.  Upon application by the practitioner, the DEA assigned a unique

27  registration number to each qualifying medical practitioner.  The DEA was responsible for enforcement

28  of controlled substance laws in the United States.

6.      The CSA required all practitioners to be registered in the state in which the patients to which they were prescribing controlled substances were located, regardless of whether the prescribing was taking place via telemedicine.  The CSA provided that every person who dispensed, or who proposed to dispense, any controlled substance was required to obtain from DEA a registration issued in accordance with DEA rules and regulations.  21 U.S.C. § 822(a)(2).  Under the CSA, such dispensing included prescribing and administering controlled substances.  *Id*. § 802(10).  DEA was only permitted to register a person to dispense a controlled substance if that person was permitted to do so by the jurisdiction in which his or her patients were located.  *Id*. §§ 802(21), 823(f).  Thus, unless an applicable exception applied, DEA regulations required a practitioner to obtain a separate DEA registration in each state in which a patient to whom he or she prescribed a controlled substance was located when the prescription was made, regardless of whether the prescription was made via telemedicine.  Under the CSA, it was unlawful to distribute or dispense a controlled substance, unless otherwise authorized by law.  21 U.S.C. § 841(a)(1).  Except in limited circumstances, Schedule II controlled substances could not be dispensed without a written prescription.  21 U.S.C. § 829.

7.      Title 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions for controlled substances; it provided that, to be effective, a prescription for a controlled substance:

> must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.  An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

8.      In addition, Title 21 of the Code of Federal Regulations, Section 1306.03 required that valid prescriptions for controlled substances must be issued by an "individual practitioner" who is "[a]uthorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession . . . ."

INDICTMENT                                    3

1    The Corporate Practice of Medicine

2        9.    Certain states, including the State of California, set forth laws that a business corporation

3    may not practice medicine or employ physicians or other clinical personnel to provide professional

4    medical services.  California Business and Professions Code, Section 2052 stated that practicing

5    medicine without a valid license is unlawful.  Section 2400 stated that "[c]orporations and other artificial

6    entities shall have no professional rights, privileges, or powers."  According to the Medical Board of

7    California, limitations on the rights, privileges, and powers of corporate and other artificial entities are

8    intended to prevent unlicensed persons from interfering with or influencing the physician's professional

9    judgment.

10    State Laws Regarding Schedule II Prescriptions by Nurse Practitioners

11        10.    Certain states, including the State of California, set forth regulations governing the

12    authority of nurse practitioners to prescribe controlled substances.  These regulations generally provided

13    that nurse practitioners were required to enter into an agreement with a collaborating or supervisory

14    physician in order to lawfully prescribe controlled substances, including Adderall and other stimulants.

15    These regulations also established that a collaborating or supervisory physician was responsible for

16    supervising the nurse practitioner and complying with the applicable standard of care.  On a periodic

17    basis, the collaborating or supervisory physician was required to consult with the nurse practitioner and

18    make a personal review of the prescription practices for each patient, including a review of medical files.

19        11.    For example, the State of California Business and Professions Code Section 2836.1

20    provided that a nurse practitioner was prohibited from furnishing or ordering drugs unless, *inter alia*, all

21    of the following applied:

22        a)    the drugs were furnished or ordered by a nurse practitioner in accordance with

23    standardized procedures or protocols developed by the nurse practitioner and the supervising physician

24    when the drugs or devices furnished or ordered were consistent with the practitioner's educational

25    preparation or for which clinical competency has been established and maintained;

26        b)    the nurse practitioner was functioning pursuant to standardized procedure or

27    protocol that was developed and approved by the supervising physician and nurse practitioner;

28        c)    (1) the standardized procedure or protocol covering the furnishing of drugs was

INDICTMENT                    4

1  required to specify which nurse practitioners may furnish or order drugs, which drugs may be ordered,

2  under what circumstances, the extent of physician and surgeon supervision, the method of periodic

3  review of the nurse practitioner's competence, including peer review, and review of the provisions of the

4  standardized procedure; and (2) in addition to the requirements in paragraph (1), the provision for

5  furnishing Schedule II controlled substances was required to address the diagnosis of the illness, injury,

6  or condition for which the Schedule II controlled substance was to be furnished; and

7          d)     the ordering of drugs by a nurse practitioner occurred under physician

8  supervision.  Physician supervision did not require the physical presence of the physician but was

9  required to include (1) collaboration on the development of the standardized procedure, (2) approval of

10  the standardized procedure, and (3) availability by telephonic contact at the time of patient examination

11  by the nurse practitioner.

