Exhibit 1

BZ-22-2002

| DSC_4451 | 1/9 12:39 AM |
|---|---|
| DSC_4452 | |
| DSC_4453 | **Target [Ruthia]:** |
| | • Teacher/Mentor, I think I needed to think about the aftermath. |
| | • In April, If I got arrested or being fine. |
| | • What should the company do? |
| | |
| | **W⬛ [Teacher]:** |
| | • Under the extreme cases, I suggested transferring part of the funds to the Cayman Islands/Hong Kong. |
| | • And then, you return to mainland China. |
| | • We changed to in-person now, probably you won't encounter this extreme situation. |
| | • Under the extreme cases, there is no need to consider any legal channels or means, and the problem can only be resolved through risk separation and isolation. |
| | |
| | **Target:** |
| | • Hmm, do I need to open a bank account in Hong Kong? Where do I open a bank account in Cayman Islands? |
| | |
| | **W⬛:** |
| | • You can open at any countries. |
| | • It is best to open an account in Hong Kong. |
| | |
| | **Target: Why?** |
| | |
| | **W⬛:** |
| | • Risks between China and the United States are basically isolated. |
| | • Cayman Islands can't protect you from your assets or funds being seized. |
| | • Even in Swaziland bank account can be seized/confiscated. |
| | • I'm talking about under the extreme cases. |
| | • Only Mainland China and Hong Kong cannot be confiscated |
| | • However, the US currency in China cannot be circulated, generally relies on Hong Kong only. |
| DSC_4485 | 1/9 8:32 PM |
| | **Target:** |
| | • Our situation is that the government may now suspect that we are doing cross-border drug trafficking. It best to avoid cross-border entities. |
| | • Especially those related to China need to be very careful. Hong Kong entity should be low risk. |

| DDSC_4487 | 1/9/ 8:53 PM<br>Target:<br><ul><li>Singapore does not require on-site presence to open an account.</li><li>But it seems there is an extradition clause.</li><li>If I had known this, I would have opened it when I went to Hong Kong last time.</li></ul> |
| --- | --- |

1/8 9:46 PM

嗯嗯 刚才在和 AK 电话 

1/9 12:39 AM

老师 我觉得得想想后事呢 

4 月份的时候 如果真的说要被抓或者要罚款 

公司要肿么办喵 

 如果极端情况，我建议是提前转移资金一部分到开曼/香港

 然后你人回到国内

 我们转了 inperson，大概率不会遇到极端情况的

1/9 12:43 AM

 但是极端情况，就是不需要考虑什么的法律途径了，只能通过风

 我们转了 inperson，大概率不会遇到极端情况的

1/9 12:43 AM

 但是极端情况，就是不需要考虑什么的法律途径了，只能通过风险隔离来解决

嗯嗯 也是需要在香港那边的银行开户么 开曼这种群岛一般开户会在哪里 





 在任意国家呀都可以

Ruthia：嗯嗯 也是需要在香港那边的银行开户么 开曼这种群岛一般开户会在...

 香港开户是最好的

 香港开户是最好的

为什么呀 

 中美之间基本上风险隔离

 开曼是保不住你的

 就连瑞士都可以被没收噢

 我指的是极端情况

 只有中国大陆和香港是可以的

 但是大陆的美金没法流通，一般只能靠香港

 喵呢 

 最好的办法就是，香港开个公司，把菲律宾和大陆的工资流水都放过去

 B方案，香港注册＋港资银行账户（恒生之类的），成本 4 万＋，成功率不确定，速度比上面慢一点

1/9 8:22 PM

 需要你确认一下才能继续推进了

嗯嗯 这么复杂 

开个户这么贵  

1/9 8:32 PM

我们的情况是 现在政府可能怀疑我们在跨境 fd 最好避免跨境的实体 

 尤其是中国相关的需要小心 香港实体应该风险低

1/9 8:34 PM

中资银行的香港分行 和 港资银行账户 的区别是? 

  

101    王越    •••

1/9 8:53 PM

 如果是这样有可能到香港一趟来开设本土的好一点

Ruthia：我们的情况是 现在政府可能怀疑我们在跨境 fd 最好避免跨境的实体

 或者新加坡实体配新加坡银行？按时 web3 很多人都在呀

新加坡是不需要到现场的 

但是好像有引渡条款吧 

早知道就上次去香港的时候开了 

哇今天工作了 11 个小时呢 

要晕了呜呜 

 对的 考虑的怪周全

Ruthia：但是好像有引渡条款吧

 是的 当时没想到这个问题

Exhibit 2

Apr 22, 2022 11:12 PM

Magicmike-:     Hahahaha

Magicmike-:     The epidemic has continued for nearly three years, many enterprises have been walking haltingly and facing several problems such as production chain, capital chain, operation, management and strategic transformation. How an enterprise can shake away continuous blows from the epidemic and how to seek opportunities to survive or even expand are realistic problems needed to be resolved by every entrepreneur.

April 23 (Saturday) 2:00PM – 5:00PM, at the conference room of Zhongguancun Maker Headquaters, Beijing University Youth CEO Club invites university professor from Chinese Academy of Sciences, former Special Assistant to President of Foxconn Technology Group, Chairman of SEG Group Sun Yulin to conduct a private advisory board meeting for the enterprises of the club. Directed by the questions and in the form of case analysis, we will mutually deliberate about the ways for the enterprises to survive and develop under the effect of the epidemic, put forward plans to resolve the problem, so that we can all unite in an effort to walk out of the difficult situation. Teacher Sun Yulin is especially recommended by Vice Chairman of the Club Zhang Tianyi. He has played extremely important role in the growth and development of overbearing people and an important advisor for overbearing people. Tianyi will also participate to study and inquire with everyone on the scene. Due to the epidemic prevention and control requirement and an effort to assure the result of the event, the number of attendants for this private board meeting is limited to 10 persons and it is not opened to public. Only those who are invited are welcome and those who are not invited will be declined.

Are you available to attend? I will take your reservation if you are.

Cai Runwei, Secretary General of Beijing University Youth CEO Club

[To be continued]

Apr 22, 2022 11:17 PM

Ruthia:          Is this Maker Headquarters located on the side of Beijing University

Magicmike-:     [Map Location]

                Zhongguancun Internet Education and Innovation Center

                Beijing City Haidian District Zongguancun Street No. 18 Building B

Magicmike-:     Meet me here at 1.45 so I can take you to go up there

Magicmike-:     Beijing I feel there is no problem

Apr 24, 2022 10:05 PM

Ruthia:          (You) are so confident in Beijing [Emoticon] Then I feel at ease to go to work- My plan for today is to go to the bank for last step of the process to open an account, then will work for 2-3 hours to set okr, and follow up with the investors again- If the teacher is free please take a look at the growth data

Magicmike-:     Hmm

He-WeChat-0000000001

Exhibit 3

Magicmike-:    The schoolbag was left in their vehicle

Ruthia:        Has it not been brought back yet

Apr 18, 2022 1:13 AM

Ruthia:        Then we can look for a coffee shop

Magicmike-:    Hmm-hmm

Magicmike-:    Let me think

Ruthia:        Or I can go look for Teacher before going over together to take a look

Magicmike-:    How about meeting up at Likuibanjinbu over there?

Magicmike-:    By coincidence CEO happens to come to Beijing over there at the bar

Ruthia:        Is he over there? Fine

Magicmike-:    Also wanted to see me

Ruthia:        [Emoticon]

Ruthia:        Alright

Apr 18, 2022 1:18 AM

Ruthia:        What time did you arrange? Will I be interrupting you? How about you guys meet before I will go over, as I happen to want to patch my nail

Ruthia:        And I also want to go to the bank to open an account [Emoticon] Almost forgot

Magicmike-:    Hahaha

Magicmike-:    Fine

Magicmike-:    I'm going over there now

Magicmike-:    (You) are not interrupting

Apr 18, 2022 1:20 AM

Magicmike-:    You just tell me when you are finished

Magicmike-:    If it's later at night we can also go to marsol

Ruthia:        Hmm- I'll try to finish opening (account) earlier

Apr 18, 2022 1:48 AM

Ruthia:        [Emoticon] (They) said (I) wouldn't be able to open (account) until Thursday

Ruthia:        Where is your address

Magicmike-:    [Map location:

He-WeChat-0000000001

Exhibit 4

**EAST WEST BANK**                                    Foreign Status Certification

| Name | Permanent Residency Address |
|---|---|
| Changli Li | ███████████████ |
| Country of Citizenship | Beijing Beijing |
| China | CHINA |
| Country of Residency | |
| CHINA | |

## SECTION A

**I certify under penalty of perjury that:**

I have provided a U.S. mailing address and/or a U.S. phone number because I am: (select one)

☑ A non-U.S. individual who WILL NOT be present in the US for at least 31 days this year.

☐ A non-U.S. individual who WILL BE present in the U.S. for at least 31 days this year but does not meet the substantial presence test
**(Additional Section B required)**

☐ A non-U.S. individual who meets the closer connection exception to the substantial presence test
**(Additional Section C required)**

☐ I am present in the United States under a valid and current U.S. issued visa
**(Additional Section D required)**

## Certification

Your agreement to this certification acknowledges your intent to electronically sign this **Foreign Status Certification:**

| Printed Name and Signature | Date |
|---|---|
| **Changli Li**   *Electronically Signed* | 07-18-2023 |

Substantial Presence Test: A resident of the United States includes individuals who hold a U.S. Permanent Resident Card (i.e., Green Card), as well as individuals who meet the Internal Revenue Service Substantial Presence Test (i.e. an individual who has been present in the U.S. for at least 31 days during the current year and 183 days [in accordance with the I.R.S. "days of presence" calculation] during the 3 year period including the current year and 2 years immediately before that.)

Please seek advice from your tax advisor regarding the Substantial Presence Test as needed, or refer to IR.S. Publication 519 for additional guidance.

FOREIGN STATUS CERTIFICATION_ADDRESS CHANGE | June 2021





| Form **W-8BEN** (Rev. October 2021) Department of the Treasury Internal Revenue Service | **Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)** For use by individuals. Entities must use Form W-8BEN-E Go to www.irs.gov/FormW8BEN for instructions and the latest information. Give this form to the withholding agent or payer. Do not send to the IRS. | OMB No. 1545-1621. |
|---|---|---|

| **Do NOT use this form if:** | **Instead, use Form:** |
|---|---|
| ■ You are NOT an individual | W-8BEN-E |
| ■ You are a U.S. citizen or other U.S. person, including a resident alien individual | W-9 |
| ■ You are a beneficial owner claiming that income is effectively connected with the conduct of trade or business within the United States. (other than personal services) | W-8ECI |
| ■ You are a beneficial owner who is receiving compensation for personal services performed in the United States | 8233 or W-4 |
| ■ You are a person acting as an intermediary | W-8IMY |

**Note:** If you are resident in a FATCA partner jurisdiction (i.e., a Model 1 IGA jurisdiction with reciprocity), certain tax account information may be provided to your jurisdiction of residence.

### Part I    Identification of Beneficial Owner (see instructions)

| 1 Name of individual who is the beneficial owner Changli Li | 2 Country of citizenship China |
|---|---|

3 Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**
████████ Beijing Beijing

| City or town, state or province. Include postal code where appropriate. | Country CHINA |
|---|---|

4 Mailing address (if different from above)
████ San Francisco CA 94110 ████ San Francisco CA 94110

| City or town, state or province. Include postal code where appropriate. San Francisco CA 94110 | Country UNITED STATES |
|---|---|

5 U.S. taxpayer identification number (SSN or ITIN), if required (see instructions)

| 6a Foreign tax identifying number (see instructions) ████████ | 6b Check if FTIN not legally required ........... ☐ |
|---|---|
| 7 Reference number(s) (see instructions) | 8 Date of birth (MM-DD-YYYY) (see instructions) ████ |

### Part II    Claim of Tax Treaty Benefits (for chapter 3 purposes only) (see instructions)

9 I certify that the beneficial owner is a resident of ___CHINA___ within the meaning of the income tax treaty between the United States and that country.

10 **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article and paragraph _____ of the treaty identified on line 9 above to claim a_____ % rate of withholding on (specify type of income): _____ . Explain the additional conditions in the Article and paragraph the beneficial owner meets to be eligible for the rate of withholding: _____

### Part III    Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:

- I am the individual that is the beneficial owner (or am authorized to sign for the individual that is the beneficial owner) of all the income or proceeds to which this form relates or am using this form to document myself for chapter 4 purposes;
- The person named on line 1 of this form is not a U.S. person;
- This form relates to:
  (a) income not effectively connected with the conduct of a trade or business in the United States; (b) income effectively connected with the conduct of a trade or business in the United States but is not subject to tax under an applicable income tax treaty; (c) the partner's share of a partnership's effectively connected taxable income; or (d) the partner's amount realized from the transfer of a partnership interest subject to withholding under section 1446(f);
- The person named on line 1 of this form is a resident of the treaty country listed on line 9 of the form (if any) within the meaning of the income tax treaty between the United States and that country; and
- For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.

Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. **I agree that I will submit a new form within 30 days if any certification made on this form becomes incorrect.**

**Sign Here** ☐   I certify that I have the capacity to sign for the person identified on line 1 of this form.

| *Changli Li*    Electronically Signed | 07-18-2023 |
|---|---|
| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) |

Changli Li
Print name of signer

| For Paperwork Reduction Act Notice, see separate instructions. | Cat. No. 25047Z | From **W-8BEN** (Rev. October 2021) |
|---|---|---|

Exhibit 5

**To:** @wsj.com] @wsj.com]
**Bcc:** Done PR[press@donefirst.com]
**From:** Done. Public Relations[press@donefirst.com]
**Sent:** Mon 3/21/2022 11:04:07 PM (UTC)
**Subject:** Response to Secondary Set of Questions

Hello ███,

Done. prides itself on exemplary patient outcomes, while working day in and day out to limit the potential of abuse of medication that has caused the undue burden of stigma around controlled substances used to effectively treat ADHD. Our company has helped countless individuals seek mental healthcare when they otherwise would not or could not due to the extreme shortage of psychiatrists and mental health professionals in the United States. We have helped individuals who otherwise may not have been comfortable seeking care in person due to stigma, in addition we provide a vital lifeline to individuals who otherwise would not have access to a mental health professional either due to cost or availability.

From what started as a passion project to help friends, coworkers, and loved ones in need of mental healthcare that were struggling to have continued access and support navigating the complex healthcare system and with guidance from the most advanced clinical leadership, working with board certified psychiatrists from day one to build the platform from the ground up, Done. has created an enjoyable healthcare experience, while also ensuring that patients received the highest quality care by collecting, scoring, and navigating a series of healthcare questions related both to physical and mental health before accessing the platform.

Answers to your questions are below.

**Our reporting indicates that J█ M██████s venture capital firm ██████ is also an investor in Done. Is that accurate?**

Yes.

**Our reporting indicates that Done does not have an active Chief Medical Officer. Is that accurate?**

We have a clinical leadership team in place headed by a Clinical President. The medical operations are managed by an independent professional corporation (PC) headed by board certified psychiatrists and psychiatric mental health nurse practitioners.

**Who oversees Done's clinical protocol, prescribing protocol, clinical survey design and modification?**

The medical operations are managed by an independent PC headed by board certified psychiatrists and psychiatric mental health nurse practitioners.

