# EXHIBIT 1

**S 101 Management Company, Inc.**                                    Apt. # 69

**Rental Agreement**                                              Type _A Jr. 1br_

This Residential Lease Agreement (hereinafter "Agreement" or "Lease") is entered into between _Latham Square apartments_

(hereinafter "Management") and the following individuals, jointly and severally (hereinafter collectively "Residents"):
_Rujia He_ .

1. LEASED PREMISES: Management rents to Resident(s) the premises located at _2250 Latham St., Mountain View, CA 94040_
   Apartment # _69_ , Santa Clara_____ County, California (hereinafter "the Premises"), which is located within
   the Apartment Community, commonly known as _Latham Square apartments_
   (hereinafter the "Apartment Community" or "Property") for use as a residence and for no other purpose. Pursuant to Civil Code
   Section 1962(a)(1) the current property manager is authorized to manage the premises. The telephone number and street
   address at which personal service may be effected on this person is _____ _(650) 967-0101, Fax (650) 967-0121_
   _2250 Latham Street, Mountain View, CA 94040_____. The person designated above, so
   long as he/she is employed at the property, is also the person authorized by the Owner of the Premises (hereinafter "Owner")
   to act for and on behalf of the Owner for the purpose of service of process and for the purpose of receiving and receipting for
   all notices and demands.

2. TERM:
   a. Original Term. This Lease shall be for a period of _SIX_____ months, commencing on _10-7-14_____ ,
      and ending on _4-6-15_____, unless sooner terminated as provided in this Lease.

   b. Delay of Possession. Resident(s) understand that, for reasons beyond the control of Management, Management may not be
      able to provide occupancy to Resident(s) on the commencement date if, for example, a former tenant of the Premises who
      has given notice to leave cancels the notice or fails to leave by the scheduled date. If, for any reason, Management is unable
      to provide occupancy to Resident(s) by the scheduled commencement date, Resident(s)' remedy in this event shall be limited
      to termination of this Agreement and Resident(s) shall be entitled to a prompt refund of any monies paid. Management shall
      have no liability to Resident(s) if there is a delay of possession other than to promptly refund any monies paid.

   c. Holding Over. Any holding over by Tenant(s) at the expiration of the Lease term with the consent of Management shall
      create a tenancy from month to month on the same terms and conditions set forth herein, subject to amendment
      by Management as set forth in Civil Code section 827 and terminable by either party on thirty days written notice in
      accordance with the provisions of California Civil Code section 1946.

3. TERMINATION: Should Resident wish to terminate a month to month tenancy or terminate tenancy at the expiration of a
   specified Lease term, Resident must serve Management with a 30 days prior written notice of Intent to Vacate. Said notice
   period will commence upon receipt by Management of written notice. Should Resident vacate the Premises prior to the
   expiration of said 30 days, Resident agrees that such prior vacating shall in no way relieve the Resident from Resident's
   obligation to pay rent for the entire 30 day period. The Premises shall be considered vacant when all personal property of the
   Resident has been removed from the premises and the keys returned to the Management or his agent. **Management will
   give Resident at least thirty days notice of its intent to terminate the lease and no less than that required by applicable law.**

4. RENT: Resident(s) shall pay to Management, as rent for the Premises, the sum of $ _1825.00_____ each month. The name,
   telephone number and address of the person or entity to whom rent payments shall be made is
   _Latham Square apartments, (650) 967-0101, 2250 Latham Street, Mountain View, CA 94040_____ .
   Except as otherwise provided herein, said sum shall be paid in full, in advance, on or before the first day of each month in
   the form of personal check, cashier's check, traveler's check or money order. CASH WILL NOT BE ACCEPTED. All payments
   received will be posted to the student charges first and then in the order of damages, cleaning fees, late fees, service of notice
   fees first and last rent. We may apply any payment that you make to any outstanding amount due at our sole discretion. If
   in any month the rent is paid after the fifteenth day of the month, payment must be in the form of cashier's check or money
   order. If Management serves Resident(s) with a three-day notice to pay rent or surrender possession, which Management
   may do on any date after the first day of the month, any payment tendered following service of said notice must be in the
   form of cashier's check or money order. If any check given by Resident(s) is, for any reason whatsoever, returned unpaid by
   the bank upon which drawn, all subsequent payments for the balance of Resident(s)' occupancy of the Premises (including
   the payment necessary to replace the dishonored check) must be in the form of cashier's check or money order unless
   Management agrees, in writing, to waive this requirement. It is Resident(s)' responsibility to be certain that each payment is
   actually received by Management on or before the due date. Use of a rental payment drop box is encouraged, but primarily
   is for Resident(s)' convenience - the risk of receipt of funds by Management when such box is used is Resident(s)', and not
   Management's, risk. The usual days and hours when rent payments may be made personally are
   _Mon-Fri: 10am-6pm, Sat: 10am-4pm_____ .

5. CHECK CONVERSION: Notice to Residents Making Payment by Check (via U.S. Mail or Drop Box). If you send us a check, it may
   be converted into an electronic funds transfer (EFT). This means we will copy your check and use the account information on

**Page 1 of 11**

it to electronically debit your account for the amount of the check. The debit from your account will usually occur within 24 hours, and will be shown on your regular account statement. You will not receive your original check back. We will destroy your original check, but we will keep the copy of it. If the EFT cannot be processed for technical reasons, you authorize us to process the copy in place of your original check. If the EFT cannot be completed because of insufficient funds, Management will require payment in certified funds pursuant to Paragraph 4 above.

6.   LATE CHARGE AND NSF CHARGE: Management and Resident(s) agree that the actual cost to Management when Resident(s) fail to pay rent on time, or when Resident(s) pay rent by a check which is subsequently dishonored by the bank, is difficult or impossible to ascertain, but the parties agree that Management does, in the event of late payment or in the event of a dishonored check, incur certain costs, such as additional bookkeeping and administrative charges, bank charges, lost opportunity costs of the late payment, etc. The parties accordingly agree that, any time the rent for any given month is paid after the fifth day of such month, Resident(s) will in that month pay to Management, as additional rent due with the late payment, a late charge in the sum of $4.00 per day, computed from the sixth day of the month until the rent is paid in full, total payment not to exceed $40.00 in any one month. Management and Resident(s) further agree that, in the event of a dishonored check, Resident(s) will pay to Management, as additional rent due with the payment required to replace the dishonored check, a NSF fee in the sum of $25.00. The parties agree that the payment of these sums does not constitute a license to pay rent late nor does it constitute a license to pay by dishonored check. Rent remains due on the first day of the month and there is no grace period for the payment of rent. A three-day notice to pay rent or quit may be served at any time after the first day of the month irrespective of the existence of the late charges as set forth herein. If such notice is served after the second day of the month, it may include the late charge (or NSF charge, if applicable) which charges, as set forth above, are payable as additional rent.

7.   RENTAL PRO-RATION: Resident(s) shall pay to Management, before taking occupancy of the Premises, one full month's rent in addition to a security deposit (see Paragraph #7). If Resident(s) take occupancy of the Premises on a day other than the first day of the month, Resident shall pay the prorated amount of $ 1471.77 on the first day of Nov'14 to cover rent due for the initial partial month of occupancy. A full month's rent shall be due each month thereafter on or before the first day of the month as stated in Paragraph #4 above. In the event of a conflict between the amount set forth in this paragraph and the amount which an arithmetic computation would yield based upon the rental rate set forth in Paragraph #4 above divided by the actual number of calendar days in the pro-ration month, with the result multiplied by the number of days in the pro-ration period, the amount determined by said arithmetic computation shall govern (i.e., if the amount set forth in this paragraph is computed incorrectly, any such arithmetic error shall not be binding - the amount owing shall be the amount resulting from a correct arithmetic computation of the pro-ration).

8.   SECURITY DEPOSIT: Resident(s) shall pay to Management, as security, the sum of $700.00 , which sum shall not exceed the maximum permitted by California Civil Code Section 1960.5. THIS SECURITY DEPOSIT IS NOT RENT AND MAY NOT BE DEDUCTED BY THE RESIDENT FROM ANY RENTAL PAYMENT DUE, INCLUDING THE LAST MONTH'S RENT. This sum shall be applied and accounted for in accordance with the provisions of California Civil Code § 1950.5 and any other applicable statutes. Except where required by applicable law, Management shall not be obligated to pay Resident(s) interest in connection with such security deposit. Management shall have the right to, but need not, deduct from the security deposit any amount owed by Resident(s) due to Resident(s)' failure to perform any obligation of this Agreement, including, but not limited to (a) defaults in the payment of rent, (b) to repair damages to the premises caused by Resident, exclusive of ordinary wear and tear, and (c) to clean the Premises if necessary in order to return the Premises to the same level of cleanliness it was in at the inception of the tenancy. If any portion of the security deposit is so applied, Resident(s) shall deposit with Management an amount equal to the amount deducted within five (5) days of receipt of a written demand by Management. It is understood that the security deposit is applicable to all Resident(s) jointly, and need not be accounted for until the permissible statutory period after such time as all Residents have vacated the Premises. Any refund due at such time may be made payable jointly to all Resident(s) and it shall be the responsibility of all Resident(s) to work out between themselves the manner of dividing said security deposit. If Management chooses to make the refund to any of the Resident(s) individually (which need not be done until the statutory time has elapsed after all Residents have vacated the Premises), in legal contemplation the payment shall be deemed to have been made to all Residents and Management shall have no liability to any one or group of Resident(s) for failure of any Resident(s) to equitably divide such refund. In the event of sale, lease or other transfer of property of which the Premises is a part, Management may transfer the above security deposit. Upon notifying Resident(s) by mail of the transferee's name and address, Management shall thereupon be released from any liability for the return of such security deposit.

9.   OCCUPANCY: The Premises shall be occupied only by the following persons:

| Name: Rujia He | Date of Birth: | Name: | Date of Birth: |
| Name: | Date of Birth: | Name: | Date of Birth: |
| Name: | Date of Birth: | Name: | Date of Birth: |
| Name: | Date of Birth: | Name: | Date of Birth: |

No other persons have permission to occupy the Premises unless such permission is in writing and signed by Management or its authorized agent. Management's acceptance of rent from any other individual shall be deemed to be the payment of rent on behalf of the Resident(s) named above and shall not constitute permission for the person making the payment to occupy the Premises. Should any person not named above make any claim to right of possession of the Premises any such person shall be deemed to be the guest or invitee of the named Resident(s) and their claim to right of possession shall be denied. Any person named above in this Paragraph #8 who is not also named above as a Resident and/or who is not a signatory to this Lease shall be deemed to occupy the Premises under the named Resident(s) who are signatories to this Agreement and shall thus be deemed the invitees of said named Resident(s). Accordingly, should any such individual not be named in any unlawful detainer action to regain possession of the Premises, and should any such individual thereafter make a claim to right of possession of the Premises, that claim shall be denied on the basis that said individual is the invitee of the named Resident(s) and does not have an independent claim to right of possession of the Premises.

10. UTILITIES: Payment of all utilities charges, including utility deposits shall be the responsibility of Resident(s), with the exception of __NONE__

which shall be paid by Management. With respect to the utilities charges listed above to be paid by Management, Resident(s) shall not make excessive or unreasonable use of such utilities. In the event that Resident(s) do make excessive or unreasonable use of such utilities, Management may bill Resident(s) for such excessive or unreasonable use and said billing shall become due and payable, in full, as additional rent together with the regular monthly rental payment on the first day of the month next following the date of such billing. In the event of a dispute as to any such charges, Resident(s) shall pay the disputed amount as required, but may file a Small Claims Court action for a refund and, if such Court determines that the amount charged by Management is excessive, Management shall promptly refund any such overcharge. In the event Resident(s) fail to pay any utility charges which are to be paid by Resident(s), Management may, at its option, pay such charges to retain continuing utilities service. In the event that Management does so, any such charges may be billed to Resident(s) by Management and said billing shall become due and payable, in full, as additional rent together with the regular monthly rental payment on the first day of the month next following the date of such billing.

11. PARKING: The parking areas on the Premises shall be used solely for the purpose of parking vehicles and shall not be used for any other purpose, including repairing, maintaining or washing of vehicles. Any excessive grease or oil must be cleaned up immediately at the expense of Resident(s). Any non-operating vehicle which has not been moved for thirty days is subject to being towed at Resident(s)' expenses. All vehicles parked on the premises must have current vehicle registration with the DMV. The parking of motor homes, trailers, boats and commercial vehicles is prohibited.

12. JOINT AND SEVERAL LIABILITY AND AUTHORITY: All persons signing this agreement as Resident(s) shall remain jointly and severally liable for all obligations arising hereunder, whether or not they remain in actual possession of the Premises. The giving by any individual Resident of a notice of termination of tenancy shall not terminate the Lease as to that Resident unless all Residents vacate the Premises by the agreed date. Management may, however, treat any such notice as a notice binding against all Resident(s) of the Premises, and may institute unlawful detainer proceedings against all Resident(s) in the event that they do not restore possession of the Premises to Management on or before the end of the notice period. Conversely, Management may, at its sole option, if one or more Resident(s) give notice, but all Residents do not return possession of the Premises to Management within the notice period, continue the tenancy in effect and, if Management does so, all Resident(s), including the Resident(s) giving notice, shall remain fully liable for all obligations arising hereunder whether or not they remain in occupancy of the Premises.

13. NOTICES: Any notice which Management gives to Resident(s) shall be deemed properly served (whether or not actually received by Resident(s)) if served in the manner prescribed in Code of Civil Procedure Section 1162. Except as prohibited by law, if Management fails to serve the notice in accordance with the provisions of Code of Civil Procedure section 1162, but Resident(s) actually receive the notice, the actual receipt shall be deemed to cure any defects in the manner of service and the notice shall be deemed properly and personally served. Service upon any of the Resident(s) of the Premises shall be deemed valid service upon all Resident(s) - it is not necessary to individually serve each Resident unless otherwise required by law.

14. ACCESS TO PREMISES: The parties agree that, with reasonable written notice to Resident(s), unless otherwise agreed to by Resident(s), Management shall have the right to enter the Premises during normal business hours for the purpose of (a) making desired, necessary or agreed repairs, decorations, alterations, improvements, or renovations to the Premises, an adjacent unit or for the benefit of the building in which the Premises is located; (b) supplying necessary or agreed services; (c) showing the unit to prospective residents during 30 day notice period prior to termination of tenancy, (see paragraph #3 above), to prospective or actual purchasers, mortgagees, workmen or contractors; or (d) for any other purposes permitted by California Civil Code § 1954 and any other applicable statutes or amendments which might be enacted subsequent to the execution of this Lease. The parties agree that twenty-four (24) hours written notice shall be presumed reasonable, although the parties agree that a shorter notice period may be reasonable under the circumstances. In the case of an emergency, or Resident(s)' abandonment or surrender of the Premises, Management or its agent may enter the Premises at any time without notice and without first securing Resident's prior permission. Resident(s) agree to permit Management access to the Premises in accordance with this Paragraph. Resident(s) agree that, should they deny Management access to the Premises when Management is in compliance with statutory requirements and entitled to access, any such denial of access shall be deemed a material and incurable breach of this Lease and shall entitle Management to serve Resident(s) with a three-day notice terminating the tenancy.

15. MISSTATEMENTS ON APPLICATION: Resident(s) have completed an application in connection with securing this Lease. Management has relied upon the statements set forth in said application in deciding to rent the Premises to Resident(s). It is agreed that, should Management subsequently discover any misstatements of fact in the Resident(s)' application, any such misstatements shall be deemed a material and incurable breach of this Lease and shall entitle Management to serve Resident(s) with a three-day notice terminating the tenancy.

16. USE OF PREMISES: Resident(s) agree that the Premises are rented for residential use only. Except as required by applicable law, Resident(s) shall not use the Premises as a business address, nor shall Resident(s) conduct any business activities on the Premises. Conducting business activities includes, without limitation, using the Premises as a mailing address for a business enterprise, having a business telephone line in the Premises, having business clients meet with Resident(s) at the Premises, having business stationery setting forth the address of the Premises as a business address, assembling or manufacturing any product upon the Premises, or otherwise holding out the Premises as the address of any business. Resident(s) additionally agree not to permit the Premises to be used for any illegal purpose, nor to engage in any illegal acts upon the Premises or upon the grounds of the apartment complex. Resident(s) agree not to have any illegal narcotics in the Premises or on the grounds of the apartment complex. Resident(s) further agree not to harass, annoy or endanger any other Resident of the Apartment Community or their guests or create any nuisance in the Apartment Community. Resident(s) also agree not to do or permit anything to be done in the Premises that may be deemed hazardous or which will cause a cancellation of or an increase in the premiums for any insurance for the Apartment Community. Resident(s) additionally agree not to deface or damage any part of the Premises or the Apartment Community or permit the same to be done or keep any flammable or explosive materials or any substance considered dangerous, hazardous or toxic under any governmental law or regulation in the Premises. Any violation of this provision shall be deemed a material and incurable breach of this Lease and shall entitle Management to serve Resident(s) with a three-day notice terminating the tenancy. Nothing set forth herein shall be deemed as disallowing any use of the premises that cannot legally be prohibited.

17. ASSIGNMENT AND SUBLETTING: Resident(s) shall not assign this Lease nor sublet all or any part of the leased Premises. Permitting any person not named as an occupant or as a resident in this Lease to occupy the leased Premises shall be deemed an improper subletting of the leased Premises and shall subject the tenancy to termination. Any attempted subletting or assignment in violation of this provision shall be void.

18. MILITARY TRANSFER: If Resident(s) is or becomes a member of the Armed Forces on extended active duty, a member of the State National Guard serving on full-time duty, or a civil service technician with a National Guard unit, and receive change-of-duty orders to depart from the local area for longer than ninety (90) days, or are relieved from such duty, Resident(s) may terminate this Lease by giving thirty (30) days prior written notice to Landlord, provided you are not otherwise in default. As condition to such termination, you will furnish us with a certified copy of the official orders which warrant termination of this Lease. Military orders authorizing base housing in the local area in which the Premises is located do not constitute change-of-duty hereunder.

19. CONDITION OF PREMISES-ALTERATIONS: Resident either has examined the Premises, or will examine the Premises immediately upon taking possession of the Premises, and all equipment and furnishings thereon, and accepts them as being in good order, condition and repair except as noted on the Move-in Inspection form to be completed by Resident prior to or at move-in. If Resident fails to return the Move-in Inspection form within twenty-four (24) hours of move-in, the parties will presume that the Premises and all equipment and furnishings thereon are in good order, condition and repair. Resident waives all rights to make repairs at the expense of the Management, except as provided by law. Resident agrees to keep the Premises in good order and condition and to pay Management promptly for any costs to repair, replace or rebuild any portion of the Premises damaged by the negligence or misuse of Resident(s) or guests. Resident(s) shall make no alteration or improvements to the Premises, inside or out, or do any painting or redecoration without the prior written consent of Management. Should Resident(s) damage or depreciate the Premises or make alterations or improvements, or do painting or decorating without written consent of Management, then all costs necessary to restore the Premises to its prior condition shall be borne by Resident(s). Resident may not make any alterations to cable or telephone inside wiring (such as may occur when changing telecommunications providers or adding cable or phone lines and jacks) without prior written notification and written consent of the Management. The notice shall include the name, address and telephone number of any new telecommunication provider and/or installer. Resident agrees to pay all costs resulting from the alteration and agrees to pay to the Management any costs associated with restoring the inside wiring to the condition at the time of move-in, except for reasonable wear and tear.

20. DUTY TO CLEAN AND VENTILATE: Resident(s) hereby acknowledge that mold and mildew can grow in the Premises if the Premises is not properly maintained and ventilated. Resident(s) acknowledge that it is important that Resident(s) regularly allow air to circulate in the apartment. Resident(s) agree to regularly allow air to circulate in the Premises by using bathroom fan(s), using ceiling fans, where available, and regularly opening the windows and/or sliding doors where available. Since it is common for mold and mildew to grow if even a small amount of moisture builds up, Resident(s) also agree to clean all toilets, sinks, counter-tops, showers, bathtubs and tile or linoleum floors with a household cleaner on at least a bi-weekly basis. Resident agrees not to block or cover any of the heating , ventilation or air-conditioning ducts in the Premises.  Please refer to the Tips on Preventing Mold provided by Management for further information on how to clean and ventilate to avoid mold problems. Resident agrees to immediately report in writing to the management office (i) any evidence of water leak or excessive moisture in the Premises as well as in any storage room, garage or other common area; (ii) any evidence of mold- or mildew-like growth that cannot be removed by simply applying a common household cleaner and wiping the area;(iii) any failure or malfunction in the heating, ventilation, air conditioning systems or laundry systems in the apartment; and (iv) any inoperable doors or windows. Any failure to comply with the requirements of this Paragraph shall be deemed a material breach of this Lease and resident shall be responsible for damage to the Premises and Resident's property as well as injury to the Resident and Occupants resulting from Resident's failure to comply with the terms of this Paragraph. We see a significant reduction in mold/moisture problems when the bathroom exhaust fan is used consistently and in good working condition. It is important to know that because these new fans move air around so efficiently, they collect dust rapidly. This dust build up could eventually render the fan ineffective and will diminish the life of the fan. *So, regular cleaning of the cover AND the fan is necessary to prolong the life and efficiency.* If you are unable to clean the cover and the fan properly, please let management know and we will clean it for you. Failure to clean and/or report dust build up or maintenance issues with the fan could be considered damage to the premises and resident will be charged accordingly.

21. PACKAGE RELEASE: Resident(s) give Management and it's agents permission to sign and accept any parcels or letters that may be sent to Resident(s), whether anticipated or unanticipated, through UPS, Federal Express, Airborne, United States Postal Service, hand deliveries, or the like.  Management does not accept any responsibility or liability for any lost, damaged, or unordered deliveries and Resident(s) agree to hold Management and Management's agents harmless from any loss or damage to any of Resident(s)' packages.

22. SAFETY CONCERNS:

    a. Landlord makes no representations or guarantees to Resident(s) concerning the security of the Premises or the Apartment Community. Landlord is under no obligation to Resident(s) to provide any security measure or take any action not required by statute. The presence of courtesy patrols, patrol cars, access gates, surveillance cameras or other deterrents do not guarantee that crime can or will be prevented. All such systems are subject to personnel absenteeism, human error, mechanical malfunctions and tampering. Resident(s) are responsible for planning and taking action with respect to the safety of Resident(s) and their property as if such systems and deterrents did not exist.

    b. · Landlord has no obligation to obtain criminal background checks on any Resident(s) and bears no responsibility or liability related to the criminal background or actions (whether past, present or future) of any person, even if Landlord has actually run a criminal background check on applicants.  Resident(s) shall not rely on the fact that Landlord may have run a criminal background check on Resident(s) or any other applicant when deciding whether to enter into this Agreement.  Background checks are limited to the information actually reviewed and are not a guarantee that a person with a criminal background does not reside at the Apartment Community.  Landlord has not made and does not make any representations as to the background of any existing or future resident and Landlord is under no obligation to run background checks on any existing resident or future applicant.

c. Resident(s) agree to report immediately all suspected or actual criminal activity to the appropriate local law enforcement agencies and, after doing so, to Landlord, and shall provide Landlord with such law enforcement agency's incident report number upon request.

