MATTHEW M. YELOVICH (CABN 351330)
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

MATTHEW M. YELOVICH (CABN 351330)
Acting Chief, Criminal Division

GLENN S. LEON (NYBN 250785)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Principal Assistant Chief
Fraud Section, Criminal Division

    950 Constitution Avenue, NW
    Washington, D.C. 20530
    Telephone: (202) 514-2000
    FAX: (202) 514-3708
    Jacob.Foster@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
KATHERINE M. LLOYD-LOVETT (CABN 276256)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6912
    FAX: (415) 436-7234
    Kristina.Green@usdoj.gov
    Katherine.Lloyd-Lovett@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 24-329 CRB (TSH) |
| Plaintiff, | UNITED STATES' MEMORANDUM OPPOSING DEFENDANT RUTHIA HE'S RENEWED MOTION FOR RELEASE |
| v. | |
| RUTHIA HE, A/K/A RUJIA HE, and DAVID BRODY, | |
| Defendants. | |

## I. Introduction

The government met and conferred with defense counsel last week and raised concerns about Defendant's proposal that were not addressed in Defendant's filing. ECF No. 76. These concerns included Defendant's (1) formal control of Done; (2) indirect control of Done; (3) assets; (4) secured bond; and (5) Defendant's communications and monitoring. As a result, for the reasons discussed below, Defendant's conditions do not sufficiently mitigate the risks of flight, obstruction, and danger.

In addition, the government's ongoing investigation has revealed additional, material evidence that Defendant has not disclosed to the Court, despite Defendant being present on repeated occasions where these topics were directly discussed, further indicating that no condition or combination of conditions are sufficient as to flight or dangerousness. In particular, the government has discovered that:

(a) while Defendant has represented that she does not control Done, and that Done is run by five purportedly independent people who act as the CEO and give direction to counsel, in fact Yue Wang, one of the five named individuals, is the very same person with whom Defendant communicated about fleeing and transferring funds to foreign countries without extradition treaties, and who offered to set up foreign bank accounts in his own name to disguise foreign transfers that could later be used by Defendant after she fled (see ECF No. 52, Exs. 1, 26; Ex. 48);

(b) over $50,000 was transferred by Done to Wang's foreign bank accounts in his own name (Ex. 54);

(c) in a new message recently discovered and translated from Mandarin, Wang advised Defendant to shift Done's "salary flow" from the Philippines (a country that has an extradition agreement with the United States) to a new company in Hong Kong, thus enabling her to transfer assets overseas to a country without extradition while making financial transfers appear to be legitimate (Ex. 58);

(d) although Defendant has represented to the Court that MakeBelieve is an independent third-party that provides contracting services, newly discovered financial records indicate that, only a few months after Wang advised Defendant to dissipate assets overseas, Done paid a Hong Kong accounting company and this same accounting company, only thirteen-days later, incorporated MakeBelieve in Hong Kong (Ex. 50);

U.S. MEM. RE DEFENDANT'S DETENTION           1

   (e) financial records corroborate that Defendant followed Wang's advice as Done started making payments to MakeBelieve Asia in Hong Kong, including the suspicious extra payments that led Done's financial institution to close Done's account due to suspected money laundering;

   (f) although Defendant represented that there was difficulty obtaining information from the owners of MakeBelieve to substantiate the legitimacy of these payments, in fact the government has identified that the only named owner of MakeBelieve Asia is YiYing Zhu (aka Hayley Zhu), another of the five purportedly independent individuals who are controlling Done and giving direction to company counsel (Ex. 41); and

   (g) MakeBelieve Asia does not have an office at the listed address in Hong Kong and appears to be a shell company (Ex. 49).

