Exhibit 39

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN FRANCISCO DIVISION


 4
      UNITED STATES OF AMERICA,        )   CR-24-0329-CRB
 5                                      )
                        PLAINTIFF,      )   SAN JOSE, CALIFORNIA
 6                                      )
              VS.                       )   AUGUST 29, 2024
 7                                      )
      RUTHIA HE, A/K/A RUJIA HE         )   PAGES 1-39
 8                                      )
                        DEFENDANT.      )
 9                                      )
      _____  )
10                                      )

11                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE CHARLES R. BREYER
12                   UNITED STATES DISTRICT JUDGE

13

14    A P P E A R A N C E S:

15    FOR THE GOVERNMENT:      BY:  KRISTINA GREEN
                               U.S. ATTORNEY'S OFFICE
16                             450 GOLDEN GATE AVENUE, 11TH FLOOR
                               BOX 36055
17                             SAN FRANCISCO, CA 94102

18    FOR THE GOVERNMENT:      BY:  JACOB NATHANIEL FOSTER
                               U.S. DEPARTMENT OF JUSTICE
19                             FRAUD SECTION
                               950 PENNSYLVANIA AVENUE NW
20                             WASHINGTON, DC 20530

21
      ALSO PRESENT:            VANESSA VARGAS, U.S. PRETRIAL
22

23    OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                                  CERTIFICATE NUMBER 13185
24

25             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

```
1     APPEARANCES CONTINUED:

2     FOR THE DEFENDANT:        BY:  ELLIOT REMSEN PETERS
                                     CODY GRAY
3                                    NICHOLAS MARAIS
                                KEKER, VAN NEST & PETERS LLP
4                               633 BATTERY STREET
                                SAN FRANCISCO, CA 94111
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              SAN JOSE, CALIFORNIA              AUGUST 29, 2024

 2                         P R O C E E D I N G S

 3         (COURT CONVENED AT 11:00 A.M.)

 4              THE CLERK:  CALLING CRIMINAL ACTION CR- 24-0329.  USA

 5    VERSUS RUTHIA HE.

 6              COUNSEL, PLEASE STEP FORWARD AND STATE YOUR APPEARANCES

 7    FOR THE RECORD.

 8              MR. FOSTER:  GOOD MORNING, YOUR HONOR.

 9              JACOB FOSTER AND KRISTINA GREEN ON BEHALF OF THE

10    UNITED STATES.

11              THE COURT:  GOOD MORNING.

12              PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

13         VANESSA VARGAS WITH U.S. PRETRIAL SERVICES.

14              MR. PETERS:  GOOD MORNING, YOUR HONOR.

15         ELLIOT PETERS WITH MY PARTNERS NICK MARAIS AND CODY GRAY

16    ON BEHALF OF RUTHIA HE WHO IS PRESENT IN COURT IN THE CUSTODY

17    OF THE MARSHALS.

18              THE COURT:  GOOD MORNING.

19              MR. PETERS:  GOOD MORNING, YOUR HONOR.

20              THE COURT:  SO THANK YOU VERY MUCH.  I RECEIVED A

21    SUBMISSION FROM THE DEFENSE AS TO PROPOSED CONDITIONS,

22    INDICATING THAT IT WOULD BE HELPFUL TO HAVE A DISCUSSION THIS

23    MORNING.

24         I DON'T KNOW WHEN YOU RECEIVED IT, MY GUESS IS PROBABLY

25    WHEN I RECEIVED IT, OR SOME TIME AROUND THERE, BUT LET ME TURN
```

1  TO THE GOVERNMENT AND ASK YOU IF YOU HAVE ANY THOUGHTS ABOUT

2  ANY OF THESE CONDITIONS?

3          MR. PETERS:  WE RAN THIS BY THE GOVERNMENT ON

4  SATURDAY, YOUR HONOR.

5          THE COURT:  I'M SORRY?

6          MR. PETERS:  WE DID RUN THIS, THE OUTLINE OF THIS

7  PROPOSAL BY THE GOVERNMENT LAST SATURDAY, SO THEY HAVE HAD A

8  LITTLE BIT OF TIME TO THINK ABOUT IT.

9          MR. FOSTER:  YOUR HONOR, MANY THOUGHTS.

10      I WOULD NOTE THAT SOME THINGS WERE RUN BY THE GOVERNMENT,

11  SOME THINGS ARE VERY DIFFERENT THAN WHAT WAS RUN BY THE

12  GOVERNMENT.  WE RECEIVED IT WHEN YOUR HONOR RECEIVED IT.

13          THE COURT:  YES.  THIS IS AN ONGOING PROCESS THAT THE

14  DEFENSE IS ENGAGED IN AS WELL, THEY HAVE TO TALK TO PEOPLE AND

15  FIGURE OUT WHERE WE ARE.

16      BUT ANYWAY, WHERE WE ARE IS WE ARE HERE, SO NOW THE

17  QUESTION IS, WHAT IS YOUR VIEW AS TO ANY OF THESE CONDITIONS

18  THAT HAVE BEEN SUGGESTED BY THE DEFENSE?

19          MR. FOSTER:  CLEARLY INSUFFICIENT, YOUR HONOR.  A

20  NUMBER OF REASONS.

21      FIRST, THEY HAVEN'T ADDRESSED THE COURT'S CONCERNS THAT

22  THE COURT CLEARLY STATED ON THE RECORD.  ONE OF THOSE WAS

23  OBSTRUCTION.  EVEN IF THIS DEFENDANT HAS NO ACCESS TO FUNDS,

24  THERE IS AN UNUSUAL, AND IN THE GOVERNMENT'S VIEW OVERWHELMING

25  AMOUNT OF EVIDENCE OF HER PLANS TO FLEE, TO TRANSFER ASSETS

1    OVERSEAS AND TO OBSTRUCT.

2         AND WHETHER SHE HAS ACCESS TO $10 MILLION, A MILLION

3    DOLLARS OR ZERO DOLLARS, SHE HAS A FAMILY THAT CAN WELCOME HER.

4    SO FUNDS AREN'T DETERMINATIVE OF HER RISK OF FLIGHT, THE

5    QUESTION IS CAN SHE BE TRUSTED?  MAGISTRATE JUDGE HIXSON SAID

6    NO, AND WE SUBMIT THAT ANSWER IS CORRECT.

7         SECOND.  FUNDS.  THE COURT WAS VERY CLEAR THAT IF WE CAME

8    BACK, SOMETHING THAT NEEDED TO BE ADDRESSED WAS NOT ONLY FUNDS

9    GOING FORWARD, BUT FUNDS IN THE PAST.  THE MAKE BELIEVE FUNDS.

10        WE HAVE HEARD FROM COUNSEL LAST SATURDAY THAT THEY WOULD

11   BE PROVIDING US WITH DOCUMENTATION OF THE MAKE BELIEVE FUNDS

12   AND THEIR LEGITIMACY.  THERE ARE NONE, AND YOUR HONOR SAID THAT

13   IF WE WERE COMING BACK, THAT YOU BETTER HAVE SOME EXAMINATION

14   OF PEOPLE WHO ARE RUNNING MAKE BELIEVE TO ENSURE SHE HAS NO

15   ACCESS TO THAT OVER $1.4 MILLION.

16        EVEN BEYOND THAT, A WEEK AGO THURSDAY WE PROVIDED

17   SUBSTANTIATION THAT THE MAKE BELIEVE FUNDS ARE $1.4 MILLION OF

18   A BROADER $13 MILLION IN TRANSFERS TO INTERNATIONAL ENTITIES

19   AND INDIVIDUALS.

20        THE DEFENSE HAS HAD RECORDS OF EVERY ONE OF THOSE

21   TRANSACTIONS SINCE LAST THURSDAY.  WE HAVE REQUESTED REPEATEDLY

22   THAT IF THEY DISAGREE WITH THE FACT THAT THESE ARE FINANCIAL

23   TRANSFERS TO INTERNATIONAL ENTITIES AND INDIVIDUALS, THEY

24   APPRISE US OF THAT.

25        WE HAVEN'T HEARD ANYTHING.  AND WE WANT TO BE VERY CAREFUL

1   AND FORTHRIGHT ABOUT WHAT WE ARE SAYING.  WE ARE NOT SAYING

2   THAT THOSE ARE ALL A POT OF MONEY AVAILABLE FOR THE DEFENDANT,

3   BUT WHAT WE ARE SAYING IS THAT IT ILLUSTRATES ONE, THE EXTENT

4   OF HER FOREIGN TIES; AND TWO, THAT BECAUSE THIS WAS PART OF A

5   PLAN THAT SHE LITERALLY WROTE TO MOVE CONTRACTORS AND THE

6   BUSINESS OVERSEAS, BECAUSE OF THE PENDENCY OF THE INVESTIGATION

7   AND BECAUSE IN EXHIBIT 1 SHE CORRESPONDS WITH OTHERS, AND

8   EXHIBIT 26 ABOUT OPENING UP BANK ACCOUNTS IN THE NAME OF

9   NOMINEES, THE GOVERNMENT AT THIS POINT CANNOT FORECLOSE THAT AT

10  LEAST SOME AMOUNT OF THOSE FUNDS ARE AVAILABLE FOR HER BECAUSE

11  THAT'S THE PLAN THAT SHE DISCUSSED.

12       IN THAT REGARD, FUNDS, WHERE IS THIS MONEY COMING FROM FOR

13  PRIVATE SECURITY?  WE WERE TOLD LAST WEEK THAT SHE DIDN'T HAVE

14  THE RESOURCES TO DO IT AND IT WAS OVERWHELMINGLY EXPENSIVE.

15       NOW APPARENTLY THERE ARE RESOURCES.  AND I THINK THIS IS

16  INDICATIVE OF AN ONGOING PROCESS WHERE HER NET WORTH HAS RISEN.

17  IN EARLIER BOND PROCEEDINGS, WE DIDN'T EVEN KNOW ABOUT THESE

18  DIVIDENDS.

19       WHAT WE WERE TOLD YESTERDAY ABOUT THE BOARD MEMBER, NOW A

20  FORMER BOARD MEMBER, IS THAT HE WAS NOT INVOLVED IN AUTHORIZING

21  THOSE DIVIDEND PAYMENTS, WHICH OF COURSE WOULD HAVE TO BE THE

22  PROCESS THAT WOULD HAVE TO BE AUTHORIZED BY THE BOARD, WHICH

23  SUGGESTS THAT THE DEFENDANT SIMPLY PAID HERSELF THE MONEY,

24  WHICH GOES DIRECTLY TO HER ABILITY TO CONJURE UP MONEY WHEN SHE

25  WANTS IT.

1           IN THAT REGARD, FOOTNOTE ONE STRUCK ME AS EXTREMELY

2     INTERESTING IN THEIR SUBMISSION.  THEY INDICATED THAT THE

3     DEFENDANT MAY SEEK TO SELL SOME OF HER SHARES BACK TO THE

4     COMPANY, BUT WHAT INTEREST WOULD AN INDEPENDENT COMPANY HAVE IN

5     BUYING BACK THE DEFENDANT'S SHARES IN THIS TYPE OF SITUATION?

6           THAT CASTS SIGNIFICANT DOUBT ON THE INDEPENDENCE OF THE

7     FIVE, THAT'S TO THE DEFENDANT'S BENEFIT, NOT TO THE COMPANY'S

8     BENEFIT, AS ARE THESE PROPOSALS ABOUT PUTTING IN A RECEIVER TO

9     MONITOR THE FINANCIAL FUNDS, THAT'S FOR THE DEFENDANT'S BENEFIT

10    IN THESE BOND PROCEEDINGS, NOT FOR THE COMPANY'S BENEFIT, WHICH

11    ALL GOES BACK TO THE QUESTION OF INDEPENDENCE THAT THE COURT

12    RAISED, WHICH HAS NOT BEEN SATISFACTORILY MENTIONED.

13          THEY PROPOSE -- MY NEXT POINT, IS IN REGARDS TO THE

14    INDEPENDENCE, THEY PROPOSE THAT SHE WILL, IN THE FUTURE,

15    EXECUTE DOCUMENTS RELINQUISHING HER FORMAL CONTROL OF THE

16    COMPANY, WHICH IS ONLY ONE PIECE, THERE IS THE FORMAL AND THE

17    INFORMAL THROUGH THESE INTERMEDIARIES.  BUT SPEAKING AS TO THE

18    FORMAL, I DON'T THINK WE SHOULD BE HERE UNTIL THAT HAPPENS.

19          THE GOVERNMENT INTERVIEWED THE BOARD MEMBER, THE OTHER

20    BOARD MEMBER, NOW FORMER BOARD MEMBER, AND WHAT WAS REPRESENTED

21    ON AUGUST 23RD TO THIS COURT THAT *DUN HAS "AN INDEPENDENT

22    BOARD MEMBER, MS. HE IS NOT IN COMPLETE CONTROL OF THE COMPANY

23    AND ITS ASSETS."

24          WHEN WE READ THAT QUOTATION TO MR. COHEN, WHO WAS THE ONE

25    OTHER BOARD MEMBER WHO HAS NOW RESIGNED HIS POSITION, HE STATED

THAT THAT REPRESENTATION WAS MADE TO THE COURT WAS INACCURATE.

HE HAD NO INVOLVEMENT OR ABILITY TO CONTROL THE COMPANY AND ITS

ASSETS AND THAT THE DEFENDANT WAS IN COMPLETE CONTROL OF THE

COMPANY AND ITS ASSETS.

HE FURTHER STATED THAT AFTER THE DEFENDANT'S ARREST, PRIOR

TO THE DEFENDANT'S ARREST, HE WAS LIKE A QUASI ADVISOR, SPENT

MAYBE FOUR HOURS RELATED TO DONE, NO FORMAL BOARD MEETINGS, NO

BOARD PROCESS, NOT AWARE OF ANY BYLAWS.  AFTER ARREST HE SAYS

OH, MY GOODNESS, I HAVE THIS BIG PROBLEM, I'M AFFILIATED WITH

THIS COMPANY, I'M TECHNICALLY ON A BOARD THAT HASN'T MET, I

NEED TO DO SOMETHING.

HE FIRST THINKS ABOUT RESIGNING AND THEN HE'S ADVISED

THROUGH COUNSEL THAT HE MAY HAVE SOME CORPORATE OBLIGATIONS.

SO WHAT DOES HE DO?  HE TRIES TO PUT TOGETHER A PACKAGE WHERE

THE DEFENDANT, RELINQUISHING HER BOARD SEAT, WHERE HE BRINGS IN

NEW BOARD MEMBERS, WHERE HE BRINGS IN NEW OUTSIDE COUNSEL,

WHERE THEY REMEDIATE AND ENGAGE WITH THE GOVERNMENT.

AND HE MAKES THIS PROPOSAL, THROUGH COUNSEL, TO THE

DEFENDANT, AND HE'S STYMIED WITH IT, WHICH ULTIMATELY LEADS TO

HIS RESIGNATION, WHICH MEANS AT THE VERY LEAST, THE DEFENDANT

WELL KNEW AT THE TIME THESE REPRESENTATIONS WERE BEING MADE TO

THE COURT ABOUT THE INDEPENDENT BOARD MEMBER, THAT THEY SIMPLY

WERE NOT TRUE AND THAT THE DEFENDANT HASN'T HAD MANY

OPPORTUNITIES TO RELINQUISH HER CONTROL OF THE COMPANY IN THE

MANY MONTHS SINCE SHE WAS ARRESTED IN JUNE AND HAS NOT DONE SO,

1    WHICH ULTIMATELY LEAD TO HIS RESIGNATION.

2          FURTHER, THE FIVE PEOPLE WHO ARE RUNNING THE COMPANY.

3    WHEN WE WERE HERE LAST WEEK, THE COURT SAID, I'M HIGHLY

4    SUSPICIOUS OF ANY RELATIONSHIP THAT ISN'T CLEARLY SEPARATE FROM

5    ANY CONTROL SHE OR MEMBERS OF HER FAMILY OR FRIENDS CAN

6    IMPLORE.

7          I MEAN, YOU COULD PUT IN A SEPARATE RECEIVER, YOU COULD

8    TAKE ALL THESE PEOPLE OUT AND PUT IN SOMEBODY WHO COULD RUN THE

9    COMPANY.  AND WHEN WE CORRESPONDED WITH DEFENSE COUNSEL LAST

10   WEEK, WE TOLD THEM THAT JUST HAVING SOMEONE OVERSEE THE FUNDS

11   WAS NOT, IN THE GOVERNMENT'S VIEW, SUFFICIENT.

12         FURTHER, WE HAVE INTERVIEWED PEOPLE AS OF YESTERDAY, THE

13   GOVERNMENT'S INVESTIGATION IS ONGOING, AND WE THINK GIVEN

14   SOMETHING WAS FILED THIS MORNING, IF THE COURT WANTS A FULL

15   BRIEFING, WE ARE HAPPY TO FILE A BRIEF, BUT WE THINK THAT

16   SHOULD HAPPEN AFTER THERE IS A FORMAL PROPOSAL.

17         BUT WHAT WE HEARD YESTERDAY IN AN INTERVIEW OF ANOTHER

18   WITNESS IS THAT NONE OF THESE FIVE PEOPLE ARE INDEPENDENT OF

19   THE DEFENDANT.  THESE INDIVIDUALS ARE CLOSE ASSOCIATES OF THE

20   DEFENDANT, THEY'RE THE DEFENDANT'S PROXIES.  MANY OF THEM ARE

21   IN FACT LOCATED OUTSIDE OF THE UNITED STATES.

22         AND THIS GOES TO THE GOVERNMENT'S CONCERN THAT THIS IS

23   REALLY A FOREIGN ENTERPRISE AT THIS POINT, IT WAS DESIGNED TO

24   BE A FOREIGN ENTERPRISE AS PART OF THIS PLAN TO OBSTRUCT THE

25   INVESTIGATION, THE CRITICAL PERSONNEL, EVIDENCE IS LOCATED

1    OVERSEAS, AND IT'S NOT CLEAR -- I UNDERSTAND THAT COUNSEL AND

2    COMPANY COUNSEL IS REPRESENTING THAT THEY BELIEVE THAT THESE

3    PEOPLE ARE INDEPENDENT, THAT THEY BELIEVE THAT THEY HAVE NO

4    ASSOCIATION WITH THE WRONGDOING, THE EFFORTS TO OBSTRUCT,

5    TRANSFER FUNDS THAT MS. HE IS INVOLVED WITH, BUT THEY ALSO HAVE

6    NO BASIS REALLY FOR KNOWING THAT AND NO ABILITY IN FACT TO

7    VERIFY THAT.

8         AND SO THIS IS, IN THE GOVERNMENT'S VIEW, COMPLETELY

9    INSUFFICIENT AS TO OBSTRUCTION, AS TO DANGEROUSNESS.  AND ONE

10   ALARMING THING WE LEARNED JUST THE DAY BEFORE YESTERDAY IS THAT

11   AFTER THE DEFENDANT'S ARREST, COMPANY COUNSEL REPRESENTED TO

12   THE GOVERNMENT THAT THE COMPANY WAS NO LONGER TAKING NEW

13   PATIENTS.

14        AND THAT WAS SIGNIFICANT TO THE GOVERNMENT'S ASSESSMENT TO

15   THE RISK OF DANGER.  I MEAN, IT WAS QUITE CLEARLY CONCERNED

16   THAT THE COMPANY HAD IN THE DEFENSE -- IN THE COMPANY COUNSEL'S

17   ESTIMATION, 40 TO 50,000 ONGOING PATIENTS, AND IN THE

18   GOVERNMENT'S VIEW, A SIGNIFICANT NUMBER OF THOSE WERE RECEIVING

19   MEDICALLY UNNECESSARY PRESCRIPTIONS.

20        BUT IT IS A MUCH MORE HEIGHTENED LEVEL OF CONCERN IF THE

21   COMPANY WAS IN FACT TO BE ENGAGED IN ONGOING OPERATIONS

22   ACCEPTING NEW PATIENTS, PARTICULARLY IF IT WAS CONTINUING TO

23   USE SOME OF THE POLICIES AND PROTOCOLS THAT THE DEFENDANT

24   HERSELF PUT IN PLACE UNDER THIS MANAGEMENT TEAM.

25        AND WHAT THE GOVERNMENT FOUND OUT THROUGH ITS OWN

1    INVESTIGATIVE EFFORTS, NOT THROUGH THE EFFORTS OR THE

2    DISCLOSURES BY COMPANY COUNSEL, IS THAT NOW THE COMPANY, YES IS

3    IN FACT TAKING NEW PATIENTS, WHICH SIGNIFICANTLY RAISES THE

4    STAKES AS TO DANGEROUSNESS, AS TO THREAT TO THE COMMUNITY.  AND

5    WHEN WE HAVE TO GO AND ASK COMPANY COUNSEL TO CONFIRM THAT, HE

6    INDICATED THAT IN FACT THEY WERE.

7                MR. PETERS:  CAN WE --

8                THE COURT:  I WILL GET TO YOU.

9                MR. FOSTER:  24/7 SECURITY.

10        AND AGAIN, WE ARE HAPPY TO BRIEF ALL OF THIS, YOUR HONOR,

11    BUT IT'S ONLY AS GOOD AS THE TRUSTWORTHINESS OF THE DEFENDANT.

12    THE COURT KNOWS THAT WELL.  NOT ONLY THE CASE THE COURT IS

13    FAMILIAR WITH BUT THE CASE DOWN IN THE SOUTHERN DISTRICT OF

14    CALIFORNIA, WHERE HE WAS UNDER 24/7 SECURITY, CUT HIS TETHER

15    AND WAS ABLE TO MAKE IT TO A FOREIGN JURISDICTION.

16        HE OF COURSE -- LUCKILY ENOUGH, THAT WAS AN EXTRADITABLE

17    COUNTRY AND SO HE WAS ULTIMATELY EXPEDITED BACK TO THE UNITED

18    STATES, BUT AS THE COURT HAS NOTED IN THIS SITUATION, THE

19    DEFENDANT HAS TALKED TO GOING TO JURISDICTIONS WITHOUT

20    EXTRADITION, AND THAT MAKES THE SITUATION SIGNIFICANTLY

21    DIFFERENT.  IT ALSO DOESN'T PREVENT THE TYPES OF OBSTRUCTION

22    AND DANGEROUSNESS WE HAVE TALKED ABOUT.

23        FURTHER, THEY TALKED ABOUT THEY CAN PUT IN AN INDEPENDENT

24    COMPANY TO MONITOR FUNDS.  AND IN TERMS OF THE DETAILS OF THIS

25    AND THE DETAILS OF PRIVATE SECURITY, THE FIRST TIME WE ARE

1    SEEING ANY DETAILS WHATSOEVER ABOUT IT IN TERMS OF THE

2    COMPANIES, ET CETERA, IS THIS MORNING.  BUT ONE THING THAT I

3    WOULD NOTE THAT IS PARTICULARLY ALARMING IN RELATION TO THE

4    PAST REPRESENTATIONS MADE TO THE COURT, IS THAT IN THEIR BRIEF,

5    ECF 48 AT 16 TO 17, THE DEFENSE ALREADY REPRESENTED THAT

6    DEFENDANT WASN'T A FLIGHT RISK BECAUSE SHE HAD "HIRED A FORMER

7    DEA AGENT TO SERVE AS ITS COMPLIANCE OFFICER."

8        NOW THE GOVERNMENT HAS INTERVIEWED THIS FORMER DEA AGENT

9    WHO PURPORTEDLY WAS THE COMPLIANCE OFFICER AND PURPORTEDLY

10   ENSURED THE DEFENDANT'S GOOD FAITH AND ENSURED THE LEGITIMACY

11   OF THE COMPANY AND ALL THAT, HE TOLD THE GOVERNMENT THAT HE

12   FELT HE WAS USED AS COVER AND THAT "HE WAS GIVEN A FALSE

13   IMPRESSION OF DONE BY RUTHIA, ON THE COMPANY AND ITS

14   COMPLIANCE".

15       AND THEREIN LIES THE PROBLEM, YOUR HONOR, HAVING

16   INTENTIONALLY SOUGHT TO OBSTRUCT THIS INVESTIGATION, PLACED THE

17   COMPANY'S OPERATIONS IN CHINA AND IN THE HANDS OF CLOSE

18   ASSOCIATES, INFORMATION THAT WOULD BE PROFFERED TO THE COURT,

19   TO A MONITOR, TO FORMER LAW ENFORCEMENT AGENTS, TO A COMPANY,

20   IS ONLY RELIABLE AS THE SOURCES PROVIDING IT.

21       AND AT THIS POINT THE GOVERNMENT HAS NO CONFIDENCE AND

22   SUBMITS THE COURT SHOULD HAVE NO CONFIDENCE IN THE LEGITIMACY

23   OF ANY OF THOSE REPRESENTATIONS OR THE ABILITY OF ANYONE COMING

24   IN NEW TO BE ABLE TO MONITOR WHAT IS GOING ON IN A COMPANY

25   OPERATED IN LARGE EXTENT FROM OVERSEAS.

1       SO I THINK I WOULD FINALLY NOTE THAT THE NEWLY PROPOSED

2   PACKAGE DOES NOT ADDRESS THE COURT'S CONCERNS, INCLUDING AN

3   INDEPENDENT MONITOR FOR OPERATIONS, BUT YOU COULD PUT IN A

4   SEPARATE RECEIVER, A GREATLY INCREASED SECURED BOND.  "I DOUBT

5   I WOULD FIND ANYTHING SATISFACTORY OTHER THAN TAKING THE 9

6   MILLION AND DEPOSITING IT WITH THE COURT."  AND IF SHE CAN SELL

7   THESE SHARES, WHETHER THROUGH A BUY BACK OR OTHER MEANS, IF

8   THEY HAVE LIQUIDITY BECAUSE THIS COMPANY IS STILL GENERATING

9   MILLIONS OF DOLLARS OR HOWEVER MUCH IT'S GENERATED A MONTH,

10  THEN IN ADDITION TO THE 800,000, NONE OF WHICH SHE'S OFFERED

11  DEPOSED IN HER OWN ASSETS, SHE HAS ANOTHER LUCRATIVE SOURCE OF

12  FUNDS THAT SHE'S NEVER DISCLOSED, WHICH IS HER NEAR TOTAL

13  CONTROL OF DONE IN THE FORM OF SHARES, THAT ARE VALUABLE,

14  WHETHER BOUGHT BY THE COMPANY OR WHATEVER.

15      BUT MORE IMPORTANTLY, WE THINK THAT ADDITIONAL EVIDENCE

16  THAT HAS BEEN DEVELOPED IN THE FORM OF INFORMATION FROM HER

17  ORIGINAL SURETOR, WHO IS ONE OF THE PEOPLE WHO KNEW HER THE

18  BEST, WOULD INFORM THE COURT THAT SHE WOULD BE A FLIGHT RISK IF

19  SHE WAS LET OUT ON RELEASE, TO THE FACT THAT NONE OF THOSE

20  ORIGINAL SURETORS CAME HERE VOUCHING FOR HER TODAY, TO THE

21  ADDITIONAL INFORMATION AS TO OBSTRUCTION AND THE ABILITY TO

22  TRUST THE REPRESENTATIONS THAT SHE MAKES.

23      WE SUBMIT THAT THE COURT SHOULD REACH THE SAME CONCLUSION

24  REACHED BY MAGISTRATE JUDGE HIXSON WHEN HE SAID, I DON'T THINK

25  IT'S POSSIBLE TO MITIGATE AGAINST THIS LEVEL OF RISK OF FLIGHT.

```
 1    AND HE DID SO NOT -- CERTAINLY NOT SOLELY AS A QUESTION OF

 2    FUNDS, BUT THERE'S THE QUESTION OF THIS REPEATED AND EGREGIOUS

 3    COURSE OF CONDUCT TO DELETE THINGS, TO -- IN THE FACE OF

 4    WIDESPREAD PUBLICITY IN THE *WALL STREET JOURNAL* AND OTHER MAJOR

 5    NEWS MEDIA PUBLICATIONS THAT RAISE CONCERNS ABOUT THE

 6    LEGITIMACY OF HER PRACTICES, TO DOUBLE DOWN ON THEM; IN THE

 7    FACE OF MOTHERS CALLING IN ABOUT THEIR CHILDREN WHO HAD

 8    OVERDOSED AND DIED, TO MAKE CLEAR NOT BECAUSE OF THE ADDERALL,

 9    BUT BECAUSE THEY ALLEGED THAT THE ADDERALL PRECIPITATED A

10    DISSENT FROM SOBRIETY THAT LEAD TO AN OVERDOSE AND DEATH.

11         AND WHEN OTHERS IN THE COMPANY VIEWED THIS AND TOLD THE

12    DEFENDANT, WE SHOULD CHANGE THE PRACTICES, SHE PERSISTED,

13    DIDN'T CHANGE A THING; TO WHEN SHE RECEIVED A GOVERNMENT

14    SUBPOENA AND DOUBLED DOWN ON THE OBSTRUCTION AND THE PLAN FOR

15    FLIGHT.

16         AND HAVING DOUBLED DOWN ON THE CRIME, WE SUBMIT THAT

17    WHATEVER QUANTUM OF RESOURCES SHE HAS ACCESS TO, SHE'S FULLY

18    CONFIDENT, SELF-PORTRAYED AS A GENIUS, THAT IF SHE MAKES IT

19    BACK TO CHINA, SHE WILL BE ABLE TO GENERATE ENOUGH FUNDS TO

20    HAVE A COMFORTABLE LIFE WITH HER FAMILY AND FRIENDS.

21         AND THEREFORE WE THINK THIS PROPOSAL IS INADEQUATE.  IF

22    THE COURT IS GOING TO CONSIDER IT, WE WOULD LIKE THE

23    OPPORTUNITY TO BRIEF IT, BUT WE SUBMIT THE COURT SHOULD SIMPLY

24    DENY THIS AND WE WILL BE READY TO PROCEED TO TRIAL AT ANY DATE

25    SET BY THE COURT.
```

```
1              THE COURT:  YOUR VIEW?

2              MR. PETERS:  YOUR HONOR, SO MUCH OF WHAT COUNSEL SAYS

3     IS NOT TRUE, AND I'M GOING TO TALK ABOUT THAT SPECIFICALLY.

4          SO MUCH OF WHAT COUNSEL SAID IS DIRECTED AT THIS

5     OBSTRUCTION CHARGE IN THE CASE.  OUR PROPOSAL IS DIRECTLY

6     ADDRESSED TO THE POSSIBILITY OF FLIGHT, TO PUT TOGETHER A

7     SERIES OF CONDITIONS WHICH MAKE FLIGHT IMPOSSIBLE, ABSOLUTELY

8     IMPOSSIBLE TO ACCOMPLISH, AND WE HAVE PROPOSED A BUNCH OF STEPS

9     TO DO THAT.

10         THE STRENGTH OF THE OBSTRUCTION CASE OF COURSE IS NOT

11    REALLY RELEVANT TO THE ISSUE OF FLIGHT, AND THE STRENGTH OF THE

12    CASE IS THE LEAST SIGNIFICANT BAIL FACTOR, BUT I'M GOING TO

13    TALK ABOUT IT BECAUSE COUNSEL SPENT SO MUCH TIME TALKING ABOUT

14    THIS PURPORTED OBSTRUCTION.

15         I DO WANT TO REMIND THE COURT THAT THIS IS THE SAME LAWYER

16    WHO TOLD THE COURT THAT SHE INTENDED TO FLEE TO COSTA RICA.

17    AND THAT WAS FALSE.  THIS IS SAME PROSECUTOR WHO TOLD THE COURT

18    THAT SHE USED TWO PASSPORTS, AND THAT OF COURSE WAS ALSO FALSE.

19         THE FIRST EXHIBIT IN THE GOVERNMENT'S SUBMISSION THAT I

20    KNOW YOUR HONOR READ IS A DOCUMENT -- THAT RELATES TO BEST

21    PRACTICES AND THE GOVERNMENT CLAIMS THAT THAT DOCUMENT WAS

22    DESTROYED, BUT WHAT COUNSEL ALSO KNOWS IS THAT AFTER MAKING

23    THAT ARGUMENT TO YOUR HONOR LAST WEEK, THEY GOT A LETTER FROM

24    THE COMPANY'S LAWYER AT FENWICK WITH COPIES OF THAT DOCUMENT

25    WHICH HAD IN FACT BEEN PRODUCED TO THE GOVERNMENT, TO SAY YOU
```

