Exhibit 1

                                            Pages 1 - 24

                      UNITED STATES DISTRICT COURT

                     NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,            )
                                 )
   VS.                           )          **NO. CR 24-0329 CRB**
                                 )
RUTHIA HE, a/k/a RUJIA HE, and   )
DAVID BRODY,                     )
                                 )
            Defendants.          )
_____ )
                                      San Francisco, California
                                      Wednesday, August 21, 2024

                      **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                        ISMAIL J. RAMSEY
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  **BY:  KRISTINA GREEN, ASSISTANT U.S. ATTORNEY**

                        DEPARTMENT OF JUSTICE
                        1400 New York Avenue, NW - 8th Floor
                        Washington, D.C.  20005
                        **JACOB FOSTER,**
                        **PRINCIPAL ASSISTANT CHIEF**

For Defendant Ruthia He:
                        KEKER & VAN NEST
                        633 Battery Street
                        San Francisco  CA  94111
                  **BY:  CODY J.K. GRAY, ATTORNEY AT LAW**
                        **ELLIOT R. PETERS, ATTORNEY AT LAW**

Also Present:           **VANESSA VARGAS, U.S. PRETRIAL**

Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                        U.S. District Court - Official Reporter

1    <u>**Wednesday - August 21, 2024**</u>                                    <u>**10:46 a.m.**</u>

2                            **P R O C E E D I N G S**

3                                ---oOo---

4         **THE CLERK:**  Calling criminal action CR24-0329, USA

5    versus Ruthia He.

6        Counsel, please state your appearances.

7         **MR. FOSTER:**  Good morning, Your Honor, Jacob Foster

8    and Kristina Green on behalf of the United States.

9         **THE COURT:**  Good morning.

10        **MR. PETERS:**  Good morning, Your Honor, Elliot Peters,

11   also appearing with my partners Cody Gray and Nick Marais on

12   behalf of Ruthia He.  She is present in court as are a number

13   of her family and friends.

14        **THE COURT:**  Right, good morning.

15        **MR. PETERS:**  Good morning, Your Honor.

16        **MS. VARGAS:**  Good morning, Your Honor, vanessa Vargas

17   with U.S. Pretrial Services.

18        **THE COURT:**  Thank you for coming.

19        So this matter is on as an appeal from Judge Hixson's

20   detention order, and obviously it's a -- under the law, it's a

21   de novo determination, and the Court has received a great deal

22   of materials and maybe I can characterize it, at least what my

23   thoughts are.

24        There is a wide divergence of views on the issue of --

25   well, it goes to the issue of flight maybe to some extent

1   dangerousness, but I think the primary issue is one of flight;

2   and the argument that the Government prevailed upon with the

3   magistrate judge is that the Defendant is at high risk for

4   flight; no set of conditions can guarantee her appearance; and,

5   therefore, she ought to be detained.

6        And the justification for the flight finding are a series

7   of events that in the -- in the Government's judgment warrants

8   the inference that she would flee.

9        The Defense analyzes those -- those justifications, those

10  series of events, and takes a very different view stating

11  essentially there are reasonable -- and I think they are saying

12  more than that -- I think they are saying there are actual

13  contrary interpretations that are borne out by the evidence

14  that they feel that they have in connection with it.

15       And clearly, this type of contest between the two parties

16  would require an evidentiary hearing in the Court's view.

17       All right.  So looking at the allegations now supporting

18  the inference of flight, there are three that give the Court

19  some concern.

20       And I'm really turning to Mr. Peters on this -- and not in

21  any particular order, one is the access to considerable sums of

22  money, which while she may not have direct -- she -- I mean,

23  Ms. He may not have direct access -- does have access to it

24  through other means.

25       And, by the way, I have no idea whether these statements

1    are true or not; okay.  I mean, that's why we have a hearing to

2    make some determination.  I don't know.

3        But that's -- that's the Government's argument.  There are

4    considerable sums of money that the Government cites to.  And,

5    therefore, I think I need to know from the Defense -- I need

6    more information about those sums of money.

7        One, are they -- not to the dollar and cents -- but are

8    they basically correct; that there are literally, I think,

9    millions of dollars to which she would have -- the Defendant

10   would have access to or arrange to have access to?  That's

11   number one.

12       Number two, what exactly were the circumstances

13   surrounding the use of a passport, which the Defendant

14   allegedly said was a stolen passport -- was a missing

15   passport -- lost, missing, stolen, whatever it is -- namely,

16   did the Defendant use that passport subsequent to having

17   reported that it was missing or stolen?  What were the

18   circumstances surrounding that?

19       Three -- let's see if I remember three -- yes, there is an

20   issue as to really -- in connection with her ties to the

21   Northern District of California, the United States -- in the

22   last five years -- well, the question is:  Has she really

23   resided here or has she really resided elsewhere in the sense

24   of where has she spent almost all of her time or most of her

25   time regardless of the reason.

```
 1        Regardless of the reason, whether it be the illness of her
 2   brother, whether it be her job requires it -- regardless of the
 3   reason, the Government takes the position -- whether correct or
 4   not -- that you look at the last, I guess, a long period of
 5   time; but I'm only interested in basically the last five years.
 6        In the last five years how much time has she spent in the
 7   United States versus how much time she has spent elsewhere?
 8        She doesn't have a house.  I mean, I know that one has
 9   been arranged in connection with a bail condition, but she
10   doesn't really, to my understanding, own real property in the
11   United States.
12        I don't know what her ties are really to the United
13   States, but I thought it would be extremely informative if I
14   could get a sense of what is -- what is her conduct, habit,
15   facts of her ties to the United States in the sense of where
16   she has resided.  So I need -- I need that information.
17        Now, I have another thing to say because we are not going
18   to have that today.  I'm going to set it over for a hearing.  I
19   was actually going to set it over for Friday because she is in
20   custody, but I need these questions answered.
21        Another question that I want you to think about -- and
22   only you can think about this, Mr. Peters, you and your brain
23   trust back there -- is one possible condition of a release
24   would be not unlike the conditions that were imposed for
25   Dr. Lynch.
```

1      That is to say, that there be a protective service paid by

2  the Defendant or by members of her family or by friends or by

3  someone to -- to essentially a house arrest situation which is

4  enforced by an independent agency.

5      If she has those resources -- and I'm not -- in a sense I

6  don't -- I don't care.  I mean, I'm not -- I'm not -- I am here

7  to -- if she -- it's my responsibility to see whether a set of

8  circumstances could guarantee or assure her presence.  That's

9  the issue.

10      If she has the resources or people are willing to put up

11  the resources or the company is willing to devote the resources

12  or somebody is willing to devote the resources -- my view is

13  she is presumed to be innocent; and she should enjoy that

14  presumption -- and because she has resources, it doesn't mean

15  she shouldn't be able to use them if that's a possibility.

16      And, again, Mr. Peters, I don't want you to answer any of

17  these questions today because I think it is part of a larger

18  mosaic that -- I mean, you can if you wanted to.  I'm not

19  muzzling you.  I mean, good luck with that.

20      But it is not my intention to put you on the spot.  It is

21  actually my intention to get you to -- and both sides

22  basically -- to be prepared to answer these questions in a

23  cohesive way.

24      And if that's possible, fine.  If not, also fine.  So I

25  was not going to entertain any discussion unless somebody wants

1  to talk and simply set this over for Friday at 11:00.

2       And if you have to return to Washington, you can

3  participate by Zoom; but you have perfectly decent counsel out

4  here that can deal with it or you can stay.

