**Volume 7**

**Pages 1360 - 1652**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
   vs.                       )   **NO. 3:24-cr-00329-CRB**
                             )
RUTHIA HE and DAVID BRODY,   )
                             )
            Defendants.      )
_____)

San Francisco, California
Wednesday, October 8, 2025

**TRANSCRIPT OF PROCEEDINGS** (CORRECTED)

**APPEARANCES**:

For Plaintiff:
                      CRAIG H. MISSAKIAN
                      United States Attorney
                      Northern District of California
                      450 Golden Gate Avenue
                      San Francisco, California 94102
                **BY: KRISTINA GREEN**
                      **ASSISTANT UNITED STATES ATTORNEY**

                      U.S. DEPARTMENT OF JUSTICE
                      FRAUD SECTION
                      950 Pennsylvania Avenue NW
                      Washington, D.C. 20530
                **BY: JACOB N. FOSTER,**
                      **ACTING CHIEF, HEALTHCARE FRAUD UNIT**


              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
                 Official Reporter, CSR No. 12219

**APPEARANCES**:  **(CONTINUED)**

U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
1400 New York Avenue NW
Washington, D.C. 20001
BY: **EMILY GURSKIS, ASSISTANT CHIEF**

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
BY: **ARUN BODAPATI, TRIAL ATTORNEY**

For Defendant He:

WILLKIE FARR & GALLAGHER LLP
2029 Century Park East - Suite 2900
Los Angeles, California 90067
BY: **KOREN L. BELL, ATTORNEY AT LAW**

WILLKIE FARR & GALLAGHER LLP
787 7th Avenue
New York, New York 10019
BY: **MICHAEL S. SCHACHTER, ATTORNEY AT LAW**
**STEVEN J. BALLEW, ATTORNEY AT LAW**

For Defendant Brody:

LAW OFFICE OF VALERY NECHAY
Law Chambers Building
345 Franklin Street
San Francisco, California 94102
BY: **VALERY NECHAY, ATTORNEY AT LAW**

**Also Present:  Thifany Braga**
**Simon Hall**
**Andy Cepregi**
**Ashley Moore**
**Michael Yu Zhu, Mandarin Interpreter**
**Barbara Hua Robinson, Mandarin Interpreter**

1

**I N D E X**

2

Wednesday, October 8, 2025 - Volume 7

3

**GOVERNMENT'S WITNESSES**                                    **PAGE**    **VOL.**

4

**BOWEN, KRISTIN (RECALLED)**
(PREVIOUSLY SWORN)                                          1366      7
5
Direct Examination by Ms. Green                             1366      7
Cross-Examination by Mr. Schachter                          1468      7

6

**E X H I B I T S**

7

**TRIAL EXHIBITS**                                   **IDEN**  **EVID**  **VOL.**
320                                                          1415      7
8
332                                                          1383      7
9
348                                                          1402      7
10
354                                                          1437      7
11
355                                                          1437      7
12
377                                                          1424      7
13
378                                                          1429      7
14
917                                                          1463      7
15
1119                                                         1367      7
16
1120                                                         1367      7
17
1123                                                         1367      7
18
1124                                                         1367      7
19
1125                                                         1367      7
20
1126                                                         1367      7
21
1127                                                         1367      7
22
1128                                                         1367      7
23
1129                                                         1367      7
24
1130                                                         1367      7
25
1131                                                         1367      7

```
 1                        I N D E X

 2                      E X H I B I T S
        TRIAL EXHIBITS                    IDEN   EVID   VOL.
 3      1132                                     1367    7

 4      1306                                     1401    7

 5      1308                                     1401    7

 6      1340                                     1390    7

 7      1344                                     1418    7

 8      1351                                     1420    7

 9      1388                                     1399    7

10      1414                                     1417    7

11      1418                                     1457    7

12      1468                                     1390    7

13      2709                                     1367    7

14      2845                                     1446    7

15      3035                                     1367    7

16      5192                             1511            7

17      5363                             1506            7

18      5382                             1505            7

19      6028                                     1557    7

20      6146                                     1572    7

21      6249                                     1475    7

22      6251                                     1483    7

23      6253                             1515    1515    7

24      6254                                     1523    7

25      6255                                     1537    7
```

```
 1                         I N D E X

 2                       E X H I B I T S

    TRIAL EXHIBITS                          IDEN   EVID   VOL.
 3
       6258                                        1538    7
 4
       6261                                        1542    7
 5
       6263                                        1544    7
 6
       6264                                        1547    7
 7
       6269                                        1496    7
 8
       6270                                        1498    7
 9
       6275                                        1591    7
10
       6275 T                                      1591    7
11
       6276                                        1597    7
12
       6281                                        1604    7
13
       6282                                        1609    7
14
       6283                                        1625    7
15
       6284                                        1615    7
16
       6318                                        1606    7
17
       6359                                        1509    7
18
       6362                                        1596    7
19
       6365                                        1527    7
20
       6366                                        1531    7
21
       6648                                        1477    7
22
       6649                                        1584    7
23
       6651                                        1599    7
24
       6660                                        1490    7
25
```

| | |
|---|---|
| 1 | <u>**Wednesday - October 8, 2025**</u> <u>**9:17 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury.) |
| 5 | **THE COURTROOM DEPUTY:**  All rise.  Court is now in |
| 6 | session, the Honorable Charles R. Breyer presiding. |
| 7 | **THE COURT:**  Okay.  Bring in the jury. |
| 8 | **MS. GREEN:**  Your Honor, I don't believe Ms. Nechay is |
| 9 | here.  Defendant Brody's counsel. |
| 10 | (Kristin Bowen steps forward to resume the stand.) |
| 11 | **THE COURT:**  Anybody know where she is? |
| 12 | **MS. BELL:**  Let me inquire, Your Honor. |
| 13 | **THE COURTROOM DEPUTY:**  Ready for the jury? |
| 14 | **THE COURT:**  Okay.  Bring in the jury.  We'll find out. |
| 15 | (The jury enters the courtroom.) |
| 16 | (Proceedings were heard in the presence of the jury.) |
| 17 | **THE COURT:**  Please be seated.  We're waiting for |
| 18 | Dr. Brody's counsel. |
| 19 | **THE COURTROOM DEPUTY:**  She sent an e-mail saying |
| 20 | there's a lot of traffic.  She'll be five minutes late. |
| 21 | **THE COURT:**  Well, it's five minutes late. |
| 22 | (Pause in proceedings.) |
| 23 | **THE COURT:**  Let's just wait a minute.  If she's not |
| 24 | here, then you can go back in.  Okay. |
| 25 | Okay.  Let the record reflect show all counsel are |

 1    present, all parties are presented.

 2        You may proceed.

 3            **MS. GREEN:**  Thank you, Your Honor.

 4                        <u>**KRISTIN BOWEN**</u>,

 5    called as a witness for the Government, having been previously

 6    duly sworn, testified further as follows:

 7                    <u>**DIRECT EXAMINATION**</u>

 8    **BY MS. GREEN:**

 9    **Q.**   Good morning again, Ms. Bowen.

10    **A.**   Good morning.

11    **Q.**   We're going to talk about advertising.  Did you review

12    Done's advertisements in 2021, either before or during your

13    time at Done?

14    **A.**   Yes, I saw some of them.

15    **Q.**   Okay.

16            **MS. GREEN:**  Your Honor, I'd like to admit the

17    following advertisements:  1119, 1120, 1123 through

18    Exhibit 1132, 2709, and 3035.

19            **MR. SCHACHTER:**  Your Honor?

20            **THE COURT:**  Yes.

21            **MR. SCHACHTER:**  Many of these advertisements are dated

22    outside of Ms. Bowen's tenure.  We have no objection to their

23    admission with this witness, but they are -- they bear dates

24    that are either before she arrived or maybe in some

25    circumstances after, but outside of her tenure.

1    **THE COURT:**  Okay.  Thank you very much.

2    Number 1, they're all admitted.

3    **MS. GREEN:**  Thanks.

4    (Trial Exhibits 1119, 1120, 1123, 1132, 2709, 3035

5    received in evidence.)

6    **BY MS. GREEN:**

7    **Q.**   Ms. Bowen, have you viewed these advertisements before?

8    **A.**   Yes.

9    **Q.**   And you're familiar with them?

10   **A.**   Yes.

11   **MS. GREEN:**  Members of the jury, we are now going to

12   play these advertisements.  Some are PDFs that we will scroll

13   through and some are very short videos.  I intend to just play

14   some of these without stopping and then ask a series of

15   questions at the end.

16   So I would ask, with the Court's permission, if you just

17   raise your hand if Ms. Braga is scrolling too quickly or if you

18   miss a video, because some of them are quite quick, and then if

19   Your Honor permits, we can play it again.  But for the most

20   part, I'll ask maybe one or two questions and then just save my

21   questions for the end.

22   Is that okay with Your Honor?

23   **THE COURT:**  That's fine.  Thank you.

24   (Trial Exhibits 1124 through 1131 received in evidence.)

25   **MS. GREEN:**  Ms. Braga, let's start with 1128, please.

1          (Video played but not reported.)

2  **BY MS. GREEN:**

3  **Q.**   Ms. Bowen, did that first part of that ad say "Don't miss

4  out on your discounted ADHD diagnosis"?

5  **A.**   Yes.

6  **Q.**   And what did that ad suggest to you about whether if you

7  came to Done, you would get an ADHD diagnosis?

8  **A.**   I mean, it sets the expectation that all you have to do it

9  pay the 199 and get your ADHD diagnosis.

10 **Q.**   Thank you.

11          **MS. GREEN:**  Ms. Braga, let's show 1129, please.  And

12 let's show 1120.

13                  (Pause in proceedings.)

14          **MS. GREEN:**  I believe this is multiple pages, so if

15 you could just scroll through for the jury.

16      Let's show 1124.

17                  (Pause in proceedings.)

18          **MS. GREEN:**  And let's show 1125.

19                  (Pause in proceedings.)

20          **MS. GREEN:**  1126, please.

21                  (Pause in proceedings.)

22          **MS. GREEN:**  1127.

23                  (Pause in proceedings.)

24          **MS. GREEN:**  1128.

25              (Video played but not reported.)

```
 1              MS. GREEN:  1130.
 2                   (Video played but not reported.)
 3    BY MS. GREEN:
 4    Q.   Let's pause there for a moment.  Does that say "One-minute
 5    assessment before the potential member can get their
 6    appointment," Ms. Bowen?
 7    A.   Yes.
 8              MS. GREEN:  Thank you.  Please continue, Ms. Braga.
 9                   (Video played but not reported.)
10              MS. GREEN:  1131.
11                   (Video played but not reported.)
12    BY MS. GREEN:
13    Q.   Did that last screen just say, "One-click refills"?
14    A.   Yes, it did.
15              MS. GREEN:  Let's please play 2709.
16                   (Pause in proceedings.)
17              MS. GREEN:  And I think this is multiple pages,
18    Ms. Braga.
19                   (Pause in proceedings.)
20              MS. GREEN:  And going back to page 2, Ms. Braga, can
21    you zoom in on the line that says, "Easy automatic refill"?
22         Thank you.
23         And 3035, please.
24    BY MS. GREEN:
25    Q.   Does that also talk about automatic refills?
```

1    **A.**    It does.

2    **Q.**    Okay.  On what platforms primarily do you recall Done

3    advertising?

4    **A.**    TikTok, Instagram I think were the primary ones I knew

5    about.  Facebook.

6    **Q.**    Other forms of social media?

7    **A.**    Right.

8    **Q.**    Did you have concerns about Done's advertisements?

9    **A.**    Oh, yes.

10    **Q.**    And what were those concerns?

11    **A.**    I mean, they completely ignored many clinical aspects of

12    ADHD.  It was really just setting this expectation that all you

13    had to do was just sign on to the platform, you know, do your

14    consultation, and then you would get automatic refills, which

15    you can't refill controlled substances, so that in and of

16    itself is misleading.

17        But it makes it very difficult for our providers to not

18    give them stimulants, to not give them an ADHD diagnosis,

19    because people came in with this expectation that this is all I

20    had to do.  This is what your advertising told me.

21    **Q.**    And you mentioned that you can't even refill controlled

22    substances.  Can you explain to the jury what you mean by that?

23    **A.**    Controlled substances, you have to visit your provider

24    every month.  You can only get one-month refill of it at a

25    time.  So each time, it's a new prescription, essentially.

1    There's no such thing as a refill of controlled substances.

2        And so this concept of a refill, when it comes to

3    especially Schedule II controlled substances, doesn't exist.

4    **Q.**    And was your concern exacerbated by the fact that the

5    advertisements suggested automatic refills or one-click

6    refills?

7    **A.**    Yeah.  I mean, people thought they were going to refill it

8    like they might their Lipitor, you know, that, oh, it just --

9    doc can send in three months' supply with three refills and I'm

10   good for the year.

11   **Q.**    Who was the ultimate decision-maker on what ads would run

12   during your time at Done?

13   **A.**    It was always Ruthia.

14   **Q.**    And while you were at Done, were you aware of whether

15   there was any clinical review of ads to make sure that they

16   were medically appropriate before the ads were posted --

17   **A.**    Yeah.

18   **Q.**    -- for example, the type of concerns you were raising?

19   **A.**    I never saw any clinical review or, honestly, any staff

20   review.  A lot of times the employees of the company, we

21   would -- the first time we would learn about it is seeing it on

22   social media.

23   **Q.**    Did your -- did you discuss your concerns about Done's ads

24   with Defendant He?

25   **A.**    Yes.  Many of us did.

1  Q.   Many.  And what were -- what did you tell her?

2  A.   I mean, we kept trying to say that this is, if not

3  illegal, borderline illegal.  The way that you're presenting

4  this as like, you know, they can just get their drugs, it's an

5  automatic refill, and that we -- we were getting a lot of

6  complaints from providers that patients were getting very

7  upset.  If they didn't get their ADHD diagnosis, they would

8  leave a bad review for the provider, you know, because this

9  expectation had been set by the advertising, or the providers

10 themselves would see -- they'd come across the advertising and

11 be pretty upset and horrified.

12 Q.   Did providers express pressure to prescribe based on these

13 types of advertisements and expectations that were set with the

14 Done members?

15 A.   Yes.

16 Q.   What was Defendant He's response?

17 A.   I mean, the same as it was any time they brought up these

18 concerns, which was essentially criticizing the provider,

19 saying that they were excessively paranoid and over-cautious,

20 and that the most important thing was -- it was kind of a

21 common thing she said was just -- we just need to make them

22 feel better.

23 Q.   Make them feel better.

24      What was your reaction to hearing that, "We should just be

25 making the patient feel better"?

1  **A.**   You know, as much as we tried to explain to her that, you

2  know, just giving someone stimulants doesn't make them feel

3  better -- if they have an anxiety problem, it makes their

4  anxiety worse.  If they have bipolar, they're going to go into

5  a manic episode.  If they have an underlying psychotic

6  disorder, it's going to like make them break into a psychotic

7  episode.

8      Like you don't just make someone feel better.  You know,

9  there's a lot more to it.  It's clinically complex.

10  **Q.**   And were providers comfortable with this concept of

11  essentially giving a member what they may want as opposed to

12  giving a member what they may medically need?

13  **A.**   I mean, that -- they are trained to treat them as a whole

14  patient and do what's in the best interest of the patient,

15  which isn't always, you know, giving a stimulant.  Especially,

16  you know, ADHD.  As I kind of mentioned, there's a lot of

17  differential diagnoses that need to be considered.

18      So, yeah, there was a lot of expression from our providers

19  and unfortunately, a lot of turnover, because they were

20  concerned that this expectation had been set.

21  **Q.**   And when you say a lot of turnover, a lot of providers

22  chose to leave the platform because of this expectation?

23  **A.**   Yes.

24  **Q.**   Were you involved in provider recruiting when you worked

25  at Done?

1    **A.**    Yes.

2    **Q.**    And who determined the recruiting criteria by which

3    providers were hired?

4    **A.**    Ruthia.

5    **Q.**    Did you have concerns that Defendant He, as a

6    non-clinician, was determining criteria by which to hire

7    providers?

8    **A.**    Yes, I was very surprised, just even as a CEO, that she

9    was that involved in the process, and then especially

10   overriding, you know, clinical decisions, putting her input

11   into it -- I mean putting requirements on what we could say

12   clinically.

13   **Q.**    What did Defendant He communicate to you about what

14   recruiting criteria she wanted you to use?

15   **A.**    I mean, her highest priority was that they were a good fit

16   for our model, which she frequently specified meant that they

17   were comfortable making an ADHD diagnosis in 25 minutes or

18   less; they were comfortable providing -- prescribing stimulants

19   as first-line; and essentially, you know, that they weren't

20   going to ask any questions or complain.

21   **Q.**    Did she want providers on the platform who were concerned

22   about doing follow-ups?

23   **A.**    No, she didn't.  No, that was heavily discouraged.

24   **Q.**    Okay.  These items that you mentioned -- prescribing

25   within 30 minutes or less, or always willing to prescribe

1    stimulants as a first-line and follow-ups -- in your view, were

2    those typical practices, usual course of practice for providers

3    to do?

4    **A.**    Stimulant medication for ADHD, if there are no

5    complexities, they've met the DSM-5 criteria, there's no

6    contraindications -- and there are a lot of things you have to

7    do to make sure there's no contraindications, such as like

8    being able to do a urine drug screen, being able to do an

9    EKG -- then stimulants are considered the first line for ADHD,

10    but a lot of times there are other considerations.

11    **Q.**    Okay.  You mentioned a number of other considerations,

12    like if a patient has complexity, ability to do drug screening,

13    et cetera.

14        Did Done account for any of those additional complexities

15    with a patient where first-line may not be appropriate?

16            **MR. SCHACHTER:**  Objection, foundation.

17            **THE COURT:**  Sustained.

18            **MS. GREEN:**  I'll lay a foundation.

19    **BY MS. GREEN:**

20    **Q.**    You testified about the recruiting criteria by which

21    Defendant He wanted you to hire the providers; correct?

22    **A.**    Yes.

23    **Q.**    And one of the things you said was willing to provide

24    stimulants as a first line?

25    **A.**    Yes.

BOWEN - DIRECT / GREEN

1  **Q.**   In the recruiting criteria you were told to use, did

2  Defendant He give you any other criteria by which to evaluate

3  potential providers where stimulants may not be first-line,

4  such as how they would deal with complex patients or have

5  not -- not having a drug test when they felt one was need?

6  **A.**   No, absolutely not.  As a matter of fact, when we tried to

7  include those things in the interview or recruitment process,

8  she actively pulled them out.

9  **Q.**   Okay.  Did providers raise concerns about this recruiting

10  criteria during the recruiting process?

11  **A.**   Yes.

12  **Q.**   Were many of them unwilling to practice according to this

13  Done model?

14  **A.**   Yes.

15  **Q.**   Did you share those concerns with Defendant He?

16  **A.**   Yes, especially since she was very focused on -- she felt

17  the key to unlocking company growth was to hire -- just rapid

18  hire of more and more providers.  And we tried to even kind of

19  appeal to that and say, well, look, we are losing a lot of

20  providers, you know, because we -- you know, all these other

21  things, these concerns.  You know, that didn't seem to sway her

22  either.

23  **Q.**   So she didn't change that model?

24  **A.**   No.

25  **Q.**   Was Defendant He focused on hiring providers that

**BOWEN - DIRECT / GREEN**

1  expressed a desire to do a robust diagnostic process to make

2  sure patients actually had ADHD --

3  **A.**  Absolutely not --

4  **Q.**  -- before prescribing stimulants?

5     You can answer.

6  **A.**  Sorry.

7  **Q.**  Did you say absolutely not?

8  **A.**  Absolutely not, no.

9  **Q.**  Okay.  Based on your role in recruiting and your work

10  experience, are all PMHNPs of the same quality?

11  **A.**  No.

12  **Q.**  Can they have varying levels of appearance?

13  **A.**  Yes.

14  **Q.**  And can the quality of their education differ?

15  **A.**  Yes.

16  **Q.**  Do you recall many Done providers being recruited from one

17  institution in particular?

18  **A.**  We had a lot of applicants that came from Walden

19  University, which is an entirely online university.  It's kind

20  of known for being a diploma mill for PMHNPs.

21  **Q.**  What do you mean by "diploma mill"?

22  **A.**  So essentially recruiting -- sort of just passing people

23  through.  Very low standards for the quality of their clinical

24  experiences for the education.  I mean, like I'd often get

25  people that I'd interview and, I mean, they -- they could

1  barely speak English.  You know, psychiatry is obviously

2  heavily a communication-focused specialty.

3  **Q.**    And did Done hire these PMHNPs onto the platform?

4  **A.**    I tried to discourage it when we could, but in order to

5  meet the quotas that we were given, a lot of time we had to.

6  **Q.**    Did you notice higher willingness to accept the Done model

7  from those providers who were less experienced, perhaps less

8  well-trained than others?

9  **A.**    Those tended to be the ones that would stay, that we

10  wouldn't be a part of that rapid turnover.

11  **Q.**    Okay.  So I think you were just getting to this, but what

12  pattern did you notice about which providers would stay on the

13  Done platform -- first of all, agree to join, and then stay on

14  the Done platform versus which would leave or not join?

15  **A.**    The ones that tended to have more rigorous clinical

16  process, the lot -- especially if they had a lot more

17  experience, if they had better clinical training, then those

18  were the ones that tended to leave.

19  **Q.**    Did certain PMHNPs require collaborating physicians to

20  partner with them in order to issue prescriptions or even the

21  collaborating physician had to write the script in certain

22  states?

23  **A.**    Yes.  Many states require the -- the nurse practitioner to

24  have a collaborating or supervising physician.  There are a few

25  that allow independent practice, but...

1  **Q.**   Are Texas -- is Texas one of those states?

2  **A.**   Texas requires not only a collaborating physician, but

3  they -- it is against the law for them to prescribe Schedule II

4  controlled substances, which is stimulants.

5  **Q.**   It's against the law for the PMHNP to prescribe --

6  **A.**   Yes, PMHNP.

7  **Q.**   So in that state, the collaborating physician must do the

8  actual writing of the prescription; is that right?

9  **A.**   And actually, the law in Texas specifies that the

10 collaborating physician has to actually see the patient.  They

11 can't write the prescription for the --

12       **MR. SCHACHTER:**  Objection.  Move to strike.  Calls for

13 an incorrect legal conclusion.

14       **THE COURT:**  Well, you'd have to lay a foundation that

15 she is familiar with the Texas law.

16       **MS. GREEN:**  Yes.

17       **THE COURT:**  And what is the basis of her familiarity.

18       **MS. GREEN:**  Certainly, Your Honor.

19 **BY MS. GREEN:**

20 **Q.**   You were just discussing one of the Texas laws relating to

21 collaborating physicians.  How are you familiar with that law?

22 **A.**   So I was a registered nurse in Texas, and I had to know

23 the laws when I hired these people.  And then I've also seen

24 the guidance that was issued by the Texas medical board that

25 specified that.

1          **MR. SCHACHTER:**  Your Honor, I'll just object.

2    The Court should be the only expert on the law.  Particularly,

3    this is inaccurate.

4          **THE COURT:**  Well, okay.  The objection is sustained.

5         Now, however, I'm going to permit her to testify about

6    what her understanding was or is of the law of Texas.  She's

7    laid a foundation that she has some familiarity with it, and

8    she can testify as to what her understanding is.

9         It's not to be accepted by you necessarily as -- or

10   accepted by you as an accurate statement of what the law is in

11   Texas.  It may depend on any number of things.

12         **MS. GREEN:**  Thank you, Your Honor.

13   BY MS. GREEN:

14   **Q.**   Was California also one of those states where the

15   collaborating physician was required?

16   **A.**   Yes.

17   **Q.**   What is the collaborating physician supposed to do in

18   normal practice?

19   **A.**   So it does vary by state, but the general principle is

20   that they are available for consultation.  They are reviewing

21   cases actively with the patient.  In many circumstances, they

22   are also reviewing the records, especially if it's a newer,

23   less experienced nurse practitioner.  Then they tend to review

24   the records on all the patients, but as they gain more

25   experience, it's more of the complex cases that they'll then

 1    review.

 2    **Q.**    Okay.  And based on your understanding in Texas, supposed

 3    to see the patient?

 4    **A.**    I'm sorry.  Say again.

 5    **Q.**    Based on your understanding of Texas, were they supposed

 6    to see the patient?

 7            **MR. SCHACHTER:**  Objection.  Relevance, and, again,

 8    is --

 9            **THE COURT:**  Sorry?

10            **MR. SCHACHTER:**  Objection.  Relevance.  This witness's

11    misunderstanding of Texas law is not relevant.

12            **THE COURT:**  What is the relevance of her

13    understanding, please?

14            **MS. GREEN:**  That's okay.  We --

15            **THE COURT:**  Correct or incorrect understanding, what

16    is your --

17            **MS. GREEN:**  Your Honor, I can ask another question,

18    Your Honor.

19            **THE COURT:**  Okay.  Sustained.

20    **BY MS. GREEN:**

21    **Q.**    Do the collaborating physicians on the Done platform have

22    access to the Done medical records?

23    **A.**    No.

24    **Q.**    So they were unable to review those records even if they

25    should have wanted to?

BOWEN - DIRECT / GREEN

1    **A.**    Correct.  I did try to advocate and push for the

2    collaborating physicians to have logins, review them, you know,

3    towards the end of me being there, but for the most part, when

4    I was there and before I came there, the collaborating

5    physicians did not have access to the platform.

6    **Q.**    Okay.  Did Defendant He and Brody know that the

7    collaborating physicians were sending scripts for patients

8    where they did not have access to the platform?

9              **MR. SCHACHTER:**  Objection, foundation.

10             **THE COURT:**  Sustained.

11   **BY MS. GREEN:**

12   **Q.**    Did you discuss this issue of collaborating physicians and

13   whether they had access to the Done records with Defendant He

14   and Defendant Brody?

15   **A.**    Yes.  I explained my concerns.

16   **Q.**    Okay.  And what was their response?

17             **MS. NECHAY:**  Objection, vague as to "their."

18   **BY MS. GREEN:**

19   **Q.**    What was Defendant He's response?

20   **A.**    She was not concerned.

21   **Q.**    What was Defendant Brody's response?

22   **A.**    He was not concerned.

23   **Q.**    During your tenure at Done, did it ever change such that

24   collaborating physicians did have access to those -- the Done

25   medical charts?

1  A.   There were a few that I gave access to.  I don't know if

2  they ever used it.

3  Q.   That you personally gave access to?

4  A.   That I personally went out of my way to give them access

5  and encouraged them to use it.

6  Q.   Okay.  Did Defendant He or Defendant Brody direct you to

7  do that?

8  A.   No.

9  Q.   And you said a few, so it sounds like that wasn't the norm

10 on the Done platform?

11 A.   No, it was not.

12         MS. GREEN:  Could we please admit Exhibit 332?

13         THE COURT:  332, admitted.

14     (Trial Exhibit 332 received in evidence.)

15 BY MS. GREEN:

16 Q.   And can we go --

17     First of all, is this a conversation between you and Denis

18 Lam on April 23rd, 2021?

19 A.   Yes.

20 Q.   And let's just go straight to page 2, please.

21     Mr. Lam is referring to -- and if we look, it's right in

22 the middle of the page -- a special project requested by

23 Ruthia.  What was the special project requested by Ruthia?

24 A.   She wanted to -- instead of us interviewing in, you know,

25 traditional process with the candidates, I mean over Zoom, she

1   instead wanted us to send the candidates a list of questions

2   and -- interview questions and that they would answer on a

3   recorded video and then send that to us to review.

4   **Q.**   Did you have concerns with this special project?

5   **A.**   Yes, a lot of concerns.

6   **Q.**   Why?

7   **A.**   One, because, I think as I've mentioned before, every

8   single candidate expressed concerns about our process our

9   safeguards.  Did we -- you know, how did we prevent abuse and

10  diversion?  They had serious concerns about the lack of

11  compensation for follow-ups.  So it made it impossible for them

12  to ask those questions.

13      The second piece was that the questions that were put into

14  this that were being asked to put in the video interview

15  were -- I mean, it very much set the impression that all we

16  cared about was whether or not they were willing to prescribe

17  stimulants in a 25-minute or less assessment.

18      So it -- none of it set the impression that we were

19  concerned about, you know, a thorough clinical evaluation,

20  about even clinical skill, experience, or, you know, their

21  concerns about safeguards.  Yeah.

22  **Q.**   You just said at the end that those questions that set

23  that expectation that you could get your stimulant didn't

24  indicate that "we" were concerned about, you know, robust

25  practices, et cetera.

1    But when you say "we," was that your concern, or are you

2  referring to someone else's concern?

3  **A.**   Done -- Done's concern, which was ultimately Ruthia.

4  **Q.**   So was Defendant He concerned about ensuring that this

5  sort of expectation about, you know, an easy place to get your

6  stimulants or 25-minute visits that -- was she concerned about

7  that being conveyed to providers or not?

8  **A.**   No.  I mean, I would say it was she encouraged it.

9  **Q.**   Okay.  And is looking -- you mentioned the questions.

10    **MS. GREEN:**  So can we go to page 1, please, and zoom

11  in on the bottom paragraph.

12  **BY MS. GREEN:**

13  **Q.**   These questions -- these questions that she wanted used in

14  the video, who had they come from?

15  **A.**   It was a provider, I believe, that was there before I

16  started, Les Tsang.

17  **Q.**   Les Tsang.  Okay.

18    And you write (as read):

19    "Multiple answers could be correct, and while I

20    can tell for the most part what answer Les was

21    wanting the candidate to give, some cover some gray

22    areas, especially some legally gray areas, where in

23    reality would actually choose the option that Les was

24    wanting them to choose.

25    "It's also a 30-minute interview with little

1    buffer as it is.  I would likely need to do some

2    light editing first.  And some of these questions

3    don't help us avoid the pill mill image.  It's also a

4    bit concerning that none of the questions are

5    assessing a provider's ability to identify and" --

6    into the next page -- "response to potential abuse

7    and diversion.

8        "Any candidate would likely pick up on this

9    omission as a sign that we don't really care about

10    abuse and diversion.  there isn't a single candidate

11    that I interview that doesn't have some level of

12    concern about our legitimacy and discretion in

13    prescribing controlled substances."

14    Consistent with what you just testified about your

15    concerns with these questions?

16    **A.**    Yes.

17    **Q.**    And you write that "We don't really care about abuse and

18    diversion," but based on your interactions with Defendant He

19    about the recruiting process, did Defendant He express concern

20    about ensuring there wasn't abuse and diversion on the

21    platform?

22    **A.**    No, she never expressed any of those concerns.

23    **Q.**    Okay.  Did you discuss your concerns with Dr. Tsang's

24    questions with Defendant He?

25    **A.**    Yes.

BOWEN - DIRECT / GREEN

1  **Q.**  What was her response?

2  **A.**  She felt that my concerns were unfounded.

3  **Q.**  When providers were onboarded at Done, did they receive

4  any onboarding material?

5  **A.**  Yes.

6  **Q.**  Did the onboarding material initially include guidelines

7  on how to diagnose ADHD according to the DSM-5?

8  **A.**  Yes.

9  **Q.**  Did that reference remain in the onboarding material?

10  **A.**  No.  It was taken out.

11  **Q.**  Who took it out?

12  **A.**  Ruthia.

13  **Q.**  Do you know -- what is your understanding for why

14  Defendant He removed that reference?

15  **A.**  Because she was concerned that it provided too strict a

16  definition of ADHD.  I mean, even though it's the clinically

17  accepted definition, she wanted more people to qualify for the

18  ADHD diagnosis, and she wanted to make sure the providers

19  didn't think that we expected them to adhere to the DSM-5.

20          **MR. SCHACHTER:**  Objection.  Move to strike.  Lack of

21  foundation.

22          **THE COURT:**  Lay a foundation.

23          **MS. GREEN:**  Yeah.

24  BY MS. GREEN:

25  **Q.**  So you mentioned you were concerned about the removal of

**BOWEN - DIRECT / GREEN**

1  that reference.  Did you discuss your concerns about removing

2  the reference to the DSM-5 from the onboarding material?

3  **A.**   Yes.  Many of us did.

4  **Q.**   Many of you did.  Did many of you discuss that concern

5  with Defendant He?

6  **A.**   Yes.

7  **Q.**   And through those conversations with Defendant He, were

8  you able to gain an understanding for -- at least your

9  understanding for why she had removed the reference?

10 **A.**   Nothing other than that she felt they were too strict.

11 **Q.**   And that's -- and when you say "too strict," is that the

12 answer you just provided previously?

13 **A.**   Yes.

14 **Q.**   Okay.  Based on your experience, what diagnostic criteria

15 is used to determine if someone has ADHD?

16       **MR. SCHACHTER:**  Objection, lack of foundation.

17       **THE COURT:**  Overruled.

18       **THE WITNESS:**  The DSM-5.

19 **BY MS. GREEN:**

20 **Q.**   So is it usual practice to prescribe Adderall to someone

21 for ADHD when they meet the diagnostic criteria according to

22 the DSM-5?

23 **A.**   Yes, as long as -- as I had kind of mentioned before, that

24 there's no other contraindications.

25 **Q.**   Mm-hmm.  So were you concerned that this reference to the

1    DSM-5 was removed?

2    **A.**    Yes.

3    **Q.**    Were you concerned that that may suggest to providers that

4    they did not have to adhere to the standard practice for

5    diagnosing ADHD?

6    **A.**    Yes, I was concerned that it was communicating that.

7             **MS. GREEN:**    Could we please admit Exhibit 1468 and

8    1340.

9             **THE COURT:**    1468 and 1340 admitted.

10            **MR. SCHACHTER:**    Your Honor, foundation.

11            **THE COURT:**    Okay.    Would you lay a foundation as to

12    those.

13            **MS. GREEN:**    I can show the witness, just the witness,

14    if it helps.

15            **THE COURT:**    Yeah, go ahead.

16            **MS. GREEN:**    Let's just show Exhibit 1468.    And if you

17    can, Ms. Braga, just scroll through so Ms. Bowen can look at

18    it.

19    **BY MS. GREEN:**

20    **Q.**    Are you familiar with this document, Ms. Bowen?

21    **A.**    Yes.

22    **Q.**    What is it?

23    **A.**    It's some of the onboarding material that we gave to new

24    providers.

25            **THE COURT:**    Admitted.

 1          (Trial Exhibits 1468 and 1340 received in evidence.)

 2              MS. GREEN:  Thank you.

 3   BY MS. GREEN:

 4   Q.   And focusing on this page, we see if they don't fully meet

 5   the criteria -- sorry.  Let's go to the bottom part.

 6        (as read):

 7              "If they don't fully meet the criteria, goal is

 8        to help patients feel better.  Still might be worth

 9        doing a medication trial."

10   Do you know who wrote that language?

11              MR. SCHACHTER:  Objection, foundation.

12              THE WITNESS:  It's Ruthia.

13              THE COURT:  She's asking do you know.

14              THE WITNESS:  Yes, Ruthia.

15              THE COURT:  That's a foundational question.

16              THE WITNESS:  Yes.  Ruthia wrote it.

17   BY MS. GREEN:

18   Q.   Okay.  And similar concept to what we've just been

19   discussing about the DSM-5 criteria --

20   A.   Yes.

21   Q.   -- is that correct?

22        And "goal is to help patients feel better."  What was your

23   reaction to that being included?

24   A.   As I mentioned before, that -- you know, the goal is to

25   make the patients feel better then we would -- we should be

1    doing a robust diagnostic evaluation.  We should be making sure

2    they're receiving the appropriate medication, so -- which is

3    not what we were doing.

4    **Q.**    Mm-hmm.  And "still might be worth doing a medication

5    trial even if one does not meet the criteria."

6        Did you have concerns about that language?

7    **A.**    Yes, because it's -- you know, there's no clinical

8    indication for it.  It -- "worth doing a medication trial" is

9    not the same thing as having a diagnosis that you -- you have

10   to have the diagnosis appropriately made before you can even

11   try a medication.  So it's not just because, oh, it might be

12   worth doing it for fun.

13   **Q.**    Understood.

14       Did providers explain to Defendant He that there could be

15   safety concerns with providing stimulants to patients just to

16   make them feel better?

17           **MR. SCHACHTER:**    Objection, foundation.

18           **MS. GREEN:**    I'm happy to --

19           **THE COURT:**    Lay a foundation.

20   **BY MS. GREEN:**

21   **Q.**    Did you -- were you present with providers when they

22   expressed concerns to Defendant He about this type of

23   directive?

24   **A.**    Yes.

25   **Q.**    And did they explain their concerns to Defendant He?

```
 1    A.    Yes.

 2              MR. SCHACHTER:  Objection.  "They"?

 3              MS. GREEN:  The providers who were expressing the

 4    concerns.

 5              THE COURT:  Overruled.

 6    BY MS. GREEN:

 7    Q.    And what was Defendant He's response?

 8    A.    She did not feel that those concerns were warranted.  She

 9    still felt very strongly that, you know, a trial of a

10    medication should be given regardless of whether or not they

11    met the DSM-5 criteria.

12              MS. GREEN:  Okay.  And let's look at page 3 at the

13    top, please.

14    BY MS. GREEN:

15    Q.    And we see the line that says "Item Number 2" --

16              MS. GREEN:  We can blow that up (as read):

17              "The care team" -- this is under Refills.

18         (as read):

19              "The care team would check CURES controlled

20         substances database in California."

21         What was the care team?

22    A.    The care team was -- I think it started as about 50

23    people; it grew to over a hundred while I was there -- of

24    people in the Philippines in a call center.

25    Q.    Were they medical professionals?
```

**BOWEN - DIRECT / GREEN**

1  **A.**   No.

2  **Q.**   And just so the jury is reminded, what is CURES?

3  **A.**   So CURES is -- every state has a database where they --

4  pharmacists submit information when they fill controlled

5  substances so that the state can track a controlled substance

6  to a provider.  So if a patient comes in and says, oh, you

7  know, I take 12 milligrams of Suboxone every day --

8      (Reporter interruption for clarity of the record.)

9      **THE WITNESS:**  So if a patient comes in and says, I

10  take 12 milligrams of Suboxone every day, the provider can then

11  actually go and look at the CURES database, see if that's

12  actually what's been filled for them.  That's one example.

13     Another thing is they can also see if a patient has been

14  provider shopping, so maybe they've gone to three or four

15  providers to get various prescriptions.

16     So it solves the problem of our medical records not being

17  integrated.  They can see if they've already been given this

18  prescription.  So it's a safeguard against abuse and diversion.

19  **Q.**   So it's an important safeguard to do that check?

20  **A.**   It's critical, yes.

21  **Q.**   Before you write controlled substance prescriptions?

22  **A.**   Yes.

23  **Q.**   Okay.  So here it's saying this care team of nonmedical

24  professionals in the Philippines -- well, it's not saying that.

25  It's just saying the care team, so I'll get to that point.

1    Were providers told that a care team would check CURES for

2    them?

3    **A.**    Yes.

4    **Q.**    Okay.  And were providers told that the care team was this

5    team of nonmedical professionals in the Philippines?

6    **A.**    No.

7    **Q.**    Do you think that would have been an important point?

8    **A.**    Yes.

9         **MS. GREEN:**  And let's just look at Exhibit 1340,

10    please.

11         **MR. SCHACHTER:**  Objection, your Honor.  Foundation.

12    It's dated months before the witness even began there.

13         **MS. GREEN:**  Happy to lay a foundation.

14         **THE COURT:**  Yes.

15         **MS. GREEN:**  Is this on just for the witness?  Great.

16    And can we make it a bit bigger, including the part on the

17    right, please.  And kind of zoom out.

18    **BY MS. GREEN:**

19    **Q.**    Do you recognize this document on the left?  And we can go

20    to page 4.

21    **A.**    Yes.

22    **Q.**    Okay.  And did you have access when you were at Done to

23    sort of programs that showed who were editing certain

24    documents?

25    **A.**    Yes.

1          **MS. GREEN:**  And the Government moves to admit.

2          **MR. SCHACHTER:**  Objection.  These are -- each page is

3   a different document bearing a different date, many of which

4   predate the witness's --

5          **THE COURT:**  Well, they may predate, but that doesn't

6   mean she can't identify them.

7          **MS. GREEN:**  It's also the same document.

8          **THE COURT:**  She can identify -- the Constitution

9   predates us, but I think it's easy to identify it.

10       But -- however, if there are different pages, as counsel

11  has raised an objection, I think you have to go through the

12  pages and say:  What is your familiarity with this page or that

13  page, and we'll see what she says.

14         **MS. GREEN:**  Happy to, Your Honor.

15  BY MS. GREEN:

16  Q.   So we're focusing on page 4.  It's actually a page we had

17  just looked at.  Do you recognize this page.

18  A.   Yes.  I mean, it may have been created before I started

19  there, but it was used during my time there.

20  Q.   And you had testified that Defendant He wrote that

21  language that we had looked at; correct?

22  A.   Yes.

23  Q.   Does this document corroborate that?

24  A.   Yes, it does.

25         **MR. SCHACHTER:**  Objection.

 1          MS. GREEN:  I can just show the document, Your Honor.

 2   I think --

 3          MR. SCHACHTER:  Your Honor --

 4          THE COURT:  One at a time.

 5      Counsel.

 6          MR. SCHACHTER:  We have an objection to the document.

 7   There is two portions of the document.  In the upper left-hand

 8   corner, there is a date that long predates the witness's

 9   arrival at Done.  Then there's a document in the middle, and

10   then there's something else on the right side which is labeled

11   "version history," and the witness has not seen the -- there's

12   no foundation that the witness has looked up the version

13   history or the portions -- there's a portion of the document

14   that I believe Ms. Green has already asked the witness about.

15   No problem.

16      Then there's these other portions which there is no

17   foundation for and should be not be admitted.

18          THE COURT:  Okay.  Would you please identify those

19   portions.

20          MS. GREEN:  Yeah.  And we can make it one page, Your

21   Honor, if that helps, so it doesn't look like two portions.

22      If we just zoom out, it's going to be small, but try and

23   zoom in on the whole document that's on the screen there.

24          MR. SCHACHTER:  Your Honor, this is -- we -- the

25   portion on the right, the witness has never seen before, and we

 1   would object to.

 2   **BY MS. GREEN:**

 3   **Q.**   Have you seen the portion on the right before, Ms. Bowen?

 4         **MR. SCHACHTER:**   And to be clear, the question is not

 5   has the Government shown the witness this document and so has

 6   the witness seen it before, but did the -- is the witness

 7   testifying that she looked at this at the time.

 8         **THE COURT:**   Yes, that's correct.

 9   **BY MS. GREEN:**

10   **Q.**   Go ahead, Ms. Bowen.

11   **A.**   I mean, I frequently checked version history on all our

12   Google docs.

13         **MS. GREEN:**   Thank you.

14         **MR. SCHACHTER:**   Objection, lack of foundation.  That

15   is not this document or this version history, which the witness

16   cannot testify --

17   **BY MS. GREEN:**

18   **Q.**   Is this a Google document --

19         (Reporter interruption for clarity of the record.)

20         **MR. SCHACHTER:**   I apologize.

21       Our objection is that the witness did not -- is not

22   testifying that she recalls seeing this version history on this

23   document.  The fact that she has ever seen version history on

24   any document is not foundation for the admission of this

25   document.

1        **MS. GREEN:**  I'm happy to lay a foundation, Your Honor.

2   **BY MS. GREEN:**

3   **Q.**   Is this a Google document?

4   **A.**   Yes.

5   **Q.**   Okay.  And when you were at Done, were you familiar with

6   this document?

7   **A.**   Yes.

8   **Q.**   You mentioned that you frequently checked version history

9   in Google documents.  Did you do that while you were at Done?

10  **A.**   Yes.

11  **Q.**   Did you ever have occasion to look at the version history

12  of this document?

13  **A.**   It was four-years ago.  I can't say for sure, but it's

14  possible.

15       **MR. SCHACHTER:**  Objection.

16       **THE COURT:**  Well, I'll allow it in with the caveat

17  that it's up to the jury to make a determination whether she

18  looked at this particular version history.  She looked at

19  others -- she looked at version history.  She looked at

20  documents.  And the question is whether she actually saw this

21  particular document.

22       I'm going to allow cross-examination on the subject.

23       Go ahead.

24       **MR. SCHACHTER:**  Thank you, Your Honor.

25       **MS. GREEN:**  Thank you, Your Honor.

```
 1          The Government moves to admit 14 -- 1340.

 2               THE COURT:  Admitted.

 3               MS. GREEN:  Thank you.

 4    BY MS. GREEN:

 5    Q.   And looking at this version history for this document that

 6    by previously looked at, what does it show about who wrote that

 7    language that we've been -- previously been discussing?

 8    A.   It shows that Ruthia wrote it.

 9               MS. GREEN:  Okay.  The Government moves to admit

10    Exhibit 1388.

11               THE COURT:  Admitted.

12          (Trial Exhibit 1388 received in evidence.)

13               MS. GREEN:  And can we just go --

14               MR. SCHACHTER:  Your Honor, same objection.

15               MS. GREEN:  Happy to lay a foundation if you would

16    like me to.

17               MR. SCHACHTER:  Lack of foundation.

18               THE COURT:  Please lay a foundation with each of these

19    documents.

20               MS. GREEN:  Okay.

21          Let's show it just to the witness, please.  Maybe we can

22    zoom in a bit and let's just scroll through it so she can see

23    the pages.  Then we can just stay on page 4.

24    BY MS. GREEN:

25    Q.   Are you familiar with this document?
```

1   **A.**    Yes, I am.

2   **Q.**    What is it?

3   **A.**    So this was onboarding material.  It was hosted on a site.

4   I can't remember the -- the name of the site, but it was for

5   providers to review.

6          **MS. GREEN:**  Okay.  And let's just zoom in on the

7   language at the bottom that says "if they don't fully meet the

8   criteria."

9          **MR. SCHACHTER:**  Your Honor, just maybe to cut this

10  off, it's bearing dates after the witness left Done.  She

11  cannot possibly have foundation with respect to documents

12  created after she departed the company.

13         **MS. GREEN:**  I'm not going to -- I'm not asking about

14  the parts.  I'm just asking if she's familiar with the document

15  itself.

16         **MR. SCHACHTER:**  I believe she's asking about this

17  document, which bears dates after the witness left.

18         **THE COURT:**  I don't -- that's correct.  I mean, if

19  she's left, then I don't know how --

20  **BY MS. GREEN:**

21  **Q.**   Was this document it place -- does this also bear dates

22  from when you were there?

23  **A.**    Yes.  It was a living document, so updates may have been

24  made after I left, but I can tell you which parts I

25  recognize --

```
 1    Q.    And that's --

 2              THE COURT:  Wait till she finishes.

 3              MS. GREEN:  I'm sorry, Your Honor.

 4    BY MS. GREEN:

 5    Q.    Let's -- we can look at the version and see if this was a

 6    date predating when you were there.

 7              MS. GREEN:  So we can zoom out.  And can we look at

 8    the date on the right, please of this version that we are

 9    looking at.  If you just zoom in on the right, Ms. Braga.

10        You're right, Mr. Schachter.  We'll move on.

11        Your Honor, for this document, we aren't focused on the

12    version history; we're just focused on the content, which

13    I believe she said she was familiar with, so is it okay to

14    admit on that grounds?

15              MR. SCHACHTER:  Objection, Your Honor.  This document

16    --

17              THE COURT:  Sustained.

18              MS. GREEN:  Okay.

19        We're going to move in just a set of provider contracts

20    that she is familiar with.  I don't intend to show them.  They

21    previously been shared with the defense.  Exhibit 1306 and

22    1308.

23              MR. SCHACHTER:  No objection.

24              THE COURT:  1306 and 1308, admitted.

25        (Trial Exhibits 1306 and 1308 received in evidence.)
```

BOWEN - DIRECT / GREEN

 1  BY MS. GREEN:

 2  Q.   We're focusing on the initial appointment now.  Did

 3  providers express concern to you regarding the length of the

 4  initial appointments?

 5  A.   Yes, frequently.

 6  Q.   What was the concern?

 7  A.   That it was insufficient time to make an accurate

 8  diagnosis.

 9          MS. GREEN:  And let's admit Exhibit 348, please.

10  Your Honor?

11          THE COURT:  I'm sorry.

12          MS. GREEN:  Could we admit Exhibit 348, please?

13          THE COURT:  348, admitted.

14      (Trial Exhibit 348 received in evidence.)

15          MS. GREEN:  Thank you.

16  BY MS. GREEN:

17  Q.   And is the date of this Slack conversation May 6th, 2021?

18  A.   Yes.

19  Q.   And are you part of this conversation?

20  A.   Yes, I am.

21  Q.   And is Defendant He?

22  A.   Yes.

23          MS. GREEN:  And can we go to page 2, please?

24          MR. SCHACHTER:  I believe it's one page.

25          MS. GREEN:  I'm sorry, Ms. Braga.  My fault.

1    BY MS. GREEN:

2    Q.   What is generally being discussed in this Slack

3    communication?

4    A.   An interview.

5         MR. SCHACHTER:  Your Honor, could we just have a

6    foundation question?  What is -- if the witness could explain

7    what "bot message lever" is.

8         THE WITNESS:  So it's Slack, so it automatically takes

9    something that you put in one area of Slack and then populates

10   it into another channel.

11   BY MS. GREEN:

12   Q.   And were you part of this channel where this was

13   populated?

14   A.   Yes.

15   Q.   And is this discussing provider -- recruiting provider's

16   concern?

17   A.   Yes.

18   Q.   And it says (as read):

19        "She felt our pay model was significantly under

20        market value and that there is no way we could

21        responsibly diagnose a patient in 25 minutes and

22        without a full medical evaluation (EKG, thyroid,

23        UDS).  will not be moving forward at this time."

24        So Defendant He was on this document.  Did many providers

25   raise this concern or just one or two?

BOWEN - DIRECT / GREEN

1   **A.**   I would say every provider raised it to some degree.

2   **Q.**   And with all these providers raising this concern, did

3   Defendant He agree to increase the initial appointment time?

4   **A.**   No, no.

5   **Q.**   Were providers able to schedule a second initial

6   appointment if they felt that it was necessary to ensure an

7   accurate diagnosis?

8   **A.**   No.

9   **Q.**   Was Dr. Brody made aware of this concern about initial

10  appointments being too brief for an accurate diagnosis?

11  **A.**   Yes.

12  **Q.**   What was Defendant Brody's response?

13  **A.**   He felt that the concern was unfounded.  He said,

14  you know, I've diagnosed plenty of patients in a short amount

15  of time before.

16  **Q.**   Did he suggest how much time he had done that?

17  **A.**   One occasion, he said, "I've diagnosed them in less than

18  five minutes on many occasions."

19  **Q.**   What was your reaction to that?

20  **A.**   I -- I mean, I worked with a lot of very experienced

21  psychiatrists, so it's not a matter of inexperience, and I

22  don't think any of them -- I mean, I know none of them would

23  diagnose someone with ADHD in --

24          **MS. NECHAY:**  Objection.

25          **MR. SCHACHTER:**  Objection, foundation.  I believe that

 1    the prior experience of this witness before becoming to Done

 2    was in ER and oncology.

 3              **MS. NECHAY:**  Addition --

 4              **MR. SCHACHTER:**  I think the witness is speaking about

 5    her experience after Done.

 6              **MS. NECHAY:**  Additionally, objection, speculation from

 7    myself, Your Honor.

 8              **THE COURT:**  Okay.  Lay a foundation.

 9    **BY MS. GREEN:**

10    **Q.**   Were you concerned when you -- Dr. Brody expressed that he

11    had diagnosed patients in less than five minutes, were you

12    concerned about that while you were at Done when you heard that

13    comment?

14    **A.**   Yes, I was concerned.

15    **Q.**   Can you explain for the jury at the time that you were at

16    Done, why did that comment cause you concern?

17    **A.**   I mean, I had -- I mean, a number of close to a hundred

18    providers telling me that that was not safe, so just looking at

19    that evidence, when you have that many people saying that it's

20    not responsible to diagnose someone, a new patient, to do a

21    full psych evaluation in 25 minutes is insufficient, it would

22    seem to a contradict that.

23    **Q.**   And during the recruiting process and when providers

24    expressed concern about being able to perform an accurate

25    diagnosis in 25 minutes, what did Defendant He tell you to

1    inform them in order to alleviate their concerns?

2    **A.**    So we were told to tell them that the reason they could do

3    this through the Done platform was that we had done extensive

4    screening ahead of time, so to screen out complex patients, to

5    use the PHQ-9 to screen for risk of depression, to use the

6    GAD-7 to screen for anxiety disorders, and to use the ASRS to

7    screen or the increased probability of having ADHD.

8        So these were -- saying that we did all this ahead of time

9    was saying, oh, we're saving you this time now.  That's why you

10    can do this in 25 minutes.

11    **Q.**    And was that accurate?

12    **A.**    No.

13    **Q.**    I'm not going to revisit what we did yesterday, but was

14    Defendant He, in fact, truncating the screening process at

15    around this time?

16    **A.**    Yes.

17    **Q.**    I want to talk about provider compensation.

18        How were providers compensated while you were at Done?

19        How were they compensated?

20    **A.**    How were they compensated.

21    **Q.**    No worries.

22    **A.**    So they were paid an hourly fee for -- which was generally

23    about $100 an hour, for their initial appointments.  So

24    essentially, it comes out to $50 per initial evaluation.

25        Now, in the patient became a member, they became part of

1  what we called the "panel pay," and what that meant was then

2  going forward, they would receive -- for every member that was

3  on their panel paying that monthly subscription fee, they would

4  receive 1/14 of their hourly pay.

5  **Q.**  Okay.  For every patient on their panel, they would

6  receive 1/14 of their hourly pay?

7  **A.**  Yes.

8  **Q.**  How was that dependent on them doing follow-ups, if at

9  all?

10  **A.**  So the follow-ups themselves, the actual time was not

11  compensated, so they could schedule it.  They could have some

12  time to schedule a follow-up, but they would not be compensated

13  directly for it.

14  **Q.**  Since you brought up scheduling, let's focus on that.

15      How easy was it for a provider to schedule a follow-up if

16  they had even wanted to on the Done platform?

17  **A.**  It was incredibly difficult, because we were only allowed

18  to give them a very small portion.  So if they could give us

19  eight hours a week, generally speaking, we would only let them

20  have maybe a couple of hours for follow-ups -- you know, to be

21  blocked off on the schedule, because then that was time that

22  was not -- we weren't having patient evaluations, which was

23  revenue for Done?

24      So there was no direct money coming into Done for those

25  follow-ups, and so they tended to fill up very fast, especially

1  if they had a large patient panel.  Even if the provider tried

2  to open up some time, like if a patient critically needed to

3  get in for a follow-up, the second the care team would open

4  that time, it would get booked by another patient for a

5  follow-up.

6  **Q.**    For a follow-up or initial?

7  **A.**    If we had had the time -- it happened so quickly because

8  you have to open it up and then restrict it to follow-up,

9  sometimes it was filled before we would even restrict it --

10  with a new patient evaluation before we could restrict it to

11  being a follow-up.

12  **Q.**    And you said "we" would limit the time on their schedule.

13  Was this your decision to limit the time on a provider's

14  schedule for follow-ups?

15  **A.**    No.

16  **Q.**    Whose decision was that?

17  **A.**    There was Ruthia's.

18  **Q.**    Okay.  Did you have concerns about that?

19  **A.**    Yes, a great -- follow-ups are critical, and our patients

20  couldn't -- patients wanted the follow-ups and couldn't get in

21  for them.

22  **Q.**    Even patients that wanted to schedule a follow-up couldn't

23  get in for them?

24  **A.**    Yes.

25  **Q.**    Okay.  Did you discuss those concerns with Defendant He?

1  **A.**    Yes.

2  **Q.**    Did she agree to increase the amount of time that she

3  would permit the providers to have follow-ups?

4  **A.**    No.

5  **Q.**    And what was your understanding for why Defendant He

6  wanted to limit even the amount of available time for a

7  follow-up?

8  **A.**    Because it cut into the revenue.  So they wouldn't be

9  making revenue off that follow-up time.

10  **Q.**    Because of the subscription model?

11  **A.**    Right.

12  **Q.**    Okay.  Was there ever a point in time where you tried to

13  open up schedule for the follow-ups?

14  **A.**    So yes.  Me and my team, Jake, particularly me and Jake.

15  So we would -- we worked very closely with the providers.

16  You know, so when we would -- they would ask us or we'd work

17  with them.  They'd be like, I need more time in my schedule for

18  follow-ups.

19      And so we would go in -- our tool was called Acuity, and

20  we would change the distribution so that they had a little bit

21  more time for follow-ups.  And then there was at least one

22  occasion where we realized Ruthia had gone in and changed it

23  back, or she looked it -- she was like watching it like a hawk.

24  Like we would do it that night, and the next morning she'd be

25  like, I see that this provider has -- you know, only has six

1   hours, you know, for initial evaluations and two hours for

2   follow-ups.  You know, they're not following our process.

3   **Q.**   So Defendant He -- it sounds like you don't run this by

4   Defendant He before you attempted to do it?

5   **A.**   Yeah, no.  We had to try to do some things kind of under

6   the radar, so...

7   **Q.**   And sounds like you weren't very successful in that

8   endeavor because Defendant He was watching those provider

9   schedules like a hawk?

10  **A.**   Yes.

11  **Q.**   Okay.  What did the payment model incentivize?

12  **A.**   It incentivized -- once that they become a member to

13  essentially just automatically send those prescriptions without

14  seeing the patient.

15       Because they were, again, really essentially only

16  compensated for seven minutes per patient, and that's really

17  just enough to send that prescription.

18  **Q.**   And providers expressed concern about this payment model;

19  correct?

20  **A.**   Constantly.

21  **Q.**   Did Defendant He agree to change the payment model?

22  **A.**   No.  She would not budge.

23  **Q.**   Did Defendant Brody advocate for changing it?

24  **A.**   No.

25  **Q.**   Is this another example of Defendant He overriding

1  providers' requests for what they felt was necessary to safely

2  prescribe?

3  **A.**    Yes.

4  **Q.**    Are you familiar with how much money Done providers who

5  did stay on the platform and had their panel build up -- how

6  much money they were able to make under this compensation

7  model?

8  **A.**    The providers with the larger patient panels were making,

9  I think, 20- to 30,000 a month, as I recall, looking at the pay

10  statements?

11      In addition, this was their part-time gig.  Most of them

12  had other jobs, their full-time jobs they worked.

13  **Q.**    You mentioned this was a part-time thing.  How had

14  Defendant He described this type of compensation model to the

15  providers?

16  **A.**    So there were a number of occasions where she told us to

17  pitch the selling point that this was passive income, that

18  their patient panel -- when they would bring up these concerns

19  about not having any time to do follow-ups, she would say that

20  this is just passive income, so the money just comes in from

21  your patient panel, you know, and all you have to do is refill.

22  **Q.**    Did this compensation model cause panel sizes for some

23  providers to build up to very large sizes?

24  **A.**    Yes.

25  **Q.**    Did Defendant He attempt to impose any limits on panel

1  sizes?

2  **A.**    Oh, no.

3  **Q.**    Did you have concerns about the large panel sizes?

4  **A.**    Yes.  I just couldn't even see how it would be possible to

5  safely manage that many patients.

6  **Q.**    Going to talk about the follow-ups, which you've already

7  brought up.

8      Did Done require patients to have follow-up appointments

9  at any particular point in time in order to continue receiving

10  their refills?

11  **A.**    No, none were required.

12  **Q.**    So the Done members could just continue to obtain their

13  refills without having a follow-up appointment if they chose

14  to?

15      Did you have --

16      (Reporter interruption for clarity of the record.)

17      **THE WITNESS:**  What was the question again?

18  **BY MS. GREEN:**

19  **Q.**    I had said:  Were Done members able to continue obtaining

20  refills for an indeterminate amount of time without having a

21  follow-up appointment?

22  **A.**    Yes.

23  **Q.**    Sorry.

24      And whose decision was it to have this policy?

25  **A.**    It was Ruthia.

**BOWEN - DIRECT / GREEN**

1  **Q.**  I had asked you if you had concerns about leaving it up to

2  a patient to decide if they ever want to have a follow-up

3  appointment?

4  **A.**  Yes.

5  **Q.**  Why were you concerned about that?

6  **A.**  I mean, because the patients aren't medically trained.

7  They don't know what to look for.  I mean, I've on a number of

8  occasions seen patients think that everything was going fine,

9  and then you talk to them further and realize that, you know, a

10  symptom that they think isn't connected to the medication

11  actually is.  Like they're having palpitations, you know, or

12  something like that.

13      So it's really important to check in with them and screen

14  them for things that they may not realize are important.

15  **Q.**  Did Done providers express concerns to Defendant He about

16  this policy, of this follow-up or refill policy, essentially?

17  **A.**  Yes.

18  **Q.**  And what were their concerns?

19  **A.**  I mean, it was their greatest concern.  They were

20  concerned that they weren't able to make sure at a minimum it

21  was the right medication, it was the right dosage, that it was,

22  you know, being effective.

23      But probably even more critically that, you know, they

24  weren't experiencing severe adverse effects, that it wasn't

25  sending them into a manic episode, you know, that they had been

**BOWEN - DIRECT / GREEN**

1  misdiagnosed with ADHD and they, in fact, had bipolar.

2      So there's no way to follow up and make sure that the

3  patient was having an effective treatment or that they were

4  safe.  I mean, or that even the same patient was continuing to

5  receive the medication.

6  **Q.**  What was Defendant He's response when these concerns were

7  raised?

8  **A.**  She minimized it, was not concerned at all.  Just simply

9  said the providers needed to follow the process, and if they

10  didn't, they weren't appropriate for our platform.

11  **Q.**  Did providers also raise this concern with Dr. Brody when

12  you were present?

13  **A.**  Yes.

14  **Q.**  And what was Defendant's Brody's response?

15  **A.**  He usually aligned with Ruthia and just said that,

16  you know, yes, it's fine.  You know, you're just being

17  excessively overcautious.

18  **Q.**  Did you think the providers were being excessively

19  overcautious?

20  **A.**  Absolutely not.

21  **Q.**  Did providers raise concerns about losing their license as

22  a result of prescribing stimulants without follow-up

23  appointments?

24  **A.**  Yes, on a number of occasion.

25  **Q.**  And why would that cause a provider to lose their license?

1    **A.**    Because they wouldn't be legitimately prescribing a

2    controlled substance.

3    **Q.**    Was -- did these providers express that concern to

4    Defendant He as well as you, express that concern to

5    Defendant He?

6    **A.**    Yes.

7    **Q.**    And what was her response?

8    **A.**    I mean, of course minimized.  And at least one occasion,

9    if not more, she said that we would just -- I think I mentioned

10   this before -- we would just pay to them to get their

11   license -- their pay for their license to come back, and we

12   tried to explain that it doesn't work that way.  Like they lose

13   their livelihood.  They lose their career.  You know, it's not

14   something you just pay to get back.

15   **Q.**    When you were at Done, did Defendant He institute an

16   automatic refill process?

17   **A.**    Yes.

18            **MS. GREEN:**  And the Government would move to admit

19   Exhibit 320.

20            **THE COURT:**  320, admitted.

21       (Trial Exhibit 320 received in evidence.)

22   **BY MS. GREEN:**

23   **Q.**    And looking at the date, was this in approximately

24   March 31st, 2021?

25   **A.**    Yes.

**BOWEN - DIRECT / GREEN**

1  **Q.**  Auto-renewal policy is here.  Generally, can you explain

2  to the jury what was this policy?

3  **A.**  A policy was that the patient could, in their account,

4  check a box that essentially says that they are continuously

5  attesting that they have no side effects, that their medication

6  is working well, that everything's fine, and that they didn't

7  even have to go into the platform and request the prescription,

8  that the platform would automatically request it for them,

9  and -- which would then be sent to the provider.  The provider

10  would then send the prescription.

11      So not even having to like actively go in and say,

12  you know, everything's fine, I'm doing well, this medication is

13  working for me, just automatically be happening.

14  **Q.**  And whose decision was it to institute this policy?

15  **A.**  This was very much Ruthia.

16  **Q.**  And under this policy, who was determining if they were

17  stable?

18  **A.**  The patient themselves.

19  **Q.**  And was that appropriate, in your view?

20  **A.**  No.

21  **Q.**  Are you aware of Defendant He consulting with any medical

22  providers at Done about this policy before implementing it?

23  **A.**  Other than Dr. Brody?  I don't think so, no.

24  **Q.**  What was Dr. Brody's -- are you aware of Dr. Brody's view

25  of this policy?

1    **A.**   He generally aligned with Ruthia.  He didn't seem to

2    have -- if -- any objections, at least that I witnessed.

3            **MS. GREEN:**  The Government moves to admit

4    Exhibit 1414.

5            **THE COURT:**  1414, admitted.

6        (Trial Exhibit 1414 received in evidence.)

7    **BY MS. GREEN:**

8    **Q.**   And just focusing on the box on the bottom left, the Done

9    box, you mentioned you could sort of automatically opt into

10   this.  Was that on a member's phone?

11   **A.**   Yes.

12   **Q.**   And was it sort of a toggle, as we see on this screen?

13   **A.**   Yes.

14   **Q.**   What was your reaction to this policy?

15   **A.**   I mean, I was horrified.

16   **Q.**   Why?

17   **A.**   I mean, because there were already such little interaction

18   between the patient and the clinicians.  The clinicians already

19   had such little ability to monitor their patients safely, and

20   this was just one more step that was removing the patient from

21   the provider and setting the expectations that literally

22   the only thing they were paying for was to get their

23   prescription filled every month.

24   **Q.**   How did this policy impact, in your view, whether the

25   providers were able to exercise their independent judgment on

 1  whether the patient had a follow-up and ensure that happened?

 2  **A.**   Well, it took it away.  And then if the provider said, no,

 3  I want to see you for a follow-up, the patient was like, well,

 4  no, I got this message saying all I have to do it click this

 5  automatic renewal box.

 6          **MS. GREEN:**  The Government moves to admit

 7  Exhibit 13 -- 1344.

 8          **THE COURT:**  1344, admitted.

 9          **MR. SCHACHTER:**  Your Honor, objection.  Foundation.

10          **MS. GREEN:**  Happy to --

11          **THE COURT:**  Lay a foundation.

12          **MS. GREEN:**  Let's just show the witness here, please.

13      Ms. Braga, can you zoom in on the very small -- on the top

14  right.

15  **BY MS. GREEN:**

16  **Q.**   Do you see your name on the top right of this document?

17  It's Kristin Oliver here?

18  **A.**   Yes.

19          **MR. SCHACHTER:**  I withdraw the objection, Your Honor.

20          **MS. GREEN:**  Thank you, Mr. Schachter.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 1344 received in evidence.)

23  **BY MS. GREEN:**

24  **Q.**   And we're just going to focus on the refill request note

25  provider notes for a moment.

1        What is this refill request note, provider note?

2    **A.**    So this is just templated language that the provider could

3    copy and paste into their note, so essentially documenting

4    that, you know, they had taken certain steps to ensure it was a

5    safe refill.

6    **Q.**    And was this essentially included -- in your experience,

7    included whenever there was a refill request that was filled?

8    **A.**    Was it included by whom?

9    **Q.**    In the chart, this template refill note.

10   **A.**    The charts that I saw, yes.

11           **MS. GREEN:**    And zooming out, please.

12   **BY MS. GREEN:**

13   **Q.**    Who wrote -- and looking at the bottom, the bottom right.

14   Who wrote that language, the refill request?

15           **MS. GREEN:**    The bottom right on the right-hand side,

16   Ms. Braga, with the blue area, please.

17   **BY MS. GREEN:**

18   **Q.**    Who wrote that language with the template refill request

19   note?

20   **A.**    Ruthia.

21   **Q.**    Okay.  And the template refill request note said (as

22   read):

23           "Patient reports that their symptoms are stable,

24       medications are not causing intolerable side effects

25       and requests to continue current treatment without a

```
 1              face-to-face visit."
 2         Where, if at all, was the provider making that evaluation
 3    under this refill policy?
 4    A.    They weren't.
 5    Q.    Okay.  And were you concerned that Defendant He was
 6    drafting this type of note?
 7    A.    Yes.
 8    Q.    Why?
 9    A.    Because clinical documentation.  And it was attesting to
10    steps that the provider may not necessarily be taking and
11    wasn't taking for, you know, some of things that are said in
12    there.
13              MS. GREEN:  One moment, Your Honor.
14                        (Pause in proceedings.)
15              MS. GREEN:  Can we please move to admit Exhibit 1351.
16              THE COURT:  1351, admitted.
17         (Trial Exhibit 1351 received in evidence.)
18              MS. GREEN:  And let's focus on the middle section
19    where we see the "track changes" message to patient.
20    BY MS. GREEN:
21    Q.    Focusing on line Item 4, we see what was --
22              MS. GREEN:  Line Item 4.  Yeah.  Let's move that to
23    the right.  Thank you.  Thank you, Ms. Braga.
24    BY MS. GREEN:
25    Q.    Line Item 4, Follow-up.  We see what was written and then
```

1    scratched out, "three to four weeks sooner if needed."

2        And instead it's written (as read):

3            "Message through the website if you have any

4        side effects if the treatment is working well.

5        Refill can be requested online."

6        Who wrote that language?

7    A.    Ruthia.

8    Q.    And consistent with your understanding of Defendant He's

9    approach to whether follow-ups were necessary?

10   A.    Yes.

11   Q.    And this is a message to a -- a draft message to a

12   patient; correct?

13   A.    Yes.

14   Q.    What would happen -- we're going to shift topics.

15       What would happen if a provider chose not to prescribe a

16   stimulant to a Done member and that Done member was

17   dissatisfied with that outcome, in your experience at Done?

18   A.    So a number of things would happen.  Generally, if the

19   patient sent in a complaint to the care team, the care team

20   would reach out to the provider, let them know the patient was

21   upset, ask them if they would reconsider prescribing the

22   stimulant.

23       If the provider then said no, then they would see if

24   another provider would be willing to take the patient, or they

25   would put the prescription on Dr. Brody's list to be filled.

1  Q.   Okay.  And in your experience, would Dr. Brody fill those

2  prescriptions?

3  A.   Typically, yes.

4  Q.   And did you notice any pattern as to when it wasn't

5  Dr. Brody, which types of providers those patients were moved

6  to for that prescription?

7  A.   If there was another provider in the state, they would be

8  moved to that provider.  I did advocate for the -- to check in

9  the new provider first, make sure they understood the history

10  that the patient had already been refused a stimulant

11  prescription and that they were essentially giving a second

12  opinion.

13  Q.   You mentioned you advocated for that.  Was the second

14  provider given the information from the past provider in why

15  they hadn't wanted to prescribe a stimulant as a matter of

16  policy?

17  A.   On a couple of occasions, I was able to, but it was not

18  put into policy.  It wasn't allowed to.

19  Q.   You weren't allowed to put that into policy?

20  A.   Yeah.

21  Q.   Who didn't allow that?

22  A.   Ruthia.

23  Q.   Do you think it would have been -- you obviously advocated

24  for it, so why did you think it was important that the second

25  provider at least understand the basis of the first provider's

1    decision?

2    **A.**    I mean, it's generally good clinical practice.  And it's

3    also important, especially when you're trying to do these

4    evaluations in only 25 minutes, that if, you know, some key

5    piece of information has been collected by the first provider

6    that it's made available to the second provider.

7    **Q.**    And that second provider -- we've talked a lot about

8    follow-up appointments, whether they were compensated or were

9    not.

10       When they would transfer that patient, were they

11   compensated to do an initial appointment for that?

12   **A.**    No.  They were expected to be just put onto their patient

13   panel, and the provider could choose whether or not they wanted

14   to do a follow-up.  And the follow-ups were 10 minutes, though.

15   **Q.**    Are you familiar with Ms. Erin Kim and Ms. Elizabeth

16   Stafford?

17   **A.**    Yes.

18   **Q.**    Were they providers on the Done platform?

19   **A.**    Yes.

20   **Q.**    You've mentioned a number of concerns.  Did you have

21   concerns about these providers in -- were these among the

22   providers that you had concerns about?

23   **A.**    I initially had concerns about their large panel sizes,

24   and then as I -- more concerns came up.

25   **Q.**    What were the more concerns that came up?

**A.**    So, for example, for Erin Kim, I remember there was a
review posted online where the patient was complaining that
they were diagnosed -- they were complaining that were
diagnosed in less than five minutes and given a stimulant
prescription with no education.  They were concerned that they
didn't receive an accurate diagnosis.

       And then, after reviewing the records, saw that Erin Kim
was indeed for most of the new patient appointments was seeing
them in five minutes, seven minutes, generally under 10
minutes, a lot of them in five minutes.

              **MS. GREEN:**  The Government moves to admit Exhibit 377.

              **THE COURT:**  377 admitted.

       (Trial Exhibit 377 received in evidence.)

              **MS. GREEN:**  And let's...

**BY MS. GREEN:**

**Q.**    You mentioned you did an analysis related to
Ms. Erin Kim's appointments; correct?

**A.**    Yes.

**Q.**    And you write here -- and this is June 21st, 2021;
correct?

**A.**    Yes.

**Q.**    Did you write in that document --

              **MS. GREEN:**  And it's three paragraphs up from the
bottom, please, Ms. Braga.

\\\

1    BY MS. GREEN:

2    **Q.**    (as read):

3    "I just logged in to Erin Kim's account, which

4    she never changed her Doxy password, and it looks

5    like almost all her appointments are less than 10

6    minutes long."

7    And then you write (as read):

8    "Which validates everything that the patient

9    reported."

10    And let's just go back to page 4, please.

11    And here we see some appointment times.  Are these

12    appointment times for Ms. Kim?

13    **A.**    Yes.

14    **Q.**    And are we seeing ranges from, you know, 28 seconds to --

15    in one case at the high end, you know, 32 minutes but,

16    you know, for all of those except two in the less than a couple

17    of minutes range?

18    **A.**    Yes.

19    **Q.**    Okay.  And let's look at the next page, please.

20    This June 18th, 2021, appointment.  Was this an initial

21    appointment?

22    **A.**    Yes.  I believe that was one of the ones I was referring

23    to in the conversation.

24    **Q.**    And six minutes and 52 seconds?

25    **A.**    Yes.

BOWEN - DIRECT / GREEN

1    **Q.**   What was your reaction when you saw this data?

2    **A.**   I was -- I was actually kind of heartbroken, just

3    disappointed.   I -- you know, Erin Kim had seen -- we had

4    interacted with her a lot.   She seemed really pleasant.   She

5    seemed really competent.   Never got any patient complaints?

6        So it was just really disappointing to see, as a provider

7    that I respected, that she wasn't, you know, giving the time

8    and attention to her patients that she should have.

9    **Q.**   Mm-hmm.

10       And Defendant He was on this document.   Did you share your

11   findings with Defendant He?

12   **A.**   Yes.

13   **Q.**   What was her response?

14   **A.**   She was concerned, but her concern was that the patient

15   had left a public review, and so she wanted us to essentially

16   talk to Erin Kim and tell her essentially to kind of read the

17   patient, see if there's someone that wanted a longer

18   appointment, make sure they were filling the time, you know,

19   with other things -- coaching, more discussion -- so that the

20   patient wouldn't leave bad reviews.

21   **Q.**   Did she express concern about whether or not you can

22   provide a legitimate diagnosis in six minutes and 52 seconds?

23   **A.**   No.

24   **Q.**   Did Erin Kim stay on the platform?

25   **A.**   She did, yes.

BOWEN - DIRECT / GREEN

1  **Q.**   What is your understanding for why?

2  **A.**   Because she brought in a lot of money.  She saw a lot of

3  patients.  And she had multiple licenses across several states,

4  so she was a key provider.

5  **Q.**   And when you say she saw a lot of patients, for initial

6  appointments or follow-up appointments?

7  **A.**   Initial appointments.

8  **Q.**   Mm-hmm.

9       Did you suggest any improvements such as technology or

10  software tools that would allow Done to monitor appointment

11  times to try and control for this type of issue?

12  **A.**   Yes.  I even put together a giant memo of these different

13  platforms that we could get onto that were very, very low cost,

14  but they would allow us to have these analytics so that we

15  could monitor and make sure that, you know, they were meeting

16  expectations for the appointments, at least like time-wise.

17  **Q.**   Okay.  So when you say "meet expectations," do you mean

18  meet Defendant He's scheduled appointment time for Done, i.e.,

19  the 25 minutes?

20  **A.**   Yes.  So -- and then mainly to also validate patient

21  complaints, because we'd get a lot of patient complaints that

22  the provider ended the appointment early, the provider was a

23  no-show.  So a lot of these things, trying to actually validate

24  at least from duration.  And they had things to see like, you

25  know, if they actually connected, was there a technology issue.

1   So we could monitor those pieces.

2   **Q.**   And did you suggest this idea to Defendant He, this

3   control?

4   **A.**   Yes.

5   **Q.**   What was her response?

6   **A.**   Absolutely shut it down, because Doxy was free.

7   **Q.**   Shut it -- so it was based on cost?

8   **A.**   Yes.

9   **Q.**   Did you observe Defendant He -- we've talked about a

10  number of different policies -- but make decisions where it

11  seemed to you that she was prioritizing growth over initiatives

12  that would improve and safeguard patient care?

13  **A.**   Consistently, yes.

14  **Q.**   Was this one of those examples?

15  **A.**   Yes.

16  **Q.**   What about not paying for follow-ups?

17  **A.**   Yes.

18  **Q.**   Okay.  Did Ms. He favor certain types of providers on the

19  Done platform, based on your experience and interactions with

20  her?

21  **A.**   Did she favor them?

22  **Q.**   Yeah.  What types of providers did she value and --

23  **A.**   She -- she made sure that we did what we could to retain

24  providers that were more productive, so in the sense that they

25  were able to give us a large amount of time each week to seeing

1  new patient evaluations and would take on a large patient panel

2  and essentially not complain about that?

3       And then get no complaints about -- you know, from

4  patients.  That was a key priority for her.

5             MS. GREEN:  The Government move to commit Exhibit 378.

6             THE COURT:  378 admitted.

7       (Trial Exhibit 378 received in evidence.)

8  BY MS. GREEN:

9  Q.   We see here an Asana task about "monitor the provider

10 performance data."

11      You write (as read):

12           "Patient conversion and retention are not

13      directly related to provider performance.  They are

14      related to many other factors."

15      How did Defendant He rate patient conversion and retention

16 when she was considering providers' measurements of success?

17 A.   I mean, those were the key metrics for her.

18 Q.   What was your understanding as to why?

19 A.   Because that's what translated into revenue.

20 Q.   Okay.  And did you have concerns about using these metrics

21 to measure the success of a provider on the platform?

22 A.   Yes.

23 Q.   Why?

24 A.   Because they essentially incentivized the provider to also

25 prioritize revenue.  Didn't consider clinical quality, didn't

**BOWEN - DIRECT / GREEN**

1  consider patient outcomes.  You know, all the things that in

2  any other healthcare setting would be a priority to measure.

3  **Q.**  And to keep a patient on the platform, in Defendant He's

4  view as communicated to you, what did she think the providers

5  should be doing?

6  **A.**  Refilling their prescriptions quickly.

7  **Q.**  And let's go to page 3, please.

8      Defendant He writes (as read):

9          "The patient retention and conversion are the

10         end goal for the provider's pay:  How many patients

11         on their panel and how many convert to members.  So

12         it would be a good motivation for providers to want

13         to improve these metrics."

14     What was your reaction to Defendant He's response when you

15  raised your concerns?

16  **A.**  I mean, it was extremely concerning that she didn't

17  appreciate in any capacity that providers might be motivated by

18  something other than money and that there's a dedication to

19  patient safety and making sure that patients are well cared

20  for.  She just reduced it to nothing more than money.

21  **Q.**  Mm-hmm.

22     We mentioned this previously, but providers that did agree

23  to, you know, practice according to the Done model, were they

24  able to accumulate a large amount of income doing that?

25  **A.**  Relative to what the average nurse practitioner makes,

1    yes, far more.

2    **Q.**    How concerned was Defendant He about negative reviews from

3    Done members?

4    **A.**    Very concerned.  Extremely.

5    **Q.**    What was her response, based on your observations and

6    interactions with her, to these negative reviews?

7    **A.**    Especially if it was posted online, like on Trustpilot or

8    something that was visible to the public, I mean, that's

9    something else that she watched like a hawk, I mean, I would

10   get calls as midnight, you know, when she saw a review.  And I

11   think there was one occasion where, you know, the two people

12   that reported to me she was upset that she had read this bad

13   review.  She said they weren't doing their jobs, wanted me to

14   fire them the next morning, which they were actually amazing at

15   their jobs.

16        But, you know, she would want the care team to reach out

17   to the patient, try to get them to take the review down.

18   Essentially, we'll give you what you want.  If they didn't get

19   a stimulant, so this would be a circumstance where we would be

20   instructed to transfer the patient to a different provider if

21   there was one in that state.

22   **Q.**    If they didn't get a stimulant and had expressed that?

23   **A.**    If that was, you know, part of their motivation.

24        A lot of times the patient would say other things, like,

25   oh, the provider was rude.  But then pretty consistently, if

1  you look at the medical notes, it's because the provider deemed

2  that they did not have ADHD or that a stimulant wasn't

3  appropriate for them.

4  **Q.**   But Defendant He's response was still nevertheless to meet

5  the patient's expectation?

6  **A.**   Right, yes.

7  **Q.**   Did -- you brought up your analysis.  Did you do an

8  analysis while you were at Done into these negative member

9  reviews?

10 **A.**   Yes, especially because Ruthia was kind of increasing this

11 pressure to essentially reprimand or remove the providers from

12 the platform that were getting negative reviews, and so

13 Dr. Brindala and I, we were trying to convince her that in a

14 lot of these circumstances, it was because the patient had not

15 gotten the ADHD diagnosis; they had not gotten the stimulant

16 and -- which was clinically warranted decision, a clinically

17 valid decision?

18      So I -- there's -- it was painstaking, but I literally

19 went through, took all these statistics.  I found all the

20 patient that had negative reviews and went through their

21 charts.  I coded, put the reason for, you know, what they had

22 complained about, matched it to whether or not they had not

23 gotten the diagnosis or the stimulant, and it was a very high

24 proportion.  It was like, I think, 80 percent of the negative

25 reviews for many of the providers -- not all, but many of them

BOWEN - DIRECT / GREEN

1  were -- could be matched to not getting an ADHD diagnosis or a

2  stimulant.

3  **Q.**   Okay.  And did you share your findings with Defendant He?

4  **A.**   Yes.

5  **Q.**   And what was her reaction when you explained these

6  findings that, you know, it was related to not getting a

7  stimulant or not getting an ADHD diagnosis?

8  **A.**   She did come down some on wanting to let the provider go,

9  but it was more that she wanted us to have the provider meet

10  with Dr. Brody so that he could coach them on, you know, more

11  appropriate diagnosis and treatment.

12  **Q.**   You say "more appropriate diagnosis and treatment," but

13  you're making a facial expression there.  So can you explain to

14  the jury why you -- did you view Dr. Brody's coaching as being

15  about more appropriate diagnosis and treatment?

16  **A.**    It was just -- it was consistently trying to convince them

17  that, you know, they should diagnose ADHD with more lax

18  criteria, that stimulants weren't as, you know, dangerous or

19  high-risk as they thought they were.  That was consistently the

20  message that he coached them on.

21  **Q.**   Trying to, in your view, convince them that they should

22  change their approach?

23          **MR. SCHACHTER:**  Objection to leading.

24          **THE COURT:**  Okay.  Sustained.

25     Ladies and gentlemen, we're going to take our recess now.

1    We'll be in recess until 11:00.

2        Remember the admonition given to you:  Don't discuss the

3    case, allow anyone to discuss it with you, form or express any

4    opinion.

5                    (The jury leaves the courtroom.)

6        (Proceedings were heard out of the presence of the jury.)

7            THE COURT:  Okay.  About how much longer do you have?

8            MS. GREEN:  I'm planning to finish by lunch, if not

9    before.

10           THE COURT:  Okay.  Thank you.

11           MS. GREEN:  Thank you.

12                    (Recess taken at 10:43 a.m.)

13                (Proceedings resumed at 11:01 a.m.)

14       (Proceedings were heard out of the presence of the jury.)

15           THE COURTROOM DEPUTY:  Come to order.  Court is now in

16   session.

17           THE COURT:  Please be seated.

18       Let the record reflect all parties are present.

19       You may proceed.

20           MS. GREEN:  Thank you, Your Honor.

21   BY MS. GREEN:

22   Q.   We've been discussing your negative review analysis.  You

23   initially mentioned that Defendant He -- I think you used the

24   word "penalized," had wanted to penalize providers who had not

25   prescribed a stimulant and where there had been a negative

 1    review.

 2         What did you mean by that, "penalize"?

 3    A.   There were a few different things that were suggested.

 4         One was to reduce their pay, so their hourly rate.  One

 5    was to actually reduce the number of hours given on the

 6    platform.  You know, that would have ended up limiting revenue

 7    as well, so it wasn't really seriously considered.

 8         Another was this idea that, you know, we would do a

 9    performance improvement plan, so -- and also kind of being on

10    probation, so if more negative reviews came in, you know, then

11    it would be kind of so many strikes and then they'd be taken

12    off the platform.

13    Q.   Okay.  So if the negative reviews kept coming in and the

14    providers hadn't changed their practices with respect to their

15    willingness to prescribe the stimulant, ultimately they might

16    have to leave the platform; is that correct?

17    A.   Yes.

18    Q.   Was that similar for providers that did not respond to

19    Dr. Brody's coaching that you mentioned to adjust their

20    practices with respect to their willingness to prescribe

21    stimulants?

22    A.   Yes, but typically those providers would leave the

23    platform eventually.

24    Q.   The providers unwilling to adapt to --

25    A.   Right.

1    **Q.**    -- the Done model?

2    **A.**    Right, yeah.

3    **Q.**    And didn't Defendant He -- well, you discussed this issue

4    with Defendant He, I take it?

5    **A.**    Yes, extensively.

6    **Q.**    And did she say anything about whether providers had

7    agreed to prescribe in this sort of more liberal way, prescribe

8    stimulants, when they joined the Done platform?

9            **MR. SCHACHTER:**    Objection, leading.

10           **MS. GREEN:**    I can --

11   **BY MS. GREEN:**

12   **Q.**    Did she say anything about what providers had agreed to

13   when they joined the Done platform?

14   **A.**    I mean, she essentially said that, you know, this is

15   the -- part of their contract; this is the model that they

16   signed up for.  So... even though it kind of wasn't, because it

17   was always changing.

18   **Q.**    What were you -- what did you understand her to mean when

19   she said that?

20   **A.**    That they had implicitly agreed to prescribe the

21   medications, to give the ADHD diagnosis, you know, to just kind

22   of follow this factory assembly line protocol.

23   **Q.**    How -- since you bring this up, how did a provider get

24   someone onto their panel in the Done model?

25   **A.**    They would have to give them an ADHD diagnosis, so -- and

1  essentially the member would have to agree, so they would

2  then -- I don't know how it started exactly.  I think they

3  signed -- they checked the thing in their portal that said that

4  they wanted to become a member.

5  **Q.**  And what about retaining the member on the panel?  What

6  would the provider have to do in order to retain them?

7  **A.**  I mean, keep refilling their prescription.  So as long as

8  the patient was happy and wasn't canceling their membership.

9  But that was the basic expectation is that they were continuing

10  to fill the prescription every month.

11  **Q.**  And we've talked about the lack of follow-ups and the

12  refill policy.

13      What service was Done providing to these Done members

14  under those follow-up policies?

15  **A.**  It was really only the refills.

16          **MS. GREEN:**  The Government moves to admit Exhibit 355

17  and 354.

18          **THE COURT:**  355 and 354 admitted.

19      (Trial Exhibits 355 and 354 received in evidence.)

20  **BY MS. GREEN:**

21  **Q.**  Let's look at Exhibit 355, please.

22      Do you recognize this Slack conversation -- there we go.

23      You're familiar with this Slack conversation between

24  yourself, Dr. Brindala, Defendant He, and others?

25  **A.**  Yes.

 1  **Q.**   Okay.  There's no date on this document, so we're just

 2  going to look at Exhibit 354, just admitted, so we can orient

 3  to a date.

 4          **MS. GREEN:**  And let's scroll down, please.

 5  **BY MS. GREEN:**

 6  **Q.**   And do you see the date May 13th, 2021, for this Slack

 7  conversation?

 8  **A.**   Yes.

 9  **Q.**   And you've reviewed this document before; correct?

10  **A.**   Yes.

11  **Q.**   Is this essentially the same document, just in a different

12  form?

13  **A.**   Yes.

14  **Q.**   Okay.  So Exhibit 355 is a bit easier to read, so let's go

15  back to Exhibit 355.

16          **MS. GREEN:**  I'm sorry, Ms. Braga.  Can you go back to

17  354, please.  Apologies.

18  **BY MS. GREEN:**

19  **Q.**   Just looking at the attendees in the Slack conversation,

20  was Defendant He a part of this conversation?

21  **A.**   Yes.

22  **Q.**   Was Dr. Brody?

23  **A.**   Yes.

24  **Q.**   And yourself?

25  **A.**   Yes.

1          **MS. GREEN:**  Okay.  Let's go back to 355, please.

2     BY MS. GREEN:

3     Q.   And just looking at page 2 -- I mean page 1, paragraph 2.

4          "Resheda" -- Dr. Brindala writes (as read):

5               "Resheda might represent a good example of a

6          provider with lower ratings as a function of

7          judiciousness with stimulant prescriptions."

8          **MS. GREEN:**  And let's look at paragraphs -- page 2,

9     paragraphs 2 to 3.

10         Thank you.  Above that, please.  Paragraph 2.

11    BY MS. GREEN:

12    Q.   Dr. Brindala writes (as read):

13              "Almost every patient who does not receive a

14         stimulant and leaves a review complains about the

15         provider not listening.  The sentiment is that

16         providers who listen will hear the full story, which

17         would justify the stimulant prescription."

18         And then the -- what was Dr. Brindala's view on the

19    negative patient reviews?

20    A.   That he also felt that a large portion of them was due to

21    the patient not receiving the expected ADHD diagnosis and/or

22    stimulant prescription.

23    Q.   So in agreement with you, it sounds like?

24    A.   Yes.

25    Q.   Okay.

1          MS. GREEN:  And let's look at the penultimate

2    paragraph, please, Ms. Braga.

3    BY MS. GREEN:

4    Q.   Dr. Brindala writes (as read):

5              "@Ruthia, you seem to believe that providers you

6         like are very good at dealing with patients even when

7         they do not prescribe stimulants.  I suspect that

8         those providers you like simply have a higher rate of

9         stimulant prescriptions, which makes them seem like

10        they deal with patients better even when they don't

11        prescribe stimulants.  To find out, we can analyze

12        the reviews."

13         MS. GREEN:  And let's go to page 3, please,

14   paragraph 4.

15   BY MS. GREEN:

16   Q.   Dr. Brindala writes further (as read):

17             "@Ruthia, if we simply try to find a way for

18        every patient to get the stimulant they want, we will

19        truly be a pill mill.  We will in reality become the

20        illegitimate company represented in reviews from

21        dissatisfied patients.  We already have multiple

22        elements of illegitimacy.  Going down this route will

23        galvanize that illegitimacy see rather than reduce

24        it."

25   What was your understanding of Dr. Brindala's concern?

1  A.   I mean, his concern was that if we continued to reinforce

2  or support this idea that, you know, patients that were

3  dissatisfied with not receiving the diagnosis of the medication

4  that they wanted, that essentially -- I mean, that supports the

5  assertion that we were a pill mill.

6         MS. GREEN:  And let's look at page 3, please.

7      Let's focus on the bottom section, the last section that

8  Dr. Brindala writes.

9  BY MS. GREEN:

10  Q.   He writes further (as read):

11          "We cannot hide behind excuses to prescribe more

12      stimulants inappropriately."

13      And then he provides seven concerns (as read):

14          "One, offering a second opinion because the

15      first opinion did not prescribe a stimulant is an

16      example.  That can be hiding behind an excuse to

17      prescribe more stimulants inappropriately.

18          "Using provider interview questions from

19      Dr. Les Tsang selects for providers who prescribe

20      stimulants indiscriminately."

21      Is that the same concern you and I had just discussed

22  earlier today?

23  A.   Yes, it is.

24  Q.   And he adds the same sentence (as read):

25          "That can be hiding behind an excuse to

1          prescribe more stimulants inappropriately."

2          I'm not going to read that every time.

3          And then Item tree (as read):

4              "Following advice from Dr. Les Tsang to

5          prescribe stimulants even when a patient does not

6          meet criteria for ADHD is an example."

7          **MS. GREEN:**  Let's go to the next page, please.

8          Oh, yes.  If we could split the screen.  Thank you,

9    Ms. Braga.  That was sensible.

10         I think just Item 4 to 7.  If you can't split the

11   screen -- there we go.  Thank you, Ms. Braga.

12   **BY MS. GREEN:**

13   **Q.**   Item 4 (as read):

14             "Justifying prescription of stimulants across

15         state lines without seeing patients and without

16         reviewing patient charts is another example.  The

17         excuse is that we would abandon patients if we did

18         not illegally prescribe.  That can be hiding behind a

19         excuse to prescribe more stimulants inappropriately."

20         We have discussed -- actually, it was yesterday --

21   Dr. Brody's refills.  Did many of those cross state lines,

22   including states where he was not licensed?

23   **A.**   Yes.

24   **Q.**   And not reviewing patient charts or seeing patients, was

25   that something you had also noticed with respect to his

 1   prescriptions?

 2   **A.**   Yes.

 3          **MS. NECHAY:**  Objection, leading.

 4          **THE COURT:**  Overruled.

 5   **BY MS. GREEN:**

 6   **Q.**   The excuse is that we would abandon patients if we did not

 7   illegally prescribe.

 8          Did you agree with Dr. Brindala's view that this practice

 9   was illegally prescribing?

10   **A.**   Yes.  It was the excuse that there were no other options

11   other than to illegally prescribe in order to care for the

12   patients, which isn't true.

13   **Q.**   And why do you not agree that that was true?

14   **A.**   There's many other options to ensure continuity of care.

15   Illegally prescribing is by far the most dangerous.

16   **Q.**   (as read):

17          "Disproportionately weighting provider reviews

18          from patients who did not get a stimulant is another

19          example.  We have just been discussing this negative

20          review issue and how Defendant He valued provider

21          success."

22          Is that consistent with this point that Dr. Brindala was

23   raising?

24   **A.**   Yes.

25   **Q.**   (as read):

BOWEN - DIRECT / GREEN

1           "Refusing to put DSM-5 criteria in provider note
2       templates is another example."
3       Now, you and I had described the absence of DSM-5 criteria
4   being included in the onboarding material.  We also discussed
5   the opposite of that in other onboarding documents that talked
6   about prescribing or providing a medication when one does not
7   meet the criteria.
8       Was that, in your view, consistent with this point that
9   Dr. Brindala was raising about adherence to the DSM-5 criteria?
10  **A.**   Yes, because it was also removed from the provider note
11  template.
12  **Q.**   So you had the same concerns about that?
13  **A.**   Yes.
14  **Q.**   (as read):
15          "Blocking the providers from attesting to follow
16      their clinical judgment in assessment and management
17      is another example.  That can be hiding behind an
18      excuse to prescribe more stimulants inappropriately."
19      What was that point about?
20  **A.**   So from attesting to follow their clinical judgment and
21  assessment and management, it was -- I believe it refers to a
22  document where we had put into their contract essentially that
23  they were attesting that they were going to be using their
24  independent clinical judgment and assessment whenever managing
25  these patients.

1    **Q.**    And that was blocked?

2    **A.**    That was blocked, yes.

3    **Q.**    And based on your experience at Done, and we've talked

4    about many of these issues, did you see many circumstances

5    where Done's model and Defendant He's policies were blocking

6    providers from executing their independent clinical judgment?

7            **MR. SCHACHTER:**  Objection, leading.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  Yes.

10   **BY MS. GREEN:**

11   **Q.**    What was Defendant He's response to these concerns laid

12   out by Dr. Brindala?

13   **A.**    Dismissive.  She was -- did not accept any of them.

14   **Q.**    And did you see her sort of -- put into place any policies

15   or practices or controls that could help mitigate some of these

16   concerns?

17   **A.**    No.

18   **Q.**    What about Dr. Brody's response?

19   **A.**    I don't know that he made any response.

20   **Q.**    Okay.  Do you recall him agreeing with Dr. Brindala and

21   advocating for changes?

22           **MS. NECHAY:**  Objections.  Witness stated she has no

23   recollection.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  No, he did not -- he did not support

1    Dr. Brindala's -- he did not put anything into place to address

2    these concerns.

3    **BY MS. GREEN:**

4    Q.   And was your analysis of negative reviews and the comments

5    or Dr. Brindala's comments here, in your view, able to change

6    Defendant He's views on what metrics should be used to measure

7    provider success on the platform?

8    A.   No.  Nothing would change her mind.

9    Q.   You mentioned at the start of your testimony yesterday

10   that one of the reasons you left was because you felt that

11   changes could not be put in place.  Is this an example?

12   A.   Yes.

13           MS. GREEN:  Let's look at Exhibit 2845, please.

14           THE COURT:  2854?

15           MS. GREEN:  2845.

16           THE COURT:  2845 admitted.

17       (Trial Exhibit 2845 received in evidence.)

18           MS. GREEN:  Thank you, Your Honor.

19   **BY MS. GREEN:**

20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   And you're smiling.  Why do you recognize this document?

23   A.   Because I wrote it.

24   Q.   And why did you write it?

25   A.   Because I was trying to address these concerns that Ruthia

1  believed that the providers that were getting low ratings were

2  poor performers, so, one, I kind of wanted to, you know,

3  address these concerns specifically ahead of time.

4     I also wanted to set the expectation that it was important

5  to use their clinical judgment, to follow clinical guidelines,

6  to appropriately practice, because it was not clearly stated

7  that expectation anywhere in the onboarding and the recruiting

8  process, so I wanted to make sure that that was addressed.

9  **Q.**   And did you -- based on the topics we've already covered

10  today, which I don't want to repeat, did you feel that, in

11  fact, Defendant He with her practices and policies was setting

12  the opposite expectation?

13  **A.**   Yes.

14  **Q.**   Okay.  And let's look -- you mentioned clinical judgment.

15  We're not going to read this whole document, but just to look

16  at that second bullet point (as read):

17        "Use your clinical judgment without making them

18     feel judged."

19     This is an example of what you were trying to put in that

20  material.

21     (as read):

22        "And focus on clinical judgment to make a

23     designation and decide on treatment."

24        **MS. GREEN:**  And let's look at page 3, third paragraph

25  from the bottom.

```
1    BY MS. GREEN:

2    Q.    You see another inclusion of that point here that you're

3    trying to emphasize?

4          Did you share this document with Defendant He?

5    A.    Yes.

6    Q.    Was this document disseminated to the providers?

7    A.    At first I disseminated them to the providers, but then

8    once Ruthia realized I was doing that, she told me to stop.

9    Q.    Did you stop?

10   A.    I did, yes.

11   Q.    What was your understanding for why Defendant He told you

12   to stop?

13   A.    I think she felt like it did not encourage providers to

14   follow the Done model, that it was encouraging them to perhaps

15   not make ADHD diagnoses, to not give them the prescriptions

16   that they wanted.

17   Q.    Did Dr. Brindala write a --

18          MS. GREEN:  Thank you, Ms. Braga.  We can take that

19   down.

20   BY MS. GREEN:

21   Q.    Did Dr. Brindala write risk mitigation reports?

22   A.    Yes.

23   Q.    Did you discuss those risk mitigation reports with him?

24   A.    Yes.

25   Q.    What is your understanding for why he created those
```

1    reports?

2    **A.**    It was becoming increasingly clear that there were

3    practices, obviously, you know, that we've discussed and we've

4    gone through that were unsafe, didn't involve clinical

5    guidelines, were illegal.  So it was important to specifically

6    identify those risks, identify that we were trying to make

7    efforts to address them?

8         So clearly trying to make sure that, you know, it -- we --

9    our concerns were heard and that Ruthia knew that we needed to

10   address them.

11   **Q.**    And when you say "we were trying to make efforts to

12   address them," are you referring to yourself and Dr. Brindala

13   or Defendant He and Defendant Brody?

14   **A.**    Oh, no.  Dr. Brindala, myself, pretty much everyone else

15   at the company.

16   **Q.**    Everyone else except for whom?

17   **A.**    Except for Ruthia and Dr. Brody.

18   **Q.**    Were you involved in conversations where these risk

19   mitigation reports were discussed with Defendant He?

20   **A.**    Yes.

21   **Q.**    What was her reaction to these risk mitigation report?

22   **A.**    It resulted in a lot of arguments between her and

23   Dr. Brindala.  She refuted that they were important or concerns

24   that needed to be addressed.

25   **Q.**    What was your view as to whether these risk mitigation

1    reports were important?

2    **A.**    I felt they were completely valid, and I was glad somebody

3    at the company was addressing them.

4            **MS. GREEN:**    Let's look at Exhibit 364, which has

5    already been admitted.

6    **BY MS. GREEN:**

7    **Q.**    And this is the risk mitigation report for May 31, 2021.

8        Did you receive this report?

9    **A.**    Yes.

10   **Q.**    Okay.  And let's just go to page 2.  And let's look at the

11   risk in May 2021, because it's a topic we've been talking about

12   today.

13       Second opinions from company providers (as read):

14           "If patients are transferred to different

15       company providers when they do not receive stimulant

16       prescriptions, then the credibility of company

17       providers is undermined."

18       Is this similar to the concern that we just saw in that

19   Slack from Dr. Brindala?

20           **MR. SCHACHTER:**    Kristina, it's not up.

21           **MS. GREEN:**    I'm sorry.

22           **THE COURTROOM DEPUTY:**    Sorry.

23           **MS. GREEN:**    Thanks.

24   **BY MS. GREEN:**

25   **Q.**    So we were looking at the risk identified in the May 31st,

1    2021, risk mitigation report, second opinions from company

2    providers.

3            The risks identified is (as read):

4                "If patients are transferred to different

5        company providers when they do not receive stimulant

6        prescriptions, then the credibility of company

7        providers is undermined."

8        And I think you said that that -- similar concern to what

9    we were just discussing with the other Slack?

10   A.   Yes.

11   Q.   "The company must" -- this is the recommendation (as

12   read):

13               "-- must immediately stop all second opinions

14       from company providers when stimulants are not

15       prescribed by the initial company provider."

16       Did that recommendation get implemented?

17   A.   No.

18   Q.   And he mentions in -- the credibility of company providers

19   is undermined when this transfer happens.

20       So what was your view as to the impact of such a policy on

21   whether providers felt they could execute their independent

22   clinical judgment?

23   A.   I mean, it contradicted that.

24   Q.   To the extent the second provider issued a stimulant

25   prescription when the first did not, was that first provider's

BOWEN - DIRECT / GREEN

1   judgment respected?

2   **A.**   No.

3           **MR. SCHACHTER:**  Objection, leading.

4           **THE COURT:**  I don't know how that's leading, but

5   anyway, overruled.

6   **BY MS. GREEN:**

7   **Q.**   And looking at --

8           **MS. GREEN:**  Going to page 4, please.  Well, before

9   that.

10  **BY MS. GREEN:**

11  **Q.**   You mentioned that that recommendation was not

12  implemented.  What's your understanding as to why not, the one

13  about second opinions?

14  **A.**   Because it was a measure to prevent losing a member, so it

15  would have been revenue loss if the patient had left the

16  platform because they were dissatisfied.

17      Or sometimes the provider asked -- actually requested

18  discharge the patient because what they discovered was

19  something that was, you know, nefarious, that they were

20  provider shopping.  They saw on the CURES.

21      And so -- but then that didn't happen if they put them

22  with a second provider, so -- and we didn't lose that member.

23  We didn't risk a public review that was negative.

24  **Q.**   And who was the block on implementing that recommendation?

25  **A.**   Ruthia.

1    Q.    Let's look at page 4.  So these are risks that were

2    identified in November 2020, but looks like they remained in

3    the risk mitigation report as of May 2021.

4        Was it your understanding that these risks had been

5    mitigated by this point?

6    A.    No.

7    Q.    Did you ever think these risks were mitigated?

8    A.    No.

9    Q.    Okay.  And I just want to look at -- you know, there's one

10   pressure to diagnose ADHD and prescribe stimulants, and that

11   risk is self-explanatory.

12       But look at the resolution (as read):

13           "Provider handbook section evidence-based

14       mission was executed by Brindala, MD, on February 1,

15       2021.  This will be disseminated to all existing

16       providers and to all new providers moving forward.

17       This will also be regularly referenced and provided

18       in newsletters."

19       Do you know what this provider handbook section

20   evidence-based medicine was?

21   A.    It was never a section that I saw in the provider

22   handbook.

23   Q.    Okay.  And, you know, it looks like you were assigned to

24   this task.  Seems like you didn't disseminate this or were not

25   instructed to disassemble this to providers; is that fair?

```
 1   A.    That's fair.

 2   Q.    And we discussed your role.  You had involvement in

 3   provider recruiting and provider onboarding; correct?

 4   A.    Yes.

 5   Q.    And in neither of those roles did Defendant He instruct

 6   you to disseminate this provider handbook to providers?

 7   A.    No.

 8         MS. GREEN:  Let's zoom out, please.

 9   BY MS. GREEN:

10   Q.    And, you know, looking at risk 2, Refilling stimulant

11   prescriptions without synchronous visits.

12         And then let's just go to the next page.

13         Was the recommend -- resolution for the same for this

14   risk, this same handbook?

15   A.    Yes.

16   Q.    Okay.  Looking at the recommendation for this one (as

17   read):

18             "Encourage and incentivize providers to follow

19         their clinical judgment in conducting synchronous

20         visits at a frequency consistent with the standard of

21         care shaped by individual patient characteristics,

22         et cetera."

23         Did you see Defendant He take any steps to do that?

24   A.    No.

25   Q.    Did you see Defendant Brody take any steps to do that?
```

1   A.    No.

2   Q.    Okay.

3        MS. GREEN:  And zooming out, please.

4   BY MS. GREEN:

5   Q.    Same thing for "Refilling stimulant prescriptions for

6   transferred patients without visits."

7        We talked about that, when patients are transferred, there

8   was no visit; correct?

9   A.    Correct.

10  Q.    And same resolution given, this provider handbook.

11       So you wrote a document -- we just looked at it --

12  emphasizing providers having independent clinical judgment,

13  similar to what Dr. Brindala was recommending here.

14       How receptive was Defendant He to you disseminating that

15  document?

16  A.    She told me not to.

17       MS. GREEN:  Okay.  And this is already admitted.  It's

18  Exhibit 6146.  This is the provider handbook, just for

19  clarification, the prior handbook, I believe, that was

20  referenced here.  Can we show that?

21  BY MS. GREEN:

22  Q.    And this is the document that you do not recognize; is

23  that right?

24  A.    Yeah.  I'm -- I don't recognize it because it was never

25  put into the provider handbook.

1    Q.    Okay.  And not disseminated during recruiting or

2    onboarding?

3    A.    No.

4    Q.    And, in fact, do we see here, similar -- I don't want to

5    read all of this, but similar points?  Do we see what

6    Dr. Brindala had recommended in his Slack about using the

7    DSM-5, using clinical judgment, similar points to what you had

8    made in your document; correct?

9    A.    Correct.

10          MS. GREEN:  I want to look at Exhibit 254, which is

11   already admitted.

12       So going to the risks from November 2020.  November 2020,

13   next page, pages 3 to 4.

14   BY MS. GREEN:

15   Q.    I'm not going to read these again because these are the

16   same risks.

17       But who do you notice was responsible for mitigating

18   Risk 1, Risk 2, and on the next page, Risk 3?

19   A.    Dr. Brody.

20   Q.    So in December 2020, Dr. Brody is listed as being the

21   person responsible, but as of May 2021, these risks are still

22   in Dr. Brindala's report, and the provider -- the people

23   responsible for mitigating those risks are now no longer

24   Dr. Brody; correct?

25   A.    Correct.

1  **Q.**  What is your understanding of what Dr. Brody did, if any,

2  to mitigate these risks?

3  **A.**  I wasn't aware that anything was done.

4  **Q.**  Okay.  Did you speak with Dr. Brindala about this -- these

5  risk mitigation reports after they went out?

6  **A.**  Yes.

7  **Q.**  And what was your impression as to whether he felt

8  satisfied that Done was successfully putting into place

9  measures to mitigate these risks?

10  **A.**  He was frustrated, very frustrated, that -- not only were

11  they not being putting in place, but many solutions that were

12  very easy to implement were being actively blocked by Ruthia.

13          **MS. GREEN:**  Your Honor, and I've consulted with

14  defense counsel.  There was one document that we didn't admit.

15  We're going to admit a different version of it, Exhibit 1418.

16  And I believe defense counsel is good with that.

17          **THE COURT:**  Okay.  1418.

18      (Trial Exhibit 1418 received in evidence.)

19  **BY MS. GREEN:**

20  **Q.**  Are you familiar with this document?

21  **A.**  Yes.

22  **Q.**  What is it?

23  **A.**  The Clinician Quick Start.  So it was something we gave to

24  them, kind of a everything of how to quickly get onto the

25  platform, take care of all the things they needed to to start

1  seeing patients.

2  **Q.**    Okay.

3         **MS. GREEN:**  And let's go to page 4, please.

4      Oops.   I may have given you the wrong page.  Maybe the

5  next page.   There we go.   Sorry, Ms. Braga.

6      And let's just zoom in on that bottom language, "If they

7  don't fully meet the criteria."

8  **BY MS. GREEN:**

9  **Q.**    So this document also says (as read):

10         "If they don't fully meet the criteria for ADHD,

11      use your clinical judgment to determine if the

12      patient may still benefit from a medication trial."

13      So similar language to the medication trial language we'd

14  seen in other onboarding material; correct?

15  **A.**    Yes.

16  **Q.**    And do you know who wrote this language?

17  **A.**    Ruthia.

18  **Q.**    Did you agree with this being in the onboarding material

19  for the providers?

20  **A.**    No.

21  **Q.**    Why?

22  **A.**    Because it says that they can use their clinical judgment

23  even if they don't meet the criteria, and the criteria exist

24  for a reason, to give a medication trial.

25      Which I thought was also interesting because it was really

1    the only context that they were encouraged to use their

2    clinical judgment was if it meant giving them, you know, a

3    medication when they didn't have a diagnosis for ADHD.

4    **Q.**    That's interesting.  Can you explain that, what you were

5    just describing, that this is the only instance where they're

6    suggested to use their clinical judgment when it's going

7    outside the diagnostic criteria?

8        What do you mean by that?  Can you explain that for the

9    jury?

10   **A.**    So they could unquestionably use their clinical judgment.

11   If the patient didn't meet the criteria for ADHD, Done was fine

12   with them giving them a medication, stimulant medication,

13   typically.

14       But if it was the other way around, if the provider didn't

15   want to give them an ADHD diagnosis, didn't want to give them a

16   stimulant prescription, then they sent them to another

17   provider; they had talk to Dr. Brody.  There were all these

18   other circumstances within they were prevented from using their

19   clinical judgment without question.

20   **Q.**    And based on your discussion with providers, was it

21   standard practice to give someone a medication trial if they

22   didn't meet the criteria for ADHD?

23   **A.**    No.

24   **Q.**    Okay.

25           **MS. GREEN:**  And let's zoom out.  And let's just

1  briefly look at the italics above that language, if you can,

2  Ms. Braga.

3  **BY MS. GREEN:**

4  **Q.**  "Stimulants as a controlled substance" (as read):

5      "Please do make sure the prescriptions are for

6      legitimate medical purposes based on your clinical

7      judgment.  If you feel any pressure of prescribing

8      against your clinical judgment or have any concerns,

9      please contact our provider relations."

10  So this is also included in this document.  What's your

11  view as to this language and whether this was actually, in

12  reality, implemented at Done?

13  **A.**  It's just CYA, because then they would reach to the

14  provider support team within -- they would have them talk to

15  Dr. Brody.  He would just tell them that their, you know,

16  concerns were unfounded and it was fine.

17  **Q.**  Mm-hmm.  And we've talked about many policies and

18  practices that Defendant He put in place.  Did those allow them

19  to execute their clinical judgment if they did not think it was

20  appropriate to issue a prescription?

21  **A.**  No.  I didn't feel so, and the clinicians didn't feel it

22  was.

23  **Q.**  Okay.  And what about if they felt that they weren't

24  complying with their standard practice, like they needed to

25  have more follow-up visits?

1    **A.**    I mean, they would do their best to advocate.  They would

2    complain to us.  We would take the complaints to Ruthia.  And

3    then when nothing changed, they would leave.

4    **Q.**    Did you ever join calls --

5            **MS. GREEN:**  We can take that down.  Thank you.

6    **BY MS. GREEN:**

7    **Q.**    Did you ever join calls with Done investors?

8    **A.**    Yes.  I was actually invited to join one within my first

9    week of working there.

10   **Q.**    Who would lead these investor calls?

11   **A.**    Ruthia.

12   **Q.**    What type of information do you recall investors being

13   interested in on these calls?

14   **A.**    They were specifically interested in -- I mean, very

15   concerned about what we were doing to prevent abuse and

16   diversion to make sure we were responsibly prescribing

17   controlled substances.

18   **Q.**    Did you have concerns about the accuracy of the

19   information Defendant He communicated to the investors in

20   response to those concerns?

21   **A.**    Yes.

22   **Q.**    What did you find concerning?

23   **A.**    She was telling them and then also asking me to tell

24   them -- which was very awkward because I had just started

25   working there -- to essentially vouch for her, to say that we

1    had this robust screening processes in place, that we had

2    numerous measures to make sure that complex patients were

3    identified, that we were, you know, verifying identification on

4    the patients, that we were checking the CURES on everybody,

5    that we had all these safeguards in place that were not

6    actually being executed.

7         And anything -- I knew at least some of them were not

8    true.  I didn't fully understand how many of them weren't true

9    until I had been working there a little bit longer.

10   **Q.**  And did you come to understand that -- once you were

11   working there that these statements that were being provided

12   were not true?

13   **A.**  They -- yes.  I learned that they were not true at all.

14   **Q.**  How comfortable were you on these investor calls?  And I

15   think you used the word -- you said you felt like you were put

16   in a position where you had to vouch for what Defendant He was

17   telling these individuals?

18   **A.**  I was very shocked, because she had invited me, saying,

19   oh, it would just be a good experience to meet the investor.

20        I just thought I'd, you know, just be witnessing it kind

21   of on the sidelines since I had just started working there that

22   week.

23        So I was really shocked when she was like, And Kristin can

24   tell you, you know, this is what we're doing.  You know, she's

25   our new head of provider operations.

1    Which then I also learned that week that she had not told

2    anybody else in the company that that's the role she had hired

3    me for, but told them that.  And then I --

4    So I was put on the spot and I didn't know what to say.  I

5    mean. I don't know if maybe that's why she brought me on the

6    call was because I didn't know enough to say it wasn't true.

7    **Q.**   Did you feel pressure to agree with what she was saying?

8    **A.**   Oh, yes.

9    **Q.**   And based on your attendance on these calls and your

10   understanding of the investors' concerns, do you think they

11   would have been interested in investing in Done if they had

12   been given an accurate presentation of Done's practices?

13   **A.**   No.

14          **MS. GREEN:**  Could we admit Exhibit 917, please?

15          **THE COURT:**  917 admitted.

16   (Trial Exhibit 917 received in evidence.)

17   **BY MS. GREEN:**

18   **Q.**   This is a Slack involving you and an individual called

19   Rick Menesini dated May 3rd, 2021.

20          **MS. GREEN:**  And could we go to page 3, please.

21   **BY MS. GREEN:**

22   **Q.**   And let's look at the text that says (as read):

23          "Ruthia texted me earlier and told me that

24       Cerebral had 196 providers on their page, and we

25       needed to make it our goal to beat that.  I tried to

1        explain that they don't prescribe C II meds, at least

2        not in the large quantities that we do.  She just

3        didn't seem to get it."

4        Did Ms. He -- Defendant He compare Done to Cerebral?

5    A.   Frequently.  Very frequently.

6    Q.   And what was Cerebral?  What type of company?

7    A.   Cerebral was -- it's a psychiatric mental health platform.

8    They're comprehensive.  They address many different psychiatric

9    diagnoses.  They provide therapy services, coaching, in

10   addition to psychopharmacological management.

11   Q.   What was your understanding for why Defendant He was

12   comparing to Cerebral frequently?  What did she want?

13   A.   I mean, she was very focused on being the Number 1

14   psychiatric platform out there so frequently would -- I mean

15   obsessively look at other companies and try to find ways that

16   we could beat them.

17   Q.   Okay.

18        MS. GREEN:  And then looking at page 5, please.

19   BY MS. GREEN:

20   Q.   Focusing on the bottom three comments.  Mr. Menesini

21   writes (as read):

22        "Also planning for an IPO already seems a bit

23        rushed.  I guess it's good to think about it if it's

24        in the game plan, but we'd be shredded by an auditor

25        right now on literally everything."

1        You reply, "Everything."

2        Just for the members of the jury who may not be familiar

3    with this term, what is an IPO?

4    **A.**    Initial public offering.  So when you take a private

5    company and essentially it becomes public, people can buy

6    shares in it.

7    **Q.**    And was Done private at this time?

8    **A.**    Yes.

9    **Q.**    And did Ms. He -- or Defendant He talk about wanting to

10   take Done through an IPO?

11   **A.**    Yes, I think when it became apparent that acquisition,

12   which would be the typical pathway for a company that size, was

13   not going to be feasible.

14   **Q.**    And why did you think or agree that Done would be

15   "shredded by an auditor right now"?

16   **A.**    Because I had worked for a few different startups before

17   then that had raised Series A, Series B, and I understood,

18   you know, on the surface level what was involved in IPO.  They

19   -- you know, auditors, investigators heavily look into

20   everything in the company in detail -- your books, your

21   practices, to make sure that everything is legitimate, because

22   you have a duty to your shareholders to be an honest company,

23   to be practicing legitimately.  Like everything is in public,

24   so --

25       And most of what we were doing was, if not questionable,

1  illegitimate, so in terms of our clinical practices.  And from

2  what I understand from Rick, probably a lot of our financial

3  practices too.

4  **Q.**   Was Defendant He concerned about the in-person requirement

5  coming back?

6  **A.**   Yes.  Yes.

7  **Q.**   What did she want to do before that happened, to the

8  extent you were aware of that view?

9  **A.**   So she didn't completely have a plan.  It was always a

10  very big concern that once the requirement for a face-to-face

11  visit would be reimplemented, you know, she -- I think one of

12  the big concerns was making sure that Dr. Brody was licensed in

13  every state, just because I feel that that would come under

14  more scrutiny.

15      But, yeah, I don't think she had a game plan, to be

16  honest, about what we would do when that came back.  But I

17  think she wanted to makes as much money as possible and get as

18  many members, like recurring members, on the platform because

19  they would essentially grandfather out of it before that

20  happened.

21  **Q.**   As a result of what you observed at Done -- and we've

22  talked about it extensively -- what were -- what was your view

23  as to whether the prescriptions Done was issuing met the

24  necessary requirements for authorized prescriptions when you

25  were on the platform?

1   **A.**   I mean, I felt strongly that many, if not the majority,

2   were -- did not meet the requirements for prescribing a

3   controlled substances.

4   **Q.**   How concerned were you for the safety of Done members?

5   **A.**   Very concerned.

6   **Q.**   Why?

7   **A.**   I mean, because I -- especially now, in my role, I see

8   what happens.  You know, I have a patient right now who is

9   actively psychotic and hearing voices and punches himself in

10  the head because a provider --

11          **MR. SCHACHTER:**  Objection.

12          **THE WITNESS:**  -- put him on Ritalin.

13          **MR. SCHACHTER:**  Objection, Your Honor.  This is well

14  after the witness left Done.

15          **MS. GREEN:**  I can --

16  **BY MS. GREEN:**

17  **Q.**   Why were you concerned at the time that you were leaving

18  Done about the safety of Done members?

19  **A.**   Because I knew that they were not getting good clinical

20  care.  They were not getting a thorough psychiatric evaluation.

21  They were, most importantly, not being followed up on.  They

22  were being prescribed these controlled substances and then

23  pretty much never seen again.

24  **Q.**   And -- you chose to leave Done.  Why?

25  **A.**   The risk just got to be too high.  I mean, we had tried

1    everything to get things to change, to get Ruthia to change

2    practices, and nothing was happening, and it just became

3    apparent that I was honestly putting myself too much at risk.

4    **Q.**    You were put yourself too much at risk.  Were you

5    concerned about the risks for members who may have received

6    illegitimate prescriptions in the manners that we've been

7    discussing?

8    **A.**    Yes.

9            **MS. GREEN:**  One moment, Your Honor.

10                (Government counsel conferring.)

11           **MR. SCHACHTER:**  Thank you, Your Honor.

12           **THE COURT:**  Cross?

13           **MR. SCHACHTER:**  Thank you, Your Honor.

14                        <u>**CROSS-EXAMINATION**</u>

15   **BY MR. SCHACHTER:**

16   **Q.**    Good still-morning, Ms. Bowen.

17           **MR. SCHACHTER:**  Good morning.

18   **BY MR. SCHACHTER:**

19   **Q.**    All right.  Ms. Bowen, my name is Mike Schachter.  It's

20   nice to meet you.

21   **A.**    Nice to meet you too.

22   **Q.**    Ms. Bowen, you just testified, I believe, that you left

23   Done -- well, you left Done around the beginning of August of

24   2021; is that correct?

25   **A.**    That's correct, yes.

**BOWEN - CROSS / SCHACHTER**

1  **Q.**   You worked there for about six months?

2  **A.**   Yes.

3  **Q.**   And I believe that you just testified that you left Done

4  because the risks were just getting to be too high; you were

5  putting yourself too much at risk?  You just gave that answer?

6  **A.**   Yes.

7  **Q.**   And you testified yesterday, I believe, that you left Done

8  because of concerns with respect to recruiting medical

9  providers based on false assurances; is that right?

10 **A.**   Yes.

11 **Q.**   Okay.  You were interviewed by the Government back in

12 February of 2023, several years ago.  Do you recall that?

13 **A.**   Yes.

14 **Q.**   And what you told prosecutors back then, back in 2023, was

15 that you left Done because there was no work-life balance.

16      Do you recall that's what you told the prosecutors about

17 the lack of work life balance as being the reason for your

18 departure back in 2023?

19 **A.**   I mean, there -- it was a very hard job.  That was

20 definitely one of factors, yeah.

21 **Q.**   Do you recall telling the prosecutors back in

22 February 2023 that the reason you left Done was because of a

23 lack of work-life balance, yes or no?

24 **A.**   I don't recall telling them that, but it was definitely

25 one of the reasons.

1    Q.    Okay.  Well, I'm going to show you a document.

2          MR. SCHACHTER:  I'm going to show just for the

3    witness, the Court, and counsel Exhibit 9023, paragraph 30,

4    just so see it refreshes recollection --

5          THE COURT:  I'm sorry --

6          MS. GREEN:  Objection, asked and answered.

7          THE COURT:  Did you hear what she said?  She said,

8    "That may very well -- that was a reason."

9          MR. SCHACHTER:  Yes.

10         THE COURT:  Okay.  So that she did or did not tell the

11   prosecutor?  You can't give it to her to refresh your

12   recollection.  She said her recollection is that was a reason,

13   so her --

14       So that is why this takes so long.  Next question.  Next

15   subject.

16         MR. SCHACHTER:  Okay.  Well, may I try one last

17   question on that, Your Honor?

18         THE COURT:  You can ask questions about it.  That's

19   okay.  I don't mind that.  It's the so-called refreshed

20   recollection, which, of course, suggests that she can't recall

21   and that it's not a reason and so forth, or whatever it is.

22         MR. SCHACHTER:  Understood.

23   BY MR. SCHACHTER:

24   Q.    Back in February 2023, the only reason you told

25   prosecutors that you left Done was because of a lack of

1  work-life balance; is that correct?

2  **A.**    No.

3  **Q.**    Okay.

4       No, you did not -- your testimony is you did not tell

5  prosecutors that you left Done because there was no work-life

6  balance --

7          **THE COURT:**  No, I think what she said --

8  **BY MR. SCHACHTER:**

9  **Q.**    That was the reason you gave.

10          **THE COURT:**  I think what she said was it was not the

11  only reason, that she gave -- in her interview, she spoke of

12  other things.

13          **THE WITNESS:**  Yes, that's --

14          **THE COURT:**  Moving on.

15  **BY MR. SCHACHTER:**

16  **Q.**    Okay.  Now, since you spoke with the Government in 2023,

17  the prosecutors have met with you many times; is that correct?

18  **A.**    A few times, yeah.  I think like three or four.

19  **Q.**    You think three or four?  Okay.

20       How many times have you spoken to any prosecutor or agent

21  over the course of the last, say, week?

22  **A.**    Twice.  A lot of updates because it keeps getting pushed

23  out when I'd be -- which is very frustrating because I have to

24  get coverage for my patients at work, so they've been updating

25  me on the progress every day.

BOWEN - CROSS / SCHACHTER

1  Q.  Sure, and I'm not asking you actually about the updates,

2  although my question was unclear.

3      How many times over the past week have they discussed with

4  you questions about things that may come up in your testimony?

5  A.  I think once, maybe twice.

6  Q.  Okay.  Once or twice.

7      And then you also spoke to them on September the 29th; is

8  that correct?

9  A.  Oh, my gosh.  I can't -- I'll take your word for it.  I

10  don't remember.

11  Q.  September 27th?

12  A.  I don't know.  Maybe.

13  Q.  September 16th?

14  A.  Honestly, I'm -- I'm sorry.  I don't know the exact dates,

15  so I can't -- I don't want to say anything up here that's not

16  true.

17  Q.  Okay.  You've -- okay.

18      You've spoken to prosecutors more than three or four or

19  four or five times; is that correct?  Since 2023?

20  A.  Since 2023, yeah, I'd say maybe about four or five times.

21  Q.  Okay.  Might have been a few more?

22  A.  No, I don't think so.

23  Q.  Okay.

24      In some of your meetings, they went over the questions

25  that they were going to ask you; is that correct?

**BOWEN - CROSS / SCHACHTER**

1    **A.**    Yes.

2    **Q.**    And you provided answers to their questions; is that

3    right?

4    **A.**    Yes.  I believe I'm required to.

5    **Q.**    And at times, they gave you feedback on the answers that

6    you were giving; is that right?

7    **A.**    No.

8    **Q.**    Never.

9    **A.**    I don't know -- can you clarify what you mean by

10   "feedback"?

11   **Q.**    Sure.  Were there occasions where they asked you a

12   question like they would ask you in court and then you gave an

13   answer and they suggested different ways of answering that

14   question?  Did that ever occur?

15   **A.**    No.  No.  I mean, they might ask me to clarify, but they

16   made it very clear that I was not to say anything on the stand

17   that was not true, and if I didn't remember something, to say I

18   don't remember it.

19   **Q.**    Okay.  All right.

20         So -- and, again, with respect to the question that you

21   gave -- the answer that you gave about the reasons for your

22   departure, you had actually -- before meeting with -- you

23   resigned, obviously, before you ever had a chance to meet with

24   the prosecutors; is that right?

25   **A.**    Can you repeat the question?

BOWEN - CROSS / SCHACHTER

1  Q.   Sure.  At the time that you left Done in August of 2021,

2  you had never at that time spoken to a prosecutor; correct?

3  A.   At the time that I left Done?  No, because there was no

4  case.

5  Q.   Right.  That was before your four or five or however many

6  times that you had spent with prosecutors between then and now;

7  right?

8  A.   So I -- I quit Done.

9  Q.   Mm-hmm.

10  A.   And then are you saying --

11  Q.   That's before you met with prosecutors?

12  A.   Yeah, because there was no prosecution.

13  Q.   Of course.

14      I'm going to show you a document which we've marked as

15  Exhibit 6249.

16      MR. SCHACHTER:  And just -- Your Honor, just for

17  the Court and counsel and the witness.

18  BY MR. SCHACHTER:

19  Q.   Do you recognize that to be your resignation memo?

20  A.   I don't see anything on the screen.

21      MS. GREEN:  Mike, I don't believe we have that.

22  BY MR. SCHACHTER:

23  Q.   Do you recognize that to be your notice of resignation

24  dated August 2 -- August 2, 2021?

25  A.   Yes.

1              **MR. SCHACHTER:**  We'll offer it.

2              **THE COURT:**  Admitted.

3         (Trial Exhibit 6249 received in evidence.)

4    BY MR. SCHACHTER:

5    **Q.**   And just to look at what you wrote at the time of your

6    resignation, you wrote (as read):

7              "While I have enjoyed working with everyone at

8         Done, I do not feel that the demands of this job are

9         reasonable.  The time, energy, and personal

10        sacrifices needed to fulfill what are considered

11        minimal performance expectations are excessive, and

12        my current compensation is insufficient for me to

13        continue to work at the intensity that has been asked

14        of me."

15        That's what you wrote at the time?

16   **A.**   Yes.

17   **Q.**   Effectively, you're communicating no work-life balance;

18   correct?

19   **A.**   I think that's -- yeah, that's one of the themes here.

20   **Q.**   All right.

21        Now, you testified -- the prosecutor asked you about a

22   number of advertisements.  Do you recall that?

23   **A.**   Yes.

24   **Q.**   And you testified that you were concerned that the ads

25   ignored clinical aspects of ADHD; is that right?

1   **A.**   Yes.

2   **Q.**   And you said that you had discussed your concerns

3   regarding the ads with Ruthia.  Do you remember that?

4   **A.**   Yes.

5   **Q.**   And you testified that you kept trying to say to Ruthia

6   that the ads were borderline illegal.

7        Do you remember that testimony?

8   **A.**   I don't think I used the term "kept trying," but they were

9   communicated, yes.

10  **Q.**   To Ruthia?

11  **A.**   Yes.

12  **Q.**   That was your testimony?

13  **A.**   Yes.

14  **Q.**   Okay.  That is what you say after you've spent four or

15  five meetings with prosecutors, but what you said to Ruthia at

16  the time was something very different; isn't that correct?

17  **A.**   I don't know, but I have a feeling you're going to tell

18  me.

19  **Q.**   You would be right.

20       I'm going to show you --

21            **MR. SCHACHTER:**  Your Honor, just for the witness,

22  Court, and counsel, Exhibit 6648.

23            **THE COURT:**  Okay.

24            **MR. SCHACHTER:**  And we will offer it.

25            **MS. GREEN:**  Your Honor set -- I don't believe we've

1  been given any of these documents in advance, Your Honor, by

2  your --

3          MR. SCHACHTER:  This is impeachment.

4          MS. GREEN:  -- same instruction.

5          THE COURT:  Okay.  6648 admitted.

6      (Trial Exhibit 6648 received in evidence.)

7  BY MR. SCHACHTER:

8          THE COURT:  Am I looking at 6648?

9          MR. SCHACHTER:  It's a communication.  At the top it

10 says "Messages in chronological order."

11         THE COURT:  All right.  I'm sorry.  Let's see what I

12 have -- wait.

13         MS. GREEN:  Mr. Schachter, she's not speaking in this

14 document.  Am I missing something?

15         MR. SCHACHTER:  Yeah.

16         THE COURT:  I don't understand how this document is

17 related -- I don't understand how this document is related to

18 your question.

19         MR. SCHACHTER:  May I proceed?

20         THE COURT:  Sure.

21         MR. SCHACHTER:  Okay.

22         THE COURT:  Provided that you understand my concern.

23         MR. SCHACHTER:  I understand.

24         MS. GREEN:  Your Honor --

25         MR. SCHACHTER:  I will tie it up.

BOWEN - CROSS / SCHACHTER

```
 1                THE COURT:  One at a time.

 2                MS. GREEN:  Sorry, Your Honor.

 3                THE COURT:  Okay.  Ms. Green.

 4                MS. GREEN:  I'm just going to object to the admission

 5    at this point.

 6                THE COURT:  Okay.

 7                MS. GREEN:  I would like to understand the foundation

 8    first, please.

 9                THE COURT:  Go right ahead, Mr. Schachter.

10                MR. SCHACHTER:  Sure.

11    BY MR. SCHACHTER:

12    Q.   We are looking at a communication from an investor to

13    Ruthia.  And then do you see at the bottom --

14         You see your name, do you not?

15    A.   Yes.

16    Q.   Okay.  And you are familiar with the concept that in a

17    message, you have the ability to respond with various emojis;

18    is that correct?

19    A.   Yes.

20    Q.   You can -- thumbs-up means like?

21    A.   Yes.

22    Q.   Heart means love?

23    A.   Yes.

24    Q.   Sometimes prayer hands means praise?

25    A.   I think it's like high five.
```

BOWEN - CROSS / SCHACHTER

1  Q.  High five.  All the better.

2      And you responded to the message that Ruthia forwarded to

3  you; isn't that correct?  Do you see your emojis?

4  A.  Yeah.

5          MR. SCHACHTER:  Your Honor, may I proceed?

6          THE COURT:  Go ahead.

7  BY MR. SCHACHTER:

8  Q.  In this communication, do you recall that Andy Chen was an

9  investor?

10 A.  No.  I never -- I don't know who Andy Chen is.

11 Q.  Okay.  This person is writing to Ruthia (as read):

12         "It's a delight to hear from you, and it's been

13      good to see all the progress from afar.  I get your

14      very clever Facebook ads" --

15         MR. SCHACHTER:  Oh, I'm sorry, Your Honor.

16      Ladies and gentlemen, are you able to see this?

17      Oh, I'm sorry.

18      Your Honor, may I display this for the jury?

19         THE COURT:  Sure.

20 BY THE COURT:

21 Q.  Ruthia writes (as read):

22         "An investor replied to my e-mail and said he

23      loves our memes ads."

24      Do you see that?

25 A.  Yes.

1  **Q.**   Okay.  And she forwards to this group listed below with

2  the content of the communication she received from that person;

3  is that right?

4  **A.**   Yes.

5  **Q.**   Okay.  And that person has said (as read):

6          "It's a delight to hear from you, and it's been

7      good to see all the progress from afar.  I get your

8      very clever Facebook ads everywhere I go.  Love the

9      memes."

10     Do you see that?

11 **A.**   Mm-hmm, yes.

12 **Q.**   Okay.  And you responded with several emojis; is that

13 correct?

14 **A.**   I think so.

15 **Q.**   Yeah.  One of them is a high five; is that correct?

16 **A.**   Yes.

17 **Q.**   And also a heart?

18 **A.**   Yes, I think that's -- Kristina and I.

19 **Q.**   Okay.  And that means you loved that message?

20 **A.**   Yeah, I guess.  I don't know.

21         **MR. SCHACHTER:**  Okay.  You can take that down, please,

22 Mr. Cepregi.

23 **BY MR. SCHACHTER:**

24 **Q.**   All right.  Now, you were asked about clinical review of

25 the ads.  Do you remember Ms. Green asking you that question?

1    **A.**    If anybody clinically reviewed them?

2    **Q.**    Correct.

3    **A.**    Yes.

4    **Q.**    And you testified that the first that you had seen any of

5    the ads was when you saw them on social media.

6         Do you remember that?

7    **A.**    Some of them, yes.  Just some of them, but not all -- I

8    mean, I don't think I even saw -- I mean, I think a lot went

9    out, but I didn't I definitely didn't see all of them.

10   **Q.**    Okay.  Fair to say that you only know about conversations

11   that you participate in or hear about?  Fair to say?

12   **A.**    I think, yeah, that's fair.

13   **Q.**    Okay.  And so you are -- you do not know what, if any,

14   clinical review occurred of advertising in conversations where

15   you were not present and was not told about; fair to say?

16   **A.**    That's correct.

17   **Q.**    Okay.  So it is possible that there was clinical review of

18   advertisement and nobody told -- nobody included you, as head

19   of provider operations, in a discussion regarding the clinical

20   review of advertisements; correct?

21   **A.**    Yes, that's correct.  I was not aware of any clinical

22   review.

23   **Q.**    Okay.  Now, the prosecutor showed you a number of ads that

24   had -- that had pills in them; is that correct?

25   **A.**    Yes.

1  Q.  Now, you are familiar with ADHD; correct?

2  A.  Yes.

3  Q.  You have it?

4  A.  Yes.

5  Q.  Your kids have it?

6  A.  Yes.

7  Q.  And you know that ADHD, by virtue of your personal

8  experience, is an extremely disabling disorder to many, many

9  Americans; is that correct?

10  A.  Yes, it can be.

11  Q.  You also understand it to be easily treatable; correct?

12  A.  I would not say easily treatable, no.

13  Q.  You would not?

14  A.  Yeah.

15  Q.  I'm going to show you what we've marked as Exhibit 6251.

16       MR. SCHACHTER:  Your Honor, and we will offer it.

17       THE COURTROOM DEPUTY:  I'm sorry.  The number again?

18       MR. SCHACHTER:  6251.

19       MS. NECHAY:  Your Honor, I apologize for the

20  interruption.  I need to pause the proceedings because

21  Dr. Brody can't hear on his headset, so I need to switch it

22  out.  Please, one moment.

23       THE COURT:  Okay.

24    Would you put 6251 on the board so I can look at it.

25       MS. GREEN:  Your Honor, I'll note this is also a

1    document that wasn't provided to the Government in advance.

2            **THE COURT:**  Okay.  Let me look at it first.

3            **MR. SCHACHTER:**  Sure.

4            **THE COURT:**  Is it on now?

5            **MR. SCHACHTER:**  Yeah, I believe it is on for the

6    witness, Court, and counsel.

7            **THE COURT:**  Okay.  I want to read it.

8                        (Pause in proceedings.)

9            **MS. NECHAY:**  I'm just going to test it once, Your

10   Honor.

11        Okay.  We can proceed.  I apologize.

12           **THE COURT:**  All right?

13                        (Pause in proceedings.)

14           **MS. NECHAY:**  Yes, Your Honor.  As I have indicated, we

15   can proceed.  I apologize.

16           **THE COURT:**  Okay.  The document is admitted.

17        (Trial Exhibit 6251 received in evidence.)

18           **MR. SCHACHTER:**  Thank you, Your Honor.

19        Your Honor may it be displayed for the jurors?

20           **THE COURT:**  Yes.

21           **MR. SCHACHTER:**  Thank you.

22   BY MR. SCHACHTER:

23   **Q.**   Okay.  You just testified that you would not say that it

24   is an easily treatable condition.

25        Do you recall just giving that answer?

1    **A.**    Yes.  Now, as a nurse practitioner, I would say that it's

2    not easily treatable.

3    **Q.**    Okay.  In March of 2021, you wrote a communication to

4    Ruthia, did you not?

5    **A.**    According to this, yes.

6    **Q.**    Okay.  You wrote (as read):

7            "I think it would be good to also communicate

8        just how much ADHD impacts a person's life and

9        society.  Most providers know about the impact on

10        relationships and work performance, but they're

11        typically not aware about how or how treating ADHD

12        can, ADHD is a, one, highly prevalent; two,

13        significantly consequential; and, three, easily

14        treatable condition that makes sense as a starting

15        point for innovating psychiatric care."

16    And you also are citing to an article?  You're referencing

17    an article; is that right?

18    **A.**    Mm-hmm, yes.

19    **Q.**    And that article is entitled -- this article that you're

20    forwarding to Ruthia is titled "ADHD Doubles the Risk of Early

21    Death; AJMC Preventing Substance Abuse in ADHD Takes Early

22    Treatment, Harvard Expert Says."

23    Do you see that?

24    **A.**    Yes.

25    **Q.**    And Ms. He responds (as read):

BOWEN - CROSS / SCHACHTER

1           "I really like this.  Can you share to the core

2       team channel?"

3       Do you see that?

4   A.   Yes.

5   Q.   Okay.  Now, by "easily treatable," what you were referring

6   to is, as I think you said, that the first-line treatment for

7   the treatment of ADHD is stimulant medication; is that correct?

8   You're aware of that?

9   A.   Yes.  Now, as a nurse practitioner, I am aware of that.

10  Q.   Okay.  And you were aware of that at the time?  When you

11  said it was easily treatable, what you were referring to is

12  stimulant medication; correct?

13  A.   No.  No, I would not -- this person that was writing this,

14  as you pointed out earlier, had never worked in psychiatry.  It

15  was a personal point of view.

16      But now that I actually treat patients with ADHD,

17  stimulant medication only treats a small handful of the

18  symptoms, and it doesn't treat a lot of the other symptoms, so

19  emotional dysregulation, relationship conflict.  There's a lot

20  of other things that --

21      So, unfortunately, especially if you have co-occurring

22  anxiety, it's not easily treatable.

23  Q.   Ms. Oliver, just so you understand --

24  A.   Bowen.  My last name is Bowen.

25  Q.   I'm sorry.  Ms. Bowen.

1    **A.**    It's okay.

2    **Q.**    My questions are going to be confined to what was

3    happening at the time of the events that the jury needs to

4    consider.  Okay?

5    **A.**    Okay.

6    **Q.**    What I'm asking you about is when you wrote that it was an

7    easily treatable condition, what you were communicating to

8    Ms. He is a reference to stimulant medication being the

9    first-line treatment for ADHD, yes or no?

10   **A.**    I would not say that, no.

11   **Q.**    Okay.  Well, we'll look at a few other documents in a

12   moment.

13        Now --

14        **THE COURT:**  I think we should take our noon recess

15   now.

16        Ladies and gentlemen, we'll be in recess until a quarter

17   of.

18        Remember the admonition given to you:  Don't discuss the

19   case, allow anyone to discuss it with you, form or express any

20   opinion.

21              (The jury leaves the courtroom.)

22     (Proceedings were heard out of the presence of the jury.)

23        **THE COURT:**  Okay.  The jury has retired.

24        Mr. Schachter, approximately -- and I'm not suggesting

25   that you aren't moving along.  I just need to get an estimate

1    as to how long you think cross is going to be.

2         MR. SCHACHTER:  I think there is a pretty fair chance

3    that we're through the afternoon, but I may end before the

4    afternoon.  I would think it'll be about as long as the direct.

5         THE COURT:  Okay.  But let's assume that I don't

6    remember how long the direct was.

7         MR. SCHACHTER:  We were this morning --

8         THE COURT:  Are you able to conclude -- will you be

9    able do conclude today?

10         MR. SCHACHTER:  I don't know.

11         THE COURT:  Okay.  Thank you.

12         MR. FOSTER:  Your Honor, one issue, if we could just

13    take it up.

14         THE COURT:  Go ahead.  Go to the microphone.

15         MR. SCHACHTER:  Should the witness be excused?

16         THE COURT:  Oh, yeah.  You can step down.

17                   (Witness steps down.)

18         THE COURT:  Mr. Foster.

19         MR. FOSTER:  Thank you, Your Honor.

20     I just want to note for the record that the vast majority

21    of exhibits that the Defense has introduced in this case are

22    not exhibits that are disclosed to the defense -- to the

23    Government until the moment they're being used with the

24    witness.  Your Honor ruled that they would have to provide

25    them.

1      For example, for this witness, they only provided,

2  I believe, one video to Ms. Green.  They have a whole box here.

3  And these exhibits on their face are not merely impeachment.

4  For example, the Defense opened on the concept of ADHD being

5  really bad, and that's what this exhibit is about.

6      So, you know, it's not going to move the proceedings along

7  if they don't provide the exhibits as Your Honor ordered.

8           THE COURT:  Well, okay.  It appeared to me that the

9  two documents that so far I've seen are arguably impeachment,

10  so -- and those, they don't have to provide, the second one

11  probably in particular.

12      First one, I'm not quite sure what category that one falls

13  in, the one with the emojis.  I mean, I don't know.

14      However, I will look at each document that's been offered

15  and determine.  If it is not impeachment, then I'm not going

16  to -- and has not been provided, then I'm not going to permit

17  it.

18           MR. FOSTER:  Thank you, Your Honor.

19           MR. SCHACHTER:  Thank you, Your Honor.

20              (Recess taken at 12:08 p.m.)

21              (Proceedings resumed at 12:53 p.m.)

22      (Proceedings were heard out of the presence of the jury.)

23           THE COURTROOM DEPUTY:  Come to order.  Court is now in

24  session.

25           THE COURT:  Ready for more impeachment by emoji?

1          MR. SCHACHTER:  Yes, Your Honor.  It's a --

2          THE COURT:  It's a new form.

3          MR. SCHACHTER:  2025.  That's what we have.  That's

4     how people communicate.  At least that's how my kids

5     communicate.  The only way.

6          THE COURT:  If you're lucky.

7          MR. SCHACHTER:  If I get a thumbs-up...

8               (The jury enters the courtroom.)

9        (Proceedings were heard in the presence of the jury.)

10         THE COURT:  Okay.  Please be seated.

11    Let the record reflect all parties are present.

12    You may continue.

13         MR. SCHACHTER:  Thank you, Your Honor.

14                     <u>CROSS-EXAMINATION</u>

15    BY MR. SCHACHTER:

16    Q.   Ms. Bowen, you had testified that Ruthia only wanted

17    prescribers -- I'm sorry -- only wanted medical providers on

18    the platform who would prescribe stimulants.

19         Do you recall that testimony?

20    A.   That I -- that she only wanted prescribers on the platform

21    that would prescribe stimulants, yes.

22    Q.   Okay.  The fact it, however, that you regularly encouraged

23    providers who were considering the platform to prescribe

24    stimulants because you understood it was the first-line

25    treatment for ADHD, yes or no?

1    **A.**    You're asking if I encouraged stimulant use?  Or

2    stimulant -- sorry -- prescribing?

3    **Q.**    I'll repeat my question.

4    **A.**    Okay.

5    **Q.**    You encouraged medical providers who were considering

6    working on the platform that they should prescribe controlled

7    substances on the platform and not be discouraged from doing so

8    simply because it was telehealth; correct?

9    **A.**    I mean, that makes sense, yeah, that they should treat the

10    patient -- if it's -- if they met the criteria and qualified

11    for a stimulant prescription, yes, that makes sense.

12    **Q.**    You actively told providers that -- that because

13    stimulants -- because ADHD is a disorder that is easily treated

14    through stimulants that they should be just as willing to

15    prescribe stimulants over telehealth as they would in a

16    brick-and-mortar facility; correct?

17        Do you recall doing that?

18    **A.**    No, I don't recall doing that.

19    **Q.**    I'm going to show you --

20        **MR. SCHACHTER:**  -- what we have marked and will offer,

21    Your Honor, Exhibit 6660, which is a communication between

22    Ms. Bowen and a medical provider considering the platform on

23    this subject.

24        **THE COURT:**  Okay.  Admitted.

25        (Trial Exhibit 6660 received in evidence.)

1          **MR. SCHACHTER:**  Mr. Cepregi, if we could just blow up

2    the content on the communication.

3    **BY MR. SCHACHTER:**

4    **Q.**   So this is a communication that you had with a provider in

5    April of 2021.

6          Do you see that?

7    **A.**   Mm-hmm.

8    **Q.**   I'm sorry.  You have to answer verbally so the court

9    reporter can take it down.

10   **A.**   Sorry.  Yes, I'm reading it.

11   **Q.**   Okay.  And April 20th of 2021 -- I believe you testified

12   that you had started in about February of 2021; is that right?

13   **A.**   Yes.

14   **Q.**   Okay.  So at this point in time, you'd been working for

15   around two months of the six months that you stayed at Done; is

16   that right?

17   **A.**   Yes.

18   **Q.**   Okay.  And in this communication, the provider writes (as

19   read):

20          "I apologize, but I feel like I have the right

21     to refuse to see patients.  I have been having a

22     horrible experience lately getting patients demanding

23     high dosage for stimulants.  My license is on the

24     line here and do not want to lose it for patients who

25     I don't agree to need such high dosages.  I got a

BOWEN - CROSS / SCHACHTER

1     message today from a patient who asked me to call the

2     pharmacy as I was seeing someone else because we are

3     being called a stimulant mill and not a legit

4     company."

5     Do you see that?

6  **A.**   Yes.

7  **Q.**   Okay.  I'd like you to just read loud your response to

8  this provider in April -- April 21 of 2001.

9  **A.**   The entire thing?

10  **Q.**   Yes.  Yes, please.

11  **A.**   (as read):

12         "I very much agree with you, which is why we

13     pull the PDMP and ask providers to review it for each

14     patient.

15         "If you do a search online, you can find just

16     about any telehealth company being called a

17     medication mill of some kind.  Telemedicine is about

18     reducing barriers to care so that people who need

19     care can access it, but there will always be people

20     who believe that anything that makes it easier to get

21     care isn't legitimate.  But if you look at how we

22     operate, it isn't any easier to get a stimulant

23     medication with us than it is" -- this is moronic.

24     I'm sorry.

25         "It's just easier to get to the clinic.  There

1    are plenty of patients that do not receive an ADHD

2    diagnosis or don't get prescribed a stimulant to

3    justify Done as a legitimate and ethical healthcare

4    service.

5        "We focus on one condition for now, which is

6    ADHD, because it is highly prevalent, relatively easy

7    to treat, and getting diagnosed and treated for ADHD

8    can have a big impact on a person's life.  It is

9    unfortunate that the best treatment option is also a

10   controlled substance, but because we only treat ADHD,

11   it means that the majority of our prescriptions are

12   C IIs.

13       "However, what we do expect is that the provider

14   talks with the patient before making assumptions.

15   The patient did not ask you for high dosages of

16   stimulants.  The screener asked if she had been put

17   on medications before for ADHD.  She listed the ones

18   she had tried.  If she was drug seeking, why would

19   she have said that Vyvanse worked for her?  A simple

20   conversation would have cleared that up.

21       "You have the right to refuse to continue seeing

22   a patient after you have talked with them and feel

23   confident that they are abusing or diverting a

24   medication.  you have the right to discontinue seeing

25   a patient if they have been abusive or threatening.

1          "What we do expect, though, is that you don't

2     judge a patient's intentions without talking with

3     them first.  You wouldn't decide that someone had

4     ADHD based upon a single vague sentence written on a

5     form, so why would you decide that someone was drug

6     seeking based on the same criteria; right?

7          If you are concerned about patients demanding

8     high dosages of stimulants, I highly recommend that

9     you schedule an office hours call with Dr. David

10    Brody, our clinical president.  he is a psychiatrist

11    with almost 40 years of experience and has a pretty

12    good grasp of what is normal and what kind of

13    prescribing is not safe.  He takes calls with our

14    providers all the time to talk through complex

15    situations.  Would you like me to set up some time

16    for you to talk with him?"

17        MR. SCHACHTER:  You may take that down.

18   BY MR. SCHACHTER:

19   Q.   Now, not only did you speak to providers about prescribing

20   stimulants for ADHD, but in your role, you had -- you had other

21   people that were involved in recruiting providers that reported

22   to you; is that correct?

23   A.   Yes.

24   Q.   And you told those people that worked for you that it was

25   important that they, in speaking to candidates for the

1  platform, make sure that the provider is one who is comfortable

2  prescribing stimulants, yes or no?

3  **A.**    Yes.  That's what I was asked to do by leadership.

4  **Q.**    It is what you did; correct?

5  **A.**    It's what I was instructed to do.

6  **Q.**    And you did that for months; is that right?

7  **A.**    Sorry?

8  **Q.**    You didn't just do that at the beginning of your tenure at

9  Done; you instructed throughout your tenure at Done the people

10 that reported to you that they should make sure that providers

11 are comfortable prescribing stimulants; correct?

12 **A.**    A provider should be comfortable to prescribe stimulants,

13 yes.  That is not something I have negated.  They should be

14 comfortable.  It is a medication that is used to treat ADHD.

15 **Q.**    I'm going to show you --

16     **MR. SCHACHTER:**  And, Your Honor, we'll offer a

17 communication between Ms. Bowen and her subordinate, which is

18 Exhibit 6269.

19     Your Honor may we display that?

20     **THE COURT:**  I'm not quite sure.

21     **MR. SCHACHTER:**  Mr. Cepregi, can you just for the

22 Court and counsel and the witness, if you can turn to the

23 second page.  Second page.  If you can blow up Ms. Bowen's

24 communication to Bianca Rohr on June 1, 2021.

25     **THE COURT:**  Okay.  You may show it.

1        **MR. SCHACHTER:**  Thank you, Your Honor.

2        **THE COURTROOM DEPUTY:**  Admitted?

3        **THE COURT:**  Admitted.

4    (Trial Exhibit 6269 received in evidence.)

5  **BY MR. SCHACHTER:**

6  **Q.**   In this communication you wrote to Bianca Rohr.  Is Bianca

7  Rohr someone who conducted interviews of providers at Done?

8  **A.**   I think she was a candidate -- a contractor that we hired

9  towards the end.

10 **Q.**   She conducted interviews at Done of providers?

11 **A.**   I think so -- I can't -- I think so.

12 **Q.**   Okay.  You wrote (as read):

13        "Bianca Rohr, I noticed in your interview notes

14   that you wrote the following for Eric Neba:

15        "'Prefers to start with no controlled substances

16   and see how they're doing and then go from there.

17   Stimulants aren't first choice.'"

18   You wrote (as read):

19        "This candidate would not be considered a good

20   fit for Done.  Stimulants are the first-line and most

21   effective treatment for ADHD.  When candidates give

22   me a response like this in interviews, I typically

23   ask, 'If you had a patient that came to you with an

24   infection, would you first give them the antibiotic

25   that you knew worked well for the infection, or would

1            you have them take an antibiotic that only worked in

2            a small percentage of patients with that infection?'"

3                "They will say, 'Well, the antibiotic that I

4            know works.'

5            "I will point out" --

6            And the "I," that's you; right?

7    A.     Yes.

8    Q.     (as read):

9                "I will point out that treatment for ADHD

10           shouldn't be any different just because a drug has a

11           potential for abuse" --

12           I'm sorry.

13               "I'll point out that treatment for ADHD

14           shouldn't be any different just because a drug has a

15           potential for abuse.  If you feel that the person has

16           a qualified ADHD diagnosis, then you should start

17           with the most effective treatment.  Sometimes they

18           realize this and agree that they should start with

19           stimulants, but if they do not, they are not likely

20           going to be a good fit.

21               "We want our providers to be giving our patients

22           the best treatment possible, and have a general

23           opposition to prescribing first-line stimulants is

24           not the best care and often indicates that they don't

25           fully understand ADHD."

BOWEN - CROSS / SCHACHTER

1        Do you see that?

2   A.    Yes, I do.

3   Q.    I'm going to show you one more.

4        MR. SCHACHTER:  Your Honor, we'll offer Exhibit 6270,

5   which is a communication from Ms. Bowen regarding interview of

6   a provider candidate to a subordinate, Sydney Jiminez.

7        THE COURT:  6270 admitted.

8        (Trial Exhibit 6270 received in evidence.)

9   BY MR. SCHACHTER:

10  Q.    There is a reference at the top to a candidate who was

11  interviewing for the platform.  Do you see that?

12  A.    Yes.

13  Q.    Okay.  And in that very first paragraph, it's written (as

14  read):

15        "Though I am a little hesitant because her first

16        line of treatment is non-stimulant and uses very

17        little stimulant, however, she did state she's

18        comfortable.  It could be because she works for the

19        city," question mark.

20        And then at the bottom, you're communicating with a woman

21  name Sydney Jiminez.  Sydney Jiminez was a woman who

22  interviewed provider candidates for the platform; is that

23  correct?

24  A.    Yes.

25  Q.    She reported to you?

1    **A.**    Yes.

2    **Q.**    Along with a gentleman named Jacob Korth; is that right?

3    **A.**    Yes.

4    **Q.**    And you write (as read):

5         "Uses very little stimulants.  Is not

6    encouraging.  It's like saying I use very few

7    antidepressants for depression.  I would not

8    recommend moving forward with any candidates who are

9    not comfortable using stimulants as first-line

10    therapy 'most of the time' and 'starting with

11    non-stimulants as an exception when the circumstances

12    warrant it,' e.g., patient request for non-stimulant,

13    cardiovascular, or substance use concerns, trying to

14    rule out other conditions like depression or bipolar

15    first.

16         "If they like to start with a non-stimulant just

17    because they don't like prescribing controlled

18    substances," you wrote, "They are not going to meet

19    the standard of care that we should be providing our

20    patients."

21    That's what you wrote; correct?

22    **A.**    It appears so, yes.

23         **MR. SCHACHTER:**  Okay.  You can take that down.

24    **BY MR. SCHACHTER:**

25    **Q.**    The prosecutor asked you questions about some of the ads

BOWEN - CROSS / SCHACHTER

1  that -- that Done put out on social media; is that correct?

2  **A.**   Yes, I believe so.

3  **Q.**   They were not all of them; right?

4  **A.**   I don't believe so, no.

5  **Q.**   Okay.  They were very short because they are put on like

6  TikTok, and those tend to be shorter videos; is that right?

7  I'm not on TikTok.

8  **A.**   I'm not on TikTok either, but I think so, yes.

9  **Q.**   All right.  Now, I want to ask you a little bit about the

10  outreach to people about ADHD treatment.

11      You have an understanding, do you not, that there are many

12  reasons why --

13      Well, let me take a step back.

14      You understand that there are millions of Americans with

15  ADHD that are not getting diagnosed or treated for that

16  disorder?

17      Do you understand that?

18  **A.**   No, I do not.

19  **Q.**   You don't understand that four out of five Americans are

20  not getting treatment for their adult ADHD?

21  **A.**   No, I do not.

22  **Q.**   Okay.  Do you understand that there are people who are not

23  getting treatment, as you are, for adult ADHD?

24  **A.**   Yes, I'm sure there are.

25  **Q.**   Do you consider yourself familiar with some of the reasons

1  why people don't get treatment for ADHD?

2  **A.**   Yes.

3  **Q.**   One -- tell me if you're familiar -- is because there is a

4  shortage of psychiatrists in this country.

5       Are you familiar with that, yes or no?

6  **A.**   No.

7  **Q.**   Okay.  Are you familiar with the difficulties for people

8  to get an appointment with a psychiatrist, even if they can

9  afford one?

10 **A.**   Are you specifying psychiatrist or any psychiatric

11 provider?

12 **Q.**   Let's start with psychiatrists.  Are you familiar with the

13 fact that --

14          **THE COURT:**  I don't know that she can testify about

15 this whole line of questioning.

16          **MR. SCHACHTER:**  I'll move on, Your Honor.

17          **THE COURT:**  Pardon?

18          **MR. SCHACHTER:**  I'll move on.

19          **THE COURT:**  Yeah, thank you.

20 **BY MR. SCHACHTER:**

21 **Q.**   Let me ask you this:  In your experience, do you find that

22 some people do not seek treatment for ADHD because they

23 consider it to be a character flaw and not a disorder?

24 **A.**   I would say that's the case with any mental illness,

25 unfortunately.

1    **Q.**    Yes, that people sometimes don't seek treatment because

2    they think they're not suffering from a disorder, but rather

3    it's something that they should just be doing better?

4    **A.**    Yeah, I would.

5    **Q.**    And that's -- you said it's true of many mental disorders,

6    but it's also true of ADHD, in your experience; is that right?

7    **A.**    Mental illness is unfortunately very stigmatized.

8    **Q.**    Okay.  The Government showed you a number of videos, and

9    they may have showed you one that was not displayed.  I'd like

10   to show that.

11          **MR. SCHACHTER:**  We're going to offer Exhibit 1123.

12          **MS. GREEN:**  No objection.

13          **THE COURT:**  1123 admitted.

14          **MR. SCHACHTER:**  Your Honor, may we play that?

15          **THE COURT:**  Yes.

16              (Video played but not reported.)

17          **MR. SCHACHTER:**  Pause it one second.  Can you go back

18   a little bit, Mr. Cepregi, and pause right at the very

19   beginning.

20   **BY MR. SCHACHTER:**

21   **Q.**    Do you see the words "ADHD symptoms that I thought were

22   just character flaws"?

23          Do you see that?

24   **A.**    Yes.

25   **Q.**    And you understand this to be a Done -- one of those short

1  advertisements that was placed on social media?

2  **A.**    I believe so, yes.

3  **Q.**    Okay.  Okay.  You can proceed, Mr. Cepregi.

4              (Video played but not reported.)

5  **BY MR. SCHACHTER:**

6  **Q.**    And do you see that that video listed various -- well,

7  withdrawn.  Let me ask you a different question.

8        Nothing in that video said "Call Done because drug abuse

9  is fun," did it, yes or no?

10  **A.**    I'm sorry.  What?

11  **Q.**    Sure.  Did you see the words in that video, "Call Done

12  because drug abuse is fun," yes or no?

13  **A.**    No.  I don't think anybody saw those words.

14  **Q.**    Okay.

15        Now, when the Government showed you the advertisements

16  that Done put out -- and you said you're familiar with the

17  advertising that Done did to market itself.

18        Do you recall that?

19  **A.**    Some of them, yes.

20  **Q.**    Okay.  Done had a website, did it not?

21  **A.**    Yes.

22  **Q.**    And it placed articles on its website which specifically

23  informed people that simplifying the symptoms of ADHD without

24  providing context for other possible causes can cause people to

25  reach incorrect conclusions.

 1          Do you recall that?

 2     **A.**    I feel like this isn't a question for me.

 3               **THE COURT:**  Pardon me?

 4               **THE WITNESS:**  Like I don't see the question.  I feel

 5     like you're just saying things.

 6          No, I don't know that, but I don't see how that's a

 7     question for me.

 8               **MR. SCHACHTER:**  Sure.  Well, I'll --

 9               **THE COURT:**  Well, I don't understand the question.

10     Are you saying there's an ad which said what you say it said?

11     Well, okay.  Do you want to -- she saw some ads.  I mean, are

12     you asking her do you recall seeing an ad that said this?

13               **MR. SCHACHTER:**  Sure.

14     **BY MR. SCHACHTER:**

15     **Q.**    One of the ways that Done advertised itself was through

16     its website; is that correct?

17     **A.**    I would assume so, yeah, like most companies.

18     **Q.**    Okay.  And also Done?  You worked there.  Do you recall

19     its website?

20     **A.**    Yes, yeah.

21     **Q.**    Okay.  And do you recall that Done put out informational

22     articles, one of which entitled "ADHD misinformation and social

23     media"?

24          Do you recall that?

25     **A.**    No.

1  Q.   I'm going to show you what we have marked as Defense

2  Exhibit 5382 --

3       MR. SCHACHTER:   Previously provided to Government

4  counsel.  And, Your Honor, we'll offer that if there's no

5  objection.

6       THE COURT:   53 what.

7       MS. GREEN:   She said she didn't recall it.  Can we --

8       MR. SCHACHTER:   Just for the witness.

9       THE WITNESS:   I don't recall it.

10      THE COURT:   53?

11      MR. SCHACHTER:   5382.

12      THE COURT:   5382 for identification.

13   (Trial Exhibit 5382 marked for identification)

14  BY MR. SCHACHTER:

15  Q.   Can you take a moment to look at that?

16  A.   Yeah.  I don't -- I don't recognize it.

17      MS. GREEN:   Objection, Your Honor.  The date on the

18  top right says October 20th, 2022, which is after the time of

19  Ms. Bowen's tenure at the company.

20      THE COURT:   Number one, she says she didn't see it or

21  she has no recollection of seeing it, and therefore, we move

22  on.

23      MR. SCHACHTER:   Yes.  Yes, Your Honor.

24  BY MR. SCHACHTER:

25  Q.   Do you recall information that Done put out that was about

BOWEN - CROSS / SCHACHTER

1    the use of non-stimulant medication for ADHD?

2         Do you recall that?

3    **A.**   No, I do not.

4    **Q.**   Do you recall information -- do you recall that Dr. Brody

5    published a blog, an informational blog, on the Done website in

6    his role as clinical president?

7         Do you have a recollection of that?

8    **A.**   I know Michelle wrote some blog post for him.  I think

9    this was something she did.

10   **Q.**   Okay.  I'm going to show you what his --

11        **MR. SCHACHTER:**  Just for the Court, counsel, and the

12   witness -- Defense Exhibit 5363.  And go to the second page.

13        **THE COURT:**  5363 for identification.

14        (Trial Exhibit 5363 marked for identification)

15        **MR. SCHACHTER:**  Yes.

16   **BY MR. SCHACHTER:**

17   **Q.**   Do you have a recollection of ever seeing an article by

18   Dr. David Brody put out on the Done website about ADHD and

19   anxiety?

20        **MS. GREEN:**  Objection.  Your Honor, the date of this

21   document is, again, June 2022, which is after Ms. Bowen's

22   tenure at the company.

23        **MR. SCHACHTER:**  I was just asking if she's seen it.

24        **THE COURT:**  Pardon?

25        **MR. SCHACHTER:**  I was just asking if she saw it.

1          **THE COURT:**  Okay.  Fine.

2      Did you see it?

3          **THE WITNESS:**  No, I did not.

4          **THE COURT:**  Thank you.

5      Take it down.  Move on.

6          **MR. SCHACHTER:**  Yes, Your Honor.

7  BY MR. SCHACHTER:

8  **Q.**   Okay.  Well, let's talk about some things that I know that

9  you for sure did see.

10      You understood that part of Done's marketing was a YouTube

11  page; is that right?

12  **A.**   I actually was not aware they had a YouTube page.

13  **Q.**   Okay.  You were asked on direct examination (as read):

14          "How obvious was it to you that Dr. Brody wasn't

15      someone that should be relied on for clinical

16      advice?"

17      Do you recall that question?

18  **A.**   Yes, yes.

19  **Q.**   And you said -- you testified that he didn't -- that

20  Dr. Brody -- your testimony yesterday was that (as read):

21          "Dr. Brody didn't seem to be providing much, if

22      any, clinical advice outside of really kind of

23      deferring to what Ruthia wanted."

24      Do you recall giving that answer to that question

25  yesterday?

BOWEN - CROSS / SCHACHTER

1  **A.**    Yes.

2  **Q.**    The fact is that Dr. Brody prepared webinars as part of

3  Done's marketing that were directly provided to you.

4       Do you recall that?

5  **A.**    No.

6  **Q.**    Okay.

7       Do you recall that he recorded informational seminars on

8  ADHD that were shared with the providers on the Done platform?

9       Do you recall that?

10 **A.**    No.  No.  I feel like I would have remembered that.

11 **Q.**    Okay.  I'm going to show you what we've previously

12 provided to counsel.

13          **MR. SCHACHTER:**  And we'll offer Defense Exhibit 6359.

14 **BY MR. SCHACHTER:**

15 **Q.**    Do you see your name as a recipient of this mail on

16 June 8th, 2021?

17 **A.**    Yes.

18 **Q.**    And just directing your attention to the bottom of the

19 page, this is a communication to the Done providers, and you

20 were in charge of provider operations; is that right?

21 **A.**    Yes.

22 **Q.**    Do you see the reference to the webinar recording on the

23 bottom of that page?

24 **A.**    Yes, I do.

25          **MR. SCHACHTER:**  Your Honor, we offer Defense

```
 1   Exhibit 6359.
 2             THE COURT:  Admitted.
 3        (Trial Exhibit 6359 received in evidence.)
 4             MR. SCHACHTER:  And now the jurors can see it.  If we
 5   could just go to the very top.
 6   BY MR. SCHACHTER:
 7   Q.   Okay.  This is a communication that was sent out to the
 8   Done providers.
 9        Do you see that?
10   A.   Yes.
11   Q.   And you're copied?
12   A.   And bcc'd, yes.
13   Q.   Okay.  And it is a -- if you look at the bottom, it says
14   (as read):
15             "Last Friday, Done's clinical president,
16        Dr. David Brody, recorded an informational seminar on
17        myths causing ADHD to be a stigma.  If you're
18        interested in watching the seminar, you can view the
19        recorded seminar here."
20        Do you see that?
21   A.   I do, yes.
22   Q.   And you recognize that to be a link that the providers
23   could then go on and see what Done's clinical president had
24   offered to them as an informational seminar?
25        Do you see that?
```

1  **A.**    Yes.

2  **Q.**    Okay.

3         **MR. SCHACHTER:**  Your Honor, we will offer Defense

4  Exhibit 5192, which is Dr. Brody's webinar.  We're only going

5  to offer 10 minutes of that video.  Specifically -- and we've

6  disclosed this to counsel for the Government before -- Sections

7  230 -- these are time stamps -- 230 to 245, 819 to 1810, and

8  2030 to 29.

9         **MS. GREEN:**  Objection, Your Honor.  This is the same

10  issue that has been raised and briefed, and if we persist in

11  this, I would like to sidebar.

12         **THE COURT:**  Well, the question is with this witness --

13  you haven't laid a foundation that she actually saw that.

14         **THE WITNESS:**  I didn't.

15         **MR. SCHACHTER:**  Well, Your Honor --

16         **THE COURT:**  She got the document.  The question is did

17  she actually click on and see the informational video.

18         **MR. SCHACHTER:**  Your Honor, the witness testified that

19  Dr. Brody didn't seem to be providing much, if any, clinical

20  advice outside of really kind of deferring to what Ruthia

21  wanted, and then she receives a communication to the providers

22  that specifically provides them --

23         **THE COURT:**  Take this matter up at a recess.

24         **MR. SCHACHTER:**  Yes, Your Honor.

25  \\\

1    BY MR. SCHACHTER:

2    **Q.**   I'm also going to show you and will offer Defense

3    Exhibit 5358.

4          **MR. SCHACHTER:**   Previously provided to Government

5    counsel.

6          **THE COURT:**   Would you give me the number again,

7    please.

8          **MR. SCHACHTER:**   Sure.   6358 -- well, before I get

9    that -- well, withdrawn.

10          **THE COURT:**   6359 was the one that you previously

11    referred to.

12          **MR. SCHACHTER:**   Correct.   This is --

13          **THE COURT:**   And that's been marked for identification,

14    not played to the jury.

15       And now we have 6358.

16          **MR. SCHACHTER:**   To clarify, 6359 is the e-mail which

17    Ms. Bowen received, which I think is in.

18          **THE COURT:**   Yes.

19          **MR. SCHACHTER:**   5192 is the webinar referenced in that

20    e-mail, which has not yet been received.

21          **THE COURT:**   So 5192 is marked for identification.

22       (Trial Exhibit 5192 marked for identification)

23          **MR. SCHACHTER:**   Yes, Your Honor.

24          **THE COURT:**   Okay.   Now you're asking about 6358?

25          **MR. SCHACHTER:**   Correct.

 1              THE COURT:  And --

 2              MR. SCHACHTER:  6358.  Different document.

 3              THE COURT:  Is that on the -- on my --

 4              MR. SCHACHTER:  It is.

 5   BY MR. SCHACHTER:

 6   Q.   Do you recognize this, Ms. Bowen, to an invitation to a

 7   "What is ADHD" webinar?

 8        Do you see that?

 9   A.   Yes, I see that.

10   Q.   And that is -- and you were listed as one of the attendees

11   of that "What is ADHD" webinar.

12        Do you see that?

13   A.   Yes.  It looks like I was invited to it.

14   Q.   Okay.  And --

15              MR. SCHACHTER:  Your Honor, we will offer as Defense

16   Exhibit 5193 the August 2021 webinar presented by Dr. Brody

17   entitled "What is ADHD?"

18              MS. GREEN:  Objection, Your Honor.

19              THE COURT:  Wait.

20        With respect to the webinar, did you attend it?

21              THE WITNESS:  No, I did not.

22              THE COURT:  Okay.  So we'll take this matter up as

23   well.

24              MR. SCHACHTER:  Thank you, Your Honor.  I'll move on.

25        And, Your Honor, just so that Your Honor knows, there are

```
 1    segments of that also that we've identified for the Government

 2    that we would like to play, not in -- not in its entirety.

 3                THE COURT:  Correct.  Take it up later.

 4                MR. SCHACHTER:  Yes, Your Honor.

 5    BY MR. SCHACHTER:

 6    Q.   Now, you were in charge of provider recruiting; is that

 7    correct?

 8    A.   Yes.

 9    Q.   And you testified, I believe, that Ruthia just wanted to

10    hire and you thought didn't care about provider quality.

11         Do you recall that?

12    A.   Not in the same sense that a typical healthcare

13    institution would be looking at them.

14    Q.   I'm not sure what that means --

15    A.   How they would measure quality.

16    Q.   -- yes or no:  Did you believe that Ruthia cared about the

17    quality of the providers that were going to be working on the

18    Done platform?

19    A.   Clinical quality, no.

20    Q.   Okay.  In fact, it was Ruthia who decided not just to --

21         Well, withdrawn.

22         You understand that -- that in many states, a nurse

23    practitioner without a special psychiatric mental health

24    specialization can prescribe a controlled substance?

25         You understand that, do you not?
```

1    **A.**    That an NP cannot prescribe a controlled substance --

2    **Q.**    Can --

3    **A.**    -- a Schedule II?

4    **Q.**    I'm sorry.

5    **A.**    Sorry.  Can you restate the question?

6    **Q.**    Sure.

7        You understand that in most states, a nurse practitioner

8    can prescribe a controlled substance?

9    **A.**    Yes.

10    **Q.**    They do not need to have a special psychiatric mental

11    health specialization in order to do so?

12    **A.**    Well, there's lots of different controlled substances that

13    aren't psychiatric medications, so yes.

14    **Q.**    They do not -- a nurse practitioner does not need to have

15    a psychiatric mental health specialization in order to

16    prescribe a controlled substance; correct?

17    **A.**    For a psychiatric indication, yes.  For not a psychiatric

18    indication, no.

19    **Q.**    Okay.  In any event, it was Ruthia who decided not just to

20    hire nurse practitioners, but rather to seek out nurse

21    practitioners with the psychiatric mental health

22    specialization.

23        You understand that, do you not?

24    **A.**    Well, she would have to.  She couldn't -- a nurse

25    practitioner cannot practice outside of their scope.

1  **Q.**  I'll repeat my question.

2  **A.**  Okay.

3  **Q.**  You understand that --

4         **THE COURT:**  She said yes.  Oh, I don't know that she

5  said yes.  Pardon me.  You're right.  Go ahead.  Ask the

6  question.

7  **BY MR. SCHACHTER:**

8  **Q.**  Yes or no:  Ruthia decided to hire nurse practitioners

9  with a psychiatric mental health nurse practitioner

10 specialization, yes or no?

11 **A.**  No.

12 **Q.**  Okay.  I'm going to show you what we have marked as 6253.

13        **MR. SCHACHTER:**  And, Your Honor, we'll offer it.

14        **THE COURT:**  6253 for identification.

15    (Trial Exhibit 6253 marked for identification)

16 **BY MR. SCHACHTER:**

17 **Q.**  This is a communication from Ms. He to you regarding

18 advertising for providers to work on the platform.

19    Do you recognize that?

20 **A.**  Yes.

21        **MR. SCHACHTER:**  Your Honor, we'll offer Exhibit 6253.

22        **THE COURT:**  Admitted.

23    (Trial Exhibit 6253 received in evidence.)

24 **BY MR. SCHACHTER:**

25        **MR. SCHACHTER:**  Your Honor, may we display for the

1    jurors?

2         That's great.  Thank you.

3              **MR. SCHACHTER:**  Okay.  If we can turn, please, to the

4    second page at the -- communication says February 25, 2021, at

5    2:24 from Ruthia.

6    **BY MR. SCHACHTER:**

7    **Q.**   Okay.  Do you recognize this to be communications with a

8    publication Psych Times about advertisements for people to work

9    on the platform?

10   **A.**   Yes.

11   **Q.**   Okay.  And what Ms. He writes in this communication

12   forwarded to you is a description -- basically a job

13   description or qualifications that are required.

14        Do you see that?

15   **A.**   Yes.

16   **Q.**   Okay.  And she writes (as read):

17             "PMHNP needed for remote telemed."

18        Do you see that?

19   **A.**   Yes.

20   **Q.**   Okay.  And she also writes (as read):

21             "Experience with ADHD."

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   Okay.  And to be clear, a nurse practitioner or a

25   psychiatric mental health nurse practitioner does not need to

1  have experience with ADHD in order to prescribe a controlled

2  substance; is that correct?

3  **A.**    You need to have completed clinical rotations that involve

4  diagnosing ADHD.

5  **Q.**    Sure.  You do not -- a nurse practitioner does not have to

6  have experience with ADHD in order to prescribe a controlled

7  substance; correct?

8  **A.**    I mean, controlled substance involve opiates.  There's a

9  lot of different controlled substances.  Do you specifically

10  mean stimulants?

11  **Q.**    A nurse practitioner does not need to have experience with

12  ADHD in order to prescribe a controlled substance, yes or no?

13  **A.**    Okay.  Yes.

14  **Q.**    Okay.  And then above that, you also see an ad for

15  physicians that's being discussed.

16      Do you see that?

17  **A.**    Yes.

18  **Q.**    And it says (as read):

19          "MD needed for remote telemed.  Must be licensed

20      MD with ADHD experience."

21      Do you see that?

22  **A.**    I see that.  This is what was posted, but not happening in

23  practice.

24  **Q.**    If you can try just to focus on my question, please,

25  Ms. Bowen.

1          Then if we can look at the first page, there's a reference

2     to Dr. Brody that I would like to focus you on.

3          Do you see in the middle of the page --

4               MR. SCHACHTER:  No, lower.  There you go.

5     BY MR. SCHACHTER:

6     Q.   Ruthia writes (as read):

7               "Hi, Alice.  Thanks for the e-mail.  Dr. Brody

8          wants to add 'board-eligible psychiatrist' as a

9          requirement for psychiatrists."

10         Do you see that?

11    A.   Yes, I see.  It says "board-eligible" and not

12    "board-certified."

13    Q.   Do you see the words "Dr. Brody wants to add

14    "board-eligible psychiatrist as a requirement for

15    psychiatrists?  Do you see those words?

16    A.   Yes, I see those words.

17    Q.   Thank you.

18              MR. SCHACHTER:  Okay.  You can take that down.

19    BY MR. SCHACHTER:

20    Q.   Now, you were asked questions about -- about the questions

21    that were used to interview candidates.

22         Do you recall Ms. Green asking you that?

23    A.   Yes.

24    Q.   All right.  And you yourself conducted interviews with

25    medical providers; right?

BOWEN - CROSS / SCHACHTER

1   **A.**   Yes.

2   **Q.**   And the people that reported to you did the same?

3   **A.**   Yes.

4   **Q.**   You never in your interviews asked the medical providers

5   if they were interested in joining an illegal drug trafficking

6   conspiracy, did you?

7           **MS. GREEN:**  Objection, argumentative.

8           **MR. SCHACHTER:**  I'll move on.

9   BY MR. SCHACHTER:

10  **Q.**   You understood that the questions that were used to -- by

11  you and your team to interview -- withdrawn.

12          You understood that the questions that were proposed to

13  you to be used to interview prospective providers were actually

14  written by Dr. Les Tsang?

15          Did you understand that?

16  **A.**   I think some of the questions that were provided at one

17  point were written by Les Tsang, but I don't think the ones

18  that we started with were.  I think then we were asked to

19  incorporate his questions later.

20  **Q.**   Okay.  There comes a point in time where you are asked to

21  use in your interviews questions that were prepared by

22  Dr. Les Tsang?  You understood that; correct?

23  **A.**   Yes, later on.

24  **Q.**   Okay.

25          And did you overlap with Dr. Tsang?

1  **A.**   No, not at all.

2  **Q.**   Did understand him to be a board-certified psychiatrist?

3  **A.**   No.  I didn't know who he was.

4  **Q.**   Okay.  To be clear, at the time that you started at Done,

5  you had experience as a registered nurse; is that right?

6  **A.**   Yes.

7  **Q.**   And your experience as a registered nurse prior to joining

8  Done was in emergency room and oncology; is that right?

9  **A.**   That's correct, yes.

10  **Q.**   Now, I think we saw some communications -- well, in an

11  exhibit that I'll show you in a moment where you disagreed with

12  some of the interview questions which you understood Dr. Tsang

13  had proposed?

14  **A.**   Yes.

15  **Q.**   I'm going to show you what is in evidence as -- just a

16  moment -- as Exhibit 332.

17          **MR. SCHACHTER:**  If we could blow up the bottom half.

18  That's great.  Actually, can we -- the full bottom half, if we

19  can, Mr. Cepregi.

20  **BY MR. SCHACHTER:**

21  **Q.**   All right.  Do you recall that Ms. Green asked you about

22  this document?

23  **A.**   Yes.

24  **Q.**   Okay.  And Mr. Lam says (as read):

25          "Here is a draft of questions I'd like to

1      record."

2          Do you see that?

3  **A.**   Yes, I see that.

4  **Q.**   And just to clarify that, I think you described that this

5  is a circumstance where there was a thought about doing

6  interviews with prospective providers essentially over video;

7  is that right?

8  **A.**   Yes.

9  **Q.**   Where there would be a recording of somebody asking

10 questions to the providers, and then the providers would record

11 their answers, is that -- was that the thought?

12 **A.**   They would have a list of questions to respond to, I

13 think, yes, on recorded video.

14 **Q.**   Okay.  And it's -- Mr. Lam writes (as read):

15         "Applicant welcome greeting" and then he writes

16         "behavioral questions."

17         Do you see that?

18 **A.**   Yes.

19 **Q.**   Okay.  (as read):

20         "Tell us a little bit about yourself and what's

21         your motivation for joining us.  Do you have any

22         experience in telemedicine?  And what makes you think

23         you can be a great fit for us?  How many years of

24         experience working with ADHD do you have?  And what

25         motivated you to become a mental health provider?"

1          Do you see that?

2   **A.**    Yes.

3   **Q.**    Okay.  And that is what are listed as the behavioral

4   questions; right?

5   **A.**    Yes.

6   **Q.**    And then it goes on to qualification questions.

7          Do you see that?

8   **A.**    Yes.

9   **Q.**    Okay.  We don't need to go through those.

10         And then Mr. Lam wrote to you (as read):

11             "Let me know what you think about these

12         questions."

13         And you respond (as read):

14             "No.  Les's questions aren't used.  But to be

15         honest, the questions aren't that helpful.  Multiple

16         answers could be correct, and while I can tell for

17         the most part what answer Les was wanting the

18         candidate to give, some cover some gray areas,

19         especially some legally gray areas where the

20         candidate is likely to give the answer that is the

21         most legally correct but in reality would actually

22         choose the option that Les was wanting them to

23         choose."

24         Do you see that?

25  **A.**    Yes.

1  **Q.**    You say (as read):

2          "We could possibly incorporate one to two of the

3      questions, but I would likely need to do some light

4      editing first, and some of these questions don't help

5      us avoid the pill mill image."

6      Do you see that?

7  **A.**    Yes.

8  **Q.**    That was your reaction to these questions that Les Tsang

9  had written; is that correct?

10  **A.**    I think this document is incomplete, because it doesn't

11  actually have Les's questions on here.

12  **Q.**    Okay.  I am going to show you Defense Exhibit 6254, which

13  is a communication with Ms. Bowen and Ruthia about the

14  questions -- about Les Tsang's behavioral questions.

15          **THE COURT:**  Admitted.

16      (Trial Exhibit 6254 received in evidence.)

17          **MS. GREEN:**  Can I -- can I just take a quick look?

18      Apologies, Your Honor.

19          **THE COURT:**  Any objection?

20          **MS. GREEN:**  No, thank you, Your Honor.

21  BY MR. SCHACHTER:

22  **Q.**    Now, you raised to Ruthia your concerns with Dr. Tsang's

23  questions; is that correct?

24  **A.**    Yes.

25  **Q.**    Okay.  And Ms. He asks (as read):

BOWEN - CROSS / SCHACHTER

1      "Do we confirm we don't need these questions?

2      "Number 4, what's your treatment medication

3   approach to ADHD?

4      "Number 5, what's your communication style with

5   patients?

6      "Number 8, one of the benefit working with us is

7   you can set your own schedule.  How soon can you

8   start?  What's your available hours per week?"

9   And Ms. He also asks (as read):

10      "Also, are we going to include the behavioral

11   questions from Les?  If so, how would we evaluate?"

12   Do you see that?

13  A.   Yes.

14  Q.   And this is Ms. He asking questions to you and others

15   about what would be appropriate questions to be asked in these

16   interviews; is that right?

17  A.   Yes.

18  Q.   Okay.  And Mr. Lam writes (as read):

19      "I am not including the behavioral questions

20   from Les because Kristin's feedback was that they are

21   not needed and will actually make us lose applicants.

22   Kristin can clarify or confirm."

23   And you wrote (as read):

24      "Yes, the questions are likely to weaken our

25   experience of legitimacy."

1          Do you see that?

2    **A.**   I do see that, yes.

3    **Q.**   Okay.  And just to look at the behavioral questions that

4    Mr. Lam identified.

5              **MR. SCHACHTER:**  If we can just go back to 332.  We can

6    blow up Mr. Lam's communication.

7    **BY MR. SCHACHTER:**

8    **Q.**   Do you see he lists behavioral questions in his question

9    to you?  Do you see that?

10             **MS. GREEN:**  Objection, Your Honor.  I believe the

11   witness testified that these weren't Dr. Tsang's questions.

12             **THE WITNESS:**  That's Dennis -- he's rewritten them,

13   adapted them.  It's not the original document with Dr. Les's

14   questions.  Or Dr. Tsang. I'm sorry.

15             **MR. SCHACHTER:**  Okay.  If we can go back to 6254,

16   please, Mr. Cepregi.

17   **BY MR. SCHACHTER:**

18   **Q.**   You wrote (as read):

19             "Also, the providers are likely" --

20             **MR. SCHACHTER:**  At the bottom of the page.  That's

21   fine.

22   **BY MR. SCHACHTER:**

23   **Q.**   (as read):

24             "Also, the providers are likely to respond in

25        such a way that they are giving a response that

1     seems the safest and most legally conservative and

2     not actually what they would do in a real-life

3     situation."

4     Do you see that?

5  **A.**   Yes.

6  **Q.**   And Ms. He responds (as read):

7          "My understanding is it's very typical for

8     traditional clinics to screen people based on

9     behavioral questions like these.  The goal is to dive

10    deeper into how they treat patients and the care

11    approach, which is the most important criteria we are

12    looking for when screening providers.

13         "I don't see the questions are likely to weaken

14    our appearance of legitimacy.  Since Dr. Tsang a

15    psychiatrist, I do think the detailed medical

16    questions here actually make us more legit as a

17    healthcare company."

18    Do you see that?

19 **A.**   Do I see that?  Yes, I see that.

20 **Q.**   Okay.  Let's look at the questions that you disagreed

21    with.

22         **MR. SCHACHTER:**  I'm going to show you what we have

23    marked as 6365, and we'll offer it.

24 **BY MR. SCHACHTER:**

25 **Q.**   I'm sorry.  Do you recognize this to be an Asana task

1  which has been assigned to you, draft questions for Kristin to

2  review?

3  **A.**  Yes.

4          **MR. SCHACHTER:**  Your Honor, we'll offer 6365.

5          **THE COURT:**  Admitted.

6      (Trial Exhibit 6365 received in evidence.)

7  **BY MR. SCHACHTER:**

8  **Q.**  And I didn't highlight the date of the communication with

9  Mr. Lam that we were looking at before, but do you recall that

10  it was April 23, 2021?

11  **A.**  That's what it says, yes.

12  **Q.**  Okay.  And so this is also -- this document that we're now

13  looking at is also dated April 23rd, 2021.

14      Do you see that?

15  **A.**  Yes.

16  **Q.**  Okay.  And it is a task which has been assigned to you,

17  "Draft questions for Kristin to review."

18      Do you see that?

19  **A.**  Yes.

20  **Q.**  Okay.  And it lists behavioral questions and qualification

21  questions.

22      Do you see that?

23  **A.**  Yes.  These are the questions that Dennis drafted.

24  **Q.**  That Les Tsang drafted?

25  **A.**  No.  Dennis.  These aren't Les's questions.

BOWEN - CROSS / SCHACHTER

1    Q.    Okay.  We'll get to this in a moment, I believe.

2         In any event, you are spending to behavioral questions.

3    You have concerns about the behavioral questions; is that

4    right?

5    A.    Yes, but we don't have those listed here.

6    Q.    Okay.  Well, on this task which has been assigned to you,

7    do you see the following listed as behavioral questions in this

8    task which has been assigned to you --

9    A.    These are not behavioral questions from Les, but, yes, I

10   see these in the task.  These are the ones from Dennis.

11   Q.    Right.  So that we're clear on April 23rd, 2021, there was

12   a list of draft questions for Kristin to review.  We're looking

13   that on the screen; correct?

14   A.    Yes.

15   Q.    On the very same day, you have a communication with Les in

16   which you are communicating your objections to what you call

17   Les's questions in that communication?

18   A.    You said I was communicating with Les?

19   Q.    No.  I'm sorry.  I'll restate it.

20   A.    All right.

21   Q.    In your communication with Mr. Lam, you are sharing

22   objections to Les's questions?

23   A.    Yes.

24   Q.    Okay.

25   A.    There's a separate document he sent me.

1  **Q.**  Understood.

2      On the same day, you are sent the following behavioral

3  questions (as read):

4          "Tell us a little bit about yourself.  Do you

5      have any experience in telemedicine?  How many years

6      of experience working with ADHD do you have?"

7      Do you see that?

8  **A.**  Yes.

9  **Q.**  And there's also qualification questions.

10      Do you see that?

11  **A.**  Yes.

12  **Q.**  Okay.  And then there is a link to optional clinician

13  screening questions.

14      Do you see that?

15  **A.**  No.

16  **Q.**  At the bottom of the page.  Are you able to see that?

17  **A.**  Now I see it, yes.

18  **Q.**  Okay.  I am now going to show you those.

19      **MR. SCHACHTER:**  Your Honor, we're going to offer as

20  Exhibit 6366 the clinical screening questions recommended by

21  Dr. Les Tsang.

22      **MS. GREEN:**  Objection, Your Honor.  Can we lay a

23  foundation?  She said this question -- in this document, 6365,

24  were not Dr. Tsang's questions, and this document may seek to

25  admit is Dr. Tsang's questions, so I would like a foundation

1  that the link in the Asana task is to this actual document and

2  that she's seen it.

3        **MR. SCHACHTER:**  Sure.  I will attempt to lay

4  additional foundation.

5  **BY MR. SCHACHTER:**

6  **Q.**  Going back to the Asana task that was assigned to you,

7  there's a list of behavioral --

8        **MR. SCHACHTER:**  If we can pull back up Defense -- I'm

9  sorry -- Exhibit 6365.  Okay.

10  **BY MR. SCHACHTER:**

11  **Q.**  Do you see in this task that's assigned to you behavioral

12  questions?

13      Do you see that?

14        **THE COURT:**  I think we've just finished that.

15        **MR. SCHACHTER:**  Yes, Your Honor.

16        **THE COURT:**  The question is the one about Dr. Tsang's

17  question.

18        **MR. SCHACHTER:**  Yes.

19        **THE COURT:**  Okay.  You've shown her a document which

20  has on the top of it questions of Dr. Tsang.  The question is

21  has she seen that document.

22        **MR. SCHACHTER:**  Yes, Your Honor.

23  **BY MR. SCHACHTER:**

24  **Q.**  Do you recognize this document --

25        **MR. SCHACHTER:**  Can we put back up, just for the

 1    witness, Court, and counsel, Exhibit 6366.

 2    **BY MR. SCHACHTER:**

 3    **Q.**   Do you see this document entitled "Clinical screening

 4    clinical questions recommended by Dr. Les Tsang"?

 5         Do you see that?

 6    **A.**   Yes.

 7    **Q.**   Do you recognize that to be the optional clinical

 8    screening questions that were linked in the task that was

 9    assigned to you?

10         Do you recognize these?

11    **A.**   I don't know -- I recognize this document, but I don't

12    know if it was what was linked.

13    **Q.**   Okay.

14    **A.**   I don't think it actually was, but --

15    **Q.**   Okay.

16    **A.**   -- but I can't say for sure.

17    **Q.**   You recognize this document?

18    **A.**   I do recognize it, yes.

19              **MR. SCHACHTER:**  We'll offer 6366.

20              **THE COURT:**  Okay.  Admitted.

21         (Trial Exhibit 6366 received in evidence.)

22    **BY MR. SCHACHTER:**

23    **Q.**   We're not going to go through the whole thing, but --

24              **MR. SCHACHTER:**  Is the jury able to see it?  Okay.

25    Great.

1  **BY MR. SCHACHTER:**

2  **Q.**   The document is entitled "Clinical screening clinical

3  questions," and he lists a number of clinical -- he says the

4  following -- or it says (as read):

5           "The following clinical scenarios are in a

6      telemedicine setting unless otherwise specified."

7      And then he goes through some various hypothetical

8  situations; is that right?

9  **A.**   Yes.

10 **Q.**   (as read):

11          "Your patient is a 23-year-old female previously

12     diagnosed with ADHD, inattentive subtype, who's been

13     treated with Adderall immediate release 10-milligram

14     two times a day for the last three to four-years.

15     She was getting her prescription refilled" --

16     And goes on.  The jury can review it themselves.

17     And if we can pull out and if I can just show the jury and

18 as well as the witness the various pages.  If we can just give

19 a moment to them to review it.

20          **THE COURT:**  What would you like her to do?  Read all

21 these questions?

22          **MR. SCHACHTER:**  No.  I just wanted the jury to have an

23 opportunity to review it.

24          **THE COURT:**  I'm trying to figure out what really is

25 the relevance of all of this.

1          MR. SCHACHTER:  Sure.

2          THE COURT:  It's not apparent.

3          MR. SCHACHTER:  I'll try to make it clearer.  I

4    apologize, Your Honor.

5          THE COURT:  Go ahead.  Don't have to apologize.  Just

6    try to make it clearer.

7    BY MR. SCHACHTER:

8    Q.   Ms. Bowen, you said that there were questions from

9    Les Tsang that you objected to using in interviews.

10         Do you recall that?

11   A.   Yes.

12   Q.   You said it was not the behavioral questions that were

13   listed in that task.  Were they the qualification questions

14   that were listed in the task?

15         MS. GREEN:  Objection, misstates testimony.  She has

16   been clear the task did not have Les Tsang's questions in them.

17         THE COURT:  Overruled.  Go ahead.

18   BY MR. SCHACHTER:

19   Q.   Did you have an objection to the qualification questions?

20   A.   It's these questions.

21   Q.   It's these question?

22   A.   These questions.

23   Q.   I see.  That's what I was asking.

24         So these are the questions that you objected to posing to

25   providers who were interviewing on the platform?

**BOWEN - CROSS / SCHACHTER**

1  **A.**   Yes.  They're all trying to assess how much the provider

2  would bend the rules.

3  **Q.**   Okay.  Thank you.  Let's spend a little bit more time on

4  them.

5       So let's start with the first one (as read):

6            "Your patient is a 23-year-old female previously

7       diagnosed with ADHD, inattentive subtype, who's been

8       treated with Adderall immediate release 10 milligrams

9       two times a day for the last three to four-years.

10      She was getting her prescription refilled through her

11      primary care physician until she recently relocated

12      and has been unable to establish care with a new

13      clinician.  Her symptoms are well controlled.  She

14      reports doing well and is requesting a refill to

15      continue her medications.

16           "She verifies her prescription by showing you

17      the prescription bottle, which is consistent with her

18      report.  What is the next best step?"

19      Do you see that?

20  **A.**   Yes.

21  **Q.**   And then there are multiple -- there's some multiple

22  choice answers that are provided.

23  **A.**   Yes.

24  **Q.**   (as read):

25           "Postpone any action until you can review old

1    records or speak to her previous clinician.

2         "Consider switching to Vyvanse, as it has a

3    lower abuse potential.

4         "Consider switching to Vyvanse as you think she

5    could benefit from a medication that is extended

6    release.

7         "Refill her medications as requested for one

8    month

9         "Consider switching her to Ritalin because

10    you're more comfortable and familiar with this drug."

11    Do you see that?

12 **A.**    Yes.

13 **Q.**    Okay.  And it is your testimony that these questions are

14    improper because they -- they propose an answer from the

15    provider; is that correct?

16 **A.**    Yeah.  This is the least of them that's sketchy, but yes.

17 **Q.**    Let's look at the next one.

18 **A.**    Okay.

19 **Q.**    We look at the next one (as read):

20         "It's Friday afternoon, and you're about to

21    complete your first week working with Done.  You're

22    close to the end of your day when the care team

23    contacts you regarding a prescription for a patient

24    you saw earlier in the morning.  The pharmacy is out

25    of stock on the medication, but the care team has

1    located medication at a different pharmacy.  The new

2    pharmacy is requesting a new electronic prescription,

3    as the pharmacist advises it cannot be transferred.

4    What is the next best step?

5         "Answer:  The pharmacist is wrong.  The

6    prescription does to the need to be resubmitted.

7         "B.  Resubmit the prescription as requested.

8         "C.  It's the weekend.  This can wait until

9    Monday.

10        "D.  Ask a colleague to help with the

11   prescription.

12        "E.  Send a message back to the care team asking

13   them to figure something out."

14   Do you see that?

15   A.   Mm-hmm, yes.

16   Q.   Let's look at the next one.

17        I'll just allow the jury for a moment to look at it.

18   Well, they've had an opportunity, actually --

19        MR. SCHACHTER:  Your Honor, I'll move on.

20        THE COURT:  What was the question as to the last one?

21   BY MR. SCHACHTER:

22   Q.   That one was sketchy?

23   A.   No.  That one wasn't that sketchy.

24        THE COURT:  I'm sorry?

25        THE WITNESS:  No.  I'm -- it was assessing more of

 1    their willingness to work late.

 2            **MR. SCHACHTER:**  Okay.  I'll move on.

 3        And let's just -- actually, let me just show you what I

 4    think we've already offered as 6255, which is a communication

 5    between you and Ms. He about Dr. Tsang's questions.

 6            **THE COURT:**  I'll allow it.

 7            **THE COURTROOM DEPUTY:**  Is it admitted?

 8            **THE COURT:**  6255.

 9        (Trial Exhibit 6255 received in evidence.)

10    **BY MR. SCHACHTER:**

11    **Q.**   Ms. He writes (as read):

12            "Obviously, it's not suitable for Kristina to

13        read it through video.  We can keep it as multiple

14        choices and even optional if the providers choose not

15        to answer."

16        Do you see that?

17    **A.**   Mm-hmm.

18    **Q.**   And you respond (as read):

19            "I agree that potential scenarios and

20        role-playing are part of clinician interviews, but

21        Dr. Tsang's questions are not appropriate for this

22        format."

23        Do you see that?

24    **A.**   Yes.  For the video format.

25    **Q.**   Okay.

1    MR. SCHACHTER:  You can take that down.  Let's move

2    on.

3    BY MR. SCHACHTER:

4    Q.   Okay.  You testified that Ms. He wanted the rapid hire of

5    providers.

6         Do you remember that testimony?

7    A.   Yes.

8    Q.   Okay.  In fact, it was Dr. Brindala who told you that

9    there was urgency to hire providers before the pandemic ends;

10   yes?

11   A.   I don't recall that, no.

12   Q.   I'm going to show you what we've marked --

13        MR. SCHACHTER:  And, Your Honor, will offer Defense

14   Exhibit 6258, communication between Ms. Bowen and Dr. Brindala.

15        THE COURT:  Okay.

16        MR. SCHACHTER:  If we could specifically, Mr. Cepregi,

17   focus on the middle paragraph from Dr. Brindala and then his

18   entire communication towards the bottom of the page.

19   Thank you.

20   I'm sorry.  Is it admitted, Your Honor?

21        THE COURT:  Yes.

22   (Trial Exhibit 6258 received in evidence.)

23        MR. SCHACHTER:  Thank you, Your Honor.  I apologize.

24   May we display it for the jurors?

25        THE COURT:  Pardon me?

1          **MR. SCHACHTER:**  May we display it for the jurors?

2          **THE COURT:**  Yes.

3          **MR. SCHACHTER:**  And if we could actually turn to the

4     first page, Mr. Cepregi, do you see the --

5     **BY MR. SCHACHTER:**

6     **Q.**   This is just a communication just between you and

7     Dr. Brindala.  Do you see that?

8     **A.**   Yes.

9     **Q.**   Ruthia is not on this communication.

10         Do you see that?

11    **A.**   Yes.

12    **Q.**   All right?

13         **MR. SCHACHTER:**  If we could turn to the second page.

14    **BY MR. SCHACHTER:**

15    **Q.**   And if you could please read out loud the highlighted

16    sections from -- Dr. Brindala is communicating to you.

17    **A.**   Just the highlighted area?

18    **Q.**   Yes, please.

19    **A.**   (as read):

20              "The provider capacity represents the growth

21         engine of the company.  My work to pare, stabilize,

22         refine, and grow the provider workforce caused our

23         monthly revenue to go from 400,000 in November 2020

24         when I joined to an estimated 1,300,000 in

25         March 2021.  Nothing else changed much to drive this

BOWEN - CROSS / SCHACHTER

change."

**Q.**   And then at the bottom, please.

**A.**   (as read):

"We should be able to start another 30 to 50 providers in Q2 with the current people and processes.  We could potentially lower ad costs of hiring, improve rate of hire/interviews, hire with a lower hourly rate, and deliver other quality and efficiency improvements with intentional focus.

"However, it is more important to start as many providers as possible as soon as possible, even with the current quality inefficiency.  Our company runway ends with the pandemic public health exception. Based on current data information, I predict this will likely happen at the end of December 2021 or possibly Q1 2022.  The pandemic situation could change at any time, though.

"You can do the interviews and manage individual provider needs yourself, you can hire people to do this work, or you can use a combination.  Whatever the case, we need to start dozens of new providers rapidly while managing all the individual provider needs."

**MR. SCHACHTER:**  You can take that down.

\\\

BOWEN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    **Q.**    We talked a little bit about the certifications that

3    Ms. He wanted to have for the -- for the providers on the

4    platform.

5         Do you recall that?

6    **A.**    Yes.

7    **Q.**    And we talked just a moment ago a little bit about the

8    psychiatric mental health specialization; right?

9    **A.**    It is a legal requirement, yes.

10   **Q.**    Okay.  However, it was you who expressed an interest in

11   hiring nurse practitioners that did not have a psychiatric

12   mental health certification; isn't that correct?

13   **A.**    I -- no.  I did?  I don't know.  You tell me.

14   **Q.**    I'm going to show you.

15        **MR. SCHACHTER:**  And, Your Honor, we'll offer

16   communication with Ms. Bowen, Exhibit 6261 on the subject of

17   not requiring the psychiatric mental health certification.

18        **THE WITNESS:**  Oh, no, yeah.  They were PMHNPs who just

19   hadn't gotten their board certification yet.  Yeah, so they

20   would still be PMHNPs in their education, but it's the board

21   certification, so that -- where you actually have to pass the

22   boards.

23        It's the same thing as the earlier comment about being

24   board-eligible versus being board certified.

25   \\\

BOWEN - CROSS / SCHACHTER

1  BY MR. SCHACHTER:

2  **Q.**   I'm sorry.  If you can wait until I ask a question.

3  **A.**   I'm sorry.  I thought you did.

4          **THE COURT:**  Well, she is answering your question.

5  That's what she's doing.  She's answering your question.

6      So next question.

7          **MR. SCHACHTER:**  Your Honor, we offer this document.

8          **THE COURT:**  Pardon?

9          **MR. SCHACHTER:**  We offer this document.

10         **THE COURT:**  Admitted.

11     (Trial Exhibit 6261 received in evidence.)

12  BY MR. SCHACHTER:

13  **Q.**   Okay.  This is a communication that you have with

14  Mr. Menesini as well as the people that report to you, Jacob

15  Korth and Sydney Jiminez; is that right?

16  **A.**   Yes.

17  **Q.**   Okay.  And you write (as read):

18          "Sydney, Jake, and I talked about this and

19          wanted to run it by Jayaram first."

20          Do you see that?

21  **A.**   Yes.

22  **Q.**   (as read):

23          "Maybe we can require two professional

24          references in lieu of the PMHNP board cert or allow

25          her to practice on the condition that she has her

BOWEN - CROSS / SCHACHTER

1      board cert by a certain date."

2          Do you see that?

3  **A.**    Yes.  That's a common practice in healthcare.

4  **Q.**    And Ms. Jiminez responds with the answer -- you understand

5  that to be her responding with the answer that she has received

6  from Dr. Brindala?

7          Do you see that?

8  **A.**    Yes.

9  **Q.**    And Mr. Brindala says (as read):

10         "I strongly recommend maintaining the

11         requirement for all NPs to be true PMHNPs."

12         Do you see that?

13  **A.**    Yes, so that they've already passed their boards as

14  opposed to having their degree but not passed the boards yet.

15  **Q.**    Right.  And this is a question that is being posed to

16  Dr. Brindala about the hiring requirements for the platform;

17  correct?

18  **A.**    He strongly recommended it, but he didn't have final say.

19  But he could offer recommendations.

20  **Q.**    Okay.  And then right after, Ms. Jiminez writes (as read):

21         "Jayaram, I strongly recommend maintaining the

22         requirement for all NPs to be true PMHNPs."

23         Did you respond (as read):

24         "Well, we still need to ask Ruthia whether we

25         can have this relaxed requirement because

BOWEN - CROSS / SCHACHTER

1     Dr. Brindala doesn't have the final answer."

2     Did you write that?

3   **A.**   No, I didn't write that.

4   **Q.**   Right.  Right after Ms. Jiminez reports Dr. Brindala's

5   answer, Ms. Jiminez writes (as read):

6         "Seems like we won't be able to move forward

7     with her."

8     Do you see that?

9   **A.**   Yeah, that's what she said.

10  **Q.**   Now, it was also you who thought that the recruiting --

11  people that reported to you, in particular, Ms. Jiminez, was

12  being too selective in recruiting providers?

13    That was you, was it not?

14  **A.**   That I felt Sydney was being too selective?

15  **Q.**   Yes.

16  **A.**   On what criteria?

17  **Q.**   I'm going to show you --

18        **MR. SCHACHTER:**  Your Honor, we'll offer Exhibit 6263,

19  a communication with Ms. Bowen and Ms. He on the subject of

20  Ms. Jiminez being too selective.

21    Mr. Cepregi, if you could show the highlighted version

22  just for the Court and counsel.

23        **THE COURT:**  Admitted.

24    (Trial Exhibit 6263 received in evidence.)

25        **MR. SCHACHTER:**  Thank you.

BY MR. SCHACHTER:

Q.   All right.  At the very top, Ms. He writes (as read):

          "Hi, Kristin.  I feel like we would need more

     interviews to hit our goals.  How do you think?"

     Do you see that?

A.   Mm-hmm.

Q.   She's asking for your view; correct?

A.   Yes.

Q.   All right.  And you write (as read):

          "I agree.  I also think we can do a better job

     of advancing our current applicant pool.  Jake and I

     were talking and we agreed that Sydney may be a

     little too selective in her recruitment efforts in

     moving people through the pipeline.

          "Here's what I wrote to the team earlier.  I

     just wanted to share that we need to be making better

     progress towards our hiring goal.  This means" -- you

     wrote -- "we may need to be a little less selective

     in who we move forward and make offers to."

     Do you see that?  That's what you wrote; right?

A.   Yes.

Q.   Now, by the way, you also go on to say a little further

down (as read):

          "If they have some patients with ADHD but not

     many" --

1          **THE COURT:**  For completeness, read the sentence as to

2     what she means.

3          **MR. SCHACHTER:**  Sure.

4          **THE COURT:**  So if it seems like someone may not be

5     great with technology.  That's what she's saying.

6          **MR. SCHACHTER:**  Yes.  I'll go on, Your Honor.  I

7     apologize.

8     **BY MR. SCHACHTER:**

9     **Q.**  (as read):

10          "So if it seems like someone may not be great

11          with technology, that's okay.  We will just work with

12          them a little more closely during onboarding.  If

13          they seem completely unable to learn or adapt to

14          technology, then we would not move forward with them.

15          If they have seen some patients with ADHD but not

16          many, let's still move them forward, but consider

17          pairing them with an experienced provider that they

18          can learn from and setting them up with Dr. Brody for

19          weekly office hours for the first month or so.  If

20          they seem somewhat uncomfortable with a stimulant

21          first approach but not completely opposed to it, we

22          can also pair them with a experienced provider and

23          try to implement policies that address potential

24          abuse/diversion so that they feel more comfortable

25          prescribing stimulants."

1        Do you see that?

2   **A.**    Yes.

3            **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

4   **BY MR. SCHACHTER:**

5   **Q.**    And, in fact, you recall that Mr. -- Ms. He encouraged you

6   in hiring providers not to place speed over quality.

7        Do you remember that?

8   **A.**    Oh, no.  Absolutely not.

9   **Q.**    Okay.  I'm going to show you what we've marked as Defense

10  Exhibit 6264, a communication with you and Ms. He.

11           **MR. SCHACHTER:**  And, Your Honor, we'll offer 6264.

12           **THE COURT:**  All right.

13           **MR. SCHACHTER:**  If we can turn to -- Mr. Cepregi, if

14  we can turn to the next page.

15           **THE COURT:**  I'm sorry.  What am I supposed to look at?

16           **MR. SCHACHTER:**  Your Honor, Ms. He's comment, April 1,

17  last sentence, that's been displayed right now before

18  the Court.

19           **THE COURT:**  Okay.  You may read that to the jury.

20           **MR. SCHACHTER:**  Okay.  Thank you.

21           **THE COURTROOM DEPUTY:**  Admitted?

22           **THE COURT:**  Admitted.

23        (Trial Exhibit 6264 received in evidence.)

24           **THE COURTROOM DEPUTY:**  Thank you.

25  \\\

BOWEN - CROSS / SCHACHTER

1    BY MR. SCHACHTER:

2    **Q.**    Okay.  Let's actually look at the first page just so we

3    can get the context for this communication.

4         Well, actually, let's just go back to that page.  Let me

5    see if we can try it this way.

6         All right.  Now, do you recall that there was an issue

7    with -- withdrawn.

8         You testified on direct that in Texas, a nurse

9    practitioner is unable to write a prescription for a controlled

10   substance; correct?

11   **A.**    Schedule II.

12   **Q.**    Schedule II?

13   **A.**    Only Schedule II, yes.

14   **Q.**    Thank you.

15        And the way it works in Texas is that the prescription is

16   issued in the name of the collaborative or supervising

17   physician that the nurse practitioner must have a relationship

18   with; is that correct?

19   **A.**    Again, this is what the Texas medical board is that they

20   need to independently see and assess the patient.  It's been a

21   big issue because the Texas physicians feel they should have a

22   right to delegate, but they legally do not.

23   **Q.**    Okay.  Well, I suppose we can at some point show you the

24   actual Texas law.  Is it possible that you're wrong about the

25   need for a Texas collaborative physician to actually see the

BOWEN - CROSS / SCHACHTER

1  patient, or do you consider yourself an expert in Texas law in

2  this area?

3  **A.**   I reviewed the law at the time of this.  I also worked in

4  public policy, and so I was looking at the policy that was

5  being proposed, which died in the -- in the policy development

6  process and never got passed through the House?

7       But that was their claim is that they wanted to be able to

8  delegate and they currently could not.

9  **Q.**   My only question is:  Is it possible that --

10        **THE COURT:**  Anything is possible.  Next.

11 **BY MR. SCHACHTER:**

12 **Q.**   Okay.  In any event, the nurse practitioners that were

13 evaluating patients in Texas needed to have a collaborative

14 physician; is that correct?

15 **A.**   Yes.

16 **Q.**   All right.  And one of the collaborative physicians that

17 had a relationship with the nurse practitioners was a man named

18 Dr. Lucchese; is that correct?

19 **A.**   Yes.

20 **Q.**   And there had been an issue -- we can look at the

21 document, but let's see if you recall.

22       There had been an issue with a patient who complained that

23 the pharmacy had rejected their prescription because, according

24 to the pharmacy, there had been multiple providers that had

25 issued the prescription that did not seem to have the treatment

1    of ADHD in their practice area.

2        Do you remember that?

3    **A.**    I think it's what we saw on the earlier document, yes.

4    **Q.**    Okay.  All right.  And Dr. Brindala is involved in this

5    communication.

6        Do you see that?

7    **A.**    Yes.

8    **Q.**    And he writes (as read):

9           "The argument can be made that Dr. L is a

10       surgeon and that primary care management of ADHD with

11       amphetamines is outside his scope of practice."

12       Do you see that?

13   **A.**    Yes.

14   **Q.**    Okay.  And what Dr. Brindala is saying there is that

15   Dr. Lucchese, who is one of the collaborative physicians,

16   because the prescription is issued in his name, the pharmacy

17   may see him as a surgeon and therefore not someone who is --

18   who doesn't deal with ADHD on a regular basis; correct?

19   **A.**    Yes.

20   **Q.**    All right.

21       And then Ruthia writes (as read):

22          "We need to call the patients to comfort him and

23       make sure to explain what is going on, including why

24       Titi -- and that is a nurse practitioner named

25       Titi Johnson; is that right?

1    **A.**    Mm-hmm.  Yes.

2    **Q.**    And what she's saying is that Titi Johnson has been the

3    nurse practitioner with the patient for this period of time,

4    but the collaborative physician may have changed or the

5    collaborative physician may not be in a field where ADHD

6    treatment is to the pharmacy, obviously, core to that doctor's

7    practice.

8        Do I have that right?

9    **A.**    Yes.

10    **Q.**    Okay.  Thank you.  So Ruthia writes (as read):

11        "We should explain what's going on, including

12        why Titi has switched collab many times.  If he knows

13        it's from the same practitioners, just different

14        collab, it can help explain the situation."

15        And she writes (as read):

16        "Meanwhile, let's not prioritize speed over

17        quality and focus on getting psychiatrists or primary

18        care doctors, assuming that is within their scope in

19        Texas."

20    **A.**    Yes.  She was referring to the collaborating physicians,

21    not the providers on the platform.

22    **Q.**    Understood, understood.  Ms. He is saying that even with

23    respect to the collaborative physicians that in finding the

24    collaborative physicians that are going to be working with the

25    nurse practitioners that Done should not emphasize speed over

1  quality?

2      Those are her words, are they not?

3  **A.**  For the collaborating physicians only, not for the actual

4  providers on the platform, the nurse practitioners.

5  **Q.**  You said that.  Understood.

6      Now, I want to point to another portion of this document.

7  Ruthia writes -- she continues on (as read):

8          "Let's see what he will say.  We can pay above

9          market rate for good collab, and I highly suggest not

10         get many new patient in Texas before we figure out a

11         playbook for the collab in Texas, or we can use our

12         mail order pharmacy partner, Scripx, which we already

13         have a relationship with and has been stable."

14     Do you see that?

15 **A.**  Yes.

16 **Q.**  Okay.  And then I want to focus you on Dr. Brindala's

17 response.  He writes (as read):

18         I'm sorry.  He writes (as read):

19         "Ruthia, the team can certainly pause new Texas

20         patients if you want.  Dr. Lucchese, our Texas

21         collaborating physician" -- Dr. Brindala writes --

22         "is more than capable and has been excellent to work

23         with, as far as I understand."

24     Do you see Dr. Brindala's comments to Ms. He about

25 Dr. Lucchese?

BOWEN - CROSS / SCHACHTER

1  **A.**   Yes.

2  **Q.**   (as read):

3         "We only have three NPs in Texas.  All of them

4     use Dr. L.  It took months to find him."

5     Do you see that?

6  **A.**   Yes.

7  **Q.**   Okay.  And then at the bottom, Dr. Brindala writes (as

8  read):

9         "Please see the direction from Ruthia.  Texas

10    will be challenging until nurse practitioners can

11    prescribe stimulants themselves, as in the bill you

12    shared."

13    Do you see that?

14  **A.**   Mm-hmm.

15  **Q.**   And that's a discussion of the fact that at this point in

16  time, while there may be legislation being --

17         **MR. SCHACHTER:**  I'm sorry.  Can you go a little bit

18  further down, Mr. Cepregi.  I'm sorry.  Page 3, the part that's

19  not highlighted.  Thank you.

20  **BY MR. SCHACHTER:**

21  **Q.**   Okay.  And then if we can turn to Ms. He's response --

22         Actually, if we can go to the next page.  Actually, at the

23  very top, you write at the top of that page -- and we can

24  see --

25         **MR. SCHACHTER:**  If we can look at the page before

1  that, it shows that's it's written by Ms. Bowen.  Thank you.

2  Okay.

3  **BY MR. SCHACHTER:**

4  **Q.**  And you are speaking about some kind of contact with the

5  state policy person in Texas; is that right?

6  **A.**  Yes.

7  **Q.**  And you give an update on this potential legislation that

8  would allow nurse practitioners to prescribe Schedule II

9  controlled substances in Texas; is that right?

10  **A.**  Yes.

11  **Q.**  Okay.  And Ms. He writes (as read):

12        "Policy change will always take time.  Let's try

13        our best to do what we can within the currently

14        regulatory landscape."

15        Do you see that?

16  **A.**  Yes.

17        MR. SCHACHTER:  Okay.  You can take that down,

18  Mr. Cepregi.

19  **BY MR. SCHACHTER:**

20  **Q.**  All right.  Ms. Green asked you about various provider

21  materials.

22        Do you recall those questions?

23  **A.**  Yes.

24  **Q.**  And in -- she showed you Defense Exhibit -- I'm sorry --

25  Exhibit 1418, in evidence.

1          **MR. SCHACHTER:**  And I'd like to display that for the

2    witness, Your Honor.  And may we display for the jurors as

3    well?  It's in evidence.

4    **BY MR. SCHACHTER:**

5    **Q.**   If we can look at the last page of that exhibit.

6          Okay.  Do you remember Ms. Green asking you about this?

7    **A.**   Yes.

8    **Q.**   All right.  And in particular, she asked you about the

9    section (as read):

10             "If they don't fully meet the criteria for ADHD

11         use your clinical judgment to determine if the

12         patient may still benefit from a medication trial.

13         Redirect to the clinical leadership if the situation

14         is complex."

15         Do you see that?

16   **A.**   Yes, I do.

17   **Q.**   Okay.  Now, there were many questions that Ms. Green asked

18   you about the DSM-5.

19         Do you recall these questions?

20   **A.**   Yes, I think there were some questions about the DSM-5.

21   **Q.**   Okay.  And you testified about the criteria in the DSM-5

22   for ADHD.

23         Do you remember that?

24   **A.**   Yes.

25   **Q.**   Okay.  And just to be clear, the DSM-5 -- just so the jury

1  understands -- that is the Diagnostic and Statistical Manual of

2  Mental Disorders; is that correct?

3  **A.**   That's correct.

4  **Q.**   Okay.  It's like a definition that's used by mental health

5  professionals to try to identify particular disorders; is that

6  right?

7  **A.**   It defines diagnostic criteria for psychiatric conditions.

8  **Q.**   Great.

9       Okay.  And one of them is for attention deficit

10  hyperactivity disorder; is that right?

11  **A.**   Yes.

12  **Q.**   Okay.  I'm going to show you and we'll offer Exhibit 6028,

13  the section of the DSM on ADHD.

14  **A.**   The most current edition is the TR.

15            **THE COURT:**  I'm sorry?

16            **THE WITNESS:**  This is fine.

17            **THE COURT:**  I'm sorry.  What?

18            **THE WITNESS:**  I was just noticing that it's the DSM-5

19  but it's not the TR.  But I think this was actually what was

20  used at that time, so disregard.

21            **THE COURT:**  The TR is the new one?

22            **THE WITNESS:**  That's the new one, yes.

23            **THE COURT:**  Right.

24            **MR. SCHACHTER:**  That, Your Honor, is very impressive.

25            **THE COURT:**  That was not -- the TR was not the one,

1    not the edition that was available at this time.

2            THE WITNESS:  I think the text revision came out after

3    that time.  You can tell me.

4            MR. SCHACHTER:  Your Honor, may I display the section

5    of the DSM-5 on ADHD?

6            THE COURT:  Yes.

7            MR. SCHACHTER:  I'm sorry.  Thank you, Your Honor.

8            THE COURTROOM DEPUTY:  It's admitted?

9            THE COURT:  Admitted.

10        (Trial Exhibit 6028 received in evidence.)

11            MR. SCHACHTER:  Go to the first page, please,

12    Mr. Cepregi.

13            THE COURT:  This is the TR?  Oh, no, that's not the

14    TR.

15        Okay.  Go ahead.

16    BY MR. SCHACHTER:

17    Q.   All right.  So this is the -- I guess title of the book;

18    right?

19    A.   Yes.

20    Q.   Okay.  And if we can go to the page of this exhibit, which

21    is Number 3, and it lists attention deficit hyperactivity

22    disorder, and it lists diagnostic criteria.

23        Do you see that?

24    A.   Yes.

25    Q.   All right.  And then it lists -- we're not going to go

BOWEN - CROSS / SCHACHTER

1    through all of them, but the jury can see it for themselves.

2        (as read):

3            "A is a persistent pattern of inattention and/or

4        hyperactivity impulsivity that interferes with

5        functioning or development as characterized by 1

6        and/or 2."

7        Right?

8   A.   Correct.

9   Q.   And 1 lists things that are indicative of inattention;

10  right?

11  A.   Yes.

12  Q.   And it says (as read):

13            "Six or more -- inattention, six or more of the

14        following symptoms have persisted for at least six

15        months to a degree that is inconsistent with

16        developmental level and that negatively impacts

17        directly on social and academic occupational

18        activities."

19        Right?

20  A.   Correct.

21  Q.   Okay.  And then we don't need to belabor the record, but

22  if I could just give the jury a moment to see the things that

23  the DSM lists which are indicative of inattention.

24                    (Pause in proceedings.)

25  BY MR. SCHACHTER:

BOWEN - CROSS / SCHACHTER

1  Q.    Okay.  And it says -- it's six or more of those things is

2  what should be considered; correct?

3  A.    Yes.

4  Q.    Okay.  And then if we could turn to the next page, there's

5  a section on hyperactivity and impulsivity, and it lists,

6  again, six or more of following symptoms which would indicate

7  hyperactivity?

8          MR. SCHACHTER:  And, again, I'll just give the jury a

9  moment to look at it.

10                      (Pause in proceedings.)

11  BY MR. SCHACHTER:

12  Q.    Okay.  And, again, you have to have six or more of those

13  symptoms.

14        And then the DSM goes on to have diagnostic -- there's

15  diagnosis codes that are used in medicine; is that correct?

16  A.    Are you referring to -- there's diagnostic codes in ICD-9,

17  now ICD-10.  And there's also the DSM-5 diagnostic codes.

18  They're different.

19  Q.    You're way ahead of me.

20        So what we just saw lists -- in the chapter on ADHD, it

21  list us the symptoms of inattention, the symptoms of

22  hyperactivity; right?  We just looked at that.

23  A.    Mm-hmm.

24  Q.    And then if we could turn to page 9 of this chapter, there

25  is something called "other specified attention deficit

1  hyperactivity disorder."

2      Do you see that?

3  **A.**   Yes.

4  **Q.**   And then there is a section that I want to focus you on on

5  unspecified attention deficit hyperactivity disorder.

6      Do you see that?

7  **A.**   Yes.

8  **Q.**   Okay.  And what the DSM defines to be unspecified

9  attention deficit hyperactivity disorder is the following (as

10  read):

11          "This category applies to presentations in which

12      symptoms characteristic of attention deficit

13      hyperactivity disorder that cause clinically

14      significant distress or impairment in social,

15      occupational, or other important areas of functioning

16      predominate but do not meet the full criteria for

17      attention deficit hyperactivity disorder or any of

18      the disorders in the neurodevelopmental disorders

19      diagnostic class.

20          "The unspecified attention deficit hyperactivity

21      disorder category is used in situations in which the

22      clinician chooses not to specify the reason that the

23      criteria are not met for attention deficit

24      hyperactivity disorder or for a specific

25      neurodevelopmental disorder and includes

1          presentations in which there is insufficient

2          information to make a more specific diagnosis."

3          Do you see that?

4    **A.**    Yes.

5    **Q.**    And that is what the DSM defines as unspecified attention

6    deficit hyperactivity disorder.

7          Do you see that?

8    **A.**    Yes.

9    **Q.**    Okay.

10          **MR. SCHACHTER:**  You can take that down.

11   **BY MR. SCHACHTER:**

12   **Q.**    To be clear, the DSM does not include a definition of what

13   medications a licensed medical provider is required to

14   prescribe to any particular patient that they're treating;

15   correct?

16   **A.**    Correct, yes.

17   **Q.**    A licensed medical provider, when evaluating a patient and

18   prescribing a treatment, is required -- is ethically obligated

19   to use their -- their medical judgment to assess the patient

20   and prescribe whatever medication, if any, that they believe is

21   medically necessary and in the patient's interest; correct?

22   **A.**    As long as it's evidence-based.

23   **Q.**    Yes, correct.

24          Okay.

25          Now, going back to Exhibit 1418, particularly the last

1    page and the language at the bottom that Ms. Green asked you

2    about, it says (as read):

3            "If they don't fully meet the criteria for ADHD,

4        use your clinical judgment to determine if the

5        patient may still benefit from a medication trial."

6        Do you see that?

7    A.    Yes.

8    Q.    And you know, do you not, that this language came from

9    Dr. Les Tsang?  Do you know that, yes or no?

10   A.    No, I do not know that.

11   Q.    Okay.  Well, there came a point in time --

12       Well, let me ask you this:  You were shown Exhibit 6146.

13           MR. SCHACHTER:  Could we turn to that.  6146.  Ah,

14   thank you.  Okay.

15   BY MR. SCHACHTER:

16   Q.    Do you remember Ms. Green showed you this document?

17   A.    Yes.

18   Q.    Okay.  Now, let me ask you a little bit about how things

19   worked at Done.

20       There was something called -- there was a platform called

21   CODA.

22       You recall that, do you not?

23   A.    Yes.

24   Q.    Okay.  And CODA was a place where clinical policies were

25   placed that the medical providers on the Done platform could go

1    to to see the clinical policies.

2         Do you recall that?

3    **A.**   I believe so, yes.

4    **Q.**   Remember Ms. Green asked you about this particular

5    provider handbook and asked you if it had ever been

6    disseminated to the medical providers?

7         Do you recall her asking you that?

8              **MS. GREEN:**  Objection, misstates the question.  Ever?

9              **MR. SCHACHTER:**  I'll ask a different question.

10        Oh, is it in evidence?

11             **MS. BELL:**  Mike, I don't think the --

12             **THE COURTROOM DEPUTY:**  It's not the same exhibit

13   number.  What exhibit number did the Government use?

14             **MS. GREEN:**  I think we used 6146.

15             **MR. SCHACHTER:**  Then we'll offer it, because I think

16   we offered it originally.

17             **MS. GREEN:**  It was from yesterday.  Yeah, I believe

18   that's right.

19             **MR. SCHACHTER:**  Your Honor, 6146 is -- we believe it's

20   already in evidence, but to clarify, we're offering it.  I

21   don't believe there's an objection.  The Government asked about

22   it.

23             **MS. GREEN:**  I think you admitted it yesterday, yeah.

24             **MR. SCHACHTER:**  I think that's right.

25             **THE COURT:**  6146?

1      **MR. SCHACHTER:**  Yes, Your Honor.

2      **THE COURT:**  It's in evidence?

3      **MR. SCHACHTER:**  Yes.

4      **THE COURT:**  Okay.

5      **MR. SCHACHTER:**  Okay.  And this is the document

6  analysis.  I had neglected to actually make sure that it was

7  being shown to the jurors.  I apologize.

8  **BY MR. SCHACHTER:**

9  **Q.**  This in the document that Ms. Green showed you, and she

10  took you through and asked you was it ever disseminated to the

11  medical providers on the Done platform.

12      Do you remember her asking you that?

13  **A.**  I do remember that, yes.

14  **Q.**  And you said -- you said no, you're not aware of this ever

15  being disseminated; is that right?

16  **A.**  We did not send this to providers.  Not that I was aware

17  of.

18  **Q.**  Okay.  However, you are aware that this very document was

19  added by Ms. He to the CODA platform, which is where the

20  clinical policies reside on February 5th, 2021; isn't that

21  correct?

22  **A.**  Ruthia added this?

23  **Q.**  Yes.  Do you know that?

24  **A.**  No, I do not know that, no.

25      **MR. SCHACHTER:**  May I have just a moment, Your Honor?

1   **THE COURT:**  Ladies and gentlemen, we're going to take

2   a recess now.  We'll be in recess until 10 to three.

3   Remember the admonition given to you:  Don't discuss the

4   case, allow anyone to discuss it with you, form or express any

5   opinion.

6   (The jury leaves the courtroom.)

7   (Proceedings were heard out of the presence of the jury.)

8   **THE COURT:**  The jury has retired.

9   I think 6146 was for demonstrative purposes, but it

10  wasn't.

11  **MR. SCHACHTER:**  Your Honor, should the witness be

12  excused?

13  **THE COURT:**  Pardon?

14  **MR. SCHACHTER:**  Should the witness be excused?

15  **THE COURT:**  No, no.  Have a seat.

16  **MR. SCHACHTER:**  I don't think so.  I think we used it.

17  Yesterday Ms. Bell used it, and then the Government used it as

18  well.

19  **THE COURT:**  Okay.  I don't know whether there's a

20  foundation laid for this document, but maybe there is.

21  **MR. SCHACHTER:**  The Government showed this document to

22  the witness.

23  **THE COURT:**  Okay.  I don't know.

24  **MR. SCHACHTER:**  And it came in through Mr. Menesini.

25  **THE COURT:**  Oh, that may be the confusion.  That may

 1    be the confusion.  That's why I don't have it on my list.

 2         Yes, I have it marked demonstrative, but you're saying it

 3    was actually not demonstrative.  Okay.  All right.  We have it

 4    marked as demonstrative.

 5         I'm a little confused as to the relevance.  You showed the

 6    witness the DSM-IV -- 5 back earlier, and then you showed her

 7    the section that dealt with hyperactivity, et cetera disorder.

 8    And then you showed her the unspecified attention deficit

 9    hyperactivity disorder, and then you showed her the document

10    which said if you don't fully meet the criteria of the

11    attention deficit disorder, then you can -- the document -- I

12    don't -- I don't want to characterize it.  It said something

13    like you can give the person a trial.

14              MR. SCHACHTER:  No.  I'm sorry, Your Honor, but --

15              THE COURT:  That's what the document says.

16              MR. SCHACHTER:  Yes, Your Honor.  But again --

17              THE COURT:  No, but I'm trying to figure out -- this

18    is a question of relevance --

19              MR. SCHACHTER:  What the connection is.  Sure.

20              THE COURT:  No.  I mean, so it's relevant because you

21    are drawing the line, as I understand it, between the medical

22    trial and unspecified attention disorder?  Is that the line

23    you're drawing?  Because that's --

24              MR. SCHACHTER:  Not exactly.  We have --

25              THE COURT:  Well, then it's pretty misleading, isn't

1   it?

2          **MR. SCHACHTER:**  No.  If I may, Your Honor, there are

3   several points.

4      One is Ms. Green asked the witness about whether it's

5   appropriate to do a -- in her view, to do a medication trial

6   for someone who does not meet the DSM criteria.

7          **THE COURT:**  Yeah.  Yes, that's right.

8          **MR. SCHACHTER:**  It doesn't have ADHD under the DSM

9   criteria.

10         **MS. GREEN:**  I said who does not meet the DSM

11  diagnostic criteria.

12         **MR. SCHACHTER:**  Right.  Right.

13     The DSM -- I'm no expert -- in the definition of ADHD

14  contains different definitions of what falls within the

15  definition of ADHD, and it somewhat confusingly says it's six

16  factors here, six factors there.  But then it also in the

17  chapter on attention deficit hyperactivity disorder also has a

18  condition where if it is significantly -- if it is causing

19  clinically significant distress or impairment, you call it

20  unspecified attention deficit hyperactivity disorder.

21         **THE COURT:**  Right.

22         **MR. SCHACHTER:**  Okay?  So when one talks about what

23  is -- what is in the DSM on ADHD, you have ADHD that meets the

24  criteria.  You also have something called "unspecified ADHD."

25  It's what the DSM-5 calls it.

1    **THE COURT:** And it's your testimony -- your experts

2    are going to testify that you can -- that this is what is

3    meant. You can give medical trials to people who have

4    unspecified attention deficit disorder.

5    **MR. SCHACHTER:** Your Honor, we will establish that.

6    We will establish that for sure.

7    **THE COURT:** In other words if I have two of qualities,

8    two of the characteristics, it's perfectly appropriate under

9    the DSM to call "unspecified attention deficit disorder," and

10   therefore -- okay.

11   So, I mean, basically there are no limits to medication,

12   are there? I mean, because if you can't specify it but you can

13   treat it the same way, then what's the point of having a

14   criteria?

15   But maybe -- maybe that's what your expert is going to

16   say.

17   **MR. SCHACHTER:** Sure. And, Your Honor, to be clear --

18   **THE COURT:** And I'll be very interested in that

19   testimony.

20   **MR. SCHACHTER:** There is something called "off-label

21   prescriptions" --

22   **THE COURT:** Oh, I know all of about off-label.

23   **MR. SCHACHTER:** Medical professionals are absolutely

24   able to use medication in their independent clinical judgment

25   where they believe it is going to be inappropriate.

1    **THE COURT:**  So you say this is off label?  That's what

2    this defense in the case is off label?

3    **MR. SCHACHTER:**  It's not a question of if being off

4    label.  The label does not require that it meet six criteria of

5    this.

6    There's two different subjects, and the Government is

7    conflating them.  One is the DSM criteria.  The other is an

8    independent medical provider's judgment about what is the

9    appropriate way to treat someone who is in clinically

10   significant distress or impairment.

11   And, no, there is no restriction, legal or otherwise, on a

12   medical provider to exercise their independent clinical

13   judgment and say, you know what I think?  Because I want to

14   help this person, my purpose in prescribing this medication is

15   a medical one, and even if the lawyers for the justice

16   department would disagree with that medical assessment, as long

17   as it is sincere, as long as that doctor is trying to help this

18   patient and not try to further their addiction or their drug

19   abuse, then they are not committing a crime.

20   And, Your Honor, it is our view that this prosecution is

21   very misplaced for many reasons, but that is certainly one of

22   them.

23   **THE COURT:**  All right.  Well, we're taking a recess

24   now, and we'll resume.

25   **MR. SCHACHTER:**  And, Your Honor, we also have the

1  issue -- and we can address it tomorrow if you wish -- the

2  videos, Dr. Brody's clinical videos --

3          THE COURT:  We'll deal with that later.

4          MR. SCHACHTER:  Yes, Your Honor.

5              (Recess taken at 2:35 p.m.)

6          (Proceedings resumed at 2:54 p.m.)

7      (Proceedings were heard out of the presence of the jury.)

8          THE COURTROOM DEPUTY:  Come to order.  Court is now in

9  session.

10         THE COURT:  Okay.  Let the record reflect --

11     Be seated.

12     The parties are here.  The jury is not.

13     Mr. Schachter, as you told me before lunch you would use

14  as much time as the Government, I just want to point out the

15  Government was two hours and eight minutes, and so far you're

16  two hours and four minutes, so I assume this will be brief.

17         MR. SCHACHTER:  Actually, Your Honor, unfortunately, I

18  have a lot of ground to cover.

19         THE COURT:  Well, okay.  Well, then you're going to

20  have to move quickly, yes.

21         MR. FOSTER:  Your Honor, the next exhibit that the

22  Defense apparently wants to cross this witness on --

23         MR. SCHACHTER:  Your Honor, should the witness be

24  excused?

25         THE COURT:  Oh, I don't think you have to.  Come on.

1          **MR. SCHACHTER:**  Okay.

2          **MR. FOSTER:**  -- is a document from the system CODA,

3    and with Mr. Menesini, Your Honor let in subject to a motion to

4    strike, which the Government is going to be filing similar

5    documents.

6          And the reason that the Government objects is because, as

7    you can see, this document does not have a Done Health Bates

8    number, which means as far as the Government is aware -- we're

9    just receiving it now -- it was not produced by the company in

10   discovery, although directly responsive to the subpoena.

11         You can also see on the right-hand side there's this

12   version control, and what this means is that if someone has

13   access to the electronic version of the system, they can click

14   on that and they can see what edits were made before and what

15   edits were made after.  And you can see in this exhibit there's

16   lots of edits.  Each day listed there is a day on which edits

17   occur.

18         And I don't know what's happening, but it appears that the

19   defendant has access to this system.  She's given access to

20   counsel for the purpose of printing these PDFs.  But the

21   Government isn't able to be prepared to cross, to redirect, to

22   prepare witnesses, because as far as we're aware, the company

23   has not produced these different versions.

24         **THE COURTROOM DEPUTY:**  The exhibit number?

25         **MR. FOSTER:**  6704.  Also on this one there's nothing

1  to indicate --

2       THE COURT:  I'm not going to permit it at this time.

3  I'll hear some argument afterwards, after the jury is finished.

4     Okay.  Let's bring in the jury.

5       THE COURTROOM DEPUTY:  And then for the record, we're

6  admitting 6146, just so it's on the record.

7     (Trial Exhibit 6146 received in evidence.)

8       MR. SCHACHTER:  And I'll ask some foundational

9  questions just to make sure the witness is aware.

10    I apologize.  I just intend to ask some foundational

11 questions for the witness to see if that provides a basis for

12 admission.  If not, then we'll move on.

13      THE COURT:  Okay.  You may do that.  Why don't you do

14 it now.

15      MR. SCHACHTER:  Sure.

16 BY MR. SCHACHTER:

17 Q.   CODA is it the system where all practitioners, medical

18 providers look to for clinical policy documents?

19 A.   We used it, I think, for a portion of the time I was

20 there.

21 Q.   And I believe when the Government asked you questions

22 about version history on various documents, you said, oh, I'm

23 very familiar with these, because you would look on the system

24 as well as on the version history of many documents; is that

25 correct?

1    **A.**    For the Google documents, yes.  I don't know about CODA.

2    **Q.**    And you would also look on CODA to look for clinical

3    policies; is that correct?

4    **A.**    Yes.

5              **MR. SCHACHTER:**  Okay.  And may I show the witness this

6    document, Your Honor?

7              **THE COURT:**  Okay.  Go show the witness the document.

8    **BY MR. SCHACHTER:**

9    **Q.**    Showing you what's been market as Exhibit 6704.

10            Do you see that?  Do you see the date, February 5, 2021?

11            And you understand how version history works?  You

12   described that when the Government asked you questions; is that

13   correct?

14   **A.**    I'm sorry.  I think I need readers.  This is really tiny.

15            I think I see February 5th, yes.

16   **Q.**    With respect to version history, when you highlight a

17   particular name and time, what will show up is the change that

18   that person made at that time; is that right?

19   **A.**    I don't know what "synch table updated" means.  I don't

20   know -- I don't understand how to read this version history.

21   **Q.**    But the highlighted portion that says "Ruthia He" that is

22   dated February 5, 2021, at 8:06 a.m., this reflects changes

23   that Ms. He made to the CODA document on that date; isn't that

24   correct?

25            **MS. GREEN:**  Objection, foundation.  I'm not sure she's

1    familiar with this document at this point.

2         THE COURT:  Let's see if she knows.  Let's see what

3    her response is.

4        Do you know that?

5         THE WITNESS:  I don't recognize it, no.

6         THE COURT:  Okay.  Thank you.

7        Okay.  Let's bring in the jury.

8              (The jury enters the courtroom.)

9        (Proceedings were heard in the presence of the jury.)

10        THE COURT:  Okay.  Let the record reflect all jurors

11   are present.

12       You may proceed.

13        MR. SCHACHTER:  Thank you, Your Honor.

14   BY MR. SCHACHTER:

15   Q.   Good afternoon, Ms. Bowen.

16       When we last left off, we are talking a little bit about

17   the clinical policies at Done; is that right?

18   A.   I believe so, yes.

19   Q.   And you had just described a system called CODA where

20   clinical policies are put for the medical providers to see the

21   clinical policies of the company; is that right?

22   A.   A lot of documents were hosted there.  I think clinical

23   policies were as well.

24   Q.   Okay.  And I'm just asking for your recollection.  Do you

25   recall that around the time that you started, there was a

1    change to the clinical policies instituted by Ms. He that told

2    providers that they must follow the criteria of the DSM-5 in

3    diagnosing ADHD?  Do you remember that that was made part of

4    the clinical policies by Ms. He in February of 2021?

5    **A.**    No.

6    **Q.**    Okay.  Putting aside your recollection of Ms. He, do you

7    recall that around the time that you started that the clinical

8    policies that were posted on CODA for all the medical providers

9    to see required that clinicians apply the criteria of the DSM-5

10   when diagnosing attention deficit hyperactivity disorder and

11   other disorders?

12        Do you recall that?

13   **A.**    No.

14   **Q.**    Okay.  You were shown a number of policy documents by the

15   Government with version histories on the right side.

16        Do you recall that?

17   **A.**    The Google documents, yes.

18   **Q.**    Yeah, those Google documents.

19        And when the prosecutor was asking you questions, do you

20   recall that you were able to recognize each and every one of

21   those?  Do you remember that?

22   **A.**    Yes.

23   **Q.**    Mm-hmm.  Okay.

24        I just want to briefly show you some of those.  If we can

25   look at first Exhibit 1340.

1        Do you remember the prosecutor showed you this?

2        Do you remember that?  I'm sorry.  Is it on your screen?

3            **MR. SCHACHTER:**  Your Honor, may we display 1340 for

4    the jurors?  It's in evidence.  Okay.

5    **BY MR. SCHACHTER:**

6    **Q.**  And the prosecutor showed you the section that was

7    highlighted that says "Ruthia He."

8        Do you see that?

9    **A.**  Yes.

10   **Q.**  Okay.  And do you see that there was a version of the

11   document September 24th, 2020, which would have been edited --

12   that would show an edit the day after; is that right?

13   **A.**  Yes.

14   **Q.**  Okay.  And what name do you see right above Ms. He's?

15   **A.**  David Brody.

16   **Q.**  Okay.  Thank you.

17       If we can turn to the second page, the one labeled

18   "Medication Guideline."

19       Okay.  And the prosecutor showed you that Ms. He's name is

20   reflected in the version history.

21       Do you see that?

22   **A.**  Yes.

23   **Q.**  Okay.  And what is the name that is reflected in the

24   version history right above that?

25   **A.**  David Brody.

1    Q.    Okay.  And then if we can turn to the third page.

2          Do you see the page on refill requests?

3    A.    Yes.

4    Q.    Okay.  And the prosecutor asked you about the name Ruthia

5    He in the version history.

6          Do you see that?

7    A.    Yes.

8    Q.    What is the name that is right above that?

9    A.    David Brody.

10   Q.    Okay.  And then if we can just look to the last page of

11   this Google document that says "Patient has

12   depression/anxiety."

13         And do you see the version history?  It says -- the

14   prosecutor showed you that Ruthia He's name is in the version

15   history.

16         Do you see that?

17   A.    Yes.

18   Q.    And then there's an additional revision the day after.

19         Do you see that?

20   A.    Yes.

21   Q.    And what name appears?

22   A.    That's David Brody.

23   Q.    Thank you.

24         **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

25   \\\

1  BY MR. SCHACHTER:

2  **Q.**   Okay.  Now, I believe that you testified that Ms. He --

3  you were asked a number of questions about Ms. He's control

4  over different facets of the company.

5       Do you remember that?

6  **A.**   Yes.

7  **Q.**   And with respect to each of those questions that Ms. Green

8  repeatedly asked you, you said Ms. He was in complete control.

9       Do you remember that?

10  **A.**   Ruthia always had the final say, yes.

11  **Q.**   Yeah.  The question that she was asking about was control.

12       Do you remember that?

13  **A.**   Yes.

14  **Q.**   Okay.  With respect to your provider -- your area, you

15  were put in charge of both provider recruiting, correct, as

16  well as provider management; isn't that right?

17  **A.**   Yes.

18  **Q.**   Okay.  And with respect to some of the procedures that you

19  put in place for provider management -- let's put it this way:

20       Ruthia was -- there were a lot of different portions of

21  this company; is that right?  It had a lot of different

22  operations?  There were a lot of different people that worked

23  at Done?

24  **A.**   No, no.  She -- it was a matter of pride that there were

25  only 10 people there.  Ruthia was very proud of that.

1    Q.    Okay.  There were --

2    A.    And the care team in the Philippines.  But -- yeah.

3    Q.    Sure.  Okay.

4          With respect to your area of supervision, provider

5    management, I am correct, am I not, that Ms. He expected you to

6    come up with your own processes for how to run your area of

7    provider management; isn't that right?

8    A.    With her approval.  We -- I would have to go to her for

9    approval, and she would either approve it or not approve it,

10   but it was definitely at her direction.

11   Q.    Okay.  And in many times, she was unaware of what

12   processes you were putting in place with respect to the

13   management of providers; is that correct?

14   A.    That is not correct, no.

15   Q.    Okay.  I'm going to show you -- well, withdrawn.

16         Let's actually move on.

17         So you testified regarding questionnaires that were put in

18   place that you testified were important safeguards.

19         Do you recall that?

20   A.    Yes.

21   Q.    And let's talk about what those were.

22         One was called the ASRS; is that right?

23   A.    The SRS, yes.

24   Q.    That is the ADHD self-reporting scale; is that right?

25   A.    Yes.

1   Q.   Okay.  And that is a scale that provides information to

2   providers that they can utilize to the extent they, in their

3   judgment, think it's important in assessing whether or not a

4   patient has ADHD once they see the patient; correct?

5   A.   It screens for possibility of having ADHD, increased

6   probability.

7   Q.   Okay.  And it is not something that was only utilized at

8   Done; the ASRS is utilized commonly among mental health

9   professionals as well as primary care physicians and

10  pediatricians.

11       You understand that, do you not?

12  A.   It's pretty standard practice for -- I don't know about

13  primary care, but pediatricians and psychiatrist and

14  psychiatric providers.

15  Q.   Okay.  And there are two section of it the ASRS A and the

16  ASRS B; is that correct?

17  A.   That is correct.

18  Q.   And the ASRS is shorter and the ASRS B is longer; is that

19  right?

20  A.   Slightly longer, yeah.

21  Q.   Are you familiar with studies that have reflected that the

22  ASRS A is a better indicator of whether somebody has ADHD than

23  the ASRS B?  Are you aware?

24  A.   Citation, please.

25  Q.   Okay.  Well, have you reviewed an article entitled "The

1  World Health Organization Adult ADHD Self-Report Scale:  A

2  Short Screen Scale for Use in the General Population"?

3      Are you familiar with that study?

4  **A.**   What's the publication and year?

5  **Q.**   It is January 21, 2005.  And do you recall it's stating

6  that in light of the evidence that the six-question ASRS

7  screener outperforms the full ASRS; the six-question ASRS

8  screener seems to hold more promise than the full --

9      **THE COURT:**  I think the witness wanted to know what

10  the source was.  What is the --

11      **MR. SCHACHTER:**  Sure.

12      **THE COURT:**  -- study.

13      **MR. SCHACHTER:**  Sure.

14  **BY MR. SCHACHTER:**

15  **Q.**   Are you familiar with an article in Psychological Medicine

16  entitled "The World Health Organization Adult ADHD Self-Report

17  Scale:  A Short Screening Scale for Use in the General

18  Population," authored by Ronald C. Kessler of Harvard Medical

19  School, Olga Demler of Harvard Medical School, Leonard Adler of

20  NYU Langone Medical Center, and Kristina Secnik Boye from Eli

21  Lilly?

22      Are you familiar with that article?

23  **A.**   Is it a study or is it an op ed?

24  **Q.**   Would you like to look at it?

25  **A.**   Yeah, yeah, I would.

```
 1            MR. SCHACHTER:  May I have a moment, Your Honor?

 2       May I approach?

 3                 (Counsel approaches witness.)

 4  BY MR. SCHACHTER:

 5  Q.   Let us know when you've familiarized yourself with it.

 6  A.   (Witness examines document.)

 7                 (Pause in proceedings.)

 8            THE WITNESS:  Okay.  Yeah.

 9  BY MR. SCHACHTER:

10  Q.   Does this appear to be an article or an op ed?

11  A.   It's a study, yes.

12  Q.   It is a study?

13  A.   Yes.

14  Q.   And you understand one of authors of the study,

15  Dr. Leonard Adler, to be one of the foremost experts in ADHD in

16  the world?  Do you understand that?

17       If you don't, that's okay.

18  A.   I actually recognize Kessler more so than Adler, but yes.

19  Q.   Okay -- sorry.

20       And without -- I'll just ask --

21            MR. SCHACHTER:  Just a moment, Your Honor.

22                 (Pause in proceedings.)

23                 (Defense counsel conferring.)

24  BY MR. SCHACHTER:

25  Q.   And do you understand that Dr. Kessler and Dr. Adler wrote
```

1  that (as read):

2          "The unweighted screener should be preferred to

3      the full ASRS both in community surveys and in

4      clinical outreach and case finding initiatives"?

5          **MS. GREEN:**  Objection, foundation.  Could we establish

6  the witness has seen this before we continue?

7          **THE WITNESS:**  I have not seen this, no.

8          **MR. SCHACHTER:**  Okay.  We'll move on, Your Honor.

9  **BY MR. SCHACHTER:**

10 **Q.**  Okay.  We can put that aside.

11     All right.  So now we're talking about these

12 questionnaires that Done utilized.

13     One was the ASRS; correct?

14 **A.**  Yes.

15 **Q.**  Okay.  And you also testified that there are two other

16 questionnaires which can be utilized to help a medical provider

17 assess whether or not someone suffers from depression or

18 suffers from generalized anxiety disorder; is that right?

19 **A.**  Yes.

20 **Q.**  One is called the PHQ-9; correct?

21 **A.**  Yes.

22 **Q.**  That one's for depression?

23 **A.**  Yes.

24 **Q.**  One's called the GAD-7, and that's for anxiety; correct?

25 **A.**  Correct.

1  Q.   All right.  You recall that it was actually Ms. He that

2  wrote to you about the research that she had done into the

3  usefulness of these questionnaires a couple months into your

4  tenure; is that correct?

5  A.   That Ruthia had some research?

6  Q.   Yeah.

7  A.   No.

8         MR. SCHACHTER:  Okay.

9      Your Honor, we'll offer Defense Exhibit 6649, a

10  communication between Ms. Bowen and Ms. He.  And we'll offer

11  it, Your Honor.

12         THE COURT:  Okay.  Admitted.

13      (Trial Exhibit 6649 received in evidence.)

14         MR. SCHACHTER:  Thank you, Your Honor.

15  BY MR. SCHACHTER:

16  Q.   Okay.  Okay.  Here Ms. He is sending to you -- do you see

17  your name, Kristin, at the bottom?

18  A.   Yes.

19  Q.   And she's sending you some readings about the diagnostic

20  criteria (as read):

21         "Here are research papers about the validity of

22      ASRS to diagnose ADHD."

23      Do you sue that?

24  A.   Yes.

25  Q.   And then she also forwards to you an article, and she

1  writes (as read):

2        "Here is one for PHQ-9 for depression and GAD-7

3     for anxiety as a reference."

4     Do you see that?

5  A.   Yes.

6  Q.   Okay.

7        MR. SCHACHTER:  You could take those down,

8  Mr. Cepregi.

9  BY MR. SCHACHTER:

10 Q.   Now -- and I think we had saw your high five at the

11 bottom?

12 A.   Yes.

13 Q.   Okay.  Very good.

14    Now, the prosecutor asked you were you aware -- this is

15 yesterday (as read):

16        "Were you aware of Ms. He taking action that

17     reduced safety for Done members?"

18     Do you recall that question?

19 A.   Yes.

20 Q.   You gave one example.  You said that (as read):

21        "At some point, Ruthia shortened the intake

22     questionnaire" -- hold on one second.  Let me get it

23     exactly right.

24     You said (as read):

25        "So, for example, we had members or, you know,

1            patients would fill out the PHQ-9, which screens for

2            depression, possible depression, the GAD-7, which

3            screens for possible anxiety, which these are

4            conditions that could mimic symptoms of ADHD, and

5            then one day we just started getting providers coming

6            to us saying they're not in there."

7            Do you recall that?

8    A.    Yes.

9    Q.    Okay.  And then what happened, I think you described, is

10   that you and others met with Ms. He.

11           Do you recall that?

12   A.    That we met with her?

13   Q.    Yes.  You described a discussion in which people tried to

14   convince her of the necessity of having the PHQ and the GAD-7

15   to be mandatory.

16           Do you recall that?

17   A.    Our daily standup, yes.

18   Q.    Daily standup.  Thank you.

19           And in that discussion, you and the others explained the

20   reasons why this depression questionnaire and this anxiety

21   questionnaire had to be a mandatory part of the intake process;

22   is that right?

23   A.    Yes.

24   Q.    Okay.  That's because the -- the group was communicating

25   that this information is useful to providers in making an

1  initial evaluation of a patient; is that right?

2  **A.**   Yes.  We were sharing the feedback we received from our

3  providers.

4  **Q.**   Okay.  And Ms. He -- you recall pushing back?

5  **A.**   Yes -- yes.

6  **Q.**   Okay.  And let me just ask you:  In your experience

7  working with Ms. He, you found her to be difficult; fair to

8  say?

9  **A.**   Yes.

10 **Q.**   You found her to be stubborn?

11 **A.**   I -- stubborn, I guess, yes.  I guess that would work.

12 **Q.**   Okay.  The fact of the matter is that after hearing your

13 reasons in that meeting, Ms. He almost immediately reinstated

14 the depression and anxiety questionnaires as a mandatory part

15 of the intake process; isn't that correct?

16 **A.**   No, I don't believe that's correct.

17 **Q.**   Okay.  The prosecutor showed you Exhibit 356, in evidence.

18         **MR. SCHACHTER:**  And if we may display that for the

19 jurors.

20 **BY MR. SCHACHTER:**

21 **Q.**   This is May 14, 2021, and this is a communication that

22 Ms. Green asked you about.

23         Do you remember that?

24 **A.**   Yes.

25 **Q.**   And she had you read Dr. Brindala's response (as read):

1    "I have had this conversation with her.  She

2    will not change her mind."

3    Do you see that?

4        **MR. FOSTER:**  Mr. Schachter, I don't believe the jury

5    has it.

6        **MR. SCHACHTER:**  Oh, thank you.  I apologize.

7    Your Honor, may we display it for the jury?

8        **THE COURTROOM DEPUTY:**  356 or 355?

9        **MR. SCHACHTER:**  356.

10    Thank you.

11   **BY MR. SCHACHTER:**

12   **Q.**   Do you remember -- oh.

13    Do you remember Ms. Green asking you about this?

14   **A.**   Yes.

15   **Q.**   Okay.  And she had you read Dr. Brindala saying "She will

16   not change her mind"; right?

17   **A.**   Yes.

18   **Q.**   And then you wrote (as read):

19        "This was -- that was readily apparent after an

20        hour of 10 people trying to reason with her

21        disappointed."

22    Do you see that?

23   **A.**   Yes, I do.

24   **Q.**   Okay.  This was May 14, 2021.  I have checked.  That is a

25   Friday.  I suppose you don't have a recollection whether

1    May 14, 2021, was a Friday or not --

2    **A.**   No, I do not.

3    **Q.**   Okay.  The fact of the matter is --

4         Well, let me also show you Exhibit 359.

5              **MR. SCHACHTER:**  And if we may display that for the

6    jurors.  It's in evidence.

7    **BY MR. SCHACHTER:**

8    **Q.**   This is a calendar invite which the prosecutor showed you

9    for a discussion -- "Intake forms discussion meeting May 17,

10   2021, 2:30 to 3:00 p.m. Pacific."

11        Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   And I guess -- does that mean that you're the one that

14   sent out that invitation?

15        Doesn't matter.  Never mind.

16   **A.**   No, it's from Michell.

17   **Q.**   Okay.  In any event, you had a discussion with Ms. He on

18   that day -- ah, it says Monday.  Monday, May 17th.

19        Do you see that?

20   **A.**   Yes.  9:30 p.m.?

21   **Q.**   Yeah.  Anyway, do you see where it says "Monday, May 17th"

22   on the subject?

23   **A.**   Oh, I see.  Yes, there.  Okay.

24   **Q.**   Okay.  The fact of the matter is that on that very same

25   day, May 17, 2021, Ruthia He asked the engineers to make the

1    depression and anxiety questionnaires a mandatory part of the

2    intake process; isn't that correct?

3    **A.**    I don't recall that, no.

4    **Q.**    I'm going to show you --

5            **MR. SCHACHTER:**  Your Honor, we will offer what we've

6    previously provided to the Government as Exhibit 6275 and

7    6275 T because it's in Mandarin, a translation of that

8    document, between Ms. He and a Mr. Jason Leng, and we will --

9    dated May 17, 2021.

10           We'll offer it, Your Honor.

11           **MS. GREEN:**  Objection, foundation.  I don't believe

12    Ms. Bowen is on this document.

13           **MR. SCHACHTER:**  Your Honor, we are offering this to

14    impeach because it is inconsistent --

15           **THE COURT:**  Well, how does it impeach her?

16           **MR. SCHACHTER:**  It is inconsistent with the witness's

17    testimony that the change was not made that very day.

18           **THE COURT:**  So you're -- but you are introducing this

19    for the truth of the matter; right?  So why isn't it --

20           **MR. SCHACHTER:**  It is a direction, Your Honor.  It is

21    not capable of being true or false.

22           **THE COURT:**  I will allow it.

23           **MR. SCHACHTER:**  Thank you, Your Honor.

24           **THE COURTROOM DEPUTY:**  Admitted?

25           **MS. GREEN:**  She's testified she did not recall this

1  being made mandatory again, and this document does not impeach

2  her on that because she's not on it.

3          THE WITNESS:  And it wasn't made mandatory.

4          THE COURT:  I'm sorry.  What do you want me to read on

5  this document?

6          MR. SCHACHTER:  Sure, Your Honor.

7      Ms. He's direction, which is not hearsay, to Jason Leng on

8  May 18, 2021, 1:49 a.m.

9          THE COURT:  Okay.  So it's admitted, and the witness

10  can explain.

11      (Trial Exhibits 6275 and 6275 T received in evidence.)

12          MR. SCHACHTER:  Thank you.

13          MS. GREEN:  Objection, foundation.  She hasn't seen

14  this document, Your Honor.

15          THE COURT:  I understand that, but the question -- I

16  think this -- I think she said she was not unaware -- she was

17  not aware of this command.  Okay.  All right.

18          MR. SCHACHTER:  If we may display it for the jurors?

19  BY MR. SCHACHTER:

20  Q.  Do you see where at 1:49, it's time-stamped May 18th at

21  1:49 a.m.  That would be a few hours from your meeting on

22  May the 17th; is that correct?  Some number of hours?

23  A.  Yes.

24          THE COURT:  1:49?

25          MR. SCHACHTER:  A.m.

 1          **THE COURT:**  Right, like a quarter of two in the

 2  morning?

 3          **MR. SCHACHTER:**  It may be a -- it may be a Chinese

 4  time stamp, Your Honor.

 5  **BY MR. SCHACHTER:**

 6  **Q.**   Do you see Ms. He saying --

 7       By the way, did you know Jason Leng -- oh, yeah.

 8          **MR. SCHACHTER:**  Actually, can we side-by-side -- this

 9  is the translation.  Can we side-by-side 6275.  Mr. Cepregi?

10  6275 and 6275T.  6275 is a different document.

11       Okay.  In any event, let's look at 6275T while we're

12  pulling up 6275.

13          **THE COURTROOM DEPUTY:**  So if we use the ELMO --

14          **THE COURT:**  What is 6275?

15          **MR. SCHACHTER:**  Can I display 6275 on the Elmo?

16                    (Pause in proceedings.)

17          **MR. SCHACHTER:**  Let's start with 6275 T, which is the

18  translation, the one you have up here.

19                    (Pause in proceedings.)

20  **BY MR. SCHACHTER:**

21  **Q.**   Okay.  And if we could focus on page 2, middle.  Do you

22  see where Ms. He writes (as read):

23          "Could you do two favors for the provider team?

24       First, make the question PHQ-9/GAD-7 mandatory.

25       Currently, if the answer to the previous question, do

 1          you have depression/anxiety, is no, the question

 2          PHQ-9/GAD-7 will be skipped.  Only when the answer to

 3          the previous question is yes, the respondent can move

 4          on to the next question.  We can remove the previous

 5          question."

 6          Do you see that?

 7   A.    Yes, I do.

 8   Q.    Okay.  And what happened was that if the prospective

 9   patient answered a question that was a little bit longer, but

10   it said "Do you have depression or anxiety" and the person said

11   "no," then they would not be directed to respond to the

12   depression or anxiety questionnaire; is that correct?

13   A.    Correct, yes.

14   Q.    Okay.  And so the objection was that shouldn't take place;

15   this should be mandatory information provided by the patients

16   in their intake questionnaire, so no matter what, the provider

17   is able to get that information; correct?  That was the -- that

18   was your objection and others'?

19   A.    Yes.

20   Q.    Okay.  And that was communicated to Ms. He; correct?

21   A.    Yes.

22   Q.    That it should be mandatory; correct?

23   A.    Yes.

24   Q.    And here, Ms. He --

25          By the way, did you understand Jason Leng to be in

1   engineering at Done?

2   **A.**   Yes.

3   **Q.**   Okay.  And here, Ms. He is telling Mr. Leng in engineering

4   make the question PHQ-9/GAD-7 mandatory.

5        Do you see that?

6   **A.**   Yeah, I do, but it never happened.

7   **Q.**   Okay.  Never happened?  That's your testimony?

8   **A.**   Yes.

9   **Q.**   Okay.

10  **A.**   We continued to get complaints from providers.

11  **Q.**   Okay.  We'll come back to that?

12           **MR. SCHACHTER:**  If I can first just show, Your Honor,

13  6275.  Do we have that?  We have it on this screen, I believe.

14  If we may display 6275?

15           **THE COURTROOM DEPUTY:**  Okay.

16           **MR. SCHACHTER:**  Okay.

17           **MS. GREEN:**  Same objection.

18       And can I see 6275, Mr. Schachter?

19           **MR. SCHACHTER:**  Sure.  How's your Mandarin?

20           **MS. GREEN:**  Not good, as I don't think Ms. Bowen's is

21  either.

22       Foundation.  This is -- and hearsay.  This is another

23  Chinese document that Ms. Bowen isn't on.

24           **MR. SCHACHTER:**  It's the same document.

25           **THE COURT:**  But you see -- I'm going to deal with it

1    is ask the witness a question.

2        You say that this never happened, that it was not made

3    mandatory?

4            **THE WITNESS:**  That's correct.

5            **THE COURT:**  And what is the basis for that opinion?

6            **THE WITNESS:**  Because --

7            **THE COURT:**  What is your basis for believing that it

8    did not happen?

9            **THE WITNESS:**  Because we continued to receive feedback

10   from the providers that those questionnaires were not being

11   filled out by the patients ahead of the appointments.

12           **THE COURT:**  Did you receive this feedback subsequent

13   to the date of May 18th, the date that purports to make them

14   mandatory?

15           **THE WITNESS:**  Yes, we did.

16           **THE COURT:**  Okay.  Let's move on.  Let's move on.

17       This is the difficulty of documents without a proper

18   foundation.  I want you to understand that.

19       But let's move on.

20           **MR. SCHACHTER:**  Okay.  Your Honor, just to clarify

21   this, may we -- we will now offer 6362, a communication to

22   Ms. Bowen about making the GAD-7 -- "pushing to production a

23   new feature to require these questionnaires on intake" sent to

24   Ms. Bowen on June 11th.  We'll offer 6362.

25           **THE COURT:**  6362.  Okay.  I'll allow it.  Admitted.

1          (Trial Exhibit 6362 received in evidence.)

2              MR. SCHACHTER:  Ladies and gentlemen, can you see it?

3              THE COURT:  I'm sorry.  Where is the reference?

4              MR. SCHACHTER:  Sure.

5      BY MR. SCHACHTER:

6      Q.    Ms. Bowen, do you see that you're a required attendee?

7            Do you see that?

8      A.    Yes, I see it.

9      Q.    And it says (as read):

10              "New features ready to be pushed to production,"

11           and it lists a number of features.

12           Do you see that?

13     A.    Yes.

14     Q.    And do you see that one of them is "GAD-7/PHQ-9 required

15     on intake"?

16           Do you see that?

17     A.    Yes.

18     Q.    All right.

19             MR. SCHACHTER:  You can take that down.

20           Okay.  All right.  One last one.

21           Just to clarify, Your Honor, we'll offer 6276 very

22     quickly.

23             THE COURT:  I'll reserve judgment.

24             MR. SCHACHTER:  May we display it, Your Honor?

25             THE COURT:  I'll address it later.  6276?

1          MR. SCHACHTER:  Yes, Your Honor.

2          THE COURT:  It's not the translation?

3          MR. SCHACHTER:  No, Your Honor.  It's a communication

4  sent to Ms. Oliver on June 14, 2021.

5          THE COURT:  Okay.  Let me look at it.

6                  (Pause in proceedings.)

7          THE COURT:  Okay.

8  BY MR. SCHACHTER:

9  Q.   Do you see where -- it's come from Dennis Lamb.

10      Do you see that?

11 A.   Yes.

12          MR. SCHACHTER:  Ladies and gentlemen, are you able to

13 see it?

14      May we display for the jurors, Your Honor?

15          THE COURTROOM DEPUTY:  Is it admitted.  Is it

16 admitted, Judge?

17          THE COURT:  Yes, admitted.

18      (Trial Exhibit 6276 received in evidence.)

19          THE COURTROOM DEPUTY:  Thank you.

20 BY MR. SCHACHTER:

21 Q.   This is June 14, 2021.  Do you see that?

22 A.   Yes, I see that.

23 Q.   This is an Asana task, is it not?

24 A.   Yes.

25 Q.   The task is entitled "Make PHQ-9 and GAD-7 mandatory for

1    all patients to complete before first appointment."

2        Do you see that?

3    **A.**   Yes, I see is that.

4    **Q.**   Do you see where it says "Dennis Lamb completed this

5    task"?

6    **A.**   Yes.

7            **MR. SCHACHTER:**  All right.  You may take it down,

8    Mr. Cepregi.  Thank you.

9        Let's move on.

10   **BY MR. SCHACHTER:**

11   **Q.**   I believe that you testified that providers thought it was

12   important for them to be able -- some providers thought under

13   some circumstances it was important to be able to order urine

14   drug tests on patients; is that correct?

15   **A.**   Yes.

16   **Q.**   I am correct that providers would ask you about whether

17   and how they can order urine tests.

18       Do you recall that?

19   **A.**   Yes.

20   **Q.**   And you told them that they could order the urine tests

21   and told them how.

22       Do you recall that?

23   **A.**   I believe I may have told them that the patient could go

24   to their primary care doctor or could go to Quest Labs.  I

25   think that was what we told them.

1  Q.   And you also told them that most providers do not need a

2  urine drug test; is that correct?

3  A.   I may have said that at the time, yes.

4       **MR. SCHACHTER:**  Your Honor, we'll offer 6651, which is

5  a communication from Ms. Bowen to a provider in which that is a

6  subject.

7       **THE COURT:**  Admitted.

8       (Trial Exhibit 6651 received in evidence.)

9  BY MR. SCHACHTER:

10 Q.   Here, Ms. Bowen, a provider says to you (as read):

11      "I would like to know if we do urine tests for

12      clients on stimulants."

13      Do you see that?

14 A.   Yes.

15 Q.   You wrote (as read):

16      "We don't administer any kind of laboratory

17      testing ourselves, but the care team can help you

18      order one through a lab service if you feel that the

19      patient needs one.  Just put the request in the Your

20      Slack support channel.

21      "That being said, most of our providers do not

22      order a UDS unless there is a reasonable suspicion of

23      substance abuse or diversion (though diversion can be

24      difficult to judge by UDS results, since amphetamines

25      have such a short half-life).  However, it is up to

BOWEN - CROSS / SCHACHTER

1      your clinical judgment what you feel is the best

2      diagnostic and treatment approach

3          "Hope that helps answer your question."

4      Do you see that?

5  **A.**   I do, yes.

6  **Q.**   Okay.  And just to quickly -- when you say that diversion

7  can be difficult to judge by UDS results because amphetamines

8  have a short half-life, what you mean is that amphetamines --

9  in other words, evidence of Adderall or some other

10  amphetamine-based medication, does not last in the urine for

11  very long?

12  **A.**   Yes, that's true.

13  **Q.**   Okay.  Thank you.

14  **A.**   Relatively speaking.

15  **Q.**   Thank you.

16      Another very quick question.  I believe you testified on

17  direct that a dosage can be based -- a dosage can be based on a

18  patient's weight.

19      Did you testify to that?

20  **A.**   No.  And I -- I mean, I know what I clinically know now.

21  I can't testify -- I don't remember what I clinically knew

22  then, but I know now it's not.

23  **Q.**   It's not.  And, in fact, you knew that then, didn't you,

24  and you would tell others at Done that the amount -- the size

25  of the dosage to a patient is not, in fact, based on their

1  weight; correct?

2  **A.**   If I said that back then, I was not qualified to say it,

3  unfortunately.

4  **Q.**   But you -- but if you said it, you would have been right?

5  **A.**   If I had said it, it would have been right?

6       When it comes to stimulant medication, it is not

7  weight-based.

8  **Q.**   It's not weight-based.  Thank you.

9  **A.**   Not always.

10  **Q.**   Does it have to do more with how an individual person --

11  how their blood moves through their body?

12  **A.**   The metabolism, their CYP450 enzymes.

13  **Q.**   So somebody who is actually very small may need, under

14  some circumstances, a higher dosage of a stimulant medication

15  than someone who is physically large?

16  **A.**   Typically children are the ones that require higher

17  dosages because they have a higher metabolism.

18  **Q.**   I see.  Okay.

19       But in any event, it's not based on one's physical size;

20  it's based on their metabolism?

21  **A.**   This is true, yes.

22  **Q.**   Okay.  Thank you.

23       All right.  Next topic.

24       You testified about Erin Kim.  Do you recall Ms. Green

25  asking you a number of questions about her?

1  **A.**    Yes, I do.

2  **Q.**    Okay.  And you testified, I believe, about how Ms. He

3  thought that Erin Kim was a great and important provider; is

4  that right?

5  **A.**    I'm sorry.  Say again.

6  **Q.**    Sure.  I believe you testified, to summarize, that Ms. He

7  would say that Erin Kim is a -- is a terrific and productive

8  provider?

9  **A.**    I feel like she -- yeah, she held her in high esteem.  I

10  mean, she knew her name, so -- which was -- we had a lot of

11  providers, so she was recognizable to Ruthia.

12  **Q.**    Mm-hmm.  At some point she was.  But, in fact, you are the

13  one that told Ms. He that in your opinion, she was a stellar

14  provider, did you not?

15  **A.**    I thought she was, yes.

16  **Q.**    Okay.  And you were the one who hired Erin Kim; is that

17  right?

18  **A.**    Oh, no.  I think Erin Kim was already on the platform.  I

19  mean, I can't be certain, but I feel like she already was.  I

20  don't remember interviewing her at all.

21  **Q.**    Okay.  In fact, do you remember that when you first had

22  conversations with Ms. He about Erin Kim, Ms. He was unfamiliar

23  with her?  Do you remember that?

24  **A.**    With Erin -- no, no.  She was familiar with Erin.

25  **Q.**    Okay.  I'm going to ask you about an issue that came up

1  with respect to Ms. Kim.

2      Do you recall that there was a point in time where you had

3  a discussion with Ms. He about Erin Kim needing a collaborative

4  physician in order to prescribe medication in certain states?

5  **A.**  Because she was expanding to new states.

6  **Q.**  Right, that she was getting licenses in other states and

7  would need a collaborative physician.

8      Do you remember that topic of discussion?

9  **A.**  I don't, but I believe that it happened, because I do

10 remember her expanding to other states.

11 **Q.**  Okay.  And you would use a service called Collaborating

12 Docs that would help nurse practitioners find collaborating

13 physicians for a fee.

14     That was their business; right?

15 **A.**  Yes, that's correct.

16 **Q.**  Okay.  And there came a point in time where you spoke to

17 Ruthia about paying the fee to Collaborating Docs to find a

18 collaborative physician for Erin Kim in certain states.

19     Do you remember that?

20 **A.**  Yes, that sounds familiar.

21 **Q.**  Okay.  I'm going to show you what -- you said that you

22 didn't recall that Ms. He was unfamiliar with Erin Kim and that

23 you told her about her, but I'm going to show you what we've

24 identified as 6281, a communication between you and Ms. He

25 about Erin Kim and about this issue that we just discussed?

1          MR. SCHACHTER:  We'll offer it, Your Honor.

2          THE COURT:  6281 admitted.

3       (Trial Exhibit 6281 received in evidence.)

4   BY MR. SCHACHTER:

5   Q.   Okay.  You see here you wrote to Ms. He (as read):

6          "Erin Kim has been with us since the end of

7       January.  She works more hours than any other

8       provider, has never had a review less than four

9       times" --

10      I think you might have meant stars, four stars?

11  A.   Oh, yes.  Yeah, that sounds right.

12  Q.   Stars?

13  A.   Yes.

14  Q.   Okay.  Fine.  Thank you.

15      (as read):

16          "Responds quickly on Slack, and she signed a

17      one-year sign-on bonus, so she will be with us for a

18      while.  She also takes up quite a lot of the hours in

19      Florida, so opening her up to two other states will

20      allow the other providers to use more of their

21      availability."

22      And Ms. He responds (as read):

23          "Got it.  That context is helpful."

24      Do you see that?

25  A.   Yes.

1    **MR. SCHACHTER:**  And if you can just zoom out, because

2    I want to just to be able to see the document.  If we can go

3    down just so Ms. Bowen can see the context.

4    **BY MR. SCHACHTER:**

5    **Q.**   If you look at it closely, do you recall that the

6    discussion that's being had is about whether Done should pay

7    Ms. Kim's fee to have a collaborating doctor?

8    **A.**   Yes.

9         **MR. SCHACHTER:**  Okay.  You can take that down.

10   **BY MR. SCHACHTER:**

11   **Q.**   Now you testified, I believe, that -- when Ms. Green was

12   asking you questions that you told Ruthia that you were

13   concerned about Erin Kim's appointment times?

14   **A.**   That was much later, though, yes.

15   **Q.**   Okay.  But that's -- that's what you're saying, that you

16   are the one that brought a concern to Ms. He's attention about

17   how long Ms. Kim was spending with patients?

18   **A.**   Oh, no.  I think the care team brought it up.  I think the

19   care team brought up the review that the patient had left.  And

20   I can't remember the exact logistics of who brought it up when,

21   but it came to the attention that patient had left a negative

22   review or reached out to the care team and had complained.  It

23   was something along those lines.

24   **Q.**   Right.  Do you recall that it was Ms. He that brought to

25   your attention her concern about Ms. Kim not spending enough

 1  time with patients?

 2  **A.**   She was concerned about the complaint that the patient had

 3  left.

 4  **Q.**   All right.

 5          **MR. SCHACHTER:**  Your Honor, we will offer

 6  Exhibit 6318, a communication between Ms. Bowen and Ms. He

 7  about this matter and who was concerned about Erin Kim's

 8  appointment times.

 9       That's page 3, Mr. Cepregi.

10          **THE COURT:**  6318 admitted.

11       (Trial Exhibit 6318 received in evidence.)

12          **MR. SCHACHTER:**  Thank you, Your Honor.

13  **BY MR. SCHACHTER:**

14  **Q.**   Now, do you recall that well before you and Ms. He had

15  conversations directly about Erin Kim that Ms. He asked you to

16  look into complaints that providers were not spending enough

17  time with patients?

18       Do you remember that?

19  **A.**   Do I remember her asking me to look into it?

20  **Q.**   Correct.

21  **A.**   I don't specifically remember that, but I know it was

22  something that -- it was a concern and I was asked to look into

23  it.  Or maybe I volunteered to look into it.  I don't remember.

24  **Q.**   Okay.  Well, here, Ms. He is communicating to you, and

25  this is in May.  You started in February, so this is about

1  three months into your tenure?

2  **A.**   Yes.

3  **Q.**   And she rights (as read):

4         "How about the ones like the provider only shows

5         up for five minutes of the appointment?"

6  You respond (as read):

7         "I was thinking about that too.  I have to see

8         if there's a way" --

9  Oh, I'm sorry.

10  Ms. He, again, asks you --

11  This is because you're in charge of provider management;

12  is that correct?  Do you understand that why she's directing

13  this question to you?

14  **A.**   Yes.

15  **Q.**   Okay.  And she writes (as read):

16         "Also for replying to provider below four-star

17         reviews, right now is care team working on it or not

18         or can ask them to review first and escalate."

19  And then she says (as read):

20         "How about the ones like the provider only shows

21         up for five minutes of the appointment?"

22  You write (as read):

23         "I was thinking about that too.  I have to see

24         if there's a way to verify the length of the

25         appointment from the Doxy data.  Otherwise, the

1          provider will just claim that they spent a full 25

2          minutes with the patient."

3          And Ms. He responds to you.  (as read):

4              "There is.  We can use their Doxy account to log

5          in and check the history log."

6          **MR. SCHACHTER:**  And if we can just see also below

7    that, Mr. Cepregi.

8    **BY MR. SCHACHTER:**

9    **Q.**   She writes (as read):

10             "I know we can do it unless we no longer help

11         them create Doxy account."

12         Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   So Ms. He is asking you about providers that are -- where

15   there's been complaints from patients that they're not

16   spending -- they're spending a very short time with patients,

17   and she is asking you to look into it; correct?

18   **A.**   Yes.

19   **Q.**   And you say you don't even know if there's a technological

20   way to do that; right?

21   **A.**   Right.

22   **Q.**   And Ms. He says, "Sure, there is.  You can -- as long

23   as -- she doesn't seem to know, but she seems to say if we are

24   still helping them create their Doxy account, then we can use

25   that account to log in and check the history log.

1         Do you see that?

2    **A.**    Correct.

3    **Q.**    Okay.  Now, you did not do anything about this after

4    Ms. He asked you to look into it; is that corrected?

5    **A.**    What?  No, I most definitely did.

6    **Q.**    Okay.  About a month later, Ms. He heard about a two-star

7    reviewed that had come in from a patient about Erin Kim.

8         Do you remember that?

9    **A.**    Yes.  I don't know what the -- how long after -- I don't

10   know about the timing.

11   **Q.**    Okay.

12         **MR. SCHACHTER:**  Your Honor, we'll offer Defense

13   Exhibit -- I'm sorry -- Exhibit 6282, which is a communication

14   between --

15         **THE COURT:**  6282 admitted.

16         (Trial Exhibit 6282 received in evidence.)

17         **MR. SCHACHTER:**  Thank you, Your Honor.

18   **BY MR. SCHACHTER:**

19   **Q.**    Do you see this communication between you and Ms. He?

20   **A.**    Yes.

21   **Q.**    Okay.  And you see that topic of this communication is

22   "Complaint about Erin Kim"?

23         Do you see that?

24   **A.**    Yes.

25   **Q.**    All right.  Now, Ms. He writes to you on June 19, 2021.

1    Do you see that?

2  **A.**    Yes.

3  **Q.**    Okay.  And that's about a month -- that's more than a

4  month after the last communication we saw on May 8th where

5  Ms. He asked you to look into issues with providers not

6  spending enough time with patients.

7    Do you recall that?

8  **A.**    And we did.  That's when we started looking through all

9  the different -- because providers would change their account

10  passwords for Doxy, so that's when we did the big memo looking

11  at all the different platforms we could possibly get to do

12  analytics.

13  **Q.**    We're going to look into that.

14    Okay.  Ms. He writes to you.  She forwards a complaint

15  about Erin Kim; is that right?

16  **A.**    I'm guessing yeah.  This was forwarded from Ruthia.

17  **Q.**    Okay.  She writes (as read):

18    "The appointment was only" --

19    Let's look at the complaint.

20    Erin Kim (as read):

21    "My clinician was late seven or eight minutes

22    and talked to me only for another seven or eight

23    minutes.  I felt afterwards like I paid $200 for

24    someone to give me Adderall.  I was told that

25    Adderall was my only option basically because the

1        only other option is Vyvanse and my insurance

2        wouldn't pay for that yet.  I've never taken a

3        stimulant before.  I was allowed to choose my dosage.

4             "I didn't feel like my clinician was engaged in

5        me as a person and my psychiatric needs.  I don't

6        know if all of this is her problem or the problem of

7        Done.  I was informed I probably shouldn't need to

8        speak with her again, only send messages monthly for

9        refills."

10       Do you see that?

11   A.  Yes, I do.

12   Q.  Okay.  And Ms. He, when she forwards this to you, does not

13   say "High five, great, this is exactly what I want, patients

14   who only -- providers who only spend seven to eight minutes,"

15   does she?

16   A.  No.

17   Q.  Instead, she writes (as read):

18            "The appointment was only seven to eight minutes

19       long and was seven to eight minutes late?  That

20       sounds concerning."

21       Was that what Ms. He wrote to you?

22   A.  Yes.  That was -- appeared to be her only concern.

23   Q.  And then can you please read your response to Ms. He in

24   June of 2021.

25   A.  (as read):

1              "Erin Kim is normally a stellar provider.

2       Unfortunately, without a videoconferencing tool that

3       can show us how long the appointment lasted, there's

4       no way to verify this patient's report.  We can try

5       and ask Erin about this review on Monday."

6  Q.    Okay.  So what you are saying now, more than a month after

7  Ms. He told you that you can simply log on to Doxy and check

8  the providers' logs, you are saying (as read):

9              "Unfortunately, without a videoconferencing tool

10       that can show us how long the appointment lasted,

11       there's no way to verify the patient's report."

12       That's what you wrote, correct?

13  A.    And that still holds true.

14  Q.    Does it?

15  A.    It does.

16  Q.    Are you aware, Ms. Bowen, that shortly after your

17  departure, they switched -- Done switched from Doxy to Zoom so

18  that they would be able to assess how long the provider was

19  spending with the patient?

20          MS. GREEN:  Objection, foundation and argumentative.

21          THE COURT:  Sustained.

22          MR. SCHACHTER:  Withdrawn.

23  BY MR. SCHACHTER:

24  Q.    All right.  Anyway, after you say there's no way to verify

25  the patient he's report, can you please read aloud what Ms. He

**BOWEN - CROSS / SCHACHTER**

1   says.

2   **A.**   (as read):

3         "We need to collect every provider's Doxy

4   account -- it shouldn't be hard since we helped them

5   create it -- and log in to check logs.  But most of

6   them change their passwords."

7   Do you want me to keep reading?

8   **Q.**   I'm sorry.  I didn't see that.

9   **A.**   No, that's my --

10  **Q.**   Ms. He writes (as read):

11        "We need to collect every provider's Doxy

12  account -- it shouldn't be hard, since we helped them

13  create it -- and log in to check logs."

14  Do you see that?

15  **A.**   I do see.  I see that.  But we weren't able to do that

16  because providers changed their passwords, which is what we

17  instructed them to do.

18  **Q.**   And then Ms. He writes to you (as read):

19        "It is an operations challenge, and I believe

20  many other platforms using Doxy have this issue.  We

21  need to creatively solve it, not only relying on

22  magic technology!  I agree that technology is magic,

23  but it also has limitations and always takes time to

24  develop/integrate."

25  Do you see that?

1   **A.**   Yes, I do.

2   **Q.**   Okay.  Now, you say -- you are saying to Ms. He you are

3   going to follow up on this issue; correct?

4   **A.**   In this one?

5   **Q.**   Yeah.

6   **A.**   Where do I say that?

7   **Q.**   Where you say (as read):

8           "We can try and ask Erin about this review on

9       Monday."

10  **A.**   Oh, yes.

11  **Q.**   Do you see that?

12  **A.**   Yes.

13  **Q.**   Okay.  So you're saying that you're going follow up with

14  Erin Kim because you're in charge of provider operations;

15  correct?

16  **A.**   My team would, yeah.

17  **Q.**   Okay.  And you said -- withdrawn.

18      Okay.  And by the way, this is a bad review, and it is not

19  based on a complaint that the patient wasn't getting

20  stimulants; correct?

21  **A.**   That's correct.

22  **Q.**   Remember you had a conversation with Ms. Green with the

23  subject of people only giving bad reviews because they were

24  unhappy that they weren't getting stimulants?

25  **A.**   No, I never said "only."  I never said "only."

BOWEN - CROSS / SCHACHTER

1  Q.   Okay.  You recall that there was a conversation that you

2  had about bad reviews being prompted by a patient being upset

3  that they didn't get a stimulant?

4      Do you remember that conversation?

5  A.   There was a large proportion of bad reviews that were

6  associated with patients that did not receive an ADHD diagnosis

7  or a stimulant prescription, yes.

8  Q.   We're going to get into the reviews in a moment.

9      This review that we're looking at is a bad review where

10 the patient was diagnosed -- was prescribed a stimulant and is

11 still unhappy; correct?

12 A.   This is correct, yes.

13 Q.   Okay.  Now, you told -- here in this communication, you

14 told Ms. He that Erin Kim is normally a stellar provider, even

15 though you knew that she had received negative reviews; isn't

16 that correct?

17 A.   That is not correct, no.

18 Q.   Well, I'm showing you what is marked as Exhibit 6284.

19         MR. SCHACHTER:  And we will offer it.

20         THE COURT:  Admitted.

21      (Trial Exhibit 6284 received in evidence.)

22 BY MR. SCHACHTER:

23 Q.   Do you see the date of this document that you're on,

24 Ms. Bowen?

25 A.   Yes.

1  Q.    Okay.  That's June 3rd, 2021; is that correct?

2  A.    Yes.

3  Q.    Okay.  So that would be roughly 15 days before you tell

4  Ms. He "Erin Kim is normally a stellar provider"; is that

5  correct?

6  A.    Yes.  The -- her negative review rate was about -- I think

7  it was less than 5 percent, so that's not 0, to say, but it's

8  less than 5 percent.

9  Q.    Aha.  Okay.  In any event, your comment to Ms. He that

10 Ms. Kim is normally a stellar provider came shortly after you

11 had actually received a negative review about Ms. Kim; correct?

12 A.    And as you can see, it says it would be out of character

13 for Erin.  She still had low ratings -- as I mentioned, it's

14 not 0.  There's no such thing as 0 bad reviews.

15 Q.    My only question, Ms. Bowen, is:  You wrote to Ms. He that

16 Ms. Kim is normally a stellar provider shortly after you had

17 received a negative review about Ms. Kim, yes or no?

18 A.    And shortly after I had reviewed her review data and seen

19 that it was not a common incident for her, and I still stand by

20 that characterization.  And based on the reviews.

21 Q.    Okay.  Let's look at what you received a couple weeks

22 before you told Ms. Kim -- I mean Ms. He that Erin Kim is a

23 stellar provider.

24      Here, this is on June 3rd, you received a one-star review

25 for Ms. Kim; is that correct?

1    **A.**    Yes.

2    **Q.**    The patient wrote "She was condescending and rude to me."

3    Do you see that?

4    **A.**    Yes.

5    **Q.**    And you wrote (as read):

6    "Will investigate this review, but this would be

7    out of character for Erin."

8    Do you see that?

9    **A.**    Yes, I do.

10   **Q.**    This goes to what you were saying, you thought she was a

11   terrific provider?

12   **A.**    Yes, statistically speaking.

13   **Q.**    Okay.  And you wrote (as read):

14   "It sounds like the patient was upset that Erin

15   agreed with the patient's current psychiatrist that

16   an EKG would be needed before her dose could be

17   increased."

18   Is that right?

19   **A.**    Yes.  So I'm assuming I reviewed the patient's chart

20   and -- to review what Erin's assessment of the patient had

21   been.

22   **Q.**    Okay.  In any event, what has happened here is that the

23   patient is upset because Erin Kim was just as conservative as

24   this patient's primary care physician; is that right?

25   **A.**    Sorry.  I'm reading.

1  **Q.**  Sure.  Take your time.

2  **A.**  (Witness examines document).

3      Okay.  What was the question again?

4  **Q.**  Sure.

5      What has happened here is that Erin Kim has taken a pretty

6  conservative step as a medical provider; is that right?

7  **A.**  Yes.

8  **Q.**  Her -- this patient's primary care physician said that

9  they need an EKG or a cardiac clearance in order to increase

10  the patient's Adderall dosage; is that right?

11  **A.**  Yes.

12  **Q.**  And Erin Kim, conservatively, is saying, I agree.  I am

13  not going -- I told this patient that I am not going to

14  increase her dosage without an EKG or a cardiac clearance

15  because this patient needs cardiac health monitoring; is that

16  right?

17  **A.**  Yes.

18  **Q.**  Okay.  Now --

19          **MR. SCHACHTER:**  You can take that down, Mr. Cepregi.

20  **BY MR. SCHACHTER:**

21  **Q.**  -- after Ms. He brought to your attention Erin Kim's

22  two-star review about only spending seven to eight minutes with

23  the patient and being seven or eight minutes late, you then

24  followed up about how long Erin Kim was spending with patients;

25  is that right?

BOWEN - CROSS / SCHACHTER

1    **A.**    I then followed up with Erin Kim about how long?

2    **Q.**    You tried to do some work, as Ms. He asked you, to

3    determine how long Ms. Kim was spending with patients; is that

4    right?

5    **A.**    I believe so.

6    **Q.**    Right.  I'm going to show you what is in evidence as

7    Exhibit 377.  The Government showed you this one, but not the

8    communications which we just talked about that came before.

9            **MR. SCHACHTER:**  If we can display Exhibit 377, in

10    evidence.

11    **BY MR. SCHACHTER:**

12    **Q.**    Okay.  Now, this is the document that the Government

13    showed you about Erin Kim.

14        Do you recall that?

15    **A.**    Yes.

16    **Q.**    Okay.  And this document is dated June 21, 2021; is that

17    correct?

18    **A.**    Yes.

19    **Q.**    So that comes after Ms. He has sent you the communications

20    about Erin Kim's two-star review in which she says this is

21    concerning, right?

22    **A.**    Yes.

23    **Q.**    Okay.  You didn't see this document in your direct

24    examination; correct?

25    **A.**    This document?  I don't know.

**BOWEN - CROSS / SCHACHTER**

1  **Q.**  This document you did, but not the ones that came before

2  this?

3  **A.**  I don't think so.  It's been a lot of documents.  I'm

4  sorry.

5  **Q.**  I know.

6      Okay.  So in this document, on June 21, after Ms. He has

7  asked you to follow up and look into Erin Kim's appointment

8  times, you wrote (as read):

9          "The Doxy log will not tell us who logged in,

10         when it started, or how long the appointment lasted."

11     Do you see that?

12 **A.**  Yes.

13 **Q.**  And you wrote (as read):

14         "This is why we are looking to use a different

15         VC platform and also because Doxy audio/video quality

16         it relatively poor"; right?

17 **A.**  Yes, I wrote that.

18 **Q.**  You're saying it can't be done?

19 **A.**  Yeah.  The Doxy log will not tell us who logged in, when

20 it started, or how long the appointment lasted.

21 **Q.**  Right.  And then Ms. He seems to have done just that,

22 because she then sends to you -- this is the report from Doxy.

23 You didn't find it; Ms. He found it and sent it to you; is that

24 correct?

25 **A.**  I think so, but it doesn't really make any sense.  But

1    I'll take your word for it.

2            **MS. GREEN:**  Objection, speculation.

3            **MR. SCHACHTER:**  Well, I'll ask a foundational

4    question.

5    **BY MR. SCHACHTER:**

6    Q.   Ms. Bowen, do you see Ms. He is writing to you and says,

7    "This is the report from Doxy"?

8         Do you see that?

9    A.   Yeah, I'm just not sure how she got it, because I say in

10   the next one that I logged in to Erin Kim's account.

11   Q.   No, what you actually said the next one is (as read):

12            "Which provider is this for?"

13        Do you see that?

14   A.   Oh, yeah, yeah.  So I don't know which provider she pulled

15   this up on, because I'm the one who pulled up the one on Erin

16   Kim.

17   Q.   Okay.  Yeah, well, let's look at -- maybe you don't know

18   what it is, but Ms. Green showed it to you --

19   A.   It says October 20, 2020, is the date.

20   Q.   Yeah.  Let's look at the second page, which Ms. Green

21   showed to you during the course of your direct testimony?

22            **MR. SCHACHTER:**  If we can show the second page of this

23   exhibit.

24   **BY MR. SCHACHTER:**

25   Q.   Do you remember when Ms. Grown showed this to you?

1    **A.**    Yes, I think this is the same one.  I don't know if the

2    number add up, but yeah.  But the dates here say October 20,

3    2020, and then all of a sudden it jumps to 2021.

4    **Q.**    Do you remember, Ms. Bowen, when Ms. Green was asking you

5    questions, you said you were very familiar with this document?

6    **A.**    I'm familiar with the Doxy log.

7    **Q.**    Mm-hmm.  Okay.  In any event, when Ms. Green showed you

8    this document, you identified certain portions of it.

9        And if we look at the next page, do you see there you

10    talked about this with the jury on direct, and you said this

11    appointment has only -- it was only six minutes and 52 seconds?

12        Do you remember telling the jury that?

13    **A.**    Yeah.  I think this was the one that lined up with the

14    complaint for Erin Kim, but I can't -- I'm not seeing the full

15    thing.  I can't see where this is coming from.

16    **Q.**    Do you recall that this is the exact same document that

17    Ms. Green showed you this morning?

18    **A.**    I think it was yesterday.

19    **Q.**    Yesterday was a long time ago.  Okay.

20        In any event, now you say you don't know what this is?

21        **MS. GREEN:**  Objection, misstates testimony.

22        **THE COURT:**  I think that's not what she said.

23        **THE WITNESS:**  I said that this looks like the Doxy log

24    from Erin Kim's visit.

25    \\\

**BY MR. SCHACHTER:**

**Q.**   Okay.  If we can go back to the first page.  This is the

document that Ms. He sent to you; correct?

**A.**   This is the -- this is a Slack transcript, so it's from

the Slack messaging tool.

**Q.**   Ms. He writes, "This is the report from Doxy."

Do you see that?

**A.**   Yeah.  She's saying this is an example of a report from

Doxy.

**Q.**   And I know it's --

       **MR. SCHACHTER:**  Can we blow up the thing that's

attached here.

**BY MR. SCHACHTER:**

**Q.**   Do you see where it "analytics" and it's got these numbers

on the right side?

**A.**   Mm-hmm, yes.

**Q.**   Those are the same numbers that we just looked at just a

moment ago; right?

**A.**   Yes.

**Q.**   Okay.

**A.**   And I realize now this wasn't the one that I pulled for

Erin Kim.  This is the one that Ruthia, I guess, pulled.  Like

she must have saved it from a screenshot she must have done a

while back.

**Q.**   Okay.  In any event, this is the document Ms. He says,

1  "This is the report from Doxy"; correct?

2  **A.**  This is, I guess, what a report from Doxy looks like.

3  It's what she's saying she had the ability in the past to pull

4  it.

5  **Q.**  Right.  And she sends it to you, and you say, "Which

6  provider is this for"; correct?

7  **A.**  Correct.

8  **Q.**  Okay.  And then -- then you say, after Ms. He has sent

9  this to you, you say (as read):

10       "I just logged in to Erin Kim's account.  She

11       never changed her Doxy password.  And it looks like

12       almost all her appointments are less than 10 minutes

13       long."

14       Do you see that?

15  **A.**  Yes.

16  **Q.**  This is you finally doing what Ms. He had asked you to do

17  more than a month earlier; is that correct?

18  **A.**  That is not correct, no.  There's a lot that happened in

19  between then.

20  **Q.**  Okay.  All right.  But now you are saying -- now, on

21  June 21st, you said that you logged in to Erin Kim's account

22  and you saw that her appointment times are less than -- are

23  less than 10 minutes long; is that correct?

24  **A.**  That's what it says here, yes.

25  **Q.**  Okay.  Now, you then -- then on June 21st, then

1   communicate with people on your team and others about Erin

2   Kim's -- you saw in Erin Kim's Doxy account.

3        Do you remember that?

4   **A.**   Yes.

5   **Q.**   I'm going to show you that communication, which we've

6   marked as Exhibit 6283.

7             **THE COURT:**   6283 admitted.

8        (Trial Exhibit 6283 received in evidence.)

9   **BY MR. SCHACHTER:**

10  **Q.**   And here, now, on June 21st, 2021, you write to others

11  displayed on the first page -- but I don't know that we need to

12  look at that.  You write (as read):

13             "I was able to log in to Erin Kim's Doxy account

14        and see her meeting history.  It is very rare that

15        any of her appointments last longer than 10 minutes,

16        and she seems to be starting them late in many cases.

17        Her average session time is seven minutes and 38

18        seconds."

19  You now, on June 21st, say (as read):

20             "This is pretty shocking.  Nikki, Patrice, and

21        Jam, have you received many reports of Erin Kim

22        showing up late or having short appointments, or does

23        this seem to be an issue across providers?"

24        Do you see that?

25  **A.**   Yes, I see that.

1   **Q.**   Okay.  And when you say "This is pretty shocking," does

2   that help you remember that you, in fact, had done nothing to

3   look into this issue since Ms. He brought it to your attention

4   on May the 8th?

5   **A.**   That does not insinuate that at all.  This is one Slack

6   conversation.

7   **Q.**   Okay.  So it's your testimony that you had been doing a

8   lot of work on this subject of Erin Kim's appointment times

9   between May 8th and June 21?

10   **A.**   Yes.  I had done quite a bit.

11   **Q.**   Okay.  And then -- but you write to --

12       And by the way, Niki Mercado, she is head of the care

13   team; is that right?

14   **A.**   That's correct.

15   **Q.**   And you're writing to other people that are in the care

16   team?

17   **A.**   Yes.  I believe, Niki, Patrice, and Jam -- or sorry.

18   Patrice and Jam, I think, were kind of higher-level members of

19   the care team.

20   **Q.**   And Ms. Mercado writes (as read):

21       "Erin Kim's patients love her.  We had only had

22       few bad reviews regarding the appointment time, four

23       reviews month to date."

24       Do you see that?

25   **A.**   Yes.

1    **Q.**    And just if we can look at the first page, Ms. He is not

2    in this communication.

3        Do you see that?

4    **A.**    It appears no, she is not.

5    **Q.**    Okay.  That's because this is you, doing your work as head

6    of provider management, to sort this out; correct?

7    **A.**    I'm sorry.  I don't understand the question.

8    **Q.**    Okay.  The fact is that Ms. --

9            **MR. SCHACHTER:**  You can take that down.

10   **BY MR. SCHACHTER:**

11   **Q.**    Both Ms. He and Dr. Brody continued to express concerns to

12   you about patients not spending enough time with -- I'm

13   sorry -- about providers not spending enough time with

14   patients?

15   **A.**    You're suggesting that Ruthia and Dr. Brody were

16   concerned?  Like that was an ongoing concern of theirs?

17   **Q.**    Correct.  That's my question to you.

18   **A.**    That was not a top concern of theirs.

19           **THE COURT:**  Okay.  We're going to take a recess now.

20       Ladies and gentlemen, we will be in recess until

21   9:15 tomorrow morning.

22       Remember the admonition given to you:  Don't discuss the

23   case, allow anyone to discuss it with you, form or express any

24   opinion.  We will only go to noon tomorrow.  Thank you.

25                          (Witness excused.)

1          (The jury leaves the courtroom.)

2     (Proceedings were heard out of the presence of the jury.)

3          **THE COURT:**  Let the record reflect the jurors have

4    left.

5        How much longer do you have, Mr. Schachter?

6          **MR. SCHACHTER:**  Your Honor, I would say maybe an hour

7    and a half.

8          **THE COURT:**  Well, I'm going to give you an hour, so --

9          **MR. SCHACHTER:**  Yes, Your Honor.

10          **THE COURT:**  -- work within it.  That's -- seems

11    sufficient time.

12        You can step down.  You can step down or step aside or

13    step down.

14                    (Witness excused)

15          **THE COURT:**  Now, there are two exhibits -- let's

16    discuss the video.

17        It's my understanding you wish to show excerpts of the

18    video, and the video will be a video of Dr. Brody discussing --

19    I don't know -- care or something related to care, which video

20    was shown to various individuals who were considering

21    employment or were employed or independent contractors with

22    Done.

23        And you want to ask this witness, though this witness has

24    not -- and the present witness has not viewed the video?

25          **MR. SCHACHTER:**  She said even though it was sent to

1    her, she said --

2            THE COURT:  Well, it wasn't really sent to her.  In

3    today's parlance, what was sent to her was a document which had

4    a number of things in it, one of which was a link to the video.

5    That's what was sent to her.  Okay.  All right.

6        So whatever that means.  May mean nothing.  I mean,

7    there's no question she had access to it, so if that's the

8    issue, you're correct.  She had, certainly, access to it, and

9    it was called to her attention along with other things, but her

10   testimony is she didn't view it.  Okay.

11       So she can't -- as an example, she could not -- you

12   could -- if you showed it to her while she was there and

13   propounded a question, the question would be what, exactly?

14           MR. SCHACHTER:  Well --

15           THE COURT:  What question are you going to ask her

16   after you showed the jury the video?

17           MR. SCHACHTER:  The lead-in to that was you testified

18   on direction examination that Dr. Brody did no -- I have the

19   quote -- but did no clinical work as --

20           THE COURT:  To her knowledge.

21           MR. SCHACHTER:  To her knowledge.  And this is

22   information provided to her that is directly to the contrary.

23           THE COURT:  No.

24           MR. SCHACHTER:  It is Dr. Brody --

25           THE COURT:  Well -- oh, so you say it's your view that

1   she actually did view the video and that she's lying about it

2   when she said she didn't view it?  That's what you're going to

3   establish?

4           MR. SCHACHTER:  I don't know that, Your Honor.  That's

5   not --

6           THE COURT:  That is not impeachment.

7           MR. SCHACHTER:  That's not going to be my point.

8       My find is -- I guess it's two points.

9       One is it impeaches her testimony that -- which she made

10  very clearly, the Government elicited from her, Dr. Brody did

11  nothing other than defer to Ruthia.  That was her testimony.

12  She was very clear that Dr. Brody -- he does nothing.  He's a

13  mail-in -- this is the Government's whole point.  He was a

14  mail-in.

15          THE COURT:  There's no question you can have the --

16  you could introduce evidence, if it's appropriate, that

17  would --

18      Would you please stand aside, Counsel.  Just go back.  Sit

19  down.  Actually, he's a very good lawyer.  He doesn't need you.

20  Sit down.  Please sit down.

21          MS. NECHAY:  I'll take a seat, Your Honor, as well.  I

22  just on behalf of Dr. Brody --

23          THE COURT:  You can stand up.  You're representing a

24  separate -- I don't want to face two lawyers here representing

25  the same person.

1        Mr. Schachter, I've found that he's capable of

2   articulating his client's position perfectly.

3        Okay.  Now, I'm just trying to work my way through it,

4   because the issue isn't is this at all admissible, though it

5   may come to that at some point.  The issue is can you use it to

6   impeach this witness when she says he did nothing and you want

7   to introduce a -- or wasn't involved in this, and you want to

8   introduce some other evidence that -- that he was involved in

9   it.  Okay.

10       And you feel that you could do that because it is -- oh,

11  because it's impeachment, and therefore, anything -- well, of

12  this nature, of this materiality -- I'll give you all of

13  that -- is it proper to ask him -- her about.  That's the

14  question.

15       Because I'm not doing it in a global way; I'm doing it for

16  this witness, who we've now had on the stand for the third day.

17  Okay.

18            MR. SCHACHTER:  And, Your Honor, if I may just

19  clarify?

20            THE COURT:  Of course.  And by the way, I don't want

21  to misstate your position.  I actually want to make sure I

22  understand exactly what your position is.

23            MR. SCHACHTER:  We are not seeking through this

24  witness to introduce everything.  There is a lot of evidence

25  that Dr. Brody -- of Dr. Brody acting exactly as a clinical

1  president should.  We are not seeking to introduce that.

2      We are seeking here to introduce the two videos that were

3  separately brought to this witness's attention as the work that

4  Dr. Brody was doing, so we think it's appropriate to do those.

5  We have plenty of other evidence for other witnesses and

6  perhaps in our case-in-chief, but these were specifically

7  brought to this witness's attention in her role as it being in

8  charge of provider management, and so we think it's appropriate

9  to play those videos brought to her attention in her testimony.

10          **THE COURT:**  Oh.  Mr. Foster.

11         **MR. FOSTER:**  Thank you, Your Honor.

12      Your Honor ruled on a video on Monday and excluded it, and

13  this video presents the exact same issue.  A witness can't be

14  impeached with self-serving exculpatory hearsay from a

15  defendant that they have never seen.  A witness, one, has to

16  have personal knowledge, which she lacks, because she's never

17  seen it.

18      Two, the e-mail is the fact of Defendant Brody doing

19  something.  The video is his hearsay statements.  And we've

20  cited many cases in the brief we filed on Sunday that

21  Your Honor accepted in excluding the other video that a

22  defendant cannot make an end run around the hearsay rule by

23  claiming it is for purposes of impeachment.

24      And therefore, Your Honor should not allow them to examine

25  this witness about it just for the --

1    **THE COURT:**  And the hearsay -- I want to understand

2    what the hearsay is.

3        The hearsay is the -- is the content of the video; that

4    is, of the video -- the content of the video is setting policy

5    or doing something of that nature.

6        Instructing.  The content is instructing the person.  So

7    it's being introduced for the truth of the matter is; that is

8    that he is instructing.  Here is an example of his instructing

9    the --

10    **MR. FOSTER:**  Well, Your Honor, the e-mail establishes

11    the sending out, that he sent out a newsletter or a video.  The

12    video is him just talking on and on to an unidentified audience

13    with an unidentified distribution, if any, that this witness

14    knows nothing about.

15        And so the purpose of introducing this is for the content

16    of what the defendant is saying.  If the defendant wants to

17    talk about his views about the appropriateness of Adderall

18    prescribing, he can testify.

19        But that's what they're trying to do here with something

20    the witness has never seen.

21    **THE COURT:**  Well, this is what strikes me about it.

22        Going to your point, he did this thing.  Okay?  So the

23    question really is -- and I think somebody could say -- I saw

24    it and it was part of the instructional materials, and, yeah, I

25    saw it at the time or it was given to me at the time, and it

1    was part of the part of the instruction.

2        She can't say that.  She's not the witness who can say

3    that.  Ostensibly, there are other witnesses who could say it,

4    I assume.  If you can't find anybody who could say it, then I

5    have to wonder whether anybody was actually shown it or what

6    the circumstances were of its dissemination.

7        That it's in an e-mail doesn't mean anything.  It means

8    something, but it doesn't mean -- it doesn't mean that these

9    people were instructed or that Mr. -- Dr. Brody, when he did

10   it, did it with the intention of instructing all people who

11   came in.

12       Anyway, I don't believe it's -- this is the witness on

13   that subject.  I'm not going to allow examination on that

14   subject.  I'm not foreclosing you from using it at some

15   appropriate time when there is a witness who can testify as to

16   its dissemination.

17       **MR. SCHACHTER:**  Your Honor, may I just -- I just want

18   to -- what I think is correct the record on several points.

19       **THE COURT:**  Go ahead.

20       **MR. SCHACHTER:**  First of all, we can check the

21   transcript.  Mr. Foster is absolutely wrong.  The Court did not

22   exclude the other video, so I just want to make sure that's

23   clear.

24       Number 2 --

25       **THE COURT:**  I'm not trying to be consistent.

1           **MR. SCHACHTER:** Number 2 is that as an instruction, it

2    is not capable -- an instruction or a direction can never be

3    hearsay, because it is not being offered for the truth of the

4    matter asserted.

5           Do something is not true or false.  It is not a statement

6    of fact, and therefore, because it is not an out-of-court

7    statement that is offered for the truth of the matter asserted,

8    it is not hearsay.  A direction instruction can never be.

9           In any event, we are not offering any of these contents.

10   It doesn't matter whether it is true or false.  That is not the

11   point.  And, in fact, we have no objection to an instruction

12   from the Court that these are being offered to show

13   Dr. Brody -- you could -- we would love it if the Court could

14   say acting as a clinical president.  We don't expect the Court

15   to do that.

16          But we have no objection to an instruction that this is

17   not being offered to the -- prove the truth of what Dr. Brody

18   is saying, but rather that it was said.  That is our whole

19   point.  We don't care if he's right, wrong.  He can be from

20   Mars and making up, you know, medical dogma and the Government

21   can show that it's false if they wish, and they can, more

22   importantly, show that it was intentionally false.  Sure.  More

23   power to them.  They will not be able to do that.  They can

24   have that.

25          But the fact that he acted as a clinical president in

1   providing instructional videos to providers -- honestly,

2   whether the providers reviewed them or not, that's not

3   Dr. Brody's fault.  He is the one that is communicating to the

4   providers here are my instructional videos and -- in an e-mail

5   to please watch them.

6       That is him doing what the Government says he did not, and

7   that is important to us, not just -- it's obviously important

8   to Dr. Brody, but it's certainly also important to us because,

9   again, Ms. He -- it doesn't matter whether --

10          **THE COURT:**  Well, as I said before, I'm not excluding

11  it in its entirety.  I don't think that this is -- I think this

12  witness's testimony on that subject will be extremely marginal.

13  She didn't see it and -- or, you know, you have no evidence

14  that she did see it.  And so I'm not going to allow it just in

15  terms of now the third day of the testimony, and I think that

16  we have a lot that she could be questioned on, and you seem to

17  find it, to clarify her testimony.

18      So I'm excluding it from this witness's testimony.  I'll

19  certainly -- I understand what you're saying about the hearsay,

20  that it's not actually hearsay.  I have to think about that a

21  bit more, Mr. Foster.

22          **MR. FOSTER:**  Yes, Your Honor.  I can explain.

23      We cited a litany of cases that that's incorrect,

24  actually, that you can't do an end run around the hearsay rule

25  for this reason, and any marginal benefit the content would

1    have, courts have ruled is far outweighed under 403, because

2    when there is long, substantive content that is not being

3    offered for the truth or falsity, as Mr. Schachter just

4    admitted, it wasn't being offered for, then the substantive

5    content itself has very, very low marginal relevance, and it's

6    excludable under 403 because it gets back the fact of sending

7    something out is what's relevant.

8         **THE COURT:**  I'll get to the 403, but I'm not relying

9    on the 403 for this witness.

10        **MR. SCHACHTER:**  And, Your Honor, just to clarify, I

11   provided the excerpts that we intended to play.  One video is

12   10 minutes long.  These people are on trial for their liberty.

13   One is 10 minutes long, the other is 18 minutes long.  We are

14   not intending to pursue this entire thing because we are trying

15   to make efficient use of the time.

16      But this is like the Court's timecard example which

17   the Court provided when incorrect -- Mr. Foster is incorrect

18   when the Court ruled quite the contrary, and we could submit

19   the transcript of the Court's views on the last video.  It's

20   exactly the same in that regard.

21        **THE COURT:**  Anyway.

22        **MR. SCHACHTER:**  Understood.

23        **MS. NECHAY:**  Your Honor, before we foreclose this

24   issue, may I make a record, please?

25        **THE COURT:**  Yes.

1          MS. NECHAY:  I think we also find ourself in a

2    situation that's not dissimilar to the questioning with

3    Mr. Menesini.  He stated that he was kind of checked out.

4    However, he did make a comment regarding the video that maybe I

5    did see it, and there was a possibility, at least, that if the

6    witness was given an opportunity to review the material that it

7    would refresh their recollection.

8          What I would like to request outside the presence of the

9    jury tomorrow morning is for the witness to be examined further

10   about --

11         THE COURT:  Which witness?

12         MS. NECHAY:  This particular witness, Ms. Bowen, on

13   whether she remembers, because she stated, Your Honor, she did

14   not attend the meeting.  There actually was -- my intention was

15   also to introduce this content, but there was no question

16   specifically about whether she had seen that video.

17         THE COURT:  I'm sorry.  Was the video played at a

18   meeting?  Was that it?  It was played?

19         MS. NECHAY:  Yes, but it was also available on the

20   website and through the platform in a variety of ways, so there

21   is still the possibility that this witness could lay the

22   foundation.

23         So my request on behalf of Dr. Brody would be that the

24   witness be played the video, some portions of it, and to ask

25   whether that, in fact, refreshes her recollection on whether

1    she has seen those training materials.

2         **MR. FOSTER:**  I believe she said she didn't see it,

3    Your Honor.

4         **THE COURT:**  I thought that was her testimony.  I don't

5    think her testimony was "I don't recall having seen it."  I

6    think she said she didn't see it.

7         **MS. GREEN:**  She did.

8         **MS. NECHAY:**  Your Honor, there's two different videos.

9         **THE COURT:**  I just -- okay, there are two videos.

10   Fine.

11        I am not going to permit it under 403.  Under undue

12   consumption of time and confusion, it's not directly

13   impeaching.  It introduces evidence that may or may not be

14   relevant, may or may not be admissible as to -- as to the

15   defendant but not as to the -- not for impeachment purposes of

16   this witness.  It doesn't go to her truth-telling abilities.

17   From her perception, she says, "I don't believe he was doing X,

18   Y, or Z."

19        And you have evidence that says he does do Y, Y, or Z, and

20   you can but in that evidence.  I'm not foreclosing you from

21   putting in that evidence.  Not with this witness.

22        Or you can try your whole case with the first witness.

23   And just ask -- because this is our case, this is our defense,

24   we're now going to play our entire case in front of the witness

25   and see whether or not they can recall any of this.

 1          **MR. SCHACHTER:**  Understood.

 2          **THE COURT:**  This is why this is interminable.

 3    Interminable.

 4          And I do want to say -- I don't want to say that -- okay.

 5    Thank you.

 6          I'm quite serious.  I do want to finish with this witness

 7    tomorrow.  I want her to -- you to finish your direct.

 8          If you have any cross, obviously, or redirect -- well,

 9    cross, you're entitled to do it, and they are entitled to do

10    some brief redirect.

11          But I don't -- also, and my view of redirect, so the

12    Government knows, is not to go over their direct.  I mean, it

13    has to just -- you know --

14          And that's in large part, much to the consternation of the

15    defense, I allow leading questions, because leading questions

16    are by -- basically, as they're being utilized in this case,

17    they don't suggest the answer.  What they do is they tee up the

18    topic so that -- so that the witness can know exactly what's

19    focused on and they could say yes or no.

20          I've noticed frequently that the answer to, quote, a

21    leading question is the negative, not the positive.  And I do

22    that to try to move this case ahead.

23          We have a real problem here in terms of time.

24          How long is the defense in the case going to take?

25          **MR. SCHACHTER:**  Probably two weeks.

1        **THE COURT:** Two weeks?  Okay.  Well, we'll see.

2     I mean, I do also take into account what has been

3  developed in the cross-examination of a particular witness,

4  because that is the defense case.

5     So it's wrong to look at it as it's not being presented in

6  that context.  It is presented in that context, and that is a

7  factor.

8        **MS. GURSKIS:**  Your Honor, I wanted to raise an issue

9  with a witness who the Government is calling tomorrow.

10     So we have a nurse practitioner, Julie Sullivan, who's

11  been on our witness list since March and identified with the

12  asterisk since August, and the subject matter of her testimony

13  is that she treated a Done patient after the patient went to

14  Done, and we learned from Ms. Bell last night at 10:00 p.m.,

15  even though she's been on the witness last for a very long time

16  and was disclosed to the defense on the 3rd as testifying --

17  well, Tuesday, but obviously that didn't happen -- we now --

18  she is taking issue with the testimony, the scope of the

19  testimony.

20     So we wanted to bring that to Your Honor's attention

21  because obviously that's an issue for first thing in the

22  morning.

23        **THE COURT:**  That's fine.

24     Let me ask the question of the Government:  How long is

25  this witness going to take?

PROCEEDINGS

```
1              MS. GURSKIS:  Hopefully 15 minutes on direct, Your
2    Honor.
3              THE COURT:  Okay.  And where is she from?
4              MS. GURSKIS:  Buffalo, New York.  She's been here
5    since Monday.
6              THE COURT:  Fine.  We'll put her on first.
7         Okay.  Next.
8              MS. BELL:  May I, Your Honor?
9              THE COURT:  Now, assuming she can testify, we'll
10   interrupt this witness and put on your -- if you want to.
11             MS. GREEN:  No, I think the issue is more --
12             THE COURT:  I can't --
13             MS. GREEN:  Sorry.
14             THE COURT:  I can't guarantee -- I have to terminate
15   at noon because of the note and the -- so I don't want -- I
16   don't know exactly when Mr. Schachter is going to finish,
17   though he's promised on his oath that he'll finish in an hour,
18   but that has a way of getting -- it's a little loose.  As it
19   should be.
20        Okay.  Ms. Bell, go ahead.
21             MS. BELL:  Thank you, Your Honor.
22        So the issue with this witness is we have no problem with
23   the scope of the testimony, as Ms. Gurskis just described it,
24   which is the only thing that was disclosed to us prior to
25   October --
```

1          **THE COURT:**  Ms. Bell, right now I'm not going to get

2    into what were the promises, what were said, what was

3    disclosure, unless that becomes the issue that we're fighting

4    about.

5          **MS. BELL:**  That's the issue, Your Honor.

6          So we got a new memorandum of interview just three days

7    ago, on October 5th, which vastly expanded the testimony from

8    what Ms. Gurskis just stated, which is percipient knowledge of

9    this provider's treatment of a Done patient.

10          What happened was there was a woman who was treated at

11    Done.  She goes on and she sees now this provider they're

12    calling as a witness, and this provider treats her for anxiety

13    and depression after she's been treated at Done.

14          That was the scope of the testimony that's set forth in

15    the interview memorandum which we received previously, dated

16    January 2025.

17          Just three days ago, we got a new memorandum of interview

18    which expands her testimony into a host of new areas, which is

19    undisclosed expert testimony, in our view, such as at two prior

20    undisclosed places of employment of this witness, she saw some

21    undisclosed number of patients which she describes as 20 to

22    30 percent of her patient population, and she says of those,

23    5 percent came from either Done or some other telehealth

24    platform and had an inaccurate ADHD diagnosis.

25          This, in our view, is undisclosed expert testimony.  We

1  wouldn't even begin to be able to cross-examine her tomorrow on

2  information we received three days ago that has no specificity

3  about, you know, what entities, which patients, what are the

4  bases for your opinions, what's your experience that gives you

5  a basis to provide these types of opinions.  We haven't gotten

6  any of that.

7       She's also, in a recently disclosed interview memo we

8  received on September 24th, purportedly going to talk about two

9  other subject matters, including the usual course of practice,

10  which is clearly undisclosed expert testimony.  The disclosure

11  date passed on July 2nd.  Again, we don't know what the basis

12  for that type of opinion testimony from this witness would be

13  or what her qualifications are.

14      And she purports to testify about Done's reputation in the

15  community as -- based on I'm not sure what, again, but the

16  reputation for, you know, being easy access to medication.

17      All of those topics we believe are inadmissible for

18  various reasons, including because it's undisclosed expert

19  testimony.

20      So we don't have a problem with her being presented

21  tomorrow on the original scope, which is what we understood her

22  testimony to pertain to, but these other subject matters we

23  don't believe are admissible, and we would be -- like the

24  opportunity to move to exclude if the Court would like

25  additional briefing on that, but as to her testimony tomorrow,

1    there would be no way for us to do our job on something we got

2    three days ago where it's undefined patients, undefined

3    entities.  I mean, I wouldn't know how to begin to test that.

4         THE COURT:  Well, I don't think -- you got it three

5    days ago.  It would depend -- whether you're prepared to

6    examine depends on the nature of the testimony, not necessarily

7    the lateness of the disclosure, in my view, though I think that

8    you're -- you seem to be correct when you say if it's in a --

9    almost a conclusory form.

10        But she says she's a percipient witness; I saw --

11   5 percent of the patients that I saw were Done patients, or I

12   saw a lot of Done patients who were improperly treated.

13        I don't know how you prepare that in three days.  I don't

14   know.

15        MS. BELL:  May I hand the memos to Your Honor so --

16        THE COURT:  Of course you may.

17        MS. GURSKIS:  May I respond briefly, Your Honor?

18        (Reporter interrupts for clarity of the record.)

19        MS. BELL:  I apologize.

20        So, Your Honor, you can see there we have the original

21   memo, which pertains to the patient at issue and her patient

22   file and her percipient treatment of that patient.  And then

23   you see the October 5th disclosure where it's a completely new

24   subject matter, which really is expert testimony, in our view.

25   It's very similar to what the Government is doing with their

1  actual noticed expert, Dr. Goodman, where they took 16

2  patients, except for there we have a hundred-page report with

3  detailed explanations for why he is reaching the basis for his

4  opinion as to those patients, that they were not properly

5  diagnosis or prescribed.

6      Here, we've just got this, and there -- as you can see,

7  Your Honor, there's no explanation of the bases for these

8  opinions or the qualifications of the witness to give those

9  opinions.

10     There's an additional report I have here which goes to the

11 usual course of practice issue.  I'll hand that up too.

12     And this one, we also just got.  My apologies for my

13 notes, but this one, we just got on September 24th.

14         **MS. GURSKIS:**  If I may, Your Honor?

15         **THE COURT:**  Yes, go right ahead.

16         **MS. GURSKIS:**  Your Honor has ruled on this issue, on

17 the percipient witness issue of these nurse practitioners.  She

18 treated -- indeed, she treated Ms. Farouq.  Her witness reports

19 have been disclosed since March.  She was included and has been

20 on the witness list.

21         **THE COURT:**  That's not the problem.  They're not

22 objecting to that.  Or maybe they are --

23         **MS. GURSKIS:**  But as the recipient nature --

24         (Reporter interruption for clarity of the record.)

25         **THE COURT:**  Wait till I finish.

1          **MS. GURSKIS:**  I'm so sorry.

2      But as to the percipient nature of her testimony, she will

3  testify as has been documented.  Ms. Farouq and others came to

4  her practice from Done.  She had observations that she -- where

5  she disagreed with the diagnosis, and as Your Honor has ruled,

6  as percipient witness testimony, she can explain how, in her

7  discussion and her interaction with the patients, she didn't --

8  she didn't agree.

9          **THE COURT:**  Okay.  Let's stop.  Let's try to break it

10  down into categories.

11      Okay.  First.

12      Is it her purported testimony that she had a conversation

13  with the defendant or had some interaction with the defendant?

14          **MS. BELL:**  No, Your Honor.  This is a provider who

15  never worked at Done.  She works at another telehealth platform

16  called Brightside, I believe.

17      And moreover, the testimony they want to elicit from this

18  woman is about two unnamed entities, not even Brightside.  So

19  if I wanted to issue subpoenas today to be like, well, what's

20  your policy on X, Y, and Z, which she's purporting to say that

21  apparently there were some policies about Done patients at

22  these two unnamed prior entities where she worked --

23          **THE COURT:**  Okay.

24          **MS. BELL:**  -- regarding unnamed patients.

25          **THE COURT:**  I think she can't testify as to that,

1  because I think the disclosure is not timely, and there's no

2  way that they could prepare, especially when they are given

3  reports that essentially are before -- before this week, which

4  are abbreviated.

5       **MS. GURSKIS:**  Your Honor, can I correct the record on

6  that?  I don't mean to talk over Your Honor, but I do think

7  there is a bit of a disagreement as to the content of the

8  disclosure and its timeliness.

9       So from the beginning, her testimony was going to be about

10  her interaction with a former Done patient and her

11  conclusion -- percipient witness testimony based on interaction

12  with the Done patient.

13      We have been meeting with her, and on September 24th, she

14  clarified that other Done patients, she also disagreed with the

15  diagnosis.  That's her percipient testimony.

16      **THE COURT:**  Okay.  Okay.  Stop.

17      That part of her percipient testimony, was it -- when was

18  it first disclosed to the Defense?

19      **MS. BELL:**  On September 24th, and then October 5th is

20  more new stuff.

21      **MS. GURSKIS:**  I believe it was the 3rd, Your Honor,

22  and the 24th.

23      **THE COURT:**  Fine.  I think that's not timely.

24      Okay.  Not timely.

25      I don't know how -- I mean, one thing you can say, the

**PROCEEDINGS**

 1   Defense has done an enormous amount of preparation in this

 2   case, and indeed, it's hard to believe that if it had been

 3   disclosed earlier, there wouldn't have been some type of

 4   investigation as to what these other so-called -- who are these

 5   other misdiagnosed patients and -- it would have been the

 6   subject of a motion, I have to believe.

 7          **MS. BELL:**  Yes, Your Honor.  Not only -- yes.

 8          **THE COURT:**  Because it's highly prejudicial.  It's

 9   highly prejudicial to talk about Done patients who are, quote,

10   misdiagnosed and not identified -- until trial.  I understand

11   that we -- that the Government has it and they may not have

12   this information, but they do not have the names and the -- of

13   these patients who have been misdiagnosed other than the one

14   that is being testified to.

15          **MS. BELL:**  Correct, Your Honor.  And the Government

16   has offered an expert who's coming to testify, Dr. Goodman.

17   We've gotten a very lengthy expert report --

18          **THE COURT:**  Okay.  Now, that's good.  This is the way

19   I'm going to do it.  I'm going to cut off everybody, because

20   somebody has to.

21          **MS. BELL:**  It's very effective.

22          **THE COURT:**  Because we all have to go to bed tonight.

23       Okay.  In terms of her testimony about the ordinary course

24   of practice -- okay.

25       I turn to the Government, because apparently that's --

1  she's not going to give that testimony; is that right,

2  Mr. Foster?

3        **MR. FOSTER:**  Yes, Your Honor.  This is a witness who

4  was disclosed in our nonexpert report as well.  She's not an

5  expert.  She's only talking about the patients who she saw and

6  that when she saw them, they didn't have ADHD.

7        The Defense has taken the position for percipient

8  witnesses.  The Jencks Act doesn't require disclosure of

9  reports until the witness testifies.  We've been disclosing

10  them early.

11        This fact witness, like many other fact witnesses, when

12  they say something new, we document it.  We turn it over to

13  them.  They've had it for weeks for a 15-minute witness, and

14  the issue that are being raised go to weight, not to

15  admissibility.

16        **THE COURT:**  Okay.  I think that's right.  I mean, I

17  think it would have been admissible had it been disclosed --

18        And by the way, I'm not blaming the Government.  The

19  Government may have found out five days ago that she's going to

20  testify.

21        But then the question is not:  Is the Government

22  overreaching, because I don't believe they are.  The question

23  is:  Is it fair to the Defense to have this kind of testimony

24  placed before them, placed before a jury, in which they are not

25  either, one, prepared, or two, can be prepared in the ordinary

1    course.

2         Now, I mean, I guess a couple of options.  One option I

3    have is don't call her tomorrow; have her come back in two

4    weeks, and then she can testify as to those things to the

5    extent that you've been -- that the disclosure is complete

6    enough so that some preparation can be.

7         Now, that's a question.  I think -- I think you would have

8    to get some further facts and give them to the Defense in terms

9    of who were the other entities and what did she know about the

10   patients.  In other words, she has to be pretty complete in

11   her -- whatever her recollection is, and then you furnish that

12   information to the Defense, and the Defense has the opportunity

13   to conduct any relevant discovery.  You can do that if you

14   want.

15            **MR. FOSTER:**  Understood, Your Honor.  And they've been

16   very active with subpoenas, September 24th, so I agree with

17   Your Honor.  Exclusion shouldn't be the remedy, and if they

18   want to subpoena her or the clinics, they can, and we'll, of

19   course, per Your Honor's instructions, if we go down that route

20   and decide to bring her back later, make the disclosure more

21   detailed as well.

22            **THE COURT:**  Okay.  That's fine.

23            **MS. BELL:**  Your Honor, I would just say we can't issue

24   any subpoenas because we don't know which entities or which

25   patients, and so we would need --

PROCEEDINGS

1          **THE COURT:**  He said he would make a further disclosure

2    to the extent they're able to do so.

3          **MS. BELL:**  Very well.  Thank you, Your Honor.

4          **THE COURT:**  Okay.  So have we addressed this crisis?

5          **MS. BELL:**  Yes.  Yes, Your Honor, I believe so.  Thank

6    you for taking my handwritten notes.

7          **THE COURT:**  We're in recess.

8                  (Proceedings adjourned at 4:42 p.m.)

9                          ---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, October 8, 2025


_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court