12  <u>The Corresponding Responsibility of Pharmacies</u>

13        12.    Pharmacists were required to exercise sound professional judgment, and to adhere to

14  professional standards, when making a determination about the legitimacy of a controlled substance

15  prescription.  21 C.F.R. §§ 1306.04(a) and 1306.06.  Such a determination was made before the

16  prescription was dispensed.  The law did not require a pharmacist to dispense a prescription of doubtful,

17  questionable, or suspicious medical legitimacy.  To the contrary, the pharmacist who deliberately

18  ignored the high probability that a prescription was not issued for a legitimate medical purpose and filled

19  the prescription, was subject to prosecution along with the issuing practitioner and others responsible,

20  for knowingly and intentionally distributing controlled substances.  Moreover, DEA possessed the

21  authority to revoke a pharmacy's registration based on a finding that its pharmacists had violated their

22  corresponding responsibility for the proper prescribing and dispensing of controlled substances.

23  <u>The Ryan Haight Act</u>

24        13.    The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 was enacted to

25  stem the increase in the use of controlled substances purchased on the Internet.  The Act mandated, with

26  limited exceptions, that the dispensing of a controlled substance by means of the Internet be predicated

27  on a valid prescription issued by a practitioner who had conducted at least one in-person medical

28  evaluation of the patient.  The Act was codified in Title 21 of the United States Code.

14.     Title 21, United States Code, Section 841(h) provided that it was unlawful to "knowingly or intentionally— writ[e] a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of [Title 21, United States Code,] [S]ection 829(e) ...."

15.     Title 21, United States Code, Section 829(e)(1) provided that, "[n]o controlled substance that is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

16.     Title 21, United States Code, Section 829(e)(2)(A) provided that in order for a prescription to be valid it had to be "issued for a legitimate medical purpose in the usual course of practice by— (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner."

17.     Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" was "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

18.     Title 21, United States Code, Sections 829(e)(3) and 802(54) provided that the requirement of conducting at least one in-person medical evaluation did not apply in certain circumstances involving "the practice of telemedicine" where the Secretary of Health and Human Services ("HHS") has declared "a public health emergency" and it "involve[d] patients located in such areas, and such controlled substances, as the Secretary [of HHS], with the concurrence of the Attorney General, designate[d]...."  21 U.S.C. § 802(54)(D).

19.     Title 21, United States Code, Section 802(54) provided that "[t]he term 'practice of telemedicine' means, for purposes of this subchapter, the practice of medicine in accordance with applicable Federal and State laws by a practitioner (other than a pharmacist) who is at a location remote from the patient and is communicating with the patient, or health care professional who is treating the patient, using a telecommunications system referred to in [S]ection 1395m(m) of [T]itle 42 ...."

20.     Title 42, United States Code, Section 1395m(m)(1) and implementing regulations, including Title 42, Code of Federal Regulations, Section 410.78, provided that a telecommunications

system meant "multimedia communications equipment that includes, at a minimum, audio and video equipment permitting two-way, real-time interactive communication between the patient and distant site physician or practitioner," and "include[d] store-and-forward technologies that provide for asynchronous transmission of health care information" only in "telemedicine demonstration program conducted in Alaska and Hawaii."

21.     On or about January 31, 2020, the Secretary of HHS declared a national public emergency under Title 42, United States Code, Section 247d as a result of the spread of the novel coronavirus COVID-19 within the United States.