As mentioned in multiple other answers, Providers are contractors, they are enabled and empowered to make their own independent clinical decisions additionally they are provided resources when it comes to ensuring a patient is given excellent care.

**Who oversees prescribers or manages clinical operations?**

The medical operations are managed by an independent PC headed by board certified psychiatrists and psychiatric mental health nurse practitioners.

As mentioned in multiple other answers, Providers are contractors, they are enabled and empowered to make their own independent clinical decisions additionally they are provided resources when it comes to ensuring a patient is given excellent care.

**Who is in charge of ensuring a high standard of care?**

The medical operations are managed by an independent PC headed by board certified psychiatrists and psychiatric mental health nurse practitioners.

As mentioned in multiple other answers, Providers are contractors, they are enabled and empowered to make their own independent clinical decisions additionally they are provided resources when it comes to ensuring a patient is given excellent care.

**Our reporting indicates Done does not have a board of directors overseeing CEO Ruthia He. Is that accurate? Who oversees Ms. He?**

This is inaccurate, Done has a board of directors in place.

All of Done's team is held accountable by the patient's they serve.

**If the above is accurate, does the company feel it has the necessary oversight and controls in place to ensure a high standard of care for patients?**

The medical operations are managed by an independent professional corporation (PC) headed by board certified psychiatrists and psychiatric mental health nurse practitioners.

**Our reporting indicates a risk mitigation report was circulated internally each month from November 2020 through May 2021. Is that accurate?**

This is inaccurate. Done did not and does not currently produce a monthly risk mitigation report. An outside consultant submitted a proposal that included monthly reports on risk mitigation, and to fulfill their commitment they produced the reports without prompting from the company. We found the reports to be irrelevant to our business and asked the consultant to stop submitting these reports.

**What was the purpose of the risk mitigation report?**

Done did not and does not currently produce a monthly risk mitigation report. An outside consultant submitted a proposal that included monthly reports on risk mitigation, and to fulfill their commitment they produced the reports without prompting from the company. We found the reports to be irrelevant to our business and asked the consultant to stop submitting these reports.

**If the risk mitigation report is no longer circulated, when and why did the company decide to end the practice?**

Done did not and does not currently produce a monthly risk mitigation report. An outside consultant submitted a proposal that included monthly reports on risk mitigation, and to fulfill their commitment they produced the reports without prompting from the company. We found the reports to be irrelevant to our business and asked the consultant to stop submitting these reports.

**We have reviewed a copy of a report that notes "pressure to diagnose ADHD and prescribe stimulants." Did/does the company feel changes were warranted to address this issue? If so, how has the company made changes to its practices?**

This is inaccurate. Done did not and does not currently produce a monthly risk mitigation report. An outside consultant submitted a proposal that included monthly reports on risk mitigation, and to fulfill their commitment they produced the reports without prompting from the company. We found the reports to be irrelevant to our business and asked the consultant to stop submitting these reports.

**The report also notes prescription refill practices for established and transferred patients without synchronous visits that put nurse practitioners and the company "at risk for legal consequences." Did/does the company feel changes were warranted to address this issue? If so, how has the company made changes to its practices?**

This is inaccurate. Done did not and does not currently produce a monthly risk mitigation report. An outside consultant submitted a proposal that included monthly reports on risk mitigation, and to fulfill their commitment they produced the reports without prompting from the company. We found the reports to be irrelevant to our business and asked the consultant to stop submitting these reports.

**Our reporting indicates that the company at Ms. He's direction instituted policies including changing nurse practitioner pay that had the effect of discouraging video follow ups. Is that accurate?**

No, this is inaccurate.

Providers are paid as follows:

A flat hourly rate when completing in-takes and video consultations to establish patient care and evaluation.

A ratio of the hourly rate for each patient they actively take care of, known as panel pay.

This allows for providers to provide the best patient care by disincentivizing simply sending a prescription, but encouraging them to maintain a long-term relationship with the patient and affiliation with Done, ensuring the provider is compensated for all patient interactions like messages, follow-ups, note writing, treatment, and charting.

Specifics of how much providers make are confidential. However, the hourly rate is based upon their location, experience, and commensurate w/ other telemedicine platforms in the same space.

**Our reporting indicates that the purpose of reducing video follow ups was partly to lower costs as well as to speed the process of getting patients their medications. Is that accurate?**

No, this is inaccurate.

Providers are paid as follows:

A flat hourly rate when completing in-takes and video consultations to establish patient care and evaluation.

A ratio of the hourly rate for each patient they actively take care of, known as panel pay.

This allows for providers to provide the best patient care by disincentivizing simply sending a prescription, but encouraging them to maintain a long-term relationship with the patient and affiliation with Done, ensuring the provider is compensated for all patient interactions like messages, follow-ups, note writing, treatment, and charting.

Specifics of how much providers make are confidential. However, the hourly rate is based upon their location, experience, and commensurate w/ other telemedicine platforms in the same space.

**What percentage of Done's prescription refills for controlled substances are processed in conjunction with a video follow up?**

Our membership and patient data are proprietary information.

**Can you describe your policy as it relates to video follow ups and prescription renewals?**

This practice remains at the discretion of the provider.

Patients have 2 options to request a renewal of their prescription:

1. If indicated and the patient is deemed stable, the patient may complete a standard renewal request

electronically via their patient portal for their provider to review.

    a.    Patients also make an affirmative attestation at each renewal request that they are not experiencing any side effects

2.    If the patient is not deemed stable, they will be invited to schedule a video consultation for dose changes.

    a.    Occasionally, based on the history and establishment with the patient, a provider may elect to have the patient complete an alternative symptom scoring and narrative answers to modify a dose.

**Our reporting indicates that CEO Ruthia He removed psychiatric screening questionnaires from the sign-up process, specifically the GAD7 and PHQ9, in order to speed the process for patients to be seen by clinicians. Is that accurate?**

This is inaccurate.

All patients regardless of prior diagnosis must complete the following:

- ASRS (ADHD Self Report Scale)
- GAD-7 (Generalized Anxiety Disorder Screening)
- PHQ-9 (Patient Health Questionnaire for Depression)

Additionally, patients complete:
Past Medical History Questions
- Previous diagnosis(es)
- Current medications and supplements
- Prior familial history of psychiatric conditions
- Common questions related to contraindications
- General health questions
- Identity Verification
- Upload photo ID that can be positively confirmed in their 2-way audio, visual video visit with their provider
- Current Demographics
- Current and Past Address
- DOB
- Phone Number
- Emergency Contact

Using the information provided above:
- The patient is deemed eligible for a telemedicine visit
- The patient is allowed to schedule a telemedicine visit

Verifications & Checks Prior to Visit:

- Patients are sent through a system that checks all states Prescription Drug Monitoring Program within 48 hours of their visit

    ○ The patient's PDMP report is reviewed by internal teams that have been trained by pharmacists to identify potential patterns of abuse or misuse, after cleared
    ○ The patient's PDMP report is reviewed by their provider and ultimately cleared by them in accordance with state regulation(s).

After a 30-minute video consultation is conducted over Zoom, if a patient is diagnosed with ADHD or any other psychiatric condition the provider will prepare a treatment recommendation and issue prescription(s) in accordance with state / federal regulations.

**Our reporting indicates she made this decision against the recommendation of her Chief Medical Officer and others on staff. Is that accurate?**

This is inaccurate. This situation did not occur.

**Some felt the additional questionnaires gave clinicians important information to help them make a proper mental health diagnosis and that not having them made that harder. Does the company wish to comment?**

This is inaccurate.

All patients regardless of prior diagnosis must complete the following:

- ASRS (ADHD Self Report Scale)
- GAD-7 (Generalized Anxiety Disorder Screening)
- PHQ-9 (Patient Health Questionnaire for Depression)

**Our reporting indicates that a list of best practices shared with clinicians in 2020 stated that even for patients who don't meet DSM5 criteria for adhd it may still be worth putting them on a medication trial. And that such trials involved low doses of adderall. Is that accurate?**

Done does not provide a list of best practices to providers. In addition, we do not have any documents prompting a provider to recommend trials using Adderall for patients who do not meet the DSM5 criteria for ADHD.

Our providers will use their clinical judgment to decide on whether to prescribe stimulants to patients. Providers are educated to properly assess, diagnose, and then treat according to evidence-based practice and standards of care. In addition, we encourage providers to refer patients who would benefit from therapy treatment to our partners who work with therapists specializing in CBT (cognitive behavior therapy). All treatments utilized by our providers are evidenced-based treatments.

**The list of best practices also says that before prescribers should email support@donefirst.com before they deny a patient. I'm told that is a reference to denying a prescription. Why would prescribers need to email support before denying a prescription?**

Done does not provide a list of best practices to providers.

Our providers use their clinical judgment to decide on whether to prescribe stimulants to patients. Providers are educated to properly assess, diagnose, and then treat according to evidence-based practice and standards of care. In addition, we encourage providers to refer patients who would benefit from therapy treatment to our partners who work with therapists specializing in CBT (cognitive behavior therapy). All treatments utilized by our providers are evidenced-based treatments.

Sincerely,
Done. Executive Leadership
--
**Done. Executive Leadership**

Public / Media Relations.
e: press@donefirst.com | Done.

DONEHEALTH_00111402

Exhibit 6

**To:** Ruthia He <r@donefirst.com>[r@donefirst.com]; R███ L████ █████@donefirst.com> ███@donefirst.com]
**Sent:** Sun 3/20/2022 4:50:09 AM (UTC)
**Subject:** D02J4FNAECU - 2022-03-20T04:50:09 - 2022/03/19

 **R██   L██**

03/20/2022 04:50:09 AM

We received their final draft, I see one quick thing that I want to change: • We do not HIRE providers, we contract with them and allow them to make their own decisions. I think we need to change this: • Our handbook does not state that providers should consider placing patients who don't meet the criteria for ADHD to be placed on medication trials involving low doses of Adderall. Because, our handbook from 2020/1 does say this actually, and I believe I found the one they got, I don't know from who yet. (I'll figure that out after). It does state that if clinically indicated and safe providers should consider a stimulant medication even if the patient doesn't meet the DSMV criteria explicitly. They simplified a lot of the responses and clarified them so they read generally for the public, I would suggest we really trust that they're doing this because if we over complicate it the press will continue to look into it. Additionally, I spoke with them on the phone, they suggest that we submit it as the "press" email or just NOT from yours, so they don't attempt to quote anyone directly, but rather they quote "Done."

**Ruthia He**

03/20/2022 05:04:52 AM

The handbook should be the coda document - it is still publicly available for providers, right?

**Ruthia He**

03/20/2022 05:19:56 AM

 **R██   L██**

03/20/2022 05:20:53 AM

Yes it is.

**Ruthia He**

03/20/2022 05:21:55 AM

But it doesn't say we should do it. Do you want me to disable this public link?

**Ruthia He**

03/20/2022 05:22:05 AM

I believe some team members may have it copied though

**R██   L██**

03/20/2022 05:23:51 AM

Let's go ahead and disable it. I already emailed Coda support to get an audit log of who might have printed it or if they can give us an audit log of who accessed it over the last 3 weeks.

**Ruthia He**

03/20/2022 05:24:34 AM

**Ruthia He**

03/20/2022 05:24:46 AM

DONEHEALTH_00326285

**R**  **L**

03/20/2022 05:24:54 AM

"Still might be worth doing a medication trial."

**Ruthia He**

03/20/2022 05:24:58 AM

I will disable the link now and only give us the access

**R**  **L**

03/20/2022 05:25:21 AM

Thank you, I didn't want to pre-emptively do it until we responded to WSJ, but I'm okay w/ doing it now.

**Ruthia He**

03/20/2022 05:27:08 AM

It's also included in this doc(Done Playbook) with more people having access to - I will disable it too.

**Ruthia He**

03/20/2022 05:29:26 AM

Actually there were another page below it more people (also with Rick and I removed him before taking the screenshot)

**Ruthia He**

03/20/2022 05:30:15 AM

**R**  **L**

03/20/2022 05:30:41 AM

I verified Rick couldn't access it because it was tied to his G-Mail suite.

**R**  **L**

03/20/2022 05:31:07 AM

Just so you're aware, I re-actived his and Christina's account to test that last night. I was like on a MISSION to find out who sent it to the press.

**Ruthia He**

03/20/2022 05:33:53 AM

That sounds good. I think Rick and Christina should have their value aligned with us. I'd say more likely Jake, Breanna or Kristin who were previously on provider team. Not sure if they listed their status on linkedin.

**R**  **L**

03/20/2022 05:37:34 AM

I think it was also potentially Y█ C█.

**Riley Levy**

DONEHEALTH_00326285

She confirmed she spoke with the reporter, and she thought she was doing "good."

DONEHEALTH_00326285

# Exhibit 7



Exhibit 8

| # | From | To | CC | BCC | Priority | Direction | Subject | Body | Status |
|---|------|-----|----|----|----------|-----------|---------|------|--------|
| 1 | 99@s.whatsapp.net F█ █ | Participants: 46@s.whatsapp.net Ru (owner), 99@s.whatsapp.net F█ █ | | | | Incoming | | Hey! I just thought I can message here since I don't have a WeChat login anymore. But we should try to refrain from talking about the articles and how it relates to us on company platforms. | Read |
| 2 | System Message System Message | Participants: 46@s.whatsapp.net Ru (owner), 99@s.whatsapp.net F█ █ | | | | Incoming | | 🔒 Messages and calls are end-to-end encrypted. No one outside of this chat not even WhatsApp, can read or listen to them Tap to learn more | |
| 3 | 99@s.whatsapp.net Riley Levy | Participants: 46@s.whatsapp.net Ru (owner), 99@s.whatsapp.net F█ █ | | | | Incoming | | Only because if they wanted to they could subpoena our slack records. | Read |
| 4 | 46@s.whatsapp.net Ru | 99@s.whatsapp.net F█ █ - Delivered:5/5/2022 4:09:28 AM(UTC+0); Read: 5/5/2022 4:09:28 AM(UTC+0) | | | | Outgoing | | Ooh i didn't know you had a wechat login | Read |
| 5 | 46@s.whatsapp.net Ru | 99@s.whatsapp.net F█ █ - Delivered:5/5/2022 4:09:41 AM(UTC+0); Read: 5/5/2022 4:09:41 AM(UTC+0) | | | | Outgoing | | I heard it was hard to get one in US□ | Read |
| 6 | 46@s.whatsapp.net Ru | 99@s.whatsapp.net F█ █ - Delivered:5/5/2022 4:09:45 AM(UTC+0); Read: 5/5/2022 4:09:45 AM(UTC+0) | | | | Outgoing | | Impressed | Read |
| 7 | 99@s.whatsapp.net F█ █ | Participants: 46@s.whatsapp.net Ru (owner), 99@s.whatsapp.net F█ █ | | | | Incoming | | I used to! I lost it when I got a new phone and it wouldn't let me log back in. | Read |
| 8 | 99@s.whatsapp.net F█ █ | Participants: 46@s.whatsapp.net Ru (owner), 99@s.whatsapp.net F█ █ | | | | Incoming | | The factory I worked with in China at Apostrophe invited me. | Read |

| 9 | ███ 46@s.whatsapp.net Ru | ███ 99@s.whatsapp.net R █ ███ - Delivered:5/5/2022 4:10:41 AM(UTC+0); Read: 5/5/2022 4:10:43 AM(UTC+0) | | | | Outgoing | I'll delete the slack messages | Read |

Exhibit 9

Nov 29, 2023 12:40:27am



Not move and make me pick him up 70 pounds

Nov 29, 2023 12:40:19am



Pull his leash

Nov 29, 2023 12:40:11am



Bite me

Nov 29, 2023 12:40:08am



He will lie down on the street

Nov 29, 2023 12:40:05am



When I take him to walk

Nov 29, 2023 12:39:58am



But with me he turns into terrorist

Nov 29, 2023 12:39:51am



He behaves very well with his parents

Nov 29, 2023 12:39:41am



I had him 6 days

Nov 29, 2023 12:39:27am



Hoochu went back home today

Nov 29, 2023 12:39:23am



Yes

Nov 29, 2023 12:39:19am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:39:11am



If attorney says I can talk to friends about other things

Nov 29, 2023 12:38:53am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:38:51am



So I think let's just wait for that

Nov 29, 2023 12:38:44am



Which tends to be dogs and god these days

Nov 29, 2023 12:33:27am



If attorney says I can talk about other things that's fine

Nov 29, 2023 12:33:14am



But attorney may advise me to not talk to friends as I cannot share any specifics

Nov 29, 2023 12:32:37am



Which is probably 80% of my texts lately anyways

Nov 29, 2023 12:31:23am



I know there is no harm in sharing dog photos videos or essays about god

Nov 29, 2023 12:31:12am



This is how hoochu behaves with me

Nov 29, 2023 12:28:34 AM



0:00



Nov 29, 2023 12:28:32am

**Ruthia He**

*This message was unsent*
Nov 29, 2023 12:22:21am



**\*\*Believe in God for the Impossible: An Essay on Faith and Surrender\*\***

In the labyrinth of life, where uncertainty is the only certainty, belief in a higher power often becomes the guiding star. This belief, rooted in the profound depths of faith, whispers a comforting message: everything happens for a reason, and when we surrender to God, the impossible becomes possible.