23. LIABILITY: Management shall not be liable to Resident(s) or to any guests or invitees of tenant(s) for any damage or losses to person or property arising from any cause including, but not limited to, theft, burglary, assault, vandalism, fire, flood, water leaks, rain, hail, ice, snow, smoke, lightning, wind, explosion, interruption of utilities, earthquake, or any other condition over which the Management had no control.

24. BEDBUGS. Bedbugs are wingless parasites which may lie dormant in cracks, crevices and personal belongings until a host is present. Resident(s) have inspected the Premises prior to leasing and acknowledge there is no visible evidence of the presence or infestation of insects or vermin including bedbugs in the Premises. Resident(s) agree to maintain the Premises in a manner that prevents the occurrence of an infestation of insects and vermin including bedbugs.

Resident(s) should not attempt to treat for bedbugs on their own. Any attempts to treat for bedbugs by Resident(s) will not be adequate and may contribute to the spreading of bedbugs to other units. Resident(s) shall report any problems to Landlord immediately. Specifically, Resident(s) shall: (1) **Report any signs of bed bugs immediately.** Do not wait. Even a few bugs can rapidly multiply to create a major infestation that can spread from unit to unit. (2) **Report any maintenance needs immediately.** Bed bugs like cracks, crevices, holes, and other openings. Request that all openings be sealed to prevent the movement of bed bugs from room to room.

Resident(s) shall cooperate with pest control efforts. If your unit (or a neighbor's unit) is infested with bed bugs, a pest management professional may be called in to apply pesticides. The treatment is more likely to be effective if your unit is properly prepared. Resident(s) must comply with the recommendations from the pest management professional, including but not limited to:

(1) **Removing all bedding** (bed skirts too), drapes, curtains, and small rugs; bag these for transport to the laundry or dry cleaner.
(2) **Checking mattresses carefully;** those with minimal infestation may be cleaned, encased in vinyl covers, and returned to service. Heavily infested mattresses are not salvageable; seal these in plastic and dispose of them properly.
(3) **Emptying dressers, nightstands, and closets.** Remove all items from floors and surfaces. Inspect every item for signs of bed bugs. Using sturdy plastic bags, bag all clothing, shoes, boxes, toys, stored goods, etc. Bag washable and nonwashable items separately. Take care not to tear the bags, and seal them well. Used bags must be discarded properly
(4) **Vacuuming floors,** including inside closets. Pay special attention to corners, cracks, and dark places.
(5) **Vacuuming all furniture,** including inside drawers and nightstands. Vacuum mattresses, box springs, and upholstered furniture, being sure to remove and vacuum all sides of loose cushions, as well as the undersides of furniture.
(6) **Carefully removing vacuum bags,** sealing bags in plastic, and discarding.
(7) **Cleaning all machine-washable bedding** drapes, clothing, etc. Use the hottest water the machine provides, and dry at highest heat setting. Take other items to a dry cleaner, but be sure to advise the dry cleaner that the items are infested. Discard any items that cannot be decontaminated.
(8) **Moving furniture toward the center of the room,** so that technicians can easily treat carpet edges where bed bugs congregate, as well as walls and furniture surfaces. Be sure to leave easy access to closets.

Your full cooperation is required to prevent bed bug infestations in our community. If you allow individuals or items carrying bedbugs into the apartment, have infestations that cannot be traced to another source, fail to promptly report an infestation or fail to follow managements instructions or fully cooperate with management's efforts to rid the unit of the infestation, *such will be deemed damage to the unit and Resident(s) will be responsible for the cost of treatment* to their apartment, personal belongings and surrounding units as necessary to eradicate the infestation. Resident(s) also agrees to indemnify and hold harmless the Landlord from any actions, claims, losses, damages, and expenses, including, but not limited to, attorneys' fees that the Landlord may sustain or incur as a result of the negligence of the Resident(s) or any guest or other person living in, occupying, or using the premises. Please see attached addendum for more information on how to prevent bed bug infestations in our community.

25. RENTER'S INSURANCE: Management does not provide insurance coverage for Resident(s)' personal property or automobile. Renter's Insurance is designed to provide Resident(s) with reimbursement for loss, damage or destruction of their property, as well as coverage for additional living expenses incurred should the Premises, for example, become uninhabitable as the result of a fire. Such insurance can also protect Resident(s) from any liability claims resulting from their own personal activities. For example, should Resident(s)' negligence be the cause of a fire, Resident(s) may be held responsible for the damage of the property of others, including Management's property. Resident(s) acknowledge that Management strongly recommends Resident(s) agree to obtain Renter's Insurance in an amount sufficient to cover any personal possessions of Resident(s) together with a reasonable level of liability coverage of the actions of Resident(s) or Resident(s)' guests or invitees. Resident(s) further understand and agree that Renter's insurance is required if they intend to install a satellite dish in accordance with Paragraph 40 of this Agreement.

26. SUBORDINATION: This Lease and all rights of Resident(s) arising hereunder are expressly agreed to be subject and subordinate in all respects to the lien of any present or future mortgages which are or may be placed upon the property of Management or assigns of Management and to all other rights acquired by the holder of any such mortgage(s). As used herein, the term "mortgage" shall include deeds of trust or any similar security interest.

27. SUCCESSORS IN INTEREST: If the property is sold or the ownership interest otherwise transferred, the successor in interest of Management shall be deemed the assignee of all rights arising hereunder, and shall be entitled to enforce the provisions of this Lease as against Resident(s). Nothing in this provision shall be construed as conflicting or superseding the foregoing subordination or as requiring a continuation of the tenancy in the event of a foreclosure or other involuntary transfer of ownership.

28. CONDEMNATION: If any part of the Premises or the Property shall be taken or condemned for a public or quasi public use, then this Agreement shall terminate as of the date title vests in the condemner.

29. DAMAGE TO PREMISES:

   a. If the Premises is damaged by fire, flood or other casualty, necessitating repairs which require Resident(s) to vacate the Premises for any length of time), in the sole and absolute discretion of Landlord, Landlord shall have the option either (1) to repair the damage or otherwise restore the Premises, with this Agreement continuing in full force and effect, or (2) give notice to Resident(s) at any time after such damage occurs or repairs become necessary terminating this Agreement as of a date to be specified in such notice.

   b. If Landlord elects to terminate, this Agreement shall expire and all interest of the Resident(s) in the Premises shall terminate and Landlord shall have no obligation to pay for lodging costs to Resident(s) after the termination date. Landlord shall not be required to repair any damage by fire or other cause or to make any repairs of any property installed in the Premises by Resident(s).

   c. If Landlord elects to repair the damage and/or make the significant repairs and continue this Agreement in force and effect, Resident(s) agree to vacate the Premises for the time necessary for the repairs to be completed and, if Resident(s) need to be absent for more than eight (8) hours in any twenty-four (24) hour period, relocate to alternative housing of the Landlord's choosing. Landlord shall be responsible to pay for the alternative housing; however, Resident(s) will remain responsible for all rent while Landlord is paying for the alternative accommodations. If Resident(s) elect to relocate to lodging other than that designated by Landlord, then Landlord shall have no obligation to pay the cost of such lodging, which shall be at Resident(s)' sole cost and expense; although Resident(s) shall have no obligation to pay rent during the time the Premises is not available to Resident(s) during the repairs if Landlord is not paying for the alternative lodging.

30. SIGNIFICANT REPAIRS

   a. If the Premises requires significant renovations, improvements or repairs (such as, by way of example only and not by way of any limitation, tenting for termites, treating for pests or other vermin, replacing plumbing or electrical wiring, etc.) which require Resident(s) to vacate the Premises for any length of time, Resident(s) must vacate the Premises as needed and otherwise cooperate with Landlord in its efforts to perform the work. Landlord shall give Resident(s) at least ten days written notice of the need to vacate the Premises which notice shall include Landlord's best estimation of the length of time Landlord anticipates Resident(s) will need to be absent from the Premises.

   b. Resident(s) agree to vacate the Premises for the time necessary for the work to be completed and, if Resident(s) need to be absent from the Premises for more than eight (8) hours in any twenty-four (24) hour period, relocate to alternative housing of the Landlord's choosing. Landlord shall be responsible to pay for the alternative housing; however, Resident(s) will remain responsible for all rent while Landlord is paying for alternative accommodations. If Resident(s) elect to relocate temporarily to lodging other than that designated by Landlord, then Landlord shall have no obligation to pay the cost of such housing, which shall be at Resident(s)' sole cost and expense; although Resident(s) shall have no obligation to pay rent during the time the Premises is not available to Resident(s) during the repairs if Landlord is not paying for the alternative lodging.

31. DUTY TO COOPERATE: Failure to vacate the Premises or otherwise cooperate with Landlord's efforts to conduct repairs, renovations or other improvements at the Property is a material breach of this Lease and grounds for termination of this Agreement.

32. ABANDONMENT: Resident(s) shall not vacate or abandon the Premises at any time during the term of this Agreement. Abandonment shall be conclusively presumed upon the failure of Resident(s) to respond to a notice directed to Resident(s) at the Premises within fifteen (15) days after the delivery or mailing thereof by Management. If Resident shall abandon, vacate or surrender said Premises, or be dispossessed by process of law, or otherwise, then Management shall have the right to take immediate possession of and re-enter said Premises and remove any personal property therein. Resident(s) hereby waive any and all claim for damages arising out of or relating to such entry or removal.

33. MEGAN'S LAW DATABASE: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

Since the information is equally available to Resident(s) and Landlord, and Landlord cannot discriminate against Registrants pursuant to Penal Code Section 290.46 et seq., Landlord has not made any inquiry of any applicant or resident as to whether he or she is a Registrant. Resident(s) are advised to take whatever reasonable actions Resident(s) believe necessary to protect household members or guests against any potential harm. This includes talking to any children or individuals with a diminished capacity about how to deal with strangers and similar topics. Resident(s) are advised that Landlord may not notify Resident(s) if Landlord learns or is advised that a Registrant is living in the Apartment Community. The existence of registered offenders in the Apartment Community is not grounds for breaking this Agreement.

34. CONDUCT OF RESIDENT; COMPLIANCE APARTMENT COMMUNITY RULES:

   a. Resident(s) acknowledge receipt of a copy of the Apartment Community Rules ("Rules"), which Rules are incorporated into and made a part of this Lease. Resident(s) agree to abide by said Rules in all respects. Any Rules may be changed on thirty days notice and Resident(s) agree to abide by any such changes. Failure to comply with the Rules shall be deemed a breach of this Lease.

   b. Resident agrees not to harass, annoy, or endanger any other resident or person, or create or maintain a nuisance, or disturb the peace or solitude of any other resident, or commit waste in or about the Premises. Resident is responsible for the conduct of his/her/their guests or invitees while they are on the Property. Violation of this provision may result in the immediate termination of this Agreement as provided herein and by law.

   c. Certain acts are considered to be contrary to the safety, well being, peace, and enjoyment of the other residents of the Property. These include, but are not limited to, the use, possession or sale of illegal drugs, and carrying or exhibiting firearms on the Property (except as required by law or job necessity). A resident conducting any of the activities set forth hereinabove shall be deemed in violation of this Agreement, and said activity shall be grounds for termination of this Agreement with a Three (3) Day Notice to Quit.

   d. Resident further agrees not to harass, verbally abuse, denigrate or otherwise disrespect Management's employees, agents and/or contractors. Failure to abide by this policy will result in a written warning and will be grounds for termination of the lease if there are subsequent violations.

35. SMOKING: Resident(s) who smoke, or allow smoking by their invitees or guests, must ensure the smoke does not disturb the quiet enjoyment of other residents. Secondhand tobacco smoke may seep and drift through open doors, windows, and ventilation ducts, which may constitute a disturbance to those residents who do not smoke, particularly those with health and allergy- related sensitivities. Pursuant to Paragraph 34.b. of this Agreement, Resident(s) agree not to harass, annoy, or endanger any other resident or person, or create or maintain a nuisance, or disturb the peace or solitude of any other resident. Resident(s) are responsible for the conduct of guests or invitees while they are on the Property. Violation of this provision may result in the immediate termination of this Agreement as provided herein and by law. Management, however, does not provide or guarantee a smoke-free environment and smoking is permitted in individual units and in most outdoor common areas, except where prohibited by law. As such, nothing herein shall be deemed a guarantee of any kind that Resident(s) will not be exposed to tobacco smoke while on the Property and Management expressly denies any such assertion.

36. PETS: No pets are permitted without the prior written consent of the Management and execution of a Pet Agreement Addendum by Resident(s). Any such consent may be revoked at any time, with or without cause, by giving ten (10) days written notice. Except to the extent written permission is given, pets may not be brought upon the Premises, whether such pets belong to Resident(s) or to any other person. The presence of any pets as to which written permission has not been given and is not currently in force, even if such pets are "just visiting", shall be deemed a material and incurable breach of this Lease and shall be cause for the service of a three-day notice terminating the tenancy.

37. LIQUID FURNISHINGS – Liquid filled furniture is permitted only in accordance with California law which requires insurance protecting Owner in an amount not less than $100,000.00, and an increase in your security deposit equal to one-half month's rent. Resident must install, maintain, and dismantle the furniture in accordance with industry standards. Management reserves the right to inspect the installation, maintenance, use and dismantling of such furniture. No Aquariums over 20 gallons are permitted without prior written consent of Management. Resident must provide evidence of insurance coverage for aquariums over 20 gallons the same as for liquid filled furniture. All approvals must be in writing from Management.

38. WASHER/DRYER/AC: Resident(s) agree not to install a washing machine, clothes dryer, or air conditioning unit in the Premises without the prior written approval of Management. In the event that such written approval is given, resident must provide evidence of Renters Insurance coverage protecting Owner. Resident must install, maintain, and dismantle the appliance in accordance with industry standards. Management reserves the right to inspect the installation, maintenance, use and dismantling of such appliance. Resident further agrees to pay Management promptly for any costs to repair, replace or rebuild any portion of the Premises damaged by the appliance or the negligence or misuse of Resident(s).

39. SMOKE DETECTOR: Resident(s) acknowledge that the Premises are equipped with operable smoke detectors. Resident(s) agree to not interfere with the presence or operability of such smoke detectors and to immediately report to Management, in writing, any defects in the condition of any smoke detectors. Resident further agrees that, if the smoke detector(s) is battery operated, Resident shall have the responsibility to: (a) ensure that the battery is in operating condition at all times by regularly performing tests using the "test button"; and (b) replace the battery as needed (unless otherwise provided by law).

40. CARBON MONOXIDE DETECTORS: If a carbon-monoxide detector device has been installed within the Premises, Resident(s) assumes responsibility for the maintenance of said device upon taking occupancy. Resident(s) assumes liability for testing of devices or periodically inspecting pressure gauges, if any, and promptly reporting any deficiencies to the Management. Upon notification to the Management by the Resident(s), Management will make the necessary repairs in a reasonable amount of time.

41. SATELLITE DISHES: If Resident(s) choose to install an individual satellite dish at the unit, it must be one meter [approximately 3 feet, 3 inches] or less in diameter or a traditional stick type antenna. Satellite dishes may only be installed inside an apartment or on a patio or balcony that is exclusively part of the Premises. The satellite dish must be securely mounted and not extend beyond the edge of a patio or balcony railing or hang outside a window. The building is to remain undamaged by the installation of a satellite dish. Resident(s) may not install a satellite dish or antenna in any common areas; drill holes through walls, roofs, railways or glass; or mount a satellite dish/antenna in a manner that will cause more than ordinary wear and tear to the Premises. In order to avoid the risk of striking electrical wires or water lines or causing structural damage to the building in which the Premises is located, the drilling of holes in railings, structural support beams, exterior walls, or locations where the building's weatherproofing might be impaired is not allowed.

    a. Assumption of the Risk. Resident(s) assume all risk and responsibility for any injury or property damage caused by the installation, operation or removal of the dish, including any caused by a failure to securely attach the dish to the Premises.

    b. Renter's Insurance. Because satellite dishes are susceptible to wind or being knocked over by occupants in the Apartment Community, Resident(s) must have Renter's Insurance that covers any and all losses from the installation, operation and removal of the dish. Resident(s) must provide Management with evidence of such coverage.

42. EXERCISE ROOM AND/OR SAUNA: Resident(s) agree to assume all responsibility for any and all damage done or injuries incurred while using these facilities and they agree to hold Management harmless for any injuries they might suffer.

43. INDEMNITY/HOLD HARMLESS: Resident(s) agree to indemnify and hold Management harmless and to indemnify Management for any costs of defense from any claims arising out of any death or injury to any person, or any damage to property, if such injury or damage is caused directly or indirectly by the act, omission, negligence, or fault of Resident(s) or Resident(s)' guests or invitee(s).

44. ASBESTOS DISCLOSURE; OPERATION AND MAINTENANCE PROGRAM       **Applicable only if checked here** 

    a. Asbestos is a mineral on the list of chemicals known to the State of California to cause cancer. Asbestos is present in the sprayed-on acoustic ceiling material (which has a "cottage cheese" appearance) in the Premises and in hallways and other areas in the building in which the Premises is located. Asbestos may also be present in other materials in the Premises and the building, including the insulation fireproofing and floor tiles.

    b. Management has instituted operations and a maintenance program directed at maintaining the Premises in accordance with any applicable Federal and State Safety requirements regarding asbestos-containing material. This program is designed (among other things) to prevent release of asbestos fibers into the air; minimize disturbance of damage to asbestos-containing material; monitor the conditions of materials and air in the building; and regulate maintenance, renovation and construction activities. No matter how small the percentage of such material may be, Resident(s) and Resident(s)'s invitees shall comply with such rules and regulations as Management from time to time may prescribe in connection with Management's operations and maintenance program, including, without limitation the following:

        i. Hazardous materials: Resident(s) shall not take or allow any action which in any way damages or disturbs all or part of the ceiling or floor tiles in the Premises, including, but not limited to: piercing the surface of the ceiling or floor tiles by drilling or any other method; hanging plants, mobiles or other objects from the ceiling; allowing any objects to come into contact with the ceiling; permitting water or other liquid to come into contact with the ceiling; painting or undertaking any repairs or improvements with respect to the ceiling;

        ii. Resident(s) shall notify Management immediately in writing (a) if there is any damage to or deterioration of the ceiling or floor tiles in the Premises, including, without limitation, loose, cracking, hanging or dislodged material, water leaks, or stains in the ceiling or floor tiles; or (b) upon the occurrence of any of the activities described in 26.B(I) above.

✗
Signature of Resident(s)

Rujia He
Printed name(s)

Signature of Resident(s)         Printed name(s)     ***Page 9 of 11***

45. LEAD-BASED PAINT DISCLOSURE AND WARNING:

a. **Lead Warning Statement.** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Managements must disclose the presence of known lead-based paint and/or lead based paint hazards in the dwelling. Resident(s) must also receive a federally approved pamphlet on lead poisoning prevention.

b. Management's Disclosure (*check appropriate box or boxes*).

☐ Management has no knowledge of lead-based paint and/or lead-based paint hazards in the Premises.

☐ Management has no reports or records pertaining to lead-based and/or lead-based paint hazards in the Premises.

☑ Management knows that lead-based paint and/or lead-based paint hazards are present in the Premises (*explain*).
A Phase 1 Environmental Assessment was performed. Lead Based Paint Survey was performed by ACC Environmental 2010

☑ Management has reports or records pertaining to lead-based and/or lead-based paint hazards in the Premises which are and have been made available to the Resident(s) for review. These reports or records are available for review in the Leasing Office during business days and business hours. Upon request, a complete copy of the report(s) or record(s) will be provided to the Resident(s) at no charge to the Resident(s). The following is a list of the reports or records pertaining to lead-based and/or lead-based paint hazards in the Premises:

Phase 1 Environmental Assessment dated October 13, 1997.
Lead-Based Paint Survey Report for Grouped Housing Buildings
ACC Environmental Consultants 2010

c. Resident(s)' Acknowledgment.

☑ Resident(s) have received the pamphlet *Protect Your Family from Lead in Your Home*.

46. PROPOSITION 65 WARNING: The Premises as well as the common areas in and around the Apartment Community contain at least one of the following chemical(s) known to the State of California to cause cancer or reproductive toxicity and for which warnings are now required. These chemicals include, but are not limited to: tobacco, smoke, lead and lead components, asbestos, carbon monoxide and gasoline components.

47. EVENTS OF DEFAULT: Resident(s) shall be guilty of material breach of this Lease if Resident(s): (a) fail to pay any rent or other sums payable under this Lease on the date it becomes due; (b) default in the performance of or breach of any other provision, term, covenant or condition of this Lease; (c) vacate or abandon the Premises before expiration of the full term of this Lease, or any extension of the term; (d) permit the leasehold interest of Resident to be levied upon or attached by process of law; or (e) make an assignment for the benefit of creditors.

48. WAIVER: Management's failure on any occasion to require strict compliance with any provision of this Lease or to exercise any rights arising hereunder shall not be deemed a waiver of Management's right to subsequently enforce any such provision or to insist upon any such right. The fact that Management may have accepted late payment(s) on one or more occasions shall not be deemed a waiver of Management's right to insist upon timely payment of rent nor to exercise any remedy available for late payment of rent. Acceptance of rent following a breach of this agreement shall not be deemed to constitute a waiver of such breach. No custom or practice which may develop between the parties in the course of the tenancy shall be construed to waive the right of Management to enforce any provision of this Lease.

49. TIME IS OF THE ESSENCE: Time is of the essence with respect to the provisions of this Lease. This provision shall be interpreted in its strictest sense irrespective of the relative hardship to the parties.

50. SEVERABILITY If a provision or paragraph of this Lease is legally invalid, or declared by a court to be unenforceable, such provision or paragraph will be deemed deleted, and the rest of this Lease remains in effect. To the extent that any provision of this Lease is in conflict with any provisions of applicable law, such provision is hereby deleted, and any provision required by applicable law which is not included in this Lease is hereby inserted as an additional provision of this Lease, but only to the extent required by applicable law and then only so long as the provision of the applicable law is not repealed or held invalid by a court of competent jurisdiction.

51. NON-DISCRIMINATION: There shall be no discrimination against or segregation of, any persons on account of race, creed, religion, sex, sexual orientation, marital status, family status (minor children or no minor children), national origin, ancestry, disability or any other protected classification under state or federal law, in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Premises, nor shall the Landlord or any person claiming under or through Landlord, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use of occupancy of residents, lessees, subtenants, sub lessees or vendees of the Premises.