   This Court was correct in pointing out this is a "different situation" than Dr. Lynch's case. Ex. 39 (Aug. 29 Hrg. Tr.) at 30:12-25. Unlike Dr. Lynch, who used the formal, overt, extradition process to try to remain in the U.K, Defendant's communications and other evidence demonstrate an intention to subvert the legal process. Not only does Defendant have strong ties to a non-extradition country—China—she exchanged explicit communications about fleeing, transferred funds to foreign countries without extradition treaties, and deleted evidence. The weight of the evidence as to flight, dangerousness, and obstruction, is, the government respectfully submits, extremely unusual in its quantity and nature.

   More importantly, that Defendant has allowed the misimpression to be provided to the Court that the individuals controlling the company are independent and that payments to MakeBelieve Asia are legitimate, and has not disclosed the material information above despite sitting in Court for repeated discussions of these topics, is further indication of the reason that Judge Hixson believed that <u>no</u> conditions are sufficient; namely, Defendant does not respect the legal process. *See* July 12, 2024 Hearing Tr., ECF No. 48-1 at Ex. 17, at 37:23–38:5. Attached to this brief are statements from three additional witnesses who have told the government that Defendant offered a Tesla to the first person to go jail for Done (Exs. 61–63). Guards can be bribed, tethers cut, and companies distributing illegal drugs run through encrypted messages and intermediaries. Done is now largely run from China by close associates of Defendant, it has recently begun accepting new patients, and it has not produced

U.S. MEM. RE DEFENDANT'S DETENTION  2

responsive documents, including those from WeChat (the communications program the China team uses to carry out the operations of Done). Throughout her operation of Done, in response to learning about the investigation, and now before this Court, Defendant has demonstrated that she cannot be trusted, and the Court should affirm the detention order and set the earliest possible date for trial.

## II. Defendant's Proposal

The government has repeatedly met and conferred with counsel about proposals for release, in good faith and to refine the issues for the Court. On August 22, prior to the August 23 hearing, the parties had a 46-minute call in which the government provided its thoughts on potential conditions to narrow issues in dispute. On Saturday, August 24, defense counsel sent an email regarding additional conditions, to which government counsel responded in a lengthy email on August 26. The government participated in a call of approximately 55-minutes on August 30 where it provided further observations regarding Defendant's proposal. In these discussions, the government suggested, at a minimum, certain proposed conditions that are not included in Defendant's proposal, including those discussed below.

## III. Defendant's Formal Control of Done

Defendant claimed to the Court that Done was run by an independent board, but, the (former) board member was interviewed, and stated that Defendant was inaccurate. Ex. 43 (under seal). On August 23, Defendant represented that she "is not in complete control," as Done had an "independent board member." Ex. 40 at 23:3-7. The (former) board member stated that was incorrect because he "never had any control." Ex. 43 at 5.

Defendant owns almost 100% of the common shares. Defense counsel indicated an intent to divest Defendant of her control of the company, ECF No. 68 at 3, but no specifics have been provided as to when and how Defendant will be relinquishing control. Recent facts indicate her reluctance to do so and cast doubt on the veracity of this promise. When Defendant was arrested, the former board member put forth proposals to hire a new CEO, institute an independent board of directors, and conduct an internal review of Done's operations. *See* Ex. 43 (under seal) at 4. Defendant did not relinquish control, so he resigned. See *id.*; Ex. 44. Unless Defendant relinquishes control of the company, and operations are in the hands of an independent management team, she has the legal authority to transfer Done's assets, direct its operations, and control what evidence is produced to the government.

U.S. MEM. RE DEFENDANT'S DETENTION         3

## IV. Defendant's Indirect Control of Done

Facts proffered thus far show that the Court cannot trust Defendant's representations regarding the independence of Done's management. Defendant represented that Defendant lacked means to flee because "she doesn't have access to [company bank accounts]" and these accounts were controlled by "five people running the company at this point," who purportedly were independent of Defendant. Ex. 40 (Aug. 23 Tr. at 8:23-9:6). They are not. Defendant will retain the ability to direct the operations of the company, its use of its assets, and its responses to legal process unless Done is in the hands of an independent management team.