1    TOLD THE COURT THAT THIS BEST PRACTICES DOCUMENT WAS DESTROYED.

2    BUT HERE ARE COPIES OF IT, THEY HADN'T BEEN DESTROYED.

3         HE ALSO TOLD THE COURT LAST WEEK THESE GOOGLE E-MAIL

4    ACCOUNTS WERE DELETED BY THE COMPANY, AND I KNOW THAT WAS

5    SOMETHING THAT CONCERNED THE COURT.

6         AND THIS LETTER FROM MR. STESKAL OF FENWICK TO THE

7    GOVERNMENT, WHICH I HAVE A COPY OF AND I CAN HAND TO

8    YOUR HONOR, AND YOU CAN LOOK AT IT --

9              MR. FOSTER:  ARE YOU GOING TO SUBMIT A RESPONSE TO

10    THE LETTER?

11             MR. PETERS:  PLEASE DON'T INTERRUPT ME.  PLEASE DON'T

12    INTERRUPT ME, SIR.

13        THE LETTER FROM FENWICK SAID THAT THE GOOGLE E-MAILS WERE

14   NOT DESTROYED AND THAT THEY ALSO HAD BEEN PRODUCED TO THE

15   GOVERNMENT.

16        HE TALKS ABOUT -- I CAN'T BELIEVE I HEARD THIS -- THAT A

17   PERSON HAD DIED.  THE PERSON WHO DIED, DIED OF SOME KIND OF

18   OPIOID OVERDOSE, SOME KIND OF FENTANYL OR OPIOID OVERDOSE.  TO

19   TRY AND LAY THAT ON MS. HE IN THE CONTEXT OF DANGEROUSNESS IN

20   THIS HEARING IS REALLY, REALLY INAPPROPRIATE.

21        THE EXHIBITS THAT YOUR HONOR SAW RELATING TO THIS

22   OBSTRUCTION CASE DATE BACK PRIMARILY TO 2022 AND EARLY 2023.

23   AND WHAT WE HAVE STRESSED TO THE COURT IS STARTING IN

24   FEBRUARY 23RD, MS. HE GAVE HER PASSPORT TO HER LAWYER.  SHE WAS

25   ASKED NOT TO TRAVEL, SHE DIDN'T.  SHE ASKED TO TRAVEL IN

1    DECEMBER, SHE DIDN'T.  SHE BOUGHT LAND IN GEORGIA.  THEIR

2    THEORY IS THAT WHILE SHE DIDN'T TAKE IT SERIOUSLY, BUT AS IT

3    BECAME MORE SERIOUS, SHE WAS INTENDING TO FLEE.  THAT'S THIS

4    WHOLE COSTA RICA STORY WHICH IS JUST UTTER NONSENSE.

5         WHAT ACTUALLY HAPPENED IS THAT AS THE INVESTIGATION BECAME

6    MORE SERIOUS, SHE BECAME MORE WILLING TO COOPERATE WITH THE

7    GOVERNMENT.  AND NOW WHAT WE ARE PROPOSING IS A VERY DRAMATIC

8    AND DRACONIAN SERIES OF CONDITIONS WHICH WOULD MAKE IT

9    IMPOSSIBLE FOR HER TO FLEE.

10        SO LET ME DIRECT MYSELF -- WELL BEFORE I TALK ABOUT THE

11   CONDITIONS AND HOW WHAT WE ARE PROPOSING WOULD WORK, LET ME

12   TALK ABOUT THIS ARGUMENT ABOUT $13 MILLION.

13        COUNSEL KEEPS SAYING THERE'S $13 MILLION OF TRANSFERS OUT

14   THERE, AND WE HAVE PROVIDED THE EVIDENCE TO THE DEFENSE.  THEY

15   SENT US ABOUT A THOUSAND PAGES OF DOCUMENTS, WE HAVE LOOKED

16   THROUGH THEM.  I DON'T HAVE ANY IDEA WHAT THEY ARE TALKING

17   ABOUT.  SO I HAVE SENT THIS PROSECUTOR SEVERAL E-MAILS SAYING,

18   IN THEIR BRIEF TO THE COURT THEY REPRESENT FINANCIAL ANALYSIS,

19   SHOWS THAT THERE'S 13 MILLION WORTH OF TRANSACTIONS.

20        SHOW US THE FINANCIAL ANALYSIS.  SHOW US THE TRANSACTIONS.

21   WHEN DID THEY TAKE PLACE?  WHO RECEIVED THE MONEY?  IF YOU

22   DON'T WANT TO GIVE US ALL YOUR FINANCIAL ANALYSIS, PICK THE

23   THREE BEST ONES BECAUSE I DON'T KNOW WHAT YOU ARE TALKING

24   ABOUT, ABOUT THIS $13 MILLION.  I REALLY DON'T.

25        AND HE DOESN'T RESPOND.  HE DOESN'T ANSWER THAT BASIC

1    QUESTION.  IF THERE'S $13 MILLION, POINT OUT ONE OF THOSE

2    TRANSACTIONS TO ME SO I CAN RESPOND TO IT.  I THINK IT'S MADE

3    UP OR IT'S OLD TRANSACTIONS THAT TOOK PLACE PRIOR TO 2022, BUT

4    I DON'T KNOW WHAT THEY ARE TALKING ABOUT.

5        THE ISSUE ABOUT MAKE BELIEVE, WE HAVE BEEN WORKING ON THAT

6    AND WE CONTINUE TO WORK ON THAT.  WE HAVEN'T GOTTEN MUCH

7    COOPERATION FROM MAKE BELIEVE OR ACTUALLY FROM THE PEOPLE AT

8    DONE.  AND I THINK THAT'S BECAUSE THEY ARE ALL FRIGHTENED WITH

9    THE GOVERNMENT RUMMAGING AROUND.  AND I'M NOT CRITICIZING THEM

10   FOR THAT, BUT WE DO HAVE SOME EVIDENCE ABOUT MAKE BELIEVE AND

11   WHAT WAS GOING ON.  EVERY PIECE OF EVIDENCE I'VE SEEN IS

12   CONSISTENT WITH WHAT I TOLD THE COURT ON FRIDAY.

13       HE JUST COMPLAINED.  COUNSEL JUST COMPLAINED THAT THEY

14   MOVED OPERATIONS OF THE COMPANY TO OFFSHORE.  THERE'S NOTHING

15   WRONG WITH THAT, THERE IS NOTHING SINISTER ABOUT THAT, LOTS OF

16   COMPANIES HAVE THEIR OPERATIONS OFFSHORE, BUT WHAT IT POINTS

17   OUT IS THAT THEY KNOW THAT THERE ARE EMPLOYEES OFFSHORE WHO

18   HAVE TO GET PAID AND THEY HAVE ACCESS TO THE RECORDS, AND OUR

19   POINT IS THAT THOSE TRANSFERS TO MAKE BELIEVE WERE TO PAY

20   CONTRACTORS AND EMPLOYEES, AND WE ARE TRYING TO GET THE

21   DOCUMENTS TO ESTABLISH THAT IF IT'S NECESSARY.

22       BUT WHAT WE FOCUSED ON INSTEAD IS PROVIDING THE COURT WITH

23   A COMBINATION OF CONDITIONS WHICH ADDRESSED THE COURT'S CONCERN

24   ABOUT FLIGHT, BECAUSE WE HEARD THAT LOUD AND CLEAR, AND SO WHAT

25   HAVE WE PUT FORTH AND WHAT ARE THE OBJECTIONS ABOUT THAT?

1          COUNSEL SAYS WE MUST BE LYING BECAUSE WE TOLD THE COURT

2     THAT MS. HE HAS A TOTAL OF $800,000 OF ASSETS AND OVER TWO

3     HUNDRED OF THAT IS TIED UP IN LAND, SO SHE'S GOT ABOUT SIX

4     HUNDRED IN LIQUID ASSETS.  BUT THEIR ARGUMENT IS IT'S THE --

5     THE COMPANY HAS $8 MILLION.  YOU PUT IT ALL TOGETHER, SHE COULD

6     HAVE THAT MONEY.

7          HOW ARE WE GOING TO PAY FOR THE GUARD?  WE ARE SUPPOSEDLY

8     LYING ABOUT THAT.  BECAUSE AS PART OF THIS CORPORATE

9     RESTRUCTURING DEAL, WHAT THE COMPANY IS GOING TO DO IS

10    ACKNOWLEDGE ITS INDEMNITY OBLIGATIONS UNDER DELAWARE LAW AND

11    ITS BYLAWS TO MS. HE, AND AS PART OF THIS FORMAL SEPARATION, WE

12    ARE GOING TO ESTABLISH AN INDEMNIFICATION SO THAT ATTORNEY'S

13    FEES CAN BE PAID AND EXPENSES REASONABLY RELATED TO THE DEFENSE

14    OF THE CASE CAN BE PAID.

15         AND WE BELIEVE UNDER DELAWARE LAW THAT THE GUARD WOULD BE

16    AN APPROPRIATE EXPENSE AS PART OF THE DEFENSE.  WE ARE ACTUALLY

17    IN DISCUSSIONS WITH THE COMPANY ABOUT THAT.  THEY ARE NOT SO

18    SURE THEY AGREE WITH IT, BUT WHERE IS THE MONEY GOING TO COME

19    FROM TO PAY FOR THE 24/7 GUARD WITH HER?  IT'S GOING TO COME

20    FROM THIS DEAL WE ARE PROPOSING TO MAKE WITH THE COMPANY.

21         COUNSEL COMPLAINS ABOUT THE TIMING OF THE RESTRUCTURING.

22    WE COMPLETELY UNDERSTAND THAT WE ARE NOT HERE TODAY WITH THE

23    SIGNED PAPER.  BUT LET ME JUST REVIEW WHAT WE ARE PROPOSING AND

24    WHY.  WE ARE PROPOSING A 24/7 GUARD, SOMEONE LIKE THIS

25    GENTLEMAN WITH MS. HE ALL DAY LONG, THREE DIFFERENT SHIFTS OF

1     EIGHT HOURS.  SHE'S GOT AN ANKLE BRACELET ON.  THE GUARD HAS

2     ACCESS TO THAT TRACKING DATA.  SHE DOESN'T HAVE A PASSPORT.  SO

3     SHE WOULD HAVE TO SOMEHOW FAKE THE GUARD, CUTOFF THE ANKLE

4     BRACELET AND GO TO THE SAN FRANCISCO AIRPORT WHERE SHE DOESN'T

5     HAVE A PASSPORT.  AND IF SHE TRIES THAT AND GETS CAUGHT, SHE'S

6     COMMITTING AN ADDITIONAL CRIME, SHE'S GOING TO RIGHT TO JAIL.

7     WE ARE DOING EVERYTHING WE CAN THINK OF TO ADDRESS THE COURT'S

8     CONCERN AND TAKE THAT AN IMPOSSIBILITY.

9          THE COURT EXPRESSED A CONCERN ABOUT HER ACCESS TO THE

10    COMPANY'S CASH, IN THE CONTEXT OF THE FLIGHT.  SO WHAT HAVE WE

11    DONE TO TRY AND ADDRESS THAT CONCERN?  TWO THINGS:  WE ARE

12    GOING TO FORMALLY REMOVE HER FROM THE COMPANY WHERE SHE'S GOING

13    TO PUT HER SHARES IN A TRUST SO THAT SHE CAN'T VOTE.  SHE HAS

14    NO ACTUAL AUTHORITY OVER THE COMPANY.  THERE WOULD BE AN

15    INDEPENDENT TRUSTEE OF THOSE TRUSTS WHO WOULD HAVE THE RIGHT TO

16    VOTE THOSE SHARES IN THE BEST INTEREST OF THE COMPANY, BUT SHE

17    NO LONGER HAS ANY CONTROL OVER THE COMPANY.  AND THE COMPANY'S

18    CASH, PRESENT AND FUTURE?  THE COMPANY GENERATES CASH HERE IN

19    THE U.S., SO THE COMPANY'S CASH GOES INTO A BANK ACCOUNT --

20          THE COURT:  BEFORE YOU GO TOO LONG ON THIS CORPORATE

21    THING, LET ME JUST GIVE YOU MY TAKE ON IT.

22          MR. PETERS:  YEAH.

23          THE COURT:  I THINK IT'S -- WELL, LET'S SEE, I KNOW

24    EVERYTHING IS RELEVANT, BUT IT'S THE LEAST RELEVANT FACTOR FOR

25    THE COURT TO CONSIDER, IN THE SENSE THAT I THINK THAT WHAT HAS

1    BEEN PRESENTED TO ME UP UNTIL NOW, IS THAT THE DEFENDANT HAS

2    ARGUABLY ACCESS TO WHAT I WOULD SAY SUBSTANTIAL MONEY.  AND I'M

3    NOT SAYING SHE SHOULDN'T OR THAT'S WRONG OR THAT'S EVIDENCE OF

4    SOMETHING, I DON'T KNOW, I MEAN THERE ARE A LOT OF WEALTHY

5    PEOPLE WHO COME IN AND THEY HAVE TREMENDOUS ACCESS TO MONEY.

6         SO I THINK THAT -- I THINK THAT I AM SORT OF EMBARKED ON

7    AN ERRAND THAT'S NOT GOING TO WORK OUT IF I HAVE TO TRY TO

8    FIGURE OUT WHETHER WE COULD PUT INTO PLACE SOME CONSTRUCT OF

9    CONTROLS AND INDEPENDENT BOARDS AND ALL OF THIS THAT WE ARE

10   TALKING ABOUT IN ORDER TO ESSENTIALLY DENY HER ACCESS TO THESE

11   FUNDS.

12        MAYBE IT WOULD WORK, MAYBE IT WOULDN'T, AND ALSO MAYBE

13   IT'S UNFAIR.  YOU KNOW, I'M NOT TAKING -- I DON'T KNOW THE

14   EVIDENCE OF GUILT HERE.  YOU KNOW, I DON'T.  AND THAT'S THE

15   LEAST THAT I CAN CONSIDER, I THINK, UNDER THE BAIL REFORM ACT.

16        AND SHE WALKS IN, THERE IS A PRESUMPTION OF INNOCENCE, AND

17   SHE HAS A COMPANY, THE COMPANY OBVIOUSLY HAS MADE VAST SUMS OF

18   MONEY OR LARGE SUMS OF MONEY, SOME OF WHICH I KNOW THAT THE

19   GOVERNMENT CONTENDS IS ILLEGAL.

20        I DON'T KNOW, I MEAN, I DON'T HEAR THAT, I DON'T HEAR THIS

21   IS A PONZI SCHEME, I DON'T HEAR THAT.  AND I'VE SEEN A LOT OF

22   PONZI SCHEMES.  THEY ARE NOT SAYING THAT, THEY ARE SAYING THAT

23   THERE WAS A PRACTICE, WHICH BY THE WAY MAY HAVE BEEN THE

24   DRIVING FORCE TO SKIRT THE CONTROLLED SUBSTANCES ACT, AND THAT

25   THROUGH THAT SHE ACQUIRED A GREAT DEAL OF WEALTH.  THAT'S WHAT

1    THEY ARE SAYING.

2         BUT IF YOU -- AND I THINK THE GOVERNMENT IS VERY CAREFUL

3    IN WHAT IT SAID, IT'S NOT THAT EVERYBODY HAS GOTTEN MEDICATION,

4    YOU KNOW, DOESN'T -- IT'S NOT WARRANTED THAT THEY GOT

5    MEDICATION, I DON'T EVEN THINK THEY ARE SAYING THAT EVERYBODY

6    WHO GOT MEDICATION DIDN'T GO THROUGH A PROPER PROCEDURE TO GET

7    MEDICATION.  I DON'T KNOW TOO MUCH ABOUT THIS COMPANY AND ABOUT

8    THE FACTS OF THE CASE, SO I SIT HERE AND I THINK, YOU KNOW, SHE

9    MAY BE ENTITLED TO SOME OF THIS MONEY, MAYBE SOME OF THE MONEY

10   IS NOT ILL GOTTEN GAINS, MAYBE A LOT OF IT IS NOT THE SUBJECT

11   OF ILL GOTTEN GAINS.  AND AGAIN, IT STRIKES ME THAT TO CUT HER

12   OFF FROM THE FUNDS, THAT IS THE BENEFICIAL USE OF THE FUNDS,

13   MAY BE UNFAIR IN SOME REAL SENSE.

14        I DON'T WANT TO FORECLOSE HER FROM PRESENTING A VIGOROUS

15   DEFENSE.  I DON'T THINK THAT'S FAIR.  AND I COME -- LISTEN,

16   I'VE DONE DOING THIS A LONG TIME AND I AM A STRONG BELIEVER,

17   AND I THINK EVERYBODY IS, IN THE RIGHT OF A DEFENDANT TO USE

18   WHAT RESOURCES THEY HAVE AVAILABLE TO DEFEND THEMSELVES IN A

19   CRIMINAL PROSECUTION.

20        SO WHAT I'M SAYING TO YOU, MR. PETERS, IS I'M MUCH MORE

21   CONCERNED ABOUT THE SYSTEM OF GUARDS, I'M MUCH MORE CONCERNED

22   ABOUT FLIGHT, AND I AM ALSO CONCERNED, SUBJECT TO EFFORTS THAT

23   APPARENTLY SHE MADE THROUGH THE SUBMISSION OF A GOVERNMENT TO,

24   I GUESS THE WORD IS "OBSTRUCT," I THINK IT IS OBSTRUCT, IT IS

25   DELETION OF E-MAILS, IT IS DELETION OF ACCESS TO ACCOUNTS, IT'S

1    ALL THAT SORT OF THING WHICH IS PART AND PARCEL -- AND BY THE

2    WAY, THESE ARE ALLEGATIONS, THESE ARE ALLEGATIONS, I GOT THAT,

3    BUT THERE SEEMS TO BE, FROM A VARIETY OF SOURCES, CORROBORATION

4    OF THESE EFFORTS, THAT IS THE EFFORTS TO EVADE DETECTION.

5         OKAY.  THOSE ARE TWO SORT OF BIG FOCAL POINTS IN MY MIND.

6    SO THIS MORNING BEFORE I CAME OUT AND AFTER I READ YOUR

7    SUBMISSION, I WENT BACK AND I LOOKED AT THE CONDITIONS OF DR.

8    LYNCH.  AND I WILL TELL YOU THEY ARE NOT APPLES AND APPLES

9    BECAUSE DR. LYNCH BASICALLY HAD NO PLACE TO GO, THAT IS TO SAY

10   HE COULDN'T -- NO, THAT'S NOT TRUE.

11            MR. PETERS:  HE COULD NOT, YOUR HONOR.

12            THE COURT:  THERE ARE PLACES TO GO.  HE COULDN'T GO

13   BACK TO HIS HOME.  I MEAN, HE WAS EXPEDITED FROM GREAT BRITAIN.

14   AND YOUR CLIENT COULDN'T -- IF SHE FLED TO CHINA, THAT WAS A

15   TOTALLY DIFFERENT PICTURE THAN WHAT DR. LYNCH WAS FACING, OF

16   COURSE THE ASSETS WERE VERY, VERY DIFFERENT, I UNDERSTAND THAT,

17   BUT THE CONSEQUENCES WERE NOT.

18        AND THE CONSEQUENCES WERE DIFFERENT, THAT IS SHE WOULD --

19   IF SUCCESSFUL IN HER FLIGHT, SHE WOULD NOT BE EXPEDITED, IN THE

20   COURT'S OPINION, AND SHE WOULD -- AND THAT WOULD BE THE END OF

21   THAT PROSECUTION AGAINST HER.  SO THAT WAS A CONCERN.

22        SO I LOOKED AT DR. LYNCH'S CONDITIONS, WHICH I THINK YOUR

23   PROPOSAL FALLS SHORT IN SOME RESPECTS, SO I THOUGHT I WANTED TO

24   TALK TO YOU ABOUT IT.  AND LET'S -- YOU KNOW, WE CAN GO BACK

25   AND FORTH AND BACK AND FORTH, AND I UNDERSTAND THAT THE

 1    GOVERNMENT TAKES THE POSITION THAT YOU STRONGLY BELIEVE IS

 2    INACCURATE, ERRONEOUS AND SO FORTH, AND THEY BELIEVE THAT YOU

 3    HAVE -- THAT THE REPRESENTATIONS COMING FROM THE DEFENSE ARE

 4    INACCURATE AND ERRONEOUS.  AND I CAN SIT HERE ALL DAY TRYING TO

 5    FIGURE OUT WHO IS RIGHT AND WHO IS WRONG, TO WHICH AT THE END

 6    OF THE DAY, I MEAN, SO WHAT?  I MEAN, THERE IS A CERTAIN "WHAT"

 7    TO SO WHAT, BUT IT'S NOT GOING TO REALLY -- FIRST OF ALL, I

 8    DON'T THINK I WOULD KNOW VERY MUCH MORE ABOUT THE BENEFIT OF AN

 9    EVIDENTIARY HEARING, AND A LENGTHY EVIDENTIARY HEARING, AND ONE

10    SUBJECT TO CROSS-EXAMINATION AND SO FORTH.

11         SO LIKE, OKAY, WHY DON'T YOU JUST GET TO THE TRUTH OF THE

12    MATTER ISN'T SO EASY FOR ME TO DO UNDER THIS SCENARIO; AND

13    WHILE ULTIMATELY, IT COULD BE PRODUCTIVE AND INFORMATIVE, I

14    DON'T THINK THAT THAT PROCESS IS REALLY A LOGICAL PROCESS

15    UNLESS THESE CONDITIONS CAN'T BE MET.

16         SO I WANT TO READ THEM TO YOU AND I WOULD LIKE TO GET SOME

17    FEEDBACK AS TO WHETHER OR NOT THESE CONDITIONS, WHICH AREN'T --

18    WELL, THEY SPEAK FOR THEMSELVES.

19         OKAY.  HERE IT SAYS, "DEFENDANT SHALL DELIVER TO THE CLERK

20    OF COURT A BOND IN THE AMOUNT OF $100 MILLION SECURED BY $50

21    MILLION IN CASH, AND WIRE TRANSFER AN UNENCUMBERED SHARES OF

22    PUBLICLY TRADED STOCK ACCOMPANIED BY POWER OR SALE OR

23    COMBINATION THEREOF."

24         I DON'T KNOW WHETHER HER STOCK IN DONE, I DON'T KNOW HOW

25    THAT FITS IN, IT'S NOT PUBLICLY TRADED, IS IT?

1          MR. PETERS:  NO, IT'S NOT, NO.

2          THE COURT:  SO I DON'T KNOW WHETHER THAT IN PART IS

3     AN ANSWER TO "THE LIQUIDITY ISSUE OR THE MONEY ISSUE."

4     OBVIOUSLY YOU HAVE COME FORWARD AND YOU HAVE SAID WE ARE GOING

5     TO PUT OUT -- I FORGET WHAT YOUR PROPOSAL IS, HOW MUCH MONEY --

6     SOME SUM OF MONEY IN CASH, A BOND GREATER THAN THE CASH, I

7     THINK YOU SAID $500,000.

8          MR. PETERS:  WE PUT 600,000 BOND AND 500,000 IN CASH.

9          THE COURT:  SO IS THE ANSWER SOME COMBINATION OF

10    THAT?  THAT IS TO SAY CASH SHOULD BE MORE THAN 500 OR -- AND

11    THE BOND SHOULD BE -- OBVIOUSLY THE BOND IS GREATER THAN THE

12    CASH.  WHAT SHOULD THE BOND AMOUNT BE?  WHAT SHOULD THE CASH

13    AMOUNT BE?  I THINK THAT'S A QUESTION FOR A DISCUSSION, NOT

14    RIGHT THIS SECOND.

15         MR. PETERS:  OKAY.  GOT IT.  NO, I APPRECIATE THIS

16    VERY MUCH.

17         THE COURT:  ALL RIGHT.

18    NEXT, WHICH IS AGAIN THERE IS A CONTRAST HERE.  "DEFENDANT

19    SHALL BE CONFINED TO AN ADDRESS IN THE CITY AND COUNTY OF

20    SAN FRANCISCO, SUBJECT TO THE APPROVAL OF THE U.S. ATTORNEY'S

21    OFFICE AND THE COURT AND MAY ONLY TRAVEL FOR MEETINGS WITH

22    COUNSEL, MEDICAL APPOINTMENTS AND COURT APPEARANCES, ALL OF

23    WHICH MUST BE LOCATED IN THE CITY AND COUNTY OF SAN FRANCISCO;

24    ANY FURTHER TRAVEL MUST BE APPROVED BY THE U.S. ATTORNEY'S

25    OFFICE AND THE COURT."

1          I DON'T KNOW WHETHER IT OUGHT TO BE THE CITY AND COUNTY OF

2     SAN FRANCISCO, BUT ESSENTIALLY THIS IS HOUSE ARREST, WHICH

3     ISN'T WHAT YOU'VE SAID, AND I DON'T THINK, WITHOUT A LOT OF

4     DISCUSSION, I COULD BE CONVINCED THAT SOMETHING OTHER THAN THAT

5     ARRANGEMENT WOULD BE SATISFACTORY.

6          IN OTHER WORDS, WHAT I'M LOOKING AT HERE, BECAUSE OF THE

7     RISK OF FLIGHT AND THE CONSEQUENCES OF FLIGHT, WHAT I'M LOOKING

8     AT HERE IS ESSENTIALLY A HOUSE ARREST SITUATION WHERE SHE CAN'T

9     GO ANYWHERE, OTHER THAN SHE CAN HAVE MEDICAL APPOINTMENTS AND

10    SHE CAN MEET WITH HER LAWYERS AND SHE CAN COME TO COURT.  AND

11    THAT'S ESSENTIALLY TANTAMOUNT TO A CUSTODIAL SITUATION BUT

12    HAVING THE ADVANTAGE OF NOT BEING IN A JAIL IN SANTA RITA.

13          MR. PETERS:  AND BEING ABLE TO PARTICIPATE

14    MEANINGFULLY IN PREPARATION --

15          THE COURT:  THAT'S RIGHT.  SO I MEAN, YOU WORK IT ALL

16    OUT.

17          NOW THEN YOU GET TO THE GUARD SERVICE, AND HERE IT IS,

18    "DEFENDANT SHALL BE GUARDED 24-HOUR BASIS BY A PRIVATE SECURITY

19    COMPANY AT DEFENDANT'S EXPENSE."  ET CETERA, ET CETERA,

20    ET CETERA.

21          AND AGAIN, I WOULD -- THE AGREEMENT WE HAD WITH DR. LYNCH

22    WAS TWO GUARDS AT ALL TIMES, AND I THINK -- YOU KNOW, I DON'T

23    KNOW ANYTHING ABOUT THIS COMPANY, I DON'T KNOW -- ACTUALLY I

24    DON'T KNOW ANYTHING ABOUT THE COMPANY THAT DR. LYNCH USED, BUT

25    MY APPROACH TO THESE THINGS WAS I WOULD GIVE IT TO THE U.S.

1    ATTORNEY'S OFFICE AND SAY IS THERE ANYTHING -- IS THERE

2    SOMETHING ABOUT THIS COMPANY I SHOULD KNOW?  OR, YOU KNOW, IT

3    WOULD BE EASIER, I SUPPOSE, IF YOU USED THE SAME COMPANY THAT

4    DR. LYNCH USED, BUT I'M NOT IN THE BUSINESS, THAT'S A QUESTION

5    THAT YOU WOULD HAVE TO -- THAT'S A MATTER OF YOUR CONCERN, AND

6    A DISCUSSION WITH THE GOVERNMENT.  IF THE GOVERNMENT COMES IN

7    AND SAYS WE DON'T LIKE COMPANY A OR COMPANY B, I HAVE TO LISTEN

8    TO WHAT THEY HAVE TO SAY AND FIGURE OUT WHY.  BUT I THINK

9    THAT'S A MATTER BEST LEFT TO DISCUSSIONS BETWEEN THE PARTIES

10   RATHER THAN LET THE COURT JUMPING IN.

11        THEN OF COURSE ALL TRAVEL DOCUMENTS.

12        NOW THE ADDED COMPLEXITY OF YOUR CLIENT'S CASE OVER

13   DR. LYNCH IS ACCESS TO A COMPUTER.  AND I HAVE SOME VERY

14   SERIOUS CONCERNS IN THAT REGARD BECAUSE THERE IS EVIDENCE IN

15   THE RECORD OF DISCUSSIONS OF DELETIONS OF DOCUMENTS AND SO

16   FORTH.  AND A COMPUTER CAN GIVE THAT OPPORTUNITY TO A PERSON.

17        SO I WOULD RESTRICT, AS AN INDIVIDUAL WHO WOULD BE IN

18   CUSTODY, I WOULD RESTRICT ACCESS TO A COMPUTER.  WHAT I MEAN BY

19   THAT, I'M NOT SURE, BUT I SIMPLY POINT OUT THAT IF SHE WERE IN

20   CUSTODY, HER ACCESS TO A COMPUTER WOULD BE VERY LIMITED.  SHE

21   WOULD BE PERMITTED OF COURSE TO HAVE AN IPAD AND REVIEW

22   DOCUMENTS AND SEE EVIDENCE AND SO FORTH, HOW MUCH MORE SHE

23   WOULD HAVE IS A QUESTION THAT I WOULD ADDRESS IF THE U.S.

24   ATTORNEY'S OFFICE RAISES IT AS AN ISSUE.

25        IN OTHER WORDS, I THINK AGAIN, AND I KNOW TEMPERAMENTS ARE

1    SUCH THAT IT'S DIFFICULT AT TIMES TO SIT DOWN AND WORK THESE

2    THINGS OUT, BUT I THINK YOU ARE MUCH BETTER OFF ON BOTH SIDES

3    TO SORT OF LET BYGONES BE BYGONES, IF THEY EVER ARE, AND SIT

4    DOWN AND SEE WHETHER YOU CAN WORK OUT SOME ACCOMMODATION AS TO

5    THE ISSUE.

6         I THINK IT'S IMPORTANT FOR YOU TO KNOW THAT OF THOSE LISTS

7    OF CONCERNS, I'M VERY CONCERNED ABOUT FLIGHT, I'M VERY

8    CONCERNED ABOUT OBSTRUCTION, I'M FAR LESS CONCERNED ABOUT

9    ACCESS TO FUNDS.

10         MR. PETERS:  OKAY.

11         THE COURT:  BECAUSE TO ME, I DON'T KNOW, YOU KNOW,

12    IT'S LIKE I'M NOT -- YOU KNOW, I SORT OF SAID IT AND I THINK

13    EVERYBODY SORT OF UNDERSTANDS THERE ARE A LOT OF DIFFERENT

14    THINGS GOING ON.  I DON'T KNOW RELATIONSHIPS, I DON'T KNOW ARE

15    THESE FIVE PEOPLE OR TEN PEOPLE OR TWENTY PEOPLE, HOW FRIENDLY

16    ARE THEY, HOW INDEPENDENT WOULD THEY BE, WHAT ARE THE

17    RESPONSIBILITIES OF THE COMPANY, WHAT ARE THE RESPONSIBILITIES

18    TO MEMBERS OF THE FAMILY AND SO FORTH, WHATEVER HAPPENED IN THE

19    PAST.  I DON'T KNOW ANY OF THOSE THINGS, AND I DON'T WANT TO

20    GET INTO IT BECAUSE IT'S TOO -- IT'S NOT UNKNOWN, BY THE WAY,

21    IT PROBABLY IS UNKNOWABLE TO THE COURT, AND MY GUESS IS IN

22    LARGE PART IT'S UNKNOWABLE TO THE LAWYERS BECAUSE THERE ARE

23    RELATIONSHIPS THAT HAVE OCCURRED OVER TIME THAT YOU EITHER KNOW

24    OR MAY NOT KNOW OR UNDERSTAND OR NOT UNDERSTAND, AND YOU HAVE

25    FAMILY ISSUES, YOU HAVE ALL SORTS OF OTHER ISSUES.  SO I WOULD

1     LIKE TO STAY OUT OF THE MONEY BUSINESS, SAVE AND EXCEPT FOR

2     POSTING A SUBSTANTIAL AMOUNT OF CASH AND ANY REAL PROPERTY.

3         NOW --

4           MR. PETERS:  THE CLIENT -- THAT THE DEFENDANT HAS,

5     UH-HUH.

6           THE COURT:  YEAH.