5           MR. FOSTER:  We do.  And I'm perfectly happy to stay

6  in my hometown for a couple of days, Your Honor.

7           THE COURT:  Okay, great.  Well, you can go this

8  afternoon, 12:30, there is a Giants game.  They are playing the

9  White Sox, which apparently is the only team they can beat, but

10 you are free to do as you wish.

11          MR. FOSTER:  It's a beautiful day for baseball.

12          THE COURT:  Pardon me?

13          MR. FOSTER:  It's a beautiful day for --

14          THE COURT:  It's a beautiful day.  Go ahead,

15 Mr. Peters.

16          MR. PETERS:  I could address all of these issues now.

17 I'm wondering what the Court envisions in terms of a -- of a

18 hearing and what the Government envisions.

19      I mean, are they going to call agents to testify about

20 certain facts?  I'm just not -- I'm trying to picture what will

21 happen Friday.

22          THE COURT:  First of all, it is a de novo hearing.

23          MR. PETERS:  Right.

24          THE COURT:  Okay.  And I think the answer to that

25 is -- is the Government can do whatever they want to do.

1   However, I would ask the Government to tell you what they are

2   going to do, either today or tomorrow morning or something.

3   Today is Wednesday.  So, I mean, you can tell them either at

4   the end of today or tomorrow morning so that the -- so that the

5   Defense can prepare.

6           **MR. FOSTER:**  Of course, Your Honor.

7           **MR. PETERS:**  Your Honor, it may be helpful to sharpen

8   the issues for a little bit for me to respond on these three

9   issues.

10          **THE COURT:**  And, by the way, I don't know that these

11  are the only issues.  I will tell you there was so much

12  material -- and you see I have been engaged in other frolics

13  and detours with other cases, trying to figure out why I don't

14  have jurisdiction to change a detention hearing -- so I don't

15  know that I have devoted enough time to really understand --

16  and I just got the Government's brief, you know.

17          **MR. FOSTER:**  We apologize, Your Honor.

18          **THE COURT:**  That's all right.  And this is a little

19  bit like a -- not to make light of it, but the positions are so

20  starkly opposed, they are -- that you read one brief and you

21  say, "Oh, you are right."  And then you read the next brief and

22  you say, "No.  You are right."  And the answer -- I don't know

23  what the answer is.

24      So, I don't like "you are right; you are right; you are

25  right."  There has got to be some -- the Court has to make some

1    reasoned judgment.

2         Now, it's obvious to me -- I don't know "obvious" may be

3    the wrong word -- there may be people who are providing

4    information to the Government as to what's in the -- what's

5    been disclosed that it may be important to present one way or

6    the other.  I do think this is a very significant motion

7    obviously.

8         **MR. PETERS:**  It is very important to us to try this

9    case with her not in custody.

10        **THE COURT:**  Right.  I can understand that.  And, by

11   the way, I just want to point out, I'm ready to try it early.

12   I mean, that's always a grand statement.  I mean, I will try

13   this case as soon as the Defense is ready to proceed.

14        So if you are telling me you are ready to proceed in

15   60 days, we will try it in 60 days.

16        **MR. PETERS:**  I'm not telling you that, Your Honor.  We

17   have been focused on bail.  I haven't looked at discovery.

18        **THE COURT:**  You are not in that position, but I do

19   want you to know that I can appreciate -- I can appreciate the

20   seriousness of the case and your client's situation and -- and

21   it will -- I'm free to try it at the convenience of the

22   parties.

23        **MR. PETERS:**  Your Honor, maybe it's a failing of mine

24   that I can't come to court and have -- be asked three questions

25   that I think I can address to Your Honor and not start to

1    address them, and I think it may sharpen whatever happens on

2    Friday if we do.

3              **THE COURT:**  Go ahead.

4              **MR. PETERS:**  So let's talk about access to money --

5    and this relates a little bit to the third issue you

6    mentioned -- but in 2023, Ms. He bought real estate in Georgia;

7    spent about $250,000 with another person.  Owns real estate in

8    Georgia.  Not exactly the kind of thing that a person does, who

9    according to the Government at that point in time, has

10   attempted to and is intending to flee.

11        She also received, here in the United States, a $400,000

12   dividend from Dunn, the company that she founded in 2023; paid

13   taxes on it and bought at HSBC Bank a fairly stringent

14   certificate of deposit.  So -- and that's really the lion's

15   share of the money she has.

16        She has an account in China that she has had for a long

17   time with $1,400 in it.

18        The Government talks about millions of dollars, and I

19   think on page 18 of their brief they refer to Dunn transferring

20   a million dollars or so to this company called Make Believe in

21   Hong Kong.

22        Make Believe is an agency which hires contractors who work

23   for Dunn.  That money was paid by Dunn to hire people in Asia

24   Pacific region who work for the company.  It is not Ms. He's

25   money.  She doesn't have control of it.  She doesn't spend it.

So, the idea that she has access to millions of dollars, she doesn't.  She -- and the circumstances of the assets that she does have, suggest not a person who is attempting to flee and put money abroad so she can feather some foreign nest.

She buys real estate in '23 in Georgia investing in her assets in this country.  She has a certificate of deposit at HSBC Bank, which is the post tax $400,000 dividend.

So, the idea, which sort of gets us around -- I'm going to address your last question about the Lynch type condition.

We have looked into that because we are obviously familiar with the Lynch case.  It's just really, really expensive to do what Lynch did.  Cost in the neighborhood, I think, of about $150,000 a month to do that.

And so, having the resources to do it, that said if there is some -- we will move heaven and earth to address the Court's concerns.  And if there is conditions that the Court wants us to find some way to do, we will.  That's why we have proposed that she live in this rented house in Fremont -- she doesn't own it.  Her family doesn't own it -- with her aunt and her mother, who is present in court, came here from China.

And her mother and father -- father is still in China but her mother is here in this courtroom -- are prepared to post $500,000 in cash, which is essentially their life savings.  So that if she were to flee, she would be taking her parents' cash, so -- on the first.

1          The second, this idea of the lost passport, that was

2    first -- came to my attention last night when I read the brief.

3    I hadn't seen this document before.  It is Exhibit 23 to the

4    Government's brief.

5          And it struck me right off the bat as strange because the

6    suggestion would be that back in 2021 -- before there was a

7    criminal investigation, before anything happened -- that she

8    had somehow fabricated the loss of her passport, which she

9    would have had no motive to do.

10         We have submitted to the Court the document from China

11   about her passport being lost and her getting a replacement

12   passport.

13         So -- and this is something that just may be sharpened for

14   the hearing on Friday -- Exhibit 23 to the Government's brief

15   is this document -- and the Government says in its brief that

16   she presented the old passport when she came into San Francisco

17   on January 3rd of 2023.

18         That's not what that document shows.  If you look at that

19   document, it refers to something called the Advanced Passenger

20   Information system.

21         And so what did I do last night?  I Googled it:  And there

22   is information on Customs and Border Patrol which explains the

23   Advanced Passenger Information system.

24         And the Advanced Passenger Information system requires

25   airlines in foreign cities when passengers are traveling to the

1    United States to be shown a document by each passenger to

2    demonstrate that they have the right to enter the United

3    States.

4        Makes sense.  The U.S. Government doesn't want airlines

5    bringing people to the airports in the U.S. who have no right

6    to enter the country.