22.     In response to the COVID-19 Public Health Emergency as declared by the Secretary, pursuant to the authority under Section 319 of the Public Health Service Act (42 U.S.C. § 247), the DEA granted temporary exceptions to the Ryan Haight Act and DEA's implementing regulations under Title 21, United States Code, Section 802(54)(D), thereby allowing the prescribing of controlled medications via telemedicine encounters—even when the prescribing practitioner had not conducted an in-person medical evaluation of the patient—in certain circumstances in order to prevent lapses in care.

23.     These emergency flexibilities to limit the spread of COVID-19 allowed, during the pendency of the COVID-19 Public Health Emergency, the prescribing of controlled substances without first conducting an in-person examination only if all of the following conditions were met:  the prescription was issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice; telemedicine communication was conducted using an audio-visual, real-time, two-way interactive communication system; and the practitioner was acting in accordance with applicable federal and state laws.

Medicare and Medicaid

24.     The Medicare program ("Medicare") was a federally-funded health care program that provided benefits to persons who were at least 65 years old or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of HHS.

25.     The Medicaid program ("Medicaid") was jointly funded by the federal and state governments and was a program that provided health care benefits to certain low-income individuals and

families in states.  Medicaid was administered by CMS and various state agencies.

26.     Medicare and Medicaid were each a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b).

27.     Individuals who received benefits under Medicare and Medicaid were referred to as "beneficiaries."

28.     Pharmacies and other health care providers, all of which provided services to beneficiaries, were able to apply for and obtain a "provider number."  A health care provider that received a provider number was able to file claims with Medicare and Medicaid to obtain reimbursement for services provided to beneficiaries.

29.     To participate in Medicare and Medicaid, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS, relevant state and federal agencies, and authorized agents and contractors.

30.     A health care provider who was assigned a provider number and provided services to beneficiaries was able to submit claims for reimbursement that included the provider number assigned to that medical provider.  Payments were often made directly to a provider of the goods or services, rather than to a beneficiary.  This payment occurred when the provider submitted the claim for payment.

31.     Medicare and Medicaid required health care providers to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records that documented actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare and Medicaid required complete and accurate patient medical records so that Medicare and Medicaid would be able to verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare and Medicaid, or their contractors, to review the appropriateness of payments made to the health care provider.

32.     Medicare and Medicaid paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the patient's illness or injury, documented, and actually provided as represented to Medicare and Medicaid.  Medicare and Medicaid would not pay for items or services that were procured through kickbacks and bribes.

<u>Medicare and Medicaid Prescription Drug Plans</u>

33.     To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan.  Medicare drug plans were operated by private health care insurance companies approved by Medicare and referred to as drug plan "sponsors."  A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

34.     Medicare's drug plans were administered by pharmacy benefit managers ("PBMs"), which adjudicated and processed payment for prescription drug claims submitted by eligible pharmacies.  PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

35.     A pharmacy could participate in Medicare Part D by entering into a provider agreement with a Part D drug plan or with a PBM.  Pharmacies entered into contractual agreements with PBMs either directly or indirectly.  If indirectly, providers first contracted with pharmacy network groups, which then contracted with PBMs on behalf of providers.  By contracting with drug plans or PBMs, directly or indirectly, pharmacies agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state laws.

36.     Medicaid also provided coverage to its recipients for prescription drugs.  Medicaid beneficiaries could obtain their prescription drug benefits from pharmacies either through "fee-for-service" enrollment or through "Medicaid Managed Care Plans," which were administered by private insurance companies that were paid by Medicaid.  A beneficiary in a Medicaid drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

37.     Upon receiving prescriptions, pharmacies submitted claims for reimbursement to Medicare, PBMs, or Medicaid for the prescription drugs dispensed to beneficiaries.  Medicare, PBMs, and Medicaid reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

38.     Pharmacies were permitted to submit claims for reimbursement to Medicare and Medicaid only for prescription drugs that were dispensed upon a valid prescription, medically necessary, and eligible for reimbursement.

39.     Medicare and Medicaid drug plans were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

Commercial Insurance Plans

40.     Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services.  Individuals who received benefits from Commercial Insurers were referred to as "members."

41.     Each of the Commercial Insurers was a "health care benefit program" as defined in Title 18, United States Code, Section 24(b) and Title 18, United States Code, Section 220(e)(3).