The essence of this belief lies in understanding that life, in its infinite complexity, operates beyond our limited comprehension. We plan, strategize, and attempt to steer our lives in desired directions, but often, things don't go as planned. This is where the belief that everything happens for a reason brings solace. It's an acknowledgment that our understanding is finite, but God's wisdom is infinite. It's an acceptance that there's a larger plan at work, one that weaves meaning into the tapestry of our life experiences, including those that initially seem inexplicable or unjust.

When we face situations that are out of our control, surrendering to God doesn't imply passivity or resignation. Rather, it's an active engagement with faith. It's about trusting that there is a higher reason behind every event, even when the dots don't immediately connect. In this surrender , there is freedom – the freedom from the anxiety of trying to control the uncontrollable, the freedom to focus on what we can control, which is our response to the events of our lives.

To believe in God for the impossible is to acknowledge that there are forces in this universe more powerful than our individual will. It's to recognize that miracles do happen, and they are often clothed in the ordinary, seen only by those who have the eyes of faith. This belief is not blind but is a vision illuminated by the light of trust in God's omnipotence.

Surrendering to God's will requires humility and courage. It means accepting that some things – many things, in fact – are beyond our control. This acceptance is not a defeat; it's a victory of spirit, an alignment with the flow of life. Instead of resisting the waves, it's about learning to ride them, knowing that the ocean is in God's hands.

In this journey, it's essential to remember that we are never alone. With God by our side, isolation transforms into solace, and fear turns into hope. The presence of God in our lives provides a companionship that transcends human understanding, offering comfort during our lowest lows and joy in our highest highs.

In conclusion, believing in God for the impossible is a journey of faith, surrender, and acceptance. It's about trusting in the bigger picture, embracing life's ebbs and flows, and finding peace in the knowledge that even when the path is unclear, we are guided, loved, and never alone. The answers we seek often lie in surrender, and in this surrender, we find the strength to face the impossible, buoyed by the faith that with God, all things are possible.

Nov 29, 2023 12:16:37am

I will share one essay as I often do about life

Nov 29, 2023 12:14:45am



Like I can't even tell my parents (and won't)

Nov 29, 2023 12:11:54am



Until and unless I am allowed to talk to anyone besides attorney

Nov 29, 2023 12:11:46am



So I cannot talk to friends about it

Nov 29, 2023 12:10:17am



I cannot share or talk about specifics or advice from anyone besides attorney

Nov 29, 2023 12:09:54am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:09:39am



Unfortunately I think we have to cut contact until I am allowed to share anything with anyone besides attorney so I am unable to talk to friends about it or get advice besides from attorney

Nov 29, 2023 12:09:09am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:05:23am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:05:16am

**Ruthia He**

*This message was unsent*

Nov 29, 2023 12:02:28am



I cannot confirm or deny why they visited me or what they talked about

I think I should first consult independent attorney and if they say it is ok to consult a company lawyer since they are free then I can consider that

Nov 29, 2023 12:01:20am

---

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:59:19pm

---

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:58:54pm



I will have to independently find an attorney I think

Nov 28, 2023 11:58:12pm



Again I cannot and have not shared anything specific

Nov 28, 2023 11:57:22pm

---

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:57:10pm

---

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:55:35pm

---

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:55:12pm



So I went to meet them in Avery lobby and I can't share anything after that besides I probably have to find lawyer tomorrow

Nov 28, 2023 11:54:09pm



I could not figure out why they want to talk to me so much but I called a lawyer friend and her advice was to just go meet them since they won't leave until they meet me

Nov 28, 2023 11:53:37pm



I filed my taxes and set up installments plan for the $5000 I owe them

Nov 28, 2023 11:52:50pm



I was thinking what could it be

Nov 28, 2023 11:52:32pm



I was outside with dog

Nov 28, 2023 11:52:11pm



There were three people who waited three hours in Avery lobby for me

Nov 28, 2023 11:52:08pm



But she may refer to someone

Nov 28, 2023 11:51:22pm



She's a crypto lawyer so not useful for me

Nov 28, 2023 11:51:14pm



I'll talk to her and maybe she might have a referral

Nov 28, 2023 11:51:09pm



I have a friend who is a lawyer

Nov 28, 2023 11:51:00pm



I don't know

Nov 28, 2023 11:50:53pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:48:07pm



Attorney*

Nov 28, 2023 11:47:46pm



That's all I can say because I'm not allowed to share specifics besides with strong

Nov 28, 2023 11:47:42pm



3) I have to go find a lawyer tomorrow

Nov 28, 2023 11:47:19pm



2) after I met them I told you that I cannot say anything specific or confirm or deny anything

Nov 28, 2023 11:47:08pm



1) before I met them I had already told you there are some government people looking for me in the lobby and they've been waiting for three hours for me three people

Nov 28, 2023 11:46:47pm



All I have said is

Nov 28, 2023 11:46:15pm



Again I cannot share any more information

Nov 28, 2023 11:46:11pm



But they checked the badges / id

Nov 28, 2023 11:45:59pm



Actually at first when the building concierge called I thought it's a scam

Nov 28, 2023 11:45:51pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:45:00pm



I have until April to pay it

Nov 28, 2023 11:44:23pm



I filed on time in October

Nov 28, 2023 11:44:06pm



I was like why is the irs looking for me, I've filed my taxes, I owe $5000 and got an extension

Nov 28, 2023 11:43:59pm



I have not done anything wrong, I don't believe I am in trouble, but I need to make sure going forward everything is done under supervision of a lawyer

Nov 28, 2023 11:42:43pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:42:10pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:41:50pm



I cannot confirm or deny anything but yes I do plan to get a lawyer next

Nov 28, 2023 11:41:40pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:40:07pm



We should not talk until I am allowed to talk to about whatever it was to anyone besides a lawyer

Nov 28, 2023 11:38:57pm



And the only other thing I can say right now is

Nov 28, 2023 11:38:17pm



So before I met them all I shared with you was that there were three government employees from IRS in my lobby for three hours

I was outside with the dog and when I came back they talked to me

I cannot say what it was about or why or say anything more

Nov 28, 2023 11:38:06pm



I can't say why they were here or what they said or anything

Nov 28, 2023 11:33:12pm



So I won't be able to talk to you for some time until I'm allowed to

Nov 28, 2023 11:32:58pm



I cannot share anything with anyone except lawyer

Nov 28, 2023 11:32:10pm



1) I can't say anything 2) I can't talk 3) we can't talk until I am allowed to 4) I am not allowed to share anything or it gets me into trouble

Nov 28, 2023 11:31:34pm



I don't

Nov 28, 2023 11:28:25pm



I cannot talk is all I will say

Nov 28, 2023 11:28:22pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:28:20pm



I cannot say what it was about who they were or anything

Nov 28, 2023 11:27:33pm



I cannot say anything

Nov 28, 2023 11:27:18pm



There were three government officials in the lobby for three hours waiting for me

Nov 28, 2023 11:27:11pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:27:11pm



I have to get a lawyer and I can't say anything or confirm or deny anything

Nov 28, 2023 11:26:32pm



I can't say anything legally

Nov 28, 2023 11:24:48pm

**Ruthia He**

*This message was unsent*

Nov 28, 2023 11:07:31pm

**Ruthia He**

Ruthia called you.

Nov 28, 2023 9:25:32pm

Duration: 4 minutes

 

Ruthia missed your call.

Nov 28, 2023 9:21:12pm

**Ruthia He**

You missed a call from Ruthia.

Nov 28, 2023 9:20:45pm



Ruthia missed your call.

Nov 28, 2023 7:08:27pm



So I didn't let front desk let them up here

Nov 28, 2023 6:40:41pm



Which doesn't make sense

Nov 28, 2023 6:40:26pm



But they said they are from IRS

Nov 28, 2023 6:40:23pm



So I didn't let them up

Nov 28, 2023 6:40:14pm



I never heard of them

Nov 28, 2023 6:40:11pm



Three people came to see me

Nov 28, 2023 6:40:08pm



I got a call from front desk

Nov 28, 2023 6:40:03pm



Ruthia missed your call.

Nov 28, 2023 6:39:57pm



You sent an attachment.
Worry is caused by not trusting God to take care of you. Remember that God is with you and he has everything under control. He has all things in the palm of ...
https://www.youtube.com/watch?v=el4MYer1I6E

Nov 28, 2023 8:46:47am



Journal Entry:

Today, I found myself immersed in the sea of my problems and desires. Each challenge appeared daunting, almost insurmountable, like they required nothing short of a miracle to resolve. I pondered over my aspirations and the things I've longed for, realizing that I've been seeking answers and solutions for what seems like an eternity.

In these moments of contemplation, I encountered a profound realization – that I don't have all the answers, and perhaps I never will. It became clear that despite my persistent efforts and prayers, I couldn't single-handedly overcome these hurdles or manifest my desires through sheer willpower.

And then, like a gentle whisper from the universe, I heard the word "surrender." It resonated within me as a profound truth. Surrendering wasn't a sign of weakness; it was a testament to my faith and trust in something greater than myself. It was an acknowledgment that there are forces beyond my control, mysteries beyond my comprehension, and a divine presence that holds the key to it all.

So, today, I choose to surrender. I release the need to have all the answers and to control every aspect of my life. Instead, I offer my challenges, desires, and dreams to the vast and loving universe. I relinquish the burden of trying to figure it all out and open myself to the guidance and wisdom that flows from a higher source.

Surrender is my new compass, leading me towards a path of inner peace, faith, and trust. I don't know exactly what the future holds, but I am learning to embrace the uncertainty with an open heart. In surrendering, I find solace, and I understand that sometimes, the answers we seek reveal themselves when we let go and allow life to unfold as it should.

Nov 26, 2023 7:49:42pm



Spanish

Nov 25, 2023 7:06:54pm



Brought him to coqueta

Nov 25, 2023 7:06:52pm





Nov 25, 2023 6:50:32pm



And pees a lot

Nov 25, 2023 5:54:02pm



He sheds a lot of hair

Nov 25, 2023 5:53:59pm



Gave him shampoo shower in pet spa in Avery

Nov 25, 2023 5:53:53pm



Exhibit 10

**From:** Quora <curiosity-noreply@quora.com>
**To:** rujiahe@gmail.com
**Subject:** More related to "If a Gmail account is deleted, can the police check Google's history?"
**Sent:** Fri 12/2/2022 5:17:48 PM (UTC)



Stories from your activity

## Can the police track a deleted email account?



J████ T████, 24 Plus Years in IT (1998-present)
Answered November 12, 2020

I am not in law enforcement however my take is that it is best to assume that the police can.
Emails have both a sender and a receiver so if the sender deletes the email a c...
Read more »

## If I delete my gmail account, does that mean that Google will permanently delete all my personal data?



S███ G█████████, System Administrator (1994-present)
Answered September 9, 2017

It would be better to actively delete it yourself if that's what you require. If you are asking if you lose access to your data if your Gmail account is deleted then probab...
Read more »

## What tools do the police use to find deleted Google accounts?



A████ K███, Videographer at Self-Employment
Answered August 12, 2021

Very serious crimes of Terrorism, Hate, or Murder, or physical/sexual abuse will become criminal investigations.
The path of the investigation may result in requests to a ju...
Read more »

He-GoogAccount-0000029507

## How can I view deleted Google history?



G███ R██████████, worked at Google (2014-2019)
Answered September 6, 2018

Any data from your Google account history (including location, seaches, YouTube watches) that you have chosen to delete is deleted irrevocably. This makes sense since it wo...
Read more »

## I want to subpoena Google to compel them to tell me the owner of a Gmail account. The user has deleted their Gmail account, is the information still available?



C█ Ha██, 25+ years as a professional Geek. Networks, PCs, gadgets...
Updated December 18, 2020

/chuckles… You can use the word subpoena, but that doesn't mean you can issue one just because you *want* something. Not even if you're a judge. This may be helpful, in a gen...
Read more »

## Can the police get access to my Google account without my permission?



A████████ ███████████), studied Chartered Accountants at The Institute of Chartered Accountants of India...
Updated September 26, 2019

Thanks for A2A.
Reading the question I am assuming that Police wants access to the account either for your safety or you are being accused of a serious crime.
There is a spec...
Read more »

## I opened a gmail account about 5 days ago and sent a highly confidential email, then deleted the account. Is it possible to locate my IP address from that account?



P██████ D███, Freak. Abnormal. Unbounded thoughts. Sapiosexual, speaker, and observer.
Answered May 20, 2015

Yes. It is possible.
Ideally, an email is not just what we read, it has many other information embedded into it in the background.
One can go into settings of the email inter...
Read more »

## Can a deleted Google account from a year ago be accessed by hackers?

 T███ L██, More than a few years around a keyboard and seen a lot.
Answered November 22, 2016

No not really not at all I would say no. Even if so even Maskill chance that it could be, it's been deleted it's gone and depends on how long ago it was going to so unless ...
Read more »

## How do I delete my Google Plus account without deleting my Gmail?

 N██ A██████, Digital Marketer, Content Writer, SEO
Answered October 17, 2017

This reminds me of a joke.
Q: What's the best place to hide a dead body?
A: Google Plus.
With Facebook **exclusively** tending to our social networking needs, it's only logical th...
Read more »

## When the police try to find something related to a deleted Gmail account, can they find it by the phone number that was connected to the deleted Gmail account?