52. ENTIRE AGREEMENT: This Lease and the attached addenda, if any, set forth the entire agreement between the parties with respect to the matters set forth herein. It shall not be altered nor modified unless such alteration or modification is in writing and signed by all signatories hereto. No verbal agreements or representations have been made or relied upon by either party or any agent or employee of either party, and neither party nor any agent or employee of either party is entitled to alter any provisions of this Lease by any verbal representations or agreements to be made subsequent to the execution of this Lease. The foregoing notwithstanding, should Resident(s) hold over after the expiration of the Lease term on a month-to-month holdover basis, Management may change any provision of this Lease without the consent of Resident(s) in the manner prescribed by California Civil Code section 827.

53. ADDENDA: By initialing as provided, Resident acknowledges receipt of the following applicable addenda, as indicated, copies of which are attached hereto, and are incorporated as part of this Agreement:

*initial all* _RH_ Move-in Inspection _RH_ Community Rules _RH_ Tips on Preventing Mold _RH_ Prop. 65 _RH_ EPA Lead
_RH_ Bed Bug Addendum _RH_ Home Care Guide _RH_ Utility Addendum

_____ _____ _____

_____ _____

54. SIGNATORIES: The undersigned Resident(s), whether or not in actual possession of the Premises, are jointly and severally responsible for all obligations arising hereunder (see Paragraph #11 above). This Lease shall not be considered to be in full force and effect until signed by Management or Management's authorized agent. Management may, without liability, refuse to enter into this Lease and may refuse to allow Resident(s) to occupy the Premises at any time prior to signing this Lease. Anything to the contrary in this provision notwithstanding, Resident(s) shall be fully liable for all obligations arising hereunder, and Management may enforce the provisions of this Lease as against Resident(s) if, for any reason or by any means, Resident(s) obtain occupancy to the Premises before such time as this Lease has been signed by Management or Management's authorized agent.

Dated: _09 / 24 / 2014_

X _Ruyia He_
Resident

_____
Management

_____
Resident

_____
Resident

_____
Resident

_____
Resident

_____
Resident

# EXHIBIT 2

Date **11/03/2015**

**Rujia He,** ████████████████████████

Dear **Rujia,** ████████████████ :

Welcome to **Avalon at MissionBay North III**.  We realize you have many options when choosing where to live and we are delighted that you chose **Avalon at MissionBay North III** to call home.  We know that moving can be a stressful time; therefore, we have designed this information package to help make your move as easy as possible.

**Getting Started:**
Please be sure to read and understand the enclosed materials before signing and returning the following items to the Community Leasing Center.
- Lease Agreement with Lease Summary Page
- Security Deposit Agreement
- Utility & Renter's Insurance Verification Form
- Community Policies
- "About Avalon Access" reference guide, your key to 24-hour service, 7 days a week.
- Community Specific Forms – i.e. lead paint, concession addendum, etc.

**Next Steps:**
The following must be completed *prior* to your move-in day:
1. **Read, sign and return all lease paperwork to the Community Leasing Center.** *All paperwork, including the enclosed Utility & Renter's Insurance Verification Form must be completed and fees paid in order to receive keys to your new apartment home.* Please note that obtaining renter's insurance and most utility connections can be done on the internet at www.AvalonAccess.com.
2. **Contact your Community Consultant to make all necessary moving arrangements.**   To ensure that all resources will be available, such as elevators or loading docks, we recommend contacting us as soon as possible to select a time that is most convenient for you.
3. **Schedule your Community Orientation!**  During your brief orientation on move in day, a Community Consultant will familiarize you with your new apartment home, as well as answer any questions about your new neighborhood.  At this time you will receive keys to your new apartment and complete any outstanding paperwork.

**Contact us!**
- **Billing Inquiries** – Your rent is due on the 1st of the month and is to be sent to the following:

     **Avalon at MissionBay North III**
     P.O. Box 6060
     Artesia, CA 90702-6060

- For questions, please contact the AvalonBay Customer Care Center at 1-877-AVB-MAIN (1-877-282-6246) or via email at customercarecenter@avalonbay.com.  Hours of operation are Monday – Friday 8:30 AM - 8:30 PM and Saturday 12:30 PM – 5:00 PM EST.
- **Maintenance Requests** – www.AvalonAccess.com or the 24-hour maintenance line **(866)830-4556**.
- **For all other questions** - Please call me or the Community Manager, **Nina Cook**, at **415-615-9100** or via email at **amissionbay@avalonbay.com**.  The Community Leasing Center is open **Monday - Thursday 9:30 AM – 6:30 PM and Friday - Saturday 8:30 AM – 5:30 PM.**

Again, thank you for selecting **Avalon at MissionBay North III**.  Our entire team is dedicated to creating a community that you are proud to call home.

Sincerely,


**Salvador Millado**
**Community Representative**
**Avalon at MissionBay North III**

*RH*

Account# CA084-00M-427-6

## CALIFORNIA CONDOMINIUM APARTMENT LEASE AGREEMENT

### INTRODUCTION

### Avalon at MissionBay North III

You are entering into an Condominium Apartment Lease Agreement (this "Lease") as of the Lease Execution Date set forth in the Summary of Key Lease Terms (the "Summary") that we have provided to you as part of this Lease. Capitalized terms used in this Lease that are not defined are identified in the Summary.

We have tried to make this Lease as easy as possible for you to review, including writing much of it in a question and answer format.  Your Lease consists of all of the following, taken together:

- This Introduction
- Document 1:   Summary of Key Lease Terms
- Document 2:   Questions and Answers (Additional Lease Terms)
- Document 3:   Community Specific Terms
- Document 4:   Community Policies
- Document 5:   Security Deposit Agreement
- Any Other Addenda and Documents we give to you as part of the Lease at the time you enter into the Lease.
- Any Rules and Regulations posted from time to time at the Community

This Lease is contingent on our approving your application and we are entering into it with you based on what you told us in your application.  Your representations in the application are deemed material.  If any of those representations are untrue, incorrect or misleading, you will have breached this Lease and we may terminate this Lease in accordance with applicable law.

RH

Account# CA984-00M-427-6

## APARTMENT LEASE AGREEMENT - SUMMARY OF KEY LEASE TERMS

This Summary of Key Lease Terms (the "Summary") is an integral part of your Lease and is included within this Lease for all purposes. All terms used in the Summary are deemed to be defined terms for purposes of the Lease.

**APARTMENT ADDRESS:** 353 King Street 427, San Francisco, California 94158
**COMMUNITY NAME ("The Community"):** Avalon at MissionBay North III

**LEASE EXECUTION DATE:**

| | | | |
|---|---|---|---|
| **LEASE BEGIN DATE:** | 11/12/2015 | **CURRENT LEASE TERM:** | 12 |
| **LEASE END DATE:** | 11/11/2016 | **ORIGINAL MOVE-IN:** | 11/12/2015 |

**RESIDENT(S):**  Rujia He

**OCCUPANT(S):**

**MANAGER:** We are the property manager and agent of the Owner. In this Lease, the Manager is referred to as "we", "us", and "our".

Name: **AvalonBay Communities, Inc.**
Address: **383 King Street, San Francisco, California 94158**
Phone Number: **(415)615-9100**

**OWNER:** The Owner is:

Name: **AvalonBay Communities, Inc.**
Address: **671 N. Glebe Road, Suite 800, Arlington, VA 22203**

**PAYMENT OBLIGATIONS (ALL AMOUNTS PAYABLE UNDER THIS SECTION CONSTITUTE "RENT"):**

**SUMMARY OF RECURRING MONTHLY CHARGES:**

| | | | |
|---|---|---|---|
| Base Rent: | $4,975.00 | | |
| Trash Collections | $29.00 | | |
| **TOTAL Monthly Charges:** | **$5,004.00** | First Month Proration: | $3,169.00 |

**SUMMARY OF REQUIRED DEPOSITS:**

Security Deposit:  $1,000.00

**OWNER UTILITY OBLIGATIONS:**

**Electricity: Paid by Resident**
**Trash: Paid by Resident**
**Sewer: Paid by Resident**
**Other: Not Applicable**
**Gas/HWE: Paid by Resident**
**Water: Paid by Resident**

**SUMMARY OF ONE-TIME PAYMENTS:**

Application Fees      $30.00

**MISCELLANEOUS TERMS/CHARGES:**

**ASSIGNMENTS:**

| | |
|---|---|
| *RENT DUE DATE:* | *1st of Month* |
| *LATE CHARGE DATE:* | **4th** |
| *LATE CHARGE:* | **$60.00** |
| *Returned Check Charge:* | **$25.00** |

RH

**AvalonBay Communities** <noreply@qemailserver.com>    **Unsubscribe**    Thu, Aug 12, 2021, 3:05 PM

to me



Hello Rujia,

We understand that you have decided not to renew your lease at Avalon at Mission Bay III. We have enjoyed the opportunity to serve your living needs. We truly value our residents and would appreciate your feedback regarding your living experience at Avalon at Mission Bay III.

Recently you were sent an invitation to participate in the Avalon at Mission Bay III Move-Out Survey. However, our records indicate you have not yet completed the assessment. In case our first attempts to contact you were unsuccessful or you were interrupted while filling out the survey, please take this opportunity to provide us with your opinions.

We understand your time is valuable, and as a thank you for your participation, completed surveys are entered into a quarterly drawing for a **$1,000 American Express® Gift Card\***.

We have partnered with Qualtrics, a third-party research company, to conduct the survey of our residents. Completing the survey will take only five minutes of your time.

**Follow this link to the Survey:**
[Take the Survey](Take the Survey)

# EXHIBIT 3

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-797C, Notice of Action**

## THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.

| Receipt Number<br>LIN1801150221 | | | Case Type<br>I140 - IMMIGRANT PETITION FOR ALIEN WORKER |
|---|---|---|---|
| Received Date<br>10/17/2017 | Priority Date<br>10/17/2017 | | Petitioner<br>HE, RUJIA |
| Notice Date<br>10/30/2017 | Page<br>1 of 1 | | Beneficiary<br>HE, RUJIA |

RUJIA HE
353 KING ST 427
SAN FRANCISCO  CA  94158

**Notice Type:** Approval Notice
**Section:** Alien of Extraordinary Ability,
Sec.203(b)(1)(A)
**Consulate:**
**ETA Case Number:** NA
**SOC Code:** 151133

We have mailed an official notice about this case (and any relevant documentation) according to the mailing preferences you chose on Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative. **This is a courtesy copy, not the official notice.**

**What the Official Notice Said**

The above petition has been approved. The petition indicates that the person for whom you are petitioning is in the United States and will apply for adjustment of status. He or she should contact the local USCIS office to obtain Form I-485, Application to Register Permanent Residence or Adjust Status. A copy of this notice should be submitted with the application, with appropriate fee, to this Service Center. Additional information about eligibility for adjustment of status may be obtained from the local USCIS office serving the area where he or she lives, or by calling 1-800-375-5283.

If the person for whom you are petitioning decides to apply for a visa outside the United States based upon this petition, the petitioner should file Form I-824, Application for Action on an Approved Application or Petition, to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that require consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing. It will then forward the approved petition to that consulate.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

This courtesy copy may not be used in lieu of official notification to demonstrate the filing or processing action taken on this case.

**THIS FORM IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

Nebraska Service Center
U. S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 82521
Lincoln NE 68501-2521

**Customer Service Telephone: 800-375-5283**



If you are visiting a field office and need directions, including public transportation directions, please see **www.uscis.gov/fieldoffices** for more information.

---

### Notice for Customers with Disabilities

---

USCIS is committed to providing customers with disabilities the same level of access to its programs and activities that customers without disabilities have (see the USCIS Web site for an explanation and examples of accommodations). If you need an accommodation for your appointment due to a disability that affects your access to a USCIS program or activity OR if a disability prevents you from going to the designated USCIS location for your appointment, please call the National Customer Service Center (NCSC) at 1-800-375-5283 (TTY: 1-800-767-1833) to request an accommodation.

**Call the NCSC even if you indicated on your application or petition that you require an accommodation. Also, you must contact the NCSC to request an accommodation each time you have an appointment with USCIS.** For example, you must call the NCSC to request an accommodation for your biometrics appointment and again for an accommodation for your interview appointment.

**NOTICE:** All domestic USCIS offices are accessible to individuals with physical disabilities. You do not need to request an accommodation if your ONLY need is an accommodation that would enable or facilitate you having physical access to a domestic USCIS office.

**NOTE:** Naturalization applicants should **not** call the NCSC to request an exception from the English and/or civics testing requirement. You **must** submit Form N-648, Medical Certification for Disability Exceptions to request an exception. See the form instructions for additional information.

# EXHIBIT 4





# EXHIBIT 5

 DeepL Subscribe to DeepL Pro to translate larger documents.
Visit www.DeepL.com/pro for more information.

知乎 ··· write an article



## Integrating life: who says you can't have it both ways, by committing to work and enjoying life?

**Ruthia Ho**
ESTP, no resistance to beauty.
1 person endorsed the article

Follow her.

For the past year, I've had to live the life of a digital nomad because of the outbreak controls in my country. When an outbreak starts to take control in one city, I run to another.

I wander from city to city with a small suitcase. Basically changing cities once or twice a month.

In half a year, from Hainan -> Shenzhen -> Chengdu -> Hangzhou -> Shanghai -> Shenzhen -> Yunnan -> Beijing -> Suzhou -> Shenzhen -
> San Jose -> San Francisco -> Washington -> New York -> Miami -> Las Vegas .








when it comes to putting in the work and enjoying
life? - Knowing








The good thing about a small suitcase is that it makes my life simpler, so that I don't want to buy or own something that I can't take with me anyway. Come gently, go quietly, and don't take a cloud with you.

I've come to love going to libraries. In almost every city I went to, I would sweep the libraries, that is, go through all the books in a library that I liked. Many times, it was an afternoon or a whole day.




A lot of literary books talk about traveling, photography, and food, as if this is the best life one can think of. I've never felt connected to literature, but I suddenly realized that I seem to be unknowingly living what others see as an ideal life.

## Integrating Life

Nomadic pastoralism refers to a form of human production and lifestyle that has developed in the grasslands. Nomadic pastoralism refers to a mode of livestock production that drives or accompanies one or several types of herbivorous livestock within a certain geographical area, and obtains living resources by repeatedly utilizing the pastureland at certain intervals and in a mobile manner, often avoiding the pastureland from reaching its natural carrying capacity. Modern archaeological excavations are gradually proving that nomadic pastoralism was born no earlier than 1,000 BC.

The digital nomad, on the other hand, is a lifestyle of travel that many people have chosen nowadays with globalization and the rise of telecommuting. It is supposed to rise to satisfy people's needs to travel, expand new knowledge, experience life, and relieve the pressure of existence. More specifically, I introduced it in another article 2 years ago, "What will the world be like when everyone telecommutes? I also introduced it in another article "What will the world be like when everyone telecommutes?

On the one hand, technology is advancing, our lives are becoming affluent, and we are so much happier than people were 100 years ago. But why are we still so busy that we don't

On the other hand, traveling has become easier and safer than ever before, photography has become incredibly easy because of the popularity of cell phones, and food is everywhere, especially with the innovations of restaurants sprouting up in the country, allowing us to enjoy a wide variety of cuisines at affordable prices.

Why not combine the two?

Telecommuting to work is possible. I wrote an article about digital nomads as a way of life 2 in years ago. The Epidemic

this                    d had a fully telecommuting model, and even many companies founded in

Let many U.S. companies last few years have been remote since their inception. I

p

p

ea

r

Our company is one such example when it comes to putting in the work and enjoying life? - Knowing

In the beginning, because of the epidemic, I only worked remotely from San Francisco. Then I realized that the good thing about the epidemic was that traffic was no longer congested and restaurants no longer had to wait in line, so you could see me at the Napa Winery, wine tasting and working at the same time; or at the hotel restaurant in half moon bay, dialing in for a meeting while looking out at the ebb and flow of the ocean and enjoying the chef's food; and I used to have meetings on the I've also had meetings on the treadmill, working out while I work.






During this time, I've been staying in San Francisco, and instead of calling myself a digital nomad, I think it should be called integrating life (work life integration). I think it should be called work life integration instead of digital nomad.

Many of our other employees, during the epidemic, moved to cheaper and more spacious places in the middle of the US. There were even employees that bought RVs and ate and lived on roadtrip (and, of course, carried internet signal boosters with them).

In 2021, I went back to my home country to visit my mother because she was sick, and then I encountered the epidemic control. So, I simply carried a suitcase and lived as a sojourner in various cities.

Looking back at 2022, this should be the most groundbreaking achievement I have ever realized without even realizing it - the freedom to integrate my life!
(work life integration).

**pending**

when it comes to putting in the work and enjoying
life? - Knowing

We are always complaining that we are too busy with work to enjoy traveling, food and life.
And the easiest way to do that is to go for the option of integrating life and work.

This will allow you to When you complain about work, think about what
as you would be doing if you weren't working.

p

Travel, or food?                    when it comes to putting in the work and enjoying
                                    life? - Knowing

Aren't I already enjoying myself?

It's that simple, so that we don't feel like we're sacrificing our lives and good times when we're
working hard to make the mood more balanced and enjoyable.

The more you start a business in the mental health field, the more you understand the importance of mental health. Being
happy is the right way to open your life.

Wouldn't our lives be better off if we enjoyed our lives while working? Promoting the popularity
of telecommuting should be considered one of the few positive impacts of the epidemic on our
lives.

> Advertisement: We are looking for product, design, operation and engineering talents. If you are interested, please leave
> me a message.



My Public / Knowledge column: More than Design - A Designer Out of Practice

Edited on 2022-11-28 08:51 · IP Property USA

Digital Nomad                  Work Life Balance    Telecommuting


Speak rationally and interact in a friendly manner



No reviews yet, post the first
one!

Recommended
Reading

when it comes to putting in the work and enjoying
life? - Knowing

### How do you separate work from life?

This question is to be understood by dividing it into a number of sub-questions: 1. what is work? 2. what is life Live? 3. How are life and work different? 3. How are they separated? Let's start by answering two questions about what is work and what is life. Literally.

Will, there is no need to separate the two...

Su Jinzhi (1953-), Qing dynasty writer and poet

### How to work easily and efficiently? Start by constructing a work system

We often encounter the following problems. Every day there are endless things to do, important things are put off until the end, people below us don't do what they are asked to do, and we don't have any leisure time for ourselves. This

It's a true reflection of our lives, how can we get rid of all this pain? ...

NLP Psychology Yang Hao Ming

### The best answer I've ever seen on how to balance work and life

People who really harmonize work and life are not bad at either. Zuckerberg is the CEO of Facebook, the world's largest social networking company with a market capitalization of $43.325 billion. His name is generally compared to Warren Buffett and Bill Gates. CEOs of tech companies are naturally busy...

flower of north India, Datura stramonium, Sanskrit: mandara



### How to build your own work

Gary's journey of growth

# EXHIBIT 6



**Department of the Treasury
Internal Revenue Service
Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

**Date:**
01/30/2024
**Employer ID number:**
93-3978034
**Person to contact:**
  Name: Customer Service
  ID number: 31954
  Telephone: 877-829-5500
**Accounting period ending:**
  December 31
**Form 990-PF required:**
  Yes
**Effective date of exemption:**
  August 18, 2023
**Addendum applies:**
  No
**DLN:**
  26053425003944

THE SMILING INITIATIVE INC
112 SOUTH PARK STREET SAN FRANCISCO
SAN FRANCISCO, CA 94102

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code
(IRC) Section 501(c)(3). Donors can deduct contributions they make to you under IRC Section 170. You're also
qualified to receive tax deductible bequests, devises, transfers or gifts under Section 2055, 2106, or 2522. This
letter could help resolve questions on your exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as either public charities or private
foundations. We determined you're a private foundation within the meaning of Section 509(a).

You're required to file Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Trust Treated as
Private Foundation, annually, whether or not you have income or activity during the year. If you don't file a
required return or notice for three consecutive years, your exempt status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of
this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities.
Enter "4221-PF" in the search bar to view Publication 4221-PF, Compliance Guide for 501(c)(3) Private
Foundations, which describes your recordkeeping, reporting, and disclosure requirements.

Sincerely,

*Stephen A. Martin*

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

**Letter 1076 (Rev. 2-2020)**
Catalog Number 35161A

B2034-2113 08/15/2023 8:50 AM Received by California Secretary of State

5862891



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**ARTICLES OF INCORPORATION
CA NONPROFIT CORPORATION
PUBLIC BENEFIT**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

**-FILED-**

File No.: 5862891

Date Filed: 8/15/2023

| Corporation Name | |
| --- | --- |
| Corporation Name | The Smiling Initiative Inc |

| Initial Street Address of Principal Office of Corporation | |
| --- | --- |
| Principal Address | 112 SOUTH PARK STREET<br>SAN FRANCISCO, CA 94107 |

| Initial Mailing Address of Corporation | |
| --- | --- |
| Mailing Address | 112 SOUTH PARK STREET<br>SAN FRANCISCO, CA 94107 |
| Attention | |

**Agent for Service of Process**

☒ I certify the selected California Registered Corporate Agent (1505) has agreed to serve as the Agent for Service of Process for this entity.

California Registered Corporate Agent (1505)         LEGALCORP SOLUTIONS, INC
                                                    Registered Corporate 1505 Agent

**Purpose Statement**

This corporation is a Nonprofit Public Benefit Corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for: Public and Charitable purposes

**Additional Statements**

The specific purpose of this corporation is to Addressing global mental health crisis, we're a nonprofit providing free AI companion mental health support for low income individuals.

This corporation is organized and operated exclusively for the purposes set forth within the meaning of Internal Revenue Code section 501(c)(3).

No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation, and this corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

The property of this corporation is irrevocably dedicated to the purposes set forth herein and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person.

Upon the dissolution or winding up of this corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for charitable, educational and/or religious purposes and which has established its tax-exempt status under Internal Revenue Code section 501(c)(3).

Notwithstanding any of the above statements of purpose and powers, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the specific purpose of this corporation.

Additional information and signatures set forth on attached pages, if any, are incorporated herein by reference and made part of these Articles of Incorporation.

**Electronic Signature**

☒ I declare that I am the person who executed this instrument, which execution is my act and deed.

*Rujia He* _____    *08/15/2023* _____
Signature                              Date

B2034-2114 08/15/2023 8:50 AM Received by California Secretary of State

# EXHIBIT 7

**Return Recorded Document to:**
**Leaders Law Firm, LLC**
**6075 Barfield Rd**
**Sandy Springs, GA   30328**
**Parcel ID: 15N17H 003**

## LIMITED WARRANTY DEED

STATE OF GEORGIA

COUNTY OF FULTON

      **THIS INDENTURE,** made the **8th day of September, 2023**, between **Issa Nkosi Edward Lee-Hall and Jasmine Nicole Lee-Hall** of the State of Georgia, parties of the first part, and **Rujia He and**      as Tenants in Common, parties of the second part,

      **WITNESSETH** That: the said parties of the first part, for and in consideration of the sum of **TEN AND 00/100 DOLLARS ($10.00)** and other goods and valuable considerations in hand paid, at and before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed, and by these presents do grant, bargain, sell and convey unto the said parties of the second part, their heirs and assigns, all that tract or parcel of land

**See Exhibit "A" attached hereto and made a part hereof.**

      **TO HAVE AND TO HOLD** the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said parties of the second part, their heirs and assigns, forever, in FEE SIMPLE.