The Court has stated that "I'm highly suspicious of any relationship that isn't clearly separate from any control she [Defendant] or members of her family or friends can [employ]." Ex. 40 at 27:4-7. The Court is correct to be suspicious. Defendant has represented that the following five individuals run Done currently: "Jessie Lee, Annie Zhang, Hayley Zhu, Rumi Ge, and Yue Wang."

Each of the five individuals are close associates of Defendant. Four of the five lack significant ties to the United States; Zhu, Ge, and Wang are all based in China, and Zhang is on an H1B visa that was petitioned for by Defendant. Ex. 45 (Done employee list); Ex. 46 (Record of petition for Zhang). Done Employee-1, a senior employee who Defendant once proposed as a suretor, has also explained that each of the five is a close friend or associate of Defendant. Ex. 55 (under seal). Yue Wang is a former university classmate from China, Zhang worked with Defendant in a previous venture, and Lee has been Defendant's "right-hand person" since joining Done. *See id.*; ECF No. 59, Ex. 32 (under seal). Moreover, each joined Done after Defendant began moving operations to China. That is consistent with Done Employee-1's statement that Defendant would bring in close friends to do anything that U.S.-based employees viewed as unsafe and that the China team answers to Defendant. Ex. 55 (under seal).

The fact that four of the five individuals Defendant selected to operate Done are based in, or closely tied to, China is consistent with information the government has gathered indicating that Defendant was increasingly shifting operations to China prior to her arrest due to an "investigation." ECF No. 52, Ex. 12. In September 2022, after Done received a government subpoena, multiple individuals have stated that Defendant switched to using encrypted communications. The Done China team uses encrypted communications to carry out the day-to-day operations of the business, but these

U.S. MEM. RE DEFENDANT'S DETENTION  4

communications were not produced in response to the government's initial subpoena (for which the company has represented that the production was complete) and are outstanding for a subpoena that was served in June that covers a later time period than the initial subpoena. Done is largely operated from China, which bears on both the risk of dangerousness or obstruction posed by Defendant's indirect influence over its operations and the risk that she could easily operate from China should she flee. The government obtained a deleted Instagram page that validates these concerns and was posted (presumably by a U.S.-based Done employee) on June 20, 2024 (this post has since been removed):



**Yue Wang** is purportedly an "APAC Head" and "executive leader" in China. Ex. 47. The government's investigation has revealed that Wang is the individual with whom Defendant discussed, via WeChat in January 2023, fleeing the United States to avoid arrest, which countries had extradition treaties, and opening foreign bank accounts, with Wang even offering to open the foreign account in his name and then transfer funds to Defendant. *See* ECF No. 52, Exs. 1, 26. Wang advised Defendant to "open a company in Hong Kong and transfer the salary flow from the Philippines and the mainland to Hong Kong"—conduct that is strikingly consistent with the appearance of Makebelieve, discussed further below. Ex. 58. Wang used the WeChat ID "wangyue19930729" in these chats, and, while Done itself has not produced WeChat communications in response to the government's subpoena, the

government recently obtained WeChat communications from a former employee of Done, which reflected that Wang used the same WeChat ID that he used in communications with Defendant about flight in communications with other Done employees and China-based contractors. Ex. 48. Done also wired over $50,000 to Wang personally over the course of just one month, from December 15, 2023, to January 19, 2024. Ex 54. That Defendant has not been upfront with the Court regarding her affiliation with Yue Wang is telling, and it strongly suggests she cannot be trusted to abide by conditions of release. *See, e.g.*, *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (discussing whether defendant could "be trusted to abide by conditions of release" as a "quite significant" consideration in its analysis); *id.* at 894 (Breyer, C.J., concurring) (agreeing that detention was appropriate where the relevant factors "together demonstrate that judicial authorities cannot trust [the defendant]").