7         SO I DON'T KNOW WHAT THOSE AMOUNTS ARE.  I AM GOING TO

8     ENCOURAGE -- I'M NOT DOING ANYTHING RIGHT NOW, AS YOU CAN

9     GUESS, I'M ENCOURAGING THE PARTIES TO MEET AND CONFER ON THESE

10    PARTICULAR ISSUES, SEE WHAT -- WHILE THERE MAY BE VAST

11    DIFFERENCES OF OPINION BETWEEN THE PARTIES AS TO THE MERITS OF

12    THE CASE AND/OR THESE OTHER THINGS THAT HAVE BEEN SAID, YOU'VE

13    GOT TO TRY TO ARRIVE AT SOME ACCOMMODATION WHERE, NOT

14    WITHSTANDING WHAT YOUR VIEW OF THINGS ARE OR HOW THEY OCCURRED,

15    YOU CAN CONSTRUCT A SERIES OF CONDITIONS THAT ADDRESS FLIGHT

16    AND OBSTRUCTION.

17        OKAY.  NOW WHY DON'T I JUST TRY TO ANSWER YOUR SPECIFIC

18    QUESTIONS RATHER THAN GOING BACK AND FORTH AS TO LET ME EXPLAIN

19    THIS AND LET ME EXPLAIN THAT AND WHY WE CAME TO THIS AND WHY WE

20    CAME TO THAT.  AND I'M NOT FORECLOSING ANYBODY FROM WRITING

21    ANYTHING THEY WANT TO WRITE ABOUT IT BUT I DON'T KNOW WHERE WE

22    ARE.

23        YEAH, GO AHEAD.

24         MR. PETERS:  IF YOU HAVE SOME QUESTIONS, YOU CAN GO

25    AHEAD AND GO FIRST, BECAUSE I HAVE A COUPLE.

1        MR. FOSTER:  WELL I THINK FIRST, YOUR HONOR, I DO

2  WANT TO MAKE CLEAR THAT WE HAVE ENGAGED AND ARE HAPPY TO ENGAGE

3  WITH THE DEFENSE IN GOOD FAITH.

4        THE COURT:  GOOD.  I APPRECIATE THAT.

5        MR. FOSTER:  THEY PROVIDED US SOME THOUGHTS AND WE

6  INDICATED OUR VIEW THAT WE, AT THIS POINT, DID NOT THINK THE

7  DEFENDANT WAS BONDABLE BUT WE PROVIDED GUIDANCE ABOUT MANY OF

8  THE CONDITIONS, BOTH BECAUSE WE FEEL IF THERE WAS A SPECIFIC

9  PROPOSAL, WE COULD RUN THAT UP OUR CHAIN; AND SECOND, AS WE

10  SAID IN AN E-MAIL TO DEFENSE COUNSEL, IT COULD NARROW THE

11  ISSUES TO BE PRESENTED BEFORE THE COURT.  SO WE HAVE PROVIDED

12  SOME THOUGHTS ON THESE.

13     I JUST WANTED TO MAKE THREE QUICK POINTS AND PERHAPS FOR A

14  LATER DATE, BUT TO GENTLY EXPLORE THE SIMILARITIES OR

15  DIFFERENCES WITH MR. LYNCH.  ONE, THIS IS A PRESUMPTION CASE

16  AND I THINK THAT GREATLY DIFFERENTIATES IT FROM DR. LYNCH.

17        SECOND, THIS DEFENDANT UTILIZED --

18        THE COURT:  ACTUALLY I GOT TO TELL YOU, I MEAN YEAH,

19  I UNDERSTAND IT'S A PRESUMPTION CASE, IT'S A DIFFERENT KIND OF

20  PRESUMPTION CASE.  I MEAN, IT IS CONTROLLED SUBSTANCES, BUT

21  THERE ARE CONTROLLED SUBSTANCES AND THERE ARE CONTROLLED

22  SUBSTANCES, AND I KNOW THE PRESUMPTION IS RIGHT ACROSS THE

23  BOARD FOR ALL CONTROLLED SUBSTANCES, BUT IT IS IN A -- IN THE

24  CONTEXT OF WHAT HAPPENED HERE, IT IS SLIGHTLY DIFFERENT.

25     NOW AS TO -- WELL, I THINK I -- YOU KNOW, I DON'T KNOW

1   THAT I CAN OR WOULD OR HAVE TO SAY ANYTHING MORE ABOUT HOW

2   DR. LYNCH'S SITUATION WAS DIFFERENT, I MEAN, I WAS CONCERNED

3   ABOUT FLIGHT, I'M STILL CONCERNED ABOUT FLIGHT.  THE ONE THING

4   I WASN'T CONCERNED ABOUT DR. LYNCH BECAUSE THERE IS NO WAY I

5   COULD HAVE DONE ANYTHING AT ALL -- OH, I WILL TELL YOU WHAT,

6   WAS THAT THERE WAS -- IS THAT HE HAD VAST FINANCIAL RESOURCES,

7   I MEAN, TRULY VAST, AT HIS FINGERTIPS.

8         AND ALSO, IN TERMS OF PRESUMPTION, WHILE DR. LYNCH ENJOYED

9   A PRESUMPTION OF INNOCENCE, HIS CO-DEFENDANT HAD BEEN

10   CONVICTED.

11               MR. PETERS:  POORLY REPRESENTED, HOWEVER.

12               THE COURT:  PARDON?

13               MR. PETERS:  POORLY REPRESENTED, HOWEVER.

14               THE COURT:  OH, HE HAD GREAT REPRESENTATION.  HE HAD

15   GREAT REPRESENTATION, IT'S NOT --

16               MR. PETERS:  I WAS MAKING A JOKE, YOUR HONOR, I WAS

17   NOT TRYING TO PUT THOSE WORDS IN THE COURT'S MOUTH.

18               THE COURT:  I KNOW, BUT I DIDN'T WANT TO APPEAR ON

19   THE RECORD THAT I AGREED WITH THAT, BECAUSE I THOUGHT --

20               MR. FOSTER:  NOTED, YOUR HONOR, AND I THINK THIS IS

21   FOR -- I THINK THIS IS FOR A LATER DATE, BUT I UNDERSTAND YOUR

22   RELUCTANCE TO WADE INTO SOME OF THE COMPANY'S ISSUES, BUT I

23   MENTION THE PRESUMPTION IS TOO TO DANGEROUSNESS BECAUSE I THINK

24   IF EVIDENCE EMERGES THAT THESE INDIVIDUALS AREN'T INDEPENDENT,

25   THAT SHOULD BE A SIGNIFICANT CONCERN.

1            THE COURT:  WELL, IT WOULD BE.  AND I THINK WHAT I

2    HAVE TO DO, AND ONE OF THE THINGS FOR YOU TO TALK ABOUT WHEN WE

3    TALK ABOUT WHAT FORMS OF COMMUNICATION THE DEFENDANT SHOULD BE

4    PERMITTED, IS WHETHER TO RESTRICT HER ACCESS TO TALKING TO

5    ANYBODY ABOUT THE COMPANY, RESTRICT HER ACCESS TO ANY COMPANY

6    OPERATIONS, RESTRICT HER ACCESS TO ANY EFFORTS TO INVOLVE

7    HERSELF IN ANY OF THE RECORDKEEPING AND SO FORTH WITH RESPECT

8    TO IT.  IF SHE NEEDS, IN HER DEFENSE, TO HAVE INFORMATION FROM

9    THE COMPANY, IT SHOULD ALL BE DONE THROUGH THE LAWYERS, WHO I

10   TRUST ONE THOUSAND PERCENT.  SO IT SHOULD ALL BE DONE THAT WAY.

11            NOW, YOU KNOW, NORMALLY, I MEAN AGAIN, I COME BACK TO THE

12   FACT THAT SHE SHOULD NOT -- YOU KNOW, OBVIOUSLY IF SHE IS IN A

13   SITUATION WHERE SHE'S UNDER HOUSE ARREST, PEOPLE CAN COME AND

14   SEE HER, BUT I THINK THAT THERE HAS TO BE SOME IMPOSITION BY

15   THE COURT TO RESTRICT HER FROM DISCUSSING ANY OF THESE ISSUES

16   OUTSIDE THE PRESENCE OF THE LAWYER.

17            THE LAWYER HAS TO BE THERE, YOU KNOW, AND THESE LAWYERS

18   ARE VERY SOPHISTICATED PRACTITIONERS.  AND -- YOU KNOW, AND

19   THEY WOULD NEVER EVER DO ANYTHING THAT EVEN REMOTELY SUGGESTED

20   TAMPERING.

21            SO I FEEL THAT'S A WAY SHE CAN PREPARE HER DEFENSE WHILE

22   AT THE SAME TIME NOT IMPACTING THE AVAILABILITY OF EVIDENCE

23   THAT THE GOVERNMENT MAY BE SEEKING.

24            SO IT'S A LITTLE COMPLICATED, BUT THERE ARE AREAS THAT YOU

25   CAN WORK OUT THROUGH CONVERSATIONS I THINK ON BOTH SIDES IN AN

1     ATTEMPT TO DEAL WITH THAT.

2              MR. FOSTER:  OKAY, YOUR HONOR.

3         I THINK THE OTHER QUESTION I HAVE IS THAT THE DEFENSE

4     LIKES TO SAY HER OWN ASSETS.  IN THE GOVERNMENT'S VIEW, THE

5     COMPANY ASSETS --

6              THE COURT:  THAT'S WHY I ACTUALLY DON'T WANT TO GET

7     INVOLVED.  IF SOMEBODY OWNS A COMPANY, YOU KNOW, OR OWNS A

8     MAJORITY INTEREST OF THE COMPANY, YOU KNOW, COMPANIES ARE

9     CREATIONS OF LAW, CREATURES OF LAW.  ASSETS ARE NOT GENERALLY

10    CREATIONS OF LAW, THEY ARE CREATIONS OF FACT.

11        AND SO YOU HAVE $9 MILLION IN A BANK ACCOUNT, THAT'S A

12    FACT.  HOW YOU HAVE ACCESS TO IT OR WHO CONTROLS IT AND SO

13    FORTH, THAT'S SOMETIMES A MATTER OF LAW.  AND I'M CHOOSING TO

14    BACK OFF ON THAT, TO THE EXTENT I CAN OR SHOULD, BECAUSE I

15    DON'T THINK I CAN REALLY EFFECTIVELY IMPOSE A SET OF CONDITIONS

16    THAT WILL BE TRULY A MEANINGFUL SET OF CONDITIONS WITHOUT

17    BASICALLY PUTTING HER IN JAIL.

18        AND BY THE WAY, PUTTING HER IN JAIL MAY NOT ELIMINATE THAT

19    PROBLEM, YOU KNOW.  SO IT MAY SOUND OH, GREAT, THAT JUDGE IS

20    TOUGH, PUT HER IN JAIL, AND THEN TO WHAT END?  TO WHAT END?

21             MR. PETERS:  I HAVE A -- I REALLY APPRECIATE THE

22    COURT'S OBSERVATIONS AND I'M NOT INTENDING TO ARGUE ABOUT

23    ANYTHING I JUST HAVE A COUPLE OF QUESTIONS SO THAT WE CAN TRY

24    AND PUT TOGETHER THIS PACKAGE.

25        I'M MORE THAN HAPPY TO TRY AND WORK SOMETHING OUT WITH THE

```
 1        GOVERNMENT, BUT IT'S BEEN MY VIEW AND EXPERIENCE IN THIS CASE

 2        THAT THEY DON'T WANT TO DO ANYTHING WHICH WILL CAUSE HER TO --

 3                THE COURT:  EVERYBODY TAKE A DIFFERENT VIEW.  DEEP

 4        BREATH.  WE ARE ALL HERE NOW.

 5                MR. PETERS:  YOU WON'T BE HERE SOON WHEN WE ARE

 6        TALKING.

 7                THE COURT:  NOT IN SOME OTHER BUILDING OR SOME OTHER

 8        COURT AND SO FORTH, SO --

 9                MR. PETERS:  OKAY.  IN TERMS OF THE AMOUNT OF CASH

10        PUT UP, THE NUMBER ON THE BOND IS ONE THING YOU WANT, BASICALLY

11        ALL OF HER CASH AND THE POSTING OF HER PROPERTY IN GEORGIA?  I

12        MEAN, SHE NEEDS A LITTLE BIT TO --

13                THE COURT:  NO, NO, NO, I DON'T WANT ALL OF HER CASH,

14        THAT'S NOT --

15                MR. PETERS:  I'M JUST TRYING TO FIGURE OUT A

16        PROPOSAL.

17                THE COURT:  I DON'T KNOW.  I THINK WHY DON'T YOU SIT

18        DOWN AND TALK BETWEEN THE TWO OF YOU.

19                MR. PETERS:  OKAY.

20           YOUR HONOR MENTIONED THE WIRE TRANSFER, I THINK, OR A

21        TRANSFER OF MR. LYNCH'S STOCK TO THE CLERK OF THE COURT.  AND

22        WE PROPOSED KIND OF PUTTING HER STOCK IN TRUST BUT THAT WAS

23        MORE OF A MECHANISM OF REMOVING HER CONTROL OF THE COMPANY.

24           I'M NOT SURE -- I MEAN, TRANSFER, I DON'T EVEN KNOW IF

25        THERE ARE PHYSICAL SHARES OF STOCK IN THIS COMPANY, I BET THERE
```

1    AREN'T, SO I'M NOT SURE HOW WE WOULD ADDRESS THAT CONDITION BUT

2    WE ARE HAPPY TO DO IT.

3         THE COURT:  I DO KNOW, INDEMNIFICATION IS A CREATURE

4    OF DELAWARE LAW, IT'S AN OBLIGATION THAT THE COMPANY HAS TO

5    PROVIDE A DEFENSE TO INDEMNIFY AN OFFICER/DIRECTOR, AS A

6    GENERAL RULE, FOR LEGAL EXPENSES, IRRESPECTIVE OF THEIR GUILT

7    OR INNOCENCE.  I THINK IT'S DONE -- IT'S OBVIOUSLY DONE IN A

8    PROSPECTIVE WAY BEFORE AN ADJUDICATION.

9         SO IT'S NOT MY INTENTION, AND AGAIN I SAY IT, IT'S NOT MY

10   INTENTION TO FORECLOSE THE ABILITY OF THE DEFENDANT TO PAY FOR

11   A SATISFACTORY GUARD SERVICE.  AND THESE COUNSEL, YOU KNOW, I

12   DON'T KNOW, THEY ARE PROBABLY A VERY MODEST FEES THAT THEY

13   CHARGE, AT LEAST EXPENSIVE, I THINK IT'S JUST CJA RATES, CLOSE

14   TO IT -- CLOSE TO IT, SO CERTAINLY -- CLOSE TO IT.

15        LET THE RECORD SHOW THAT WAS GREETED WITH SOME LAUGHTER.

16        WHATEVER THEIR RATES, THEIR RATES ARE, THEY PROVIDE A

17   LEGAL DEFENSE, IT'S ON THE MARKET, AND IF THE DEFENDANT AGREES

18   TO IT, I'M SATISFIED THAT IT'S APPROPRIATE.

19        NOW I'M NOT INTO DELAWARE LAW, YOU DON'T HAVE TO DEAL WITH

20   THAT.

21        MR. PETERS:  GOT IT.  THAT'S OUR PROBLEM AND WE WILL

22   WORK THAT OUT WITH THE COMPANY.

23        IF YOU WANT -- WE DID SPEAK -- WE GOT THIS COMPANY -- I

24   WOULD TELL COUNSEL THIS, AND I WILL TELL THE COURT THIS, WE GOT

25   THE NAME OF THIS COMPANY FROM THE COMPANY THAT MR. LYNCH USED

 1    BECAUSE THEY ARE EXTREMELY EXPENSIVE FOR THIS SERVICE, AND

 2    THAT'S WHERE SOME LIMITS ON RESOURCES MAKE THE DIFFERENCE, BUT

 3    IF YOUR HONOR WANTS TWO GUARDS RATHER THAN ONE, WE ARE GOING TO

 4    PROVIDE TWO GUARDS RATHER THAN ONE.

 5            THE COURT:  RIGHT.  I DO.

 6            MR. PETERS:  I HEARD YOU SAY THAT.  I'M NOT HERE TO

 7    ARGUE ABOUT IT.

 8            TRAVEL DOCUMENTS, THAT'S EASY.

 9            THE ACCESS TO A COMPUTER, JUST SO I UNDERSTAND WHAT THAT

10    MEANS, IS SO THAT SHE DOESN'T HAVE THE ABILITY TO ATTEMPT TO

11    INFLUENCE WITNESSES.  I MEAN, IN TERMS OF DOCUMENTS, THEY HAVE

12    GATHERED THE EVIDENCE THEY HAVE, THEY ARE NOT PERMITTED TO USE

13    THE GRAND JURY ANYMORE TO PREPARE THIS CASE, SO I THINK THE

14    EVIDENCE THAT THEY HAVE IS THE EVIDENCE THEY HAVE.  THEY HAVE

15    BEEN DOING THIS INVESTIGATION FOR YEARS.  I DON'T THINK THERE

16    IS A RISK THAT SHE COULD OR WOULD, BUT I GUESS IT'S "COULD"

17    THAT WE ARE REALLY TALKING ABOUT, INTERFERE WITH DOCUMENTS, BUT

18    I JUST WANT TO ADDRESS YOUR CONCERNS.  YOU KNOW --

19            THE COURT:  WELL, I DON'T KNOW.  THE FACT IS SHE'S --

20    THE FACT IS IT'S NOT JUST COMMUNICATION WITH RESPECT TO THE

21    OBSTRUCTION, IT'S ALSO COMMUNICATION WITH RESPECT TO FLIGHT,

22    AND IT'S ALSO IN COMMUNICATION WITH RESPECT TO TRANSFER ASSETS.

23            SO I'M NOT QUITE SURE HOW TO WRITE IT UP.

24            MR. PETERS:  OKAY.

25            THE COURT:  -- BUT I SORT OF -- I GO BACK TO, WHAT IS

1    IT LIKE IN JAIL?  WELL IT'S HIGHLY, HIGHLY RESTRICTIVE.  THERE

2    IS NO INTERNET, THERE IS THE USE OF A COMPUTER TO REVIEW, AN

3    IPAD, SO I WANT TO GIVE HER SOME VARIANT OF THAT, BUT I THINK

4    YOU HAVE TO --

5              MR. PETERS:  AND I WOULD LIKE TO BE ABLE TO

6    COMMUNICATE WITH HER TOO, EITHER BY SENDING HER A TEXT OR

7    SAYING CALL ME OR WHATEVER.

8         SO I ALSO THINK WE MIGHT WANT TO CONSULT WITH PRETRIAL

9    ABOUT THAT BECAUSE THEY DEAL WITH THIS IN OTHER CONTEXT --

10             THE COURT:  I THINK THAT WOULD BE VERY USEFUL.

11             MR. PETERS:  -- AND THEY HAVE EXPERTISE.

12             THE COURT:  AND ULTIMATELY I WILL LISTEN TO PRETRIAL

13   AS TO WHAT CONDITIONS THEY THINK ARE APPROPRIATE AND WHETHER

14   THEY FEEL COMFORTABLE.

15        I ALWAYS ASK THEM, DO YOU FEEL COMFORTABLE WITH THIS

16   ARRANGEMENT?  IS THIS SOMETHING THAT YOU ASK?  AND SO I WOULD

17   VERY MUCH -- YOU CAN HAVE YOUR CONVERSATIONS, BUT I WOULD

18   CERTAINLY ENCOURAGE BOTH SIDES TO TALK TO PRETRIAL.

19             MR. FOSTER:  YES, YOUR HONOR.  AND THERE HAVE BEEN

20   SIMILAR CONDITIONS IMPOSED IN OTHER CASES.

21             MR. PETERS:  YEAH.  WE WILL WORK WITH PRETRIAL ON

22   THAT.

23             THE COURT:  JUST LET ME KNOW WHEN YOU ARE READY TO

24   COME BACK.

25             MR. PETERS:  WE ARE GOING TO TRY AND DO IT AS QUICKLY

```
 1    AS WE CAN.

 2            THE COURT:  OBVIOUSLY YOU WILL, BUT I DON'T SEE ANY

 3    PURPOSES IN SETTING TUESDAY OR WEDNESDAY.  I WILL BE HERE, I'M

 4    NOT GOING ANYWHERE, AND I WILL HEAR YOU AT BASICALLY YOUR

 5    CONVENIENCE, IF I'M AVAILABLE.

 6            MR. PETERS:  I'M GOING TO TRY AND DO IT NEXT WEEK

 7    BECAUSE I'M OUT THE FOLLOWING WEEK.  I KNOW THAT MR. FOSTER HAS

 8    THE BURDEN OF TRAVELING FROM D.C.

 9            THE COURT:  WELL I KNOW THERE ARE OTHER PEOPLE, IF

10    YOU TURN AROUND, THERE ARE OTHER PEOPLE WHO HAVE ACTUALLY BEEN

11    IN COURT WHO ACTUALLY --

12            MR. FOSTER:  YOUR HONOR, WE WOULD JUST ASK TO THE

13    EXTENT THAT THERE IS ANOTHER HEARING SET THAT THERE BE

14    PROVISION FOR NOTICE AND RESPONSE SO THAT WE CAN RESPOND.

15            THE COURT:  OH, OF COURSE.  OF COURSE.  YEAH.

16    ABSOLUTELY.  I DON'T WANT TO CUT ANYBODY OFF.  OKAY.

17            MR. PETERS:  THANK YOU, YOUR HONOR.

18            THE COURT:  THANK YOU.

19            MR. PETERS:  IT'S APPRECIATED.

20            THE COURT:  OKAY.  THANK YOU VERY MUCH.

21            (WHEREUPON THE PROCEEDINGS IN THIS MATTER WERE CONCLUDED.)

22

23

24

25
```

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM

15   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED

16   MATTER.

17

18

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185        DATED: 8/29/24

Exhibit 40

```
 1                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
 2                     SAN FRANCISCO DIVISION


 3


 4      UNITED STATES OF AMERICA,        )  CR-24-00329 CRB
                                         )
 5                       PLAINTIFF,      )  SAN FRANCISCO, CALIFORNIA
                                         )
 6            VS.                        )  AUGUST 23, 2024
                                         )
 7      RUTHIA HE, A/K/A RUJIA HE,       )  PAGES 1-43
                                         )
 8                       DEFENDANT.      )
        _____ )
 9


10                    TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE CHARLES R. BREYER
11                    UNITED STATES DISTRICT JUDGE

12     A P P E A R A N C E S:

13     FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                               BY:  JACOB FOSTER
14                             950 CONSTITUTION AVENUE, NW
                               WASHINGTON, D.C.  20530
15
                               BY:  KATHERINE M. LLOYD-LOVETT
16                             450 GOLDEN GATE AVENUE, BOX 36055
                               SAN FRANCISCO, CALIFORNIA  94102
17

18     FOR THE DEFENDANT:      KEKER, VAN NEST & PETERS
                               BY:  ELLIOT R. PETERS
19                                  NICHOLAS D. MARAIS
                                    CODY GRAY
20                             633 BATTERY STREET
                               SAN FRANCISCO, CALIFORNIA  94111
21

22     PRETRIAL OFFICER:       VANESSA VARGAS

23     REMOTE REPORTED BY:     LEE-ANNE SHORTRIDGE, CSR, CRR
                               CERTIFICATE NUMBER 9595
24

25             PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
                  TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1      SAN FRANCISCO, CALIFORNIA              AUGUST 23, 2024

 2                      P R O C E E D I N G S

 3          (COURT CONVENED AT 11:03 P.M.)

 4              THE CLERK:  CALLING CRIMINAL ACTION CR-24-0329,

 5      U.S.A. VERSUS RUTHIA HE.

 6          COUNSEL, PLEASE STEP FORWARD AND STATE YOUR APPEARANCES

 7      FOR THE RECORD.

 8              MR. FOSTER:  GOOD MORNING, YOUR HONOR.

 9          JACOB FOSTER AND KATIE LLOYD-LOVETT ON BEHALF OF THE

10      UNITED STATES.

11              THE COURT:  GOOD MORNING.

12              MR. PETERS:  GOOD MORNING, YOUR HONOR.

13          ELLIOT PETERS APPEARING WITH MY PARTNERS, NICK MARAIS AND

14      CODY GRAY, ON BEHALF OF RUTHIA HE, WHO IS PRESENT IN COURT.

15      SHE IS IN CUSTODY, BUT SHE'S PRESENT.

16              THE COURT:  GOOD MORNING.

17              PRETRIAL OFFICER:  GOOD MORNING, YOUR HONOR.

18      VANESSA VARGAS WITH U.S. PRETRIAL SERVICES.

19              THE COURT:  GOOD MORNING.

20          SO SINCE OUR LAST APPEARANCE TWO DAYS AGO, I'VE RECEIVED A

21      SUBMISSION BY THE GOVERNMENT, WHICH I REVIEWED THIS MORNING.

22          I'VE ALSO JUST RECEIVED A SUBMISSION FROM THE DEFENSE, A

23      PROFFER OF EVIDENCE IN RESPONSE TO THE COURT'S QUESTIONS.

24          ALSO SINCE THAT TIME, I HAVE READ THROUGH THE EXHIBITS

25      WHICH WERE ATTACHED TO THE GOVERNMENT'S MOTION.  THERE ARE --
```

```
 1    IS IT 38?  I DON'T QUITE KNOW WHAT THE NUMBER IS.  IT'S FAIRLY

 2    VOLUMINOUS.

 3              MR. FOSTER:  IT WAS 31 IN THE INITIAL MOTION, YOUR

 4    HONOR, AND THEN WE ATTACHED A COUPLE MORE EXHIBITS TO THE BRIEF

 5    FILED LAST NIGHT.

 6              THE COURT:  SO I THINK THE TOTAL IS SOMEWHERE IN THE

 7    NEIGHBORHOOD OF 38.

 8              MR. FOSTER:  I BELIEVE YOU'RE RIGHT, YOUR HONOR.

 9              MR. PETERS:  INCLUDING WHAT THEY FILED LAST NIGHT, I

10    THINK IT'S 38.

11              THE COURT:  THIRTY-EIGHT.

12        SO THIS IS, OF COURSE, A DE NOVO HEARING ON AN APPEAL OF A

13    DECISION, I GUESS IT'S ONLY JUDGE HIXSON'S DECISION, THOUGH

14    THERE WAS A PREVIOUS MAGISTRATE JUDGE, A DIFFERENT MAGISTRATE

15    JUDGE'S DETERMINATION IN LOS ANGELES, BUT THAT'S NOT BEING

16    APPEALED.  THAT'S -- I GUESS IT'S SUPERSEDED, ESSENTIALLY, BY

17    JUDGE HIXSON'S REVIEW, DETERMINATION.

18        THE COURT HAS ALSO, SO YOU'RE AWARE OF IT, REVIEWED THE

19    PLEA AGREEMENTS OF THE ALLEGED CO-CONSPIRATORS THAT WAS FILED

20    IN THIS CASE.  ARE YOU AWARE OF THAT?  I DON'T KNOW WHETHER

21    YOU'VE SEEN THOSE.  ARE THEY UNDER SEAL?

22              MR. FOSTER:  THEY'VE BEEN UNSEALED, YOUR HONOR,

23    AROUND THE TIME OF DEFENDANT'S ARREST, AND WE DID CITE TO ONE

24    SPECIFICALLY BY DOCKET NUMBER IN OUR BRIEF.

25              THE COURT:  SO HAVE YOU REVIEWED THEM?
```

4

```
 1                 MR. PETERS:  NO.

 2                 THE COURT:  HAVE YOU SEEN THEM?

 3                 MR. PETERS:  NO.

 4                 THE COURT:  OKAY, WELL, ARE THEY A MATTER -- I MEAN,

 5      I CAN GIVE YOU MY COPIES.  I DON'T KNOW THAT I'LL -- YOU MAY OR

 6      MAY NOT WANT TO REFER TO THEM IN THE COURSE OF -- I DON'T WANT

 7      YOU TO HAVE NOT SEEN SOMETHING THAT I HAVE SEEN.

 8                 MR. PETERS:  OKAY.

 9                 THE COURT:  SO HERE, WOULD YOU HAND THESE TO

10      MR. PETERS (HANDING).

11           OH, THEY'RE FILED IN A DIFFERENT CASE.

12                 MR. FOSTER:  EACH OF THEM ARE SEPARATE CASES, YOUR

13      HONOR.  THEY WERE FILED BY INFORMATION.

14                 THE COURT:  OKAY.  BUT THEY ALL RELATE TO THIS CASE?

15                 MR. FOSTER:  THEY'VE ALL BEEN RELATED TO THIS CASE,

16      YES, YOUR HONOR.

17                 THE COURT:  OKAY.  SO YOU HAVE THOSE SUBMISSIONS AS

18      WELL.  AND IF YOU NEED SOME TIME TO TAKE A LOOK AT THEM, OF

19      COURSE I'LL GIVE YOU THAT.

20                 MR. PETERS:  I'M NOT SURE WHAT THE COURT THINKS IS

21      PARTICULARLY RELEVANT TO THESE PROCEEDINGS ABOUT THEM, SO

22      OBVIOUSLY IF YOU DO, I WANT TO REVIEW THEM.  I DON'T WANT TO

23      WASTE THE COURT'S TIME.

24                 THE COURT:  YEAH.

25                 MR. PETERS:  I HAVEN'T REVIEWED THESE BEFORE, AND WE
```