7        So -- and I don't know exactly what happened here, but I

8    am confident that Ms. He did not use that old passport.  Here

9    is what I believe happened -- and maybe we can learn more by

10   Friday because the Government would have access to this

11   information -- the document that she would have had to have

12   shown in Singapore when she got on that plane -- and keep in

13   mind she is coming back voluntarily at a time that the

14   Government is saying she wants to flee.  She is getting on a

15   plane in Singapore and flying back to the United States.

16       She would have had to have shown her green card.  She had

17   a green card.  She got her green card in 2020 as permanent

18   resident alien because she wants to live here.

19       And so she would have shown her green card.  Now, I don't

20   know whether under some U.S. Government database or a United

21   Airlines database that green card would have corresponded to

22   her prior passport, and that's why the -- that passport number

23   would have shown up on that document.

24       But if you look at that document, it's clear that it

25   refers to the advanced passenger data, which is the system that

1   I have just described, and that's based not on any access to

2   people from Customs and Border Patrol.  It is my reviewing

3   documents online last night from Customs and Border Patrol,

4   which explain this system, and I believe that that's the

5   explanation for how that happened.

6        But hopefully we can learn more about that because when I

7   read that in their briefing -- it had never come up before.

8   Never been raised before in any of the detention hearings.  And

9   I saw that document, and I didn't understand it so I started

10  looking at it and trying to figure it out; and that's what I

11  learned.

12       And to the third issue, where she lived in the last five

13  years, she -- except for one year in China during the pandemic

14  when her mother was sick, she has lived here.

15       We can show you where she lived, but she has lived here

16  and she has got her assets here.  She recently bought real

17  estate.  She doesn't live there in Georgia.  We have --

18            **THE COURT:**  What I need to know very simply is:  There

19  are 365 days a year.  Tell me of the 365 times five, how many

20  days she has been here or is there somewhere else.  And I don't

21  care where else, and I don't know the reasons.

22            **MR. PETERS:**  We will refine that, but basically four

23  out of the five years she has been here.  She had to be here

24  until the fall of 2020 when she got her green card.  And then

25  she went to China for a year.

1       Since she got back from that trip in January of '23, she

2  has been here.  She hasn't left the country.

3       She was going to take a trip in February of '23, and a

4  bunch of agents came to her house and told her not to travel

5  and so she didn't.  She gave her passport to Miranda Kane, who

6  was then her lawyer, and Miranda Kane told the Government,

7  "We've got her passport."

8       She hasn't had her passport since then.  I have her

9  passport in court today.  Thereafter, the Government made a big

10  deal in front of Magistrate Judge Hixson in September of '23

11  she tried to go to Costa Rica.

12       I think they have abandoned that now.  I think we have

13  demonstrated that that was just a mistake because San Jose,

14  Costa Rica and San Jose, California have almost the same code

15  if you buy a ticket.  And why would she flee to San Jose, Costa

16  Rica?  I mean, it just makes no sense.

17            **THE COURT:**  Have you ever been to San Jose?

18        **MR. PETERS:**  I have actually.  I wouldn't flee to San

19  Jose, Costa Rica.  Others might.  I don't know.  But Ms. He was

20  not fleeing.  As soon as it was pointed out to her that she had

21  made this mistake in a booking, she said thank you.

22            **THE COURT:**  I accept that.

23        **MR. PETERS:**  And then the last one is December of last

24  year, her then lawyer Vicki Chou, former AUSA in Los Angeles,

25  said to the Government, "Is it okay if she travels and goes to

1    China?"

2        They said, "We don't want her to travel."  She didn't.  So

3    she hasn't traveled in 18, 19 months.  Hasn't had her passport.

4    We have her passport.

5        So, we can cover the time period; but this whole period of

6    time that the Government says she is attempting to flee or

7    planning to flee, she voluntarily gives up the passport and

8    never leaves the country.  I think that's powerful, Your Honor.

9            **THE COURT:**  Okay.  All right.  So there may be other

10   issues that -- did you want to respond to any of this or --

11           **MR. FOSTER:**  I'm happy to, Your Honor.

12           **THE COURT:**  Go ahead.

13           **MR. FOSTER:**  If you would like.

14           **THE COURT:**  Sure, go ahead.

15           **MR. FOSTER:**  I will be brief.

16           **THE COURT:**  Just address the three issues if you will

17   because --

18           **MR. FOSTER:**  Yes.  Access to money, it is rare that --

19   that you have a plan to prepare for flight that is this brazen

20   and is documented in encrypted communications.  And there is a

21   number of exhibits related to that including exhibits about

22   setting up accounts in the names of foreign nominees who would

23   then transfer funds to her.

24       Government records in complete show that through the

25   company that over $13 million has been transferred to overseas

1  accounts of unknown origin.

2      And we continue to find out about additional information

3  such as just yesterday finding out that a bank had closed one

4  of the company accounts because of suspicion of international

5  money laundering and fraudulent invoices.

6          **THE COURT:**  Okay.  Are you able to establish that she

7  has any -- that she has access to these accounts?

8          **MR. FOSTER:**  Those accounts, not specifically.  What

9  she does have access to are the company accounts.

10     And one thing should be made clear.  She is the company

11 and the company is her.  This is not a company with a board of

12 directors.  It's not a company like Hewlett Packard.

13     This is a company that she is in almost complete control

14 of.  We know that she has transferred through the company

15 millions of dollars in connections with legal expenses.  We

16 know the company accounts recently had over $10 million in

17 them.

18     We know that we found out after -- there's a lot we are

19 finding out after these two magistrate judges concluded that

20 she should be detained, we found out about this HSBC account

21 with $400,000 in it, which I think cuts against the previous

22 representations about the modest salary and living on a

23 shoestring budget.

24     She does have foreign bank accounts with some amounts of

25 money in them, and she has access to all of these funds.

1    Second, the passport -- our understanding from CVP -- we

2    will get someone here Friday to explain it to the extent that

3    that is an issue -- but this again goes beyond what both

4    magistrate judges thought was sufficient.

5    Where she spent the time, she spent time in China, over a

6    year and she made false statements -- what multiple witnesses

7    believe to be false statements about the reason that she was

8    staying there; lying because it was the COVID pandemic and she

9    couldn't travel to the United States when those restrictions

10   were not in force.

11   Then she came back briefly for a little over two months

12   and left the country for about a month and then she came back

13   again.  And in that time period, the January time period, she

14   is communicating with foreign associates about how she needs to

15   transfer funds to countries without extradition treaties; how

16   she needs to transfer funds to accounts in the names of

17   nominees; how she needs to flee to China in the event that she

18   is arrested.

19   These are communications -- and we have submitted -- I

20   think it's Exhibits 22 and 23, perhaps -- additional

21   communications about this plan for flight that we have found

22   since these magistrate judge proceedings.

23   Now, it is correct that she did stay.  She was advised by

24   her lawyers that she might be arrested if she attempted to

25   leave, but we have heard from multiple witnesses that she

1    nonetheless did not consider these proceedings particularly

2    serious because many prominent technology executives had been

3    investigated without being charged criminally.

4         Nonetheless, in this time period she did make -- through

5    Counsel -- false representations to the Government.

6         The Atlanta house, in December it was represented to the

7    Government that she should be allowed to leave the country to

8    China because in her view this investigation wasn't going

9    anywhere.  It was languishing.  And she now had ties to the

10   United States in the form of property that she was residing in

11   in Atlanta.

12        But, of course, the Government discovered that the day

13   after she had purchased the property, months previous, she had

14   put it up for rent, one day after the purchase and never

15   resided there.

16        Further, during this time period she was opening up bank

17   accounts in nominee names.  She got a cellular telephone in the

18   name of a third party.  She had no fixed address.