42.     Commercial Insurers often made payments directly to pharmacies and other providers, rather than to members who received the health care benefits, items, and services.

43.     Commercial Insurers offered drug plans, which were administered and operated by PBMs.  A PBM acted on behalf of one or more drug plans.  Through a plan's PBM, a pharmacy could join the plan's network.  This allowed a member of a Commercial Insurers' drug plan to fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

44.     To obtain payment for treatment or services provided to a member, pharmacies and other providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically.  The claim form required certain important information, including: the member's name and identification number; a description of the health care benefit, item, or service that was provided or supplied to the member; the billing codes for the benefit, item, or service; the date upon which the benefit, item, or service was provided or supplied to the member; and the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

//

45.     When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with applicable laws and regulations.  The provider also certified that the items or services being billed were medically necessary and were in fact provided as billed.

## The Defendants

46.     Ruthia He ("R. He"), also known as Rujia He, was a resident, at various times, of the Northern District of California.

47.     David Brody was a resident of the Northern District of California.  Brody was a psychiatrist who maintained a DEA registration number and was authorized to prescribe controlled substances in the State of California.

## Other Entities and Individuals

48.     Okay Health, Inc., was a Delaware corporation that was incorporated on or about February 26, 2020, and did business as "Okay Health" and "Done."  In or around April 2021, R. He submitted a certificate of amendment of incorporation of Okay Health, Inc., to rename the corporation Done Global, Inc. (collectively, with its predecessor name Okay Health, Inc., referred to herein as "Done Global").  R. He was a Founder, the President, and the Chief Executive Officer ("CEO") of Done Global.

49.     Done Health, P.C., was a California corporation that was incorporated on or about August 7, 2020 (together with its affiliated company, Done Global, referred to herein as "Done").  In or about August 2020, Brody was identified as the sole incorporator of Done Health, P.C.  Brody was the Clinical President of Done.  In truth, R. He owned, controlled, and operated Done.

50.     Done was a self-proclaimed "digital health company" that operated on a subscription-based model where individuals ("Done members") paid a monthly fee to Done.  Done advertised that it provided online diagnosis, treatment, and refills of medication for attention deficit hyperactivity disorder ("ADHD").  Since the beginning of the COVID-19 pandemic, Done arranged for the prescription of over 40 million pills of Adderall and other stimulants and obtained over $100 million in revenue.  Done's principal place of business was within the Northern District of California.

//

51.    Done maintained a network of medical professionals ("Done Prescribers") that included doctors and nurse practitioners who Done paid to diagnose Done members with ADHD and to write prescriptions for controlled substances, including Adderall and other stimulants.  Done Prescribers included Brody, Prescriber 1, Prescriber 2, and others.

52.    The following individuals, identified by initials but known to the Grand Jury, were Done members and were prescribed Adderall and other stimulants by Done Prescribers, and received those controlled substances pursuant to prescriptions written by Done Prescribers: H.B.; T.T.; V.S.; and N.C.

53.    Entities referred to as Pharmacy 1, Pharmacy 2, and Pharmacy 3 were pharmacies operating in the United States that were authorized to distribute controlled substances, and entities that did distribute Adderall and other stimulants to Done members based on prescriptions submitted to these pharmacies by Done Prescribers acting on behalf of and in conjunction with Done.  Pursuant to their corresponding responsibility, Pharmacy 1, Pharmacy 2, Pharmacy 3, and others adopted policies to ensure that controlled substance prescriptions were issued for a legitimate medical purpose in the usual course of professional practice, and that pharmacists were acting in the usual course of professional practice in filling such prescriptions.  21 C.F.R. §§ 1306.04(a) and 1306.06.  In order to exercise their corresponding responsibility, Pharmacy 1, Pharmacy 2, Pharmacy 3, and other pharmacies that filled Done prescriptions employed pharmacists who reviewed relevant information about the prescription, including documentation and evidence provided by the Done Prescriber or others regarding whether the prescription was issued for a legitimate medical purpose in the usual course of professional practice. Pharmacy 1, Pharmacy 2, Pharmacy 3, and others in the ordinary course relied on information transmitted by the Done Prescriber or others acting on the Done Prescriber's behalf.