 P███ S██, B.S.M.E from Chicago Tech (1973)
Answered August 23, 2021

Not likely. The connected phone number is used only for recovery of your username/password to recover get access to the email account PROVIDED it is still valid. Actually i...
Read more »

Search More on Quora

He-GoogAccount-0000029507

This email was sent by Quora (605 Castro Street, Mountain View, CA 94041).
If you don't want to receive this type of email in the future, please unsubscribe.

https://www.quora.com

He-GoogAccount-0000029507

Exhibit 11

[2/5/24, 2:56:45 PM] Ruthia: Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them.

[2/5/24, 2:56:45 PM] Ruthia: hi

[2/5/24, 2:56:54 PM] N████: Hi!

[2/5/24, 3:12:46 PM] Ruthia: Ruthia turned on disappearing messages. New messages will disappear from this chat 24 hours after they're sent, except when kept. Tap to change.

[2/22/24, 10:07:06 AM] Ruthia: <attached: 00000125-PHOTO-2024-02-22-10-07-06.jpg>





Redacted

FOIA CONFIDENTIAL TREATMENT REQUESTED BY DONE HEALTH
SUBJECT TO FEDERAL RULES OF CRIMINAL PROCEDURE 6(e)

Redacted

FOIA CONFIDENTIAL TREATMENT REQUESTED BY DONE HEALTH
SUBJECT TO FEDERAL RULES OF CRIMINAL PROCEDURE 6(e)

DONEHEALTH_03800887
DONEHEALTH_03800886

Exhibit 12

Ruthia:          Disclaiming the relationship

Apr 15, 2022 2:25 PM

Magicmike-:    What do (you) mean

Apr 15, 2022 2:40 PM

Ruthia:          Some staff members just wanted to disclaim the relationship when they read about the concerns from the media

Ruthia:          But there are not too many- they are those new people whom (we) are not familiar with

Apr 15, 2022 2:56 PM

Ruthia:          Teacher please go home safely- Don't drink- It's hurting your health- I'll go to accompany you if I don't have this strange job

Apr 15, 2022 3:10 PM

Magicmike-:    Hmm!

Magicmike-:    I'm going home

Magicmike-:    Feel at ease

Magicmike-:    I am always by your side

Ruthia:          [Tap to retry]

Ruthia:          Alright- Go home- Good night

Magicmike-:    Hmm

Ruthia:          Ask me to join you if have any fun activity tomorrow- Finally don't have to work...

Apr 15, 2022 3:32 PM

Magicmike-:    Hmm!

Apr 15, 2022 10:47 PM

Ruthia:          Let's hurry up to move our marketing team to China... this way-feel there will be an investigation sooner or later because of the advertisement

Apr 15, 2022 10:51 PM

Magicmike-:    [Emoticon]

Magicmike-:    Hmm!

Ruthia:          Our older sister who handles the advertisement does not even know what the advertisement writing is

Ruthia:          Good morning Teacher

9

# Exhibit 13

# Detention Hrg. Tr. 6/13/24

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,        ) Case No. 2:24-MJ-03534-DUTY
                                    )
5            Plaintiff,             ) Los Angeles, California
                                    )
6  vs.                              ) Thursday, June 13, 2024
                                    )
7  RUTHIA HE,                       ) (3:46 p.m. to 4:47 p.m.)
                                    )
8            Defendant.             )
   _____ )

9

10

                      TRANSCRIPT OF INITIAL APPEARANCE
11            BEFORE THE HONORABLE ALICIA G. ROSENBERG
                   UNITED STATES MAGISTRATE JUDGE
12

13

   Appearances:                    See next page.
14

   Court Reporter:                 Recorded; CourtSmart
15

   Courtroom Deputy:               Karl Lozada
16

   Transcribed by:                 Jordan Keilty
17                                  Echo Reporting, Inc.
                                    9711 Cactus Street, Suite B
18                                  Lakeside, California 92040
                                    (858) 453-7590
19

20

21

22

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

1  APPEARANCES:

2  For the Plaintiff:            JACOB N. FOSTER, ESQ.
                                SANDOR CALLAHAN, ESQ.
3                               Assistant United States
                                  Attorney
4                               Office of the United States
                                  Attorney
5                               312 North Spring Street
                                12th Floor
6                               Los Angeles, California 90012
                                (213) 894-2434
7
   For the Defendant:           BRIAN A. SUN, ESQ.
8                               ALEX J. SCANDROLI, ESQ.
                                Norton Rose Fulbright
9                               555 South Flower Street
                                Forty-First Floor
10                              Los Angeles, California 90071
                                (213) 892-9267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    Los Angeles, California; Thursday, June 13, 2024 3:46 p.m.

2                          --o0o--

3                     (Call to Order)

4         THE CLERK:  Calling Case Number 2:24-MJ-03534,

5    United States of America versus Sealed.

6         Starting with the Government, would counsel please

7    state your appearances for the record?

8         MR. FOSTER:  Yes.  Good afternoon, your Honor.

9    Jacob Foster, Principal Assistant Chief in the Fraud

10   Sections Criminal Division, and here with me is Sandor

11   Callahan, Trial Attorney in the Fraud Sections Criminal

12   Division.

13        MR. CALLAHAN:  Good afternoon, your Honor.

14        THE COURT:  Thank you.

15        MR. SUN:  Good morning, your Honor.  Brian Sun,

16   Norton Rose Fulbright, with my colleague Alex Scandroli,

17   here with the Defendant who's in custody.  We're specially

18   appearing on behalf of Vicki Chou, C-H-O-U, from Hueston

19   Hennigan who I believe is retained counsel.  Ms. Chou is en

20   route back to Los Angeles and asked us to specially appear

21   on behalf of the Defendant today.

22        THE COURT:  All right.  Thank you.

23        All right.  So, we have here the advisement form

24   of the Defendant's statutory and constitutional rights.

25        MR. FOSTER:  And, your Honor, we would request

4

1  that the matter be unsealed.

2          THE COURT:  All right.  Yes.  Granted.

3          There are actually two Defendants.  Is this matter

4  unsealed completely?

5          MR. FOSTER:  Yes.  The -- actually, the terms of

6  the order provided that it was unsealed upon arrest, and the

7  Co-Defendant was apprehended this morning and appeared in

8  the Northern District of California.  So, the matter is

9  considered unsealed in --

10          THE COURT:  Unsealed in it's --

11          MR. FOSTER:  -- the originating --

12          THE COURT:  -- entirety?

13          MR. FOSTER:  -- District.  Yes.

14          THE COURT:  All right.  Motion granted.

15          All right.  So, then back to the advisement form.

16  So, Ms. He, have you had a chance to talk with your

17  attorneys about the statutory and constitutional rights

18  described on this form?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And, yes, if you could just move the

21  microphone.  Thank you.

22          THE DEFENDANT:  Yes.

23          THE COURT:  And do you understand your rights as

24  described on this form?

25          THE DEFENDANT:  Yes.

5

1          THE COURT:  Thank you.  Do you agree that I do not
2   need to read the rights to you?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Thank you.  So, on the advisement
5   form, there's a section on page two entitled "Acknowledgment
6   of Defendant" where you state that you had read the
7   advisement of rights and understand it.

8          Is that your signature under acknowledgment of
9   Defendants?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And then whose signature is this under
12   "Statement of Counsel"?

13          MR. SCANDROLI:  That would be mine, your Honor.

14          THE COURT:  All right.  Thank you.  And your name
15   for the record?

16          MR. SCANDROLI:  Alex Scandroli.

17          THE COURT:  Okay.

18      (Pause.)

19          THE COURT:  All right.  Ms. He, so, I have the
20   indictment from the Northern District of California, and it
21   has several allegations.  Have you had a chance to go over
22   the indictment with your counsel?

23          THE DEFENDANT:  Um-hmm, yes.

24          THE COURT:  And do you understand what the
25   Government claims you did?  I'm not asking you to admit or

6

1   deny any of the allegations.  I'm just asking do you

2   understand what the Government claims that you did?

3           THE DEFENDANT:  My counsel explained to me.

4           THE COURT:  All right.  That's -- that's fine.

5           And then, Counsel, can you confirm that you

6   explained the allegations of the indictment?

7           MR. SCANDROLI:  Yes, your Honor.

8           THE COURT:  All right.  Thank you.

9           All right.  So, I have the Government's notice of

10  request for detention.  Is the Defense prepared to proceed

11  this afternoon?

12          MR. SUN:   Yes, we are, though, your Honor, we --

13  we just got the Pretrial Services Report, and we are

14  reacting to it, and we may want to augment somewhat what's

15  in the report and make some of the additional facts known to

16  the Court, but we want to proceed, yes.

17          THE COURT:  Want to proceed.  Okay.  All right.

18  So, we will start with this.

19          Let me ask the Government to state its proffer in

20  support of the request for detention.

21          MR. FOSTER:  Yes, your Honor.  We would proffer

22  the notice and the Pretrial Services Report, and we're

23  prepared to make a factual proffer.  We have a number of

24  exhibits that we've marked.  May I approach and hand them

25  up?

7

1           THE COURT:  Certainly.  Have you already given the

2   exhibits to defense counsel?

3           MR. FOSTER:  I have a copy that I will hand to

4   defense counsel as well.

5           THE COURT:  All right.

6       (Pause.)

7           THE COURT:  All right.  I have the exhibits, and

8   then is there anything else?  You said the Pretrial Report,

9   the exhibits that you've handed to the Court and to defense

10  counsel.

11          MR. FOSTER:  And an oral proffer, your Honor.

12          THE COURT:  And an oral proffer.  And, then, I

13  assume you're also relying on the indictment?

14          MR. FOSTER:  Yes, your Honor.

15          THE COURT:  Yes.  Okay.  All right.  I -- has

16  defense counsel had a chance to review these exhibits or are

17  you reading them now for the first time?

18          MR. SUN:  I think we're reading them for the first

19  time, your Honor.

20          THE COURT:  My next question was going to be

21  whether you accept the proffer for purposes of today's

22  hearing only --

23          MR. SUN:  Yeah.

24          THE COURT:  -- or for purposes of the bail and

25  detention hearing?

8

1          MR. SUN:  Yeah, we can -- we can accept this as
2   part of the Government's proffer, your Honor.  I may have to
3   reserve the right to, depending on after looking at all this
4   and hearing what the Government has to say in connection
5   with its proffer with these documents, then I might need to
6   -- may need to seek an extension of the -- a continuance of
7   the hearing for a few days, but I'd like to -- I'm happy to
8   hear the Government's proffer first.

9          THE COURT:  Okay.  All right.  So, please proceed.

10          MR. FOSTER:  Yes, your Honor.  The Defendant is a
11   citizen of China with few ties to the United States,
12   millions of dollars in assets, and a demonstrated disregard
13   for the U.S. legal system.  She masterminded a scheme that
14   the grand jury found probable cause to believe had
15   distributed addictive stimulants across the country,
16   defrauded healthcare insurers, and conspired to obstruct
17   justice.

18          This is one of the largest stimulant distribution
19   schemes charged in U.S. history.  She did so by targeting
20   drug seekers and vulnerable Americans with deceptive
21   advertising on TikTok, Instagram, and other social media
22   platforms, and she arranged for nurses and doctors working
23   for her telemedicine company to rubberstamp unnecessary
24   prescriptions.  This scheme made Defendant's company over
25   $100 million in revenue.

9

1          The Court should detain her, as Pretrial Services
2  found.  They found this, in fact, without considering the
3  presumption, but this is a presumption case.  The Court
4  should detain her because of the presumption, which she
5  cannot rebut, applicable in this controlled substances
6  prosecution, that she's a risk of flight, obstruction of
7  justice, and danger to the community.  And this can't be
8  addressed by any combination of conditions here.

9          As the proffer and the exhibits demonstrate, there
10  are five primary reasons to detain the Defendants. First,
11  this is a presumption case.  And, as the Supreme Court in
12  Salerno recognized, defendants who commit Title 21 offenses
13  are far more likely to be a danger to the community after
14  their arrest.  And, for this reason, Congress mandated that
15  courts presume that no condition or combination of pretrial
16  release conditions will reasonably assure the appearance of
17  the Defendant or the safety of the community, and that's
18  3142(e)(3)(A).

19          Second, the magnitude of the crime and the
20  Defendant's exposure under the applicable sentencing
21  guidelines.  The grand jury found probable cause to believe
22  that the Defendant perpetuated a widespread stimulate abuse
23  schemes.  The platform has prescribed over 40 million pills
24  of Adderall across the country.  A drug conversion based on
25  her one Co-Defendant's prescriptions alone would result in a

10

1 guidelines level that is 360 to life imprisonment, and

2 that's just one of the many providers who were prescribing

3 controlled stimulants on the platform.

4          But it's not only about the guidelines.  It's

5 about the patient harm in this case, including patients with

6 mental health issues, patients who are addicts, drug dealers

7 who acquired pills to resell on the street.  It's about

8 mothers who contacted Done, as the Defendant was made aware,

9 telling them that their children had overdosed and died and

10 begging them to change their practices.  And witnesses have

11 told the Government that when the Defendant was informed of

12 that, she said she wasn't going to change anything.

13          In addition, foreign ties, I think the report

14 makes it clear the Defendant was born abroad in China.

15 She's a citizen of China.  She faces deportation if she's

16 convicted.  She lived the first 20 years of her life in

17 China.  Her entire family, according to her interview,

18 resides in China.

19          In addition, the Defendant operated this business

20 for nearly a year from inside China, and multiple witnesses

21 told the Government that the Defendant stayed in China

22 because she feared being arrested if she came to the United

23 States.

24          The Defendant also previously attempted to flee

25 the country, and she was stopped in flight.  She has no

11

1 fixed address in the United States, as she admitted.  She

2 stays in hotels and with friends.  And she has used assumed

3 identities.  She has the means to flee, including millions

4 of dollars in offshore bank accounts.

5          Fourth, she can't be trusted to abide by any

6 conditions of release in this case because, as the

7 indictment alleges, she's a frequent and flagrant liar about

8 central aspects of the business and collateral matters.

9          The indictment alleges that she lied to many

10 parties about many aspects of Done's business and its

11 compliance measures.  Paragraph 60 of the indictment alleges

12 that she lied that this company was successful prior to the

13 Pandemic.  In reality, prior to the Pandemic, it made

14 little, if any, money, and it was only through regulatory

15 waivers put in place designed to enable access to care in

16 the COVID-19 Pandemic by allowing prescriptions to occur

17 over the Internet without a prior face-to-face encounter

18 that the Defendant was able

19 obtaining tens of millions of dollars in revenue.

20          And the Defendant explained her motive for the

21 scheme.  She said that the company was already worth $100

22 million in a valuation in a document that she wrote and that

23 she hoped to read a $3 billion valuation for this company.

24          In addition, she lied that the company provided a

25 range of medical treatment options to try and make it seem

12

1   more legitimate when in reality, it provided Adderall and

2   other stimulants.  That's paragraph 66.  She lied to

3   Medicare, Medicaid, and commercial insurers, including

4   through causing the submission of fraudulent prior

5   authorizations to obtain insurance coverage for patients

6   because this was a subscription-based enterprise, so

7   patients paid a monthly fee to the Defendant's company in

8   exchange for cash.  But she was worried that patients

9   wouldn't continue to pay her company that money if it was

10  costly for them to obtain Adderall or other stimulants from

11  pharmacies, if they were unable to use their insurance.

12  And, so, the indictment alleges that she participated in a

13  conspiracy to defraud those insurance companies and caused

14  them to pay money that should be held in trust for the

15  elderly, the disabled, and the economically disadvantaged.