      **AND THE SAID** parties of the first part, for their heirs, executors and administrators, will warrant and forever defend the right and title to the above described property, unto the said parties of the second part, their heirs and assigns, against claims of all persons owning, holding or claiming by, through or under the said parties of the first part.

      **IN WITNESS WHEREOF,** the said parties of the first part have hereunto set their hands and seals, the day and year above written.

Signed, sealed and delivered in the presence of:

                                                         **(Seal)**
                                 **Issa Nkosi Edward Lee-Hall**

                                                         **(Seal)**
                                 **Jasmine Nicole Lee-Hall**

**Unofficial Witness**

**Notary Public**

OFFICIAL SEAL
QING SHEN
NOTARY PUBLIC-GEORGIA
DEKALB COUNTY
My Comm. Expires March 7, 2027

## EXHIBIT "A"

ALL THAT TRACT or parcel of land lying and being in Land Lot 879 of the 15th District in the City of Woodstock, Cherokee County, Georgia, being Lot 3 of Ridgewalk Landing, Phase II-A, more particularly described upon a Final Plat of Ridgewalk Landing, Phase II-A prepared by Planners and Engineers Collaborative, certified by Michael C. Sanford, GRLS No. 3179, recorded on March 2, 2021 in Plat Book 119, Page 908-918, Cherokee County, Georgia Records. Along with exclusive use of the concrete drive adjoining and serving only Lot 3, and along with non-exclusive use of all shared private drives, streets, and common areas shown on the aforementioned Final Plats.

This Deed is given subject to all easements and restrictions of record.

Property Address for information purpose only: ████████████ Woodstock, GA 30188
Parcel ID: 15N17H 003

# EXHIBIT 8

*English Translation*

## Certificate of Lost Document

**Serial Number: 0139266**

Name: He, Rujia.  Gender: Female. Date of Birth: 1981.8.18

On October 8, 2021, he (she) reported that his (her) "People's Republic of China passport / Mainland Travel Permit for Hong Kong and Macao / Mainland Travel Permit for Taiwan / Taiwan Compatriot Permit"  (Number: EB174120) is lost.

Seal:

Beijing Municipal Public Security Bureau
Exit -Entry Administration Special Seal

Date: October 9, 2021



## 证件报失证明

编号：0139266

姓名 ___何烈佳___    性别 ___女___    出生日期 ___1991. 8. 19___

于___2.21___年___10___月___9___日向我局报告他（她）的《中华人民共和国护照》/

《中华人民共和国往来港澳通行证》/《大陆居民往来台湾通行证》/《台湾居民

来往大陆通行证》（号码：___EB1741210___）丢失。

北京市公安局
出入境管理
专用章

2021年　10月　9日

# EXHIBIT 9

中华人民共和国外交部请各国军
政机关对持照人予以通行的便利和必
要的协助。

*The Ministry of Foreign Affairs of
the People's Republic of China
requests all civil and military
authorities of foreign countries to
allow the bearer of this passport to
pass freely and afford assistance in
case of need.*



中华人民共和国  PEOPLE'S REPUBLIC OF CHINA

护　照
PASSPORT

类型/Type P
国家码/Country Code CHN
护照号码/Passport No.

姓名/Name
何 如 佳
HE, RUJIA

性别/Sex 女/F
国籍/Nationality 中国/CHINESE
签发日期/Date of birth

出生地点/Place of birth
北京/BEIJING

签发地点/Place of issue
北京/BEIJING

签发机关/Authority
中华人民共和国国家移民管理局
National Immigration Administration,PRC

签发日期/Date of issue
14 10月/OCT 2021

签发日期/Date of expiry
13 10月/OCT 2031

持照人签名/Bearer's signature

POCHNHE<<RUJIA<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<



备注  OBSERVATIONS

① 本护照根据中华人民共和国第EB1741210号护照补发。

This passport is issued to replace the passport
No. EB1741210 of the PRC.

2021年10月14日于北京
14 OCT 2021 BEIJING

备注  OBSERVATIONS

# EXHIBIT 10

# done.

**Ruthia He <r@donefirst.com>**

## SFO — MNL Flight for Rujia He is Confirmed
1 message

**TravelBank** <noreply@travelbank.com>                                    Thu, Dec 8, 2022 at 2:26 PM
To: r@donefirst.com







## Your SFO — MNL Flight is Confirmed

Need to change, cancel, or add to your reservation? Email us at **brex-travel@travelbank.com**. For emergencies and 24/7 support call us at **(866) 682-8785**.

### TravelBank Itinerary ID: SFN7FP

### Philippine Airlines Confirmation Number: pending ticket

**Flight Details**                                    Booking Date: Dec 08, 2022

**Status:**              Completed

**Traveler(s)**

**Rujia He**
Known Traveler Number ending in 1

**One Way Flight**                                    SFO — MNL (Nonstop)

| | | | |
|---|---|---|---|
| **Airline:** | Philippine Airlines | **Flight:** | PR105 |
| **Departure:** | 9:35 PM Fri, Dec 23, 2022 (SFO) | **Duration:** | 15 hours, 5 minutes |
| **Arrival:** | 4:40 AM Sun, Dec 25, 2022 (MNL) | **Miles:** | 6978m / 11230km |
| **Seats:** | 65-E | | |

Total Cost                                    Charged to: Brex Points Balance

**Base Fare:**                                    141,700 points ($1417.00)

**Taxes & Fees:**                                    23,180 points ($231.80)

**Total Paid:**                                    **164,880 points ($1648.80)**

---

Know Before You Go

Please note: In keeping with best practice guidelines from the Centers for Disease Control, and for the safety of our customers and airline crew members, most airlines now require employees and passengers to wear face masks and, if possible, maintain six feet of distance from each other.

**Airport Check-in Requirements**

- Two hours prior for domestic flights three hours prior for international flights; please be prepared to present a valid photo ID/passport

**done.**

Ruthia He <r@donefirst.com>

## MNL — HKG Flight for Rujia He is Confirmed
1 message

**TravelBank** <noreply@travelbank.com>                              Sun, Dec 25, 2022 at 7:42 AM
To: r@donefirst.com



### Your MNL — HKG Flight is Confirmed

Need to change, cancel, or add to your reservation? Email us at **brex-travel@travelbank.com**. For emergencies and 24/7 support call us at **(866) 682-8785**.

## TravelBank Itinerary ID: P9Q532

## Cathay Pacific Confirmation Number: pending ticket

---

**Flight Details**                                    Booking Date: Dec 25, 2022

**Status:**                 Completed

**Traveler(s)**

**Rujia He**
Known Traveler Number ending in 4TB1
Mileage Program Number ending in 3648

**One Way Flight**                                    MNL — HKG (Nonstop)

| | | | |
|---|---|---|---|
| **Airline:** | Cathay Pacific | **Flight:** | CX918 |
| **Departure:** | 5:45 PM Wed, Dec 28, 2022 (MNL) | **Duration:** | 2 hours, 45 minutes |
| **Arrival:** | 8:30 PM Wed, Dec 28, 2022 (HKG) | **Miles:** | 712m / 1146km |
| **Seats:** | N/A | | |

**Total Cost**                                    Charged to: Brex Points Balance

**Base Fare:**                                    16,000 points ($160.00)

| | |
|---|---|
| **Taxes & Fees:** | 2,510 points ($25.10) |
| **Total Paid:** | **18,510 points ($185.10)** |

Know Before You Go

Please note: In keeping with best practice guidelines from the Centers for Disease Control, and for the safety of our customers and airline crew members, most airlines now require employees and passengers to wear face masks and, if possible, maintain six feet of distance from each other.

**Airport Check-in Requirements**

- Two hours prior for domestic flights three hours prior for international flights; please be prepared to present a valid photo ID/passport



# Flight award booking

**onlinebooking-NO-REPLY** <onlinebooking-no-reply@cathaypacific.com>

| | |
|---|---|
| From | onlinebooking NO REPLY |
| To | MYPITCH <mypitch@qq.com> |
| Size | 56K |
| Date | 2022/12/27/ 05:53 |



Dear Miss Rujia, thank you for choosing Cathay Pacific.

What to know about COVID-19 before you fly

 **View the latest travel restrictions and COVID-19 travel FAQ**

Check the latest information to ensure you're eligible to fly. **View travel restrictions** >

The most frequently asked questions about travel restrictions, ticket changes and cancellations and protect your wellbeing on board. **View our FAQ** >

## Trip summary

Booking reference: **5ON4SD**

| **Sat 31 Dec 2022** | Hong Kong to Singapore |
| --- | --- |

| **Flight** | **Depart** | **Arrive** |
| --- | --- | --- |
| CX2691 | 12:15 | 16:20 |
| Cathay Pacific | Hong Kong International (HKG) | Changi (SIN) |
| Airbus A350-900 | Terminal 1 | Terminal 4 |

| **Duration** | **Cabin class** | **Seat** |
| --- | --- | --- |
| 4h 5m | Premium Economy Standard Award | Not selected |
| | | Miss. He Rujia |

| **Cabin baggage** | **Check-in baggage** | **Meal** |
| --- | --- | --- |
| 1 piece(s), 7kg each* | 2 piece(s), 23kg each* | Meal included |

*For details of your baggage allowance and maximum baggage dimensions, please visit our baggage information page .

**Passenger(s)**

**Adult**

Miss. He Rujia

███████████████

mypitch@qq.com
Cathay
172****648

Manage My Booking

## Miles, taxes and surcharges

| Air transportation charges | | 18,000 + HKD **253** |
|---|---|---|
| Flight awards | Adult:    18,000 x 1 | 18,000 |
| Carrier surcharges | Adult: HKD 253 x 1 | HKD 253 |

| Other charges and fees | | HKD **265** |
|---|---|---|
| Taxes/fees/charges | Adult: HKD 265 x 1 | HKD 265 |

Total amount:    18,000 + HKD **518**

## Payment details



Taxes/ fees/ surcharges — HKD **518**

Total amount: HKD **518**

Legal and privacy     Contact us     Copyright © Cathay Pacific Airways Limited 國泰航空有限公司

# done.

**Ruthia He <r@donefirst.com>**

---

### SIN — SFO Flight for Rujia He is Updated
1 message

---

**TravelBank** <noreply@travelbank.com>
To: r@donefirst.com

Sat, Dec 31, 2022 at 3:17 AM





## Your SIN — SFO Flight is Updated

Need to change, cancel or add to your reservation? **Chat with us** in the app or
email us at **reservations@travelbank.com**. For emergencies and 24/7 support
call us at **(866) 682-8785**.

### TravelBank Itinerary ID: J0GN1U

### United Airlines Confirmation Number: HM8818

---

Flight Details                                   Booking Date: Dec 31, 2022

**Status:**              Completed

**Traveler(s)**

**RUJIA HE**
Known Traveler Number ending in 4TB1
Mileage Program Number ending in 7083

**One Way Flight**                                       SIN — SFO (Nonstop)

| Airline: | United Airlines | Flight: | UA28 |
|---|---|---|---|
| Departure: | 10:20 PM Mon, Jan 02, 2023 (SIN) | Duration: | 14 hours, 40 minutes |
| Arrival: | 9:00 PM Mon, Jan 02, 2023 (SFO) | Miles: | |
| Seats: | N/A | | |

Total Cost                                  Charged to: Card ending in 4072

| Base Fare: | $978.41 |
|---|---|
| Taxes & Fees: | $80.95 |
| **Total Paid:** | **$1062.95** |

Know Before You Go

Please note: In keeping with best practice guidelines from the Centers for Disease Control, and for the safety of our customers and airline crew members, most airlines now require employees and passengers to wear face masks and, if possible, maintain six feet of distance from each other.

**Airport Check-in Requirements**

- Two hours prior for domestic flights three hours prior for international flights; please be prepared to present a valid photo ID/passport

Follow us

tw  

Read the Blog

# EXHIBIT 11

# done.

**Ruthia He <r@donefirst.com>**

---

### SFO — PEK Flight for Rujia He is Confirmed
2 messages

---

**TravelBank** <noreply@travelbank.com>                    Tue, Feb 14, 2023 at 7:52 AM
To: r@donefirst.com







## Your SFO — PEK Flight is Confirmed

Need to change, cancel, or add to your reservation? Email us at **brex-travel@travelbank.com**. For emergencies and 24/7 support call us at **(866) 682-8785**.

### TravelBank Itinerary ID: M67LGK

### Cathay Pacific Confirmation Number: pending ticket

---

**Flight Details**                              Booking Date: Feb 14, 2023

**Status:**                    Completed

**Traveler(s)**

**Rujia He**
Known Traveler Number ending in 4TB1
Mileage Program Number ending in 3648

**One Way Flight**                                        SFO — PEK (1 Stop)

**SFO — HKG**

| | | | |
|---|---|---|---|
| **Airline:** | Cathay Pacific | **Flight:** | CX893 |
| **Departure:** | 11:45 PM Sat, Feb 18, 2023 (SFO) | **Duration:** | 15 hours, 10 minutes |
| **Arrival:** | 6:55 AM Mon, Feb 20, 2023 (HKG) | **Miles:** | 6915m / 11129km |
| **Seats:** | N/A | | |

**2 hours, 5 minutes layover (HKG)**

**HKG — PEK**

| | | | |
|---|---|---|---|
| **Airline:** | Cathay Pacific | **Flight:** | CX386 |
| **Departure:** | 9:00 AM Mon, Feb 20, 2023 (HKG) | **Duration:** | 3 hours, 30 minutes |
| **Arrival:** | 12:30 PM Mon, Feb 20, 2023 (PEK) | **Miles:** | 1239m / 1994km |
| **Seats:** | N/A | | |

Total Cost                                     Charged to: Brex Points Balance

**Base Fare:**                                141,700 points ($1417.00)

**Taxes & Fees:**                             18,640 points ($186.40)

**Total Paid:**                               **160,340 points ($1603.40)**

Know Before You Go

Please note: In keeping with best practice guidelines from the Centers for Disease Control, and for the safety of our customers and airline crew members, most airlines now require employees and passengers to wear face masks and, if possible, maintain six feet of distance from each other.

**Airport Check-in Requirements**

- Two hours prior for domestic flights three hours prior for international flights; please be prepared to present a valid photo ID/passport

📄 **flight-invite-0.ics**
1K

---

**Ruthia He** <r@donefirst.com>                                    Tue, Feb 21, 2023 at 11:05 AM
To: Miranda Kane <mkane@conmetkane.com>, gyang@conmetkane.com

[Quoted text hidden]

📄 **flight-invite-0.ics**
1K

# EXHIBIT 12



Ruthia He <r@donefirst.com>

---

## AIR ITINERARY REQUESTED Fri, Jul 21 : (Jul 17, 2023) Seattle
2 messages

---

**no-reply@spotnana.com** <no-reply@spotnana.com>
To: r@donefirst.com

Fri, Jul 21, 2023 at 3:14 PM



# Get Ready!

New Trip - **(Jul 17, 2023) Seattle** was
successfully created

The details of your trip are below.

---

### BEFORE YOU FLY

Please check the entry and health requirements before your trip by using the module at the bottom of our homepage.

**Learn more**

### Trip details

| | |
|---|---|
| Trip name | (Jul 17, 2023) Seattle |
| Company | Done Global, Inc |
| Legal entity | Done Global, Inc |
| Agency reference | XRZEOX |
| Trip ID | 1718583915 |

### Flight details                                                    New

Seattle–Tacoma International Airport to Norman Y. Mineta
San Jose International Airport

**2hr 14min** (Non-stop)

$CO_2$ emissions

95 kg $CO_2$

Alaska Airlines, Inc., AS 1200
Operated by **Alaska Airlines, Inc.**

# SEA

Seattle–Tacoma International Airport

# SJC

Norman Y. Mineta San Jose International
Airport

2hr 14m

| | |
|---|---|
| Airline reference | LMDKIV |
| Departure date | Fri, Jul 21 |
| Departure time | 05:55 PM |
| Arrival time | 08:09 PM |
| Cabin | ECONOMY |
| Seat | Un-assigned (Rujia He) |

You can view or manage your itinerary using the button below.

**View itinerary**

**Need help?**

Please contact Customer Experience Team for assistance.

Mention **Trip ID: 1718583915** for faster service

🇺🇸 US: +1 8669368739

This is an auto-generated email.



WWW.SPOTNANA.COM

brexrewards@spotnana.com

Spotnana Technology Inc | 115 Broadway | Suite 10-114 | New York, NY 10006

Disclaimer | Privacy Policy | Contact Us

---

**2 attachments**

📄 **Flight to San Jose, US.ics**
1K

📄 **Itinerary Confirmation.pdf**
121K

---

**no-reply@spotnana.com** <no-reply@spotnana.com>
To: r@donefirst.com

Fri, Jul 21, 2023 at 3:15 PM



# Get Ready!

New Trip - **(Jul 17, 2023) Seattle** was
successfully created

The details of your trip are below.

---

## BEFORE YOU FLY

Please check the entry and health requirements before your trip by using the module at the bottom of our homepage.

**Learn more**

## Trip details

| | |
|---|---|
| Trip name | (Jul 17, 2023) Seattle |
| Company | Done Global, Inc |
| Legal entity | Done Global, Inc |
| Agency reference | WHBWIE |
| Trip ID | 1718583915 |

## Flight details                                      New

Seattle–Tacoma International Airport to Norman Y. Mineta San Jose International Airport          2hr 14min (Non-stop)

$CO_2$ emissions          95 kg $CO_2$

**Alaska Airlines, Inc., AS 1200**
Operated by **Alaska Airlines, Inc.**

# SEA                                  # SJC

Seattle–Tacoma International Airport          Norman Y. Mineta San Jose International Airport

2hr 14m

| | |
|---|---|
| Airline reference | JCQLZS |
| Departure date | Fri, Jul 21 |
| Departure time | 05:55 PM |
| Arrival time | 08:09 PM |
| Cabin | ECONOMY |
| Seat | Un-assigned (Rujia He) |

You can view or manage your itinerary using the button below.

**View itinerary**

---

**Need help?**

Please contact <u>Customer Experience Team</u> for assistance.

Mention **Trip ID: 1718583915** for faster service

🇺🇸 US: +1 8669368739

This is an auto-generated email.



WWW.SPOTNANA.COM

brexrewards@spotnana.com

Spotnana Technology Inc | 115 Broadway | Suite 10-114 | New York, NY 10006

<u>Disclaimer</u> | <u>Privacy Policy</u> | <u>Contact Us</u>

**2 attachments**

📄 **Flight to San Jose, US.ics**
1K

📄 **Itinerary Confirmation.pdf**
121K

# EXHIBIT 13



**Book**  Trips  Analytics  Program  Support



it's a perfect day to plan a trip

| ✈ **Flight** | 🏙 Hotel | 🚗 Car | 🚆 Rail |

| ↗ One way | ↙ Round trip | ⇆ Multi city |

Where from?

Where to?
**san jose**

)24

| ✈ | **Juan Santamaría International Airport**  San José, Costa Rica | SJO |
| ✈ | **Tobías Bolaños International Airport**  San José, Costa Rica | SYQ |
| ✈ | **Norman Y. Mineta San Jose Internatior**  San Jose, California, United States | SJC |
| ✈ | **Reid–Hillview Airport of Santa Clara Cc**  San Jose, California, United States | RHV |
| ✈ | **Los Cabos International Airport**  San José del Cabo, Baja California Sur, Mex… | SJD |
| ✈ | **San Jose Airport**  San Jose, Philippines | SJI |
| ✈ | **Capitán José Daniel Vazquez Airport**  Puerto San Julián, Santa Cruz, Argentina | ULA |

✕   🧑 Book for a g

**Search Flights**

Travel restrictions and visa requirements   ⌄

# EXHIBIT 14

SPOTNANA

# Get Ready!

**Washington DC** has been changed.

The details of your trip are below.

---

## BEFORE YOU FLY

Please check the entry and health requirements before your trip by using the module at the bottom of our homepage.

**Learn more**

## Trip details

| | |
|---|---|
| Trip name | Washington DC |
| Company | Done Global, Inc |
| Legal entity | Done Global, Inc |
| Agency reference | GDTVHK |
| Trip ID | 1563882752 |

## Traveler details

| | |
|---|---|
| Traveler | Rujia He |
| TSA | *****4TB1 |

## Flight details                    Updated

| | |
|---|---|
| **John F. Kennedy International Airport to Juan Santamaría International Airport** | **5hr 21min** (Non-stop) |
| **CO$_2$ emissions** | 437 kg CO$_2$ |

 **JetBlue Airways, B6 1793**
Operated by **JetBlue Airways**

# JFK                              # SJO

John F. Kennedy International Airport    Juan Santamaría International Airport

                                        5hr 21m

| | |
|---|---|
| Airline reference | FJSPAT |
| Departure date | Thu, Sep 28 |
| Departure time | 05:59 PM |
| Arrival time | 09:20 PM |
| Cabin | ECONOMY |
| Seat | **12E  (Rujia He)** |

## Invoice

| | |
|---|---|
| Merchant | Spotnana |
| Date of Invoice | Thu, Sep 28 |
| Trip name | Washington DC |
| Date of travel | Thu, Sep 28 05:59 PM - Thu, Sep 28 09:20 PM |
| Traveler | Rujia He |

| | |
|---|---|
| Brex Reward | |
| Amount | $208.28 |

**Rujia He**

| | |
|---|---|
| Departure date | Thu, Sep 28 |
| Route | JFK to SJO |
| Ticket number | 2798056198962 |

| | |
|---|---|
| Fare | $150.00 |
| Seat | $0.00 |
| Extra Baggage Cost | $0.00 |
| Taxes | $48.28 |

| | |
|---|---|
| Total | $198.28 |

**Service fees**

| | |
|---|---|
| Service Fee | $10.00 |
| Number of Travelers | 1 |

| | |
|---|---|
| **Grand total** | **$208.28** |
| **Paid by** | **20828 Brex Rewards Points** |

You can view or manage your itinerary using the button below.

**View itinerary**

---

**Need help?**

Please contact Customer Experience Team for assistance.

Mention **Trip ID: 1563882752** for faster service

🇺🇸 US: +1 8669368739

This is an auto-generated email.



WWW.SPOTNANA.COM

brexrewards@spotnana.com

Spotnana Technology Inc | 115 Broadway | Suite 10-114 | New York, NY 10006

Disclaimer | Privacy Policy | Contact Us

# EXHIBIT 15

SPOTNANA

# Get Ready!

**Washington DC** has been changed.

The details of your trip are below.

---

## BEFORE YOU FLY

Please check the entry and health requirements before your trip by using the module at the bottom of our homepage.