**Yiying "Hayley" Zhu** is a Shanghai-based contractor with the title "Ops Project Manager". Ex. 45 at 3. Hong Kong registry records indicate that Yiying Zhu is the sole listed director of Makebelieve, which, based on the records, appears to be nothing more than a shell company. Ex. 41 at 3. There is no Makebelieve office located at its purported address. Ex. 49 (Photos of location). The only company present at the address is an accounting firm (ECB Accounting), which is listed as the company secretary in the registry documents. *Id.*; Ex. 41 at 4. Despite the multiple discussions with the Court about Makebelieve in recent weeks, Defendant never once informed the Court about the ties between Makebelieve and Zhu. The Hong Kong records indicate that Makebelieve is not an independent third party, as Defendant undoubtedly is aware but chose not to share with the Court.

**Jessie Lee** is US-based and, according to Done Employee-1, Lee appeared very close with Defendant and acted as Defendant's "right hand person" shortly after appearing at Done in approximately April 2024. ECF No. 59, Ex. 32 (under seal). Lee is purportedly a "legal consultant" (it is unclear whether she is a lawyer licensed to practice law), but participated in chats discussed below where Defendant enabled deleting message functions. Done Employee-1 informed the government that Lee called her shortly after Defendant's arrest to inform her that Defendant would be calling her from jail, and Lee instructed the employee: "Make sure to answer, and not to talk about anything operational because calls were recorded." ECF No. 59, Ex. 32 (under seal); Ex. 55 (under seal).

**Rong "Annie" Zhang** is a Chinese national and citizen who Defendant petitioned to come to the

U.S. MEM. RE DEFENDANT'S DETENTION            6

United States, making her responsible to Defendant for her presence in the country. *See* Ex. 46. Done Employee-1 stated that Zhang first became involved with Done around January 2024, and that Defendant put her in charge of "secretive things" that she "did not want people to know she was doing." Ex. 55 (under seal). Zhang operated at least one of Done's bank accounts, listing her legal address as the same address that Defendant's mother used for her flight booking. *See* Ex. 56 (electronic visa update for Defendant's mother); Ex. 57 (Okay Health Account Information for Zhang).

**Xuru "Rumi" Ge** is an independent contractor with the title "legal consultant" based in Beijing (although it is unclear whether she is licensed to practice law). Ex. 45 at 3.

Defendant's continued control of Done and affiliation with others purportedly running operations of Done is relevant to dangerousness and flight. Done Employee-1 recalled that Defendant asked herself and another employee to move communications to WhatsApp, an encrypted messaging platform, as recently as early 2024. ECF No. 59, Ex. 32 (under seal). Not only did Defendant ask employees to use WhatsApp to communicate, but she also set messages to disappear. On May 8, 2024, in a WhatsApp chat between Defendant, a former employee, and Jessie Lee, Lee turned off disappearing messages, only to have Defendant immediately turn on disappearing messages again (after which Lee did not seek to change this setting again). Ex. 51 at 4. As with Lee, Defendant also added Zhang to encrypted WhatsApp chats related to Done, with messages set to automatically be deleted after seven days. *See* Ex. 52. Records produced by former employees confirm that WeChat appears to be the primary form communication used by Defendant and the China contractors to conduct Done business, *see, e.g.,* Ex. 48, but Done has not produced any records from encrypted messaging platforms in response to the government subpoenas. In addition, the government recently discovered that Defendant told Done Employee-1 to lie to the government if she was asked about WhatsApp communications that she was exchanging with Defendant and others at Done. ECF No. 59, Ex. 32 at 2-3 (under seal). Defendant told Done Employee-1 to falsely state that the WhatsApp communications were personal in nature when in fact they concerned Done's business operations. *Id.*

**V.     Foreign Transfers and MakeBelieve**

On August 23, 2024, the Court stated, "in terms of the money that's at Makebelieve, I better have some examination of people who are running that to ensure that she has no access to that." Ex. 40

(Aug. 23 Tr.) at 27:12-14. The Court was correct to insist on this condition, both because the availability of foreign resources is relevant to flight and Defendant's candor with the Court, but also because dissipation of assets through transfers to third parties obstructs justice within the meaning of the bail statute, see 18 U.S.C. § 3142(f)(2)(B), because it becomes more difficult, if not impossible, to recover all available forfeitable assets to recompense victims.