1    HAVEN'T REALLY REVIEWED THE DISCOVERY.  WE'VE JUST BEEN

2    FOCUSSING ON BAIL.  I MEAN, THERE'S --

3            THE COURT:  WELL, THERE ARE REFERENCES -- WHEN YOU

4    SAY YOU'RE FOCUSSING ON BAIL, YOU HAVE BEEN FOCUSSING ON THE

5    EXHIBITS --

6            MR. PETERS:  YES.

7            THE COURT:  -- SENT -- SUBMITTED TO THE COURT IN

8    CONNECTION WITH BAIL?  I MEAN, I HAVEN'T SEEN ANYTHING -- I

9    HAVE NOT SEEN ANYTHING OTHER THAN THE EXHIBITS THAT WERE

10   SUBMITTED BY THE GOVERNMENT, AND THESE PLEA AGREEMENTS.  THAT'S

11   WHAT I HAVE SEEN.

12           MR. PETERS:  THANK YOU.

13           THE COURT:  AND WHAT YOU HAVE SUBMITTED.

14       BUT NOTHING ELSE.

15       THE FIRST THING IS IN TERMS OF WHAT IS IN THE RECORD,

16   WHICH I THINK I'VE JUST STATED, BUT WHAT IS IN THE RECORD ARE

17   THE, ARE THE EXHIBITS ATTACHED TO THE ARGUMENT, AND SO THE

18   COURT HAS THAT IN THE RECORD AND THAT FORMS A BASIS, A PART OF

19   THE BASIS FOR THE COURT'S FINDINGS, WHATEVER THEY MAY BE.

20       TWO, I THINK IT'S AGREED UPON THAT THERE IS A PRESUMPTION

21   OF DETENTION BY VIRTUE OF THE OPERATION OF THE LAW, THAT IS,

22   SINCE IT'S A CONTROLLED SUBSTANCE ALLEGATION, THE CRIMINAL

23   CHARGE, THERE IS ATTACHED TO IT BY STATUTE A PRESUMPTION --

24   WHICH, OF COURSE, IS A REBUTTABLE PRESUMPTION -- OF DETENTION.

25       THIRD, WITH RESPECT TO THE STANDARD OF PROOF, I THINK AS

1    TO THE QUESTION OF FLIGHT, THAT IS A STANDARD THAT WOULD BE A

2    PREPONDERANCE OF THE EVIDENCE AS DISTINCT FROM A CLEAR AND

3    CONVINCING EVIDENCE STANDARD.

4          AND WHAT IS OF CONCERN TO THE COURT, AND I THINK I

5    IDENTIFIED IT IN THE LAST HEARING, WAS, FIRST AND FOREMOST, THE

6    QUESTION OF FLIGHT; AND, SECONDARILY, THE QUESTION OF

7    DANGEROUSNESS.

8          THE ARGUMENT AS TO THE DANGEROUSNESS I THINK REVOLVES

9    AROUND TWO ALLEGATIONS.  ONE IS THAT THERE IS A -- THERE IS

10   EVIDENCE THAT DOCUMENTS HAVE BEEN DESTROYED OR DELETED OR

11   BECOME UNAVAILABLE THROUGH THE NORMAL CHANNELS OF SUBPOENA AND

12   PRODUCTION OF THESE DOCUMENTS.

13         THE SECOND ASPECT OF DANGEROUSNESS IS AN ALLEGATION THAT

14   THE BUSINESS CONTINUES, THE ENTERPRISE, WHATEVER IT IS,

15   CONTINUES TO PERMIT DRUGS TO BE DISPENSED TO INDIVIDUALS WHO

16   MAY NOT HAVE BEEN SATISFACTORILY EXAMINED AS TO THEIR NEED AND,

17   THEREFORE, THAT CREATES A SENSE OF DANGEROUSNESS.

18         I HAVE NO IDEA WHETHER THIS BUSINESS IS NOW OPERATING IN

19   SOME REAL WAY OR NOT, SO I WOULD LIKE THAT DISCUSSED THIS

20   MORNING.

21         I ALSO AM CONCERNED ABOUT A NUMBER OF THINGS, ONE OF

22   WHICH -- OR MAYBE I SHOULD SAY WHAT I'M NOT CONCERNED ABOUT.

23         I'M NOT CONCERNED ABOUT THE PASSPORT ISSUE, THAT IS TO

24   SAY, DID THE DEFENDANT TRAVEL ON A PASSPORT THAT SHE HAD

25   REPORTED WAS STOLEN?  I THINK THE EXPLANATION THAT THE DEFENSE

1    OFFERED IN THAT REGARD MAKES SENSE AND I DON'T CONSIDER THAT TO

2    BE AN ISSUE.

3         AS A MATTER OF FACT, THE OPPOSITE WOULDN'T MAKE SENSE.  IT

4    WOULDN'T MAKE SENSE FOR HER TO LEAVE THE COUNTRY WITH ONE

5    PASSPORT AND THEN RETURN TO THE COUNTRY USING A PURPORTEDLY

6    STOLEN PASSPORT.  THAT JUST MAKES NO SENSE AT ALL.

7         NOW, A LOT OF THINGS HAPPEN IN ANY CASE, SOME OF WHICH

8    MAKE SENSE AND SOME OF WHICH DON'T.  BUT I DON'T THINK THAT

9    THAT'S -- NUMBER ONE, IT DOESN'T MAKE SENSE; AND, NUMBER TWO,

10   THE DEFENSE HAS OFFERED AN ENTIRELY PLAUSIBLE EXPLANATION.  SO

11   I DON'T THINK THAT'S AN ISSUE FOR THE COURT TO CONSIDER.

12        THERE IS AN ISSUE AS TO ACCESS TO FUNDS AND WHAT IS

13   HAPPENING WITH THE FUNDS.  AND I HAVE -- MAYBE I'M SORT OF

14   STARTING WITH WHAT THE DEFENSE HAS OFFERED THIS MORNING, WHICH

15   IS THAT THE -- IN THEIR MEMORANDUM, IN POINT A, THEY DESCRIBE

16   THAT THE DEFENDANT'S FINANCIAL RESOURCES ARE $616,000, AND THAT

17   THEY ARE IN ACCOUNTS IN THE UNITED STATES.

18        THEN A NON-LIQUID RESOURCE WOULD BE HER INTEREST IN SOME

19   REAL PROPERTY IN GEORGIA, WHICH WOULD BE 241,000, I GUESS

20   RECENTLY PURCHASED.

21        NOW, THAT IS SHARPLY AT ODDS WITH THE GOVERNMENT'S

22   REPRESENTATION THAT THE COMPANY OF WHICH THE DEFENDANT IS A

23   PRINCIPAL SHAREHOLDER HAS ASSETS OF APPROXIMATELY $10 MILLION

24   IN ACCOUNTS, AND I DON'T KNOW THAT I AM -- I DON'T KNOW THAT

25   THESE ARE NECESSARILY IN CONFLICT.  I DON'T KNOW THAT YOU

1  DISAGREE WITH THAT, DEFENSE, OR YOU'RE SIMPLY SAYING SHE

2  DOESN'T HAVE ACCESS TO THAT MONEY, I DON'T KNOW WHICH, OR THAT

3  THE MONEY ISN'T THERE.  I DON'T KNOW.

4      I MEAN, I DON'T -- YOU HAVEN'T PROVIDED ANY EXPLANATION OF

5  THAT, SO I'M NOT QUITE SURE WHAT THE ISSUE IS WHERE YOU DON'T

6  AGREE.

7          MR. PETERS:  OKAY.

8          THE COURT:  MR. PETERS.

9          MR. PETERS:  SO ON EXHIBIT A IN TERMS OF HER LIQUID

10  RESOURCES, JUST TO POINT OUT THAT THE HSBC ACCOUNT ALSO

11  INCLUDES A CD WHICH IS RESTRICTED.

12      SO SHE'S NOT VERY LIQUID PERSONALLY, AND SHE DOESN'T HAVE

13  A HUGE AMOUNT OF ASSETS PERSONALLY.

14      AS TO THE COMPANY'S MONEY, SHE'S NOT -- AND I THINK THIS

15  IS PART OF OUR PROFFER, OUR FACTUAL PROFFER REGARDING WHAT THE

16  COMPANY'S LAWYER, MR. STESKAL, TOLD US -- THAT SHE IS NOT

17  PRESENTLY A SIGNATORY ON ANY OF THE COMPANY'S ACCOUNTS.

18      WE CAN GET INTO -- YOU KNOW, THE GOVERNMENT ALLEGED IN

19  THEIR PAPER AND THEY TOLD YOUR HONOR THE OTHER DAY THAT THERE

20  WAS $13 MILLION OF OFFSHORE TRANSFERS, AND THEN THEY PRODUCED

21  EVIDENCE OF $1.4 MILLION, ALL OF WHICH CAN BE READILY EXPLAINED

22  AND I'M HAPPY TO EXPLAIN IT.

23      BUT NOW WE'RE FOCUSSED ON THE BALANCE IN THE COMPANY'S

24  BANK ACCOUNTS.  SHE DOESN'T CONTROL IT.  SHE DOESN'T HAVE

25  ACCESS TO IT.  IT'S -- THAT'S CONTROLLED BY THE COMPANY, AND

```
 1      THERE'S FIVE PEOPLE RUNNING THE COMPANY AT THIS POINT, AND

 2      SHE'S NOT ACTIVELY INVOLVED IN THAT.

 3           AND SO THAT -- YES, THE COMPANY HAS THOSE ASSETS.  WE

 4      DON'T DISPUTE THAT.

 5           BUT THEY'RE NOT AVAILABLE TO HER, AND WHAT'S AVAILABLE TO

 6      HER IS, IS WHAT'S ON OUR CHART A.

 7                THE COURT:  SO WHERE ARE THOSE ASSETS, THE

 8      $10 MILLION?

 9                MR. FOSTER:  SO, YOUR HONOR, THEY'RE IN COMPANY BANK

10      ACCOUNTS, AND WE WOULD RESPECTFULLY DISAGREE WITH THAT

11      CHARACTERIZATION.

12                THE COURT:  WHERE ARE THE COMPANY BANK ACCOUNTS

13      LOCATED?

14                MR. FOSTER:  THEY'RE LOCATED HERE, YOUR HONOR.

15                THE COURT:  IN THE UNITED STATES?

16                MR. FOSTER:  CORRECT.

17                THE COURT:  OKAY.

18                MR. FOSTER:  AN ACCOUNT CALLED MERCURY, WHICH IS AN

19      ONLINE BANK ACCOUNT.

20           THEIR ACCOUNTS AT RAMP, ANOTHER ONLINE FINANCIAL

21      INSTITUTION, WERE SHUT DOWN, AS WE NOTED, AND THEY WERE

22      TRANSFERRED, TO THE BEST OF OUR KNOWLEDGE, TO MERCURY.

23                THE COURT:  SO MERCURY PRESENTLY HOLDS $10 MILLION IN

24      CASH, ROUGHLY?

25                MR. FOSTER:  ROUGHLY, MINUS THE DEFENDANT'S ASSETS.
```

1     THE 10 MILLION INCLUDED BOTH THE COMPANY ACCOUNTS AND I THINK

2     THE 600,000 OR SO THAT DEFENSE REFERRED TO.

3             THE COURT:  OKAY.

4             MR. PETERS:  YES, IT'S A LITTLE LESS THAN 10.

5             THE COURT:  SO BETWEEN 9 AND 10?

6             MR. FOSTER:  YES, YOUR HONOR.

7             THE COURT:  OKAY.  AND NOW THE QUESTION IS, WELL, WHO

8     HAS ACCESS TO THE -- THE QUESTION IS, SIMPLY, DOES THE

9     DEFENDANT HAVE ACCESS OR POTENTIAL ACCESS TO THOSE FUNDS?

10            MR. FOSTER:  YES, YOUR HONOR.

11         AND SO WHAT I CAN TELL YOU --

12            THE COURT:  BECAUSE THERE'S NO QUESTION THAT SHE

13    CONTROLS -- I DON'T THINK THEY'RE DISPUTING THAT SHE CONTROLS A

14    MAJORITY SHAREHOLDER'S INTEREST IN THOSE -- IN THE COMPANY, AND

15    OSTENSIBLY, IF YOU CONTROLLED 54, OR MORE THAN 50 PERCENT OF

16    THE INTEREST OF THE COMPANY, YOU CONTROL THE COMPANY AND THE

17    COMPANY HAS $10 MILLION, $9 MILLION IN ASSETS.

18            MR. FOSTER:  YES, YOUR HONOR.  AND I THINK THERE'S

19    TWO ISSUES, ONE OF LEGAL AUTHORITY AND ONE OF ACTUAL AUTHORITY.

20         IN TERMS OF LEGAL AUTHORITY, WE SPOKE TO MR. STESKAL AND

21    HE TOLD US THAT SHE REMAINS THE SHAREHOLDER OF NEARLY ALL THE

22    SHARES AND SHE HAS ALL THE POWERS THAT THAT ENTAILS.

23         WE'VE ASKED FOR ANY SORT OF FORMAL, LEGAL AUTHORITY

24    REFLECTING A TRANSFER TO OTHER INDIVIDUALS, AND IT HAS NOT BEEN

25    PROVIDED TO US.

1    WE WERE TOLD THAT THERE WAS ONE ADDITIONAL BOARD MEMBER

2    WHO CAME ON TO THE BOARD WITH THE DEFENDANT, THE ONLY OTHER

3    BOARD MEMBER, IN 2023.  WE SPOKE WITH HIS COUNSEL AND HE

4    INFORMED US THAT THAT INDIVIDUAL HAD NO UNDERSTANDING OF WHAT

5    WAS GOING ON WITH THE COMPANY OR NO ACTIVE INVOLVEMENT WITH THE

6    COMPANY.

7    THE DEFENDANT IS THE CEO, AND THE CEO CANNOT JUST BE

8    REMOVED WITHOUT SOME SORT OF PROCESS PURSUANT TO CONTRACTUAL

9    LAW AND CORPORATE GOVERNANCE.

10    SECOND IS THE ACTUAL REALITY OF WHAT IS GOING ON HERE.

11    THE GOVERNMENT SUBMITTED AN EXHIBIT SHOWING HER AS THE ADMIN

12    USER ON THE MOST RECENT INFORMATION WE OBTAINED FOR THAT

13    MERCURY BANK ACCOUNT, WHICH SHOWS THAT SHE CONTROLS THE FUNDS.

14    BUT MORE IMPORTANT THAN THAT, THESE OTHER INDIVIDUALS ARE

15    ALL CLOSE ASSOCIATES OF THE DEFENDANT.  AND AS WE SUBMITTED IN

16    CONNECTION WITH THE REPORT OF INTERVIEW OF A DONE EMPLOYEE

17    WHO'S ONE OF THE LONGEST RUNNING DONE EMPLOYEES AT THE COMPANY,

18    THE DEFENDANT INTENTIONALLY TRANSFERRED, TO OBSTRUCT THE

19    INVESTIGATION, THE OPERATIONAL FUNCTIONS OF THE COMPANY TO

20    CHINA, OUTSIDE OF THE JURISDICTION, AND EXHIBIT 12 REFLECTS

21    THAT THE PURPOSE OF DOING SO WAS BECAUSE THERE WAS AN

22    INVESTIGATION.

23    AND WHAT THAT STATEMENT OF INTERVIEW REFLECTS, WHICH IS

24    CORROBORATED BY A HOST OF EXHIBITS, AS WELL AS BY OTHER

25    WITNESSES, IS THAT THE DEFENDANT SET UP AN INTENTIONAL PLAN TO

1    PUT THIS COMPANY'S OPERATIONAL FUNCTIONS OUTSIDE OF THE

2    JURISDICTION OF THE UNITED STATES.  SHE EXECUTED THAT PLAN,

3    THERE'S BEEN HUGE AMOUNTS OF TRANSFERS OVERSEAS, AND SHE'S

4    FULLY CAPABLE OF RUNNING THIS COMPANY, OR ANOTHER ONE, FROM

5    CHINA WHERE SHE HAS BUSINESS CONTACTS, FAMILY, AND FRIENDS.

6         SO WE HAVEN'T SEEN ANY LEGAL AUTHORITY EITHER THAT THE

7    DEFENDANT HAS RELINQUISHED HER CONTROL IN THE COMPANY.

8         AND TO THE CONTRARY, OUR UNDERSTANDING FROM COMPANY

9    COUNSEL HAS BEEN THAT'S A PROCESS THAT THEY HAVE PUSHED THE

10   DEFENDANT TO ENGAGE FOR A LONG TIME, EVEN PRECEDING HER ARREST,

11   BUT SHE'S NOT BEEN WILLING TO DO SO.

12        AND EVEN BEYOND THE LEGAL AUTHORITY, THE GOVERNMENT, GIVEN

13   THE EXHIBITS, HAS SERIOUS CONCERNS ABOUT THE PRACTICALITIES OF

14   MONITORING THIS DEFENDANT AND HER COMMUNICATIONS WITH THIRD

15   PARTIES LOCATED OUTSIDE THE COUNTRY WHO HAVE THE ABILITY TO

16   ACCESS AND MOVE THESE FUNDS.

17        THE COURT:  IT SEEMS -- IT JUST SEEMS TO ME THAT

18   THERE IS A WAY TO DEMONSTRATE, ONE WAY OR THE OTHER, WHETHER

19   THE DEFENDANT HAS ACCESS TO THESE FUNDS OR CAN ACHIEVE ACCESS

20   TO THESE FUNDS.

21        MR. PETERS:  YOUR HONOR --

22        THE COURT:  I MEAN, IT'S ONE THING TO SAY, OKAY,

23   SHE'S NOT A SIGNATORY ON THE ACCOUNT.  HERE ARE -- I DON'T KNOW

24   WHO ARE SIGNATORIES ON THE ACCOUNTS, BUT APPARENTLY SHE'S NOT.

25        MR. PETERS:  SHE'S NOT.

```
1              THE COURT:  OKAY.  BUT SOMEBODY IS.  SOMEBODY HAS THE

2    AUTHORITY TO --

3              MR. PETERS:  THE BUSINESS HAS --

4              THE COURT:  SO WHY DON'T I HAVE THE PERSON WHO HAS

5    THE AUTHORITY TO COME IN AND SAY WHATEVER THAT PERSON WOULD SAY

6    AS TO THAT PERSON'S AUTHORITY AND WHETHER THE DEFENDANT HAS THE

7    ABILITY TO INSTRUCT OR REQUEST THIS INDIVIDUAL TO TRANSFER

8    FUNDS FOR HER BENEFIT?  WHY -- ISN'T THAT THE NEXT THING THAT I

9    WOULD DO?

10             MR. PETERS:  YOUR HONOR, THAT'S WHAT WE WERE

11   ATTEMPTING TO ADDRESS BY PROFFERING WHAT MR. STESKAL TOLD US,

12   THAT SHE DOESN'T HAVE AUTHORITY AND THAT HE -- AND THAT THE

13   PEOPLE WITH AUTHORITY IS THIS GROUP OF FIVE PEOPLE WHO GIVE HIM

14   INSTRUCTIONS.  THOSE ARE THE PEOPLE WHO HAVE AUTHORITY FOR THE

15   COMPANY.

16        NOW, MS. HE HAS BEEN IN CUSTODY FOR THE LAST 60 DAYS.  THE

17   COMPANY CONTINUES TO DO BUSINESS.  IN FACT, THE GOVERNMENT HAS

18   POINTED OUT SOME TRANSFERS WHICH ARE NECESSARY FOR IT TO DO

19   BUSINESS BECAUSE THEY NEED TO PAY THEIR CONTRACTORS AND

20   EMPLOYEES WHO WERE LOCATED OFFSHORE.  COUNSEL JUST REFERENCED

21   THAT THEY HAVE ACTIVITIES OFFSHORE.  THEY NEED TO PAY THE

22   PEOPLE THAT WORK AT THE COMPANY.

23        THE ONLY FINANCIAL TRANSACTIONS THAT THE GOVERNMENT HAS

24   OFFERED TO YOUR HONOR EVIDENCE OF ARE THESE TRANSACTIONS THAT

25   HAVE TAKEN PLACE, SOME OF WHICH SINCE MS. HE'S BEEN IN CUSTODY.
```

1    SHE OBVIOUSLY DIDN'T MAKE THOSE TRANSACTIONS OR CAUSE THOSE

2    TRANSACTIONS TO BE MADE.  SHE'S BEEN SITTING IN SANTA RITA, AND

3    BEFORE THAT WAS IN TRANSIT FROM L.A. THROUGH OKLAHOMA TO GET UP

4    HERE.

5        THE FIVE PEOPLE WHO ARE LISTED IN OUR PROFFER ARE THE

6    PEOPLE THAT ARE IN CHARGE OF THE COMPANY.  I DON'T KNOW

7    SPECIFICALLY --

8            THE COURT:  SO MAYBE I SHOULD HEAR FROM THEM.  MAYBE

9    THEY SHOULD TESTIFY.  MAYBE THEY SHOULD BE SUBJECT TO

10   CROSS-EXAMINATION.

11       I MEAN, THE -- I DON'T KNOW, MAYBE THEY'RE FRIENDS OF

12   HERS.  MAYBE THEY'RE RELATED TO HER.  MAYBE THEY -- MAYBE THEY

13   DON'T -- MAYBE THEY'VE RECEIVED INSTRUCTIONS FROM HER OR

14   HAVEN'T.  MAYBE THEY WOULD SAY THEY WOULD FOLLOW WHATEVER

15   INSTRUCTIONS THEY GOT FROM HER OR THEY WOULDN'T.

16       BUT THAT'S THE ONLY WAY I CAN, I CAN DEAL WITH IT.

17       I DON'T THINK WHAT MR. STESKAL HAS SAID, WHICH I'M SURE IS

18   ACCURATE, WHICH I'M SURE IS ACCURATE, ANSWERS THESE CONCERNS.

19   IT WOULD BE AN EASY THING IF SHE'S ON A CARD, SHE'S ON A CARD,

20   THE SIGNATURE.  SHE'S NOT.

21       BUT THAT HARDLY ANSWERS THE CONCERN THAT THE GOVERNMENT

22   HAS WITH RESPECT TO IT.

23       NOW, YOU MENTIONED THESE INVOICES, AND YOU'RE, I THINK,

24   TALKING ABOUT THE INVOICES THAT WENT TO A COMPANY,

25   UNFORTUNATELY NAMED MAKEBELIEVE, AND IN -- INVOICES FOR

1    $250,000, MAYBE ONE OR TWO.

2              MR. FOSTER:  TWO, YOUR HONOR.

3              MR. PETERS:  I CAN ADDRESS THAT.

4              THE COURT:  WELL, THE THING THAT STRUCK ME ABOUT IT

5    IS IT'S RARE TO SEE AN INVOICE FOR PAYMENT OF MONEY GENERATED

6    BY THE PERSON WHO OWES THE MONEY.

7              MR. PETERS:  I DON'T THINK THAT THAT'S A PROPER -- I

8    MEAN, I DON'T THINK THAT THAT'S --

9              THE COURT:  WELL, ISN'T THAT TRUE?

10             MR. PETERS:  NO, I DON'T THINK SO.  I THINK THAT'S

11   JUST THE WAY THE INVOICE WAS PREPARED.

12        THE GOVERNMENT SAYS IT'S ON THEIR LETTERHEAD, IT HAS THEIR

13   NAME, IT HAS THE NAME DONE AT THE TOP, BUT I THINK THAT'S

14   BECAUSE THEY'RE THE RECIPIENT OF THE SERVICES.

15        LET ME GIVE YOU A LITTLE BACKGROUND.

16             THE COURT:  THERE'S NOTHING IN IT -- YOU LOOK AT THE

17   PIECE OF PAPER.  IT DOESN'T SAY "FOR SERVICES RENDERED."  IT

18   DOESN'T EXPLAIN THAT THIS IS FOR CONTRACTING SERVICES FOR OTHER

19   PEOPLE.  IT SIMPLY SAYS -- IT COMES FROM, OR APPEARS TO COME

20   FROM THE COMPANY, NOT -- NOT MAKEBELIEVE, IT COMES FROM DONE OR

21   DONE.  I DON'T KNOW HOW TO PRONOUNCE IT.

22             MR. PETERS:  DONE.

23             THE COURT:  IT APPEARS TO COME FROM DONE.  IT'S ON

24   DONE'S LETTERHEAD.

25        BUT BE THAT AS IT MAY, IT'S A VERY ODD INVOICE AND IT

```
 1        DOESN'T SEEM TO HAVE BEEN GENERATED BY MAKEBELIEVE, AND THERE'S

 2        NOTHING ON IT FROM MAKEBELIEVE THAT WOULD INDICATE THAT IT WAS

 3        FOR SERVICES RENDERED BY MAKEBELIEVE.

 4             MR. PETERS:  THERE'S --

 5             THE COURT:  AND HERE IT IS, $500,000 OR SO, THAT WAS

 6        JUST TRANSFERRED OUT OF THE UNITED STATES AND TRANSFERRED TO

 7        SOME ACCOUNT I GUESS IN CHINA.  I DON'T KNOW WHERE IT WAS.

 8             MR. PETERS:  HONG KONG.

 9             THE COURT:  HONG KONG.

10             MR. PETERS:  YES.

11             THE COURT:  HONG KONG IS CHINA NOW.

12             MR. PETERS:  I'M TRYING TO MAKE AN ACCURATE RECORD,

13        YOUR HONOR.

14             THE COURT:  OKAY.  YOU HAVE.  YOU HAVE.  AND

15        HONG KONG IS CHINA NOW.

16          SO I THINK -- I THINK ANY FINANCIAL TRANSACTIONS THAT GO

17        ON THROUGH HONG KONG WILL PROBABLY NEED THE BLESSING OF THE

18        CHINESE GOVERNMENT, OR AT LEAST IT GOES WITH THEIR KNOWLEDGE,

19        THOUGH I'M NOT -- LISTEN, I KNOW SO LITTLE ABOUT IT THAT I

20        SHOULDN'T GIVE AN OPINION.

21             MR. PETERS:  NO, THE -- YOUR HONOR, THE GOVERNMENT IS

22        WELL AWARE THAT DONE HAS CONTRACTORS AND EMPLOYEES ABOARD,

23        INCLUDING IN HONG KONG AND THE PHILIPPINES, AND THEY NEED TO

24        GET PAID.

25             AND WHAT HAPPENED WAS THAT IN DECEMBER OF LAST YEAR, DONE
```

```
1      AND MAKEBELIEVE ENTERED INTO A CONTRACT FOR DONE TO -- FOR DONE

2      TO RECEIVE WORK THROUGH CONTRACTORS PROVIDED BY MAKEBELIEVE,

3      AND THE AMOUNT PAID WAS BASED UPON THE NUMBER OF CONTRACTORS

4      THAT WERE SUPPLIED.

5            IN JUNE, AS THE COURT IS WELL AWARE --

6                  THE COURT:  BY THE WAY, NONE OF THIS IS IN THE

7      RECORD.  NONE OF THIS IS IN THE RECORD.

8                  MR. FOSTER:  NO.

9                  THE COURT:  IS IT?

10                 MR. FOSTER:  WE DON'T HAVE EVIDENCE OF THAT.

11                 MR. PETERS:  I'M PROFFERING THESE FACTS.

12           I GOT THEIR PLEADING AT 8:40 LAST NIGHT.  THAT'S WHEN THEY

13     FILED THIS INFORMATION ABOUT --

14                 THE COURT:  NO, NO, WAIT.  MR. PETERS, THE $250,000

15     INVOICE, THEY'VE BEEN AROUND FOR AWHILE, NOT JUST LAST NIGHT.

16     I MEAN, I SAW IT EARLIER.  I THOUGHT I SAW IT EARLIER.

17                 MR. FOSTER:  THEY WERE ATTACHED TO THE ORIGINAL

18     BRIEF.

19                 THE COURT:  BUT BE THAT AS IT MAY --

20                 MR. PETERS:  CAN I JUST PROFFER JUST SO THE COURT

21     UNDERSTANDS WHAT OUR POSITION IS?  AND IF I NEED TO PRODUCE

22     EVIDENCE, FURTHER EVIDENCE ABOUT IT, I WILL.  BUT I JUST WANT

23     THE COURT TO UNDERSTAND WHAT WE BELIEVE THE EVIDENCE WILL SHOW

24     AND TO PROFFER THESE FACTS.

25           DONE ENTERED INTO AN AGREEMENT WITH MAKEBELIEVE.
```

1    MAKEBELIEVE SUPPLIES CONTRACTORS TO WORK FOR THE COMPANY.  THE

2    AMOUNT THAT'S PAID EVERY MONTH IS BASED ON THE NUMBER OF

3    PEOPLE.

4         THE CONTRACT PROVIDES THAT IT WAS, IT WAS TO BE -- THE

5    MONEY WAS TO BE PAID AT THE END OF EVERY MONTH.

6         IN JUNE, MS. HE WAS INDICTED, AND THERE WAS A LOT OF

7    PUBLICITY ABOUT THAT.  MAKEBELIEVE -- AND PEOPLE LEFT DONE AS A

8    RESULT OF THAT.  EMPLOYEES LEFT DONE.

9         SO MAKEBELIEVE HAD TO HIRE MORE PEOPLE TO WORK IN THE

10   FINANCE CAPACITY AND IN TERMS OF SOFTWARE ENGINEERING FOR THE

11   COMPANY, AND THEY SAID, "WE DON'T WANT TO BE PAID AT THE END OF

12   THE MONTH, WE WANT YOU TO PAY US AT THE BEGINNING OF THE

13   MONTH."

14        SO AT THE END OF JUNE, THERE ARE TWO PAYMENTS OF $250,000.

15   ONE IS FOR JUNE LOOKING BACKWARDS PURSUANT TO THE CONTRACT, AND

16   THE OTHER IS FOR JULY LOOKING FORWARD, AND THERE WILL BE

17   ANOTHER PAYMENT AT THE -- AND THEN THERE'S SUBSEQUENT PAYMENTS

18   FOR THE WORK THAT MAKEBELIEVE IS DOING.

19        THAT'S THE REASON WHY THERE ARE THOSE TRANSFERS.

20        MS. HE WAS IN JAIL IN THE END OF JUNE WHEN THOSE PAYMENTS

21   WERE BEING MADE.  SHE DIDN'T HAVE ANYTHING TO DO WITH MAKING

22   THEM.  PEOPLE OPERATING THE COMPANY -- THE COMPANY STILL

23   OPERATES.  THE COMPANY HASN'T BEEN CHARGED WITH ANYTHING.

24        AND WE -- WE CONTEND THAT THE COMPANY, ALL OF THE

25   COMPANY'S ACTIVITIES ARE LEGITIMATE.

1          BUT I DON'T THINK THE GOVERNMENT DISPUTES THAT THE VAST

2     MAJORITY OF THE ENCOUNTERS WHICH ARE BETWEEN DOCTORS AND

3     INDIVIDUALS, THAT DOCTORS PRESCRIBE THE MEDICATION.

4          I MEAN, I UNDERSTAND THAT THE PRESUMPTION APPLIES HERE

5     BECAUSE 846 APPEARS ON THE INDICTMENT.  BUT THIS ISN'T THE KIND

6     OF NORMAL, YOU KNOW, HEROIN CASE OR DRUG CASE WHERE IT'S --

7     WHERE OBVIOUSLY THE SUBSTANCE IS ILLEGAL.

8          THE PEOPLE THAT RECEIVED ADDERALL GOT IT FROM PHARMACIES

9     WHICH WERE --

10               THE COURT:  BUT THIS IS -- THAT'S NOT UNIQUE.

11               MR. PETERS:  -- PRESCRIBED BY DOCTORS.

12               THE COURT:  THAT'S NOT UNIQUE.  I SAT HERE AND TRIED

13     A CASE FIVE, EIGHT YEARS AGO IN WHICH MR. COHEN AND MR. SWANSON

14     WERE COUNSEL FOR AN INTERNET PRESCRIPTION ORDERING SERVICE THAT

15     PROVIDED MEDICATION OF CONTROLLED SUBSTANCES, LIKE ADDERALL, I

16     THINK IT WAS AMBIEN AND A FEW OTHER DRUGS, AND PROVIDED THAT

17     WITHOUT A SERIOUS, DOCUMENTED DOCTOR'S EXAMINATION AND THE

18     PRESCRIPTION.

19          AND THE PEOPLE WHO WERE BEING PROSECUTED, THERE WERE SOME

20     DOCTORS, BUT THE PEOPLE WHO WERE BEING PROSECUTED WERE PEOPLE

21     WHO SET UP THE WHOLE SCHEME AND THEY WEREN'T DOCTORS.  THEY

22     WERE -- AND THEY WEREN'T PHARMACISTS.  THEY WERE ENTREPRENEURS

23     WHO ESTABLISHED THIS NETWORK OF ORDERING DRUGS.

24          SO THIS ISN'T UNIQUE.  I MEAN, YOU -- I LOOK AT THIS THING

25     AND I THOUGHT SOMEBODY SAID, WELL, THIS IS SORT OF THING IS

```
 1       THIS -- YOU KNOW, IS IT GOING AFTER TELEMARKETING COMPANIES?
 2       YES, THEY'VE BEEN GOING AFTER TELEMARKETING COMPANIES FOR AT
 3       LEAST TEN YEARS.  THIS IS ONE MORE.
 4           NOW, THERE MAY BE NO -- THERE MAY BE NO EVIDENCE OF IT.
 5       IT MAY BE TOTALLY LEGITIMATE.
 6           BUT THEY'RE NOT SAYING EVERYBODY WHO GOT MEDICATION WAS AN
 7       ILLEGITIMATE -- SHOULD NEVER HAVE GOTTEN THE MEDICATION.
 8           WHAT THEY ARE SAYING IS THAT SOME PEOPLE WHO GOT THE
 9       MEDICATION DID SO WITHOUT A PROPER MEDICALLY JUSTIFIABLE REASON
10       BECAUSE OF THE MANNER IN WHICH IT WAS SET UP AND THEY BECAME
11       ADDICTED AND THEY ABUSED THIS MEDICATION, AND THAT'S WHY THE
12       FDA IS CONCERNED ABOUT THESE THINGS, TELEMARKETING AND INTERNET
13       PHARMACIES, FOR THAT REASON.
14           SO THAT'S -- THAT'S THE OVERALL PICTURE.
15           BUT I DON'T THINK I GET INTO THE OVERALL PICTURE.  I'M
16       TRYING TO FIGURE OUT, IS SHE GOING TO -- IS SHE A FLIGHT RISK?
17       PERIOD.  THAT'S ALL I HAVE TO DECIDE, IS SHE A FLIGHT RISK?
18           AND YOU'RE TELLING ME THAT THESE PAYMENTS OF $250,000 TO A
19       COMPANY LOCATED IN HONG KONG ARE PERFECTLY LEGITIMATE PAYMENTS,
20       TO WHICH I SAY, THERE'S NO EVIDENCE OF THAT.  THE EVIDENCE THAT
21       HAS BEEN PRESENTED ARE -- OF THE PAYMENTS ARE TWO INVOICES
22       WHICH SEEM TO BE HIGHLY QUESTIONABLE AS TO THEIR AUTHENTICITY,
23       THEIR LEGITIMACY.  THAT MAY BE A BETTER WAY OF PUTTING IT.
24           SO THAT'S WHAT I HAVE IN THE RECORD.
25           I ALSO HAVE YOUR PROFFER, BUT A PROFFER IS NO EVIDENCE.  I
```