19        And the Government was obtaining multiple ping warrants.

20   She was doing things like using her phone in airplane mode such

21   that AT&T reported that it was off during the time, so it was

22   very difficult to identify her whereabouts as a nomad.

23        And in regards to the time period here, I think the

24   question is given these charges, which are now extremely

25   serious any way you look at it, it has significantly changed

1    the calculus as to flight.

2        And so someone who was making a demonstrated plan for

3    flight previously -- even when she didn't take this very

4    seriously -- now has every motive to flee.

5        And I think to Your Honor's questions about conditions,

6    you referenced Mr. Lynch -- and this is a very light package --

7    but I think even before Mr. Lynch, you referenced Mr. Cohen --

8    and of course me and Mr. Topel were on the other side of

9    that -- and I would say that like Mr. Cohen in Your Honor's

10   view, this Government just can't trust this Defendant.

11           **THE COURT:**  Well, wait a minute.  I mean --

12           **MR. FOSTER:**  She has a history of obstruction.

13           **MR. PETERS:**  So --

14           **THE COURT:**  You know, I think it's very -- I cite

15   Dr. Lynch because -- because of the arrangement that was worked

16   out, which was entirely satisfactory; and that is an

17   arrangement that the Court can consider.

18       Indeed, you are absolutely right that Mouli Cohen, I had a

19   similar arrangement -- Mr. Lincenberg was counsel in that

20   arrangement -- and it didn't work out too well because he was

21   bribing the guards and trying to figure out a way to shake the

22   tail of the officers.

23       I don't think -- so, I just leave that aside.  I mean, I

24   don't -- I don't -- sure, a Defendant has that -- has that

25   opportunity.  There always are opportunities.

1    I don't know that -- that -- I don't think it's fair
2  necessarily to take one and say the other.
3    I would have to be convinced if that's a path that -- that
4  we should consider, I would have to be convinced that -- that
5  that condition wouldn't work.
6    I think the burden is on -- in a sense on the Court --
7  maybe on the Government -- to show no set of conditions,
8  reasonable -- that are reasonably ascertainable.
9    And so I'm asking the question, reasonably -- well, I
10  don't know, ascertainable -- that are within the scope of the
11  Defense's ability to provide.  You know, you are not going
12  to -- I'm not going to give some condition that nobody can
13  provide -- can satisfy.
14    The question is whether or not -- the first question is
15  can they be provided.  That's the first question.
16    I think in a way that's the most extreme -- when I take a
17  look at Dr. Lynch, I thought that was a pretty extreme set of
18  conditions.  The reason is that the person had $400 million and
19  had absolutely no ties to the United States whatsoever; no
20  property, no family and had fought extradition for four years.
21    And so the one thing that was clear is that he didn't want
22  to be here; notwithstanding the fact that he was acquitted.
23  But this is -- you know, that's hindsight perspective.
24    So, I think his case was the most extreme.  And yet, those
25  conditions were entirely satisfactory.  I mean, he was a person

1   who could arrange private planes without any -- without a

2   moment's notice.  So those conditions were satisfactory.

3        I think you have to treat the conditions as they are if

4   there are conditions that the Defense can satisfy.

5        I mean, I really do think that I have to go through a set

6   of conditions.  That's a set of conditions that I'm proposing

7   only if they are achievable, and I'm not asking the Defense at

8   this point whether they are achievable or not though on Friday

9   they should be prepared to discuss.

10        **MR. FOSTER:**  I agree, Your Honor.

11        **MR. PETERS:**  I would ask, Your Honor, that, you know,

12   Counsel makes and has made this morning a bunch of sweeping

13   statements without reference to any specific facts.

14        And with all respect, I believe some of them are

15   inaccurate.  The statement about $13 million transferred, I

16   would like to know what he is talking about because none of

17   that money is Ms. He's.

18        And so, if there are documents that show Dunn or somebody

19   transferred $13 million, I would like to see the documents.  I

20   have never seen them.

21        **THE COURT:**  Okay.  So let's put down the ground rules

22   for the hearing because I think you are right.  I think as to

23   any particular fact that you say mitigates against a release,

24   you know, it -- the basis of that assertion should be in your

25   pleadings or advise Mr. Peters of it or Mr. Cody [sic] or

1    someone advise --

2          **MR. FOSTER:**  Of course, Your Honor.

3          **MR. PETERS:**  And, you know, that she has complete

4    control of the company, the company is represented by Chris

5    Steskal from Fenwick & West.  Counsel knows that.  They have an

6    independent board member.  Ms. He is not in complete control of

7    the company --

8          **THE COURT:**  I don't know.

9          **MR. PETERS:**  -- and its assets.

10         **THE COURT:**  I don't want to get into this argument.

11   If it's going to be a point, which obviously that's a point, it

12   has to be -- there has to be evidence of it.

13       That's what the evidentiary hearing is all about.  So

14   that's what we are going to do on Friday at 11:00 o'clock, and

15   I think --

16         **MR. PETERS:**  Could we see the evidence in advance --

17         **THE COURT:**  Go talk to --

18         **MR. PETERS:**  -- besides 10:30?

19         **MR. FOSTER:**  Of course, Your Honor.

20         **THE COURT:**  Sit down with him and go through it.

21   Okay.

22         **MR. PETERS:**  Thank you, Your Honor.

23         **THE COURT:**  All right.  And I want to thank everyone

24   for coming.  They can come back on Friday or not, but I

25   understand her family is obviously in support of her and so

```
 1   forth.

 2       Do you have a condition -- do you have a set of the

 3   Dr. Lynch conditions?

 4          MR. PETERS:  We got your order online.  It just -- if

 5   Ms. He had anything close to the money that Dr. Lynch had, it

 6   would be a different thing.  Just, $150,000 a month is really a

 7   lot.

 8          THE COURT:  You know what?  Of course it's a lot of

 9   money, but that's what it costs.  I'm not in the negotiation

10   business, and that's what it costs.  Some people can afford it

11   and some people can't.

12       I don't know.  And it may be that your client cannot

13   afford it and cannot raise the funds to pay for it.  If that's

14   the case, that's the case.  I mean, that's the case.  But, I

15   mean, that obviously is a set of conditions.  I'm not saying

16   it's the only set of conditions.

17          MR. PETERS:  Yep.

18          THE COURT:  And I'm not saying -- I'm not saying

19   anything except I will see you at Friday at 11:00 o'clock.

20          MR. PETERS:  And thank you, Your Honor, for taking the

21   time to read all of that stuff, which obviously is quite a lot.

22          THE COURT:  Yes.  Thank you, very much.

23          MR. PETERS:  We appreciate it.  Thank you, Your Honor.

24          MR. FOSTER:  Thank you, Your Honor.

25               (Proceedings adjourned at 11:22 a.m.)
```

1

2

3                       **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   August 22, 2024