COUNT ONE: (21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances)

54.    Paragraphs 1 to 53 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

55.    From in or around February 2020, and continuing through in or around January 2023, in San Francisco, in the Northern District of California, and elsewhere, the defendants,

RUTHIA HE and DAVID BRODY,

did knowingly and intentionally combine, conspire, confederate, and agree together, and with other

persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and dispense mixtures and substances containing a detectable amount of controlled substances, including amphetamine-dextroamphetamine and other stimulants, Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice, in violation of Title 21, United States Code, Section 846.

### Purpose of the Conspiracy

56.     It was the purpose of the conspiracy for R. He, Brody, and others to unlawfully enrich themselves by: (a) conspiring to provide Done members with prescriptions for Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice; (b) enabling Done members to obtain Adderall and other stimulants from pharmacies by defrauding pharmacies and Medicare, Medicaid, and the Commercial Insurers; (c) concealing and disguising the unlawful prescription of Adderall and other stimulants, the submission of false and fraudulent claims to Medicare, Medicaid, and the Commercial Insurers, and the receipt and transfer of the proceeds of the conspiracy; (d) increasing revenue and causing the value of Done to increase through the illegal distribution of controlled substances to Done members who paid subscription fees to Done on a monthly basis in exchange for Adderall and other stimulants; (e) concealing and disguising the scheme by making false and fraudulent representations to third parties, corruptly altering, destroying, and concealing records or documents, and obstructing, influencing, and impeding the Grand Jury's investigation; and (f) diverting proceeds of the conspiracy for their personal use and benefit, for the use and benefit of others, and to further the scheme.

### Manner and Means of the Conspiracy

57.     The manner and means by which R. He, Brody, and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

58.     R. He co-founded Done to obtain financial gain by offering easy access to prescriptions for Adderall and other stimulants in exchange for payment of a monthly subscription fee.  Brody joined Done Health P.C. as Clinical President to advance this shared goal.

59.     R. He initially owned, controlled, and operated Done Global in violation of California's corporate practice of medicine law, and R. He, Brody, and others concealed and disguised the scheme by

1   creating Done Health P.C. to create the false appearance that it was an independent company in

2   compliance with California law.

3       60.   R. He made false and fraudulent representations that Done was a successful business

4   prior to the pandemic, when, in fact, Done did not generate material revenue until R. He, Brody, and

5   others exploited emergency flexibilities during the public health emergency to provide easy access to

6   Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of

7   professional practice, including those provided to H.B., T.T., V.S., N.C., and others.

8       61.   R. He and others caused Done to acquire thousands of Done members by, among other

9   things, spending tens of millions of dollars on deceptive social media advertisements, intentionally

10  targeting drug-seeking patients, and advertising that members could obtain easy access to prescriptions

11  for Adderall and other stimulants in exchange for payment of a monthly subscription fee.

12      62.   R. He, Brody, and others hired Done Prescribers who they believed were not overly

13  concerned about drug-seeking patients and willing to prescribe Adderall and other stimulants at an initial

14  telemedicine encounter.

15      63.   R. He, Brody, and others obtained confidential patient information for thousands of Done

16  members and provided it to Done Prescribers in order for Done Prescribers to write prescriptions for

17  Adderall and other stimulants.

18      64.   R. He and others made false statements and material omissions that Done was able to

19  accurately diagnose ADHD in shorter appointment times than other medical clinics because its intake

20  process purportedly screened out individuals who were unlikely to have ADHD, when in fact

21  individuals who were unlikely to have ADHD were not prevented from scheduling an appointment.

22      65.   R. He, Brody, and others established policies at Done for initial telemedicine

23  encounters—including limiting the information available to Done Prescribers, instructing Done

24  Prescribers to prescribe Adderall and other stimulants even if the Done member did not qualify, and

25  mandating that initial encounters would be under 30 minutes—thereby causing Done Prescribers,

26  including Prescriber 1 and Prescriber 2, to write prescriptions that were not for a legitimate medical

27  purpose in the usual course of professional practice.