16          The indictment also alleges that she lied to media

17  outlets, paragraph 73.  When the <u>Wall Street Journal</u> and

18  other major national news media publications began reporting

19  that Defendant's company made Adderall and other stimulants

20  too easy to obtain online, she authorized responses that

21  denied the existence of incriminatory policies that the

22  Government, through search warrants and other means, has

23  uncovered, in fact, existed.

24          Finally, she lied to regulatory and credentialing

25  authorities -- that's paragraph 73 -- to keep in business.

13

1          Fifth, this is a perhaps unique case because of

2   the lack of domestic ties but also because of the conspiracy

3   to obstruct justice.  So, this not only shows that she would

4   be a danger if released.  It shows that she's willing to

5   commit a new crime to protect herself from another crime.

6   And someone's who's willing to commit a second crime to

7   protect themselves from the first is the same kind of person

8   that would commit yet another crime essentially by fleeing

9   the country.

10          In terms of the factual proffer, we've submitted

11  the indictment.  It's a seven-count indictment, conspiracy

12  to distribute controlled substances, Counts 2 through 5, or

13  distribution of controlled substances.  Count 6 is a

14  conspiracy to commit healthcare fraud, and Count 7 is a

15  conspiracy to obstruct justice.

16          The maximum term of imprisonment is 20 years on

17  Counts 1 through 5 and Count 7 and 10 years on Count 6,

18  which if ran consecutively, would be a term of imprisonment

19  of 130 years.

20          It's when the scheme in its outset, that the

21  evidence supporting the allegations in the indictment is

22  incredibly compelling.  So, paragraphs 48 and 49 and 58 of

23  the indictment allege that the Defendant was the founder of

24  a company that provided easy access to stimulants online.

25          Paragraph 61 establishes that the company acquired

14

1  thousands of members by targeting drug users directly.  So,

2  if anyone today googled the phrase "buy Adderall online,"

3  the Defendant's company would show up as a sponsored search

4  result, which is, of course, tempting illegal drug seekers

5  into the company because it is illegal to buy Adderall

6  online.  You can't obtain Adderall without a licensed

7  prescription from a medical professional who prescribes it

8  for a legitimate medical need.

9         And, so, the company was intentionally targeting

10  drug seekers, and it was also advertising deceptively on

11  social media platforms to people who might confuse whether

12  they, in fact, had ADHD because it's a condition that, as

13  experts have told the government, is often confused with

14  depression, anxiety, other types of social disorders.  And,

15  so, there are also vulnerable people who are lured into this

16  scheme and prescribed stimulants, as the indictment alleges,

17  that they did not need.

18         The indictment alleges at paragraphs 62, 65, and

19  66 to 70 that the Defendant essentially created a roster of

20  compliant prescribers through a combination of carrots and

21  sticks, unusual compensation policies, and above-market pay,

22  and a willingness to discipline, fire, place other pressure

23  on prescribers who would not prescribe Adderall and provide

24  easy access to it.

25         Paragraph 72 of the indictment makes it clear that

15

1  the Defendant was well aware that her conduct was illegal.

2  And, therefore, she can't rebut the presumption because

3  someone faced with so many warning signs but who,

4  nonetheless, decides to persist is someone who can't be

5  trusted to abide by any conditions of release.  And that

6  paragraph alleges that they persisted in the same unlawful

7  practices after they were being made aware that there were

8  Done members who were on social networks obtaining

9  information about how to obtain Adderall online.  And her

10 Co-Defendant said in a communication with her that reading

11 it gave him a sinking feeling in his stomach, but they

12 persisted.

13         She was also aware that members of the platform

14 had overdosed and died, and I want to be clear, we're not

15 alleging those are but-for deaths.  These individuals

16 overdosed and died from opioid, Fentanyl, other matters, but

17 they're relative at least in the case of one substance count

18 in the indictment reached -- reached out and alleged that it

19 precipitated that individual's decline.  And, despite that,

20 which experts would say would be a sentinel warning, the

21 Defendant persisted in the same practices.

22         She was also aware as a result of receiving direct

23 communications from patients that there were patients who

24 came on the platform who were describing the company as "a

25 straight-up pill mill."  And that's corroborated by

16

1  interviews that agents have done with patients around the
2  country, others of whom have described the platform as a
3  pill mill and stated that it was the easiest way to get
4  drugs if you were going to do it not on the street.  The
5  same has been true by -- said by former prescribers who
6  worked for the company as well.

7          Now, in terms of the basis, I want to incorporate
8  the Pretrial Services Report, and I think that makes clear
9  that there's very few, if any, ties to the United States and
10 also that there is a proposal of a package that's -- that's
11 willfully insufficient.

12         But, irrespective of the financial package here,
13 the factors that are considered under 3142(g) mean that
14 there's no financial package, certainly not the one that's
15 proposed, that would mitigate against the risk of flight,
16 obstruction, and the danger to the community because this
17 platform is still operating, as I indicated today.

18         As indicated, the guidelines range would be 360 to
19 life based just on the Co-Defendant's prescriptions.  That's
20 a base offense level of 34, using the drug conversion weight
21 which converts to 11,600,800 grams, a two-level enhancement
22 for mass marketing by means of computer, a four-level
23 enhancement for aggravating role, and a two-level
24 enhancement for obstruction.

25         And, as the Ninth Circuit said in <u>Townsend</u>, that

17

creates a motive to plea because of the enhanced penalties
that she is facing and the likelihood of a significant
person of incarceration, and that's magnified by the lack of
ties to the United States and the amount of assets and money
that exist in this case.

In terms of the weight of the evidence, it is said
in this Circuit and others that weight of the evidence is
the least important factor, and it goes to the weight of the
evidence in regards to flight and dangerousness, but
Townsend in the Ninth Circuit acknowledged that when
evidence of the underlying crime is significant, that
bolsters the risk of flight, obstruction, other types of
danger, because Defendants facing an overwhelming case are
more likely to flee than those are not.

And here in connection with this case, three
Defendants have already pled guilty to participating in the
same conspiracy that the Defendant is alleged to have
orchestrated and are cooperating with the Government.

So, the case is strong.  In addition, the risk of
flight and obstruction is strong.  So, in terms of the
history and characteristics of the Defendant, the Pretrial
Services Report is correct that she's not a U.S. citizen and
she has few ties to the country.  She doesn't have a fixed
residence.  In contrast, she has close family and numerous
other contacts in China, and she has substantial overseas

18

1  assets.

2          So, Exhibits 2 and 3, which I handed out, are

3  exhibits that involve communications where the Defendant is

4  discussing opening a bank account in China while she is

5  inside China.  And, so, the English translation of messages

6  are her saying she wants to go to the bank and open an

7  account, and Exhibit 3:

8               "My plan for today is to go to the

9               bank for the last step of the process,

10              to open an account."

11         And her financial accounts overseas in China and

12  Hong Kong are corroborated by financial transfers that the

13  Government has obtained records of.

14         In addition, the Defendant can continue this crime

15  from outside the country because it's based on the Internet,

16  and that's proven by the fact that she ran the company for

17  nearly a year.  And that was from September 8th, 2021 to

18  September 2nd, 2022, and that the Defendant returned to the

19  U.S. just before a full year had passed suggests that she

20  simply did not want her green card to expire, which it would

21  have done after a year, and less than a month after

22  returning to the United States, she applied for immigration

23  relief that would have allowed her to remain outside of the

24  country for even longer.

25              Most importantly, after the Government served a

19

grand jury subpoena, the Defendant booked a one-way flight
out of the country for February 18th, 2023.  She changed her
plans only after the Government informed her counsel that
such a flight would force the Government to make the
decision on whether to arrest.  And conversations that the
Government has obtained, including Exhibit 1, confirm that
she was planning to place herself and her assets beyond the
Government's reach.

Since that time, the Defendant has taken steps to
conceal her activities from law enforcement and, thus,
enable her flight from the country.  She has used assumed
identities to shield her involvement both with financial
accounts and also cellular telephones, which has made the
Government's ability to obtain evidence and also identify
her location even domestically extremely difficult.  The
Government only learned that her new phone belonged to her
because she was seen with the person in whose name the
account was opened and because the Defendant had associated
the account with one of her email accounts.  But essentially
she -- after having her phone seized in connection with the
Hong Kong flight, she obtained a new cell phone in someone
else's name, and she used that new phone to contact her
coconspirators, and she was traveling with it upon arrest.
She's also taken similar steps with financial transactions,
opening bank accounts and financial accounts that she's

20

1 transferred money to in other individuals' names.  That's

2 Exhibit 4 which we provided which indicates that she

3 fraudulently opened a bank account in her mother's name in

4 2023, and that account has been receiving funds.  It's a

5 bank account that has branches in China, suggesting that

6 it's storing funds easily accessible from China.  And while

7 there's not a huge sum of money in that account, we have

8 other evidence that the Defendant has opened a number of

9 different accounts and transferred different amounts of

10 funds to them, potentially trying to make them available in

11 a situation like occurred here.

12          In terms of the nature and seriousness that would

13 be posed by the person's release, Pretrial Services

14 correctly concluded that there were no conditions that would

15 ameliorate the risk of flight.  But, in addition, the

16 administration of justice is a weighty interest here.

17 Before the Defendant learned of the Government's

18 investigation, she would regularly dismiss concerns about

19 the legality of her actions.  Multiple company insiders have

20 told us that she did not have a respect for any legal or

21 regulatory concerns, that she was repeatedly warned that the

22 company was violating the law and engaged in a practice of

23 medicine that was not suitable for patients but that,

24 nonetheless, that she persisted because she wanted to create

25 a frictionless environment where patients could obtain drugs

21

1 without there being any -- any friction or barriers to that.

2 And, of course, the problem with that is that the practice

3 of medicine and the medical practice, practiced

4 appropriately, involves a process that does involve

5 friction.

6          Moreover, multiple witnesses, at least three, have

7 told the Government that the Defendant in their presence

8 told others that she would give a Tesla to the first person

9 for Done -- at Done who got arrested and that they viewed

10 that as an attempt to influence the willingness of people

11 within the company to cooperate and provide evidence to the

12 Government, which is extremely serious.

13          Multiple witnesses also attest that the Defendant

14 told them that many major companies would not have become

15 successful if they did not break the law and that that was

16 her attitude towards legal requirements.

17          And the Defendant's conduct worsened a the

18 prospect of an investigation became more likely, and one

19 example of the Defendant's willingness to destroy evidence

20 is contained within Exhibits 5 through 7.

21          So, in March of 2022, a reporter with a national

22 news asset asked Done about certain of its practices,

23 including whether they had a policy to put patients who did

24 not qualify for the DSM-5 criteria on a medication trial.

25 And that statement was accurate.  That was a policy of

22

1 Done's, but Done's press team, as the Defendant was aware,

2 replied that there was no such best practices guide with the

3 company and also that the policy did not say that patients

4 who don't meet the criteria for ADHD should be placed on

5 medication trials.  And that's Exhibit 5 is the press agency

6 response.

7          And Exhibit 6, the Defendant knew the statement

8 was false because she discussed that statement and that

9 document with another employee of the company and discussed

10 that it was -- it would exist, and she decided to disable

11 access to it so no one else within the company could access

12 that document.  And Done's press team repeated her falsehood

13 a day later, informing the reporter that Done, "did not have

14 any documents prompting a provider to recommend trials using

15 Adderall for patients who did not meet the DSM-5 criteria

16 for ADHD."

17          The Defendant has withheld truth from the

18 Government.  The indictment alleges that after receiving a

19 grand jury subpoena, the Defendant switched to encrypted

20 messaging platforms such as Signal, WeChat, and other

21 encrypted messaging platforms.  And -- and the Government

22 did not obtain any of those documents in response to a

23 subpoena.

24          There's also email communication between the

25 Defendant and her Co-Defendant, Mr. Brody, where Mr. Brody

23

suggests that they refrain from engaging in conversations on

company channels because he prefers to use platforms that

"won't necessarily be scrutinized using the mechanism of a

subpoena."  And there's evidence that they then did use

those personal email accounts and devices and those were not

produced to the Government, although some of them were

recovered through other law enforcement means.

's also evidence that the Defendan

frequently deleted or contemplated deleting incriminatory

communications.  So, in Exhibit 8 is a WhatsApp message,

which is an encrypted messaging platform involved with end-

to-end encryptions as reflected on the face of Exhibit 8

itself, and that reflects that in May '22, a co-conspirator

messages the Defendant on WhatsApp "because if the

Government wanted to, they could subpoena our Slack

records."  And if you look at the bottom of that chain, it

prompts the Defendant to reply, "I'll delete the Slack

records."  And the cooperating witness said she did, in

fact, then delete the Slack records which were official

company communications and would have been responsive to the

Government's grand jury subpoena.

Similarly, the -- Exhibit 9 reflects that the

Defendant unsent approximately 20 messages to a Done

employee after that employee or individual had been

approached by law enforcement and refused to discuss the

24

1  details of the law enforcement approach with her.

2         In addition, Exhibit 10 is an email that the -- an

3  email notification the Defendant received which reflects

4  that she had searched online to determine "If a gmail

5  account is deleted, can the police check Google's history."

6  The Defendant also directed employees to use encrypted

7  messaging platforms where she could alter the settings to

8  automatically delete messages.  For example, in February of

9  '24, Exhibit 11 reflects that the Defendant changed her

10 settings in a particular WhatsApp chat to ensure that the

11 messages would disappear after 24 hours.

12        So, what this shows is that the Government has

13 uncovered extensive I would say overwhelming evidence that

14 the Defendant is willing to do anything to obstruct justice

15 and to make an evidence unavailable for the Government in

16 its investigation, and it also indicates that she's not

17 likely to be deterred by the pending criminal charges given

18 her disrespect for the rule of law.

19        And when there's this type of really methodical

20 and repetitive efforts to not only distribute controlled

21 substances and not only to defraud but also to evade

22 detection, that suggests she would continue to pose further

23 harm to the administration of justice if released.

24        And, as Exhibit 1 demonstrates, the Defendant

25 discussed her plan for what she would do exactly in a

25

1  circumstance such as this.  So, if the Court reviews Exhibit

2  1 attached to the Government's exhibit proffer, it's a

3  conversation on a seized phone, and it confirms that if

4  she's arrested, her plan is to place both herself and her

5  assets beyond the Government's reach.

6          So, on January 9th, 2023, the Defendant asked an

7  associate based in China what to do if she "got arrested".

8  And the associated replied she should "transfer part of the

9  funds to the Cayman Islands, Hong Kong," and then "return to

10 Mainland China."  And these are English translations of

11 messages to and from the Defendant.

12         The Defendant also discussed in this conversation

13 the best countries to open a foreign account, observing that

14 "Singapore does not require onsite presence to open a

15 account," referring to a bank account.  And then continues

16 to say, "but it seems there is an extradition clause."  And

17 what that reflects is that she is well aware that in an

18 instance where she is arrested, as she has now been, she's

19 going to need to flee the country -- flee this country to a

20 country without an extradition clause so she can remain

21 permanently outside the reach of U.S. law enforcement.

22         The Defendant also contemplated choosing bank

23 accounts in certain countries would trigger suspicion and

24 that she wanted to make sure that the Government couldn't

25 suspect they were doing cross-board drug trafficking, in her

26

 1    words.

 2              So, given these combination of facts and evidence,

 3    there is no combination of conditions that will ensure

 4    Defendant's appearance at future proceedings in this matter.

 5    And, therefore, we ask that she be detained here in this

 6    District until a time that she can be transferred and make

 7    an appearance in the Northern District of California.