**Learn more**

## Trip details

| | |
|---|---|
| Trip name | Washington DC |
| Company | Done Global, Inc |
| Legal entity | Done Global, Inc |
| Agency reference | ELQIUV |
| Trip ID | 1563882752 |

## Traveler details

| | |
|---|---|
| Traveler | Rujia He |
| TSA | *****4TB1 |

## Flight details                    Updated

| | |
|---|---|
| **John F. Kennedy International Airport to Norman Y. Mineta San Jose International Airport** | **6hr 17min** (Non-stop) |
| **CO$_2$ emissions** | 526 kg CO$_2$ |

jetBlue **JetBlue Airways, B6 669**
Operated by **JetBlue Airways**

# JFK                                # SJC

John F. Kennedy International Airport     Norman Y. Mineta San Jose International Airport

                                         6hr 17m

| | |
|---|---|
| Airline reference | INIPRN |
| Departure date | Thu, Sep 28 |
| Departure time | 06:35 PM |
| Arrival time | 09:52 PM |
| Cabin | ECONOMY |

| Seat | Un-assigned  (Rujia He) |
|---|---|

## Invoice

| Merchant | Spotnana |
|---|---|
| Date of Invoice | Thu, Sep 28 |
| Trip name | Washington DC |
| Date of travel | Thu, Sep 28 06:35 PM - Thu, Sep 28 09:52 PM |
| Traveler | Rujia He |

| Brex Reward | 33390 Brex Points |
|---|---|
| Amount | $333.90 |

**Rujia He**

| Departure date | Thu, Sep 28 |
|---|---|
| Route | JFK to SJC |
| Ticket number | 2798058613491 |

| Fare | $296.74 |
|---|---|
| Seat | $0.00 |
| Extra Baggage Cost | $0.00 |
| Taxes | $37.16 |

| Total | $333.90 |
|---|---|

| **Grand total** | **$333.90** |
|---|---|
| **Paid by** | **33390 Brex Rewards Points** |

You can view or manage your itinerary using the button below.

**View itinerary**

---

**Need help?**

Please contact Customer Experience Team for assistance.

Mention **Trip ID: 1563882752** for faster service

🇺🇸 US: +1 8669368739

This is an auto-generated email.



WWW.SPOTNANA.COM

brexrewards@spotnana.com

Spotnana Technology Inc | 115 Broadway | Suite 10-114 | New York, NY 10006

Disclaimer | Privacy Policy | Contact Us

# EXHIBIT 16

**CALIFORNIA ASSOCIATION OF REALTORS®**

# RESIDENTIAL LEASE OR
## MONTH-TO-MONTH RENTAL AGREEMENT
### (C.A.R. Form RLMM, Revised 6/24)

Date   06/26/2024 , _____ Changli Li _____ ("Tenant")
and _____ Peiquan Wang _____ Rental Property Owner ("RPO"), Authorized
Broker or Agent, or Property Manager ("Housing Provider"), agree as follows ("Agreement"):

1. **PROPERTY:**
   A. Housing Provider rents to Tenant and Tenant rents from Housing Provider, the real property and improvements described as:
      _____ Fremont, CA 94538 _____ ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: _____
      _____
      Any person in the Premises, other than those listed in this paragraph are considered guests. Guests are not permitted to stay
      more than **14 (or _____) days** without Housing Provider's written consent.
   C. The following personal property, maintained pursuant to **paragraph 11**, is included: _Refrigerator, Washer & Dryer_
      _____ or ☐ (if checked) the personal property on the attached addendum is included.
   D. The Premises may be subject to a local rent or eviction control ordinance, or both.

2. **TERM:** The term begins on (date) _07/01/2024_ ("Commencement Date"). If Tenant has not paid all amounts then due; (i)
   Tenant has no right to possession of keys to the premises and; (ii) this Agreement is voidable at the option of Housing Provider, 2
   calendar days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant (i) in person; (ii) by mail
   to Tenant's last known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate
   with Housing Provider or its agent. If Housing Provider elects to void the lease, Housing Provider shall refund to Tenant all rent and
   security deposit paid.
   **(Check A or B):**
   ☐ A. **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may
      terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be
      responsible for paying rent through the termination date even if moving out early. Housing Provider may terminate the
      tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** This Agreement shall terminate on (date) _06/30/2025_ at _11:59_ ☐ AM/ ☒ PM. Tenant shall vacate the
      Premises upon termination of the Agreement, unless: (i) Housing Provider and Tenant have extended this Agreement in
      writing or signed a new agreement; (ii) mandated by any rent increase cap or just cause eviction control under any state or
      local law; or (iii) Housing Provider accepts Rent from Tenant (other than past due Rent), in which case a month-to-month
      tenancy shall be created which either party may terminate as specified in **paragraph 2A**. Rent shall be at a rate agreed to
      by Housing Provider and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full
      force and effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Housing Provider under the terms of the Agreement, except security
   deposit.
   A. Tenant agrees to pay $4,200.00 _____ per month for the term of the Agreement.
   B. Rent is payable in advance on the 1st (or _____) day of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under **paragraph 3B**, and Tenant has paid one full
      month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay
      1/30th of the monthly rent per day for each day remaining in the prorated second month.
   D. **PAYMENT:**
      (1) Rent shall be paid by ☐ personal check, ☐ money order, ☐ cashier's check, made payable to _____
          _____, ☒ wire/electronic payment to _____ Peiquan Wang _____,
          or ☐ other _____. Payment via electronic apps such as PayPal or Venmo will not (☐ will) be accepted.
      (2) Rent shall be delivered to (name) _____
          (whose phone number is) _____ at (address) _____
          (or at any other location subsequently specified by Housing Provider in writing to Tenant) (and ☐ if checked, rent may be paid
          personally, between the hours of _____ and _____ on the following days _____).
      (3) If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Housing
          Provider may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☐ money
          order, or ☒ cashier's check.
   E. Rent payments received by Housing Provider shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $8,400.00 _____ as a security deposit.
      (The maximum amount of security deposit paid on or before initial occupancy, however designated, cannot exceed one
      month's Rent unless an exception applies. See Security Deposit Exception Disclosure and Addendum, C.A.R. Form
      SDDA, for additional information.)
   B. Security deposit is in addition to any advance payment of first month's Rent. Security deposit law does not prohibit the payment
      of advance rent of not less than six months' rent if the term of the lease is six months or longer.
   C. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.

Tenant's Initials _u_ / _____        Housing Providers Initials _pw_ / _____

© 2024, California Association of REALTORS®, Inc.
RLMM REVISED 6/24 (PAGE 1 OF 9)

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 1 OF 9)**

D. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest, invitee or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within 5 days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Housing Provider shall: (1) furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and (2) return any remaining portion of the security deposit to Tenant.

E. **Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.**

F. No interest will be paid on security deposit unless required by local law.

G. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

5. **MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☐ personal check, ☐ money order, ☐ cashier's check, or ☒ wire/electronic payment.

| Category | Total Due | Payment Received | Balance Due | Due Date | Payable To |
|---|---|---|---|---|---|
| Rent from _07/01/2024_ | | | | | |
| to _07/31/2024_ (date) | $4,200.00 | | $4,200.00 | 07/01/2024 | Peiquan Wang |
| Security Deposit | $8,400.00 | | $8,400.00 | 07/01/2024 | Peiquan Wang |
| Other _____ | | | | | |
| Other _____ | | | | | |
| Total | $12,600.00 | | $12,600.00 | 07/01/2024 | Peiquan Wang |

6. **LATE CHARGE; RETURNED CHECKS:**

A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Housing Provider to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Housing Provider. If any installment of Rent due from Tenant is not received by Housing Provider within 5 (or _____) calendar days after the date due, or if a check is returned, Tenant shall pay to Housing Provider, respectively, an additional sum of $ _____ or _5.000_ % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.

B. Housing Provider and Tenant agree that these charges represent a fair and reasonable estimate of the costs Housing Provider may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Housing Provider's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Housing Provider's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under **paragraph 3** nor prevent Housing Provider from exercising any other rights and remedies under this Agreement and as provided by law.

7. **PARKING:** (Check A or B)

☒ A. Parking is permitted as follows: _Garage, Driveway and street parking._

The right to parking ☒ is ☐ is not included in the Rent charged pursuant to **paragraph 3**. If not included in the Rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in **paragraph 8**.

OR ☐ B. Parking is not permitted on the real property of which the Premises is a part.

8. **STORAGE:** (Check A or B)

☐ A. Storage is permitted as follows:
The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to **paragraph 3**. If not included in the Rent, storage space fee shall be an additional $ _____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.

OR ☐ B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

9. **UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: _Water,PG&E, Garbage, Internet, Phone_ except _____, which shall be paid for by Housing Provider, or ☐ as agreed on a separate addendum. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Housing Provider. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Housing Provider is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.

☐ A. **Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.

☐ B. **Gas Meter:** The Premises does not have a separate gas meter.

☐ C. **Electric Meter:** The Premises does not have a separate electrical meter.

Tenant's Initials _____ / _____     Housing Providers Initials _PW_ / _____

**RLMM REVISED 6/24 (PAGE 2 OF 9)**



**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 2 OF 9)**

10. **CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).
(Check all that apply:)
- ☐ A. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MII).
- ☐ B. (i) Housing Provider will Deliver to Tenant a statement of condition (C.A.R. Form MII) ☐ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date. (ii) Tenant shall complete and return the MII to Housing Provider within 3 (or _____ ) days after Delivery. Tenant's failure to return the MII within that time shall conclusively be deemed Tenant's Acknowledgment of the condition as stated in the MII.
- ☐ C. Tenant will provide Housing Provider a list of items that are damaged or not in operable condition within 3 (or __7__ ) days after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgment of the condition of the Premises.
- ☐ D. Other: _____.

11. **MAINTENANCE USE AND REPORTING:**
   A. Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for any additional phone lines beyond the one line and jack that Housing Provider shall provide and maintain. Tenant shall replace any burned out or malfunctioning light bulbs. Tenant shall immediately notify Housing Provider, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.
   B. ☐ Housing Provider ☒ Tenant ☐ HOA shall water the garden, landscaping, trees and shrubs, except: _____.
   C. ☒ Housing Provider ☐ Tenant ☐ HOA shall maintain the garden, landscaping, trees and shrubs, except: _____.
   D. ☐ Housing Provider ☒ Tenant shall maintain *The property at reasonable good condition as it is leased.* _____.
   E. Housing Provider and Tenant agree that State or local water use restrictions shall supersede any obligation of Housing Provider or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to **paragraphs 11B, 11C, and 11D.**
   F. Tenant's failure to maintain any item for which Tenant is responsible shall give Housing Provider the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.
   G. **PERIODIC PEST CONTROL:** ☐ Housing Provider ☐ Tenant shall pay for periodic pest control by the following service provider: _____. This obligation shall only be applicable if the Premises is a house and the periodic pest control treatment is being provided at the execution of this Agreement. The current cost of such treatment is: $ _____ per _____.
   H. The following items of personal property are included in the Premises without warranty and Housing Provider will not maintain, repair or replace them: _____.
   I. Tenant understands that if Premises is located in a Common Interest Development, Housing Provider may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as landscaping, shared parking structure or garage.
   J. Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

12. **NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy himself or herself as to neighborhood or area conditions, including, but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

13. **ANIMALS:** Unless otherwise provided in California Civil Code § 54.2, or other law, no animal shall be kept on or about the Premises without Housing Provider's prior written consent, ☒ except as agreed to in the attached Animals Terms and Conditions Addendum (C.A.R. Form ATCA).

14. **SMOKING:**
   A. (i) Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant acknowledges that in order to remove odor caused by smoking, Housing Provider may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.
   B. The Premises or common areas may be subject to a local non-smoking ordinance.
   C. NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is in material breach of this Agreement; (ii) Tenant, guests, and all others may be required to leave the Premises. ☐ Smoking of the following substances only is allowed: _____.

15. **RULES/REGULATIONS:**
   A. Tenant agrees to comply with all Housing Provider rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests, invitees and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.
   B. (If applicable, check one)
      - ☐ (1) Housing Provider shall provide Tenant with a copy of the rules and regulations within _____ days or _____.
      - OR ☐ (2) Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

RLMM REVISED 6/24 (PAGE 3 OF 9)     Tenant's Initials _____ / _____     Housing Providers Initials _____ / _____

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 3 OF 9)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201  www.lwolf.com     Peter Wang 4714

16. ☐ (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**
   A. The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____*N/A*_____ Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Housing Provider for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant, or Housing Provider shall have the right to deduct such amounts from the security deposit.
   B. If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in **paragraph 5**, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.
   C. (Check one)
   ☐ (1) Housing Provider shall provide Tenant with a copy of the HOA Rules within __*N/A*__ days or _____*N/A*_____.
   OR ☐ (2) Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.
17. **ALTERATIONS; REPAIRS:** Unless otherwise specified by law or **paragraph 25C**, without Housing Provider's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Housing Provider shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.
18. **KEYS; LOCKS:**
   A. Tenant acknowledges receipt of (or Tenant will receive ☒ prior to the Commencement Date, or ☐ _____):

   | | | | |
   |---|---|---|---|
   | ☒ 2 | key(s) to Premises, | ☒ 2 | remote control device(s) for garage door/gate opener(s). |
   | ☐ | key(s) to mailbox, | ☐ | . |
   | ☐ | key(s) to common area(s). | ☐ | . |

   B. Tenant acknowledges that locks to the Premises ☐ have, ☒ have not, been re-keyed.
   C. If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Housing Provider. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.
19. **ENTRY:**
   A. Tenant shall make Premises available to Housing Provider or Housing Provider's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold), decorations, alterations, or improvements; or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Housing Provider, Broker and Interested Persons may take photos of the Premises.
   B. Housing Provider and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows:
   (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice.
   (2) If Housing Provider has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers.
   (3) No written notice is required if Housing Provider and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement.
   (4) No notice is required: **(i)** to enter in case of an emergency; **(ii)** if the Tenant is present and consents at the time of entry; or **(iii)** if the Tenant has abandoned or surrendered the Premises.
   C. ☒ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).
20. **PHOTOGRAPHS AND INTERNET ADVERTISING:**
   A. In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Housing Provider has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet. Tenant is advised to store or otherwise remove from view, anything of a personal nature which Tenant would not want to appear in any Images, including but not limited to, family photos, documents, or other valuables.
   B. Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Housing Provider has control over who views such Images nor what use viewers may make of the Images.
21. **SIGNS:** Tenant authorizes Housing Provider to place FOR SALE/LEASE signs on the Premises.
22. **ASSIGNMENT; SUBLETTING:**
   A. Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Housing Provider's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Housing Provider, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Housing Provider an application and credit information for Housing Provider's approval and, if approved, sign a separate written agreement with Housing Provider and Tenant. Housing Provider's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement.
   B. This prohibition also applies ☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services.
   C. Any violation of this prohibition is a non-curable, material breach of this Agreement.

   *PW*

Tenant's Initials ____ / ____    Housing Providers Initials ____ / ____

RLMM REVISED 6/24 (PAGE 4 OF 9)

23. **JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

24. **POSSESSION:**
   A. (1) Tenant is not in possession of the Premises. If Housing Provider is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Housing Provider is unable to deliver possession within 5 (or _____) calendar days after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Housing Provider, and shall be refunded all Rent and security deposit paid.
   OR (2) ☐ Tenant is already in possession of the Premises.
   B. Possession is deemed terminated when Tenant has returned all keys to the Premises to Housing Provider.

25. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:**
   A. Upon termination of this Agreement, Tenant shall: **(i)** give Housing Provider all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Housing Provider, empty of all persons; and personal property belonging to Tenant **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in **paragraph 25C** below, to Housing Provider in the same condition as referenced in **paragraph 10**; **(v)** remove all debris; **(vi)** give written notice to Housing Provider of Tenant's forwarding address; and **(vii)** _____
   _____

   B. All alterations/improvements made by or caused to be made by Tenant, with or without Housing Provider's consent, become the property of Housing Provider upon termination. Housing Provider may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.
   C. **Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Housing Provider. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: (a) obtain receipts for Repairs performed by others; (b) prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and (c) provide copies of receipts and statements to Housing Provider prior to termination. **Paragraph 25C** does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3), or (4).

26. **BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by **paragraph 25**, in the event of termination by Tenant prior to completion of the original term of the Agreement or any extension, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Housing Provider may withhold any such amounts from Tenant's security deposit.

27. **TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Housing Provider, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

28. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Housing Provider or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Housing Provider shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Housing Provider shall have the right of termination, and no reduction in Rent shall be made.

29. **INSURANCE:**
   A. Tenant's, guest's, invitees or licensee's personal property and vehicles are not insured by Housing Provider, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage.**
   B. Tenant shall comply with any requirement imposed on Tenant by Housing Provider's insurer to avoid: **(i)** an increase in Housing Provider's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance.
   C. ☒ Tenant shall obtain liability insurance, in an amount not less than $200,000.00 _____ for injury or damage to, or upon, the Premises during the term of this agreement or any extension. The liability policy shall name Housing Provider, and Property Manager, if applicable: **(i)** as an additional interest, requiring insurer to notify such person if the policy is changed, cancelled or not renewed; and **(ii)** as an additional insured, if available from the insurer. Tenant shall provide Housing Provider a copy of the insurance policy before commencement of this Agreement, and a rider prior to renewal. Housing Provider and Tenant are advised to seek counsel from a qualified California attorney or insurance broker regarding the availability of insurance, prior to entering into this Agreement.

30. **WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher ☐ Portable Washing Machine.

31. **WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

32. **NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:
   Housing Provider: _Jerry Zang_      Tenant: _____

| P.O.BOX 321329 | —DS— | | —DS— |
| Los Gatos CA 95032 | _U._ | | _ρ/V_ |

RLMM REVISED 6/24 (PAGE 5 OF 9)    Tenant's Initials _____ / _____    Housing Providers Initials _____ / _____

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 5 OF 9)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   Peter Wang 4714

33. **TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Housing Provider or Housing Provider's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

34. **REPRESENTATION**
   A. **TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Housing Provider requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Housing Provider when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Housing Provider and Broker(s) to obtain Tenant's credit during the tenancy in connection with a modification of this Agreement. Before occupancy begins, Housing Provider may cancel this Agreement upon disapproval of the credit report(s) or upon discovering that information in Tenant's application is false. During the tenancy, Housing Provider may reject any such modification upon disapproval of the credit report(s) obtained in connection with the modification. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.
   B. **HOUSING PROVIDER REPRESENTATIONS:** Housing Provider warrants that, unless otherwise specified in writing, Housing Provider is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

35. **MEDIATION:**
   A. Consistent with paragraphs 35B and 35C below, Housing Provider and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.
   B. The following matters are excluded from mediation: (i) an unlawful detainer action; (ii) the filing or enforcement of a mechanic's lien; and (iii) any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.
   C. Housing Provider and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

36. **ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Housing Provider and Tenant shall be entitled to reasonable attorney fees and costs collectively not to exceed $1,000 (or $_____ ), except as provided in paragraph 35A.

37. **C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

38. **DISCLOSURES:**
   A. ☒ **MOLD AND DAMPNESS:** Exposure to mold may have potential health risks. Tenant acknowledges receipt of the attached booklet titled, "Information on Dampness and Mold for Renters in California" before signing this Residential Lease or Month-to-Month Rental Agreement.
   B. **BED BUGS:** Housing Provider has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Housing Provider or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Housing Provider will notify tenants of any units infested by bed bugs.
   C. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to § 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov.** Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Housing Provider nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)
   D. ☒ **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.
   E. **FLOOD HAZARD DISCLOSURE:** Flooding has the potential to cause significant damage to personal property owned by Tenant. See attached Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) for additional information.
   F. ☐ **OTHER MATERIAL FACTS:** _____
   _____
   G. **ADDITIONAL DISCLOSURES:** RPO shall make additional disclosures regarding the following matters, if applicable, on the Rental Property Owner Disclosure (C.A.R. Form RPOD): Lead-based Paint; Methamphetamine Contamination; Periodic Pest Control Contracts; Water Submeters; Mold; Asbestos; Homeowners Associations/Condominiums/Planned Developments; Military Ordnance Locations; Death on the Premises.

39. **SERVICEMEMBERS CIVIL RELIEF ACT:** Notwithstanding anything to the contrary in paragraphs 2, 4, 26 or elsewhere in this Agreement, the Servicemembers Civil Relief Act applies to this Agreement and any effort to terminate it, as specified in §§ 3951 and 3955 of the Act.

40. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California Housing Provider-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.  PW

Tenant's Initials _____ / _____      Housing Providers Initials _____ / _____

Premises: _____ Fremont, CA 94538 _____ Date: 08/30/2024

**41. AGENCY:**

A. **CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:

Housing Provider's Brokerage Firm _ColdWell Banker Realty_ License Number _01908304_
Is the broker of (check one): [X] the Housing Provider; or [ ] both the Tenant and Housing Provider (Dual Agent).
Housing Provider's Agent _Jerry Zang_ License Number _01702597_
Is (check one): [X] the Housing Provider's Agent. (salesperson or broker associate); or [ ] both the Tenant's and Housing Provider's Agent (Dual Agent).
Tenant's Brokerage Firm xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx License Number XXXXXXXXXXXXX
Is the broker of (check one): [ ] the Tenant; or [ ] both the Tenant and Housing Provider (Dual Agent).
Tenant's Agent xxxxxxxxxxxxxxxxxxxxxxxxxxxxx License Number _XXXXXXXX_
Is (check one): [ ] the Tenant's Agent. (salesperson or broker associate); or [ ] both the Tenant's and Housing Provider's Agent (Dual Agent).

B. **DISCLOSURE:** [ ] (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) have been provided to Housing Provider and Tenant, who each acknowledge its receipt.

C. **TERMINATION OF AGENCY RELATIONSHIP:**
  (1) Housing Provider and Tenant acknowledges and agrees that unless Broker is the property manager, or as specified in (2) below, once Housing Provider and Tenant enter into this Agreement, (i) Broker will not represent Owner in any manner regarding the management of the Premises; and (ii) Any representation duties that Broker may owe to, and any agency relationship that Broker may have with, either Housing Provider or Tenant, is terminated.
  (2) Notwithstanding paragraph 41C(1), Broker duties and responsibilities to either Housing Provider or Tenant will terminate upon the last to occur of the following (choose all that apply): [ ] Tenant occupancy, [ ] Delivering to Tenant keys or other means of entering the Premises, [ ] Tenant walkthrough, [ ] Completion of Move In Inspection (C.A.R. Form MII).

**42.** [ ] **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

**43. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a Housing Provider or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.

**44. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).

**45. RECEIPT:** If specified in paragraph 5, Housing Provider or Broker, acknowledges receipt of move-in funds.

**46. CITY, COUNTY OR OTHER LOCAL REQUIREMENTS:** Housing Provider and Tenant are advised that city, county or other local requirements, including those imposed by a regulatory body such as a rent stabilization or similar board, may apply, and to attach to this Residential Lease or Month-to-Month Rental Agreement or separately provide, as provided by law, any documentation required by such a local authority.