Defense counsel previously proposed to the government in meet and confer discussions that a condition of release should be "[t]hat we satisfy you or the Court with evidence (either documents or testimony) that the MakeBelieve transfers were for legitimate expenses and did not in any fashion create a fund to facilitate flight by Ruthia." Ex. 42. This should indeed be a condition. The government also is concerned about other foreign transfers and is continuing to investigate the legitimacy of the overall over $13 million that was transferred to foreign entities and individuals. *See* Ex. 53.[1]

On August 29, 2024, the Court was informed that Defendant had been struggling to gather information on Makebelieve but "we do have some evidence" and "[e]very piece of evidence I've seen is consistent with what I told the Court on Friday" (namely payment for "company contractors"). Ex. 39 at 18:5-12; Ex. 40 at 29:14-20. Defendant pointed out the difficulty in obtaining records from Hong Kong to explain why those records had not been provided to the government or Court.

During the August 30th meet and confer, the government requested the evidence supporting the proffered statements regarding Makebelieve but has received none. The government, on the other hand, recently obtained records suggesting that Done itself was involved in creating MakeBelieve. Done added ECB Accounting Services Limited (ECB), a Hong Kong company, as a "Vendor" in its payment system shortly before it paid ECB (for the first and, apparently, only time), and thirteen days after the payment, MakeBelieve Asia Consultancy Limited was registered in Hong Kong with ECB as Secretary. Ex. 50. This payment occurred prior to Defendant's arrest and while she was running Done, making it

---

[1] The government provided Defendant with a copy of records of these financial transfers on August 22 and requested that Defendant notify the government if it believed that any of its calculations were in error. The government also provided Defendant with a summary schedule of the transfers on August 31. The government again makes clear that it is not contending that all these transfers are illegitimate and notes that it has asked for Defendant to assist in substantiating any transfers it believes are legitimate, but respectfully submits that it is indicative of Defendant's overseas ties and risk that additional funds are available to her, in light of her conversations about the use of nominee bank accounts.

U.S. MEM. RE DEFENDANT'S DETENTION    8

difficult to believe that she was uninvolved or unaware of it.

Other evidence obtained by the government indicates that Makebelieve is nothing but a shell company in Hong Kong, with one listed founding member: YiYing Zhu, aka Hayley Zhu. Ex. 41 at 3. While Defendant cited the difficulty in obtaining records from Hong Kong, that does not explain why she would have difficulty obtaining evidence from one of Done's current executives, who is the owner of MakeBelieve, nor does it explain why she would be unable to provide records maintained by Done that support the payments (records that one would expect the payor company to have if the payments were legitimate). The fact that Defendant (and others running the company) do not appear to have disclosed the true facts about MakeBelieve even to their own lawyers, with whom they can have confidential and privileged conversations, and that Defendant allowed a misleading impression about Done's relationship with MakeBelieve to be provided to this Court, further indicates that there is no practical way for Defendant to be supervised if released.

## VI. Secured Bond

Defendant's proposed cash bond also falls far short of an amount that would provide adequate suasion, particularly given that Defendant could readily compensate suretors for the loss of their funds. The size of Defendant's proposed bond matters only insofar as it can reliably secure her presence, and the availability of sums exceeding the proposed bond naturally offset her incentive to appear. *See United States v. Toro*, 981 F.2d 1045, 1049 (9th Cir. 1992) ("It is not the sum of bail bond that society asks for, but rather the presence of the defendant.") (quoting *United States v. Nebbia*, 357 F.2d 303, 304 (2d Cir. 1966) (internal quotation marks omitted)).