1       CAN'T DECIDE SOMETHING BASED UPON A PROFFER AT ALL.  I HAVE

2       TO -- I HAVE TO DECIDE BASED ON EVIDENCE.

3            SO LET'S MOVE ON BECAUSE THAT'S ONLY SOME OF THE THINGS

4       THAT ARE OF CONCERN.

5            ANOTHER THING THAT IS OF CONCERN IS HER CONSTANT -- AND

6       IT'S REPLETE IN THESE DOCUMENTS -- ACTIVITIES WITH RESPECT TO

7       DELETION OF, OF INFORMATION.  I'LL CALL IT THAT.

8            AND IT'S NOT JUST ONE OCCASION.  IT IS REPEATED OCCASIONS

9       WHERE SHE IS, BOTH IN HER ACTIVITIES, THAT IS, USING VARIOUS

10      APPS THAT PERMITTED HER TO DELETE WHATEVER THE COMMUNICATION

11      WAS, ONE; TWO, CONVERSATIONS IN THAT REGARD, AND THAT HARDLY

12      FALLS WITHIN THE AMBIT OF THE HIPAA REQUIREMENTS TO PROTECT A

13      PATIENT'S PRIVACY, WHICH I SORT OF THOUGHT WAS THE

14      JUSTIFICATION FOR IT.

15           BUT CERTAINLY READING THROUGH ALL OF THESE DOCUMENTS, IT'S

16      CLEAR THAT'S NOT WHAT'S GOING ON.  IT'S CLEAR THAT SHE IS

17      ATTEMPTING TO DELETE A WHOLE SERIES OF COMMUNICATIONS IN WHICH

18      SHE IS TALKING ABOUT RUNNING THE COMPANY, TRANSFERRING FUNDS,

19      GUIDING EMPLOYEES, AND DEALING WITH -- AND HERE'S WHERE IT GETS

20      REALLY STICKY -- GOVERNMENT INVESTIGATIONS.

21           THEN YOU HAVE THE RATHER REMARKABLE CONVERSATION SHE HAS

22      WITH GOOGLE IN WHICH SHE'S CONSTANTLY TALKING, AND IT GOES ON

23      FOR PAGES, ABOUT IF I DELETE MY GOOGLE ACCOUNT, CAN THE POLICE

24      GET IT?

25           IT'S NOT WHETHER SOME HACKER CAN GET IT.  IT'S ABOUT

1   WHETHER SOME THIRD PARTY OUT THERE COULD GET IT.  IT'S ABOUT

2   WHETHER THE GOVERNMENT HAS ACCESS TO IT.

3        THEN YOU HAVE THE CONSTANT -- OR THEN YOU HAVE A SERIES OF

4   CONVERSATIONS IN WHICH SHE IS BEING TOLD ABOUT ACCOUNTS THAT

5   CAN BE SET UP WHICH CANNOT BE ACCESSED THROUGH AN EXTRADITION

6   TREATY OR A COOPERATION TREATY.

7        AND WHILE SHE'S NOT USING THE WORD "EXTRADITION," OTHERS

8   ARE IN CONVERSATIONS WITH HER.  WHAT IS -- WHAT INFORMATION CAN

9   BE OBTAINED?

10        AND FINALLY, LATCHING ON TO THE FACT THAT THE SAFEST PLACE

11   IN WHICH HER FINANCIAL INFORMATION -- AND PARENTHETICALLY

12   HERSELF -- IS HONG KONG, IS CHINA, BECAUSE SHE CAN'T BE

13   EXTRADITED FROM CHINA, ONE; AND THE DOCUMENTS, THE FINANCIAL

14   INFORMATION, CAN'T BE OBTAINED BY THE UNITED STATES IN CHINA.

15        SO ALL OF THAT -- I'M NOT EVEN TALKING ABOUT THE TRANSFER

16   OF FUNDS -- ALL OF THAT, THERE'S NO EXPLANATION THAT I'VE SEEN,

17   MR. PETERS.  I'VE NOT SEEN -- I THOUGHT IT MAY BE ONE THING,

18   BUT IT'S NOT THAT.

19        AND SO ALL -- YOU KNOW, IT -- NOT ONLY IS THERE A

20   PRESUMPTION, THERE IS ABUNDANT EVIDENCE OF HER CONCEALMENT, OF

21   HER TRANSFER OF FUNDS TO PLACES TO WHICH THERE IS NO RECOURSE

22   BY THE GOVERNMENT, OR WESTERN GOVERNMENT, TO OBTAIN HER.

23        SO I THINK SHE'S AN EXTREME FLIGHT RISK.  AND, YOU KNOW,

24   I -- IF YOU HAVE EVIDENCE THAT WILL ANSWER THESE THINGS, THEN I

25   THINK IT OUGHT TO BE PRESENTED.

1        BUT MR. STESKAL DOESN'T PRESENT THAT, AND NOR DO THESE

2    EXPLANATIONS.  THEY'RE NOT EVIDENCE.  THEY MAY BE CORRECT, BUT

3    THEY'RE NOT EVIDENCE.

4        SO, I MEAN, IF YOU HAVE SOME EVIDENCE TO PRODUCE, I'LL

5    TAKE A LOOK AT IT AND THEN WEIGH IT AGAINST WHAT THE GOVERNMENT

6    HAS SUBMITTED.

7            MR. PETERS:  WELL, WE'VE, WE'VE PRODUCED EVIDENCE IN

8    THE FORM OF THE -- I MEAN, OUR WRITTEN PROFFER WITH EXHIBITS

9    WAS INTENDED TO BE, AND VIEWED AS, EVIDENCE.

10           THE COURT:  WELL, A PROFFER IS NOT EVIDENCE.

11           MR. PETERS:  WELL, BUT THE DOCUMENTS ATTACHED TO IT I

12    THINK ARE.

13           THE COURT:  YEAH, THE DOCUMENTS ARE THAT SHOW THAT,

14    YES INDEED, THAT SHE HAS 616,000.  I'M SURE THAT'S SUSTAINED.

15        BUT IT DOESN'T ANSWER, WHAT ABOUT ALL THESE OTHER FUNDS?

16    IT DOESN'T -- WHAT ABOUT $9 MILLION?

17        AND THE GOVERNMENT HAS SAID, "LOOK, PEOPLE COME IN AS A

18    SURETY AND SO FORTH, THEY PUT UP 500,000 OR THEY PUT UP THIS OR

19    THEY PUT UP THE HOUSE."

20        IF YOU'VE GOT $9 MILLION SITTING IN AN ACCOUNT THAT YOU

21    HAVE ACCESS TO, YOU CAN TAKE CARE OF THAT.

22           MR. PETERS:  WELL --

23           THE COURT:  NOW, MAYBE, IF YOU WERE COMING IN AND

24    SAYING TO ME, "BY THE WAY, YOU KNOW WHAT WE'RE GOING TO DO WITH

25    THE $9 MILLION?  WE'LL DEPOSIT IT WITH THE COURT.  WE'LL FREEZE

```
 1        IT.  SHE WILL NOT HAVE ACCESS TO THAT, OR NO ONE WILL HAVE

 2        ACCESS TO THAT; NUMBER TWO, AS TO THE 500,000, THE MONEY IN

 3        MAKEBELIEVE, WE'LL ENSURE THAT SHE CANNOT -- SHE OR ANYONE

 4        ACTING ON HER BEHALF -- HAVE ACCESS TO IT."

 5                  MR. PETERS:  YOUR HONOR --

 6                  THE COURT:  I CAN'T WRITE OUT THE CONDITIONS.

 7                  MR. PETERS:  I UNDERSTAND.

 8            BUT THAT'S HELPFUL, YOUR HONOR, BECAUSE I'D LIKE TO

 9        ADDRESS -- I DON'T BELIEVE SHE HAS ACCESS TO THE COMPANY'S

10        MONEY, IT'S ABOUT 8 MILLION, BUT THAT'S A SUBSTANTIAL AMOUNT OF

11        MONEY.  I'M NOT DISPUTING THAT.

12            IF WE CAN ADDRESS AND MAKE IT ABSOLUTELY CLEAR THAT SHE

13        CANNOT ACCESS THAT MONEY IN A WAY THAT'S SATISFACTORY TO YOUR

14        HONOR, WOULD THAT ADDRESS YOUR CONCERN ABOUT FLIGHT?  BECAUSE

15        OUR, OUR POINT ABOUT THE CHRONOLOGY OF WHAT'S HAPPENED IN THE

16        LAST YEAR AND A HALF, YOUR HONOR, IS THAT -- AND THE GOVERNMENT

17        SAYS SHE'S BEEN PLANNING TO FLEE AND ATTEMPTING TO FLEE, BUT

18        ACTUALLY, SHE, IN FEBRUARY -- SHE CAME BACK IN JANUARY OF

19        2022 -- 2023.

20            SHE WAS ASKED NOT TO LEAVE AND TRAVEL IN FEBRUARY.  SHE

21        GAVE HER PASSPORT, HER ONLY PASSPORT, VOLUNTARILY HANDED IT

22        OVER.  I HAVE IT IN COURT HERE.  I'M PREPARED TO GIVE IT TO THE

23        COURT OR PRETRIAL SERVICES OR WHATEVER.

24            SHE REMAINED HERE THROUGHOUT THAT ENTIRE PERIOD.  IN

25        DECEMBER, SHE ASKED PERMISSION TO TRAVEL.  SHE WAS TOLD THE
```

1     GOVERNMENT DIDN'T WANT HER TO TRAVEL, AND SHE DIDN'T.

2          SO THIS -- THE HISTORY ABOUT HER ACTIVITIES AND HER

3     SUPPOSED PLAN TO FLEE ESTABLISHES THE EXACT OPPOSITE, THAT SHE

4     DISABLED HERSELF FROM DEPARTING BY VOLUNTARILY GIVING OVER HER

5     PASSPORT 18 MONTHS AGO, AND THEN SHE CHOSE TO REMAIN HERE AT A

6     POINT IN TIME WHERE THE GOVERNMENT WAS ABLE TO REACH HER

7     THROUGH HER COUNSEL AT ANY TIME THEY WANTED TO.

8          SO I THINK THERE ISN'T ANY RECORD ACTUALLY OF HER PLANNING

9     TO FLEE, INTENDING TO FLEE.

10          THE EVIDENCE THAT -- SO I THINK WE'VE REBUTTED THAT

11     EVIDENCE AND REBUTTED THE PRESUMPTION IN REGARDS TO THAT.

12          I UNDERSTAND THE COURT'S CONCERN ABOUT MONEY, THE

13     COMPANY'S MONEY, AND WE DIDN'T UNDERSTAND THAT THE COURT WOULD

14     VIEW IT AS MONEY THAT SHE COULD READILY USE.

15          BUT IF WE CAN MAKE IT CLEAR TO THE COURT THAT SHE IS

16     DISABLED FROM ACCESSING THAT MONEY, WOULD THAT --

17               THE COURT:  WELL, IS THAT IMPORTANT?  IT'S

18      SIGNIFICANT.

19               MR. PETERS:  YES.

20               THE COURT:  ONE.

21          HOWEVER, LET'S NOT FOOL OURSELVES.  IT'S NOT A LEGAL

22     QUESTION WHETHER SHE HAS ACCESS TO THE MONEY, THOUGH THAT'S

23     OBVIOUSLY A CONSIDERATION.

24          IT'S WHETHER EFFECTIVELY SHE CAN ACCESS THE MONEY.

25          AND UNLESS I'M CONVINCED THESE ARE FIVE PEOPLE, OR

1    WHATEVER IT IS, WHO HAVE NO RELATIONSHIP WITH HER AT ALL, THAT

2    THEY OWE A -- THAT IT MAKES SENSE THAT THEY'RE ON THE BOARD,

3    WHOEVER THEY ARE, AND -- THOUGH I THINK THAT THAT'S VERY

4    UNLIKELY SINCE IT'S HER COMPANY.  I WOULD FIND IT VERY ODD THAT

5    THE PERSON WHO'S THE MAJORITY SHAREHOLDER OF A COMPANY HAS A

6    BOARD OF DIRECTORS THAT THEY DON'T EVEN -- THAT SHE WOULDN'T

7    EVEN KNOW.

8              MR. PETERS:  OF COURSE SHE KNOWS THOSE PEOPLE.

9              THE COURT:  OF COURSE SHE DOES.

10        SO I THINK THAT -- SO WHAT I'M TELLING YOU, MR. PETERS, IS

11   THAT I DOUBT IF I WOULD FIND ANYTHING REALLY SATISFACTORY ON --

12   IN THAT RESPECT, OTHER THAN TAKING THE $8 MILLION, $9 MILLION,

13   AND DEPOSITING IT WITH THE COURT.  THAT'S -- THAT MAY OR MAY

14   NOT PUT THIS COMPANY OUT OF BUSINESS.  I DON'T KNOW.  I DON'T

15   KNOW ENOUGH ABOUT THE COMPANY.

16             MR. PETERS:  THE COMPANY NEEDS TO OPERATE, YOUR

17    HONOR.

18        WHAT IF -- WHAT IF ANY CHANGE IN THE BANKING RELATIONSHIPS

19   OR ANY TRANSFERS OVER A CERTAIN AMOUNT HAD TO BE APPROVED BY

20   COUNSEL FOR THE COMPANY, AND THEN IF HE THOUGHT THAT THERE WAS

21   ANYTHING SUSPICIOUS, HE WOULD TELL THE GOVERNMENT?

22             MR. PETERS:  WELL, MR. STESKAL, HE'S A PRETTY GOOD

23    PERSON.

24             MR. FOSTER:  HE IS.

25             MR. PETERS:  THAT'S WHAT I WAS THINKING OF.

 1          THE COURT:  AND THE ANSWER IS I DON'T KNOW.  LET'S

 2     SEE WHERE -- LET'S SEE WHERE WE ARE.  LET'S SEE WHAT THE

 3     PROPOSAL IS.

 4          ON THE ONE HAND -- ON THE ONE HAND, I'M HIGHLY SUSPICIOUS

 5     OF ANY RELATIONSHIP THAT ISN'T CLEARLY SEPARATE FROM ANY

 6     CONTROL SHE OR MEMBERS OF HER FAMILY OR FRIENDS CAN, CAN

 7     IMPLORE.  FOR EXAMPLE, I MEAN, THERE ARE WAYS -- YOU COULD PUT

 8     IN A SEPARATE RECEIVER.  YOU COULD TAKE ALL THESE PEOPLE OUT

 9     AND YOU CAN PUT IN SOMEBODY WHO CAN RUN THE COMPANY WHO HAS --

10     YEAH, I MEAN, THAT'S THE SORT OF THING THAT I'M LOOKING AT IN

11     TERMS OF THAT.

12          SECONDLY, IN TERMS OF THE MONEY THAT'S AT MAKEBELIEVE, I

13     BETTER HAVE SOME EXAMINATION OF PEOPLE WHO ARE RUNNING THAT TO

14     ENSURE THAT SHE HAS NO ACCESS TO THAT.  THAT'S A MILLION

15     DOLLARS AT LEAST, OR MAYBE IT'S NOT.

16          MR. FOSTER:  I BELIEVE 1.4, YOUR HONOR.

17          THE COURT:  1.4 MILLION.  SO THAT'S A SUFFICIENT --

18     THAT'S A LARGE SUM OF MONEY TO WHICH THE GOVERNMENT CONTENDS,

19     WHETHER CORRECTLY OR NOT, THAT THESE ARE FUNDS THAT SHE WOULD

20     HAVE ACCESS TO.

21          MR. FOSTER:  AND I WANT TO BE CLEAR, YOUR HONOR, WHAT

22     WE CONTEND IS THAT WE DON'T KNOW BECAUSE THERE WAS THIS

23     INTENTIONAL PLAN TO PLACE IT OUTSIDE THE UNITED STATES, AND THE

24     FINANCIAL INSTITUTE SHUT DOWN THE ACCOUNT BECAUSE OF INDICIA OF

25     INTERNATIONAL --

```
 1              MR. PETERS:  THEY SHUT IT DOWN BECAUSE OF THE

 2    INDICTMENT.  THAT'S --

 3              THE COURT:  WELL, SO WHERE THE MONEY?

 4              MR. PETERS:  -- EXACTLY WHAT HAPPENED.

 5         THE MONEY IS NOT OUTSIDE THE UNITED STATES.  IT'S HERE.

 6              THE COURT:  WHERE IS THE MONEY?

 7              MR. FOSTER:  THE 1.4 WAS TRANSFERRED TO MAKEBELIEVE,

 8    YOUR HONOR.

 9         AFTER THE TRANSACTIONS, THE FINANCIAL INSTITUTION --

10    THERE'S A REPORT OF INTERVIEW THAT WAS SUBMITTED AS AN EXHIBIT

11    THAT YOUR HONOR CAN REFER TO, AND IT INDICATED THAT HE

12    CONDUCTED AN ANTI-MONEY LAUNDERING INVESTIGATION AND THE NATURE

13    OF THE TRANSFER, THE SIZE, THE LACK OF INTERNET PRESENCE, THE

14    INVOICES, WHICH BORE THE APPEARANCE OF FRAUD, ALL LED THEM TO

15    CLOSE THE ACCOUNT.

16         SO I WANT TO MAKE CLEAR, I DON'T KNOW WHETHER THAT IS --

17              THE COURT:  BUT WHAT HAPPENED TO THE MONEY?

18              MR. FOSTER:  THE MONEY IS GONE.  IT WAS TRANSFERRED.

19              THE COURT:  TO WHERE?

20              MR. FOSTER:  TO MAKEBELIEVE IN HONG KONG.  IT'S BEEN

21    1.4 MILLION --

22              THE COURT:  OH, YOU'RE SAYING THAT THE MONEY --

23              MR. FOSTER:  OH, I CAN ANSWER THAT.

24              THE COURT:  I'M TRYING TO FIND OUT, WHERE IS THE

25    MONEY THAT WENT TO MAKEBELIEVE?
```

1          MR. FOSTER:  IN HONG KONG, YOUR HONOR.

2          THE COURT:  THAT'S IN HONG KONG?

3          MR. FOSTER:  YES.

4          THE COURT:  OKAY.  SO OSTENSIBLY SHE WOULD HAVE

5     ACCESS TO IT, OR SOMEBODY WOULD HAVE ACCESS TO IT.

6          MR. PETERS:  UNLESS IT WAS USED TO PAY CONTRACTORS.

7          THE COURT:  OKAY.  SO YOU HAVE TO -- THAT'S ANOTHER

8     ISSUE.  THAT'S ANOTHER ISSUE.

9          MR. FOSTER:  YES, YOUR HONOR.

10         MR. PETERS:  WELL, THE GOVERNMENT DOESN'T -- I MEAN,

11    THEY -- THEY'RE NOT OFFERING ANY PROOF THAT IT'S AVAILABLE TO

12    HER IN HONG KONG.  THEY'RE JUST SPECULATING THAT IT IS BECAUSE

13    THERE WERE THESE TRANSFERS.

14         BUT THEY KNOW PERFECTLY WELL THAT THE COMPANY EMPLOYS A

15    LARGE NUMBER OF CONTRACTORS AND EMPLOYEES OFFSHORE, AND THEY

16    KNOW, JUST LOGICALLY, THOSE PEOPLE HAVE TO GET PAID.

17         AND THEY HAVE ACCESS TO THE COMPANY'S BOOKS, AND THEY SEE

18    THESE TRANSFERS EVERY MONTH GOING TO MAKEBELIEVE, AND THEY KNOW

19    THAT THE -- I BELIEVE THEY KNOW THAT THE REASON FOR THAT IS TO

20    PAY COMPANY CONTRACTORS.

21         AND THERE ISN'T SOME SLUSH FUND SITTING OUT THERE IN

22    HONG KONG THAT MS. HE IS GOING TO USE BECAUSE THEY HAVE TO PAY

23    THEIR EMPLOYEES.

24         MR. FOSTER:  WHAT WE KNOW, YOUR HONOR, AND WHAT WE

25    SUBMITTED WAS THAT THE DEFENDANT TALKED WITH FOREIGN PARTIES

1     ABOUT OPENING UP BANK ACCOUNTS IN THEIR NAMES TO RECEIVE FUNDS.

2          WE DON'T KNOW WHERE THIS OVERALL APPROXIMATELY 13 MILLION

3     HAS GONE, BUT WE KNOW THAT THAT, IN COMBINATION WITH HER OTHER

4     COMMUNICATIONS, SHOULD LEAD TO AN INFERENCE THAT THERE ARE

5     FUNDS, PEOPLE, A BUSINESS AVAILABLE FOR HER IN THE EVENT OF

6     FLIGHT.

7          AND I THINK YOUR HONOR PUT YOUR FINGER ON IT, WHICH IS

8     THAT THE FINANCES ARE ONE THING, BUT WHAT REALLY DISTINGUISHES

9     THIS CASE FROM THAT OF MR. LYNCH AND OTHERS IS THE DEMONSTRATED

10    SPECIFIC INTENT TO FLEE.  WHETHER THERE'S $13 MILLION OR

11    $500,000 OR $50,000 --

12          THE COURT:  WELL, THIS ISN'T LIKE MR. LYNCH,

13    DR. LYNCH'S CASE IN SOME RESPECTS, MAYBE MOSTLY SIGNIFICANT OF

14    WHICH IS THAT DR. LYNCH REALLY COULDN'T GO ANYWHERE.  I MEAN,

15    HE COULD RETURN TO ENGLAND, BUT ENGLAND EXTRADITED HIM, AND

16    THAT WAS HIS HOME.  SO HE HAD NO SAFE HAVEN.

17          HE WOULD HAVE TO HAVE RESIDED IN A PLACE THAT HAD NO

18    EXTRADITION TREATY WITH THE UNITED STATES, OR WITH ENGLAND FOR

19    THAT MATTER.  AND HIS SITUATION -- SADLY, HIS SITUATION WAS

20    VERY, VERY DIFFERENT FROM THIS SITUATION BECAUSE IF THE

21    DEFENDANT RETURNS TO THE COUNTRY OF HER BIRTH, IN WHICH SHE'S

22    FLUENT IN THE LANGUAGE, IN WHICH RELATIVES LIVE, SHE WON'T BE

23    EXTRADITED TO THE UNITED STATES.  THE CHINESE GOVERNMENT WILL

24    NOT SEND HER BACK HERE.

25          AND SO IT'S A DIFFERENT SITUATION.

1          I USED THE DR. LYNCH SITUATION TO SAY THAT MAYBE THERE ARE

2     A SET OF CIRCUMSTANCES, CONDITIONS, THAT COULD ENSURE HER

3     PRESENCE IN THE UNITED STATES.

4          BUT IT'S NOT -- IT'S NOT -- THEY WOULDN'T NECESSARILY BE

5     THE SAME BECAUSE, ONE -- WELL, FOR THE REASONS I'VE STATED.

6               MR. PETERS:  BUT, YOUR HONOR, DR. LYNCH -- AND I

7      WASN'T INVOLVED IN THAT CASE, BUT DR. LYNCH ALSO FOUGHT

8      EXTRADITION, AND MS. HE VOLUNTARILY HANDED OVER HER PASSPORT

9      AND AGREED TO STAY HERE FOR 18 MONTHS KNOWING THAT THERE WAS

10      THIS INVESTIGATION.

11          I MEAN, IT -- THAT KEEPS GETTING DROPPED FROM THE

12      DISCUSSION, BUT I THINK SHE'S DEMONSTRATED THAT SHE HAS NO

13      INTENTION TO FLEE.

14          AND COUNSEL JUST TALKED ABOUT $13 MILLION.  I HAVEN'T SEEN

15      A SHRED OF EVIDENCE ABOUT $13 MILLION.  I SEE 1.4 TO

16      MAKEBELIEVE, AND WE'VE DISCUSSED THAT.

17          BUT I DON'T KNOW WHAT HE'S TALKING ABOUT WHEN HE TALKS

18      ABOUT $13 MILLION.

19               MR. FOSTER:  WE PRODUCED THE RECORDS TO YOU.

20               MR. PETERS:  YOU PRODUCED THOUSANDS OF PAGES.

21      THERE'S NO -- I HAVE NO IDEA WHAT YOU'RE TALKING ABOUT ABOUT

22      $13 MILLION.

23               MR. FOSTER:  WELL, I --

24               MR. PETERS:  THERE'S NO EVIDENCE BEFORE THE COURT OF

25      ANY $13 MILLION, OTHER THAN WHAT COUNSEL SAYS.

1        AND I UNDERSTAND THE COURT'S CONCERNS ABOUT THE

2    OBSTRUCTION CHARGE.  WE THINK THAT THAT'S NOT A PARTICULARLY

3    STRONG CHARGE.  THE IDEA THAT USING SIGNAL OR WHATSAPP AS A

4    METHOD OF OBSTRUCTING JUSTICE IS SOMETHING WE DON'T THINK IS A

5    STRONG ALLEGATION, BUT THAT'S THE CHARGE IN THE CASE.

6        THE RELATIONSHIP TO HER ABILITY TO FLEE OR HER DESIRE TO

7    FLEE BASED ON THE ALLEGATION THAT SHE USED SIGNAL OR, IN ONE

8    CASE SIX MONTHS BEFORE THERE WAS A GRAND JURY SUBPOENA, CHANGED

9    A DOCUMENT, I UNDERSTAND THAT MAYBE THAT'S TANGENTIALLY

10   RELEVANT TO THE QUESTION OF FLIGHT, BUT VERY TANGENTIALLY.

11            THE COURT:  ARE CONVERSATIONS ABOUT EXTRADITION

12    SIGNIFICANT IN TERMS OF FLIGHT?

13            MR. PETERS:  I THINK THAT THOSE ARE LEGITIMATE THINGS

14    FOR THE COURT TO BE CONCERNED ABOUT.

15        BUT SINCE THEN, SHE HANDED OVER HER PASSPORT AND AGREED TO

16    STAY HERE.

17            THE COURT:  WELL, BECAUSE SHE'S HERE NOW, AND I -- I

18    MEAN, MAYBE SHE THOUGHT -- I DON'T KNOW WHAT SHE THOUGHT.  I

19    DON'T WANT TO PUT MYSELF IN HER FRAME OF MIND.  I DON'T KNOW

20    WHETHER -- SHE DISCUSSES IN SOME DETAIL THAT THE REASON SHE

21    WANTS TO KEEP CASH ON HAND WAS THAT, IN HER VIEW, AS SHE

22    DISCUSSES IT -- HER WORDS -- THAT PERHAPS WHAT THE GOVERNMENT

23    WILL WANT HER TO DO IS TO PAY A FINE OR TO ALTER THE MANNER IN

24    WHICH THE COMPANY IS BEING RUN, AND SHE CITES OTHER COMPANIES

25    AS HAVING BEEN OUT OF COMPLIANCE AND THEN BACK INTO COMPLIANCE

1    WITH THE GOVERNMENT.

2         IT MAY HAVE BEEN HER VIEW THAT THIS WAS A PROBLEM THAT

3    COULD BE RELATIVELY -- "RELATIVE" IS THE OPERATIVE WORD --

4    RELATIVELY EASILY TAKEN CARE OF BY THE PAYMENT OF A FINE OR A

5    FINANCIAL ADJUSTMENT.

6         SHE DIDN'T BELIEVE SHE WAS GOING TO BE ARRESTED.

7         AT A TIME THAT SHE DOES SAY IN A CONVERSATION, DISCUSSES

8    ARREST, IN THAT CONVERSATION, SHE TALKS ABOUT EXTRADITION AND

9    SHE TALKS ABOUT OPENING ACCOUNTS THAT WOULDN'T BE SUBJECT TO

10   GOVERNMENT SCRUTINY.

11        SO TIMES CHANGE.  TIMES CHANGE, AND CIRCUMSTANCES CHANGE.

12        AND I'M QUITE SURE NOW SHE REALIZES THIS IS A VERY SERIOUS

13   MATTER.  SHE'S IN JAIL NOW, AND SHE COULD VERY WELL SPEND THE

14   REST OF HER TIME IN JAIL UNTIL A TRIAL, AND IF SHE'S

15   CONVICTED -- AND FOUR PEOPLE HAVE ALREADY PLED GUILTY AND

16   AGREED TO TESTIFY AGAINST HER -- THAT MAYBE THE LIKELIHOOD IS

17   THAT SHE WOULD BE CONVICTED.

18        AND IF SHE'S CONVICTED, THEN SHE'S NOT GETTING OUT OF JAIL

19   POSSIBLY.

20        I MEAN, WE ALL -- WHAT I'M SAYING IS REALITIES CHANGE OVER

21   TIME AND UNDERSTANDINGS OF REALITIES CHANGE OVER TIME.

22        ANYWAY, I THINK WE'RE AT THE POINT -- AND CORRECT ME IF

23   I'M WRONG -- THAT I SHOULD ALLOW YOU TO BRING IN MR. STESKAL

24   AND THESE FIVE PEOPLE IF YOU WANT TO CONVINCE ME, OR YOU HAVE

25   SOME OTHER MECHANISM, THAT SHE WILL HAVE NO ACCESS TO ANY OF

1    THESE FUNDS, OR HER FRIENDS WON'T HAVE ANY ACCESS TO THESE

2    FUNDS, I'LL CERTAINLY HEAR THAT EVIDENCE.

3               MR. PETERS:  WELL, WHAT ABOUT --

4               THE COURT:  I THINK MR. GRAY WANTS TO CONFER WITH

5    YOU.

6          GO AHEAD, TALK.

7          (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.)