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
          United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 2

```
 1                                    Pages 1 - 25

 2                      UNITED STATES DISTRICT COURT

 3                    NORTHERN DISTRICT OF CALIFORNIA

 4  Before The Honorable Charles R. Breyer, Judge

 5  UNITED STATES OF AMERICA,      )
                                   )
 6             Plaintiff,          )
                                   )
 7    VS.                          )        NO. 3:24-CR-00329-CRB-1
                                   )
 8  RUTHIA HE,                     )
                                   )
 9             Defendant.          )
    _____)
10
                                    San Francisco, California
11                                  Monday, September 9, 2024

12                        TRANSCRIPT OF PROCEEDINGS

13  APPEARANCES:

14  For Plaintiff:
                              U.S. DEPARTMENT OF JUSTICE
15                            Fraud Section
                              950 Pennsylvania Avenue, Northwest
16                            Washington, DC 20530
                         BY:  JACOB N. FOSTER, ATTORNEY AT LAW
17
                              ISMAIL J. RAMSEY
18                            United States Attorney
                              450 Golden Gate Avenue
19                            San Francisco, California  94102
                         BY:  JINA CHOI
20                            ASSISTANT UNITED STATES ATTORNEY

21  For Defendant:
                              KEKER, VAN NEST & PETERS, LLP
22                            633 Battery Street
                              San Francisco, CA 94111
23                       BY:  NICHOLAS D. MARAIS
                              CODY J.K. GRAY, ATTORNEY AT LAW
24
    Reported Remotely By:  Stephen W. Franklin, RMR, CRR, CPE
25                         Official United States Reporter
```

<u>**Monday - September 9, 2024**</u>                                          **2:04 p.m.**

2                             P R O C E E D I N G S

3                                 ---o0o---

4           **THE COURTROOM DEPUTY:**  Calling criminal action CR-

5      24-0329, USA versus Ruthia He.

6           Counsel please step forward and state your appearance for

7      the record.

8                **MR. FOSTER:**  Good afternoon, Your Honor.  Jacob

9      Foster with Jina Choi on behalf of the United States.

10               **MR. MARAIS:**  Good afternoon, Your Honor.  Nick Marais

11     and Cody Gray from Kecker, Van Nest & Peters for defendant

12     Ruthia He, who is present in court and in the custody of the

13     U.S. Marshals.

14               **THE COURT:**  And there's also an interpreter?

15               **MR. MARAIS:**  There is, Your Honor, who I believe has

16     been sworn.

17               **THE INTERPRETER:**  Your Honor, the interpreter's name

18     Yang Shao, a California certified court interpreter.

19     Certificate number is 301244.  I was just sworn in by the

20     clerk.

21               **THE COURT:**  Thank you.

22          Okay.  All right.  So the Court has received, again,

23     several filings in connection with this, one as recently as 10

24     minutes ago, roughly 10 minutes ago, 15 minutes ago.

25               **MR. MARAIS:**  We filed it at 9:00 this morning, Your

1   Honor, but ...

2           **THE COURT:**  Oh, that's the way our technological

3   system works.  Okay.  Well, be that as it may, I mean, I've

4   read it.

5        So, thank you.

6        Let me tell you what I think the issues are.  Because

7   there's a lot of back and forth about this representation or

8   that representation, or what this means and what that means,

9   and what a witness has said, and what a witness has said may be

10  unclear whether the witness understood the exact terms of what

11  went on, some approval of dividends or whatever.  And I think

12  all of that, by the way, may have some bearing at some point on

13  the case.  May have some bearing on credibility.  It's not --

14  I'm not excluding it.  But I think that a couple of things have

15  emerged that, well, I think ought to be recognized as guiding

16  principles in connection with the issue of release.

17       Number one, the question -- and the government raises it,

18  and I think I just want to respond to it -- of trust, could I

19  trust the defendant to honor any commitments that the defendant

20  undergoes in connection with bail or release, and the

21  government says, no, the defendant can't be trusted.  I think

22  that's absolutely correct.  I'm approaching it from the point

23  of view that anything that she says and what she may do are

24  subject to the reality that she presents a substantial risk of

25  flight and she presents a substantial risk of obstruction of

1    the investigation in one form or another.

2         Indeed that's exactly why we're talking about all these

3    things.  If she could be trusted, we wouldn't do this.  It

4    would be a routine.  You know, release on a series of promises,

5    and that's the way it works in 99 percent of the cases.  This

6    is the 1 percent.

7         So I'm not, quote, holding it against -- I don't think

8    it's fair to deny bail to somebody who can't be trusted.  I

9    don't think that's the test:  Can the person be trusted.  If

10   that's the test you would have -- you wouldn't have the -- you

11   wouldn't have these proceedings, and I think you wouldn't have

12   other proceedings, because clearly when you're dealing with a

13   case and where the allegations are fraud in which the person is

14   a resident, essentially, a citizen of another country which is

15   nonextraditable, you wouldn't -- it would be an open and shut

16   case.

17        I mean, it would be, well, the person can't be trusted,

18   she committed these offenses, and therefore there's no

19   condition of bail, what would be reasonable to ensure the

20   person's presence, just deny it out of hand.

21        I don't accept that.  I look at it from a different point

22   of view.  I look at it from given the fact she can't be

23   trusted, are there a set of circumstances, conditions that are

24   reasonable can be imposed and will assure, to the extent

25   possible, her presence.  Now, what does that mean in this

```
 1   context?  Well, in this context it means that it is that there
 2   may be such conditions, and that can address essentially the
 3   two criteria that I've identified, flight and obstruction.
 4        As to flight, I actually thought that there was agreement,
 5   maybe not explicit, but implicit, that if she is guarded by
 6   this agency with two guards, in which she is placed in -- in
 7   which she is confined to her home except for certain specific
 8   tasks -- lawyers, medicine, that -- and that she has
 9   surrendered her passport and wears an ankle monitor, that that,
10   from the point of view of flight, is a reasonable condition to
11   ensure her presence.
12        Now, the government takes a position, and maybe they're
13   right, these things don't necessarily work.  And I think of
14   course they don't necessarily work, but I think that they have
15   in a number of cases worked, and you would have to tell me why
16   in this particular case it wouldn't work.  If you tell me that,
17   I'll consider that reason.  But it can't be, well, we can't
18   trust her.
19        Now, I assume that but for whatever restraints we put on
20   her, she'd leave.  Okay.  Don't have to say anything more on
21   that subject.  She's outta here.  So the question is:  Are
22   these restrictions sufficient.  I went from one guard to two,
23   to confinement of eight hours a day to 24 hours.  I did certain
24   things at least occurred to me, and I've imposed them in other
25   cases that address that concern.
```

1      And I'm going to hear from you later, but you have to tell
2   me why it's not going to work, other than, we just don't think
3   it works because the person can cut this or overpower the
4   guards or something like that.  If you have some reasons, I
5   need to hear it.  But they have to be really addressed to her,
6   her circumstance; why it's not going to work in her
7   circumstance.
8      Okay.  Now, let me get to the second part, and I'll get to
9   the third in a minute.  The second part is the obstruction.
10  And it seems to me that the conditions -- and again, the
11  government comes back and says these are inadequate.  Well,
12  okay.  I don't know.  You know, first of all, interpretive
13  technology.  I'm regrettably quite behind the curve, so I
14  really do need to rely on ...
15     And the government says, well, look what you did in the
16  *Mouli Cohen* case.  Fine, I'm willing to do it in this case.  If
17  there's a condition that I imposed in the *Mouli Cohen* case the
18  defense doesn't think is a reasonable condition, they can tell
19  me.
20     On the other hand, if you want to augment that condition
21  for something else, we can do that.  Technology has changed,
22  you know, in terms of WhatsApp and da, da, da, da, da.  I
23  understand that there are things that may be more, quote,
24  current to address that particular task.
25     The third prong is what I call the incentive prong.  And

```
1   the incentive prong is how much money should be posted so that
2   if she does flee or if she's considering fleeing, she realizes
3   that financially it's going to impact such and such a thing.
4   So the government says, look, 500,000 in cash, even if it is a
5   $5 million bond, isn't -- and even if she posts her shares
6   isn't going to -- isn't sufficient, because I guess what
7   they're really saying is that even if you post her shares,
8   there's no guarantee that when the day comes, there will be
9   $5 million-worth of stock.  I guess that's what maybe the stock
10  would be worth that.
11          So I ask the government now -- or not immediately, but I
12  think what they have to do is look at the cash portion of what
13  she's putting up.  And, in other words, maybe it ought to be a
14  million dollars of cash or some other sum.  And I was curious
15  as to whether the government has an opinion as to the
16  penalties, financial penalties, that could be imposed if she is
17  found guilty of a crime, or crimes.  In other words, what is
18  really at risk here financially, even from the government's
19  point of view.
20          So that's an analysis.  But now I think there's a logical
21  nexus between the money that's being posted and the harm that
22  she's avoiding, and if it turns out like, okay, it should be
23  2 million, or a million, or 500,000 or something, then it's as
24  if -- it becomes a -- not exactly a zero sum game, but it comes
25  that the government then is repaid or receives, in a sense, the
```

1    benefit of their conviction, save except for no conviction.