28  //

66.     R. He, Brody, and others paid and caused lucrative payments to be made to Done Prescribers to cause them to sign prescriptions that were not for a legitimate medical purpose in the usual course of professional practice.  Done Prescribers wrote prescriptions for Done members with whom they lacked a pre-existing practitioner-patient relationship, without an examination, sometimes based solely on a short video or audio communication and limited patient intake documents, or without any video or audio communication at all.  R. He, Brody, and others made false and fraudulent representations that Done provided a range of medical treatment options, when in fact Done provided few, if any, medical treatment options besides prescriptions for Adderall and other stimulants.

67.     R. He, Brody, and others pressured Done Prescribers and caused them to prescribe Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice.  Brody and other Done Prescribers signed orders for Adderall and other stimulants for Done members regardless of whether the Done member (a) met the Diagnostic and Statistical Manual of Mental Disorders-5 criteria for diagnosing ADHD; (b) posed a risk of diversion; and/or (c) was provided dosages, directions, combinations, or quantities of medications beyond those normally prescribed.

68.     In order to maximize profits, R. He, Brody, and others caused Done Prescribers to write prescriptions that were not for a legitimate medical purpose in the usual course of professional practice by discouraging follow-up medical care for Done members.  R. He and Brody issued a policy that Done Prescribers were not required to have any follow-up encounters with Done members, instituted an "auto-refill" policy that would automatically generate a request by a Done member for a refill, paid Done Prescribers solely based on "patient load" (the number of patients to whom Done Prescribers wrote prescriptions each month), and refused to pay for patient consultation, time, or medical services that Done Prescribers provided to Done members after an initial consultation.  The purpose, as R. He wrote, was to "use the comp structure to dis-encourage follow-up" and, as a result, co-conspirator Done Prescribers were able to obtain lucrative pay for minimal work, sometimes hundreds of thousands of dollars a year in exchange for writing prescriptions for Adderall and other stimulants without much, if any, in-person or audio-visual telemedicine consultation with the Done members.

//

69.     R. He, Brody, and others caused Done Prescribers to write prescriptions that were not for a legitimate medical purpose in the usual course of professional practice through the use of a purported "bridge prescription" policy that transferred Done members to Done Prescribers who never had a prior in-person examination or audio-visual telemedicine consultation with the Done member, and having Done Prescribers write prescriptions for Adderall and other stimulants without having an in-person examination or audio-visual telemedicine consultation with these transferred Done members.

70.     R. He, Brody, and others caused Brody and other Done Prescribers to write prescriptions for Done members in states where Brody and other Done Prescribers were not authorized and licensed to write controlled substance prescriptions under state and federal law, including violation of state laws regarding collaborating or supervisory physicians for nurse practitioners.

71.     R. He, Brody, and others also conspired to defraud certain pharmacies and Medicare, Medicaid, and the Commercial Insurers in order to cause the pharmacies to dispense Adderall and other stimulants to Done members in violation of their corresponding responsibility; Medicare, Medicaid, and the Commercial Insurers to pay for the cost of these drugs; and Done members to pay subscription fees to Done.  R. He, Brody, and others, among other things:

a)      collected and caused to be collected Medicare, Medicaid, and Commercial Insurers' insurance information from Done members;

b)      submitted and caused to be submitted false and fraudulent prior authorizations;

c)      caused Done members' insurance information to be transmitted to pharmacies;

d)      made or caused to be made false and fraudulent representations to Pharmacy 1, Pharmacy 2, Pharmacy 3, and others about Done's prescription practices, policies, and other material facts in order to deceive pharmacies and obstruct, interfere with, and deprive pharmacies of their ability to exercise their corresponding responsibility, and cause the pharmacies to submit false and fraudulent claims;

e)      created and caused to be created false and fraudulent documents, including patient records; and

f)      caused the submission of false and fraudulent claims to Medicare, Medicaid, and Commercial Insurers, for which Medicare, Medicaid, and the Commercial Insurers paid in

excess of approximately $14 million.