 8              Thank you.

 9              THE COURT:  I have one -- just question.  You

10    answered one of them, which was was the platform still

11    operating.  In -- so, obviously, I'm looking at these

12    exhibits for the first time today at the hearing.

13              Do you have an idea of how much has been -- how

14    many assets or how much in assets have been transferred

15    abroad?

16              MR. FOSTER:  I don't have a precise number for

17    you, your Honor.  Some of these are very difficult

18    transactions to trace, and the recipients of the

19    transactions are difficult to trace.  But we know that there

20    have been at least in the hundreds of thousands of dollars

21    transferred to Hong Kong.

22              The Defendant also -- and one of the reasons that

23    untangling this is difficult, when the controversy arose and

24    this became an issue in the media, she wrote a email saying

25    that -- or a communication on a messaging platform saying

27

1  that she intended to move the operations of the business

2  overseas because she thought there would be an investigation

3  eventually.  And, so, there are huge sums of money

4  transferred overseas.  Untangling which third party

5  recipient in a foreign country such as China or Hong Kong is

6  associated with the Defendant versus associated with a third

7  party business expense is difficult.  But when you include

8  all of those types of transactions, including, you know,

9  transactions out of company accounts, it is -- it is quite

10 significant, easily in the hundreds of thousands of dollars,

11 and I wouldn't want to give you an exact amount without --

12 without more detail.

13         THE COURT:  Without looking.

14         MR. FOSTER:  But I think -- I think well -- well

15 north of that.

16         THE COURT:  One of the -- my last question had to

17 do with one of the proposed residences for the Defendant was

18 someone named Akash (phonetic), without a last name.  I

19 noticed in one of your exhibits that name came up.  I wonder

20 is that name familiar to you, and is that someone who has

21 some relationship to the Done business?

22         MR. FOSTER:  So, it is, as you noted, familiar to

23 us, and there would be great concern about residing with

24 that individual, particularly given the exhibits that was

25 submitted and the contents of it.  It is an individual who

28

1  appears to be a personal acquaintance of the Defendant, but
2  there was a period of time when they entered into a
3  purported consulting agreement.  The Government doesn't know
4  whether that agreement is, in fact, bona fide.  It was a
5  short period of time.  But, obviously, there would be
6  significant concerns, including concerns of obstruction,
7  with a situation like that.

8          THE COURT:  All right.  But do you know who that
9  person is and -- as far as you know, there was some -- some
10 kind of consulting or -- or -- it's hard to tell from these
11 documents.

12         MR. FOSTER:  It does not -- it appears that an
13 agreement was entered into for a brief period of time, but
14 the communications the Government has received indicate that
15 in addition to the professional agreement, there was also
16 personal acquaintance through the communications.  So, I
17 want to be candid about that.

18         THE COURT:  Okay.  All right.  Okay.  Thank you
19 very much.

20         All right.  So, now, I don't know who's going to
21 speak for -- on the Defense side to respond to the
22 Government's argument.

23         MR. SUN:  Well, your Honor, we -- we heard a lot
24 here from Mr. Foster, and I'll confess that some of this was
25 -- we've heard for the first time.  I'll just say

29

1  thematically speaking, that there is a different side to

2  this story.  This is a -- a case that, as the indictment

3  suggests, involves a controversy over the prescription of

4  Adderall, which is a -- as many people know, in this

5  country, is becoming an increasingly popular drug used -- or

6  a prescription that's been used mainly by youth for -- for

7  ADHD type of applications and such.

8          And when I say different side of the story, I mean

9  there are people who are very passionate about how this kind

10 of drug can be helpful to people suffering from these

11 conditions, balanced against a concern by the Government and

12 regulators that it can be abused, which we recognize to be a

13 serious concern as does our client.

14         Now, you should know just for the record that the

15 client had left the company, was doing work only part time

16 for this Done company.  She has been working as a volunteer,

17 as reflected I think in the Pretrial Services Report, for a

18 -- a nonprofit that she founded that is designed to try to

19 provide these kinds of resources to individuals and families

20 and patients who could benefit from this who can't afford

21 these kinds of resources and medications.  So, it's fair to

22 say that she's very passionate about trying to advance and

23 further the proper application of these drugs.

24         Now, the Government -- this is one of those things

25 where the Government's making big hoopla, and it may be

30

1 justifiably so, over the way in which these drugs are

2 regulated.  I would suggest that the Government -- suggest

3 to the Court that historically, the Government hasn't been a

4 model of clarity with respect to how these drugs are to be

5 maintained and prescribed and controlled, and the telehealth

6 platforms and the technology that we have nowadays does

7 afford some opportunity for abuses, either at a line level

8 or whatever level it can be done, and certainly we don't

9 think that this is not something that shouldn't be

10 investigated.

11         To pin it down here on a -- a 32-year-old woman

12 from China who came here over 10 years ago, got her Master's

13 Degree at Carnegie Mellon in industrial design and graphics

14 I think, and then moved into this realm with an idea of

15 helping people is not exactly the story that she or her

16 supporters would say here.

17         And on the issue of bail, your Honor, you know,

18 flight risk and all that sort of thing, you know, she -- you

19 know, the Government has suggested that she didn't go back

20 to China when her grandparents died.  Okay.  She wanted to

21 go back for the funerals and all that and the mourning

22 periods.  Her lawyers checked with the Government.  The

23 Government said, No.  We might end up having to decide and

24 maybe force -- maybe charge and whatever.  So, she elected

25 not to go, not suggesting that she's a flight risk but

31

1   someone who's willing to stay and fight these charges

2   because I believe the search warrants were executed over a

3   year ago.  Yet she stood here and stayed in the country.

4           She recently moved to Georgia.  She does travel in

5   connection with her -- with her nonprofit activities and her

6   consulting or employment activities with Done, but she's not

7   evidence of someone moving to just pack up and run because,

8   for all the warnings and -- and advice that she may have

9   gotten from a lot of people about take the money and run,

10  that's not what she did.  And she was coming here to meet

11  Ms. Chou this evening for a meeting with her lawyer here in

12  California is my understanding in talking to Ms. Chou today,

13  who's en route coming from -- from Chicago back to meet Ms.

14  He.

15          So, you know, you're getting this kind of thing,

16  your Honor, today.  It's a tough decision.  If the Court is

17  inclined to follow any of these recommendations as opposed

18  to hearing a proposed bail package, we would request that

19  the hearing be put over so that Ms. Chou has some time to

20  present a more robust presentation to -- in response to the

21  Government's allegations, which is what they are.

22          And on the issue of flight and danger and all

23  these sort of presumptions that the Government clearly and

24  rightly can put forward to you, I think you have the record

25  of this woman who's got a Green Card.  She intends to stay

32

1 in this country and live and promote and advance the work

2 that she's done.  Maybe she's the poster child for this

3 particular charge because the Government wants to make an

4 example out of somebody.  I understand the Attorney General

5 issued a statement about this case today, and the Department

6 of Justice has a penchant sometimes of doing that sort of

7 thing to try to make a statement as is their want and their

8 -- their mandate, but I have before you here a 32-year-old

9 live human being, woman, who has pursued a passion.  She's

10 not -- I didn't see any records of hundreds of millions of

11 dollars being wired offshore here to feather her nest.  I

12 have a woman who's got some investments at Charles Schwab

13 and some property she shares with another person in Georgia

14 and which we will -- that and some friends who are willing

15 to post property and put together I think a significant bail

16 package to secure her future appearances.

17            But if the Court is inclined to believe that we

18 need to present more, then I would ask for a continuance for

19 a few more days to -- so that --

20            THE COURT:  Yeah.  I -- I think that the --

21            MR. SUN:  -- something additional can be

22 presented.

23            THE COURT:  Right.  I think that the Government

24 has presented a lot today.  You know, I -- my main question

25 was whether the Done platform is still operating, and the

33

1 answer from the Government is yes.  But I think in terms of

2 the risk of flight in particular -- I think the risk of

3 danger we've covered today, but in terms of the risk of

4 flight, so, the Court has several concerns.  One is that

5 there seems to be no stable residence and certainly not in

6 the Defendant's name.  She seems to have changed her

7 lifestyle such that she lives in places under someone else's

8 name, has a phone under someone else's name, has accounts

9 under someone else's name.  And you heard in response to my

10 question, has transferred at least in the hundreds of

11 thousands out of the country, and -- and attempted to leave

12 but was stopped.  And, so, that -- this to me is -- is the

13 biggest problem.  There doesn't seem to be any way to really

14 keep track of where she is.

15      And the other problem is, in terms of the bail

16 package, what's before the Court is -- seems to be someone

17 who -- who works for her and describes the Defendant as her

18 boss.

19      First of all, the issues with this company are

20 quite problematic.  But, secondly, an employee who is

21 actually, you know, being supervised by this person, it

22 doesn't seem to me that the proffered bail package, at least

23 as described in the Pretrial Report, is sufficient.  And I'm

24 not -- I don't feel as though this particular person would

25 be a viable surety, at least not standing alone.

34

1        MR. SUN:  And -- and, your Honor, I fully
2 recognize that.  We had made an effort today, me and my
3 colleague, Mr. Scandroli, and Pretrial, to reach out to a
4 number of names and contacts of -- that the client and
5 others have provided to us.  There will be multiple people
6 who have been offered as their assistance or support to the
7 client.
8        Excuse me one second, your Honor.
9     (Pause.)
10       MR. SUN:  And, so, that's why we may need a little
11 more time to present a more clearer package to the Court,
12 because we have multiple persons that we have been in
13 contact with.  Even as we were beginning to start the
14 hearing, we were receiving information of people willing to
15 commit their support both by way of financial resources,
16 signing third party affidavits of surety to vouch for Ms.
17 He.
18        So, that's the problem we have practically this
19 afternoon, your Honor, is mobilizing these folks who are
20 around the country, many of whom are in Northern California,
21 as well as on the east coast, that we have communicated
22 with, and that's been a logistical issue for us.  But I can
23 represent to the Court, whether it was a $250,000 or
24 $500,000 or whatever appearance bond that we could execute
25 with third party sureties, we can -- we believe that there

35

1 can be a very robust package put together, put together by

2 people in the community who have come to know our client and

3 come to know and trust and do not believe her to be a flight

4 risk, certainly back to China, where we often hear the

5 Government throw the China thing in there, but her passport,

6 as you may know from the Pretrial Report, was surrendered to

7 Ms. Chou over a year ago, her Chinese passport.  She does

8 not have a U.S. passport.  She's not going anywhere.  She's

9 got nowhere to go except to be with her friends here in the

10 United States and her -- and her newfound sort of family,

11 because her grandparents have died.  The Government blocked

12 her ability to go back, and -- and it was -- I believe, your

13 Honor, this attempt to leave, it was they contacted the

14 Government, counsel did, and the Government suggested that

15 that would force them to make a decision, and because of

16 that, she decided not to go back and was unable to appear at

17 her grandparents' funeral, which is in Chinese culture a big

18 thing.

19          So, if the Court is still inclined that you need

20 more, then we will ask for a short continuance, whatever is

21 permitted under the law here, and -- and ask to be heard

22 again on this issue.

23          THE COURT:  Right.  So, the options would be for

24 me to make a ruling today or if you request a continuance,

25 that -- that is fine with the Court.  I can grant up to five

36

1  days.  So, let me take a look at our --

2      (Pause to confer with clerk.)

3          MR. SUN:  And, by the way, your Honor, just for

4  the record, I believe my client would say that she was --

5  you made a comment about her sort of transient business

6  lifestyle where she travels to New York and San Francisco.

7  It's mainly San Francisco area, and there's a residence

8  there, 450 Folsom Street, where she would be staying if

9  released out on bail.  We can say that because that's where

10 she probably intended to split her time anyways.  I think

11 the condominium she has in Georgia she co-owns with a

12 friend, but a lot of what she does is in the Bay Area, and

13 that's where she would reside if released on bail.

14          THE COURT:  All right.  So, in terms of looking at

15 a continuance, what -- what day would you request?

16          MR. SUN:  Well, your Honor, I guess the law says

17 we get up to five days, court days, but I think --

18          THE COURT:  Yeah, court days, and keep in mind so

19 the 19th is a Federal holiday.  So, we have -- it sounds

20 like tomorrow would be too soon anyway.

21          MR. SUN:  Right.  I think the 18th, your Honor, if

22 that's okay with the Government.  That's a Tuesday I

23 believe.

24          THE COURT:  I have the wrong date here.  Hold on.

25      (Pause to confer with clerk.)

37

1          THE COURT:  All right.  So, what we could do -- I
2   have a settlement conference in the afternoon.  Could we do
3   this -- set this on the 18th at 10:00 a.m.?
4          MR. FOSTER:  Yes, your Honor.
5      (Pause.)
6          MR. SUN:  Yes, your Honor.
7          THE COURT:  All right.  So, June 18 at 10:00 a.m.
8          MR. SUN:  Yes, your Honor.  And I'll be in contact
9   with Ms. Chou, and if she feels like there's some adjustment
10  in the schedule that -- that can be agreed upon with the
11  Government I'm sure she'll communicate with Mr. Foster and
12  his colleagues and work something out.
13         And we have an issue of -- a couple of things.
14  One is this is a case out of the Northern District, and
15  query when the removal type stuff will begin and whether
16  those proceedings will be continued down here and when the
17  Defendant would be moved, those kinds of things.  I'm not
18  quite sure what the logistics are with that and the Marshals
19  Service.
20         THE COURT:  Right.  Well --
21         MR. SUN:  Government may or may not --
22         THE COURT:  -- now that we are -- I'm sorry.  Let
23  me put this away.  We can now start talking about the waiver
24  of rights issues.  But, yeah, I don't think that anything
25  would happen in terms of transfer between now and Tuesday.

38

 1  I would be -- I don't control the transfer of a person to

 2  the charging district, but, you know, we're not looking at a

 3  lot of time.  So, it seems to me if you want to go with June

 4  18, and then if there's a change, you know, as I said, the

 5  19th is a holiday, but if you wanted to move it up, we

 6  could, I believe, be available on Monday, the 17th.

 7          MR. SUN:  Very well, your Honor.  May I have one

 8  moment, please?

 9          THE COURT:  Sure.

10      (Pause.)

11          MR. SUN:  Your Honor, I'm sorry.  Thank you for

12  your indulgence.  I was trying to explain to the client the

13  vagaries of how the U.S. Marshals Service moves people

14  around and how quickly they do or don't and how it's not

15  within our control and try and explain whether or not she

16  should have review here or perhaps in the Northern District.

17  My understanding is Judge Breyer might have drawn this case

18  up there I think.

19          THE COURT:  Yes.

20          MR. SUN:  And, so, I just have to talk to Ms. Chou

21  about that.  So, I think Ms. Chou will be in touch with the

22  Government to figure out whatever, and maybe they'll

23  stipulate.  But in the meantime, why don't we set it for

24  Tuesday, the 18th, if we can --

25          THE COURT:  All right.  So, June --

39

1      MR. SUN:  -- in the meantime, and then --

2      THE COURT:  -- 18.  Bail and detention hearing is

3 continued to Tuesday, June 18 at 10:00 a.m.  Now, I am not

4 on duty that day.  So, it will be not in this courtroom.  It

5 will be in my courtroom, which is Courtroom 550 in this

6 building.