**47. OTHER TERMS AND CONDITIONS;** If checked, the following ATTACHED documents are incorporated in this Agreement:
[X] Keysafe/Lockbox Addendum (C.A.R. Form KLA); [X] Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form LPD); [ ] Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); [ ] Parking and Storage Disclosure (C.A.R. Form PSD); [X] Bed Bug Disclosure (C.A.R. Form BBD); [X] Tenant Flood Hazard Disclosure (C.A.R. Form TFHD); [X] Rent Cap and Just Cause Addendum (C.A.R. Form RCJC)

[ ] Other Documents/Addenda: _____

[X] Other Terms: _____

**48. LEGALLY AUTHORIZED SIGNER:** Wherever the signature or initials of the Legally Authorized Signer identified in paragraphs 51 or 52 appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Legally Authorized Signer (i) represents that the entity for which that person is acting already exists and is in good standing to do business in California, and (ii) shall Deliver to the other Party, upon request, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code § 18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

**49.** [ ] **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____. Housing Provider and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

**50.** The Premises is being managed by Owner, (or, if checked):
[ ] Housing Provider's Brokerage Firm in Real Estate Brokerage section [ ] Tenant's Brokerage Firm in Real Estate Brokers section
[ ] Property Management firm immediately below
Real Estate Broker (Property Manager) _____ DRE Lic # _____
(Agent) _____ DRE Lic # _____
Address _____ Telephone # _____

Tenant's Initials _u_ / ____ Housing Providers Initials _pw_ / ____

RLMM REVISED 6/24 (PAGE 7 OF 9)

Housing Provider and Tenant acknowledge and agree Brokers: (a) do not guarantee the condition of the Premises; (b) cannot verify representations made by others; (c) cannot provide legal or tax advice; (d) will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Housing Provider in this Agreement, Brokers: (e) do not decide what rental rate a Tenant should pay or Housing Provider should accept; and (f) do not decide upon the length or other terms of this Agreement. Housing Provider and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

51. **Tenant agrees to rent the Premises on the above terms and conditions.**
   **A.** ☐ **ENTITY TENANT:** (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)
      (1) One or more Tenant is trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.
      (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 48** for additional terms.
      (3) The name(s) of the Legally Authorized Signer(s) is: _____, _____.
      (4) A. If a trust, identify Tenant as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).
         B. If Property is sold under the jurisdiction of a probate court, identify Tenant as executor or administrator, or by a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).
      (5) The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): _____

   **B. TENANT SIGNATURE(S):**
   (Signature) By, _____*Changli Li*_____ Date: 6/28/2024
   Printed name of Tenant: *Changli Li*
   ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
   Address _____ City _____ State ___ Zip ___
   Telephone _____ Text _____ E-mail ███████
   (Signature) By, _____ Date: ___
   Printed name of Tenant:
   ☐ Printed Name of Legally Authorized Signer: _____ Title, if applicable, _____
   Address _____ City _____ State ___ Zip ___
   Telephone _____ Text _____ E-mail _____
      ☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

☒ **GUARANTEE:** In consideration of the execution of this Agreement by and between Housing Provider and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Housing Provider and Housing Provider's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Housing Provider and Tenant; and **(iii)** waive any right to require Housing Provider and/or Housing Provider's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) *Done Global Corp* _____ *Jessie Lee* Date 6/28/2024
Guarantor _____
Address _____ City _____ State ___ Zip ___
Telephone ███████ Text _____ E-mail ███████

Tenant's Initials [ U ] / ____     Housing Providers Initials [ PW ] / ____

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 8 OF 9)**
Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   Peter Wang 4714



**52.** Housing Provider (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.

**A.** ☐ **ENTITY HOUSING PROVIDER:** (Note: If this paragraph is completed, a Representative Capacity Signature Disclosure (C.A.R. Form RCSD) is not required for the Legally Authorized Signers designated below.)

    (1) One or more Housing Provider is a trust, corporation, LLC, probate estate, partnership, holding a power of attorney or other entity.

    (2) This Agreement is being Signed by a Legally Authorized Signer in a representative capacity and not in an individual capacity. See **paragraph 48** for additional terms.

    (3) The name(s) of the Legally Authorized Signer(s) is: _____, _____.

    (4) A. If a trust, identify Housing Provider as trustee(s) of the trust or by simplified trust name (ex. John Doe, co-trustee, Jane Doe, co-trustee or Doe Revocable Family Trust).

        B. If Property is sold under the jurisdiction of a probate court, identify Housing Provider as executor or administrator, or by a simplified probate name (John Doe, executor, or Estate (or Conservatorship) of John Doe).

    (5) The following is the full name of the entity (if a trust, enter the complete trust name; if under probate, enter full name of the estate, including case #): _____

**B. HOUSING PROVIDER SIGNATURE(S):** *Peiquan Wang*

(Signature) By, _____   Date: 6/27/2024

Printed name of Housing Provider: *Peiquan Wang*

☐ Printed Name of Legally Authorized Signer: _____   Title, if applicable, _____

Address _____   City _____   State ___ Zip _____

Telephone _____   Text _____   E-mail *peiquanwang@foxmail.com*

(Signature) By, _____   Date: _____

Printed name of Housing Provider: _____

☐ Printed Name of Legally Authorized Signer: _____   Title, if applicable, _____

Address _____   City _____   State ___ Zip _____

Telephone _____   Text _____   E-mail _____

    ☐ IF MORE THAN TWO SIGNERS, USE Additional Signature Addendum (C.A.R. Form ASA).

Tenant's Initials _____ / _____   Housing Providers Initials _____ / _____

---

**REAL ESTATE BROKERS:**

**A.** Real estate brokers who are not also Housing Provider under this Agreement are not parties to the Agreement between Housing Provider and Tenant.

**B.** Agency relationships are confirmed in **paragraph 41.**

**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Tenant's Brokerage Firm xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx DRE Lic. # *XXXXXXXXXXXX*

By (Agent) _____   *XXXXXXXXXXXXXXXXXXXXXXXX* DRE Lic. # *XXXXXXX*   Date _____

Address *XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX*   City *XXXXXXXXXXXXXXXXXX*   State ___ Zip _____

Telephone *(XXX)XXX-XXXXXXX*   Text *(XXX)XXX-XXXXXXX*   E-mail *XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX*

Housing Provider's Brokerage Firm *ColdWell Banker Realty*   DRE Lic. # *01908304*

By (Agent) _____ *Jerry Zang* _____   *Jerry Zang* DRE Lic. # *01702597*   Date 6/27/2024

Address _____ NAAFFDE2671440D _____   City _____   State ___ Zip _____

Telephone *(408)930-4684*   Text *(XXX)XXX-XXXXXXX*   E-mail *jerryzangrealtor@outlook.com*

© 2024, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®.

Published and Distributed by: REAL ESTATE BUSINESS SERVICES, LLC, a subsidiary of the California Association of REALTORS®



**RLMM REVISED 6/24 (PAGE 9 OF 9)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (RLMM PAGE 9 OF 9)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com   Peter Wang 4714

CALIFORNIA
ASSOCIATION
OF REALTORS®

**BED BUG DISCLOSURE**
California Civil Code §1954.603
(C.A.R. Form BBD, Revised 6/23)

The following terms and conditions are hereby incorporated in and made a part of the Residential Lease or Month-to-Month Rental Agreement, OR ☐ Residential Lease After Sale, ☐ Other _____ ("Agreement"), dated ___04/26/2023___, on property known as _____ Fremont, CA 94538 _____

in which _____Changli Li_____ is referred to as "Tenant" and _____Peiquan Wang_____ is referred to as "Housing Provider".

**INFORMATION ABOUT BED BUGS:**

1. **Bed Bug Appearance:** Bed bugs have six legs. Adult bed bugs have flat bodies about 1/4 of an inch in length. Their color can vary from red and brown to copper colored. Young bed bugs are very small. Their bodies are about 1/16 of an inch in length. They have almost no color. When a bed bug feeds, its body swells, may lengthen, and becomes bright red, sometimes making it appear to be a different insect. Bed bugs do not fly. They can either crawl or be carried from place to place on objects, people, or animals. Bed bugs can be hard to find and identify because they are tiny and try to stay hidden.
2. **Life Cycle and Reproduction:** An average bed bug lives for about 10 months. Female bed bugs lay one to five eggs per day. Bed bugs grow to full adulthood in about 21 days.
3. Bed bugs can survive for months without feeding.
4. **Bed Bug Bites:** Because bed bugs usually feed at night, most people are bitten in their sleep and do not realize they were bitten. A person's reaction to insect bites is an immune response and so varies from person to person. Sometimes the red welts caused by the bites will not be noticed until many days after a person was bitten, if at all.
5. **Common signs and symptoms of a possible bed bug infestation:**
   • Small red to reddish brown fecal spots on mattresses, box springs, bed frames, mattresses, linens, upholstery, or walls.
   • Molted bed bug skins, white, sticky eggs, or empty eggshells.
   • Very heavily infested areas may have a characteristically sweet odor.
   • Red, itchy bite marks, especially on the legs, arms, and other body parts exposed while sleeping. However, some people do not show bed bug lesions on their bodies even though bed bugs may have fed on them.
6. For more information, see the Internet Web sites of the United States Environmental Protection Agency and the National Pest Management Association.
7. **Tenant shall report suspected infestations by bed bugs to the Housing Provider or Property Manager** at the mailing, or email address or phone number provided in the Agreement and cooperate with any inspection for and treatment of bed bugs.
8. Housing Provider will notify tenants of any units inspected by a pest control operator of the findings by such an operator within 2 business days of the receipt of the findings. All Tenants will be notified of confirmed infestations within common areas.

Tenant agrees to release, indemnify, hold harmless and forever discharge Housing Provider and Housing Provider's employees, agents, successors and assigns from any and all claims, liabilities or causes of action of any kind that Tenant, members of Tenant's household or Tenant's guests or invitees may have at any time against Housing Provider or Housing Provider's agents resulting from the presence of bedbugs due to Tenant's failure to comply with this Bed Bug Disclosure.

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Tenant (Signature) _____Changli Li_____ Date ___6/28/2024___
        Changli Li

Tenant (Signature) _____ Date _____

Housing Provider (Signature) _____Peiquan Wang_____ Date ___6/27/2024___
        Peiquan Wang

Housing Provider (Signature) _____ Date _____

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**BBD REVISED 6/23 (PAGE 1 OF 1)**

Bay One Real Estate Investment Corporation, 1754 Technology Dr. Suite 100 San Jose, CA 95110   Phone: 408-213-9600 603   Fax: 408-484-6123   Peter Wang 4714
Zhaoming Zang     Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

CALIFORNIA
ASSOCIATION
OF REALTORS®

**TENANT FLOOD HAZARD DISCLOSURE**
(C.A.R. Form TFHD, Revised 6/23)

The following terms and conditions are hereby incorporated in and made a part of the Residential Lease or Month-to-Month Rental Agreement, OR ☐ Residential Lease After Sale, ☐ Other _____.
dated ___06/26/2024___, on property known as [redacted] _Fremont, CA 94538_____.
in which _____Changli Li_____ is referred to as ("Tenant")
and _____Peiquan Wang_____ is referred to as ("Housing Provider").

**INFORMATION ABOUT FLOOD HAZARDS: Tenant is informed of the following:**

1. **The Property is not located in a special flood hazard area or an area of potential flooding.**

OR ☐ The Property is located in a special flood hazard area or an area of potential flooding. Property is deemed to be in a special flood hazard area or area of potential flooding if any of the following scenarios apply:

   A. The owner has actual knowledge of that fact.
   B. The owner has received written notice from any public agency stating that the Property is located in a special flood hazard area or an area of potential flooding.
   C. The Property is located in an area in which the owner's mortgage holder requires the owner to carry flood insurance.
   D. The owner currently carries flood insurance.

2. The tenant may obtain information about hazards, including flood hazards, that may affect the Property from the Internet Web site of the Office of Emergency Services, My Hazards Tool (http://myhazards.caloes.ca.gov).

3. The owner's insurance does not cover the loss of the tenant's personal possessions and it is recommended that the tenant consider purchasing renter's insurance and flood insurance to insure his or her possessions from loss due to fire, flood, or other risk of loss.

4. The owner is not required to provide additional information concerning the flood hazards to the Property and that the information provided pursuant to this section (California Government Code section 8589.45) is deemed to inform the tenant.

**The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.**

Tenant (Signature) ___*Changli Li*___ Date ___6/28/2024___
       Changli Li

Tenant (Signature) _____ Date _____

Housing Provider (Signature) ___*Peiquan Wang*___ Date ___6/27/2024___
       Peiquan Wang

Housing Provider (Signature) _____ Date _____

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



TFHD Revised 6/23 (PAGE 1 OF 1)

**TENANT FLOOD HAZARD DISCLOSURE (TFHD PAGE 1 OF 1)**



CALIFORNIA
ASSOCIATION
OF REALTORS®

## RENT CAP AND JUST CAUSE ADDENDUM
(Note: State or local laws may limit the availability of certain exemptions.
Check with a qualified California real estate attorney before proceeding.)
(C.A.R. Form RCJC, Revised 6/23)

The following terms and conditions are hereby incorporated and made part of the Residential Lease or Month-to-Month Rental Agreement dated _06/26/2024_ on property known as _____ _Fremont, CA 94538_ in which _____ _Changli Li_ _____ is referred to as "Tenant" and _____ _Peiquan Wang_ _____ is referred to as "Housing Provider".

## I. RENT CAP AND JUST CAUSE ADDENDUM TERMS

With certain exemptions, Housing Provider may be subject to the rent cap and just cause eviction provisions of the Civil Code. Housing Provider informs Tenant of the following:

California law limits the amount your rent can be increased. See § 1947.12 of the Civil Code for more information. California law also provides that after all Tenants have continuously and lawfully occupied the property for 12 months or more or at least one of the Tenants has continuously occupied the property for 24 months or more, a Housing Provider must provide a statement of cause in any notice to terminate a tenancy. See § 1946.2 of the Civil Code for more information.

## II. EXEMPTIONS TO BOTH RENT CAP REQUIREMENTS AND JUST CAUSE EVICTIONS*:

1. Housing that has been issued a certificate of occupancy within the previous 15 years.
2. A property containing two separate dwelling units (excluding ADUs and junior ADUs) within a single structure in which one of the units was Owner occupied at the commencement and throughout the tenancy.
3. **Single Family Residential** property (including a condominium and units in planned developments) that is alienable separate from the title to any other dwelling unit if the notice below is checked and delivered to the Tenant:

> [X] **Notice of Exemption**: This property is not subject to the rent limits imposed by § 1947.12 of the Civil Code and is not subject to the just cause requirements of § 1946.2 of the Civil Code. This property meets the requirements of §§ 1947.12 (d)(5) and 1946.2 (e)(8) of the Civil Code AND the Owner is not any of the following: (1) a real estate investment trust, as defined by § 856 of the Internal Revenue Code; (2) a corporation; or (3) a limited liability company in which at least one member is a corporation.

## III. ADDITIONAL EXEMPTIONS ONLY APPLICABLE TO JUST CAUSE EVICTIONS*:

1. Housing accommodations in which the Tenant shares bathroom or kitchen facilities with the Owner who maintains their principal residence at the residential real property.
2. Single-family Owner-occupied residences, including a residence in which the Owner-occupant rents or leases no more than two units or bedrooms, including, but not limited to, an accessory dwelling unit.

## IV. RENT CAP REQUIREMENTS

1. Subject to certain provisions of Civil Code § 1947.12 subdivision (b), an Owner of real property shall not increase the rental rate for that property more than 5 percent plus the percentage change in the cost of living, or 10 percent, whichever is lower, of the lowest rental amount charged for that property at any time during the 12 months prior to the effective date of the increase.
2. If the same Tenant remains in occupancy over any 12-month period, the gross rental rate shall not be increased in more than two increments over that 12-month period.
3. For a new tenancy in which no Tenant from the prior tenancy remains, the Owner may establish the initial rate not subject to **paragraph 1** of this section. **Paragraph 1** of this section is only applicable to subsequent increases after the initial rental rate has been established.

## V. JUST CAUSE REASONS FOR TERMINATION OF TENANCY

1. **"At-Fault" Reasons:**
   A. Default in payment of rent.
   B. Breach of a material term of the lease, as described in Code of Civil Procedure § 1161, paragraph (3), including but not limited to, violation of a provision of the lease after being issued a written notice to correct the violation.

© 2023, California Association of REALTORS®, Inc.

RCJC REVISED 6/23 (PAGE 1 OF 2)

### RENT CAP AND JUST CAUSE ADDENDUM (RCJC PAGE 1 OF 2)

Bay One Real Estate Investment Corporation, 1754 Technology Dr. Suite 100 San Jose, CA 95110        Phone: 408-213-8600 603        Fax: 408-484-6123        Peter Wang 4714
Zhaoning Zang        Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201   www.lwolf.com

C. Maintaining, committing, or permitting the maintenance of a nuisance as described in Code of Civil Procedure § 1161, paragraph (4).

D. Committing waste as described in Code of Civil Procedure § 1161, paragraph (4).

E. The Tenant had a written lease that terminated on or after January 1, 2020, and after a written request or demand from the Owner, the Tenant refused to execute a written extension or renewal of the lease for an additional term of similar duration with similar provisions, provided that terms do not violate § 1946.1 or any other provision of law.

F. Criminal activity by the Tenant on the residential real property, including any common areas, or any criminal threat, as defined in Penal Code § 422, subdivision (a), directed to any Owner or agent of the Owner of the premises.

G. Assigning or subletting the premises in violation of the Tenant's lease.

H. The Tenant's refusal to allow the Owner to enter the residential real property pursuant to a request consistent with Civil Code §§ 1101.5 and 1954, and Health and Safety Code §§ 13113.7 and 17926.1.

I. Using the premises for an unlawful purpose as described in Code of Civil Procedure § 1161, paragraph (4).

J. When the Tenant fails to deliver possession of the residential real property after providing the Owner written notice of Tenant's intention to terminate the hiring of real property or makes a written offer to surrender that is accepted in writing by the Housing Provider, but fails to deliver possession at the time specified in that written notice.

## 2. "No-fault" Reasons:

A. Intent to occupy the residential real property by the Owner or their spouse, domestic partner, children, grandchildren, parents or grandparents (Owner/family move-in). Tenant and Owner hereby agree that the Owner shall have the right to terminate the lease if the Owner, or their spouse, domestic partner, children, grandchildren, parents or grandparents, unilaterally decide to occupy the residential property. Owner may terminate the lease at the end of a fixed term or any time during a month to month tenancy by giving the appropriate notice.

B. Withdrawal of the Premises from the rental market. Owner may terminate the lease at the end of a fixed term or any time during a month to month tenancy by giving the appropriate notice.

C. Unsafe habitation, as determined by a government agency that has issued an order to vacate, or to comply, or other order that necessitates vacating the residential property.

D. Intent to demolish or substantially remodel the residential real property. "Substantially remodel" means the replacement or substantial modification of any structural, electrical, plumbing, or mechanical system that requires a permit that cannot be accomplished in a safe manner with the Tenant in place, and that requires Tenant to vacate the residential real property for at least 30 days. Cosmetic improvements alone do not qualify.

## 3. Just Cause Notices:

A. **Curable "At-Fault" Reasons:** Before the Owner can terminate the tenancy for an At-Fault Just Cause violation that is curable, the Owner must first provide notice to cure giving the Tenant an opportunity to cure the violation pursuant to Code of Civil Procedure § 1161, paragraph (3).

B. **Tenant Payments Pursuant to "No-Fault" Eviction: (1)** If Owner issues a termination of tenancy under a No-Fault Just Cause, Owner notifies Tenant of the right to direct payment relocation assistance equal to one month of the Tenant's rent in effect at the time of the termination and shall be provided within 15 calendar days of service of the notice. **(2)** In lieu of direct payment, Owner may waive the payment of rent for the final month of tenancy prior to the rent becoming due. The notice shall state the amount of rent waived and that no rent is due for the final month of tenancy.

**\*NOTE: Other exemptions under the Civil Code may apply. Additionally, this property may be subject to local rent cap and just cause eviction controls, which may impose additional restrictions. Housing Provider is strongly advised to seek counsel from a qualified California real estate attorney, who is familiar with the law where the property is located, prior to serving any notice.**

**The undersigned acknowledge a copy of this document and agree that the terms specified in Sections I, II(3), if checked, and V(3) are made a part of the lease or rental agreement specified above.**

| | | |
|---|---|---|
| Tenant (signature) _Changli Li_ | Changli Li Date | 6/28/2024 |
| Tenant (signature) | Date | |
| Housing Provider (signature) _Peiquan Wang_ | Peiquan Wang Date | 6/27/2024 |
| Housing Provider (signature) | Date | |

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



RCJC REVISED 6/23 (PAGE 2 OF 2)

**RENT CAP AND JUST CAUSE ADDENDUM (RCJC PAGE 2 OF 2)**

**FAIR HOUSING AND DISCRIMINATION ADVISORY**

(C.A.R. Form FHDA, Revised 6/23)

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.
2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   A. FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   B. CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§ 12900-12996,12955; 2 California Code of Regulations ("CCR") §§ 12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   C. CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") § 51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   D. AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§ 12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   E. OTHER FAIR HOUSING LAWS: § 504 of Rehabilitation Act of 1973 29 U.S.C. § 794; Ralph Civil Rights Act CC § 51.7; California Disabled Persons Act; CC §§ 54-55.32; any local city or county fair housing ordinances, as applicable.
3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION:** Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.
4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons based on that person's belonging to, association with, or perceived membership in, certain classes or categories, such as the following, is prohibited. Other classes, categories or restrictions may also apply.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Age | Sex, Sexual Orientation | Gender, Gender Identity, Gender expression | Marital Status | Familial Status (family with a child or children under 18) |
| Citizenship | Immigration Status | Primary Language | Military/Veteran Status | Source of Income (e.g., Section 8 Voucher) |
| Medical Condition | Disability (Mental & Physical) | Genetic Information | Criminal History (non-relevant convictions) | Any arbitrary characteristic |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   A. California Business & Professions Code ("B&PC") § 10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation § 2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   B. Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(I)(1); 10 CCR § 2780
6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, disability, familial status, national origin, sexual orientation, or gender identity by REALTORS®.
7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.

   - Sellers
   - Real estate licensees
   - Mobilehome parks
   - Insurance companies
   - Landlords/Housing Providers
   - Real estate brokerage firms
   - Homeowners Associations ("HOAs");
   - Government housing services
   - Sublessors
   - Property managers
   - Banks and Mortgage lenders
   - Appraisers

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   A. Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of (i) actual or unconscious bias, and (ii) potential legal claims against sellers and others by prospective buyers whose offers were rejected.
   B. Refusing to rent (i) an upper-level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or (ii) a house with a pool to a person with young children out of concern for the children's safety.
9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   A. Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   B. Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   C. "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   D. Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2023, California Association of REALTORS®, Inc.