While Defendant previously represented to Magistrate Judge Hixson that Defendant "does not have access to Done's corporate accounts for her personal use," ECF No. 48 at 2, the government subsequently discovered that this representation was not accurate because Defendant paid herself hundreds of thousands of dollars in purported "dividends" from company funds, and did so without approval of her other board member. ECF No. 52, Ex. 27; Ex. 43 (under seal).

Defendant also does not appear to have been accurate about her personal funds. While Defendant recently represented to this Court that her assets included only $1,303 in an ICBC bank account, *see* August 23, 2024 Proffer at 1, the government discovered yesterday that the reason that

there was only $1,303 in the account is because Defendant did not disclose to the Court that on July 7 Defendant wired $49,985 from her ICBC account to an East West bank account in her mother's name. Ex. 59.

Defendant now proposes an unsecured bond of $5 million, for which she now appears to be the only signatory, and that amount will be secured by only $500,000 in cash, none coming from her personally, and "a pledge of [Defendant's] shares in Done Global." ECF No. 76 at 1. That is insufficient.

The security on the bond does not provide sufficient suasion to appear, as Defendant appears to have access to, at the very least: (a) Defendant's own liquid funds, which she previously represented as at least $616,584 in her August 23, 2024 Proffer; (b) company funds, of approximately $9 million; (c) the value of her ownership stake in Done; and (d) the value of her property in Georgia. This list does not include assets transferred to her mother, Yue Wang, or other individuals and entities abroad, including, in particular, the $1.4 million to Makebelieve. Defendant's proposed pledge of shares is lacking in detail, much like her previous claim that she could divest those shares if needed. It also ignores that Defendant is a serial entrepreneur who was aiming for a $1 billion valuation for Done and who would have little difficulty running a new technology company from abroad.[2] Defendant's proposal is far from the order in *Cohen* that required him to relinquish all funds in his bank accounts. A secured bond has to bear a relation to the funds accessible to Defendant and provide suasion for her to appear.

It also is notable that none of three individuals who Defendant suggested to Pre-Trial Services as proposed sureties upon her arrest are willing to vouch for her. One has stated the opposite, that Defendant will flee if released. ECF No. 59, Ex. 32 (under seal).

Any bond proposed by Defendant — including the amounts purportedly coming from her parents — also should satisfy the requirements of *Nebbia*. *See United States v. Rubinstein*, 971 F.2d 288, 297

---

[2] The government recently became aware that Defendant changed the name of Done Medical to "Mindful Mental Wellness" in order to circumvent pharmacy restrictions on Done. Ex. 55 (under seal). There is nothing to prevent Defendant from simply bankrupting Done domestic accounts, creating a new Chinese corporation, and continuing operations under a new corporate structure.

(9th Cir. 1992) (noting that the government may seek, and District Court may require, a *Nebbia* hearing).

## VII. Defendant's Communications and Monitoring

Defendant's proposal is significantly looser in almost every material respect than the order that the Court entered in *United States v. Cohen*, Case No. 3:10-cr-00547-CRB, ECF. No. 196 (Aug. 26, 2011), another case involving private security guards.[3] It does not include, among others, written protocols and use of force agreements; pre-payment; removal from premises of any and all internet-enabled computers, cell phones, modems and any other means by which the defendant may communicate electronically except by land-line telephone; consent to monitoring of the land-line telephone; and consent by other residents of the house to abide by the conditions. *Id*. If released, Defendant also should be prohibited from communicating with witnesses or Done employees (in addition to her co-defendant, which is what Defendant proposed). Even with a flip phone, Defendant could provide directions to Done employees.