8               MR. PETERS:  ONE THING WE DISCUSSED LAST TIME IS THE

9    POSSIBILITY OF TRYING TO ARRANGE SOME SORT OF PRIVATE SECURITY

10   GUARD OF HER, ALONG THE LINES OF LYNCH.  I MEAN, I'M JUST

11   TRYING TO FIGURE OUT WHAT OPTIONS WE HAVE IN ADDITION TO

12   BRINGING IN EVIDENCE AND CONTINUING TO ARGUE TO YOUR HONOR.

13              THE COURT:  THAT'S A FAIR QUESTION, A VERY FAIR

14   QUESTION.  AND, AGAIN, I WOULD HAVE TO SEE SOME PROPOSALS.

15         BUT ALONG THE LINE OF WHAT DR. LYNCH DID WOULD BE WHAT I

16   WOULD ENVISION, WHICH WOULD BE A 24 HOUR INDEPENDENT SERVICE, A

17   PROTECTIVE SERVICE WHOSE RESPONSIBILITIES WERE TO ENSURE THAT

18   SHE REMAINS UNDER HOUSE ARREST AT A PARTICULAR LOCATION, PLUS A

19   MONITOR -- AND RESTRICT HER TRAVEL, PLUS SOME TYPE OF ANKLE

20   MONITOR OR MONITORING SYSTEM.

21         I MEAN, YOU SAW THE CONDITIONS THAT I IMPOSED WITH

22   DR. LYNCH.  I MODIFIED THEM SOMEWHAT OVER TIME TO ALLOW HIM TO

23   TRAVEL TO VISIT LAWYERS AND SO FORTH AND SO ON, WHICH I WILL DO

24   IN HER CASE AS WELL TO VISIT COUNSEL AS LONG AS SHE WAS

25   ACCOMPANIED BY THE PROTECTIVE SERVICE.

1        SO IT'S NOT -- I WOULDN'T -- I WOULD TRY NOT TO INTERFERE

2    WITH HER ABILITY TO REPRESENT HERSELF.

3            MR. PETERS:  THANK YOU.

4            THE COURT:  AND AGAIN I SAY, I DON'T KNOW WHETHER

5    YOU -- ARE YOU -- YOU SAID SPECIAL APPEARING.  THESE ARE MAGIC

6    WORDS VERY SELDOM USED IN FEDERAL COURTS SINCE THERE'S NO SUCH

7    THING.

8            MR. PETERS:  I --

9            THE COURT:  BUT I DON'T -- I DON'T BELIEVE -- YOU'RE

10   NOT -- IN MY VIEW, YOU'RE HERE FOR THE BAIL PURPOSES.  IF YOU

11   ARE THEN TO REPRESENT HER IN THE TRIAL, YOU WOULD SIMPLY ADVISE

12   ME OF THAT FACT.

13       BUT I DO WANT TO SET A TRIAL, AND I'LL SAY TO YOU, OR

14   ANYBODY ELSE WHO COMES IN, THAT I WILL SET A TRIAL WITHIN THE

15   SPEEDY TRIAL ACT, IN OTHER WORDS, I CAN SET A TRIAL WITHIN 70

16   DAYS.

17           MR. PETERS:  I -- I WANT TO ADDRESS THAT, BECAUSE

18   THAT'S FAIR.  IN FACT, I'M SURPRISED WE'VE GOTTEN THIS FAR

19   WITHOUT YOUR HONOR ASKING ME THAT.

20       WE INTEND TO REPRESENT HER IN THE CASE, BUT I WANT TO SIT

21   DOWN AND REALLY TALK TO HER ABOUT THE CASE AND THE SITUATION IN

22   A WAY WHICH IS VERY HARD TO DO, WE -- THROUGH A PHONE OR EVEN

23   IN A LITTLE ROOM IN SANTA RITA.

24       SO WHAT WE'RE HOPING TO DO IS GET THROUGH THIS PROCESS,

25   WORK OUT -- GET TO "YES" ON TERMS AND CONDITIONS THAT THE COURT

```
 1    WILL ACCEPT SO SHE CAN BE RELEASED, AND THEN SIT DOWN AND MAKE

 2    THAT TYPE OF AGREEMENT WITH HER.

 3         AND THAT'S WHAT WE EXPECT TO HAPPEN, BUT WE HAVEN'T DONE

 4    IT YET BECAUSE WE'VE JUST GOT INVOLVED RECENTLY, WE'VE BEEN

 5    VERY FOCUSSED ON TRYING TO GET HER OUT SO THAT WE CAN HAVE THAT

 6    DISCUSSION.

 7              THE COURT:  WELL, I --

 8              MR. PETERS:  YOUR HONOR KNOWS THAT IT ISN'T JUST

 9    LIKE -- REPRESENTING A PERSON IN A CASE THAT'S COMPLEX LIKE

10    THIS ISN'T JUST LIKE GOING AND --

11              THE COURT:  NO.

12              MR. PETERS:  I REALLY WANT TO SIT DOWN AND BE ABLE TO

13    HAVE A CONFIDENTIAL CLIENT-ATTORNEY CONVERSATION WITH HER ABOUT

14    THE CASE AND REPRESENTING HER, AND I'M HOPING TO DO THAT IN MY

15    OFFICE, NOT IN A LITTLE ROOM AT SANTA RITA.

16              THE COURT:  YEAH, BUT I WOULD SAY THAT -- I CAN'T

17    GIVE YOU AN ASSURANCE ONE WAY OR THE OTHER.

18              MR. PETERS:  I UNDERSTAND.

19              THE COURT:  AS OF NOW, SHE'S IN CUSTODY.  AS OF NOW,

20    I BELIEVE THAT THE GOVERNMENT HAS ESTABLISHED THAT SHE IS A

21    SIGNIFICANT FLIGHT RISK.

22         THAT CAN CHANGE DEPENDING ON WHAT YOU PRESENT TO ME, AND

23    IT'S SORT OF IN YOUR HANDS.

24         BUT, AGAIN, I'LL GO BACK TO THE FACT THAT -- WELL, LISTEN,

25    MAYBE YOU CAN'T MAKE A DECISION RIGHT NOW.  I MEAN, YOU --
```

```
1        THAT'S PERFECTLY UNDERSTANDABLE.

2              MR. PETERS:  MAKE A DECISION ABOUT?

3              THE COURT:  MAKE A DECISION AS TO A TRIAL DATE OR

4        SOMETHING ALONG THAT LINE.  MAYBE YOU CAN'T DO IT NOW.  YOU'RE

5        JUST NOT --

6              MR. PETERS:  I'M SORRY, YOUR HONOR.

7              THE COURT:  YOU'RE NOT INFORMED.

8              MR. PETERS:  I'D REALLY LIKE TO STAY FOCUSSED ON

9        BAIL.  I'D LIKE TO SEE IF WE CAN ADDRESS YOUR HONOR'S

10       CONCERNS --

11             THE COURT:  OKAY.

12             MR. PETERS:  -- AND COME BACK AS SOON AS POSSIBLE

13       WITH A PACKAGE THAT IS ALONG THE LINES OF WHAT WE'VE BEEN

14       DISCUSSING AND SEE IF WE CAN MAKE THAT WORK.

15             THE COURT:  WELL, I CAN SEE YOU NEXT WEEK TOWARDS THE

16       END OF THE WEEK, OR I COULD SEE YOU THE FOLLOWING WEEK.  WHAT

17       DO YOU WANT TO DO?

18             MR. PETERS:  SHOULD -- I MEAN, SHOULD WE SET ANOTHER

19       TIME?  I --

20             THE COURT:  WELL, OR WE CAN NOT SET A TIME --

21             MR. PETERS:  NO, I'D LIKE TO SET A TIME.

22             THE COURT:  -- AND HAVE YOU COME BACK WHEN YOU'RE

23       READY.

24          (DISCUSSION OFF THE RECORD BETWEEN DEFENSE COUNSEL.

25             MR. PETERS:  SHOULD WE JUST CONTACT YOUR HONOR'S
```

```
 1      COURTROOM DEPUTY?

 2              THE COURT:  YEAH, WHY DON'T YOU DO THAT?  I'M -- I

 3      THINK I NEED TO -- I THINK I NEED TO MAKE FINDINGS WITH RESPECT

 4      TO DETENTION BASED UPON THE RECORD AS IT PRESENTLY EXISTS.

 5          I'LL ASK THE GOVERNMENT TO PREPARE FINDINGS IN THAT REGARD

 6      CONSISTENT WITH WHAT I'VE SAID AND CONSISTENT WITH WHAT THE

 7      EVIDENCE IS THAT HAS BEEN PRODUCED.

 8              MR. FOSTER:  YES, YOUR HONOR.

 9              THE COURT:  NOW, SUBJECT TO -- SO IF, IN FACT, YOU

10      THINK AT THIS POINT YOU'RE -- AT THIS POINT, SHE SHOULD HAVE

11      BEEN RELEASED -- WELL, OF COURSE, WE HAVEN'T TALKED ABOUT

12      CONDITIONS.  BUT AS OF NOW, I'M UNAWARE OF CONDITIONS THAT

13      WOULD BE SATISFACTORY BECAUSE NONE HAVE BEEN PROPOSED.

14              MR. PETERS:  YOUR HONOR, WHAT I WOULD ANTICIPATE

15      DOING, IF WE CAN WORK IT OUT, IS TO PROPOSE THE KIND OF

16      CONDITIONS AND ARRANGEMENT THAT YOU'VE JUST DESCRIBED, ALONG

17      WITH WHAT WE'VE ALREADY PROPOSED, AND PRESENT THAT TO THE

18      COURT.

19          BUT I -- THAT'S GOING TO TAKE ME A COUPLE OF DAYS TO PUT

20      THAT TOGETHER.

21              THE COURT:  WELL, SURE.  I DON'T QUITE KNOW HOW TO

22      PROCEED.  IT SEEMS TO ME THAT I -- I SHOULD ISSUE AN ORDER WITH

23      RESPECT TO WHETHER SHE CONSTITUTES A FLIGHT RISK.

24              MR. PETERS:  OR HOLD THE HEARING OPEN UNTIL NEXT

25      WEEK.
```

1        THE COURT:  AND TO SAY, AFTER FINDING THAT AND

2   CONSISTENT WITH IT, THE COURT WILL CONSIDER PROPOSALS TO

3   MITIGATE AGAINST THIS FLIGHT RISK SHOULD SOME BE PRESENTED TO

4   IT, AND LEAVE IT UP TO YOU AS TO WHEN YOU WANT TO RESOLVE IT.

5        I WILL NOT BE HERE MONDAY, TUESDAY, OR WEDNESDAY OF NEXT

6   WEEK?

7             MR. PETERS:  YOU WILL NOT?

8             THE COURT:  I WILL NOT.

9             MR. PETERS:  SO CAN WE PUT IT ON THEN FOR THURSDAY OR

10  FRIDAY OF NEXT WEEK?

11            THE COURT:  SURE.

12            MR. PETERS:  AND I THINK BY THEN WE WILL HAVE OUR

13  DUCKS IN A ROW.

14       I JUST DON'T WANT TO BE FORECLOSED FROM COMING BACK.

15            THE COURT:  YOU'RE NOT FORECLOSED.

16            MR. PETERS:  THANK YOU.

17            THE COURT:  AS A MATTER OF FACT, IN BAIL HEARINGS, I

18  DON'T THINK YOU'RE EVER FORECLOSED.

19            MR. PETERS:  WELL, THE GOVERNMENT HAS ARGUED A COUPLE

20  TIMES THAT WE WERE.  I THINK THAT YOUR HONOR ALWAYS HAS THE

21  AUTHORITY TO MODIFY THE CONDITIONS UP OR DOWN.

22            THE COURT:  I HAD SOME -- WELL, WE'RE NOT IN THE

23  DISTRICT OF NEVADA WHERE APPARENTLY THAT SEEMS TO BE --

24            MR. PETERS:  WE WERE HERE THE OTHER DAY, YOUR HONOR.

25            THE COURT:  -- THAT SEEMS TO BE -- I DON'T KNOW WHERE

```
1        THEY GOT THAT IDEA.

2            I WOULD ALWAYS CONSIDER ANY -- YOU KNOW, I THINK YOU

3        ALWAYS HAVE TO CONSIDER IT, FOR A VARIETY OF REASONS.

4            ANYWAY, OKAY.

5                MR. PETERS:  THE TIME NEXT WEEK?

6                THE COURT:  FRIDAY?  WHAT DO YOU WANT TO DO?

7                THE CLERK:  THURSDAY, AUGUST -- THURSDAY, AUGUST 29TH

8        AT 11:00 A.M.

9                MR. FOSTER:  I SERVE AT THE COURT'S PLEASURE.  IT IS

10       MY BIRTHDAY THAT DAY, SO --

11               THE COURT:  YOUR BIRTHDAY?

12               MR. FOSTER:  YES.

13               MR. PETERS:  WHAT A WONDERFUL DAY TO BE HERE IN

14       SAN FRANCISCO.  YOUR PARENTS ARE IN BERKELEY.  THEY'LL BE

15       HAPPY.

16               THE COURT:  WHAT A WONDERFUL WAY TO SPEND A BIRTHDAY.

17           IF YOU WANT TO APPEAR BY ZOOM, YOU CAN.  AND ALSO, YOU

18       HAVE VERY, VERY COMPETENT LOCAL -- YOU KNOW, YOUR -- THE LOCAL

19       U.S. ATTORNEY'S OFFICE.

20               MR. FOSTER:  OF COURSE, YOUR HONOR.

21               THE COURT:  THEY ARE HIGHLY COMPETENT, AND SHE CAN

22       APPEAR AS WELL.

23           SO YOU WORK OUT HOW YOU WANT TO DO IT.

24               MR. FOSTER:  SURE.

25               THE COURT:  I DON'T -- I TAKE NO INFERENCE BY -- IF
```

1    YOU'RE NOT HERE, THAT DOESN'T MEAN YOU'RE NOT AS INTERESTED IN

2    IT AS YOU WOULD BE IF YOU WERE HERE.  SO THOSE THINGS DON'T --

3    LAWYERS ARE VERY, VERY BUSY.  LAWYERS OUGHT TO HAVE A LIFE

4    INDEPENDENT OF BEING A LAWYER.

5            MR. PETERS:  THAT'S A WONDERFUL ASPIRATION, YOUR

6    HONOR.  I'VE BEEN WORKING ON IT NOW FOR ABOUT, ALMOST 40 YEARS.

7    LET ME SEE IF I CAN GET THERE.

8            THE COURT:  TOO ASPIRATIONAL.

9            MR. PETERS:  WHAT WE WILL DO, YOUR HONOR, IS IF WE

10   CAN COME UP WITH AN ARRANGEMENT THAT WE THINK MAY MEET WITH

11   YOUR HONOR'S APPROVAL, I THINK WE'LL SUBMIT A PROPOSED ORDER,

12   WITH A COPY TO THE GOVERNMENT, AND THEY'LL PROBABLY OBJECT AND

13   THEN WE'LL COME BEFORE YOUR HONOR TO DISCUSS IT.

14       BUT IT'S LIKELY TO INVOLVE THE KIND OF MONITORING THAT WE

15   DISCUSSED IF WE CAN GET THAT IN PLACE FROM A REPUTABLE,

16   INDEPENDENT COMPANY.

17           THE COURT:  WELL, MONITORING IS ONE THING, AND THE

18   OTHER THING IS ACCESS TO FUNDS, ACCESS TO FUNDS.  FUNDS.

19   MONEY.  MONEY.

20           MR. PETERS:  WELL --

21           THE COURT:  BECAUSE THE, THE FUNDS PRESENT A REAL

22   PROBLEM IN THE COURT'S VIEW.

23           MR. PETERS:  IN YOUR MIND -- IN THE --

24           THE COURT:  OF COURSE I DID -- YOU CAN SAY WITH

25   DR. LYNCH, OF COURSE, HE HAD UNLIMITED FUNDS.

1           BUT, AGAIN, THE DIFFERENCE BEING, BETWEEN THE TWO, IS THAT

2      IF THE FUNDS WERE AVAILABLE TO HER -- IF I'M CONVINCED THAT

3      THEY COULD BE AVAILABLE TO HER IN CHINA AND THERE IS NO

4      EXTRADITION TREATY AND THAT'S WHERE SHE WOULD FLEE TO, THAT

5      PRESENTS AN ISSUE DIFFERENT FROM DR. LYNCH'S, AND THAT AS WELL

6      HAS TO BE ADDRESSED, TO THE EXTENT IT CAN BE.

7           MR. PETERS:  BUT, YOUR HONOR, I -- NO, IT'S HELPFUL

8      TO HEAR THE COURT'S CONCERNS, BECAUSE IF SHE HAS 24 HOUR, 7 DAY

9      A WEEK GUARD, AND AN ANKLE BRACELET ON, AND BAIL CONDITIONS AND

10     MONEY POSTED, SHE WOULD HAVE TO -- AND NO PASSPORT, SHE WOULD

11     HAVE TO SHAKE THE GUARD, CUT OFF THE ANKLE BRACELET, AND

12     SOMEHOW GET HERSELF TO CHINA.

13          THE COURT:  WELL, PUT IT ALL TOGETHER IN A WAY THAT

14     YOU THINK IS BEST.

15          MR. PETERS:  OKAY.

16          THE COURT:  I'VE IDENTIFIED TWO SETS OF CONCERNS THAT

17     I HAVE.

18          MR. PETERS:  DO YOU HAVE OTHER CONCERNS THAT WE NEED

19     TO ADDRESS?  I APPRECIATE YOUR HONOR TELLING US YOUR CONCERNS,

20     BECAUSE WE HAVE TO ADDRESS THEM.

21          THE COURT:  OKAY.

22          MR. PETERS:  ARE THERE OTHERS?  OR IS THAT --

23          THE COURT:  I MEAN, MAYBE THERE SHOULD BE SOME

24     EXPLANATION OF WHY SHE'S DELETING ALL THIS INFORMATION.

25          MR. PETERS:  WELL, I MEAN --

```
 1              THE COURT:  WHY SHE DELETES ALL THIS INFORMATION.

 2     BECAUSE -- AND WHY SHE IS SEEKING INFORMATION ABOUT

 3     EXTRADITION.

 4          I MEAN, THOSE ARE THINGS THAT ARE TROUBLESOME.

 5              MR. PETERS:  RIGHT.  YOU'VE SHARED THOSE.  WE'VE

 6     DISCUSSED THOSE, YEAH.

 7              THE COURT:  OKAY.

 8              MR. FOSTER:  THANK YOU, YOUR HONOR.

 9              THE COURT:  OKAY.

10              MR. PETERS:  WE'LL SEE YOU NEXT WEEK.

11              THE COURT:  I GUESS SO.

12              MR. PETERS:  THANK YOU VERY MUCH, YOUR HONOR.  HAVE A

13     GOOD WEEKEND.

14              THE COURT:  THANK YOU.

15              THE CLERK:  THAT CONCLUDES THE CALENDAR.  THANK YOU.

16          (THE PROCEEDINGS WERE CONCLUDED AT 12:04 P.M.)

17

18

19

20

21

22

23

24

25
```

1

2

3                    CERTIFICATE OF REPORTER

4

5

6

7        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11       THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____
     LEE-ANNE SHORTRIDGE, CSR, CRR
17   CERTIFICATE NUMBER 9595

18          DATED:  AUGUST 25, 2024

19

20

21

22

23

24

25

Exhibit 41



存案 Filed

公司編號 CR No.
**3281340**

公司註冊處
**Companies Registry**

法團成立表格
**(股份有限公司)**
**Incorporation Form**
**(Company Limited by Shares)**

表格
**Form** **NNC1**

**1**  建議採用的公司名稱 **Proposed Company Name**

建議採用的公司英文名稱 **Proposed English Company Name**

> Makebelieve Asia Consultancy Limited

建議採用的公司中文名稱 **Proposed Chinese Company Name**

> 香港美克國際諮詢服務有限公司

**2**  公司類別 **Type of Company**
*請在適用的空格內加上 ✓ 號 Please tick the relevant box*

☑ 私人 Private          ☐ 公眾 Public

**3**  公司在香港的註冊辦事處的建議地址
**Proposed Address of the Company's Registered Office in Hong Kong**

> UNIT B, 13/F

> SHING LEE COMMERCIAL BUILDING

> No.8 WING KUT STREET CENTRAL

> Hong Kong

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

**4**  電郵地址 **Email Address**

---

本處專用 **For Official Use**

Document Ref. No.:▉▉▉▉▉

Submission Date:22/05/2023

Resubmission Date:

*e*

表格
Form **NNC1**

**5  公司組成時的股本及最初的股份持有情況**
**Share Capital and Initial Shareholdings on the Company's Formation**

| 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary ／<br>Preference etc.) | 建議發行的<br>股份總數<br>Total Number of<br>Shares Proposed<br>to be Issued | 貨幣<br>Currency | 創辦成員認購的<br>股本總額<br>Total Amount of<br>Share Capital to be<br>Subscribed by<br>Founder Members<br><br>(a) | 建議發行的股份的<br>將要繳付或視為<br>已繳付的總款額<br>Total Amount to be<br>Regarded as Paid Up<br>on the Shares<br>Proposed to be Issued<br>(b) | 建議發行的股份的<br>尚未繳付或視為<br>尚未繳付的總款額<br>Total Amount to<br>Remain Unpaid or to<br>be Regarded as<br>Unpaid on the Shares<br>Proposed to be Issued<br>(a) − (b) |
|---|---|---|---|---|---|
| Ordinary | 10,000 | HKD | 10,000 | 10,000 | 0 |
| | | | | | |
| | | | | | |
| **總值 Total** | 10,000 | HKD | 10,000 | 10,000 | 0 |
| | | | | | |

**5A  股份所附帶的權利的詳情 Particulars of Rights Attached to Shares**
*(只適用於發行超過一類股份的公司 Only applicable to company issuing more than 1 class of shares)*

| 股份的類別<br>(如普通股／<br>優先股等)<br>Class of Shares<br>(e.g. Ordinary／<br>Preference etc.) | 附帶的權利的詳情<br>(包括表決權；在分派股息時參與該項分派的權利；<br>在分派股本時參與該項分派的權利；該類別股份是否屬可贖回股份等)<br>Particulars of Rights Attached<br>(Including voting rights; rights to participate in a distribution as respects dividends;<br>rights to participate in a distribution as respects capital; whether the shares are redeemable etc.) |
|---|---|
| | |

表格
Form **NNC1**

## 6 創辦成員 Founder Members

**1** 中文姓名／名稱
**Name in Chinese**

朱繹穎

英文姓名／名稱
**Name in English**

Z⬛ Y⬛⬛⬛

地址
**Address**

⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛⬛

⬛⬛⬛

國家／地區
**Country／Region**

China

認購的股本
**Share Capital to be Subscribed**

| 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary／Preference etc.) | 建議向該成員發行的股份數目<br>Shares Proposed to be Issued to the Member | | |
|---|---|---|---|
| | 總數<br>Total Number | 貨幣<br>Currency | 總款額<br>Total Amount |
| Ordinary | 10,000 | HKD | 10,000 |
| | | | |
| | | | |
| **總值 Total** | 10,000 | HKD | 10,000 |
| | | | |

**2** 中文姓名／名稱
**Name in Chinese**

英文姓名／名稱
**Name in English**

地址
**Address**

國家／地區
**Country／Region**

認購的股本
**Share Capital to be Subscribed**

| 股份的類別<br>(如普通股／優先股等)<br>Class of Shares<br>(e.g. Ordinary／Preference etc.) | 建議向該成員發行的股份數目<br>Shares Proposed to be Issued to the Member | | |
|---|---|---|---|
| | 總數<br>Total Number | 貨幣<br>Currency | 總款額<br>Total Amount |
| | | | |
| | | | |
| | | | |
| **總值 Total** | | | |

表格
Form **NNC1**

## 7 首任公司秘書 First Company Secretary

### A. 公司秘書(自然人) Company Secretary (Natural Person)

**1 中文姓名**
**Name in Chinese**

英文姓名 **Name in English**

姓氏
Surname

名字
Other Names

前用姓名
**Previous Names**

| 中文 Chinese | 英文 English |
|---|---|

別名
**Alias**

| 中文 Chinese | 英文 English |
|---|---|

香港通訊地址
**Hong Kong**
**Correspondence**
**Address**

Hong Kong

*(本處不接納郵政信箱號碼 Post office box numbers are not acceptable)*

電郵地址
**Email Address**

*(須在*
*PI-NNC1 頁*
*填報完整*
*身分識別號碼*
*Provide full*
*identification*
*number in*
*PI-NNC1 sheet)*

身分識別 **Identification**

**(a)** 香港身分證部分號碼
**Partial Number** of Hong Kong Identity Card

**\*\*\*(\*)**

**(b)** 護照
Passport

| 簽發國家／地區 Issuing Country／Region | 部分號碼 Partial Number |
|---|---|

### B. 公司秘書(法人團體) Company Secretary (Body Corporate)

**1 中文名稱**
**Name in Chinese**

創易會計事務有限公司

英文名稱
**Name in English**

ECB Accounting Services Limited

香港地址
**Hong Kong**
**Address**

UNIT B, 13/F

SHING LEE COMMERCIAL BUILDING

No.8 WING KUT STREET CENTRAL

Hong Kong

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

電郵地址
**Email Address**

公司編號 **Company Number**

■■■■■

表格
Form **NNC1**

**8  首任董事 First Directors**

**A.  董事(自然人) Director (Natural Person)**

1  中文姓名
Name in Chinese
朱繹穎

英文姓名 Name in English

姓氏
Surname
Z⬛

名字
Other Names
Y⬛

前用姓名
Previous Names

| 中文 Chinese | 英文 English |
|---|---|

別名
Alias

| 中文 Chinese | 英文 English |
|---|---|

*(須在
PI-NNC1 頁
填報董事
通常住址
Provide
director's usual
residential
address in
PI-NNC1 sheet)*

通訊地址
Correspondence
Address
⬛⬛⬛
⬛⬛⬛
⬛⬛

國家／地區
Country／Region
China

*(本處不接納郵政信箱號碼 Post office box numbers are not acceptable)*

電郵地址
Email Address

*(須在
PI-NNC1 頁
填報完整
身分識別號碼
Provide full
identification
number in
PI-NNC1 sheet)*

身分識別 Identification

(a)  香港身分證部分號碼
**Partial Number** of Hong Kong Identity Card        **∗∗∗(∗)**

(b)  護照
Passport

| China | 310102199 |
|---|---|
| 簽發國家／地區 Issuing Country／Region | 部分號碼 **Partial Number** |

**提示 Advisory Note**

所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。
**All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide.**

**出任董事職位同意書 Consent to Act as Director**
*請在適用的空格內加上 ✓ 號 Please tick the relevant box*

✓  本人同意在公司成立為法團時擔任其董事，並確認本人已年滿 **18** 歲。
**I consent to be a director of the company on its incorporation and confirm that I have attained the age of 18 years.**

簽署 Signed  :  ⬛⬛        Signed by PIN

☐  出任董事職位同意書會於公司成立為法團的日期後 **15** 日內交付登記。
**The Consent to Act as Director will be delivered for registration not later than 15 days after the date of incorporation of the company.**

表格
Form **NNC1**

**8** 首任董事 First Directors    (續上頁 cont'd)

**B.** 董事(法人團體) Director (Body Corporate)

**1** 中文名稱
Name in Chinese

英文名稱
Name in English

地址
Address

國家／地區
Country／Region

*(本處不接納「轉交」地址或郵政信箱號碼 'Care of' addresses or post office box numbers are not acceptable)*

電郵地址
Email Address

公司編號 Company Number
*(只適用於在香港註冊的法人團體 Only applicable to body corporate registered in Hong Kong)*

---

提示 **Advisory Note**

所有公司董事均應閱讀公司註冊處編製的《董事責任指引》，並熟悉該指引所概述的董事一般責任。
**All directors of the company are advised to read 'A Guide on Directors' Duties' published by the Companies Registry and acquaint themselves with the general duties of directors outlined in the Guide.**

---

出任董事職位同意書 **Consent to Act as Director**
*請在適用的空格內加上 ✓ 號  Please tick the relevant box*

☐ 本人獲上述法人團體授權確認上述法人團體同意在公司成立為法團時擔任其董事。
**I, being authorized by the above body corporate, confirm that the body corporate consents to be a director of this company on its incorporation.**

簽署 Signed  : _____

☐ 出任董事職位同意書會於公司成立為法團的日期後 **15** 日內交付登記。
**The Consent to Act as Director will be delivered for registration not later than 15 days after the date of incorporation of the company.**

表格
Form **NNC1**

**9  創辦成員陳述書 Statement of Founder Member**

本人現核證 I certify that：

**(a)**  本人為公司的創辦成員或獲其授權人士(如創辦成員為法人團體)並獲其他創辦成員(如有的話)授權簽署本表格。
I am a founder member of this company or an authorized person of a founder member, which is a body corporate (if applicable) and am authorized by the other founder members (if any) to sign this incorporation form.

**(b)**  名列本表格內的每一名屬自然人的公司秘書通常居於香港。
Each of the company secretaries named in this form who is a natural person ordinarily resides in Hong Kong.

**(c)**  名列本表格內但未簽署「出任董事職位同意書」的每一名董事已同意在公司成立為法團時擔任其董事，每一名屬自然人的董事並且已年滿 **18** 歲。
Each of the directors named in this form who has not signed the 'Consent to Act as Director' has consented to be a director of this company on its incorporation and each director who is a natural person has attained the age of 18 years.

**(d)**  所有創辦成員已為《公司條例》第 **67(1)(a)** 條的目的而簽署公司的章程細則，並確認連同本表格交付的公司章程細則的文本的內容，與由所有創辦成員簽署的該等章程細則的內容相同。
The company's articles have been signed by all founder members for the purposes of section 67(1)(a) of the Companies Ordinance.  The contents of the copy of the company's articles delivered together with this form are the same as those of the articles signed by all founder members.

**(e)**  本表格所載的資料、陳述及詳情均屬準確，並與公司的章程細則內的資料、陳述及詳情相符。
The information, statements and particulars contained in this form are accurate and consistent with those contained in the company's articles.

**(f)**  公司已遵守《公司條例》中就有關公司註冊的所有規定。
All the requirements of the Companies Ordinance in respect of the registration of the company have been complied with.

本表格包括的 **PI-NNC1** 頁的數目
**Number of PI-NNC1 Sheet(s) included in this Form**
(PI-NNC1 頁不會供公眾查閱 **PI-NNC1 Sheet is NOT for Public Inspection**)

| 1 |
| --- |

簽署  Signed: ██  *Signed by PIN*

姓名  Name： Z██ Y████

創辦成員 **Founder Member**

日期 Date： ████████

日 DD ／ 月 MM ／ 年 YYYY

Exhibit 42



**From:** Elliot Peters ████████████████ >
**Sent:** Saturday, August 24, 2024 1:11 PM
**To:** Foster, Jacob (CRM) < ███████████████ >; Green, Kristina (USACAN) < ███████████████ >;
Lloyd-Lovett, Katherine (USACAN) < █████████████ >
**Cc:** Nic Marais ████████████████ >; Cody Gray ████████████████ >
**Subject:** [EXTERNAL] Bail

Hello Jacob, Kristina, Katie,

Jacob, we hope you made it safely back home to DC.  It is actually way nicer in the East Bay (although foggy today.)