2    And I'm not suggesting they're in parity, I'm just simply

3    saying that's a way to look at it from the government's point

4    of view, from the Court's point of view.

5        So those are sort of three things that I think are in play

6    here.  I don't think it's helpful, to go back to the theme of a

7    dispute over the facts.  Look, of course there's a dispute over

8    the facts, and I'm not sitting here trying to figure out who's

9    right and who's wrong on the facts.  I think, in candor, the

10   government has produced enough unambiguous evidence to

11   demonstrate that she is both a severe flight risk and that she

12   would take efforts to obstruct the investigation.  That's all I

13   have to find.  I don't have to find anything else; that's

14   enough.

15       I say, okay, given those two things, what can be done

16   about it?  Because she is entitled to bail if there is or are

17   sets of conditions that would address those problems.  That is

18   the analysis, not anything else.  Not a presumption she's

19   guilty or not; it's a controlled substance, blah, blah; it's

20   presumed this way and that way.  I got all that.  But I also am

21   guided in principle by the fact that she is presumed to be

22   innocent, and that she's entitled to that presumption, and that

23   presumption would allow her to be free pending a conviction by

24   the jury, and that -- so that's where it starts, and then it

25   becomes more complicated by the exceptions.

1      But the exceptions aren't -- the exceptions would be

2   exceptions, but they're not -- it's not the end of the inquiry

3   is what I'm suggesting.

4      Okay.  Now, after saying all that, I'm more than pleased

5   to discuss any of these points with counsel.  I think what I'm

6   going to do, or what you're going to do, is you're going to

7   either sit down and have a joint conference or not and come up

8   with, quote, a -- see, the government, in a way, doesn't -- and

9   I got it -- doesn't want to come up with a set of conditions,

10  because they think that in doing so -- and I'm not suggesting

11  bad faith, but in doing so, that they are compromising their

12  position that there is no set of conditions.  Well, I would

13  disagree with you.  I think there's got to be some set of

14  conditions.  Now, whether they're reasonable or not, whether

15  they're doable or not, I don't know.  And that's why I'm really

16  turning to the government to flesh it out without compromising

17  your position, and that in your view there are no conditions

18  that would satisfy this.

19          MR. FOSTER:  Yes.  Of course, Your Honor.

20      And I think we've engaged in good faith with the defense.

21  We've had a series of calls bordering on an hour from the time

22  these proceedings have been initiated with the purpose of

23  narrowing the issues in dispute for the Court, so if it must,

24  it can reach a decision on whether there are no set of

25  conditions or whether there are some that would permit the

1    defendant's release.  So I'm happy to address some of the

2    questions the Court had and its observations, which I think

3    were apt, or discuss further with defense counsel.

4              **THE COURT:**  Well, I think nothing is harmed by taking

5    this opportunity to have a discussion.  I mean, unless somebody

6    want -- unless you think it ought to be just done between the

7    two groups.  I don't know.  I mean, I've expressed a view as to

8    why the -- ought to be included, and maybe your time is better

9    spent not telling me what it is.  But I'm here to answer any

10   questions, or if you have any positions that you want to be

11   articulated, I'm here then, and I'll be here tomorrow, and I'll

12   be here the next day, I'll be here the day after the next day.

13        So it's -- you know, it's in an effort to come to an

14   answer to this question.  I think both sides are entitled to an

15   answer to this question.  I don't know how -- I think the

16   answer to the question of when to proceed to trial may, in

17   large part, depend on whether the defendant is at liberty

18   during these proceedings.  So I'm not going to try to press the

19   defense on give me a date, that sort of stuff, because it

20   doesn't -- and I know the government has taken the position,

21   and I appreciate it, that you'll go to trial as soon as

22   possible.  In other words, it's not your desire to keep her

23   locked up.

24             **MR. FOSTER:**  Correct.

25             **THE COURT:**  It's your desire to go to trial, I got

that.  I think that's fine, and what you have said is totally consistent with that.

**MR. FOSTER:**  Yes, Your Honor.

Well, let me provide a couple brief observations, and there might be a couple of issues where there's been divergence in the party on sort of narrowing the gap in the conditions where the Court's views may be helpful.

But in response to your direct question about financial penalties, the indictment charges the defendant with a conspiracy to commit healthcare fraud and alleges the submission of over $14 million in claims.  So that would be, at a minimum, the amount applicable for restitution and forfeiture to those insurance plans.

Going back to where you've started.  I agree with Your Honor that it is an overgeneralization to say it's solely about trust for the reasons that you mentioned.  What the government believes distinguishes this case from a run of the mill fraud case or even egregious fraud cases are the quantum of evidence in particular in regards to obstruction.

And Your Honor made the observation that you would put in place the types of conditions at issue in the *Mouli Cohen* case, and we think that that is a substantial improvement on the conditions that have been proposed, and they ameliorate some of the concerns.

That said, there are a number of other courts, not as to

1    flight as Your Honor as observed, but in particular focused on

2    obstruction -- the *Guo* case in the Southern District of New

3    York and the earlier *Orena* case in the Second Circuit, where

4    courts have rejected these types of proposals in cases of

5    obstruction, because the replicating of prison-like conditions

6    in a context inside a home for a defendant, where the question

7    is not just trust as to the underlying offenses but the types

8    of evidence of obstruction and flight we submit are unusual

9    here, that those conditions do not reasonably prevent both

10   obstruction and dangerousness.  And we are in a situation

11   slightly different here from the normal presumption to be free

12   here, where the presumption is to be detained in this case.

13        As to the incentive prong.  This is something that we've

14   repeatedly talked to with the defense about, and in our view

15   the current proposal is actually weaker than what's been

16   proposed to us in meet and confer discussions.  One of the

17   aspects of the meet and confer discussions was a proposal that

18   there be a prong to satisfy the Court as to the Make Believe

19   payments.  And as these proceedings have gone on, what appears

20   is the representations that this -- funds were transferred to

21   Make Believe were bone fide and legitimate, and records would

22   be provided and assurances would be provided before she was

23   released on bond is no longer part of the condition.

24        And, in fact, what the government has discovered, it

25   appears the defendant set up this company, was involved through

1    her own company in setting it up.  It's controlled by the

2    individuals who are running Done now.  And so the government

3    has serious concerns that directly or indirectly the defendant

4    is influencing the operations of the company in a way that is

5    distributing illegal narcotics today.