72.     R. He and Brody persisted in the unlawful practices described herein after being made aware that Done members were reading material posted on online social networks about how to use Done to obtain easy access to Adderall and other stimulants; Done members had overdosed and died; Done members described Done as a "straight up pill mill" and a "drug-pushing scam to sell ADHD drugs and make a lot of f****** money;" national media outlets reported that Done made Adderall and other stimulants too easy to obtain; and another company that prescribed Adderall and other stimulants via telemedicine ("Telehealth Company 1") ceased prescribing Adderall and other stimulants on the same day that it was publicly reported that a Grand Jury issued a subpoena to Telehealth Company 1.

73.     R. He, Brody, and others concealed and disguised the conspiracy by making false and fraudulent representations to other third parties, including media outlets, business partners, and regulatory and credentialing entities.  These false and fraudulent representations concerned Done's business model and its policies, procedures, and practices distributing Adderall and other stimulants. The purpose of these false and fraudulent representations was to maintain or increase the value of Done, induce third parties to do business with Done, and forestall, impede, or obstruct government investigations and regulatory action against R. He, Brody, Done, and others.

74.     R. He, Brody, and others sought to conceal and disguise the conspiracy, and obstruct justice, by corruptly altering, destroying, and concealing records and documents; refraining from using company email and messaging platforms; and using encrypted messaging platforms, personal email accounts, and personal devices to communicate about company business, all with the intent to impair the communications and documents for use in the government and Grand Jury's investigation; and caused Done not to produce records in response to a Grand Jury subpoena.

All in violation of 21 U.S.C. § 846.

COUNTS TWO THROUGH FIVE:          (21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2 – Distribution of Controlled Substances and Aiding and Abetting)

75.     Paragraphs 1 through 53 and 56 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

76.     On or about each of the dates set forth below, in the Northern District of California, and elsewhere, the defendants,

RUTHIA HE and DAVID BRODY,

did knowingly and intentionally distribute and dispense, and aid or abet in the distribution or dispensing of, mixtures and substances containing a detectable amount of the listed Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice:

| Count | Done Member | Prescriber | Approx. Date of Prescription | Controlled Substance |
|-------|-------------|------------|------------------------------|----------------------|
| **Two** | H.B. | Prescriber 1 | Oct. 14, 2020 | Mixed Amphetamine Salts ER 20 mg. capsule |
| **Three** | T.T. | Brody | July 27, 2022 | Dextroamphetamine-Amphetamine ER 10 mg. capsule |
| **Four** | V.S. | Brody | June 18, 2021 | Amphetamine Salt Combo 30 mg. tablet |
| **Five** | N.C. | Prescriber 2 | Oct. 7, 2022 | Amphetamine Salt Combo 20 mg. tablet, 2x per day |

Each in violation of 21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2.

COUNT SIX: (18 U.S.C. § 1349 – Conspiracy to Commit Health Care Fraud)

77.     Paragraphs 1 through 53 and 56 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

78.     From in or around February 2020, and continuing through in or around January 2023, in the Northern District of California, and elsewhere, the defendants,

RUTHIA HE and DAVID BRODY,

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, Medicaid, and Commercial Insurers.

**Purpose of the Conspiracy**

79.     The allegations in Paragraph 56 are realleged and incorporated as if fully set forth here.

**Manner and Means of the Conspiracy**

80.     The allegations in Paragraphs 57 through 74 are realleged and incorporated as if fully set forth here.

All in violation of 18 U.S.C. § 1349.

COUNT SEVEN: (18 U.S.C. § 1512(k) – Conspiracy to Obstruct Justice)

81.     Paragraphs 1 through 53 and 56 through 74 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

82.     Beginning in or around 2022, and continuing through in or around the present, within the Northern District of California, and elsewhere, the defendants,

RUTHIA HE and DAVID BRODY,

did knowingly and willfully combine, conspire, confederate and agree with each other and with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1512(c), that is, to corruptly (a) alter, destroy, mutilate, and conceal a record, document, and other object, and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and (b) otherwise obstruct, influence, and impede any official proceeding, and attempt to do so.

83.     On or about March 11, 2022, a national media platform published an article about allegations that ADHD drugs were too easy to obtain online.