7      MR. SUN:  Very well, your Honor.

8      THE COURT:  Okay.

9      MR. SUN:  And, again, as I said, it may or may not

10 go forward depending on what Ms. Chou and Mr. Foster discuss

11 and whether they think it should stay down here or be

12 reviewed up -- up north since this is an out-of-district

13 case.

14      THE COURT:  Right.  You can keep us posted

15 obviously.  The one other possibility, I -- I will be on

16 duty again tomorrow.  I just am concerned that it may be too

17 soon for everyone.

18      MR. SUN:  My client is very anxious to want to do

19 it tomorrow, but I don't -- I can't speak for Ms. Chou, and

20 I'm hesitant to say tomorrow.

21      THE COURT:  Exactly.  I -- I -- I think you need

22 -- as I said, the -- the package that's in the Pretrial

23 Services Report that's described by the employee who would

24 sign a bond, that's not going to be sufficient for the

25 Court.  I mean, if that's what we are looking at today,

40

1  then, you know, you can see where I'm headed.

2          MR. SUN:  I got it.

3          THE COURT:  So -- so, if we have a continued

4  hearing, it may give you time to submit something different.

5  And, so, I would say let's keep the June 18 at 10:00 a.m.

6  time.  If you -- for example, if you speak with Ms. Chou and

7  she decides that she wants to move up that date, then please

8  let us know.  Now, tomorrow would probably be too soon for

9  us to try -- to try to do that.  But certainly Monday is

10 available.  So, if someone can --

11         MR. SUN:  All right.

12         THE COURT:  -- let us know tomorrow.  Again, we

13 need to -- we need to have some advance notice, but if --

14 so, if someone wants to schedule something on Monday, let us

15 know tomorrow so that we can let the Marshals know and

16 change that to -- to Monday.  Otherwise, we'll just set this

17 now, because we do need to have a date and time.

18         MR. SUN:  Sure.

19         THE COURT:  Can't leave this open.  So, bail and

20 detention hearing is continued to June 18, 2024 at 10:00

21 a.m. in Courtroom 550 in this building, and we will address

22 the further bail and detention issues at that point in time.

23         So, now, in terms of the victim notification, I

24 don't know.  Are there any issues?  Have you tried to make

25 notification?

1        MR. FOSTER:  So, your Honor, the Center for

2  Disease Control put out an alert today related to potential

3  disruption in medical care.  The Government has also put up

4  a victim notification website, and we would intend to

5  proceed in the Northern District of California with

6  publication by alternate notice for other impacted parties,

7  which would be the -- the patients of the Done platform.

8  And, so, that's how the government would intend to proceed.

9        THE COURT:  All right.  And, so, if -- if it comes

10 to your attention that any victim intends to appear on June

11 18, please let my clerk know.

12        MR. FOSTER:  We will.  Thank you.

13        THE COURT:  All right.  Okay.  Let me put the Due

14 Process Protections Act order on the record.

15        Pursuant to the Due Process Protections Act, the

16 prosecutor is ordered to comply with his or her obligation

17 to produce exculpatory evidence under Brady v. Maryland, 373

18 U.S. 83, 1963, and its progeny and is reminded of the

19 possible consequences of violating that law and this order,

20 including exclusion of evidence, adverse jury instructions,

21 dismissal of all or some charges with or without prejudice,

22 contempt and sanctions.

23        Now, just so that you know, when we're talking

24 about future proceedings, based on the information provided

25 by the Government, it appears that the initial -- or the

42

next proceeding before Judge Breyer would be on July 4,
2024.  So, I'll put that on the record that the proceeding
is July 24, 2024 at 1:00 p.m.

And, so, now we need to address the out-of-
district issues.  So --

(Pause to confer with clerk.)

THE COURT:  No, I think we can address that now
because I may as well take care of that now.

All right.  So, Ms. He, you have the right -- as
we were talking about the Advisement of Rights Form a long
time ago, you have the right to arrival of process, and you
have the right to have an identity hearing if you dispute
that you are the person named in the indictment.  Have you
talked with your lawyers about your rights to arrival of
process and an identity hearing and the consequences of
waiving those rights?

THE DEFENDANT:  Yes.

THE COURT:  And is it your desire to waive your
right to arrival of process and an identity hearing?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Did you sign the waiver of
rights form?  Is that your signature on the form?

THE DEFENDANT:  Yes.

THE COURT:  And then, Mr. Sun, is that your
signature for defense counsel?

43

1        MR. SUN:  Yes, your Honor.

2        THE COURT:  All right.  Thank you.

3        So, the Court finds that the waiver of arrival of

4 process and an identity hearing is knowing, intelligent, and

5 voluntary.  And, as stated on the form, the charging

6 document is an indictment.  So, you do not have a right to a

7 preliminary hearing.

8    (Pause.)

9        THE COURT:  All right.  Is there anything further

10 in this matter?

11        MR. FOSTER:  Not from the Government, your Honor.

12        MR. SUN:  No, your Honor.  Thank you.

13        THE COURT:  All right.  Thank you.

14        ALL:  Thank you, your Honor.

15    (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25

44

1          I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Jordan Keilty                    6/19/2024
  Transcriber                         Date

6

  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8
  /s/L.L. Francisco
9 L.L. Francisco, President
  Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 14
# Detention Hrg. Tr. 6/18/24

1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,      ) Case No. 2:24-MJ-03534-DUTY
                                  )
5            Plaintiff,           ) Los Angeles, California
                                  )
6  vs.                           ) Tuesday, June 18, 2024
                                  )
7  RUTHIA HE,                    ) (10:13 a.m. to 10:35 a.m.)
                                  ) (10:36 a.m. to 10:41 a.m.)
8            Defendant.          )
   _____)

9

10

11         TRANSCRIPT OF CONTINUED DETENTION HEARING
        BEFORE THE HONORABLE ALICIA G. ROSENBERG
12            UNITED STATES MAGISTRATE JUDGE

13

   Appearances:                  See next page.
14

   Court Reporter:               Recorded; CourtSmart
15

   Courtroom Deputy:             K. Lozada
16

   Transcribed by:               Jordan Keilty
17                                Echo Reporting, Inc.
                                  9711 Cactus Street, Suite B
18                                Lakeside, California 92040
                                  (858) 453-7590
19

20

21

22

23

24

   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

1 | APPEARANCES:

2 | For the Plaintiff:                JACOB N. FOSTER, ESQ.
                                     SANDOR CALLAHAN, ESQ.
3 |                                  Assistant United States
                                        Attorney
4 |                                  Office of the United States
                                        Attorney
5 |                                  312 North Spring Street
                                     12th Floor
6 |                                  Los Angeles, California 90012
                                     (213) 894-2434
7 |

8 | For the Defendant:               VICKI CHOU, ESQ.
                                     Hueston Henningan, LLP
                                     523 West 6th Street
9 |                                  Suite 400
                                     Los Angeles, California 90014
10 |                                 (213) 270-9056

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

3

1    Los Angeles, California; Tuesday, June 18, 2024 10:13 a.m.

2                          --o0o--

3                      (Call to Order)

4         THE CLERK:  Calling Case Number MJ-24-03534,

5    United States of America versus Ruthia He.

6         Starting with the Government, would counsel please

7    state your appearances for the record.

8         MR. FOSTER:  Good morning, your Honor.  Jacob

9    Foster and Sandor Callahan on behalf of the United States.

10        MS. CHOU:  Good morning, your Honor.  I'm Vicki

11   Chou making a special appearance for Ms. He in these out-of-

12   district proceedings.  Ms. He is present.

13        THE COURT:  All right.  Thank you.

14        Okay.  So, we're here for the continued bail and

15   detention hearing from last time.  And, as I understand from

16   my clerk, the defense counsel has kind of a proposal to

17   make.  So, if you -- you have the floor.

18        MS. CHOU:  Yes, your Honor.  Thank you.

19        So, Ms. He has been in the United States for --

20   for over a decade.  She's an entrepreneur.  She's never

21   written a prescription.  But, all of that said, we would

22   like to waive our appearance here and have her make her

23   arguments before the Magistrate Judge in the Northern

24   District of California where her mother can be present and

25   others in the community can be there to support her.

4

1        So, her intent and desire would be to waive these
2  proceedings and proceed before the Magistrate Judge in the
3  Northern District, but I understand that the Government has
4  an opposition to that.  And, so, of course, she does not
5  want to forego any argument and the opportunity to present a
6  bond.  And, so, if she can't proceed there, then we will
7  make a presentation here.  But, otherwise, her preference
8  would be to go to the Northern District.
9        THE COURT:  So, let me hear from the Government
10  what the Government's position is.
11        MR. SUN:  Yes, your Honor.  We just think it's
12  important for the record to be clear about the proceedings
13  that occurred in this District, and we consulted both with
14  the Fraud Section Appellate Chief and with Mr. Alden, the
15  U.S. Attorney Office Chief in the District.  And whatever
16  procedural consequences it has for down the road in the
17  Northern District, I think that can be hashed out there.
18  We've advised the Defense our view of what those procedural
19  consequences would be.  But for the purposes of today's
20  hearing, we think it's important to follow the procedure
21  within Rule 53142.  And, as the Court indicated, this is a
22  continuation of a detention hearing that occurred and
23  started last Thursday.  And, so, since a detention hearing
24  occurred and the Court heard a proffer and evidence was
25  submitted and arguments were made on both sides, the Defense

5

1  obviously can't waive a hearing that already occurred and
2  commenced.  And, under Rule 5, you know, the Defendant was
3  required to be brought before a Magistrate Judge, and she
4  was, and the hearing was required to occur before a
5  Magistrate Judge in the arresting district barring limited
6  exceptions, and it did.  And under 3142(a), the judicial
7  officer, yourself, shall order detention or release.  And,
8  so, that's a mandatory clause.  There isn't discretion once
9  a detention hearing has commenced.  And, as <u>Black's Law</u>
10 defines the word "hearing", a hearing is the presentation of
11 evidence or argument by lawyers to a court, and that's what
12 occurred.  You know, last Thursday we met and conferred with
13 defense counsel over the course of the day, and repeated
14 topic of conversation was whether they intended to proceed
15 in this District and whether they intended to proceed that
16 day.  And defense counsel informed the Government that they
17 did.  And then we appeared before your Honor, and the
18 Government filed its notice of detention.  The Government
19 did not seek a continuance.  Your Honor asked defense
20 counsel if they wished to proceed that day with the
21 detention hearing, and defense counsel said, yes, they did.
22 The Government introduced 12 exhibits and proffered
23 evidence.  Defense counsel made an argument in support of a
24 bail package for release, and the Court indicated that it
25 was inclined to detain the Defendant based upon the proffer

6

and what had been presented and the package that had been

proposed.  And defense counsel asked for additional time

potentially to submit a different package before your Honor

today.

So, with that hearing already having taken place,

the Government submits it would not be an appropriate

procedure for the Defendant to -- to waive something that

already occurred.  That's just not possible.  And it would

also raise serious constitutional concerns if the Court

didn't enter a detention or release order with the hearing

having commenced.

THE COURT:  So, one possibility, though, is that

-- because the idea is to -- the Defendant wants the

opportunity to present a different package than what was

presented to the Court at the last hearing.  So, one

possibility then is for the Court to enter a detention order

without prejudice to a bail and detention hearing in the

Northern District of California.

So, doesn't that solve the problem of -- I mean, I

understand your point that -- that the Court needs to enter

some kind of an order before transferring the Defendant if

she's going to remain in custody, before transferring the

Defendant to the prosecuting district.  But doesn't that

solve the problem?  I see -- do you want to weigh in first,

and then I'll go to defense counsel?

7

1          MR. SUN:  Sure.  I think the Court is required to
2    make the findings under the statute, and, of course, as this
3    Court knows, that any review of a detention procedure would
4    be de novo in the Northern District of California, and there
5    is I think a question or at least defense counsel has raised
6    a question of whether they can present that package before a
7    Magistrate Judge in the Northern District of California.
8    And the Government wanted to apprise them just of its view,
9    in fairness, that it could not, and there's case law on
10   point with this that holds -- and, you know, there's a case
11   in the Northern District of California, U.S. v. Abiwawa
12   (phonetic) this year, which is 2024 U.S. District Lexis
13   81888:
14               "Multiple courts have held that
15               when a detention hearing is held in the
16               arresting district, a Magistrate Judge
17               in the charging district cannot, upon
18               the Defendant's transfer, hold a new
19               detention hearing or reopen the
20               detention hearing held in the arresting
21               district."
22          So, the appropriate procedure is, to the extent
23   that the Defendant has a new package, they could present it
24   to your Honor or proceedings could continue before Judge
25   Breyer in the Northern District of California, which is what

8

1  we had discussed with defense counsel last Thursday, or
2  defense counsel may make arguments about why they're
3  entitled to proceed, you know, differently or whether they
4  think that decision is wrongly decided or any of those
5  things.  But, ultimately, we think that's a question for the
6  Northern District of California.  In fairness, we wanted to
7  apprise defense counsel of our view that there may be
8  consequences of having a detention hearing in this District.
9  But for the Court, the Government submits that the important
10  thing is that the hearing commenced, and, therefore, the
11  Court is obligated to issue a ruling under the appropriate
12  factors and, of course, you know, with the de novo review
13  standard, Judge Breyer or if they are able to convince a
14  different judge to review that, it obviously wouldn't be
15  binding on them, although it may not be persuasive or it may
16  be persuasive, but the important thing here is a hearing
17  occurred.  There's a package before your Honor, and the
18  Government submits that the statute requires that there be a
19  detention or release order expressing the Court's view of
20  the relevant factors under the statute.
21          THE COURT:  All right.  Thank you.
22          Let me hear from Defense Counsel.
23          MS. CHOU:  Yes, your Honor.  So, I -- I -- the
24  question I think under the statute is not whether or not a
25  detention hearing has been held but whether or not there's

9

been a pretrial order of detention, and that's clear by

looking at 3142(f) which talks about how during a

continuance, such person shall be detained or the person may

be detained pending completion of the hearing.

So, I think that that's what the Court has done up

until this date, and that's what we would ask be the

continued status of Ms. He's detention was that she's

detained pending completion of this hearing.

We are --

THE COURT:  I'm sorry.  Can you give me the

subsection that you were just reading?

MS. CHOU:  Under 3142(f), and it's -- there's like

that --

THE COURT:  Thank you.

MS. CHOU:  -- big block of text.

THE COURT:  Yes.

MS. CHOU:  And, so, sort of -- it says:

"During the continuance such person

shall be detained."

And then later on there's further language:

"The person may be detained pending

completion of the hearing."

And we are familiar with the Abiwawa case, and I

-- that case supports our reading of the statute because

what that case talks about is that the reason why there

1 should only be one detention hearing is because the orders

2 could conflict.

3          And, so, here, because there has not been yet a

4 pretrial detention order issued, there is no order to

5 conflict, and the hearing is still open.  We're still in --

6 under 3142(f), the continuance part of the statute and

7 potential detention.

8          And I have a case from the Eastern District which

9 is more no point, and that's Larker, 2022 Westlaw 1570543.

10 And there, there was a question about whether or not a Local

11 Rule governing procedures for reopening a detention hearing

12 applied because under 3142(f), there's also a procedure to

13 reopen detention hearings, which I'm sure the Court is

14 familiar with.  And in Larker, in a very similar situation,

15 a detention hearing was opened in the arresting district but

16 continued until after transport to the charging district,

17 which is exactly what we're asking for here.