**FHDA REVISED 6/23 (PAGE 1 OF 2)**

**FAIR HOUSING AND DISCRIMINATION ADVISORY (FHDA PAGE 1 OF 2)**

they have children or are planning to start a family);

    **F.** Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;

    **G.** Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);

    **H.** Denying a home loan or homeowner's insurance;

    **I.** Offering inferior terms, conditions, privileges, facilities or services;

    **J.** Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;

    **K.** Harassing a person;

    **L.** Taking an adverse action based on protected characteristics;

    **M.** Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a tenant who uses a wheelchair to install, at their expense, a ramp over front or rear steps, or refusing to allow a tenant with a disability from installing, at their own expense, grab bars in a shower or bathtub);

    **N.** Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):

        **(i)** Failing to allow that person to keep the service animal or emotional support animal in rental property,

        **(ii)** Charging that person higher rent or increased security deposit, or

        **(iii)** Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;

    **O.** Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**

    **A.** Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.

    **B.** Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.

    **C.** Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.

    **D.** Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").

    **E.** Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES:** If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.

    **A.** Federal: https://www.hud.gov/program_offices/fair_housing_equal_opp

    **B.** State: https://calcivilrights.ca.gov/housing/

    **C.** Local: local Fair Housing Council office (non-profit, free service)

    **D.** DRE: https://www.dre.ca.gov/Consumers/FileComplaint.html

    **E.** Local Association of REALTORS®. List available at: https://www.car.org/en/contactus/rosters/localassociationroster.

    **F.** Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**

    **A.** Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;

    **B.** An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved in the rental;**

    **C.** An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved in the sale or rental and (ii) no discriminatory advertising is used, and (iii) the owner owns no more than three single-family residences. Other restrictions apply;**

    **D.** An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved in the rental; and**

    **E.** Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).

    **F.** Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

**Buyer/Tenant and Seller/Housing Provider have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.**

| | |
|---|---|
| | 6/28/2024 |
| Buyer/Tenant _Changli Li_ | Changli Li Date |
| Buyer/Tenant _____ | Date _____ |
| Seller/Housing Provider _Peiquan Wang_ | Peiquan Wang Date 6/27/2024 |
| Seller/Housing Provider _____ | Date _____ |

© 2023, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



**FHDA REVISED 6/23 (PAGE 2 OF 2)**

**FAIR HOUSING AND DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 717 N Harwood St, Suite 2200, Dallas, TX 75201 www.lwolf.com    Peter Wang 4714

# EXHIBIT 17

1      UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5  UNITED STATES OF AMERICA,  )
            )
6     Plaintiff,   )
            )
7  vs.        ) No. CR 24-00329-CRB
            )
8  RUTHIA HE,      )
            )
9     Defendant.   )
  _____)

10

11         San Francisco, California
           Friday, July 12, 2024
12

13  TRANSCRIPT OF PARTIAL PROCEEDINGS OF THE OFFICIAL
  ELECTRONIC SOUND RECORDING 11:26 - 12:13 = 47 MINUTES
14

15  APPEARANCES:

16  For Plaintiff:
         United States Attorney's
17         Office
         Northern District of
18         California
         Department of Justice
19         450 Golden Gate Avenue
         11th Floor
20         San Francisco, California
         94102
21      BY:  KRISTINA GREEN, ESQ.
        KATHERINE LLOYD-LOVETT, ESQ.
22

23

24    (APPEARANCES CONTINUED ON THE NEXT PAGE)

25

*Echo Reporting, Inc.*

2

1  For Plaintiff:

2                              United States Department of
                              Justice, Fraud Section
3                              950 Pennsylvania Avenue
                                Northwest
                              Washington, DC 20530
4                       BY:   JACOB N. FOSTER, ESQ.

5  For Defendant:

6                              Hueston Hennigan, LLP
                              523 West 6th Street
                              Suite 400
7                              Los Angeles, California 90014
                        BY:   STEPHANIE XIAO, ESQ.
8                              VICKI CHOU, ESQ.

9  Pretrial Services:         VANESSA VARGAS

10 Certified Interpreter:     JEFF VINN

11 Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
12                             Transcriber
                              echoreporting@yahoo.com
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Friday, July 12, 2024</u>                        <u>11:26 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4          THE CLERK:  Calling criminal action 24-329, U.S.A.

5  versus Ruthia He.  The Honorable Thomas S. Hixson,

6  presiding.

7      Counsel, please state your appearances.  Let's start

8  with the Government.

9          MR. FOSTER:  Good morning, your Honor.  Jacob

10 Foster, along with Kristina Green and Katie Lloyd-Lovett, on

11 behalf of the United States.

12         THE COURT:  Good morning.

13         MS. CHOU:  Good morning, your Honor.  Vicki Chou

14 and Stephanie Xiao on behalf of Defendant Ruthia He.

15         THE COURT:  Good morning.

16         MS. VARGAS:  And good morning, your Honor.

17 Vanessa Vargas with U.S. Pretrial Services.

18         THE COURT:  Good morning.

19         THE INTERPRETER:  Good morning, your Honor.  Jeff

20 Vinn, V-I-N-N, appearing for this Court as a Certified

21 Mandarin Interpreter in the state courts, and provisional

22 qualifying in the federal courts.

23         THE COURT:  Good morning.  For whom are you

24 interpreting?

25         THE INTERPRETER:  Your Honor, I'm interpreting for

4

1  the Defendant, Ms. He -- Ms. He today.

2          MS. CHOU:  It's for her mother, in case the Court

3  wants to address her mother.

4          THE COURT:  Because the Defendant isn't wearing

5  headphones, so she's not --

6          MS. CHOU:  She does not need an interpreter.  It's

7  for the Defendant's mother.

8          THE INTERPRETER:  Your Honor, I stand corrected.

9  Yes, I'm interpreting for her mother (indiscernible).

10          THE COURT:  Thank you.

11          THE INTERPRETER:  Thank you.

12          THE COURT:  Well, we are here for a detention

13  hearing.  The preliminary question is whether I can have a

14  detention hearing.  I think that I can.  According to the

15  handwritten notes in Judge Rosenberg's order, she stated the

16  following:

17              "Defendant understands she is

18              entitled to a continued bail/detention

19              hearing today.  Defendant elects not to

20              proceed with a continued bail hearing

21              today and requests a continued bail

22              hearing in the prosecuting district.

23              Defendant understands she will remain in

24              custody pending her transfer to the

25              prosecuting district and further bail

5

1          hearing in the prosecuting district."

2      That doesn't sound to me like Judge Rosenberg made a

3  final decision.  And so if I were to say that I can't

4  conduct a detention hearing today, I would be giving more

5  finality to Judge Rosenberg's order than she thinks that it

6  has.

7      And I would note that Judge Rosenberg also handwrote

8  in, "the detention is without prejudice to further

9  proceedings in the Northern District of California."  So the

10  arresting district clearly contemplated that the charging

11  district would have a further bail hearing, and it looks

12  like the Defendant requested that.  So I think that I can

13  proceed today, as the arresting district did not make a

14  final decision with respect to detention.

15      So on the merits of detention, let's turn to the

16  Government.

17          MR. FOSTER:  Yes, your Honor.  So, this is an

18  extremely strong case for detention.  It is not often that

19  you have a case that involves a presumption of extreme risk

20  of flight and a risk of dangerousness, which Judge Rosenberg

21  indicated was compelling, as well as Pretrial Services in

22  the Central District of L.A.

23      And I think it's fairly addressed by the Defendant's

24  brief, both in regards to the continued operations of the

25  company, which have a deleterious impact on individual

6

1  patients and health insurance programs, and also in regards
2  to the risk of the administration of justice.
3      So, in terms of the Government's factual proffer we'd
4  like to incorporate the indictment Pretrial Services
5  reports, the proffer that was made in Los Angeles, as well
6  as the brief and exhibits that were filed.
7      A grand jury in the Northern District of California
8  returned a seven-count indictment that charges controlled
9  substance distribution offenses, which give rise to a
10 presumption, fraud-based defenses and obstruction
11 enhancements.  And the maximum term of imprisonment on each
12 of those counts, one through five, seven to 10, is 20 years.
13     In terms of the factors to be considered, in terms of
14 the nature and circumstances of the offenses charged, this
15 is an extremely serious offense.  The indictment is
16 detailed, and it alleges that there were patients who
17 overdosed and died from Fentanyl and other substances, which
18 their loved ones alleged was precipitated by Adderall
19 prescriptions that they should not have obtained.
20     And the Defendant was specifically warmed about that,
21 and witnesses have told the Government that she was
22 indifferent to those consequences because she shot -- she
23 sought to grow a $3,000,000,000 company.
24     Second, healthcare fraud alone is a serious crime that
25 Congress has long condemned as contrary to the public

7

interest, the viability of Medicare and Medicaid.  These are
funds held in trust for the elderly and disabled.  And so
there can be no doubt that these are serious offenses.
Obstruction and its impact on the administration of justice
no less.

The defense says that the Government lives in a world
of drug dealers, and the Defendant comes from a different
world.  Well, the Defendant herself in e-mail communications
and electronic messaging communications obtained by the
Government, said that she hoped to profiteer off addiction.

And in regards to other illegal methods of distributing
drugs, like for example, distributing speed and coke, she
referred to her company, which distributed Adderall, a
stimulant, and said the chemicals are sort of similar.
Speed is a class of amphetamine, too.

So, the Defendant comes from a world of drugs seekers
and abusers.  The Defendant was specifically warned
routinely over months, years, that there were drug dealers
coming onto the platform.  That there were people coming
onto the platform to obtain stimulants that they did not
need.

And the evidence shows that the Defendant ignored the
recommendations of medical professionals and others to put
in place policies and procedures that would stop that, and,
in fact, she went the other direction.  She facilitated the

8

1   access to those drugs by overruling the advice of medical

2   professionals, scores of whom by the company.

3        Now in terms of the nature and circumstances of the --

4        THE COURT:   Does she have -- the relevant

5   question is whether she is a danger, not whether she was a

6   danger.  Does she have any ongoing access to the business at

7   this point?

8        MR. FOSTER:  Your Honor, the Defendant is the

9   almost total owner of the company.  There's no board of

10  directors.  This company was set up in a start-up model

11  where she exercises almost total control.  She has every

12  right and ability to exercise her control over the business.

13       THE COURT:   Is the business still in business?

14       MR. FOSTER:  The business is still in business as

15  of today.  Our information that we've obtained from the

16  company is that there are tens of thousands of patients

17  obtaining these stimulants.  The grand jury found probable

18  cause to believe that these patients were provided with

19  Adderall and other stimulants without regard to whether they

20  needed it or not.

21       THE COURT:  Are you saying that the indictment did

22  not bring about the halt of the business model the

23  Government says is a crime?

24       MR. FOSTER:  Correct, your Honor.

25       THE COURT:  I see.

9

1          MR. FOSTER:  Yes.  And so there's no legal ability
2   for another person as far as we're aware to exercise control
3   over the business.

4          We also note that the Government has been informed at
5   various times over the course of the last year, that the
6   Defendant stepped away from the operations of the business,
7   and that was a representation made in the Central District
8   of California.  And evidence the Government has obtained, is
9   that that is not in fact true.

10          That she, as part of the scheme to conceal and disguise
11   her own involvement, purported to step away from the
12   business but was still exercising operational control.  And
13   her control bears is not only on the risk of dangerousness
14   in terms of the drugs being pushed on the street, the
15   consequences to health insurance programs, but also in
16   regards to the risk of obstruction and her ability to access
17   evidence and other information held by the company.

18          So in terms of the nature and circumstances of the
19   counts charged, and I think this bears on the risk of
20   flight, the Defendant's facing a guidelines term of life
21   imprisonment.

22          So the Defendant was charged along with one co-
23   defendant, the medical director of the company, who the
24   indictment alleges she hired to serve as a rubber stamp and
25   to sign prescriptions for patients that he never saw, had no

10

1  medical interaction with, and did not actually review any of

2  their medical records.

3       And so using his Adderall or stimulant prescriptions

4  alone, and assuming that no one else among the hundreds of

5  medical professionals that worked for this company over

6  periods of time distributed any illegitimate stimulants, the

7  Defendant would be looking at a base offense level at 34, an

8  adjustment for mass marketing by means of a computer of two,

9  a role enhancement of four, and an obstruction enhancement

10 of two, which would lead to an anticipated offense level of

11 42, which is 360 months to life.

12      Now, they say that the Defendant never wrote a

13 controlled substance prescription.  In the Government's

14 view, that makes this case stronger not weaker.  The law in

15 regards to conspiracy is well established and defendants are

16 routinely prosecuted for operating kill mills in instances

17 where they are not medical professionals but exercise

18 control over the business.

19      And here the evidence shows that this was, as

20 contemporaneous messages that went to the Defendant reflect,

21 alleged to be an on-line kill mill.  And because of its on-

22 line nature, it had a much greater scope and impact than a

23 traditional brick and mortar kill mills that you might see.

24      In addition, it makes it stronger not weaker because

25 the Defendant knowingly and willfully overruled medical

11

1 professionals.  For example, the Defendant instituted a

2 policy that initial appointments would be only 30 minutes.

3 Brick-and-mortar appointments in the real world to diagnose

4 ADHD are 60 to 90 minutes or more with a much great wealth

5 of records.

6      Multiple medical professionals told her that this was

7 resulting in patients getting Adderall and other

8 prescriptions they didn't need, and she overruled them and

9 they left the company and quit.

10      Furthermore --

11           THE COURT:  Counsel, let me ask.  At some point

12 prior to the indictment --

13           MR. FOSTER:  Yes.

14           THE COURT:  -- I take it that the Defendant became

15 aware that she was the target of an investigation?

16           MR. FOSTER:  Yes, your Honor.

17           THE COURT:  And do you know about when that was?

18           MR. FOSTER:  Yes, your Honor.  In September of '22

19 the Government served a grand jury subpoena on the company.

20 So that alerted that there was an investigation of the

21 company.  It did not alert her that she was, quote-unquote,

22 "a target," and indeed she would not have been within the

23 meaning of the justice manual.  However, in February of the

24 following year, February of '23, the Defendant attempted to

25 travel.

12

1     And so I think there's a different here, and the

2 Government would submit that this sequence of events, if I

3 can walk through them, shows that the Defendant cannot be

4 trusted.  So the defense says that the Defendant has every

5 desire to stay in the United States.  The evidence is

6 completely --

7          THE COURT:  Let me just pause --

8          MR. FOSTER:  Yeah.

9          THE COURT:  -- there for a second.

10          MR. FOSTER:  Yeah.

11          THE COURT:  When the grand jury subpoena was

12 served -- it was served on the company --

13          MR. FOSTER:  Correct.

14          THE COURT:  -- is that correct?

15          MR. FOSTER:  Yeah.

16          THE COURT:  Are you saying that the business model

17 at issue continued uninterrupted with the Defendant in

18 charge of it since that time?

19          MR. FOSTER:  Yes.

20          THE COURT:  I see.  Okay.  Continue.

21          MR. FOSTER:  And, you know, we would submit it's

22 more egregious than that, your Honor, because earlier that

23 year there were wide-spread national allegations that the

24 Defendant's business model led to patients getting

25 prescriptions they didn't need.  And indeed, that the

13

1 Defendant was creating pressure on clinicians to prescribe

2 Adderall and other stimulants that patients didn't need.

3      And their primary competitor companies, once these

4 allegations about the on-line business model became --

5 became well-known, they all ceased prescribing Adderall and

6 other stimulants on-line.  The Defendant persisted.  She

7 continued in an effort to gain market share.  And this is in

8 the spring of '22 going into the summer.

9      In addition, major pharmacy chains, such as Wal-Mart

10 and CVS, cut off prescriptions.  They would not fill them

11 because of their view that these prescriptions were not

12 lawful.  The Defendant then sought, as alleged in the

13 indictment, to lie to other pharmacies to induce them to

14 fill the prescriptions.

15      Furthermore, in regards to the obstruction conspiracy,

16 once these allegations became known, there's contemporaneous

17 evidence that the Defendant in her words, sought to delete

18 Slack messages, because they were the primary means of

19 communicating within the company.  And she said she would

20 delete them in response to a Slack from a cooperating co-

21 conspirator.  That if the Government subpoenaed us, they

22 could get access to these documents.  So there's extremely

23 strong evidence of obstruction.

24      September of '22 the Government serves a grand jury

25 subpoena.  At that point the Defendant had been out of the

14

1 country for nearly a year operating the business from China.

2 She returned to the United States only shortly before she

3 would have been in violation of the visa, which is only

4 allowed her to be out of the United States for up to one

5 year.

6       Upon returning she applied for an adjustment to that

7 visa, which would have allowed her to be outside the United

8 States for more than one year, which I think gives lie to

9 the statement that she had every desire to be in the U.S.

10       After she returns in September '22, by the Defendant's

11 own admission, she spent only two months in the country

12 before leaving again.  She returned, and then in January

13 '23, as Exhibit 1 reflects, she's already having

14 conversations about moving money to foreign jurisdictions

15 and placing herself out of the -- out of the ability to

16 extradite.

17       And in that conversation reflected in Exhibit 1,

18 Defendant specifically discusses two of the three countries

19 that she traveled to in December of '22 in those

20 conversations.  She discusses opening up accounts in Hong

21 Kong and Singapore, and suggests she made a mistake opening

22 accounts in Singapore because it has an extradition treaty

23 with the United States.

24       She also discussed in Exhibit 3 and other exhibits

25 submitted, that she had opened up foreign bank accounts in

15

China, all of which are outside the Government's ability to
access or ascertain the existence of these funds.  And then
considering she booked another flight to leave the country
the next month in February of '23, it's really hard to
credit her claims that she considers the U.S. home.

I think a further issue of concern for the Government
is that in connection with these events, counsel made false
representations -- or the Defendant via counsel made false
representations regarding the purpose of the travel.  And
even in the brief at page 11, line three, the defense says:

> "It was entirely consistent with
> her pre-investigative live that she
> would travel to Asia regularly both for
> work and travel."

And that's consistent with contemporaneous
representations that were made to the Government at the
time, that the purpose of this February '23 trip was not to
flee, it was not to engage in any effort to put funds
outside of the United States, because that was a substantial
concern of the Government at the time that I'd noticed some
financial movements as well.

And we now know in reality as a result of investigative
tools, seizures of cell phones, that in fact the purpose of
that trip was to plan for flight in the event that she was
arrested, and she now has.

16

1    You know, they also say she complied with the
2 instructions not to travel, but the sequence of events
3 strongly favors detention and the Government's view.  You
4 know, for one, she continued to delete messages and open up
5 undisclosed phone and bank accounts to evade detection.

6    And after the Government seized her phone, she opened
7 up a wireless account in the name of another associate the
8 next day.  She didn't open up a cell phone in her own name
9 that the Government would be able to ascertain, she opened
10 up a cell phone in the name of someone who's in fact a
11 proposed surety in this matter.

12    And so the Government's view is that the case is not
13 bondable.  You know, I think we can separately address
14 concerns about some of these individuals, if the Court wants
15 to hear those.  But what's important in terms of this
16 sequence of events is that the Defendant then used the new
17 phone to contact co-conspirators, and she had it with her on
18 her arrest.

19    She took similar steps in regards to financial
20 transactions.  She opens up electronic payment accounts in
21 her mother's name on July 30th, 2023, and she links that to
22 a East West Bank account, which is a bank that has branches
23 in China obviously, that was opened in her mother's name
24 around the same time.

25    Now her mother has not traveled to the United States

1  since 2012 or 2015.  So, one, you can't open bank accounts

2  in someone else's name and purport to be third parties.  And

3  two, there's no purported need to do this except, which is

4  consistent with the cell phone, to hide her activities from

5  the Government.

6  　　　Now to complicate matters, the Defendant has

7  simultaneously held multiple Chinese passports.  She then

8  books a flight to Costa Rica in September 28th, 2023,

9  essentially testing the Government's ability to monitor her

10  travel.  And the Government's ability to do so is not

11  foolproof, but in that instance we did receive an alert.

12  　　　In December of 2023 the Defendant sought to travel to

13  China and made further false statements to the Government

14  via counsel.  And I understand that statements made via

15  counsel sometimes are viewed in certain ways.  At the same

16  time in the Mendez prosecution that's occurring and ongoing,

17  the Court has recognized in the Southern District the false

18  statements made via counsel should be considered, because

19  attorneys are agents of their client.

20  　　　In that instance the Government was told that she

21  should be allowed to leave the country in December 2023

22  because she was involved in a relationship, and she had

23  bought a home in Atlanta in which she resided.

24  　　　When the Government investigated it, it found that that

25  was false.  In fact, immediately after, in the weeks after

18

1  that house was purchased, a third party who appears to be a
2  renter, put utilities in their name.  And the Defendant
3  herself never had utilities in her name, nor as far as the
4  Government is aware, has ever lived there.  In the brief it
5  does not appear that the defense is contesting that that was
6  not her home.

7      You know, further, even if she appeared to comply with
8  the Government's request for, you know, a period of time,
9  that's hardly surprising.  You know, the Supreme Court in
10 Navarette v. California, 572 U.S. 393 in 2014, noted in a
11 case of -- regarding the reasonable suspicion of drunk
12 driving, it's hardly surprising that the appearance of a
13 marked police car would lead or inspire more careful driving
14 ability.

15     And here what the evidence shows is the Defendant
16 sought to conceal and disguise what was actually going on.
17 We've submitted a number of exhibits indicated that she did
18 things like starting in September, after the Government
19 served its subpoena, she switched company communications to
20 Signal instead of conducting them over channels that the
21 company had previously conducted legitimate business on, and
22 those communications were not produced in response to the
23 Government's subpoena.

24     She did things like turn on disappearing messages,
25 including in conversations that the Government has

19

1 (indiscernible) with individuals who were approached by law

2 enforcement.  And as a result of this, substantial amounts

3 of evidence have been made unavailable.

4      In terms of the difference of course between that time

5 period and what is occurring now, there's a substantial

6 difference, and that difference is that there's been an

7 indictment.

8      Now, a critically important factor for your Honor to

9 understand is that evidence in the form of witness testimony

10 and contemporaneous communications, that the Defendant did

11 not take this investigation seriously.  She did not believe

12 that she would be indicted.

13      So multiple witnesses have told the Government that the

14 Defendant informed them that she would buy a Tesla, an

15 automobile, to the first person who went to jail for her,

16 which is an extremely alarming and concerning statement in

17 terms of the administration of justice.

18      Multiple witnesses told the Government that the

19 Defendant, who previously worked for a prominent social

20 media company, said that there was nothing to worry about

21 because the founder of that company had been under extensive

22 investigations, both the state and federal level for a

23 period of decades, and nothing had happened to him.