The weight of the evidence regarding encrypted communications, intent to flee, and obstruction, however, is why, ultimately, the government respectfully submits that even private security monitoring cannot effectively counteract her extreme risk of flight, dangerousness, and obstruction. As the government highlighted previously, there are numerous instances of defendants fleeing while on bond, including while on some form of electronic monitoring. *See, e.g.*, *United States v. Thai*, No. 4:22-cr-329 (S.D. Tex.) (defendant cutting her electronic bracelet and fleeing the country); *United States v. Satary*, No. 2:19-cr-00197-WBV-KWR (E.D.L.A.) (flight under similar circumstances). This has also occurred in situations where defendants were on pretrial release with electronic monitoring and house arrest. This Court knows its experience with Mouli Cohen. One other notable example is Leonard Francis, who fled the United States after cutting off his electronic monitoring bracelet and absconding from house arrest in September 2022. *See* Ex. 60 (January 4, 2024 Press Release). While Francis was extradited back to this country from Venezuela after over a year, a similar result cannot be expected here. As the Court has

---

[3] Federal agents spoke with representatives of the proposed security company. The security company stated that it has (a) never before conducted security in connection with pretrial release; and (b) that, while it exchanged a preliminary scope of work with Defendant, that did not specify armed guards and there are many details and operational guidelines to be finalized.

U.S. MEM. RE DEFENDANT'S DETENTION           11

already observed, "if the defendant returns to the country of her birth . . . she won't be extradited to the United States. The Chinese government will not send her back here." Ex. 40 at 30:17-25.

Private security arrangements will not reliably address Defendant's dangerousness or flight risk either. Sam Bankman Fried recently engaged in what was alleged to be attempted intimidation of a witness and obstruction while monitored by private security. *See United States v. Bankman-Fried*, No. 22-CR-673, at ECF No. 224 (S.D.N.Y. Aug. 11, 2023) (revoking Bankman Fried's bail). Courts often detain Defendants despite proposals for their release while monitored by private security, recognizing the inefficiency of private security guards at preventing obstruction. *See, e.g.*, *United States v. Guo*, No. 23-CR-118, at ECF No. 51 (S.D.N.Y. Apr. 20, 2023) (rejecting "Defendant's proposal regarding the use of private security because it is not as reliable as a federal jail" and "Defendant's past obstructive conduct . . . demonstrate[s] that the Court does not have reasonable assurance that Defendant will abide by any conditions of pretrial release"); *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1990) (noting that conditions regarding house arrest and monitoring "at best elaborately replicate a detention facility without the confidence of security such a facility instills") (internal quotation marks omitted).

Defendant has already used a wide array of messaging services such as WeChat, WhatsApp, Signal, and iMessage, consistently rotating her platform of choice to avoid government scrutiny. *See* ECF No. 52, Exs. 8, 9, 11. If released, Defendant could obtain a second device without informing counsel or Pretrial Services (like her use of multiple phones prior to her arrest), or use the device of a family member or associate to communicate, or engaging in phone conversations with others, particularly those in China, in which she can instruct them to carry out her bidding.

**VIII. Conclusion**

Ultimately, this detention issue comes down to trust. The Court has to trust that Defendant will abide by conditions of release—that trust is lacking here. This is a unique case in which the Court has seen evidence of Defendant's intent and preparations to flee. Defendant has extensive foreign ties and no ties to this district, Defendant has proven her ability to work from and live-in a non-extradition country, and Defendant has engaged in obstructive behavior. Defendant has not rebutted the presumption that she is both a significant flight risk and danger to the community, and it is clear at this

point that no combination of conditions that she proposes can assure her appearance or the safety of the community. Her motion for release should be denied, and the Court should set a date for trial.

DATED: September 6, 2024

Respectfully submitted,

MATTHEW M. YELOVICH
Attorney for the United States

GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

_____/s/_____
JACOB FOSTER
Principal Assistant Chief
RAYMOND E. BECKERING III
Trial Attorney

_____/s/_____
KRISTINA GREEN
KATHERINE M. LLOYD-LOVETT
Assistant United States Attorneys