Having listened to the Court's comments yesterday it seems clear that we will have to do a lot to get Ruthia out on bail, but also that Judge Breyer will ultimately release her if we can address his concerns with an appropriate combination of bail conditions.  I am hoping that we can work together to try and vet conditions and terms to make that possible without lots more friction or adversarial proceedings.  This message is written in that spirit.

In addition to the terms that we have already proposed in the Order we submitted last week, we propose to add the following:

1. 24/7 guard, from a reputable company.  We will get you a fairly detailed proposal Monday or asap.  We would follow the Lynch protocol on this term.
2. A mechanism at DONE to provide comfort that all cash transfers are for legitimate and actual business purposes and not to create a fund that could facilitate flight.  We are thinking about proposing to Company counsel and management in this regard that all cash is maintained in an account from which all disbursements can only occur after approval by a trusted third party monitor, who would be a former IRS or FBI agent (or the like) who has no prior relationship to Ruthia.  That would negate any access by Ruthia to the company's cash
3. That we satisfy you or the Court with evidence (either documents or testimony) that the MakeBelieve transfers were for legitimate expenses and did not in any fashion create a fund to facilitate flight by Ruthia.  Please consider what evidence would satisfy you in the first instance in this regard.  We believe what I said in Court, that the money was used for legitimate corporate expenses.
4. (Addressing Jacob's comments on the phone to us last Thursday). That upon release, Ruthia not have access to any encrypted applications, so that she could not communicate furtively with persons.  She could still use the internet, communicate with counsel, family, friends, etc.

We believe that this addresses all of the Court's concerns, and we presently intend (subject to modification) to prosper these terms to Judge Breyer next week.  Would this be acceptable to the Government?  If not, what other terms would you require?

Thank you for your consideration of these matters.  Apologies for reaching out on a Saturday.

Best,

Elliot

Exhibit 43
Under Seal

# Exhibit 44



**From:**
**To:**
**Cc:**
**Subject:** [EXTERNAL] FW: Resignation from Board
**Date:** Monday, August 26, 2024 7:42:47 PM
**Attachments:** image001.png

FYI. The below email announcing ██ ██ resignation from the Done Global board was sent to Ms. He this afternoon via her attorney, V██ ██

T██

T██ P. C██
Shareholder

Greenberg Traurig, LLP
1840 Century Park East | Suite 1900 | Los Angeles, CA 90067-2121
T +1 310.586.7827 | F +1 310.586.7800 | C +1 213.241.9645
T██ ██ | ██ | View GT Biography

**From:** ██ ██ >
**Sent:** Monday, August 26, 2024 3:33 PM
**To:** V██ ██ >; Ruthia He ██
**Cc:** C██ , T██ (Shld-LA-LT) ██ >
**Subject:** Resignation from Board

**\*EXTERNAL TO GT\***

Dear Ms. He (c/o V██ C██ ),

It is with a heavy heart that I send this letter to you. Unfortunately, I hereby resign my position as a member of the board of Done Global. As you know, since learning of the allegations against the company, I have attempted to take steps which I believed were not only in Done's best interests, but were imperative if I were to continue advising the board.

Through counsel, I have made several attempts to have my proposals considered and accepted by Done, yet apart from being asked to wait for an indefinite period of time, I have received virtually no response and no communication from the company's leaders. While it is not clear to me if the silence is simply due to the unfortunate circumstances of my fellow board member or an unwillingness on the part of the company to follow my recommendations, I cannot wait any longer to be

heard on this matter.

I am saddened that the circumstances have led to this outcome.  Please know that I wish you and Done success in the future.

Sincerely,

S C

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at ████████████████, and do not use or disseminate the information.

Exhibit 45

| Name | Start Date | Type | Location | Title |
|------|-----------|------|----------|-------|
| N███ M████ | 4/13/2020 | Full-time Employee | San Francisco, CA | Group Leader \| Patient Care |
| Ruthia He | 5/9/2020 | Full-time Employee | San Francisco, CA | Founder |
| E███ M██ R██ | 5/24/2021 | Full-time Employee | Brookhaven, GA | Associate \| Provider Success |
| W██████████ A██ | 7/6/2021 | Full-time Employee | Irvine, CA | Associate \| Paid Marketing |
| David Brody | 7/13/2021 | Full-time Employee | San Rafael, CA | Group Leader \| Clinical President |
| S███████ N███ | 7/26/2021 | Full-time Employee | Venus, TX | Lead NP |
| L████ H███ | 8/18/2021 | Full-time Employee | Baltimore, MD | Provider Relationship Manager |
| C██ C█ | 9/7/2021 | Full-time Employee | Livingston, NJ | Associate \| Provider Recruiter |
| E███ J█ W██ | 1/10/2022 | Full-time Employee | Oswego, NY | Associate \| Provider Success |
| H███ J█ J█ (█████) | 2/28/2022 | Full-time Employee | Remote | Software Engineer |
| S███████ M██ Da██ | 2/28/2022 | Full-time Employee | Chandler, AZ | Associate \| Program Management |
| L████ E██ S██ | 3/14/2022 | Full-time Employee | Seattle, WA | Provider Relationship Manager |
| M█ C█ | 3/17/2022 | Full-time Employee | San Francisco, CA | Executive Leader \| Finance & Strategy |
| S█████ L██ | 9/12/2022 | Full-time Employee | Logan, UT | Executive Assistant |
| L██████ M██ | 10/3/2022 | Full-time Employee | San Juan | Product Manager |
| R████ W██ C█ | 10/3/2022 | Full-time Employee | Upland, CA | Engineering - Design |
| T████ Gr██ | 10/17/2022 | Full-time Employee | New York City, NY | Head of Payor Product |
| K████ J█ | 12/5/2022 | Full-time Employee | Staunton, VA | Lead NP |
| L████ | 44949 | Full-time Employee | Seattle, WA | PMHNP |
| R███ T█ | 2/20/2023 | Full-time Employee | Venus Texas | PMHNP |
| S████ A█ | 2/27/2023 | Full-time Employee | Lake Frederick, VA | Senior Executive Leader |
| S█████ Ha██ | 3/1/2023 | Full-time Employee | Bedford, VA | Clinical Recruiter |
| S█████ D██ | 3/13/2023 | Full-time Employee | Bethlehem, PA | Medical Director |
| A████ G██ | 3/6/2023 | Full-time Employee | Sanford FL | Senior Recruiter |
| S██████ S█ | 3/13/2023 | Full-time Employee | El Portal FL | Head of Market Ops |
| A████ L██ | 3/1/2023 | Full-time Employee | Wolverine Lake, MI | PMHNP |
| K████ L██ | 3/1/2023 | Full-time Employee | Maiden, North Carolina | PMHNP |
| E█████ L█ | 2/21/2023 | Full-time Employee | Miami, FL | PMHNP |

| Name | Start Date | Type | Location | Title |
|---|---|---|---|---|
| J▮▮ L▮ | 7/28/2020 | Independent Contractor (FT) | Sichuan | Software Engineer |
| J▮ F▮ | 11/1/2020 | Independent Contractor (FT) | Diamond Village Salav | Care Manager |
| M▮ X▮ | 12/14/2020 | Independent Contractor (FT) | Ontario | Team Leader \| Engineering |
| F▮ C▮ | 2/1/2021 | Independent Contractor (FT) | Alberta | Care Team Lead |
| F▮ C▮ C▮ | 2/21/2021 | Independent Contractor (FT) | San Francisco, CA | Associate \| Patient Care |
| H▮ S▮ | 3/5/2021 | Independent Contractor (FT) | Canyon, CA | Care Team Lead |
| A▮ R▮ | 5/19/2021 | Independent Contractor (FT) | Manila | Care Manager |
| M▮ J▮ M▮ | 8/16/2021 | Independent Contractor (FT) | Jersey City, NJ | Associate \| Marketing |
| E▮ B▮ B▮ | 8/30/2021 | Independent Contractor (FT) | Karachi, Sindh | Associate \| Business Operations |
| S▮ F▮ | 9/1/2021 | Independent Contractor (FT) | Wenzhou | Software Engineer |
| A▮ A▮ | 10/18/2021 | Independent Contractor (FT) | İstanbul | Scheduling Associate |
| E▮ L▮ | 12/22/2021 | Independent Contractor (FT) | Navarre, FL | Associate \| Marketing |
| J▮ D▮ | 1/10/2022 | Independent Contractor (FT) | Monte Sereno, CA | Group Leader \| Brand & Marketir |
| X▮ Y▮ | 2/28/2022 | Independent Contractor (FT) | Hangzhou | Software Engineer |
| D▮ G▮ | 2/28/2022 | Independent Contractor (FT) | Santo Domingo | Scheduling Associate |
| C▮ R▮ | 3/29/2022 | Independent Contractor (FT) | Stone Mountain, GA | Care Team Lead |
| Y▮ W▮ | 4/11/2022 | Independent Contractor (FT) | Beijing | Project Manager |
| A▮ | 6/18/2022 | Independent Contractor (FT) | Shenzen | Growth Manager |
| J▮ L▮ | 6/30/2022 | Independent Contractor (FT) | Shanghai | Project Manager |
| W▮ C▮ | 7/18/2022 | Independent Contractor (FT) | Kitchener | Project Manager |
| J▮ R▮ | 7/30/2022 | Independent Contractor (FT) | | Care Manager |
| A▮ y K▮ | 8/17/2022 | Independent Contractor (FT) | Alberta | Biz Ops Manager |
| H▮ Y▮ | 8/28/2022 | Independent Contractor (FT) | Shanghai | Project Manager |
| A▮ W▮ | 9/5/2022 | Independent Contractor (FT) | Shanghai | Growth Manager |
| W▮ W▮ | 9/12/2022 | Independent Contractor (FT) | Austin, TX | Product Designer |
| K▮ Z▮ | 9/26/2022 | Independent Contractor (FT) | Hangzhou | Product Manager |
| Y▮ Z▮ | 9/29/2022 | Independent Contractor (FT) | Beijing | Growth Manager |
| C▮ S▮ | | Independent Contractor (FT) | | Clinical Recruiter |
| L▮ Y▮ | 11/22/2022 | Independent Contractor (FT) | Chengdu | Project Manager |
| N▮ T▮ | 11/24/2022 | Independent Contractor (FT) | Chengdu | Operations Assistant |
| R▮ M▮ | 12/15/2022 | Independent Contractor (FT) | | Nurse Practitioner |

| █ █ | 1/16/2023 | Independent Contractor (FT) | Chicago, IL | Operations Manager |
|---|---|---|---|---|
| █ █ | 1/25/2023 | Independent Contractor (FT) | San Francisco, CA | Ops Consultant |
| █ █ █ | 2/1/2023 | Independent Contractor (FT) | Shanghai | Ops Project Manager |
| █ █ | 2/1/2023 | Independent Contractor (FT) | Gainesville, FL | Medical Director |
| █ █ | 2/13/2023 | Independent Contractor (FT) | Hangzhou | Operations Assistant |
| █ █ | 2/20/2023 | Independent Contractor (FT) | | Care Coordinator |
| █ █ | 2/27/2023 | Independent Contractor (FT) | Beijing | Legal Consulant |
| █ █ | 2/27/2023 | Independent Contractor (FT) | Mountain View, CA | Software Engineer |
| █ █ | 3/1/2023 | Independent Contractor (FT) | Shanghai | Software Engineer |
| █ █ | 3/13/2023 | Independent Contractor (FT) | Shanghai | QA engineer |
| █ █ | 3/28/2023 | Independent Contractor (FT) | | Fractional CISO |
| █ █ | 4/3/2023 | Independent Contractor (FT) | San Francisco | Growth Consultant |
| █ █ | 12/15/2020 | Independent Contractor (PT) | Chunhua, Fujian | Software Engineer (Hourly) |
| █ █ | 11/7/2022 | Independent Contractor (PT) | San Francisco | Operations consultant |
| █ █ | 1/16/2023 | Independent Contractor (PT) | Houston, TX | HR Consultant |
| █ █ | | Independent Contractor (PT) | Shanghai | Project Manager |
| █ █ | 3/1/2023 | Independent Contractor (PT) | St Clermont FL | PMHNP |

Exhibit 46

# PCQS ELIS Details

**Role** Petitioner — **Category** Petition for a Nonimmigrant Worker:H-1B Classification — **Description** IOE8194709947: Single-Applicant Case
**Activity Date** 02/26/2024 — **Result** Approved — **Result Date** 03/01/2024

**Actions** ▾

## Petitioner Header

| | |
|---|---|
| **Name** | DONE GLOBAL INC, |
| **Alien Number** | |
| **Account ID** | |
| **I-94 Number** | |
| **Naturalization Number** | |
| **Naturalization Date** | |
| **Certificate Type** | |
| **Certificate Status** | |
| **Date of Birth** | |
| **Country of Birth** | |
| **Place of Birth** | |
| **Gender** | |
| **Case ID** | ▇▇▇▇ |
| **Case State** | Closed |
| **Case Status** | Approved |
| **Case Sub Status** | Closed - Approved |
| **USCIS Office** | CALIFORNIA SERVICE CENTER |

## Petitioner Details

| | |
|---|---|
| **Daytime Phone** | ▇▇▇▇ |
| **Mobile Phone** | |
| **Email** | ▇▇▇▇ |
| **Email Address Type** | Other |
| **Source Reference** | EXTERNAL |
| **Mailing Address** | ▇▇▇▇ |
| **Physical Address** | ▇▇▇▇ |
| **In Care of Name** | |
| **Address 1 Date From** | |
| **Address 1 Date To** | |
| **Interpreter** | |
| **Preparer's Business or Organization Name** | |

## Petitioner Biographics

| | |
|---|---|
| **Date of Birth** | |
| **Country of Birth** | |
| **Country of Citizenship / Nationality** | Unknown |
| **Gender** | |
| **Marital Status** | |
| **Height** | |
| **Weight** | |
| **Race/Ethnicity** | / |
| **Eye Color** | |
| **Hair Color** | |
| **Father's Given Name** | |
| **Mother's Given Name** | |

## Case Details

| | |
|---|---|
| **Case ID** | ▇▇▇▇ |
| **Form Number** | I-129H1B - Petition for a Nonimmigrant Worker:H-1B Classification |
| **Receipt Number** | IOE8194709947 |
| **Receipt Date - ELIS** | 02-26-2024 |
| **Receipt Date - Lockbox** | 02-26-2024 |
| **Case Status** | Approved |
| **Case Status Date** | 03-01-2024 |
| **Case Eligibility** | |
| **Basis of Eligibility** | New employment |
| **Section of Law** | |
| **Case State** | Closed |
| **Case State Date** | 02-26-2024 |
| **Card Issue Date** | |
| **Card Expiration Date** | |
| **Card Serial Number** | |
| **Name on Card** | |
| **Name Legally Changed** | |
| **IV Issued Date** | |
| **Social Security Number** | |
| **Class of Admission** | H1B |
| **Date of Admission** | 10-18-2023 |
| **Application Type** | Petition for a Nonimmigrant Worker:H-1B Classification |
| **Reason for Application** | New employment |
| **Port of Entry** | |
| **Admission Port of Entry** | |
| **Applied for at** | |
| **Received at** | |
| **Destination at Time of Admission** | |
| **Ordered Removed from U.S.** | |
| **Filed I-407/ Has Abandoned** | |
| **Requesting Accommodation** | false |
| **Preparer's Name** | |

## PCQS ELIS Details

**Category** Petition for a Nonimmigrant Worker:H-1B Classification — **Description** IOE8194709947: Single-Applicant Case
**Activity Date** 02/26/2024 — **Result** Approved — **Result Date** 03/01/2024

| | |
|---|---|
| Preparer's Mailing Address | |
| Filing Fee | 460 |
| Biometric Fee | |
| Referral Reason | |
| Assigned Date | |
| Assigned To | |
| Case Account Role | |
| Owner | |
| Current USCIS Location | CALIFORNIA SERVICE CENTER |
| Deposit Receipt | |
| External Financial System | IOE8194709947 |
| Fee Type | Form Fee |
| Payment Amount | 460 |
| Payment Date | 02-27-2024 |
| Payment Method | N/A |
| Payment Processor | OTCNET |
| Payment Status | Settled |
| Document Subcategory | |
| Document Title | |
| Document Mailing Preferred Type | |
| Intent Notices | |
| Notices Status | Print Success |
| Notices Source System | ELIS2 |
| Notices Reissue Indicator | false |
| Notices Transaction ID | 3070246245 |
| Document Status | |
| Notices Action | |
| Case Decision Notices | |
| Other Notices | |
| RFE Notices | |
| Ten Print Image Present | false |
| Biometrics Transaction ID | |
| Biometrics Capture Time | |
| Signature Waiver | |
| Employment End Date | |
| I-94 Validity Date | 02-28-2027 |
| Cap Petition | N |

## Representative Attorney Details

| | |
|---|---|
| Rep Type | A |
| Last Name | S▇ |
| First Name | N▇ |
| Middle Name | N▇ |
| Firm Name | LAW OFFICES OF NAN SHEN |
| Address Type | Mailing Address |
| Street Address | ▇▇▇▇ |
| City | ▇▇▇ |
| State | ▇ |
| ZIP Code | ▇▇ |
| Postal Code | |
| Province | |
| Country | United States |
| Attorney State License # | ▇▇ |
| USCIS Attorney # | ▇▇▇ |

## Beneficiary

| | |
|---|---|
| Last Name | Z▇ |
| First Name | R▇ |
| Middle Name | N▇ |
| Date of Birth | ▇▇▇ |
| Country of Birth | China |
| Alien Number | |
| Social Security Number | ▇▇ |
| Gender | Female |
| Email | |
| City | ▇▇▇ |
| State | ▇ |
| Postal Code | |
| Country | United States |

## Attorney / In Care Of Information

| | |
|---|---|
| Attorney Phone | ▇▇▇ |
| Attorney Email | ▇▇▇▇ |
| Attorney Fax | ▇▇▇ |
| In Care Of | R▇▇▇ |
| In Care Of Phone | ▇▇▇ |
| In Care Of Email | ▇▇▇ |
| In Care Of Fax | |

### Petitioner Contacts

| Type | Sub Type | Primary | Value | Source Type | Start Date | End Date | Action |
|---|---|---|---|---|---|---|---|
| Email | | true | ▇▇▇ | EXTERNAL | | | Not Available |
| Daytime | | true | ▇▇▇ | EXTERNAL | | | Not Available |

### Petitioner Alien Numbers

| Alien Number | Status | Parent Alien Number | Source Type | Start Date | End Date | Action |
|---|---|---|---|---|---|---|

### Petitioner Names

| Last Name | First Name | Middle Name | Source Type | | Start Date | End Date | Action |
|---|---|---|---|---|---|---|---|

Petitioner Dates of Birth

### PCQS ELIS Details

Date of Birth  Role Petitioner — Category Petition for a Nonimmigrant Worker — Classification — Description IOE8194709947: Single/Multiple Case — Source Type
Activity Date 02/26/2024 — Result Approved — Result Date 03/01/2024

Case Benefit Card Details

| Document ID | Card Type | Card Status | Date Requested | Date Issued | Action |
|---|---|---|---|---|---|

Case Appointments

| Appointment Time | Reservation Identifier | Appointment Type | Appointment Status | Location |
|---|---|---|---|---|

Case Activity History

| Date | Action | State | Status | Sub Status |
|---|---|---|---|---|
| 03-01-2024 | VIBE Check Updated | Closed | Approved | Closed - Approved |
| 03-01-2024 | Case Review Completed | Closed | Approved | Closed - Approved |
| 03-01-2024 | Case Data Sent to ADIS | Closed | Approved | Closed - Approved |
| 03-01-2024 | Approval Notice Sent | Accepted | In Process | Rendering Decision |
| 03-01-2024 | Premium Processing Clock Stopped | Accepted | In Process | Rendering Decision |
| 03-01-2024 | Approval Email Sent | Accepted | In Process | Rendering Decision |
| 03-01-2024 | Awaiting Decision Notice for Approval | Accepted | In Process | Rendering Decision |
| 03-01-2024 | Approval Case Decision Rendered | Accepted | In Process | Rendering Decision |
| 03-01-2024 | Supervisor Review Deselected | Accepted | In Process | Case Review |
| 03-01-2024 | AC21 Eligibility does not apply | Accepted | In Process | Case Review |
| 02-29-2024 | Beneficiary Name Added | Accepted | In Process | Case Review |
| 02-29-2024 | Beneficiary Name Added | Accepted | In Process | Case Review |
| 02-29-2024 | Task Ownership Changed | Accepted | In Process | Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-28-2024 | Payment Settlement Status Received | Accepted | In Process | Ready for Case Review |
| 02-27-2024 | Ad Hoc Risk and Fraud Initiated | Accepted | In Process | Ready for Case Review |
| 02-27-2024 | Restricted Content Uploaded | Accepted | In Process | Ready for Case Review |
| 02-27-2024 | Document Uploaded to Case | Accepted | In Process | Ready for Case Review |
| 02-26-2024 | Risk and Fraud Backend Check Initiated | Accepted | In Process | Ready for Case Review |
| 02-26-2024 | Manual Name Harvesting Bypassed | Accepted | In Process | Ready for Case Review |
| 02-26-2024 | VIBE Check Initiated | Accepted | In Process | Resolving Preprocessing Checks |
| 02-26-2024 | Receipt Notice Sent | Accepted | In Process | Resolving Preprocessing Checks |
| 02-26-2024 | Receipt Notice Sent | Accepted | In Process | Resolving Preprocessing Checks |
| 02-26-2024 | Risk and Fraud Check Initiated | Accepted | In Process | Resolving Preprocessing Checks |
| 02-26-2024 | Email Receipt Sent | Accepted | In Process | In Process |
| 02-26-2024 | Awaiting Payment Settlement | Accepted | In Process | In Process |
| 02-26-2024 | Case Accepted | Accepted | In Process | In Process |
| 02-26-2024 | Concurrently Filed Case Upgraded to Premium Processing | Accepted | In Process | In Process |
| 02-26-2024 | Premium Processing Clock Started | Accepted | In Process | In Process |
| 02-26-2024 | Response from MEA Sent | Accepted | In Process | In Process |
| 02-26-2024 | Case Accepted | Accepted | In Process | In Process |
| 02-26-2024 | Case Data Sent to ADIS | | | |
| 02-26-2024 | Underlying Petition Marked | | | |
| 02-26-2024 | Case was linked to Concurrent group | | | |

Case Notes

| Date | Notes | | User ID |
|---|---|---|---|
| 02-26-2024 | Case linked to concurrent filing for premium processing. | | NGUYEN, DUNG |

Case Decision History

| Previous Decision | Decision Date | User ID | Decision Reason Code |
|---|---|---|---|
| Approved | 03-01-2024 | D█ S████ | Approved |

Person Identity Documents

| Document ID | Document Type | Date Issued | Country of Issuance | Document Expiration Date | Period Of Stay Expiration Date |
|---|---|---|---|---|---|
| 844925224 | Federal Employer Identification Number | | | | |
| 923130 | NAICS Code | | | | |

## PCQS ELIS Details

Role Nonimmigrant Petition — Category Nonimmigrant Worker:H-1B Classification — Description IOE8194709947: Single-Applicant Case
**Activity Date** 02/26/2024 — **Result** Approved — **Result Date** 03/01/2024

Beneficiary Names

| Last Name | First Name | Middle Name | Source Type | Start Date | End Date | Action |
|---|---|---|---|---|---|---|
| Z▮▮▮ | A▮▮▮ | N▮▮ | INTERNAL | | | Not Available |
| Z▮▮▮ | R▮▮ | N▮▮ | EXTERNAL | | | Not Available |
| R▮▮ | Z▮▮▮ | N▮▮ | INTERNAL | | | Not Available |

Exhibit 47

| Exec Team | Roles | Full name | Title | Level | Location | Status | Monthly Salary | Annual Equivalen | Resume |
|---|---|---|---|---|---|---|---|---|---|
| APAC | Growth | A██ W█ | Growth | 1 | Shang Hai | Full Time | $5,000.00 | $60,000.00 | |
| APAC | Growth | A█ | Growth | 2 | Shen Zhen | Full Time | $3,000.00 | $36,000.00 | |
| APAC | Growth | Y█ Z█ | Project Manager | 2 | Beijing? | Full Time | $5,000.00 | $60,000.00 | |
| APAC | Project Management | J█ █ | Project Manager | 2 | Shang Hai | Full Time | $5,916.67 | $71,000.00 | |
| APAC | Project Management | W█ C█ | Project Manager | 1 | Chengdu | Full Time | $3,000.00 | $36,000.00 | |
| APAC | Project Management | H█ Y█ | Project Manager | 1 | Jiang Su? | Full Time | $3,000.00 | $36,000.00 | |
| APAC | Project management | N█ █ W█ | Ops Assistant | 1 | Chengdu | Full Time | $2,600.00 | $31,200.00 | |
| APAC | Project management | L█ C█ Y█ | Project management | 1 | Chengdu | Full Time | $2,750.00 | $33,000.00 | |
| APAC | GM | Y█ W█ | APAC Head | 5 | China | Full Time | $10,000.00 | $120,000.00 | |
| APAC | Enginering | X█ █ Y█ | Software Engineer | 1 | Hang Zhou | Full Time | $4,742.00 | $56,904.00 | |
| APAC | Enginering | H█ █ (H | Software Engineer | 1 | Hang Zhou | Full Time | $4,742.00 | $56,904.00 | |
| APAC | Enginering | J█ L█ | Software Engineer | 2 | Chengdu | Full Time | $5,333.00 | $63,996.00 | |
| APAC | Enginering | R█ (F█ ) | Software Engineer | 1 | Fu Jian? | Part Time | $3,146.00 | $37,752.00 | |
| APAC | Enginering | S█ F█ | Software Engineer | 1 | Wenzhou? | Full Time | $5,750.00 | $69,000.00 | |
| APAC | Enginering | M█ X█ | Team Lead, Engineering | 3 | Canada | Full Time | $5,798.42 | $69,581.00 | |
| APAC | Project management | H█ █ | Project Manager | 2 | Shanghai | Full Time | $2,000.00 | $24,000.00 | |
| Core | Legal | R█ █ | Legal | 2 | Beijing | Full Time | $5,000.00 | $60,000.00 | |
| | | | | | | | | $76,778.08 | |

| | |
|---|---|
| Sr. Executive Leader - Level 6 | |
| Executive Leader- Level 5 | |
| Group Leader  - Level 4 | |
| Team Leader  - Level 3 | |
| Senior Associate - Level 2 | |
| Associate - Level 1 | |
| | |
| Done Levels | |

| | |
|---|---|
| Tier 1: Shanghai, Beijing | 0.6 |
| Teir 2: Hangzhou, Chengdu, Qingdao | 0.5 |
| Tier 3: Manila, Cebu | 0.4 |

Exhibit 48

(39116204812@chatroom) 2024-05-14 21:31:23

"<a href "weixin://link_profile?username herujia">Ruthia</a>"邀请你和"<a href="weixin://link_profile?username=Y███W█ >卫彦竹</a>、<a href="weixin://link_profile?username=wangyue19930729">王越</a>、<a href "weixin://link_profile?username wxid rj67jbom3jpt12">J███L█李翠詩</a>"加入了群聊

Ruthia(herujia) 2024-05-14 21:31:23

@卫彦竹?听说你和 shelby 沟通不太顺畅，可以发 下和她的沟通记录么？我们看看怎么样协助推进

卫彦竹(Y███W█ 2024-05-14 21:32:04

DAI-GJ-000487

DAI-GJ-000487



DAI-GJ-000488

DAI-GJ-000487

卫彦竹(Y███W█ 2024 05 14 21:32:38

主要就是给代理打款的信息，两次都不太对，昨天我找她也一直没有回复。

卫彦竹(Y███W█ 2024-05-14 21:34:18

代理那边的余额已经用完了，广告账户已经停了，这次付款是 4 月 23 申请的。

卫彦竹(Y███W█ 2024-05-14 21:34:39

[Undownloaded Photo]

Ruthia(herujia) 2024-05-14 21:35:46

看到这个款项是上周四发的，这个信息可以强调一下 deadline，而且在 thread 里可能隐藏比较深，如果紧急的话建议同时 DM

Ruthia(herujia) 2024-05-14 21:36:08

你有没有尝试 huddle 她看看？

Ruthia(herujia) 2024-05-14 21:37:35

在群里发信息，有的时候同事看不见，确实需要多提醒几次

卫彦竹(Y███W█ 2024-05-14 21:37:37

嗯嗯第一次那个信息错的时候跟她 huddle 过一次说过一次。我今晚再给她打一次。

Ruthia(herujia) 2024-05-14 21:38:09

而且上周四她发的收据里面也包含 swift 信息，如果上一次已经写错了，她发的时候你应该核查一下

DAI-GJ-000489

DAI-GJ-000487

卫彦竹(Y█████W█ 2024-05-14 21:42:42

嗯，当时看了 account number 是对的，swift code 没有检查到。

Ruthia(herujia) 2024-05-14 21:45:12

嗯嗯，如果账户停了也可以发给他们之前的收据看看可不可以延期

卫彦竹(Y█████W█ 2024-05-14 21:46:28

之前的已经发给他们了但信息不对所以停了，我们付出去我给他们 receipt 就可以直接恢复了，今天能把 receipt 给他们明天就可以恢复。

Ruthia(herujia) 2024-05-14 21:47:30

那他们上周也应该检查我们的收据

J█████L█李翠詩(wxid_rj67jbom3jpt12) 2024-05-14 21:48:00

建议：直接告诉 S█████对的 swift code. Save her some time to go check and check again since it seems like she is having trouble doing it

卫彦竹(Y█████W█ 2024 05 14 21:49:19

嗯嗯，我会再单独给她发一次

J█████L█李翠詩(wxid_rj67jbom3jpt12) 2024-05-14 21:51:21

Feel free to add me into the slack as well to follow up on US time zone. J█████L█

Ruthia(herujia) 2024-05-14 21:51:44

嗯嗯 ??