6         And so in the context of our meet and confer discussions I

7    believe there's a divergence, and we pointed this out in our

8    papers where we raised concerns about the defendant's formal

9    control over Done.  The Court was told you didn't need to worry

10   about that, because there's an independent board member.  That

11   person said there was never a board meeting.  He never had any

12   control of the company.  He's now resigned.  And that, in fact,

13   he put forth proposals after she was arrested for her to give

14   up formal control.  She hasn't done that, which bears on the

15   risks and the adequacy of conditions if she's out on release,

16   because she controls the companies and its finances and its

17   assets and its policies.

18        And as to indirect control, she's been here when

19   representations have been made around that.  And the Court, I

20   think you've observed, may not have the authority to order a

21   change in the corporate practices, but certainly the Court can

22   be unconvinced that the danger to the community and obstruction

23   is ameliorated or sufficiently protected when the company is in

24   the hands of individuals who advised her to flee the country,

25   transfer the assets to foreign jurisdictions, offered to open

1   up accounts in nominee names and did, in fact, open up a

2   company called Make Believe Asia and engaged in financial

3   transfers which led a financial institution, we know, to shut

4   down the account on suspicion of money laundering.

5        And Your Honor was told that all the records were that

6   those payments were legitimate, that they were having

7   difficulty getting them.  And, in fact, the government

8   discovers that one of the owners, the only owner of the Make

9   Believe company, is Haley Zou, who's one of the five people

10  giving direction to company counsel and individual counsel.

11       As to the secured bond amount in terms of the losses, but

12  also in terms of the assets available to the defendant, which

13  are, you know, approaching $10 million, including her own

14  assets and company assets, it would be in the millions of

15  dollars, in the multiple millions of dollars, surely.  We also

16  see things like there was a financial statement provided to

17  this Court that showed her having only about $1700 in one

18  foreign bank account.  The government recently discovered that

19  that wasn't forthright.  The only reason it's down to $1700 is

20  that after her arrest, she transferred money to her mom.

21       So *Nebbia* conditions certainly would be a part of the

22  package that the government envisions.  And also the defendant

23  has no skin in the game in this current package as she's

24  representing it.  And also we've been told at various times of

25  many cosigners for this bond.  It appears that right now the

1    defendant is the only one.

2         So those are among the concerns that we have.  But I think

3    that a major unresolved issue between the parties relates to

4    the threat of dangerousness and obstruction, and that's been

5    where there have been proposals both by the government, not

6    that we would agree to her release, but maybe it would be

7    helpful in narrowing the issues in dispute for Your Honor, and

8    also proposals by the defense that would be helpful to us,

9    because we just simply don't have access to all these records

10   overseas.

11        We have a first subpoena production which the company

12   represented was complete, where we know definitively through

13   third parties that it did not produce a whole swath of

14   evidence, including communications that occurred on the

15   WhatsApp, and that's hindered the government's investigation

16   and proof in this case.  And we have an outstanding subpoena

17   for a later time period beginning in January 2023, where the

18   government hasn't received a response yet besides medical

19   records.  It's received no communications.  And we've been told

20   that, through third parties, that this China team that the

21   defendant set up, the government submits was for the purposes

22   of obstructing the investigation, communicates solely on

23   WeChat.

24        I haven't received any WeChat records for the first

25   subpoena or the current subpoena.

1     So the defendant, if released, would be able to control,

2  directly or indirectly, the response, and the government's

3  investigation in this case, Your Honor, continues.

4     So I think that we are happy to engage further on the

5  types of conditions, and I think as to protocols for private

6  security, that's something that we think the parties should be

7  able to agree upon but did want to provide those observations,

8  as there are some issues that I think perhaps philosophically

9  would benefit from the Court's intervention.

10     **MR. MARAIS:**  Your Honor, this is a good example of

11  how the meet and confer discussion has gone.  I asked many of

12  the questions that the Court has asked today of Mr. Foster when

13  we spoke last Friday.  And as today, rather than respond to

14  those questions about whether there are weaknesses in the

15  security proposal or what dollar amount would be appropriate

16  for the bond, Mr. Foster has continued to press his factual

17  allegations of the case.  Now, I'm happy to respond to those.

18  I have the strong impression the Court would rather that I do

19  not.

20     When Mr. Foster says Scott Koe (phonetic) recalls no board

21  meetings, had nothing to do with the dividend that was paid

22  out.  And I have board minutes signed by Mr. Koe and approving

23  the dividend.  We're not going to agree about the government's

24  factual allegations.

25     I understand the Court to be saying that for purposes of

1    this hearing you are assuming that the defendant cannot be

2    trusted.  I would be remiss if I didn't say that, as we said

3    before, for almost two years between when this company received

4    a subpoena from the United States government and when Ms. He

5    was arrested in June, she followed the rules that were conveyed

6    to her.  She surrendered her passport.  She asked if she could

7    leave the country to go visit family, the government said no,

8    she didn't leave the country.  Had she been asked to

9    voluntarily surrender in June, she would have done it.  There

10    is no court order, no requirement of Ms. He that she has failed

11    to comply with.

12        So when Mr. Foster talks about the *Guo* case, there is a

13    defendant who, in SDNY, was found to have disobeyed explicit

14    court orders, who had a private jet, who had a yacht, and the

15    Court was concerned that he might flee.  We're not in that

16    situation.  Ms. He has followed the rules.  She has not tried

17    to leave the country in the two-year period between when she

18    was aware of this investigation and when she was arrested.

19        I also want to address one other general point, and then

20    I'll turn to the specific conditions.  And that is this idea

21    that Ms. He has no ties to the bay area, which the government

22    has said before and said again in this brief, which personally

23    I find offensive.  Ms. He move here in 2012 to go to graduate

24    school.  She has lived in the United States since then.  She

25    has worked at a number of well-known companies in the bay area

1   in that time.  She applied for a green card.

2       When we were first before Your Honor you asked what

3   percentage of time, what physical presence component in the

4   United States?  So we did the math, and over the last 10 years

5   Ms. He has been in the U.S. 86 percent of the time.  I ran my

6   numbers this weekend.  My number is 90 percent of the time.  So

7   we're neck and neck, Your Honor.  And having gone through this

8   process, I don't think anybody at the government would say that

9   I have no ties to the bay area, and I don't think it's

10  appropriate to say that in Ms. He's case.  She has lived here,

11  she has worked here professionally, she has built her career

12  here, and she has started this company here in the bay area.

13      So I'm not pushing back on Your Honor's determination that

14  there are flight risks, that there are connections in other

15  countries, but I do think it is -- it's wrong to say that

16  Ms. He does not have ties to the bay area.

17      I'm happy to address the three conditions that you've

18  raised.  Originally when we were first here, I think the number

19  we proposed was a $600,000 bond secured by $500,000 in cash.

20  We have now increased the face value of that bond almost

21  tenfold to $5 million.  And in addition to the cash component,

22  we have proposed that Ms. He pledge her shares in the company,

23  all of them, and that they would be forfeited if she left the

24  United States or failed to appear for a court hearing.  She

25  would give up the company that she built and has spent four

1    years working on here in California.

2         So it is a significantly increased proposal from the last

3    time we were here.  When Mr. Foster and I spoke, I asked him if

4    there was a dollar amount north of 500,000 for the secured

5    component that would satisfy the government, and he didn't have

6    a response to that.