84.     On or about March 26, 2022, a national media newspaper published an article about concerns about the prescribing practices at digital companies, including Done and Telehealth Company 1.

85.     On or about May 4, 2022, it was publicly reported that a Grand Jury issued a subpoena to Telehealth Company 1.  The same day, Telehealth Company 1 announced that it would cease writing new prescriptions for drugs that treated ADHD, such as Adderall and other stimulants.

86.     On or about May 5, 2022, a national media platform published an article about allegations that patients came to Done seeking stimulants and that Done created an incentive to prescribe unnecessary stimulants.

87.     As a result of concerns about media articles and the Grand Jury subpoena issued to Telehealth Company 1, and in anticipation of a subpoena being issued to Done, R. He, Brody, and others

INDICTMENT                                    19

corruptly altered, destroyed, and concealed records, documents, and communications with the intent to impair their integrity and availability for use in investigations by federal law enforcement agents and the Grand Jury, including by deleting and causing the deletion of documents and communications, refraining from using company email and messaging platforms; and using encrypted messaging platforms, personal email accounts, and personal devices to communicate about company business.

88.     On or about September 23, 2022, during a Grand Jury investigation, a Grand Jury for the Northern District of California issued a subpoena to the Custodian of Records for Done and its affiliated entities.  The Grand Jury subpoena sought the production of records, including, among others, communications between and among employees of Done, or between and among employees of Done and medical providers regarding telehealth visits, diagnoses, prescriptions, Adderall, and prescribing practices; internal standard operating procedures, policies, training materials, or other guidance provided to employees and medical providers; and documents that relate to the news media coverage of Done or Telehealth Company 1.

89.     After receiving the Grand Jury subpoena, R. He, Brody, and others altered, destroyed, and concealed records, documents, and communications from the Grand Jury, including by deleting and causing the deletion of documents and communications; refraining from using company email and messaging platforms; using encrypted messaging platforms, personal email accounts, and personal devices to communicate about company business; and causing documents not to be provided to the Grand Jury.

All in violation of 18 U.S.C. § 1512(k).

FORFEITURE ALLEGATION:        (18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), 21 U.S.C. § 853(a), and 28 U.S.C. § 2461(c))

90.     The factual allegations contained in Counts One through Six of this Indictment are hereby realleged and fully incorporated as if set forth here, for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), Title 21, United States Code, Section 853(a), and Title 28, United States Code, Section 2461(c).

91.     As a result of the violations of Title 21, United States Code, Sections 846 and 841, set forth in this Indictment, the defendants,

INDICTMENT                    20

RUTHIA HE and DAVID BRODY,

shall forfeit to the United States of America any property, real or personal, that constitutes, or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense, and any property constituting, or derived from, any proceeds that defendant obtained, directly or indirectly, as the result of such violations, and any property used or intended to be used, in any manner or part, to commit or to facilitate the commission of such violations.

92.     As a result of the violation of Title 18, United States Code, Section 1349, set forth in this Indictment, the defendants,

RUTHIA HE and DAVID BRODY,

shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including but not limited to a sum of money equal to the gross proceeds obtained as a result of the offense.

93.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

//

//

//

1        All pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(7), 21 U.S.C. § 853(a), 28 U.S.C. §

2  2461(c), and Federal Rule of Criminal Procedure 32.2.

3

4  DATED: June 12, 2024                    A TRUE BILL.

5

6                                   _____/s/_____

7                                   FOREPERSON

8
MATTHEW M. YELOVICH

9  Attorney for the United States
Acting Under Authority Conferred

10  By 28 U.S.C. § 515

11  _____/s/_____
KRISTINA GREEN

12  KATHERINE M. LLOYD-LOVETT
Assistant United States Attorneys

13  U.S. Attorney's Office for the
Northern District of California

14

15
GLENN S. LEON

16  Chief, Fraud Section
U.S. Department of Justice

17
_____/s/_____

18  JACOB FOSTER

19  Principal Assistant Chief
RAYMOND E. BECKERING III

20  Trial Attorney
Criminal Division, Fraud Section

21  U.S. Department of Justice

22

23

24

25

26

27

28