18          And in Larker, the Court reasoned that there can

19 be no reopening of a hearing that was never concluded and

20 that until that detention hearing was concluded and an order

21 was issued, it was still proper to proceed before the

22 Magistrate Judge.

23          And it makes sense because under 3145, which

24 governs review of orders of detention or bail, there -- as

25 with any appellate process, the Court is just looking at the

1 record that was presented to them.  So, if our record, which

2 is the additional bond package, additional arguments, hasn't

3 been presented to a Magistrate Judge, I don't -- and I think

4 this is similar to what <u>Larker</u> was looking at, it's not yet

5 ripe to go before the District Judge.

6         But to Mr. Foster's point, this is obviously not

7 -- the Court can only make a decision on what is before it

8 and issue an order.  And, so, our request would be that the

9 order not be a pretrial order of detention but just the

10 continued detention given the continuance until she's back

11 up in -- back up in the Northern District.

12         THE COURT:  The only problem is that this area

13 that you mentioned, 3142(f), the reason I wanted to relook

14 at it is my recollection was that the continuance may not

15 exceed five days.  And the problem is if we do the transfer,

16 the continuance will definitely exceed five days.

17         So, I'm not sure that we can do what you are

18 suggesting.  I -- I think with the reopening it's -- it's a

19 bit easier, but I'm just continuing to see if there's any --

20 any other leeway that I would have under this --

21         MS. CHOU:  Your Honor, if I may, it does say

22 except for good cause, and the good cause here is that the

23 transfer is the result of the Marshals having to go through

24 the procedure.  It is not a result of delay by the parties

25 or -- by the parties.

12

1        (Pause.)

2            THE COURT:  And I just wanted to clarify one

3   thing.  You're saying that the proposed sureties are located

4   in the -- or at least one or more of them are located in the

5   Northern District?

6            MS. CHOU:  Some of them are -- at least I think

7   two are and also Ms. He's mother is flying from China to the

8   Northern District so that she can rent a place for them to

9   live, and she would help guarantee Ms. He's appearance by

10  being with her and making sure that she's able to do

11  everything that she needs to to live and to make her court

12  appearances.

13           THE COURT:  In other words, to create a residence?

14           MS. CHOU:  Exactly.

15           THE COURT:  All right.  So, then let me ask,

16  Government Counsel, what is your response to the argument

17  made?

18           MR. SUN:  Sure, your Honor, three points.  First,

19  as the Abiwawa court indicated, the key phrase in the

20  statute is "the judicial officer" and the article "the".  It

21  doesn't refer to "a judicial officer".  And, so, what

22  Abiwawa concluded is that the judicial officer is the

23  Magistrate Judge to whom the person is presented in the

24  arresting district, yourself.  And, so, once that person is

25  presented and once a detention hearing commences -- and here

13

1  I don't think there's any dispute that a detention hearing

2  commenced -- the judicial officer, yourself, is, therefore,

3  obligated to issue an order of either detention or release

4  after considering the factors set forth under the rule.

5           The second point would be a policy rationale, your

6  Honor.  Abiwawa indicates that the way the statute was

7  written was to prevent multiple bites at the apple and

8  inefficiencies.  So, defendants who because of fortuity

9  happen to be arrested in a different district than the

10 district of the charge have a right to elect between a

11 hearing before a Magistrate Judge in the arresting district

12 or the district of indictment.  But, because of the fortuity

13 of their location, they don't get an extra detention hearing

14 that other defendants are not able to avail themselves of.

15 And, therefore, you can see the potential deleterious

16 consequences here if a defendant can go forward with a

17 detention hearing as occurred here, listen to the Court's

18 findings or thinking on the record, and if the Court is

19 inclined to grant relief, seize on that and obtain release,

20 and if the Court, like here, is inclined to order detention,

21 as the Court indicated, then say, Oh, actually, never mind.

22 We waive our right here, and we want a second bite at the

23 apple in the arresting district, that would be problematic,

24 as the Abiwawa court indicated.  And I think there's a

25 distinction with the case that defense counsel mentions

14

1  between a continuance prior to any hearing having occurred,

2  in which case the proceeding, the singular proceeding before

3  a Magistrate, would occur in the district of indictment, and

4  what happens here where the detention hearing commenced,

5  we're in the midst and defense counsel requested a

6  continuance to submit a -- a package.

7          But I think that takes me back to where I started,

8  which is that the potential consequences of what happens

9  here ultimately are for the Northern District of California

10 to resolve, but what is important here is that with the

11 detention hearing having commenced, the Court's obligated to

12 issue an order of detention or release based upon the

13 evidence and the package presented to it and after

14 considering the factors in section 3142, and if it is an

15 order of detention, issue a -- a detention order under that

16 statute so that the Defendant can be transferred, because

17 the Rules don't provide for some sort of indefinite

18 detention while continuance type of situation.

19         MS. CHOU:  Your Honor, just very briefly on some

20 of those points.  As we've already gone through what I

21 believe the statute permits your Honor to do, and one of

22 those is allow for a temporary order or order pending

23 continuance.

24         But on the point about the two bites at the apple,

25 that's not the situation here.

15

1          THE COURT:  Right.  Yeah, I don't think that's

2   what's going on here at all.  It's just the situation

3   sometimes happens, but I haven't been involved in this kind

4   of situation before, but the situation -- the facts that you

5   may be able to present in the Northern District are

6   significantly different than what was presented to the Court

7   here.  And there are reasons for that, as  -- as I asked you

8   to explain on the record.

9          So, the -- the question is really what the Court

10  can do under these unusual circumstances.  I mean, I

11  certainly have reopened proceedings before, but that's not

12  really what is going on here.  I think that the best way

13  just to sort of put all these rules together is for me to

14  issue an order of detention based -- in other words, I'll

15  try to explain it.

16    It's an order of detention, but it is without prejudice

17  to the Defendant's ability to seek a -- kind of either a

18  continued bail and detention hearing or reopening, as the

19  case may be or an appeal if it goes directly to Judge

20  Breyer.  But I would make clear why it is without prejudice

21  and that the Defendant has not yet had an opportunity to

22  present the additional sureties, the additional situation

23  about the residence, which is something we talked about at

24  the last hearing.  All of this is going to be different in

25  the Northern District than it is here, and I think I could

16

explain that in the order, and then however the Northern

District decides to treat it, either as a continuance of the

hearing or a reopening or an appeal from, they have all

different ranges to -- to look at this.  But I can make

clear to them that the -- what you are proposing to present

there will be substantially different than the concerns that

I had at the last hearing.

So, I think what I need to know, though, and I

want to give you a chance to talk with your -- your client,

is that she needs to understand that she has the right to

have the continued bail hearing today and certainly within

five days of the initial hearing, but today we're all here,

and that she waives that five-day limit or, you know, maybe

she doesn't need to do that but she understands that she has

the -- the right to proceed today.

She elects not to proceed today.  She understands she

will remain in custody pending further proceedings in the

Northern District of California.  So, all of those things,

she needs to understand that, and -- and I will ask her to

make that clear on the record.  But I want to give you a

chance to talk this out with her.

MS. CHOU:  Thank you, your Honor.

THE COURT:  All right.  So, we'll have a short

recess.

MR. FOSTER:  Thank you, your Honor.

17

1          THE CLERK:  This court is in recess.

2      (Proceedings recessed briefly.)

3          THE CLERK:  Recalling Case Number MJ-24-03534,

4  United States of America versus Ruthia He.

5      Beginning with the Government, would counsel please

6  restate your appearances for the record.

7          MR. FOSTER:  Yes, your Honor.  Jacob Foster and

8  Sandor Callahan.

9          MS. CHOU:  Vicki Chou making a special appearance

10  for Ms. He in these out-of-district proceedings.

11          THE COURT:  All right.  Thank you.

12          So, Ms. He, I want to address you first.  Do you

13  understand that you have the right to have a continued bail

14  and detention hearing today?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And have you -- have you had a chance

17  to talk with your counsel about your right to have a

18  continued bail and detention hearing today and the

19  consequences of not doing so?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  And, after talking with your counsel,

22  is it your decision not to proceed with the continued bail

23  and detention hearing today?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  All right.  Thank you.  Do you

18

1  understand that you will remain in custody until you are

2  transferred to the Northern District of California?

3      (Pause.)

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  Okay.  So that what will end up

6  happening is that I will end -- I will end up, after the

7  conclusion of the hearing, entering an order of detention

8  without prejudice to your ability to make a proposal to the

9  -- in the Northern District.  However, it's going to be

10  treated procedurally.  That will be up to your counsel

11  there, and all I want to make sure you understand is that

12  there will be an order issued here.  I will articulate that

13  you want to present a different bail and residence package

14  in the Northern District of California.  But I want to make

15  sure you understand you will remain in custody until those

16  further proceedings in the Northern District of California.

17      (Pause.)

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  All right.  Thank you.

20          With that, I think there's nothing else for the

21  Court to do other than to enter the order that I mentioned.

22          UNIDENTIFIED SPEAKER:  Correct, your Honor.

23          THE COURT:  I think, you know, so, let me just

24  make clear that, so, I'm relying now solely on the

25  information that I had as of the original bail and detention

19

1 hearing.  And at that point, there were a couple of issues

2 as to flight risk.  One was the Defendant's citizenship in

3 China.  There were allegations that significant funds had

4 already been transferred abroad, and there were additional

5 allegations or proffers of searches made by the Defendant

6 and investigation of countries that do not have an

7 extradition treaty with the U.S.A., and then the Court also

8 had questions about where the Defendant would reside.  That

9 was also an issue.

10         And then in terms of the risk of damage, the --

11 the one issue that we had discussed before was the

12 allegation that the website at issue continues to operate

13 and that the business had been run from abroad for some

14 period of time in the past.

15         So, I'm just putting that on the record so that

16 that's the basis of the Court's findings without prejudice.

17 But I will explain the -- the issues in my order.

18         Is there anything else we need to address?  I

19 think I took the waivers last time.  So, I don't think

20 there's anything else to do for today.

21         MS. CHOU:  No.  I think just the forthwith

22 transfer.  But if I may, your Honor, just --

23         THE COURT:  Yes.

24         MS. CHOU:  -- for the record, I do -- I will have

25 additional argument on some of the points that you raised of

20

1  concern that were not presented.

2         THE COURT:  Right.  Yes, exactly, exactly.  I

3  don't know.  Do you want me to say in here that the

4  Defendant requests that a continued bail and detention

5  hearing be held in the prosecuting district?

6         MS. CHOU:  Yes, your Honor.

7         THE COURT:  Okay.

8    (Pause.)

9         THE COURT:  All right.  I think I have -- have my

10 notes.

11        All right.  Thank you everyone.

12        ALL:  Thank you, your Honor.

13        THE CLERK:  This court is in recess.

14   (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

21

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty_____   6/19/2024_____
    Transcriber                       Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
    /s/L.L. Francisco_____
9   L.L. Francisco, President
    Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 15
# Detention Order

FILED
CLERK, U.S. DISTRICT COURT

JUN 18 2024

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, )
)
                       Plaintiff, )   CASE NO. MJ-24-03534
)
               v. )
)
RUTHIA HE, )   ORDER OF DETENTION
)
)
                 Defendant. )

I.

A. (✓)   On motion of the Government in a case allegedly involving:

   1. ( )   a crime of violence.

   2. ( )   an offense with maximum sentence of life imprisonment or death.

   3. (✓)   a narcotics or controlled substance offense with maximum sentence of ten or more years .

   4. ( )   any felony - where the defendant has been convicted of two or more prior offenses described above.

   5. ( )   any felony that is not otherwise a crime of violence that involves a minor victim, or possession or use of a firearm or destructive device or any other dangerous weapon, or a failure to register under 18 U.S.C § 2250.

B. (✓)   On motion by the Government / ( ) on Court's own motion, in a case

CR-94 (06/07)                                                      

allegedly involving:

( ✓ ) On the further allegation by the Government of:

1. ( ✓ ) a serious risk that the defendant will flee.

2. ( ) a serious risk that the defendant will:

    a. ( ) obstruct or attempt to obstruct justice.

    b. ( ) threaten, injure, or intimidate a prospective witness or juror or attempt to do so.

C. The Government ( ✓ is/ ( ) is not entitled to a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of any person or the community.

II.

A. ( ✓ ) The Court finds that no condition or combination of conditions will reasonably assure:

1. ( ✓ ) the appearance of the defendant as required.

    ( ✓ ) and/or

2. ( ✓ ) the safety of any person or the community.

B. ( ✓ ) The Court finds that the defendant has not rebutted by sufficient evidence to the contrary the presumption provided by statute.

III.

The Court has considered:

A. the nature and circumstances of the offense(s) charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

B. the weight of evidence against the defendant;

C. the history and characteristics of the defendant; and

D. the nature and seriousness of the danger to any person or to the community.

---

ORDER OF DETENTION AFTER HEARING (18 U.S.C. §3142(i))

**IV.**

The Court also has considered all the evidence adduced at the hearing and the arguments and/or statements of counsel, and the Pretrial Services Report/recommendation.

**V.**

The Court bases the foregoing finding(s) on the following:

A. (✓)   As to flight risk: Citizen of China ; allegations that significant funds have already been transferred abroad ; allegations of searches and investigation of countries that do not have extradition treaty with USA ; unknown residence.

B. (✓)   As to danger: allegation that website continues to operate and business/has been run from abroad in the past

**VI.**

A. ( )   The Court finds that a serious risk exists that the defendant will:

    1. ( ) obstruct or attempt to obstruct justice.

    2. ( ) attempt to/ ( ) threaten, injure or intimidate a witness or juror.

Defendant understands she is entitled to a continued bail/detention hearing today. Defendant elects not to proceed with a continued bail hearing today and requests a continued bail hearing in the prosecuting district. Defendant understands she will remain in custody pending her transfer to the prosecuting district and further bail hearing in the prosecuting district.

In making this order, this Court relies on the proffers and argument during the original bail hearing. Defense counsel notes that Defendant intends to make a materially different bail "package" in the prosecuting district, including proposed sureties who are in that district and a proposed residence in that district with her mother. This Court expresses no view on the proposed bail "package," which is not before this Court.

AGR

1   B. The Court bases the foregoing finding(s) on the following: _____

2   _____

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9                                         VII.

10

11  A. IT IS THEREFORE ORDERED that the defendant be detained prior to trial.

12  B. IT IS FURTHER ORDERED that the defendant be committed to the *without prejudice to further proceedings in N.D. Cal.*

13      custody of the Attorney General for confinement in a corrections facility

14      separate, to the extent practicable, from persons awaiting or serving

15      sentences or being held in custody pending appeal.

16  C. IT IS FURTHER ORDERED that the defendant be afforded reasonable

17      opportunity for private consultation with counsel.

18  D. IT IS FURTHER ORDERED that, on order of a Court of the United States

19      or on request of any attorney for the Government, the person in charge of

20      the corrections facility in which the defendant is confined deliver the

21      defendant to a United States marshal for the purpose of an appearance in

22      connection with a court proceeding.

23

24

25

26  DATED: June 18, 2024

27                                  HONORABLE ALICIA G. ROSENBERG
                                    UNITED STATES MAGISTRATE JUDGE

28

---

ORDER OF DETENTION AFTER HEARING (18 U.S.C. §3142(i))

CR-94 (06/07)                                                      Page 4 of 4