24      She told another associate that the founder/CEO of a

25 prominent ride-sharing company, who was embroiled in

20

1 substantial public controversy, there was nothing to worry

2 because nothing had happened to him.

3          THE COURT:  So you think the occurrence of the

4 indictment has likely made her legal problems more real to

5 her than they were before?

6          MR. FOSTER:  Right.  And as the Ninth Circuit

7 recognized in Townsend facing waiver of penalties, and

8 that's in the context of a superceding indictment, not in

9 the context of, you know, a non-indictment to an indictment.

10 But in Townsend the Ninth Circuit recognized that when

11 someone faces severe penalties, it increases the risk of

12 flight and increases it substantially.

13     And the same thing with Cisneros, the 10th Circuit

14 case, and it's cited for another point in connection with

15 these proceedings, but the 10th Circuit there said the

16 defendant's knowledge of the seriousness of the charges

17 against her gave her a strong incentive to abscond.

18     And, of course, we're not saying as the defense says,

19 that alienage is determinative, right?  What you look at

20 when someone who is not a citizen of the United States are

21 things like familial ties in the country, frequency of

22 travel, employment tying them to the United States, a

23 history of stable residence.

24     Here, the Defendant's not a citizen and has had few

25 ties to the country.  She spent the first 21 years of her

1  life outside the United States.  She didn't visit the
2  country until 2012.  She then regularly left the United
3  States every year between '12 and '19, and only obtained
4  legal permanent residency in August of 2020.  And then
5  shortly thereafter, she left the country for an extended
6  period of time.
7      In all this time period she's never made any
8  applications to bring family members here since receiving
9  her green card.  And in contrast, the Defendant has close
10 family and numerous other contacts in China.  And she
11 appears to have substantial overseas assets.  She often
12 wired money from accounts that she controls here to accounts
13 that she controls in China and Hong Kong, such as an
14 Industrial and Commercial bank of China account in her name,
15 and Hang Seng bank account in the name of her prior
16 ventures, Renaissance.
17      Now, they say that actions speak louder than words, but
18 we think that the actions shown here are quite clear.  And,
19 of course, you can't predict the future, your Honor, but I
20 think that it is rare, particularly in a white-collar case,
21 to have as compelling evidence as a plan regarding what the
22 Defendant intended to do and arrested, as what we have here.
23      You know, on January 9th, 2023 the Defendant asked an
24 associate in China what she would do if she got arrested,
25 which has now happened.  The associate replied she should

22

1 transfer part of the funds to the Cayman Islands, Hong Kong,

2 and then return to mainland China.  And she also discussed

3 the best countries to open a foreign bank account.

4      In terms of the nature and seriousness of the danger to

5 any person or community that would be posed by the release,

6 this is the danger of risk of flight and dangerousness.

7      In terms of flight, you know, the defense makes a

8 number of statements which are incorrect.  So on page two

9 they say, "her mother since obtained a residence where she

10 will reside with Ms. He."  And on page eight she says, "her

11 mother now resides in the Bay area."

12      Neither of those statements are true, your Honor, that

13 a foreign national traveled to the U.S. on a business visa

14 does not provide ties to the United States, because her

15 mother has no permanent status.  She can't stay here.  Her

16 mother has no ties to the United States, hasn't been here

17 since 2015.  Her business visa was originally for consultant

18 work.  She cannot renew this visa when it expires.

19      As the defense admits, she will have to leave the

20 United States by December of 2024.  And then this visa will

21 expire in total on April 20th, 2025.  So, past April 20th,

22 2025, her mother has no ability to be in the United States

23 lawfully or come to the United States.  And she'll have to

24 leave to avoid the six-month bar in December.

25      Her mother in the application also made a series of

23

inconsistent statements regarding the addresses in which she
would travel to the United States.  So in her E-Visa address
application she gave an address of 2255 Octavia (phonetic),
and a 6-19 I-94 when she entered the country, she said she
was going to New York.  Now we see a third residence in the
Pretrial Services.

Further, her --

THE COURT:  Counsel, I don't mean to cut you
short --

MR. FOSTER:  Yeah.

THE COURT:  -- but you've made an extended
presentation.

MR. FOSTER:  Yeah.

THE COURT:  And so why don't you get to the
remaining final points, and then I would like to turn to the
defense.

MR. FOSTER:  Yes, certainly, your Honor.

In terms of dangerousness, the defense says at pages 13
to 14, "the only relevance of her relationship with the
company is the risk of flight that she can access assets."
And the types of packages that are being proposed, your
Honor, are minuscule, just to give you context on that
point.

One, the company accounts have millions of dollars, in
excess of $10,000,000 in them right now.  The statement that

24

1  the Defendant cannot access these funds is belied by the

2  fact that she transferred $1,000,000 out of company funds

3  after her arrest in connection with her representation,

4  which shows she has the ability to transfer funds and to

5  control their operations.

6      In addition -- that's not the only relevance.  There's

7  relevance to the community, as we've noted, and it also

8  bears on flight.  You know, the Defendant has shown an

9  ability to operate this company, or even companies like it

10 if she's removed from this company, from outside the

11 country.  There's nothing to prevent her, if she's able to

12 get outside of the territorial jurisdiction of the United

13 States, from running this company.  And the evidence we

14 submitted indicates that precisely because of the

15 investigation she moved a substantial of operations there,

16 or one like it.

17     In terms of administrative -- administration of

18 justice, there's no conditions that have been proposed that

19 indicate that we can protect the justice.  I mean, we want

20 to get to a fair trial in this case, and already there's

21 been unfairness introduced into it as a result of the

22 Defendant's efforts to manipulate the system to avoid a

23 reliable result.

24     And, you know, what we would point to is, one of the

25 allegations in this case is that the Defendant directed her

25

1  company to give Adderall and other stimulants to patients
2  even if they did not qualify for them, even if they did not
3  have ADHD.

4  The _Wall Street Journal_ in investigating these
5  practices asked the Defendant about them.  She lied to the
6  _Wall Street Journal_.  She said she didn't exist.  What did
7  she do?  She went into the electronic version of the
8  document itself and she deleted that language.  And then
9  what happened?  That document was not produced to the
10 Government.

11 So there's extremely strong evidence that there bears
12 on obstruction, that bears on consciousness of guilt, and
13 also bears on the ability of this Defendant to be supervised
14 by anyone, and her ability to manipulate the system to -- to
15 make sure that there is not a reliable result.

16 So, I think that in light of those factors, and also in
17 light of the fact that this is a presumption case, and _Well
18 Chen_ (phonetic), a Northern District case the defense cite
19 -- described the burden to rebut the presumption is small,
20 the evidence that the Defendant needs to produce still needs
21 to be, quote-unquote, "credible."

22 And what they have proposed is in the Government's view
23 not credible because it doesn't address our substantive
24 obstruction arguments, like her opening a new phone account
25 in someone else's name.  And even the case that _Chen_ cites

1 for the presumption point notes that the presumption does
2 not disappear, and it still retains evidentiary weight.  And
3 the court in <u>Chen</u> actually agreed with the Government that
4 the defendant was still a flight risk under the predominant
5 standard.

6      And the Ninth Circuit in <u>Hir</u> put the point more
7 forcefully, observing that, quote:

8                "The presumption is not erased when
9            a defendant proffers evidence to rebut
10           it.  Rather, the presumption remains in
11           the case as an evidentiary finding
12           militating against release to be weighed
13           along with other evidence relevant to
14           factors listed."

15      And the reason for that is is that Congress found in
16 cases involving controlled-substance offenses --

17           THE COURT:  Counsel, I'm familiar with the law
18 concerning the presumption.

19           MR. FOSTER:  All right.

20           THE COURT:  Thank you for your arguments.

21           MR. FOSTER:  Thank you.

22           THE COURT:  I'll turn to the defense.

23           MS. CHOU:  Your Honor, Ms. He, as you know, is a
24 permanent resident who has resided in the United for over a
25 decade.  She's joined in the courtroom today by her mom who

27

did travel from China to secure a residence where she could
live.  And it's true that her mom is here on a visa.  Her
father can come if her mother has to go back, and there are
many friends, over a dozen here, demonstrating her ties.

The United States is her home.  Pretrial have made a
bond recommendation which we ask the Court to adopt.  It is
$50,000 more than her co-defendant's bond, and her co-
defendant has also been charged with obstruction in
essentially the same conduct.

Her history and characteristics, especially her past
conduct, support release.  The Government relies on a both
of speculation and innuendo and discussions about plans, but
who hasn't discussed what you might do because you had a bad
day at work or you had a fight with your husband or, you
know, any other thing that might lead people to just
speculate or talk about fantastical scenarios.  That doesn't
mean she's going to do it.  And, in fact, the best evidence
of what she's going to do is what she has done.

And what she has done is stay -- returned to the United
States.  She was in China in April -- in March and April of
2022, which is when the Government alleges that she was
already making plans to relocate to China, to abscond, to
obstruct justice.  She was in China.  She didn't have to
flee, but she came to the United States after that.

And after the grand jury subpoena in September of 2022,

28

1 she went to Asia.  Again, she could have stayed, but, no,

2 she came back, because the United States is her home.  And

3 in February of 2023, when the Government confronted her, and

4 was concerned about her one-way ticket, what happened?  She

5 voluntarily turned over her passports and she's remained in

6 the United States for almost a year and a half at the

7 Government's request.  No court order, no other law

8 requiring her to do so, because she gave her word.

9      And as for the passports, I have both of them here.

10 There are two passports with different numbers, but that's

11 because one is expired, and the one is the valid one, which

12 we can turnover to Pretrial immediately.

13      As for the property in Georgia, as we mentioned in the

14 brief, she has been very frugal.  And so she purchased this

15 property, and when they were able to find a renter, she

16 rented it out.  But the important thing about the property

17 is that this shows that in September of 2023, long after the

18 Government had begun its investigation, what was she doing?

19 She wasn't transferring assets to Asia, she was doubling

20 down on her ties to the United States.  She's making her

21 assets more e-liquid in the United States.

22      In terms of the transfers, I think the Government has

23 admitted that they can't distinguish between whether or not

24 the transfers are for the company or for personal.  And

25 they've also admitted that, yes, the company was operating

1  overseas.  So, of course, you're going to see overseas

2  transfers.  That doesn't mean that she has access to these

3  funds.  She's been paid a modest salary in her entire time

4  at Done.  She has modest assets.  She doesn't have access to

5  these company funds for personal use.  There's been no

6  allegations of intermingling.

7      Embezzlement is a crime in China, also.  She can't just

8  take these funds.  The fact that the company would transfer

9  funds to indemnity her is something that many companies do.

10  That doesn't reflect that she has control over accounts or

11  was using them.

12      In terms of the other things that the Government has

13  mentioned, the phone in the name of a friend, yes, her

14  friend did help her get a new phone after the Government

15  took her initial one.  They weren't trying to hide anything.

16      And as for the account opened in her mother's name, it

17  wasn't opened in her mother's name, it was opened for her

18  mother, which her mother who is here, can explain and verify

19  for the Court.

20      In terms of the allegations about the events, this is a

21  first of its kind telehealth prosecution, right.  As we

22  know, she founded a technology platform to match patients

23  with providers.  The reason why this is important is because

24  as the Government quotes in the indictment, responsibility

25  for the -- and this in paragraph seven, from the Code of

30

Federal Regulations, the responsible  -- "the responsibility
for the proper prescribing and dispensing of controlled
substances is on the prescribing practitioner."

And so, we're not talking about a conspiracy with one
or two doctors to create a pill mill or something.  We're
talking about hundreds of providers around the country, like
independent obligations to make medically appropriate
determinations, because they're the ones who have the
registration.  They're the ones who have the licenses with
the state board.

And we're not talking about cocaine or heroin, which
are illegal to sell per se.  The allegations about the
chemical composition of AD -- of the Adderall is just
factually correct, but the key is that Adderall and other
ADHD medication is lifesaving.  This is discussed in the
medical literature.  Initiating medication for ADHD has been
linked with lower mortality rates.

She strongly believed in improving access to mental
health treatment, and the medical literature supports her
mission.  ADHD is under-diagnosed and it's under-treated.
Believing that patients who seek mental health treatment
need it does not someone criminal.

I haven't seen the quote about the profiteering from
addiction, but I think as said, it's probably taken out of
context, as the Tesla discussion was.  That was a reference

1 to something that they had heard about Lyft or what --

2 something else that someone has done.  Again, I haven't seen

3 those text messages.  But -- but the fact is that she -- she

4 does now, and as the Court noted, the fact of the indictment

5 does make this more real.

6     And so whatever has happened in the past, the question

7 is at this time, are there conditions that can address her

8 risk of flight and her danger to the community?  And the

9 answer to that is, yes.  I know the Court expressed concerns

10 about the continued operation of the business, so I just

11 want to spend a few minutes to address that.

12     So first, because it is a platform, there is nothing

13 inherently wrong with it.  And at this point, with the

14 indictment, with the huge amount of press around this case,

15 it would be lunacy for some provider to continue operating

16 outside of the bounds of the law.  That just doesn't seem

17 plausible to me.

18     The fact that the website is continuing to operate

19 should not be considered a danger to the community.  In

20 fact, as we cite in our brief, the CDC issued an alert about

21 the disruption to medication because there is

22 acknowledgment, I think even the Government would have to

23 acknowledge that there are probably thousands of patients

24 who are continuing to receive needed medication because of

25 this platform.

1    And so even if -- and I -- and I'm going to address her

2  continuing role next.  But even if she were continuing to be

3  involved with the business, that should not count as danger

4  to the community.  But she's -- there are thing -- there are

5  questions --

6         THE COURT:  Don't saying that would harm the case

7  on the merits, understood?

8         MS. CHOU:  Okay.  But -- but I just want to assure

9  your Honor that that's -- it's not something that -- that

10  should be considered in this assessment about danger to the

11  community.

12    Sorry.  I'm just checking my -- and so in terms of the

13  inconsistent applications from her mother, she came in a

14  rush.  She didn't have the lease yet.  She signed it when

15  she got here.  That's why there are different addresses.

16  That's no nefarious at all.  And I've addressed the funding

17  from the company.  And so, unless the Court has any other

18  specific concerns --

19         THE COURT:  Well, let's go to the main point.

20  When it comes to risk of flight, the Government's basic

21  pitch is that the Defendant may not have been all that

22  alarmed by the investigation if she thought that it would

23  likely come to nothing.  And some of your comments here

24  today about the permissibility of the business model seem

25  consistent with that view.

33

1     But then the Government takes the view that once the
2 indictment came down, and the Defendant is now facing
3 potentially life in prison in the event of a conviction, her
4 incentives have changed.

5     The potential downside to remaining in the United
6 States could be quite substantial in a way that may not have
7 seemed real to her before during the investigation phrase
8 where she didn't know if anything would happen.  So -- and
9 that that may have now given her new incentives, and she
10 does have a place where she could go.

11     So, why don't you speak directly to that concern,
12 because that's my concern.  My concern is that facing
13 potentially life in prison and -- in a way that likely may
14 not have been real to her before, and when she does have a
15 place to go and family who could welcome her there, those
16 things add up to some concern that I have that she may flee.
17 So, why don't you go and speak directly to that point.

18        MS. CHOU:  She believes strongly in her defense,
19 and she wants to stage it.  But that's the reason why we're
20 not asking for ROR.  There is going to be a bond.  She's
21 going to be on the hook, her friends are going to be on the
22 hook.  She's not going to let them down.

23     And so I had -- I had a thought and then I immediately
24 forgot.  And her passports obviously.  Like how is she going
25 to get out of the country without her passports?

34

1   To the extent that the Government is right, and they're

2   aren't about her testing the system, what that test proved

3   is that she can't get out of the country.  The -- she's a

4   32-year-old woman who worked at start-ups.  She -- how is

5   she going to get out with the -- when her passports with

6   Pretrial?  That's why -- that's what the bond is for.

7   That's what the conditions are for.

8          THE COURT:  All right.  Is there anything further

9   that you wanted to say?

10         MS. CHOU:  And she did take the Government very

11  seriously.  And that's the reason why she complied with

12  their request that she stay.  She did take it seriously and

13  she has always taken the Government's request seriously.

14         THE COURT:  All right.  Thank you.

15     Would the Government like to reply?

16         MR. FOSTER:  Yes, just briefly, your Honor.  In

17  regards to two passports, this is very concerning, and to

18  give you the context, your Honor.  The Government produced

19  evidence that multiple passports had been used in the past

20  on entry into the United States.  And we were assured by

21  counsel, prior counsel in this matter, that there was not a

22  second passport.  That in reality there was only one.  That

23  she had lost the second passport and did not have it

24  accessible to her.  So that's concerning.

25     In terms of the father, the father can't come to the

35

United States.  He has no visa, no ability to do so.  And I think Pretrial Services may have -- this may have been a point of confusion.  We e-mailed them and they said they believed the father resided in L.A. based on something in the -- in the report.  But in reality, the father resides in China.  So there's no -- there's no one who can exercise suasion over her, and I don't think family members could either.

     In terms of the friends, these are all people who -- we could get into it if we needed to.  I don't think we need to.  Travel frequently internationally, have varying degrees of status outside the United States.

     In terms of who hasn't discussed things like this, your Honor, I think law-abiding people don't discuss transferring funds internationally and fleeing the country in the event that they are arrested.  And that is extremely concerning.

     And law-abiding people don't delete evidence and make it unavailable for the Government and turn on disappearing messages.  And law-abiding people don't have millions of dollars accessible to them in some form or fashion.

     And so I think this is a perhaps unusual case in the white-collar context, whereas there is a particular strength in terms of the case for detention, not only from the presumption, the lack of U.S. ties, but the dangerousness.

     And although this is the first time a telemedicine CEO

36

1 has been prosecuted in connection with distributing

2 controlled substances, many similar schemes, orthotic

3 braces, genetic testing, have been routinely prosecuted

4 since 2019.

5     And this district is very familiar with technology

6 company CEO's who maintain that they were trying to help

7 others, but those statements, I think to your Honor's point,

8 corroborates the Government's concern that she didn't really

9 think that this was a problem.

10     The indictment, the grand jury found probable cause to

11 view otherwise.  And we also have many contemporaneous

12 communications along those lines, that she was not taking it

13 seriously until now.

14         THE COURT:  All right.  Thank you.  Let me turn to

15 the defense.

16         MS. CHOU:  We just want to clarify the passports.

17 It's always been the case that she only has one active

18 passport.  And she's -- she had an expired one as well as --

19 I'm just trying to -- I think that could explain why -- the

20 concerns about the multiple passports, but counsel's never

21 represented that there were multiple active passports.

22         THE COURT:  Okay.  So the two passports is an

23 active one and then an expired one?

24         MS. CHOU:  Yes.  There was -- I think there was

25 one that was lost in between, but the ones that are in our

37

1  possession are one expired and one --

2       THE COURT:  All right.  Thank you.

3     I am going to detain the Defendant as a risk of flight.

4  It is possible to flee the United States without a passport.

5  I am concerned because the Defendant has thin ties to the

6  United States.  She has been here for over a decade, so I

7  acknowledge that, but the ties nonetheless remain thin.

8     Her family is not here.  Her mother has recently moved

9  here for purposes of being availed a resource, but

10 otherwise, is not here.  She has -- Defendant has

11 substantial ties to China.  She has substantial financial

12 resources abroad.  She has familial ties to China.

13    Their -- the Government has put forth some evidence

14 that the Defendant previously had been planning to flee.

15 The Defendant is facing a potentially significant prison

16 sentence in the United States in the event that she is

17 convicted.  She has -- in light of that potential lengthy

18 prison sentence, she has every incentive to flee.  She has a

19 place to go, and she has family who would welcome her there.

20    So I think that there is quite a significant risk that

21 the Defendant would flee.  And so I'm going to order her

22 detained --

23       MS. CHOU:  Your Honor, would you consider home

24 confinement with ankle monitoring?  That would address any

25 concerns.  She wouldn't be able to get to the airport before

38

1  she was found out.

2          THE COURT:  I don't think there are any conditions

3  of release that would mitigate this to be a risk of flight

4  that I find here.  I don't think it's possible to mitigate

5  against this level of flight risk.

6      And so I'm going to ask the Government to draft a

7  proposed detention order for my review and to submit that.

8          MR. FOSTER:  Yes, your Honor.

9          THE COURT:  All right.  We need to set a date

10 before Judge Breyer.

11         MR. FOSTER:  Yes, your Honor.  July 31st is a

12 mutually agreeable date --

13         THE COURT:  Does that --

14         MR. FOSTER:  -- for the parties.

15         THE COURT:  -- does that work for the defense?

16         MS. CHOU:  Yes, your Honor.

17         THE COURT:  And what time is that?

18         THE CLERK:  I believe it's 1:30, but let me check.

19     Yes, it's closed.  July 31st is closed.  So let me see

20 what he has now.

21         MR. FOSTER:  I know there's a July 24th date for

22 the co-defendant but that didn't work for defense counsel.

23 So any date after that, or that's convenient for the defense

24 is convenient for the Government.

25         THE CLERK:  So, let me have -- it looks like he

39

1 has August 7th --

2            UNIDENTIFIED SPEAKER:  (Indiscernible).

3            THE CLERK:  -- at 10:00 a.m.

4            MR. FOSTER:  That works for the Government.

5            THE COURT:  Should we set that for a status?

6            MR. FOSTER:  Yes, your Honor.

7            THE COURT:  Okay.  Then we'll set it for a status

8 before Judge Breyer on August 7th at 10:00 a.m.

9       Is the Government requesting an exclusion of time

10 between now and August 7th?

11            MR. FOSTER:  Yes, your Honor.  I have a stipulated

12 order.

13            THE COURT:  Does the defense agree?

14            MS. CHOU:  Yes, your Honor.

15            THE COURT:  The Court approves the parties'

16 stipulated exclusion of time under the Speedy Trial Act,

17 between now and August 7th.

18       Is there anything further from the Government this

19 morning?

20            MR. FOSTER:  No, your Honor.  Thank you.

21            THE COURT:  Is there anything further from the

22 defense?

23            MS. CHOU:  No, your Honor.  Thank you.

24            THE COURT:  All right.  Thank you, counsel.  The

25 Defendant is remanded.

40

1          THE CLERK:  Thank you.  We're off the record in

2  this matter.

3       (Proceedings adjourned at 12:13 p.m.)

41

<u>CERTIFICATE OF TRANSCRIBER</u>

1    

2    I certify that the foregoing is a true and correct

3    transcript, to the best of my ability, of the above pages of

4    the official electronic sound recording provided to me by

5    the U.S. District Court, Northern District of California, of

6    the proceedings taken on the date and time previously stated

7    in the above matter.

8    I further certify that I am neither counsel for, related to,

9    nor employed by any of the parties to the action in which

10    this hearing was taken; and, further, that I am not

11    financially nor otherwise interested in the outcome of the

12    action.



15    Echo Reporting, Inc., Transcriber

16    Friday, July 19, 2024

*Echo Reporting, Inc.*