卫彦竹(Y█████W█) 2024-05-15 00:02:55

DAI-GJ-000490

DAI-GJ-000487

@Ruthia?刚和 S███huddle 完，两个代理的都被退回了，另外一个代理的信息是没错的但她也不知道什么原因退回了。所以后面决定两笔都用 bill.com 发起了，bill 的话之前都打款成功过这样比较保险，已经发送了，需要麻烦你这边审核一下。

Ruthia(herujia) 2024-05-15 00:15:29

bill.com 需要 4-5 天的处理时间，来得及么？

卫彦竹(Y████W██ 2024-05-15 00:15:52

Mercury 看起来也是需要一样的时间

卫彦竹(Y████W██ 2024-05-15 00:16:07

先拿到付款水单他们就可以先给我们把账户开启

Ruthia(herujia) 2024-05-15 00:20:09

好的，已经支付了

卫彦竹(Y████W██ 2024-05-15 00:21:03

好的～

DAI-GJ-000491

DAI-GJ-000487

Exhibit 49





## 13

| | | |
|---|---|---|
| **13A** | MASQUERADE | |
| **13B** | VIA VAI TRAVEL LTD. | 易為旅遊有限公司 |
| | | |
| | | |
| | | |
| **13F** | THOMAS T. M. NG & CO. CERTIFIED PUBLIC ACCOUNTANTS | 伍同明會計師 |
| | RICHPETAL LIMITED | 旺必來有限公司 |



Exhibit 50

| Process | Date | 5/9/2023 |
|---|---|---|
| Status | | Paid |
| Memo | | Inv #0001 |
| Payment | Confirmation | P23050902 - 3104472 |
| Vendor Name | | ECB Accounting Services Limited |
| Payment | Method | IntlEPmt |
| Created | Date | 5/9/2023 |
| Updated | Date | 5/9/2023 |
| # Invoice # | | 1 |
| Payment Payment | Amount | 6,000.00 |
| Payment Account Name | | Bill.com Money Out Clearing |
| Bill Payment | Process Date | 5/9/2023 |
| Bill Payment | Confirmation | P23050902 - 3104472 |
| Total | Line Items | 1 |

**Done Global Inc**
**Vendor Contact List**

| Vendor | Phone Numbers | Email | Full Name | Address | Account # | Track 1099 | 1099 Printed | Company Name | Tax ID | Note | Terms | State | City | Country | Last Name | First Name | ZIP | Street | Billing Rate | Other | Website | Phone | Created By | Create Date | Last Modified By | Last Modified |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ECB Accounting Services Limited | | yibin@donefirst.com | | Unit B on 13/F Shing Lee Commercial Building No. 8 Wing Kut Street Hong Kong 00852 Hong Kong | | | No | | | | | Hong Kong | Kut Street | Hong Kong | | | 00852 | Unit B on 13/F Shing Lee Commercial Building No. 8 Wing | | | | | Sandeep Shroff | 04/21/2023 03:18:18 AM | Sandeep Shroff | 04/21/2023 03:18:18 AM |

Exhibit 51

[2/7/24, 9:01:04 AM] J████, Ruthia & ██████████: Messages and calls are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them.

[2/7/24, 9:01:04 AM] J████, Ruthia & ██████████: You created this group

[2/7/24, 9:01:32 AM] N███: Hi!

[2/7/24, 9:30:25 AM] Ruthia: Hi here is the latest delegation plan: https://docs.google.com/spreadsheets/d/1iIJ0Q66VaS_5QQS4KNZeoDU7TLMQNkPN7pHcHttZ5XM/edit#gid=1024062088

[2/7/24, 9:31:10 AM] Ruthia: And management expectations for you and your team leads (██████████ can add to HR wiki for anyone wanting to improve management skills): https://docs.google.com/spreadsheets/d/16JpRZrYqY2UT8T6ZUaa_N9YXPTnxlTKK81A5PFMrSI8/edit#gid=0

[2/7/24, 9:32:11 AM] Ruthia: Here is the message from E████: I had a return patient today to us that was going to Klarity, but apparently they have closed down?  If so then we are likely the only telehealth company treating ADHD, yay for us helping so many people!

However, I want to let you know about a patient that was transferred to me, as this is an example of a provider that should not work at a company specializing in ADHD treatment as she can't even spell Adderall correctly, left incomplete notes and told the patient it was our policy to require anyone not on stimulants within the last two years they must "try Strattera or Qelbreee for at least 90 days before trying a stimulant, this in NOT correct, stimulants are the FIRST LINE of treatment excluding medical complications.

Patient is K█ E███████, DOB █████████

Provider is I█████ M███████, PMHNP, new grad?

I was reviewing the chart due to the patient asking for the medication as he never got the rx sent from the visit on 01/14/24.

The note was incomplete, with numerous blank spaces missing information, incomplete sentences and misspelled words, she wrote "Addrrell" in several places on the chart, this note looks like it was written by a child, not someone with a valid medical license.

There was another follow up note stating the patient "demanded Vyvanse," which I didn't see anywhere, the provider sent Adderall to a Walgreens but incorrectly as it said "print only" meaning it wasn't sent electronically so the pharmacy never got it.

The patient messaged and at first was told someone was "reviewing" the rx since it was controlled, then later the provider said she looked at the CURES report (which should be done at the visit, not days later), and since the patient had not been on stimulants for the last two years it was against our policy to prescribe without "evidence"

This is embarrassing that a patient was treated this way by a provider at an initial visit, he was transferred to me and I already corrected the issue with his rx and told him I need to see him soon to complete his chart. At least he spoke up and got transferred, and hopefully that means this provider is no longer with Done. Think about patients that saw her and had such a terrible experience they just gave up. We have to do much better than this, please let me know if you have any questions, and thank you for your awesome support!!

[2/7/24, 9:33:37 AM] N█████: Let me check on thisx

[2/7/24, 9:50:26 AM] N███: Tx MD posting

Job Overview:

We are seeking a skilled and compassionate Medical Doctor (MD) with expertise in psychiatric evaluation, particularly in Attention-Deficit/Hyperactivity Disorder (ADHD), and other mental health conditions. The ideal candidate will be dedicated to providing comprehensive assessments, accurate diagnoses, and evidence-based treatment recommendations for individuals with ADHD.

Responsibilities:

1. Conduct thorough psychiatric evaluations for patients presenting with symptoms of ADHD.

2. Utilize a patient-centered approach to gather comprehensive medical and psychosocial histories.

3. Perform diagnostic assessments, considering both the DSM-5 criteria and any additional relevant factors.

4. Collaborate with multidisciplinary teams, including psychologists, therapists, and other healthcare professionals, to ensure holistic patient care.

5. Develop and implement individualized treatment plans based on the diagnosis, incorporating a range of therapeutic modalities.

6. Provide patient education on ADHD, treatment options, and strategies for managing symptoms.

7. Maintain accurate and up-to-date medical records, documenting assessments, diagnoses, and treatment plans.

8. Stay current with advancements in ADHD research, treatments, and best practices.

9. Participate in continuous professional development and engage in supervision or peer consultation as needed.

10. Adhere to ethical and legal standards in medical practice and patient care.

Qualifications:

1. Medical Doctor (MD) degree from an accredited institution.

2. Board certification or eligibility in Psychiatry or internal medicine.

3. State medical license in good standing.

4. Subspecialty training or significant experience in ADHD assessment and treatment.

5. Strong interpersonal and communication skills, fostering a collaborative and supportive patient-provider relationship.

6. Ability to work effectively in a team-oriented environment.

7. Compassionate and empathetic approach to patient care.

8. Commitment to ongoing professional development and quality improvement.

9. Knowledge of and adherence to ethical principles in healthcare.

Benefits:

- Competitive salary commensurate with experience.

- Comprehensive health and dental benefits.

- Professional development opportunities.

- Supportive and collaborative work environment.

How to Apply:

Please submit your resume, cover letter, and any relevant certifications to "add email or contact"

[2/7/24, 9:56:03 AM] Ruthia: Thanks N█████ - I notice some issues and will send over the edits. Can I know what will be the hourly rate they'll be posting for?

Also H█████ mentioned she already wrote a transition document and is waiting for B████'s approval before sending to you.

[2/7/24, 9:56:28 AM] N███: Thank you!!

[2/7/24, 11:03:26 AM] Ruthia: ████████████ Could you please ask D███ how they created this job description? It appears to be missing important requirements such as licenses needed in certain states and a DEA license. Additionally, the description mentions comprehensive health and dental benefits, but I believe we don't offer these for 1099 contractors.

We are also open to hiring MDs or DOs, so I suggest she can find some previous job descriptions we used before and iterate from there.

[2/7/24, 11:04:02 AM] Ruthia: Ruthia turned on disappearing messages. New messages will disappear from this chat 24 hours after they're sent, except when kept. Tap to change.

[2/23/24, 10:27:34 AM] J████ D█: N██ - next Monday to get those, will it be doable?

[2/29/24, 12:00:33 PM] Ruthia: Made some small update to the first paragrah. No need to share the policy details and we should be good to go:

Thank you for reaching out. As a company in a regulated field, we have been in conversations with the medical board and government agencies, actively collaborating on inquiries, just like many other telehealth platforms and behavioral health providers in the industry. Our commitment extends beyond mere collaboration; we are dedicated to developing comprehensive clinical practices that sets industry standards, positioning us as leaders in the field. Should you have any concerns or questions, we encourage you to contact us at any time for support. We offer dedicated legal support in case you are contacted by any medical board or government entity. Our focus remains on our commitment to a patient-first philosophy while navigating the regulatory changes, especially in the evolving telehealth industry post-pandemic.

[5/8/24, 7:11:28 PM] ~ J████ : Ruthia added ~ J████ . Tap to change who can add other members.

[5/8/24, 7:13:51 PM] ~ J████ : ~ J████ turned off disappearing messages. Tap to change.

[5/8/24, 7:16:37 PM] Ruthia: Ruthia turned on disappearing messages. New messages will disappear from this chat 24 hours after they're sent, except when kept. Tap to change.

[5/15/24, 4:48:28 PM] N███ : I think the reason why she got terminated was she was DNP and not PMHNP

[5/15/24, 4:49:18 PM] N███ : As far as I remember

[5/15/24, 4:50:25 PM] Ruthia: That's right!! She said she was about to get her PMHNP but didn't actually get it 🙁

[5/15/24, 4:51:19 PM] N███ : Yes!!

[5/15/24, 4:53:27 PM] Ruthia: I think that even if it's incorrect in this letter, it shouldn't be a big issue as errors like this happen. I see her chart note did state her as a DNP correctly

[5/15/24, 4:55:41 PM] N███ : I think so too since the team doesn't really know the nuissances and this is our template

[5/15/24, 5:00:47 PM] ~ J████ : This message was deleted.

[5/15/24, 5:06:35 PM] ~ J: So should we have a control to stop DNP from prescribing?

[5/15/24, 5:07:01 PM] N███: I think this was the only case that that happened.

[5/15/24, 5:07:27 PM] N███: Now, we have a robust credentiling process

[5/15/24, 5:14:52 PM] Ruthia: To clarify it's not a problem for a DNP to prescribe medications. It happens everywhere for family medicine clinicians to prescribe ADHD meds. However, we aim to uphold a higher than the industry standard.

[5/15/24, 5:15:44 PM] ~ J███: Ah thank you for the clarification. I literally learn a new acronym everyday in the company :)

[5/15/24, 5:23:20 PM] Ruthia: It can be overwhelming at the beginning , but fortunately, we mainly specialize in one specific condition, so it's not as extensive as a general hospital.

[5/15/24, 5:23:23 PM] Ruthia: You're learning fast, and I believe those acronyms will soon become second nature to you!

[5/15/24, 5:23:46 PM] N███: Yes! We are here to help as always! ████████ 🧑‍🚀

[5/15/24, 5:25:57 PM] Ruthia: Most of us are probably already experts on ADHD now 🌟 <This message was edited>

Exhibit 52



Exhibit 53

# Ruthia He and Done: Outgoing International Payments
## By Country - January 02, 2019 to August 19, 2024

| Country | Banking | Bill.com | Payoneer | Total |
|---|---|---|---|---|
| China | $164,065 | $ - | $1,973,188 | $2,137,254 |
| Hong Kong | 3,368,212 | 846,240 | 500 | 4,484,953 |
| Philippines | - | - | 6,235,544 | 6,235,544 |
| Other International | 403,998 | 80,912 | 28,511 | 513,421 |
| Total | $4,206,276 | $927,152 | $8,237,744 | $13,371,172 |

**Sources:** Banking through 08/19/24, Bill.com through 09/14/23, and Payoneer records through 11/20/2023.

Exhibit 54

## Done Global Transfers to W███ Y███
## December 15, 2023 to January 19, 2024

| Account Name | Bank | Last 4 | Date | Receiver | Amount |
|---|---|---|---|---|---|
| Done Global, Inc. | Mercury | X2801 | 12/15/23 | W███ Y███ | $23,400 |
| Done Global, Inc. | Mercury | X2801 | 12/22/23 | W███ Y███ | 15,000 |
| Done Global, Inc. | Mercury | X2801 | 01/19/24 | W███ Y███ | 14,720 |
| Total | | | | | $53,120 |

**Notes:** Period reviewed 01/02/19 to 08/19/24.
**Sources:** Banking records.

Exhibit 55
Under Seal

Exhibit 56

# EVUS Details

Application #: [REDACTED]

Third Party: No — Waiver Of Rights: No — Status: S (Enrolled)

Submit Date: 06/16/2024 23:32
Expiration Date: 04/19/2025 20:00

**Actions ▾**

## Table of Contents

Applicant
Alias (1)
Other Citizenships (0)
Documents (4)
Global Entry Program (0)
Phone Numbers (1)
Email Addresses (2)
Social Media (0)
Addresses (2)
US Point of Contacts (1)
Emergency Contacts (1)
Employers (0)
Group Contacts (0)
IP Addresses (1)
Questions (9)



## Applicant Details

| Name | DOB | Sex | Citizenship | Resident Country | Birth Country | Birth City |
|---|---|---|---|---|---|---|
| LI [REDACTED] 李 | [REDACTED] | Female | CHINA (CHN) | CHINA (CHN) | CHINA (CHN) | [REDACTED] |

### Other Names/Alias (1)

| Name |
|---|
| LI [REDACTED] (长莉) |

### Parents (2)

| Name |
|---|
| LI Y[REDACTED] |
| Z[REDACTED] J[REDACTED] |

### Other Citizenships (0)

| Country | Document # | Type | Exp.Year | Reason |
|---|---|---|---|---|
| | | No records found. | | |

### Documents (4)

| Document Type | Document # | Issued By | Issued Date | Expiration Date |
|---|---|---|---|---|
| Primary Passport | [REDACTED] | CHINA (CHN) | 02/21/2008 | 02/20/2018 |
| Current Passport | [REDACTED] | CHINA (CHN) | 09/30/2017 | 09/29/2027 |
| National ID | [REDACTED] | CHINA (CHN) | --- | --- |
| VISA FOIL Number | [REDACTED] | USA | --- | 04/20/2025 |

### Global Entry Program Information (0)

| Membership Response | PASSID/Membership # |
|---|---|
| --- | --- |

### Phone Numbers (1)

| Phone Type | Telephone Country Code / # |
|---|---|
| Cell | CN:86 / [REDACTED] |

### Email Addresses (2)

| Email Type | Email Address |
|---|---|
| Primary | [REDACTED] |
| Secondary | [REDACTED] |

### Social Media (0)

| Social Media Type | Social Media Text |
|---|---|
| | No records found. |

### Addresses (2)

| Address Type | Address Line 1 | Address Line 2 | Apartment # | City | State | Postal Code | Country |
|---|---|---|---|---|---|---|---|
| Home | [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] | Beijing | | CHINA (CHN) |
| USA Address | [REDACTED] | | [REDACTED] | [REDACTED] | CA - CALIFORNIA | | USA |

### US Point of Contacts (1)

| US Point of Contact | Telephone Country Code / # | Address Line 1 | Address Line 2 | City | State | Country |
|---|---|---|---|---|---|---|
| A[REDACTED] Z[REDACTED] | US:1 / [REDACTED] | [REDACTED] | | [REDACTED] | CA - CALIFORNIA | USA |

### Emergency Contacts (1)

| Name | Telephone Country Code / # | Email Address | Address Line 1 | Address Line 2 | City | State | Country |
|---|---|---|---|---|---|---|---|
| W[REDACTED] Y[REDACTED] | CN:86 / [REDACTED] | [REDACTED] | | | | | --- |

### Employers (0)

| Employer Name | Job Title | Telephone Country Code / # | Address Line 1 | Address Line 2 | City | State | Country |
|---|---|---|---|---|---|---|---|
| | | | No records found. | | | | |

### Group Contacts (0)

| Name | Telephone Country Code / # | Email Address | Address Line 1 | Address Line 2 | City | State | Country |
|---|---|---|---|---|---|---|---|
| | | | No records found. | | | | |

### IP Addresses

| IP Address | Location | Country | Organization | Last Updated |
|---|---|---|---|---|
| ▇▇▇▇ | MOSCOW OBLAST 47 RU (RUSSIA) | RUS | MISAKA NETWORK, INC. | as of Current Date (07/10/2024) |

1 of 2 ⏮ ◀ ▶ ⏭

**EVUS Details**

Questions (9)

Application #: ▇▇▇▇▇▇

Third Party: No — Waiver Of Rights: No — Status: S (Enrolled)

**Table of Contents**

Applicant
Alias (1)
Other Citizenships (0)
Global Entry Program (0)
Documents (4)
Phone Numbers (1)
Email Addresses (2)
Social Media (0)
Addresses (2)
US Point of Contacts (1)
Emergency Contacts (1)
Employers (0)
Group Contacts (0)
IP Addresses (1)
Questions (9)

| | Question | Response | Reported on Application Date |
|---|---|---|---|
| 1) | Do you have a physical or mental disorder; or are you a drug abuser or addict; or do you currently have any of the following diseases (communicable diseases are specified pursuant to section 361(b) of the Public Health Service Act)? | NO | 06/16/2024 23:32 |
| 2) | Have you ever been arrested or convicted for a crime that resulted in serious damage to property, or serious harm to another person or government authority? | NO | 06/16/2024 23:32 |
| 3) | Have you ever violated any law related to possessing, using, or distributing illegal drugs? | NO | 06/16/2024 23:32 |
| 4) | Do you seek to engage in or have you ever engaged in terrorist activities, espionage, sabotage, or genocide? | NO | 06/16/2024 23:32 |
| 5) | Have you ever committed fraud or misrepresented yourself or others to obtain, or assist others to obtain, a visa or entry into the United States? | NO | 06/16/2024 23:32 |
| 6) | Are you currently seeking employment in the United States or were you previously employed in the United States without prior permission from the U.S. government? | NO | 06/16/2024 23:32 |
| 7) | Have you ever been denied a U.S. visa you applied for with your current or previous passport, or have you ever been refused admission to the United States or withdrawn your application for admission at a U.S. port of entry? | NO | 06/16/2024 23:32 |
| 8) | Have you ever stayed in the United States longer than the admission period granted to you by the U.S. government? | NO | 06/16/2024 23:32 |
| 9.v 2) | Have you traveled to, or been present in Iran, Iraq, Libya, North Korea, Somalia, Sudan, Syria or Yemen on or after March 1, 2011? | NO | 06/16/2024 23:32 |

Expiration Date: 04/19/2025 20:00

UNCLASSIFIED — FOR OFFICIAL USE ONLY

Exhibit 57

**okayhealth**  Business

Index   Review   Team   Cards   Accounts/Trx   Credit   Payments/Rules   Documents   Treasury   Limits   Capital   Sanctions   Bill Pay & Invoicing   Reimbursements

‹ Back to Team

R███ Z███      Force Password Reset      🔒 Lock Out Of Organization      🔒 Lock User Account

| | |
|---|---|
| Email address | ███@donefirst.com ✎ |
| Role | Admin |
| Status | Active |
| Preferred Name ⓘ | R██ Z██ ✎ |
| Job title | VP, Director, Manager |
| Legal Name | R██ Z██ ✎ |
| Date of birth | ███ |
| Phone number | ███ ✎ |
| Alternate Phone number | Add › |
| Organization User ID | ███ |
| Legal address | ███ ✎ |
| Other Org Users | 0 other org users   👤 Go to User Profile |

## User Permissions

| User permissions | |
|---|---|
| | ✓ Send money |
| | ✓ Create new checking and savings accounts |
| | ✓ Invite new users or manage existing users |
| | ✓ Deposit checks |
| | ✓ View payments |
| | ✓ Reset teammate 2FA |
| | ✓ Can manage vendors and review flagged payments |
| | ✓ Can create/edit recipients |
| | ✓ Can create payment requests and send invoices |
| | ✓ Issue new cards and manage existing cards |
| | ✓ Can freely transfer money to Mercury accounts |
| | ✓ Add API tokens |
| | ✓ |

## Call Verification   📞 Verify Phone Call

## Provide Support   Provide Support ⬆   Request Privileges

## 2FA Reset Requests   TOTP Enabled   No Security Keys   Mercury MFA Unconfigured

No reset requests found
⟳ Reset 2FA

## Notifications preferences

| Account Activity | | From Mercury | |
|---|---|---|---|
| | ✓ Outgoing transactions of at least $100 | | ✓ New features |
| | ✓ Failed transactions | | ✓ Events |
| | ✓ 2FA reset requests from my team members | | — Pause all |
| | — Pause all | | |

## Error log

---

Done Global, Inc. ⬍
Approved

@ okayhealth
🏢 Business
🌐 Mercury ⓘ
✉ ███
📅 Mar 18, 2020
👤 $0.01
💳 Synapse  Evolve
◐ Minimal Risk
👤 N/A
🏥 Health Services > Healthcare Tech
◔ Low

▸ Cases

▸ Account Managers

▸ Partners

▸ Names

▸ Beneficial Owners

▸ Referral Partners

Displaying errors from bugsnag for the last 30 days

| Aug 22 09:46 | Error  /transactions  `mercury-web` |
| | Error fetching in ApiHooks: Sorry, access to your account has been restricted. Contact us at help@mercury.com if you have questions. |
| | Bugsnag ↗ |

| Aug 22 09:46 | Error  /transactions  `mercury-web` |
| | Error fetching in ApiHooks: Sorry, access to your account has been restricted. Contact us at ███@mercury.com if you have questions. |
| | Bugsnag ↗ |

| Aug 22 09:46 | Error  /transactions  `mercury-web` |
| | Error fetching in ApiHooks: Sorry, access to your account has been restricted. Contact us at ███@mercury.com if you have questions. |
| | Bugsnag ↗ |

| Aug 22 09:46 | Error  /transactions  `mercury-web` |
| | Error fetching in ApiHooks: Sorry, access to your account has been restricted. Contact us at ███@mercury.com if you have questions. |
| | Bugsnag ↗ |

| Aug 22 09:46 | Error  /transactions  `mercury-web` |
| | Error fetching in ApiHooks: Sorry, access to your account has been restricted. Contact us at ███@mercury.com if you have questions. |
| | Bugsnag ↗ |

## User security log

Here are the last 30 days of activity on this account

| Event | Source | IP address | Date and time | Country |
|---|---|---|---|---|
| → Log in | Chrome (macOS, 10.15.7) | 2600:1700:6d11:523... | Aug 22, 9:31 AM | United States |
| → Log in | Chrome (macOS, 10.15.7) | 136.25.43.55 | Aug 21, 4:13 PM | United States |
| → Log in | Chrome (macOS, 10.15.7) | 136.25.43.55 | Aug 20, 8:04 PM | United States |
| ⊙ Log in two-factor auth requested | Chrome (macOS, 10.15.7) | 136.25.43.55 | Aug 20, 8:04 PM | United States |
| → Log in | Chrome (macOS, 10.15.7) | 2600:1700:6d11:523... | Jul 29, 5:25 PM | United States |
| → Log in | Chrome (macOS, 10.15.7) | 2600:1700:6d11:523... | Jul 25, 6:09 PM | United States |

```
▼ "userDetails" : {
    "email" : "███donefirst.com"
    "id" : "ae0faec6-3f1f-11ef-b40a-931792dabcc7"
    "firstName" : "R█"
    "lastName" : "2███"
    "createdAt" : "2024-07-11T00:51:16.310203Z"
    "hasConfiguredTotp" : true
  ▶ "webAuthnCredentials" : []
    "hasVerifiedEmail" : true
  ▶ "linkedUsers" : [...]
  ▶ "legalAddress" : {...}
    "phoneNumber" : "███████"
    "dateOfBirth" : "██████"
    "legalFirstName" : "R████"
    "legalLastName" : "2███"
    "passwordResetForced" : ████████
    "status" : "active"
    "hasEverBeenInAnOrganization" : true
    "isBeneficialOwnerInAnyOrg" : false
  ▶ "canOnboardTo" : [...]
  ▶ "jobTitle" : {...}
  ▶ "userSettings" : {}
    "needsTotpReset" : false
}
```

Exhibit 58

| Source | From | To | All timestamps | Content | Deleted |
|--------|------|-----|----------------|---------|---------|
| WeChat | wangyue1993072<br>9<br>王越 | Participants:<br>wangyue1993072<br>9 王越, herujia<br>Ruthia (owner) | Timestamp:<br>1/9/2023 5:45:22<br>AM(UTC+0) | Direction:<br>Incoming<br>Body:<br>最好的办法就是，香港开个公司，把菲律宾和大陆的工资流水都放过去 | |

**Google Translate Translation:**

The best way is to open a company in Hong Kong and transfer the salary flow from the Philippines and the mainland to Hong Kong.

**Human Translation:**

The best approach is to set up a company in Hong Kong and consolidate the salary statement/payroll history from both the Philippines and mainland China there.

Exhibit 59

| Field | Value |
|---|---|
| ID | ████ |
| Reference | ████████ |
| Date_Range | 20240401-20240730 |
| Amount_Range | |
| Search_String | ("RUJIA HE" OR "HE RUJIA") AND BEIJING* |
| IMAD | 2 |
| Sequence | 1 |
| flddate | 08-Jul-24 |
| Amount_2000 | $49,985.00 |
| Message Disposition_1100 | 30P N |
| Receipt Time Stamp_1110 | 07080500FT03 |
| OMAD_1120 | 20240708L2B77Q1C0006330 7080500FT03 |
| der Supplied Information_1 | 3000001076P |
| Type/Subtype_1510 | 1000 |
| IMAD_1520 | 2 |
| Amount_2000 | 4998500 |
| 3000 | |
| Sender DI_3100 | 026014591INDUSTRIAL & COMM |
| Sender Reference_3320 | BJMUS338460815GC |
| Receiver DI_3400 | 322070381EAST WEST BANK |
| vious Message Identifier_3 | |
| usiness Function Code_360 | CTP |
| Local Instrument_3610 | |
| Payment Notification_3620 | ████████ |
| Charges_3700 | SUSD15,00 |
| Instructed Amount_3710 | |
| Exchange Rate_3720 | |
| Intermediary FI_4000 | |
| Beneficiary FI_4100 | |
| Beneficiary_4200 | 4714 VALPEY PARK AVE FREMONT CALIFORNIA 94538 USA |
| eference for Beneficiary_43 | |
| unt Debited in Drawdown_ | |
| Originator_5000 | RUJIA BEIJINGSHI ████████ |
| Originator Option F_5010 | |
| Originator FI_5100 | BICBKCNBJBJM INDUSTRIAL AND COMMERCIAL BANK OF C 26 XICHANGAN STREET 100026 BEIJING CHINA |
| Instructing FI_5200 | OFFICE NO.55 FUXINGMENNEI AVENUE XICHENG DISTRICT, BEIJING 10032, PRC |

Exhibit 60

8/26/24, 6:52 PM                     Southern District of California | Fugitive Leonard Francis Back in San Diego; Appears in Federal Court | United States Department o...

Case 3:24-cr-00330-GRB Document 77-1 Filed 09/06/24 Page 149 of 155



PRESS RELEASE

# Fugitive Leonard Francis Back in San Diego; Appears in Federal Court

---

Thursday, January 4, 2024

**For Immediate Release**

U.S. Attorney's Office, Southern District of California
Kelly.Thornton@usdoj.gov

**NEWS RELEASE SUMMARY** – **January 4, 2024**

SAN DIEGO – Leonard Glenn Francis, the infamous fugitive who presided over a massive decade-long conspiracy involving scores of U.S. Navy officials, tens of millions of dollars in fraud and millions of dollars in bribes and gifts, appeared in federal court today for the first time since he cut off his electronic monitoring bracelet and absconded from house arrest in San Diego in September 2022.

At the hearing, the government asked U.S. District Judge Janis L. Sammartino to set a new sentencing date immediately to avoid delays, but the judge postponed a decision based on a request by Francis' legal team to withdraw from the case in the aftermath of his disappearance. The judge set a status hearing for February 8, 2024, at 9 a.m.

Francis, who fled the United States before he could be sentenced, was returned to the United States from Venezuela as part of a prisoner swap on December 20, 2023. From Venezuela, he arrived in the Southern District of Florida and appeared in federal court the next day in Miami, where he was ordered removed to the Southern District of California. Francis arrived in San Diego on January 3.

Francis, the owner and chief executive of Glenn Defense Marine Asia, which provided services to U.S. Navy ships in ports in the Asia-Pacific region, pleaded guilty to bribery and fraud charges in 2015. As a result of the federal investigation, more than 30 U.S. Navy officials and associates pleaded guilty.

> *"Leonard Francis is no longer on the run. He is on the hook," said U.S. Attorney Tara K. McGrath. "Mr. Francis never should have fled the United States while he was waiting to be sentenced. In fact, he was ordered by a federal judge not to do so. Now that he is back in San Diego, Mr. Francis will be held fully accountable for his crimes."*

## DEFENDANTS                    Case Number 13-CR- 4287

Leonard Glenn Francis                Age: 59        Singapore

## SUMMARY OF CHARGES

Conspiracy to Commit Bribery, in violation of 18 U.S.C. § 371. Maximum penalty five years in prison, $250,000 fine or twice the gross pecuniary gain or loss from the offense, whichever is greater;

Bribery, in violation of 18 U.S.C. § 201. Maximum 15 years in prison, $250,000 fine or twice the gross pecuniary gain or loss from the offense, whichever is greater. Mandatory restitution.

Conspiracy to Defraud the United States, in violation of in violation of 18 U.S.C. sec. 371. Maximum penalty five years in prison $250,000 fine or twice the gross pecuniary gain or loss from the offense, whichever is greater. Mandatory restitution.

## INVESTIGATING AGENCIES

Defense Criminal Investigative Service

Naval Criminal Investigative Service

Defense Contract Audit Agency

## Contact

**Media Relations Director Kelly Thornton (619) 546-9726 or Kelly.Thornton@usdoj.gov**

8/26/24, 6:52 PM
Case 3:24-cr-00330-GRB Document 77-1 Filed 09/06/24 Page 151 of 155
Southern District of California | Fugitive Leonard Francis Back in San Diego, Appears in Federal Court | United States Department o…

Updated January 4, 2024

**Topics**

**FINANCIAL FRAUD** | **PUBLIC CORRUPTION**

**Component**

[USAO - California, Southern](#)

Press Release Number: CAS24-0104-Francis

# Related Content

**PRESS RELEASE**

## President of UMI Learning Center Sentenced to 27 Months in Prison, Ordered to Pay $3.7 Million back in Stolen Childcare Benefits

SAN DIEGO – Mohamed Muriidi Mohamed was sentenced in federal court today to 27 months in prison for participating in a childcare-benefits fraud scheme that bilked a California welfare and...

August 21, 2024

**PRESS RELEASE**

## U.S. Attorney's Office, FBI Recover Millions for Elderly Fraud Victims

SAN DIEGO – Because of a new and aggressive effort to thwart criminals who target seniors, the U.S. Attorney's Office and the San Diego FBI have recovered more than $3...

8/26/24, 6:52 PM          Southern District of California | Fugitive Leonard Francis Back in San Diego, Appears in Federal Court | United States Department o…

Case 3:24-cr-00330-GRB   Document 77-1   Filed 09/06/24   Page 152 of 155

June 20, 2024

---

**PRESS RELEASE**

### Customs and Border Protection Officer Convicted by Federal Jury of Receiving Bribes, Allowing Drug-Laden Vehicles to Enter the U.S.

SAN DIEGO – Former U.S. Customs and Border Protection Officer Leonard Darnell George was convicted by a federal jury late Monday, June 10, of accepting bribes to allow vehicles containing...

June 12, 2024

---



✉ **Southern District of California**

Main Office:

Federal Office Building

880 Front Street, Room 6293

San Diego, California 92101-8807

*To report broken links or technical issues ONLY, email*  Webmaster

*To report a crime please see the Action Center.*

📞 Telephone: (619) 557-5610

Toll Free  (800) 544-1106

Fax: (619) 546-0720

TTY: (619) 557-3450

# Exhibit 61
# Under Seal

# Exhibit 62
# Under Seal

# Exhibit 63
# Under Seal