7         Ms. He has access to about $600,000 in liquid assets.

8    There's no real dispute about that between the parties.  Her

9    parents have offered to pledge $500,000, as their lifetime

10   savings, to have what Mr. Foster has referred to as skin in the

11   game.  So between those two pools of money, we're looking at

12   about a million dollars.  If there is a number between $500,000

13   and a million that the Court thinks is appropriate that would

14   still allow Ms. He to live a little while she's out and

15   awaiting trial, we're comfortable with that.  But the idea that

16   that bond needs to be north of a million because in

17   Mr. Foster's view she has unfettered access to $9 million in

18   corporate accounts is inappropriate.

19        And, again, the only evidence that they pointed to is the

20   claim that Mr. Koe said he had nothing to do with the

21   dividends, that's simply inaccurate.  Ms. He can't pledge the

22   money that is sitting in the company's bank accounts, but what

23   she can do and what she's agreed to do is pledge all of her

24   stocks in that company, so that if she failed to appear, that

25   would be the end of the road for her, we're done.

1    The second question, the Court has asked us about

2  technology.  Again, I floated this proposal when I spoke to

3  Mr. Foster.  We have suggested that she have a very basic

4  phone, a landline, a dumb flip phone that would allow her to

5  communicate with people so that she can live her life.  And in

6  addition to that, a computer that would have set restrictions

7  in place and would be monitored by Pretrial Services.

8    She needs to be able to communicate with us.  We have

9  proposed that she have access to e-mail, that she be able to do

10  Zoom calls, so that she doesn't have to travel into the city

11  with her security detail.  So she needs access to those sorts

12  of tools.

13    When I spoke to Pretrial Services, they said that's fine

14  and that's standard, and they can monitor everything she does

15  on the computer with certain instructions to make sure that she

16  isn't doing whatever it is the Court prohibits.  She would not

17  have access to any of the ephemeral messaging systems that

18  we've been talking about, like WhatsApp, or Telegram or Signal.

19    To be clear, I dispute the government's allegations about

20  obstruction, but I'm happy for purposes of this conversation to

21  assume, as the Court has suggested, that that's the world we're

22  in.  She would not have access to those apps, and her use of

23  the computer to communicate with us, to communicate with

24  friends and family, would be controlled and monitored.

25    I confess I'm not familiar with the conditions from *Mouli*

1    *Cohen's* case, but I'm happy to discuss those with the Court or

2    with Mr. Foster.

3        On the armed guards.  Consistent with the Court's

4    directions last week, we have proposed increasing that from one

5    armed guard to two armed guards.  They would monitor her 24/7.

6    They would presumably have access to any GPS information about

7    her.  We have proposed a company, Rescor, that was recommended

8    by Mike Lynch's folks.  We would not be opposed to using the

9    same team that Mike Lynch used to comply with this Court's

10   orders if that assuages the government's concerns.  But these

11   are professional outfits who have extensive experience guarding

12   high-tech executives and you name it.  So I truly do believe

13   that they are up to the task that the Court has in mind.

14       I think that covers the three buckets that the Court has

15   identified.  I am happy to continue the conversation with

16   Mr. Foster, but I think we would all benefit from some guidance

17   from the Court and --

18            **THE COURT:**  Well, I think the guidance from the Court

19   actually comes in the form of how do you -- how do we get to

20   "yes," how do we get an agreement.  I think the way to get to

21   an agreement is that the government come up with a set of

22   proposed conditions, as detailed as possible, as detailed as

23   they want to make it be.  They give them to you, you look at

24   them and respond, and then to points that you're able to

25   discuss and to ameliorate, you know, to address perhaps in a

1  different way, or accept their condition, that's fine.  Today

2  there are still points where I'm sorry we can't agree and you

3  give us -- we have a reasonable position, then you bring that

4  to me.  And that's my job, and I'm pleased to do it.

5       So my question is:  How much time do you need for this

6  process?  I mean, you have the *Mouli Cohen* -- I can -- here,

7  will you give this to -- here we are.  Give this to Mr. Marais.

8  These are the conditions in the *Mouli Cohen* case.

9            **MR. MARAIS:**  That is a lengthy document, Your Honor.

10           **THE COURT:**  Well, it has a -- it has a description of

11  the protective service.

12           **MR. MARAIS:**  Okay.

13           **THE COURT:**  So forth.  I mean, I don't think it --

14  yeah, it's not that it's -- it is what it is.  Now, of course,

15  it didn't work.

16           **MR. FOSTER:**  I remember, Your Honor.

17           **THE COURT:**  For the very reason that the government

18  thought it wouldn't work.

19           **MR. FOSTER:**  Yes.

20           **THE COURT:**  At any rate, but that's beside the point.

21  I mean, I think -- I think I'm not -- I don't know that I

22  necessarily take my experiences and say, well, it will work or

23  it won't work.  Yeah, to some extent it affects my way of

24  looking at things.  But I think there is an ironclad -- there

25  are rules out there, you know, set by the circuit as to how to

1    approach the problem.  I have to follow the rules, like we all

2    have to follow the rules.  That's fine.  You give structure in

3    any particular case, and it assures a defendant of the fairness

4    of the inquiry and the determination.  And that's important,

5    very important in any case.

6         So what do you want to do in terms of -- in terms of

7    timing?  Do you ...

8         What it is, it's going to be a two- or three-step process.

9    I would like the government to be able to furnish by tomorrow

10   morning a set of conditions.  I don't know, I'll say 9:00, or

11   10:00 or 11:00 o'clock to the defense.  I think the defense can

12   act pretty quickly on that in terms of any counterproposal.

13   Give you 24 -- you respond by Wednesday morning.  And then I

14   was going to suggest that if there are differences, I'll come

15   in Thursday afternoon.

16        Does that sound reasonable?

17        **MR. FOSTER:**  It does, Your Honor.

18        **THE COURT:**  Thursday at 2:00.

19        **MR. MARAIS:**  That's fine, Your Honor.

20        I was going to raise the timing issue that the Court has

21   raised, simply because my client has been in custody for 90

22   days now, and I would like to keep this moving.

23        **THE COURT:**  Yeah.  Well, it will -- yeah, I think

24   that's right.

25        **MR. FOSTER:**  Of course.

1              **MR. MARAIS:**  Yeah, I think that's fine, Your Honor.

2    We can work with Mr. Foster on this.  I suspect if there are

3    differences, it may help the Court to know what those are in

4    advance of the hearing, and we can find a way to file

5    something.

6              **THE COURT:**  You can file it, you know.  Just send me

7    an e-mail.  However you want to do it, that's fine.

8              **MR. FOSTER:**  Okay.

9              **MR. MARAIS:**  Okay.

10             **THE COURT:**  Yeah.  And then we can work our way

11   through it.

12             **MR. FOSTER:**  Thank you, Your Honor.

13             **THE COURT:**  Because hopefully, I'm hopeful that by

14   Thursday afternoon we'll have laid out the conditions, and then

15   that gives the parties the time to work on them in terms of

16   fulfillment of the conditions, which will probably take some

17   period of time.

18             **MR. MARAIS:**  Right.  We'll have to obviously

19   implement a security protocol and so on.  That's another delay

20   I had my eye on.

21        Okay.

22             **MR. FOSTER:**  Yes, Your Honor.

23        Thank you.

24             **THE COURT:**  Okay?

25             **MR. FOSTER:**  Yes, Your Honor.

1          **THE COURT:**  All right.  Thank you very much.  Thank

2    you for coming in.

3          (Proceedings concluded at 2:42 p.m.)

4                        ---o0o---

5                **CERTIFICATE OF REPORTER**

6          I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8    DATE:  Wednesday, September 11, 2024

9

10

11    _____

12    Stephen W. Franklin, RMR, CRR, CPE
      Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25