CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LORINDA I. LARYEA (DCBN 99769)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS (VABN 85973)
Assistant Chief, Fraud Section
ARUN BODAPATI (NYBN 5581137)
Trial Attorney, Fraud Section

> U.S. Department of Justice, Fraud Section
> 1400 New York Avenue NW
> Washington, DC 20005
> Telephone: 202-514-2000
> Jacob.Foster@usdoj.gov
> Emily.Gurskis@usdoj.gov
> Arun.Bodapati@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorney

> 450 Golden Gate Avenue, Box 36055
> San Francisco, CA 94102-3495
> Telephone: (415) 436-7200
> Kristina.Green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUTHIA HE, A/K/A RUJIA HE, and<br><br>DAVID BRODY,<br><br>Defendants. | CASE NO. 24-CR-00329 CRB<br><br>**UNITED STATES' SUPPLEMENTAL SENTENCING MEMORANDUM**<br><br>Hearing Date:  July 7, 2026<br>Time:  10:00 AM |

Gov. Supplemental Sentencing Memorandum
24-CR-00329 CRB

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

I.    DEFENDANTS' ILLEGAL DISTRIBUTION CAN AND HAS BEEN
QUANTIFIED ....................................................................................................................4

    A.    Legal Standard .................................................................................................4

    B.    There Are at Least Six Ways to Quantify the Drugs Illegally Distributed ........................5

        1.    The 16 Done Members Addressed by Dr. Goodman...............................................6

        2.    Defendant Brody's Prescriptions .........................................................8

        3.    Prescriptions Signed by Admitted Coconspirators ...................................................11

        4.    Prescriptions for Done Members Who Never Had a Follow Up
Appointment ...........................................................................................12

        5.    Prescriptions for Done Members Who Did Not Have a Follow Up
Appointment for Over 180 Days...................................................................14

        6.    The Sum Total of the Foregoing Prescriptions .....................................................14

II.   DRUGS WITH MEDICAL APPLICATIONS ARE WITHIN THE
HEARTLAND OF THE GUIDELINES.........................................................................15

    A.    Legal Standard .................................................................................................17

    B.    The Guidelines Thoroughly Account for Drugs with Medical Applications ....................17

        1.    Section 2D1.1 Fully Accounts for Adderall and Other Amphetamines ...............17

        2.    Defendant He Misrepresents the Guidelines' Approach to "Harm".......................21

    C.    The Guidelines Account for Telehealth and Technological Platforms............................25

        1.    The Guidelines Account for Telehealth and Online Drug Distribution................25

        2.    Defendants' "Access to Care" Claims Do Not Justify a Downward
Departure...................................................................................................27

III.  THE GOVERNMENT'S PROPOSED SENTENCES SERVE THE PURPOSES
SET FORTH IN SECTION 3553(A)(2) .........................................................................29

    A.    The Seriousness of the Offense and Respect for the Law ...............................................30

    B.    The Need for General Deterrence.....................................................................................32

    C.    Protecting the Public from Further Crimes of the Defendants .......................................34

    D.    A 240 Month Sentence is Appropriate for Defendant He, and a 120 Month
Sentence Is Appropriate for Defendant Brody ..........................................................36

CONCLUSION................................................................................................................37

Gov. Supplemental Sentencing Memorandum
24-CR-00329 CRB

# TABLE OF AUTHORITIES

## Cases

*Koon v. United States*, 518 U.S. 81 (1996) ........................................................................................ 17

*United States v. Ada*, 700 F. App'x 689 (9th Cir. 2017) ................................................................... 24

*United States v. Adelglass*, 20-CR-605 (S.D.N.Y.) ......................................................................... 21

*United States v. Allingham*, Case No. 25-CR-002 (E.D. Va.) .......................................................... 21

*United States v. Bajwa*, Case No. 20-CR-060 (E.D. Va.) ................................................................ 20

*United States v. Baldonado*, 21-CR-430 (D.N.J. 2025) ................................................................... 27

*United States v. Brown*, 880 F.3d 399 (7th Cir. 2018) ..................................................................... 33

*United States v. Canchola*, 19-CR-00473 (N.D. Tex. 2024) ........................................................... 27

*United States v. Contris*, 125 F.3d 849 (4th Cir. 1997) ................................................................... 28

*United States v. Hanny*, 509 F.3d 916 (8th Cir. 2007) ..................................................................... 25

*United States v. Hunt*, Case No. 23-2342, 2025 WL 2472501 (9th Cir. Aug. 27, 2025) ................. 5

*United States v. Jacobson*, 4 F.3d 987 (4th Cir. 1993) .................................................................... 24

*United States v. Kilby*, 443 F.3d 1135 (9th Cir. 2006) ...................................................................... 5

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) ................................................................ 33

*United States v. McAllister*, 491 F. App'x 569 (6th Cir. 2012) ....................................................... 24

*United States v. Mendoza*, 121 F.3d 510 (9th Cir. 1997) ................................................................. 17

*United States v. Montes-Vargas*, 750 F. App'x 595 (9th Cir. 2019) ................................................. 5

*United States v. Mudie*, 125 F.3d 849 (4th Cir. 1997) ..................................................................... 16

*United States v. Ombisi*, Case No. 24-5012, 2024 WL 3278156 (6th Cir. June 18, 2024) ............. 26

*United States v. Pacheco*, 489 F.3d 40 (1st Cir. 2007) .................................................................... 23

*United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024) ................................................................. 23

*United States v. Reed*, 575 F.3d 900 (9th Cir. 2009) ........................................................................ 4

*United States v. Reichard*, 151 F. App'x 200 (3d Cir. 2005) ........................................................... 28

*United States v. Rodriguez*, 774 F. App'x 712 (2d Cir. 2019) ..................................................... 2, 23

*United States v. Sherman*, 21-CR-20393 (E.D. Mich. 2024)..................................................... 21

*United States v. Simpson*, No. 24-5535, 2025 WL 353700 (6th Cir. Aug. 4, 2025)............................. 22

*United States v. Stevens*, 197 F.3d 1263 (9th Cir. 1999) ................................................ 17, 21, 26

*United States v. Talbot*, 21-CR-00111 (E.D. La.)........................................................ 21

*United States v. Thompson*, 130 F.4th 1158 (9th Cir. 2025) ................................................ 33

*United States v. Waxman and Zusmer*, et al., 21-CR-60253 (S.D. Fla. 2023)........................................ 27

*United States v. Young*, 21-CR-00417 (N.D. Tex. 2025) ........................................................ 26

**Statutes**

18 U.S.C. § 3553(a) ......................................................................................... passim

21 U.S.C. § 829.......................................................................................... 10

21 U.S.C. § 841.......................................................................................... 22

**Rules**

Fed. R. Crim. P. Rule 29 ................................................................................... 7

Fed. R. Crim. P. Rule 33 ................................................................................... 7

Fed. R. Evid. 704 ......................................................................................... 7

U.S.S.G. § 2D1.1 ........................................................................................ passim

U.S.S.G. § 5K2.2 ........................................................................................ 22, 23

U.S.S.G. § 5K2.14 ....................................................................................... 24, 27, 28

Gov. Supplemental Sentencing Memorandum
24-CR-00329 CRB

iv

**INTRODUCTION**

Defendants' crimes are squarely within the heartland of what the Sentencing Guidelines are designed to punish: the distribution of unauthorized medications. The potential legitimate uses of medications and the lack of but-for expert causation evidence as to physical harm is not a basis for a below-Guidelines sentence; the presence of such harm is a basis for an above-Guidelines sentence. Because of the unrestricted nationwide growth that Defendants pursued for their drug-dealing operation, Defendants qualify for a base offense level of 38, and a total offense level of 43, even if *only one percent* of the 37 million pills dispensed to Done members were prescribed illegally. Though the Court is required to only make this finding based upon the lesser preponderance standard — and courts repeatedly have been affirmed on appeal based upon an approximation drawn from trial testimony — in this case the trial evidence was overwhelming that far more than 1% of the Adderall that flowed through the platform was illegally distributed, whether based on the testimony of Dr. Goodman, co-conspirators, or specified categories of prescriptions that numerous fact witnesses testified were illegal. Indeed, Defendant Brody's own admissions establish a Level 38: he referred to Done's policy of "dealing with clinical psychiatric issues WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT" as "crazy" and a "drug-induced fantasy," but prescribed 394,324 pills in this manner, which alone is in excess of a Level 38. Trial Ex. 210. Co-conspirator Elizabeth Shapard's testimony does the same: she testified that she was rubber-stamping lengthy lists of prescriptions to make money, and the Court need find that only 14% of her prescriptions were unauthorized to reach a Level 38. Similarly, the Court would need only to find that 12% of co-conspirator Erin Kim's prescriptions were unauthorized (when the trial testimony and Zoom logs established that she diagnosed patients after meeting with them for mere minutes, and Defendant He refused to fire her over employees' repeated objection), or that only 25% of co-conspirator Yina Cruz's pills were unauthorized, when Cruz admitted to the Wall Street Journal that she signed prescriptions every 30 seconds. That's just three of the six co-conspirators. And the Brody and co-conspirator prescriptions are just two of six different extremely conservative methodologies that the Government has proposed to reach a Level 38.

*First*, the six conservative methods to reach the base offense level of 38 are all firmly rooted in the trial record: (1) pills dispensed to the 16 patients whose records were reviewed by expert witness

Gov. Supplemental Sentencing Memorandum          1
24-CR-0329 CRB

Dr. David Goodman; (2) the 394,324 pills dispensed pursuant to Defendant Brody's blind prescriptions; (3) the over 9 million pills prescribed by six convicted, admitted co-conspirators; (4) the 6.7 million pills issued to Done members who never had a single follow-up appointment, to see how stimulants affected their health; (5) the 6.6 million pills issued to members who went six or more months without any follow-up appointment, which Dr. Brindala told the Defendants would lead to "legal consequences"; and (6) the deduplicated sum of the foregoing five categories, which amounts to a staggering 17.2 million pills that were illegally distributed. With the exception of category (1), which results in a base offense level of 32, each one of these categories alone is sufficient to result in a base offense level of 38. The government does not, and need not, argue that every pill dispensed to a Done member was illegitimate. Any suggestion to the contrary by Defendants is pure misdirection.

**Second**, this case is comfortably within the heartland of Guidelines Section 2D1.1. There are two aspects of this case that the Court has discussed as potentially making it atypical: (1) that amphetamines like Adderall can have a medical use, like treating ADHD; and (2) that Defendants distributed these drugs with the aid of a technological platform, rather than handing out pills on a street corner. But the Guidelines account for both aspects already. Section 2D1.1 dedicates attention to drugs with medical uses, explaining how to quantify drugs that come in the form of "doses, pills, or capsules." *See* U.S.S.G. § 2D1.1, Application Note 9. It even specifies typical weights for amphetamine stimulant pills: the exact drugs at the heart of this case. Unsurprisingly, courts have imposed substantial sentences for cases featuring the illegal distribution of Adderall, other stimulants, and other controlled substances, including within the Guidelines. The government has provided multiple examples of Adderall distribution sentences below, all within the precise range that the government seeks here: 120 months to 240 months.

Defendant He's persistent attempts to redirect this Court to "street drug" cases involving deaths and overdoses are misleading. Defendant He would have this Court believe that "most drug trafficking cases applying § 2D1.1 as the primary guideline" feature "actual harm to patients," while this case only featured the "risk of harm." ECF No. 612 at 13. This flawed framing flips the traditional Guidelines analysis on its head, as the Guidelines are designed to punish the act of illegal distribution; the presence of such harm is a basis for an above-Guidelines sentence. *See, e.g.*, *United States v. Rodriguez*, 774 F.

Gov. Supplemental Sentencing Memorandum       2
24-CR-0329 CRB

App'x 712, 714 (2d Cir. 2019) ("[P]ermanent physical injury takes [a drug distribution] case out of the 'heartland.'"). Defendant He's suggestion that this case involves only a "risk" of harm is equally baseless. The Guidelines have long recognized, and even supported above-Guidelines sentences, for the actual harms that Done members suffered in this case: (1) addiction; (2) delays in receiving appropriate treatment, or the need for more significant treatment later in life; (3) psychological harm from believing Adderall or stimulants were the cure to more complex mental health issues; and (4) the simple fact of being subjected to medically unnecessary treatment, and all the side effects that can come with it. To be clear, the government is not seeking a sentence above the Guidelines range. Defendants are already facing an advisory term of life imprisonment as is. But the Court should not credit Defendants' deceptive claims that "street drugs" are the only ones that the Guidelines consider harmful, or that the actual harms Done members suffered in this case somehow do not matter.

As to the second aspect, the Guidelines specifically account for drug crimes that use an "interactive computer service." U.S.S.G. § 2D1.1(b)(7). Courts have addressed cases involving rubber-stamped prescriptions for online drug delivery companies as far back as 2007. Even then, courts imposed Guidelines sentences for that wrongful conduct. Courts have similarly imposed Guidelines sentences for individuals who use online marketplaces to target Adderall seekers, too. Just two years ago, the Sixth Circuit affirmed a 210-month Guidelines sentence for one such dealer. Against this backdrop, there is no reason to view Done as categorically outside of Section 2D1.1's heartland.

**Third**, the Court can vary downwards from the Guidelines term of life imprisonment to ensure that the sentence imposed is "sufficient, but not greater than necessary," to ensure a just punishment. 18 U.S.C. § 3553(a)(2). Bearing that in mind, the government seeks sentences well below the Guidelines range: the 240-month sentence sought by the Government is only 15% of Defendant He's 1,560 month Guidelines term, and a 120-month sentence is less than 10% of Defendant Brody's Guidelines term. And unlike the sentences recommended by Defendants and Probation, the government's requested sentences are anchored in relevant precedents and statistical data compiled by the Sentencing Commission, enabling the Court to avoid unwarranted sentencing disparities. The 120-month term recommended for Defendant Brody is typical for physicians convicted of controlled substance and healthcare fraud offenses, and the 240-month sentence recommended for Defendant He is the median

Gov. Supplemental Sentencing Memorandum        3
24-CR-0329 CRB

term imposed in 16 cases with the same offense level, criminal history category, and Guidelines section over the past five years, all excluding the classic "street drugs."

Ultimately, the government's proposed sentences are the only ones "sufficient" to serve the goals set forth in Section 3553(a)(2): (A) to reflect the seriousness of the offense and promote respect for the law; (B) to afford general deterrence; and (C) to protect the public from further crimes by Defendants. These Defendants openly disdained the law, telling Done employees to keep prescribing stimulants even if they went to jail and promising a Tesla for the first employee to land in jail. Defendant He held that disregard of the law precisely because she thought the most successful companies "profit [off] of addiction," and in "the early stage[s] . . . were all illegal." Trial Ex. 897 at 151, 172. Other would-be telehealth CEOs are watching this case to see what sentence the Court imposes, and whether Defendant He was right to think that breaking the law and fueling addiction is a minor cost of business on the road to billions. A lenient sentence will only embolden them to follow her lead. And a lenient sentence will allow Defendant He to quickly resume her criminal conduct from abroad, where American law enforcement cannot reach her. That is precisely why she researched non-extradition countries, moved Done's marketing team to China, wired money abroad to MakeBelieve, and hid a Chinese Travel Document from this Court for months. A sentence of 240 months is not greater than necessary to ensure a just punishment. It is the only sentence sufficient to serve that purpose.

## I.    DEFENDANTS' ILLEGAL DISTRIBUTION CAN AND HAS BEEN QUANTIFIED

As detailed below, there are at least six ways to concretely quantify the pills that should not have been distributed to Done members. Even if only one percent of the 37 million pills dispensed to Done members were based on unlawful prescriptions, that would support a base offense level of 38. Even if only two percent of the 17 million pills covered by the six categories described below were illegal, that would still establish a base offense level of 38. Defendants do not raise a persuasive basis to fault these categories; they repeat the same baseless arguments that they made and that the jury rejected in reaching its verdict at trial.

### A.    Legal Standard

The government need only establish an approximate drug quantity by a preponderance. *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009). And in "determining for purposes of sentencing the

Gov. Supplemental Sentencing Memorandum        4
24-CR-0329 CRB

quantity of drugs for which a conspirator will be held responsible, the district court is required to determine the quantity of drugs the conspirator reasonably foresaw or which fell within the scope of his particular agreement with the conspirators." *United States v. Kilby*, 443 F.3d 1135, 1142 (9th Cir. 2006); *United States v. Montes-Vargas*, 750 F. App'x 595, 596 (9th Cir. 2019).  The low bar of a preponderance can be met by a range of competent evidence, including a defendant's own self-inculpatory statements, the statements of coconspirators, and other corroborating documents and testimony.  *See, e.g.*, *Kilby*, 443 F.3d at 1141 (approving approximation based on coconspirator testimony); *United States v. Hunt*, Case No. 23-2342, 2025 WL 2472501, at *2 (9th Cir. Aug. 27, 2025) (affirming approximation based on trial testimony from coconspirators, text messages between defendant and others, and other drugs actually seized); *United States v. Caballero*, 612 F. App'x 460, 460 (9th Cir. 2015) (affirming approximation based on self-inculpatory statements of confidential source that could be corroborated).

### B.    There Are at Least Six Ways to Quantify the Drugs Illegally Distributed

As the Court correctly observed at the first sentencing, Defendants' business model "was a system which encouraged practitioners or prescribers to, in the Court's view, circumvent the process of prescribing medication in accordance with the standards that are recognized in the practice."  Hr'g Tr. 10.  Even granting that some Done members needed and appropriately received ADHD treatment, the Court recognized at least two categories of illegal distribution at Done:  drugs distributed to people who (1) "should not have received the medication," or (2) who "received an inadequate medical examination to make the determination that . . . it would be appropriate for them to receive that medication."  *Id.* 10–11.  Given the scale of Done's prescribing, the Court could find a base offense level of 38 even if only one percent of pills distributed to Done members fell into these two categories.

As set forth below, Done providers wrote prescriptions for roughly 37 million stimulant pills during the course of the conspiracy.  These pills fall into three categories:  (1) methamphetamine, (2) other amphetamines (typically amphetamine-dextroamphetamine, commonly called Adderall), and (3) methylphenidate (commonly called Ritalin).  The breakdown of these pills follows:

| Drug Type | No. of Pills | Total MG | Converted Weight |
|---|---|---|---|
| Amphetamine (actual) | 34,857,468 | 519,935,158 | 10,398,703.16 KG |
| Methamphetamine (actual) | 4,050 | 20,250 | 405 KG |
| Methylphenidate | 2,304,833 | 39,112,401 | 3,911.24 |
| Total | 37,166,351 | 559,067,809 | 10,403,019.4 KG |

Under Guidelines Section 2D1.1, a base offense level of 38 requires only 90,000 KG of converted drug weight.  But as reflected above, the 37 million pills distributed by Done amount to over 10 million KG — roughly 100 times as much.  So to reach an offense level 38, the Court need only find that 321,000 out of Done's 37 million pills were illegally distributed.

### 1.     The 16 Done Members Addressed by Dr. Goodman

At trial, expert witness David Goodman testified about his review of medical records for 16 Done members who received illegal prescriptions, including the four members who received the drugs at issue in Counts Two through Five of the Indictment. 11/3/25 Trial Tr. 3899:15–3900:12, 3903:2–6.  Dr. Goodman found that not even one of these members met the diagnostic criteria for ADHD, and none of the prescriptions for these members were written for a legitimate medical purpose within the usual course of professional practice. *See id.*  During Dr. Goodman's systematic review of these patient files, he consistently noted "inadequate evaluation that led to inaccurate diagnoses with the prescription of medications," "infrequent follow-up," and "patients receiv[ing] automatic refills [of controlled substances] as a function of their subscription to the Done model." *Id.* at 3987:12–17.  Dr. Goodman concluded that Done's model was ultimately "a business model, not a medical model." *Id.* at 3923:18–3924:4.  Ultimately, Dr. Goodman remarked that after forty years of clinical practice, he had never seen clinical practices as egregious as what he observed at Done. *Id.* at 3900:24-3901:2 ("I actually found it sad that patients were being treated this way").

As reflected in the table below, Defendants and their coconspirators dealt over 14,000 stimulant pills to these 16 members alone.  That volume already puts Defendants at a base offense level of 32:

| | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 13,962 | 288,114 |
| **Methamphetamine (Actual)** | 120 | 600 |
| **Methylphenidate** | 180 | 1,800 |

Gov. Supplemental Sentencing Memorandum       6
24-CR-0329 CRB

Defendants barely contest this evidence, except to suggest that (1) Dr. Goodman "could not testify about [] whether the defendants knowingly and intentionally caused the prescriptions without a [legitimate] medical purpose," and (2) some of the 16 patients were diagnosed with ADHD by other practitioners outside of Done.  *See* Hr'g Tr. 44–45.  Neither argument suffices to disregard Dr. Goodman's highly credible testimony.

*First*, Dr. Goodman did not need to opine that Defendants "knowingly and intentionally" caused the illegal prescriptions.  After all, expert opinions about a defendant's mental state are largely inadmissible.  *See* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").  The jury, as the trier of fact, undisputedly found that Defendants knowingly and intentionally caused the illegal distribution of drugs to four of these 16 members.  Defendant He did not even attempt to contest the jury's finding in a Rule 29 or Rule 33 motion, presumably because she knew she would not win.  The jury's finding was supported by an extensive trial record corroborating Dr. Goodman's testimony.  And the same theory that supported conviction as to the four count beneficiaries applies equally to the other members as well.

*Second*, Dr. Goodman explicitly testified that these prescriptions would not be legitimate simply because one or more of the 16 patients might conceivably have had ADHD.  As Dr. Goodman made clear, it is not medically appropriate to treat all patients reporting distractedness with stimulants because lack of focus can be caused for myriad reasons.  And as the Court already observed, the illegal prescriptions in this case include those for Done members who "received an inadequate medical examination to make the determination that . . . it would be appropriate for them to receive that medication." Hr'g Tr. 10–11.  That is because stimulants are not the only treatment for ADHD.  As Dr. Goodman testified, proper treatment for the disorder, of which stimulants are just one of numerous potential options, requires proper diagnosis of the cause of that symptom and a clinical determination of whether the drug will help that particular patient.  Stimulants can pose severe issues for patients with physical conditions like cardiac issues, and mental health conditions like anxiety, bipolar disorder, or substance abuse disorder.  *See* 11/3/25 Trial Tr. 3914:14–22, 3927:5– 23, 3954:12–19.  For example, stimulants can destabilize individuals with bipolar disorder, like N.C. and C.C., leading them to become

paranoid, psychotic, and potentially dangerous to themselves and others. *Id.* at 3954:14-19. And prescribers must exercise caution when deciding whether or not to prescribe a stimulant to someone with substance use disorder, like H.B., given stimulants' high potential for addiction. *Id.* at 3920:3–23. The Court heard from the mothers of these three patients about these exact consequences at trial.

There is every reason to believe that the pills distributed to the other thirteen patients were similarly unlawful. The jury explicitly found that prescriptions to T.T. and V.O. were illegal when it voted to convict on Counts Two through Five of the Indictment. Three of the other 16 members (A.R., K.D., and R.H.) all evidently struggled with substance abuse, and they died of drug overdoses during or shortly after their time as Done members. *See* Trial Tr. 3919–20 (noting K.D.'s opioid use), 3934–3935 (noting A.R. continued receiving stimulants for four months after he died), United States' Supplemental Submission of Victim Statements at 4–7 (letters from family members of R.H. and K.D.). And when more conscientious providers flagged that members B.H. and A.L. exhibited visible issues abusing opioids and methamphetamine, Defendants and their coconspirators simply enlisted other Done providers to prescribe stimulants to them instead. Trial Tr. 3943–3947. Still others had conditions that generally make stimulants risky if not positively inappropriate; for example, Done rerouted A.K. to a second Done provider after the first provider refused to prescribe Adderall in light of A.K.'s heart condition. *Id.* 3938–3943. And Dr. Goodman explicitly analyzed a so-called "training video" for D.J., explaining how the video positively proved her diagnosis and prescriptions were illegitimate. *Id.* 3925–3927. Dr. Goodman did not lightly conclude that these 16 patients' medical records reflected practices more egregious than he had ever seen. 3900:24-3901:2. His credible testimony reflects that every pill dispensed to these 16 patients was prescribed illegally, and every pill should count toward Defendants' base offense level.

### 2. Defendant Brody's Prescriptions

The Court could also readily find a base offense level of 38 based upon the pills prescribed by Defendant Brody alone. During the conspiracy, Defendant Brody prescribed 394,324 Schedule II stimulant pills to 6,559 Done members whom he had never evaluated or reviewed medical records for, throughout all fifty states in the country. He PSR ¶ 19; Trial Ex. 4000 at 39, 41–43. These numbers are broken down further in the following table:

|  | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 373,091 | 5,532,367 |
| **Methamphetamine (Actual)** | 0 | 0 |
| **Methylphenidate** | 21,233 | 356,771 |

The record clearly shows that Defendant Brody's prescriptions were categorically unlawful. Defendant Brody openly admitted that he didn't want to see patients, let alone take the time to carefully consider their clinical needs. *See, e.g.*, Trial Ex. 126 at 2 (Defendant Brody telling Defendant He that "when I joined [Done], one of the big attractions was not doing any clinical work"); Trial Ex. 210 (Defendant Brody telling Defendant He "my dreams are as follows, in order of preference: . . . 3. "Dealing with clinical psychiatric issues WITHOUT EVER HAVING TO SEE OR TALK TO THE PATIENT"). Defendant He knowingly participated in the conspiracy, telling Defendant Brody that "you don't even need to see patient at all just click buttons on e-prescribing too[l]." Trial Ex. 127 at 3.

That is precisely what Defendant Brody did — click and sign. As the evidence at trial showed, Defendant Brody did so even when other Done practitioners refused to authorize prescriptions or resigned from Done entirely, without even checking the medical records to see whether the other practitioners' concerns were valid. He PSR ¶¶ 19, 31; 9/30/25 Trial Tr. at 478:9–25 (Richard Menesini testifying that Defendant He rerouted prescriptions to Defendant Brody when the initial prescriber didn't think a stimulant prescription was appropriate), 527:6–12 (Menesini testifying that Defendant Brody would "sign[ ] prescriptions without going into and reading the charts and information"); 10/7/25 Trial Tr. at 1345:18–1346:3 (Kristin Bowen testifying that Defendant Brody did not even create a log-in to check medical records and never met a single patient during her tenure at Done).

As the Court understood, "that's not practicing medicine, all that is[,] is practicing distribution." Hr'g Tr. 27. These blind prescriptions are properly attributed to Defendant He, too. After all, Defendant Brody was simply following her guidance to "click buttons on e-prescribing too[l]." Trial Ex. 127 at 3. And Defendant He admitted precisely why she encouraged this wrongful behavior: "[W]e cannot afford losing him . . . it will destroy the organization . . . He dislikes seeing patients . . . If he leaves the company just will not be able to operate." Trial Ex. 910 at 1–3. As the Court correctly reasoned at the hearing, a wealth of testimony and corroborating evidence proved that these illegal prescriptions were "the natural and probable consequence[,] or a foreseeable result of[,] the conspiracy.

Gov. Supplemental Sentencing Memorandum       9
24-CR-0329 CRB

. . . It's foreseeable. She knowingly and intentionally set up the platform to operate [that] way."  Hr'g Tr. 47–48.

Defendants' only substantial response is to suggest that Defendant Brody was simply doing "bridge refills" as a "covering practitioner" for other Done providers.  *See, e.g.* ECF No. 596 at 8–9; ECF No. 612 at 21.  This position simply repeats what was raised at trial and rejected by the jury.  As an initial matter, <u>there is no such thing as a "refill" for a Schedule II stimulant</u>.  Each dispensation of a Schedule II stimulant requires a brand-new prescription because Schedule II drugs like Adderall, Ritalin, and Vyvanse have a high potential for abuse and dependence.  The prescription effectively expires the moment it is filled.  *See* 21 U.S.C. § 829(a) ("No prescription for a controlled substance in schedule II may be refilled."); Trial Tr. 3928 (Dr. Goodman testifying that "for Controlled Substance [Schedule] IIs, you cannot write refills in the usual course of professional practice").

Further, under federal law, a covering practitioner "conducts a medical evaluation (other than an in-person medical evaluation) at the request of a practitioner who . . . is temporarily unavailable to conduct the evaluation of the patient."  21 U.S.C § 829(e)(2)(C).  Defendant Brody never "conduct[ed] a medical evaluation," in person or otherwise.  He admitted that "it only [took him] 30 seconds per refill" precisely because he never checked patients' medical records.  Trial Ex. 689.  As forensic accountant Michael Petron testified, Brody signed an average of 30 prescriptions daily with an average time of approximately 33 seconds per prescription on his ten swiftest prescribing days.  He PSR ¶ 19; Trial Ex. 4000 at 72; 11/7/25 Trial Tr. at 4991:19–4992:11.  Indeed, he signed as many as 75 prescriptions in just 40 minutes. Trial Ex. 4000 at 72.  As the Court correctly recognized, Defendant Brody necessarily "didn't employ any medical judgment" when doing so.  Hr'g Tr. 27.

Defendant Brody was not just filling in a gap for providers who were "temporarily unavailable," either.  On the contrary, he prescribed a total of 87,885 pills for 1,555 Done members who had not been seen by any Done provider in over 180 days.  Ex. 4000 at 57.  Defendant Brody did not interact with the prior providers, either.  He simply looked at mass emails sent by a "care team" of unlicensed contractors in the Philippines.  10/7/25 Trial Tr. at 1346–47.  As Dr. Goodman testified, these were not "bridge refills."  They were "blind refills," written by a prescriber who didn't know the "primary provider . . . the nature of their practice . . . [or] anything about the patient."  11/3/25 Trial Tr. at 3949:10–3950:2.

Gov. Supplemental Sentencing Memorandum        10
24-CR-0329 CRB

These "blind refills" are categorically illegitimate, *id.* at 3950:3–19, and every one of Defendant Brody's pills should factor into Defendants' base offense level.

### 3.    Prescriptions Signed by Admitted Coconspirators

Defendants' base offense level of 38 could also easily be predicated only on the pills prescribed by the six providers who pleaded guilty to illegally furthering Defendants' criminal conspiracy, even if the Court concluded – contrary to their testimony at trial or factual bases that significant quantities of their pills were illegally distributed – that only a fraction were.  As the Court knows, six providers have already pleaded guilty to joining the conspiracy:  Christopher Lucchese, Ginger Simor, Yina Cruz, Erin Kim, Katrina Pratcher, and Elizabeth Shapard.  These providers' guilty pleas had a firm basis in fact, as Petron's summary analysis showed that they prescribed Schedule II stimulants for 90% to 99% of the patients they saw, and continued issuing prescriptions to 89% to 99% of patients who had not had a single appointment in the prior 180 days.  11/7/25 Trial Tr. at 5028:21–5029:9; Trial Ex. 4000 at 68.

Counting any *one* of these six provider's prescriptions alone would result in an offense level of 38.  Indeed, ***even just a fraction of one of these six provider's pills would suffice***.  As set forth below, these six coconspirators alone accounted for 9 million pills distributed to Done members:

| Provider | Amphetamine (actual) | | Methamphetamine | | Methylphenidate | |
|---|---|---|---|---|---|---|
| | Pills | Total MG | Pills | Total MG | Pills | Total MG |
| Cruz, Yina | 1,254,613 | 18,530,865 | 120 | 600 | 34,133 | 680,112 |
| Kim, Erin | 2,586,262 | 46,043,947 | | | 83,769 | 1,699,768 |
| Lucchese, Christopher | 1,453,841 | 22,588,638 | | | 198,121 | 3,581,847 |
| Pratcher, Katrina | 730,166 | 9,635,342 | 120 | 600 | 3,180 | 67,650 |
| Shapard, Elizabeth | 2,238,393 | 38,485,189 | | | 89,099 | 1,479,132 |
| Simor, Ginger | 628,064 | 9,997,707 | 240 | 1,200 | 36,287 | 656,491 |
| **Grand Total** | **8,891,339** | **145,281,687** | **480** | **2,400** | **444,589** | **8,165,000** |

Defendant He has no meaningful response to this category, claiming at base that the government had a "burden . . . to demonstrate that all of the prescriptions written by the handful of charged medical doctors were unlawful or that all of their prescriptions should be attributable to Ms. He."  ECF No. 612 at 22.  Her argument is wrong as both a legal and factual matter.  As already noted above, the prescriptions are attributable to her under black-letter conspiracy law, as the foreseeable results of the system she designed.  And the government has no burden to demonstrate that "all" prescriptions were

illegal.  It need only approximate a quantity of illegal prescriptions by a preponderance of the evidence, based upon competent evidence in the record.

The testimony of one of these six coconspirators, Elizabeth Shapard, credibly and competently establishes that a substantial amount of the prescriptions she wrote were illegitimate.  *See, e.g.*, Trial Tr. 2327 (admitting she had a patient panel of roughly 2,500 Done members on average); 2347 (testifying that she essentially rubber-stamped prescriptions, providing no care beyond simply getting members their stimulants).  Given that Shapard prescribed more than 2 million stimulant pills, the Court could find that Defendants' base offense level is 38 *even if only 14% of the pills that Shapard prescribed were distributed illegally*.

Erin Kim also featured heavily at trial.  Coconspirator Riley Levy testified that Defendant He was personally aware that Erin Kim was not seeing patients, that clinical leadership urged Defendant He to fire Kim for illegal prescribing, and that Defendant He refused. 10/28/25 Trial Tr. at 2980:20–2981:3. As reflected above, Erin Kim prescribed so many pills pursuant to the conspiracy that offense level 38 would be appropriate *even if only 12% of those pills were prescribed illegally*.

And even if only 25% of the pills prescribed by Yina Cruz were illegal, that too would suffice to reach offense level 38.  Again, the record readily supports that finding.  Cruz admitted to the Wall Street Journal that she signed prescriptions as fast as 30 seconds each, no different than Defendant Brody, for a panel of well over 2,000 patients, and that "virtually all [of them were] on stimulants."  Trial Ex. 2861 at 9–10.  As Levy testified at trial, Defendant He overruled efforts to fire Cruz even after learning this. Trial Tr. at 3380:20–3382:6.  Contrary to Defendant He's claims, there is ample evidence to support that these individuals prescribed pills illegally.  And the government certainly does not need to prove that all of those pills were illegal when a figure as low as 12% of Erin Kim's alone would suffice.  In total, the pills collectively prescribed by these six admitted felons and co-conspirators readily clears the bar for an offense level of 38.

### 4. Prescriptions for Done Members Who Never Had a Follow Up Appointment

The fourth category of illegal distribution consists of the pills provided to Done members who never once had a follow up appointment.  As established at trial and summarized above, stimulants like Adderall can have serious side effects when provided to people who do not need them or have comorbid

conditions like substance use disorder, anxiety, depression, bipolar disorder, or cardiovascular issues. Follow up appointments are thus necessary, so that conscientious providers can talk with patients to see how stimulants affect them. As Dr. Goodman explained, the standards of care therefore require a follow-up within the first month of the appointment and approximately every four months after that. He PSR ¶ 30; 11/3/25 Trial Tr. at 3929:5 – 3930:25.

Defendants knew that patients were not having follow up appointments and even caused follow up appointments to be cancelled or eliminated, and this aspect of the Done model was a crucial part of the conspiracy. So these prescriptions—which cannot be considered "practicing medicine"—were illegal. As reflected below, Done providers prescribed over 6 million pills for members who never had a single follow up appointment, in their entire time at Done:

|  | Pills | Total MG |
|---|---|---|
| Amphetamine (Actual) | 6,254,937 | 86,399,089 |
| Methamphetamine (Actual) | 1,320 | 6,600 |
| Methylphenidate | 463,604 | 7,801,720 |

Yet again, this was a natural and foreseen result of the conspiracy. As witnesses like Rick Menesini and Trevor Granger testified, Defendant He actively worked to reduce or eliminate follow-up appointments because she thought they would discourage subscribers from staying on the platform and reduce the time that Done providers could spend prescribing stimulants to get new Done subscribers. *See* 9/30/25 Trial Tr. at 485:21–25; 11/6/25 Trial Tr. at 4765:19–4766:7. Corroborating evidence at trial showed the many steps she took to make the elimination of follow-up appointments a reality. For example, in November 2020, she issued a new refill policy to Done members that highlighted that follow-up appointments were no longer a requirement. PSR ¶ 29; Trial Ex. 214 at 2. Around the same time, she directed Done employees to cancel at least 175 follow-up appointments that were already scheduled, without consulting Done providers. *Id.* And when members inquired about the cancellations, Defendant He personally replied that the member could obtain refills without appointments, again without consulting their clinicians first. *Id.* In March 2021, Defendant went further, instituting an "auto-renewal" policy to generate monthly, automatic prescription requests yet again without provider input. PSR ¶ 29; Trial Ex. 326. As noted above, these "auto-refills" would

Gov. Supplemental Sentencing Memorandum    13
24-CR-0329 CRB

continue even months after patients like A.R. had already died.  These prescriptions are all plainly illegal.

### 5.    Prescriptions for Done Members Who Did Not Have a Follow Up Appointment for Over 180 Days

As noted above, the standard of care requires follow-up appointments roughly every four months on average after the initial follow up.  But as the evidence at trial established, that standard of care was regularly disregarded at Done.  *See, e.g.*, Trial Tr. 2361 (Shapard testifying that she personally refilled prescriptions for N.C. without a single appointment over a period of roughly 180 days, which was outside the usual course of professional practice); Trial Ex. 4000 at 5 (noting member T.T. went over 649 days without a follow-up visit); *id.* at 57 (noting Defendant Brody prescribed over 87,000 pills to 1,555 Done members who had not been seen in over 180 days); Trial Ex. 364 (Dr. Brindala noting in risk mitigation report that numerous Done providers resigned because they were discouraged from following the standard of care for follow up visits).  Accordingly, another way to measure the illegal distribution is to look at the pills dispensed to members who went over six months without a follow-up appointment.  As reflected in the table below, this figure also exceeds six million pills in total:

| | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 6,408,905 | 99,569,055 |
| **Methamphetamine (Actual)** | 390 | 1,950 |
| **Methylphenidate** | 227,421 | 4,189,498 |

This is not merely a technical requirement, either.  Dr. Goodman explained what the lack of follow up appointments meant in practice: patients "suffered," they "decompensated," and they were "psychiatrically hospitalized" — "a devastating and frightening occurrence." 11/5/25 Trial Tr. at 4467:10–15.  Accounting for these pills, too, places Defendants at a base offense level of 38.  As with the prescriptions to patients that never received a follow up appointment in the category above, prescriptions to patients with long-delayed follow up appointments was central to the Defendants' conspiracy to distribute Adderall to patients outside the legitimate practice of medicine.

### 6.    The Sum Total of the Foregoing Prescriptions

The foregoing five categories are all reliable, conservative methods to calculate a baseline number of illegal prescriptions at Done.  There may have been Done members who needed ADHD

Gov. Supplemental Sentencing Memorandum        14
24-CR-0329 CRB

medication fortuitously, despite the Done conspiracy's goal of prescribing without appropriate case, and there may be members who have received a reasonable level of care from conscientious practitioners who didn't adhere to Done's model. But the categories summarized above exclude these members. And after accounting for duplicates, the sum of these five categories reveals that Defendants caused the illegal distribution of no less than 17 million pills of Schedule II stimulants:

|  | Pills | Total MG |
|---|---|---|
| **Amphetamine (Actual)** | 16,266,188 | 248,459,515 |
| **Methamphetamine (Actual)** | 2,070 | 10,350 |
| **Methylphenidate** | 958,868 | 16,878,287 |

Every one of these pills was prescribed for real individuals, who either suffered or were placed at an unacceptable risk of harm as a result. Even if the Court has any lingering doubt that the pills covered by these five categories are all illegal, that doubt cannot seriously disprove that Defendants' base offense level is 38. Given the staggering amount of pills covered by the foregoing five categories — over 17 million pills — the Court would have to find that Defendants' base offense level is 38 even if just *two percent* of those pills were illegally distributed. Whatever ambiguity there is, that is certainly no basis to adopt Defendants' position that the only harm proven across nearly eight weeks of trial was the four prescriptions at issue in Counts 2 through 5 of the Indictment. As the Court rightly observed, "there was overwhelming evidence in the record from people who were positioned to observe and to participate in this conspiracy of harm caused that was much greater" than those four prescriptions alone, and an offense level of 12 "doesn't [nearly] reflect the scope of the harm that is caused by this system." He PSR ¶ 30; 11/3/25 Trial Tr. at 3929:5 – 3930:25. Whatever the ultimate sentence imposed by the Court, the Guidelines analysis is clear: Defendants' base offense level is 38, and their total offense level is 43.

## II.    Drugs with Medical Applications Are Within the Heartland of the Guidelines

While Defendants' criminal scheme at Done was unprecedented in scope, it is ultimately just the latest variation on the timeworn crime of drug distribution. And the volume of drugs considered by application of the Guidelines is an appropriate measure of the relative culpability of the Defendants and the harm resulting from conduct that directly resulted in the distribution of millions of controlled pills. The Guidelines explicitly account for both aspects of this case that Defendants argue may take it out of

Gov. Supplemental Sentencing Memorandum        15
24-CR-0329 CRB

the heartland: (1) the potential medical uses of stimulants; and (2) the use of a technological platform to enable the drug dealing.

*First*, Guidelines Section 2D1.1 provides explicit guidance on how to treat drugs with medical applications. It explains how to calculate drug quantities for stimulant pills, as well as other controlled substances that come in the form of pills, tablets, or doses. It breaks out precisely how to measure the offense level for amphetamines like Adderall. It even accounts for the possibility that amphetamines will be distributed in the form of a "mixture," like a pill. And there are numerous cases involving convictions for the illegal distribution of Adderall and other amphetamines, including multiple defendants who received sentences between 120 months to 240 months: precisely the sentences that the government now seeks for Defendant Brody and Defendant He, respectively.

Ultimately, Defendants' attempt to frame Section 2D1.1 as focused purely on "street drugs," or presuming death and serious injuries, gets the standard exactly backwards. The Guidelines and courts across the country do not justify below-Guidelines sentences based on a lack of harm; they justify above-Guidelines sentences based on the *presence* of harm. *See, e.g.*, *United States v. Mudie*, 125 F.3d 849 (4th Cir. 1997) (noting in drug distribution case that "[i]t is not the absence of violence that merits a downward departure, but rather the presence of violence that is accounted for as a specific offense characteristic that results in an upward departure."). And Defendant He is wrong to claim that this case involved no harm. The Guidelines account for a variety of harms that Adderall specifically poses: addiction, psychological harm, delays or denial of appropriate treatment, and the endangerment of the public health more generally. While the government does not seek an upward departure, it details these kinds of harms below to illustrate why the Court should not credit Defendants' irresponsible claims about Section 2D1.1's heartland.

*Second*, Section 2D1.1 has accounted for the use of the internet to distribute drugs for over twenty years now. This includes the use of online marketplaces to target Adderall seekers, with the Sixth Circuit affirming a Guidelines sentence of 210 months as recently as two years ago. And courts have imposed Guidelines sentences for doctors participating in online "healthcare" companies distributing controlled substances as far back as 2007. Done is simply the newest form of an age-old enterprise. Defendants' "access to care" rationale is no basis for a downward departure, either. In

Gov. Supplemental Sentencing Memorandum     16
24-CR-0329 CRB

practice, Done did not expand access to care; its nationwide scope endangered the public health. That is traditionally a basis for an upward departure, not a downward one. Done's telehealth platform is not a mitigating circumstance, and it does not take this case outside of Section 2D1.1's heartland.

## A.    Legal Standard

Under the traditional regime of departures, the Sentencing Commission intended courts "to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." *Koon v. United States*, 518 U.S. 81, 93 (1996). Courts could thus "depart in cases that feature aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Commission." *Id.* Most "conduct regulated by those statutory provisions explicitly referenced [in a Guideline] would be considered 'typical' and within the 'heartland' of cases covered by that guideline." *United States v. Leahy*, 169 F.3d 433, 440 (7th Cir. 1999).

"To determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." *Koon*, 518 U.S. at 92–93 (internal quotation marks omitted). And "to determine the heartland of a particular Guideline, a district court is to compare the defendant's conduct with the conduct of all defendants who are sentenced pursuant to the same Guideline." *United States v. Stevens*, 197 F.3d 1263, 1268 (9th Cir. 1999); *see also United States v. Mendoza*, 121 F.3d 510, 515 (9th Cir. 1997) ("[T]he relevant comparison group for heartland analysis is not limited to defendants who commit the same crime as the defendant, but includes all defendants sentenced under the same Guideline as the defendant."). Ultimately, courts "must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be highly infrequent." *Koon*, 518 U.S. at 96 (internal quotation marks omitted).

## B.    The Guidelines Thoroughly Account for Drugs with Medical Applications

### 1.    Section 2D1.1 Fully Accounts for Adderall and Other Amphetamines

Guidelines Section 2D1.1 plainly recognized that drugs with medical uses could be illegally distributed. The Section's text makes that crystal clear, including for Adderall. As noted above, the vast majority of Schedule II stimulants distributed by Done were amphetamines, including Adderall. The drug quantity table in Section 2D1.1(c) explicitly lists "amphetamine" as one of the controlled

substances that it addresses, and it explains precisely how to account for amphetamines when calculating an offense level. *See, e.g.*, U.S.S.G. § 2D1.1(c)(1) (providing for a base offense level of 38 in any case involving 45KG or more of Amphetamine, or 4.5KG or more of Amphetamine (actual)); *id.* Note B (noting that "Amphetamine (actual)" refers to "the weight of the controlled substance, itself, contained in the mixture or substance."). The Guideline specifically accounts for amphetamines with a medical purpose, too. Application Note 9 addresses how to determine drug quantities based on "doses, pills, or capsules," including specific guidance for "stimulants" including amphetamines. When Section 2D1.1 provides explicit guidance on how to calculate drug quantities in cases involving stimulant pills, just like this one, there is no basis to conclude that cases involving stimulant pills are categorically outside of Section 2D1.1's heartland.

There are many cases in which courts imposed substantial sentences for the distribution of drugs that could have a medical use, including in settings where patients who received the drugs could conceivably have needed them. This fact pattern is regrettably common, occurring at pill mills run out of medical clinics across the country. These clinics are the traditional platforms for distribution of Schedule II stimulants and opioids, providing a blueprint for technological platforms like Done.

That is precisely why Defendant He saved DOJ press releases for clinic cases on her MacBook. *See, e.g.*, Sentencing Ex. 8 (Trial Ex. 2356). As this press release reveals, Defendant He specifically tracked cases involving convictions for the illegal distribution of Adderall without a legitimate medical purpose, outside the usual course of professional practice. Defendant He looked to these cases for guidance, and the Court should do so too.

The case described in Sentencing Ex. 8 is remarkably similar to the one now before the Court, save for the fact that the two defendants distributed Adderall at a traditional clinic rather than through a technological platform. Like Defendants, clinic manager Chia Jean Lee and her physician coconspirator Theodore Taylor were convicted at trial for conspiracy to distribute Schedule II controlled substances like Adderall, along with other controlled substances like oxycodone. *See id.* Their theory of the defense was substantially the same as the one the Court heard over nearly eight weeks of trial in this case. As the Fifth Circuit noted when affirming Guidelines sentences for both defendants, they claimed at trial that they "refused to prescribe to patients who tested positive for illegal drugs" and ultimately

Gov. Supplemental Sentencing Memorandum        18
24-CR-0329 CRB

"acted in good faith and trusted [their] patients to accurately report" their symptoms. *United States v. Lee*, 966 F.3d 310, 317 (5th Cir. 2020). Clinic manager Chia Jean Lee, who lacked prescribing authority, "assert[ed] that she knew nothing about the prescriptions Taylor wrote" and "was an innocent office manager." *Id.* But the evidence at trial showed that Lee was "in charge of the clinic's finances, which improved dramatically as the clinic concentrated its practice on" prescribing controlled substances. *Id.* "As the clinic's business took off, [Lee and Taylor] discussed patient volume and pricing," prioritizing growth so that "monthly revenues rose fivefold" in just over a year. *Id.* at 318–319. Lee was aware of significant red flags, including that Taylor "saw more patients than he could treat under the proper standard of care," but she continued to run the clinic in the same fashion and even "prewrote prescriptions for Taylor to sign." *Id.* at 319. For his part, the physician "Taylor did little to justify the prescriptions," writing prescriptions for up to "40 to 50 patients a day." *Id.* at 317. "What time Taylor spent with patients often involved only a cursory physical examination," and "[f]or some patients, Taylor wrote prescriptions without any examination at all." *Id.* at 318. Ultimately, the evidence showed that Taylor spent less than ten minutes with the patients he did see. *Id.* at 318. And the defendants maintained these practices even when family members begged them to stop feeding patients' drug addictions, and when others like pharmacists highlighted red flags of drug abuse and diversion. *See id.* at 317–318.

The similarities do not stop there. At sentencing, each defendant made arguments that practically mirror the claims made by Defendants here. *See United States v. Lee et al.*, Case No. 4:17-CR-009, at ECF No. 172 (N.D. Tex. May 9, 2019) (Taylor sentencing transcript); *id.* at ECF No. 209 (N.D. Tex. July 23, 2019) (Lee sentencing transcript). Like Defendant He, clinic manager Lee argued that she warranted a variance below the Guidelines range because (1) she "does not have the authority, does not have the ability, and she never did prescribe medications," ECF No. 209 at 6; (2) she was not responsible for prescribers' decisions because she spent much of her time in Taiwan, *id.* at 6–7; (3) the Court should judge her misconduct against "a typical drug distribution case," *id.* at 12; and (4) she was highly educated and had "never been looked at twice by law enforcement," *id.* at 14. But the trial record established that Lee was (1) "a micromanager and controlled things very tightly in the clinic," and that she conspired to "distribute large quantities of the charged drugs, relying on [codefendant] Taylor's

Gov. Supplemental Sentencing Memorandum     19
24-CR-0329 CRB

script writing authority," *id.* at 8; (2) "that she monitored and checked in remotely even while she was away" in Taiwan, *id.* at 8; (3) that Lee "set the cash prices for the clinic," "established a pricing structure" to ensure it was profitable, "pushed to increase the number of clients at the clinic," and "used intimidation and rudeness to keep staff . . . in line," *id.* at 11.  In short, Lee engaged in the very same practices that Defendant He did to make the drug distribution scheme at Done profitable.  The district court accordingly rejected Lee's arguments, concluding that "she ran everything in the clinic" and bore responsibility for the illegal scheme.  *Id.* at 13.  In light of this conduct, the court imposed a Guidelines sentence of 188 months in prison.  *See id.* at ECF No. 168 (Lee Judgment).

The physician defendant, Taylor, also raised many of the same arguments that Defendants make now.  For example, he argued (1) that the government had not proffered evidence "competent to substantiate the drug amounts . . . attributed" to him, ECF No. 172 at 16; (2) that "the clinic . . . was run by [Lee], not so much by him," *id.* at 21; (3) that he was "a 65-year-old man who [had] never been arrested" and "[hadn't] practiced medicine for seven years" by the time of sentencing, *id.* at 22; (4) that he "did not need money" and acted purely to help his patients, *id.* at 23–24; and (5) that he was a victim of misguided DEA efforts that reduced access to care, *id.* at 24–25.  The district court rejected all of these arguments, even while acknowledging "a substantial percentage [of the clinic's prescriptions] were perhaps legitimate."  *Id.* at 19.  Relevant here, the court expressed concern that Taylor could continue to teach and influence others with his baseless concept of medical practice, even if he lost his license.  *Id.* at 44.  The judge also noted that the 65-year-old physician was younger than her, and that she could "certainly consider recommending a medical facility if there's a concern."  *Id.* at 44–45.  Accordingly, the court imposed a Guidelines sentence of 240 months for Taylor.  *See id.* at ECF No. 166.

This is not the only case in which a court imposed a substantial Guidelines sentence for the illegal distribution of Adderall, either.  For example, another district court imposed a within-Guidelines sentence of 120 months for a physician defendant who admitted to five counts of illegally diverting Adderall and one count of illegally diverting oxycodone.  *See United States v. Bajwa*, Case No. 20-CR-060, at ECF No. 56 (E.D. Va. June 19, 2020).  As the press release for the conviction revealed, Bajwa and his staff generally did not "receive, review, or request prior medical files; obtain medical histories; conduct physical examinations; discuss the case of any attention disorder or what might properly address

Gov. Supplemental Sentencing Memorandum      20
24-CR-0329 CRB

such a condition; discuss any alternatives to treatment; or obtain and analyze urine samples to ensure his patients were taking their medications as directed." Sentencing Ex. 9. Indeed, Bajwa wrote "monthly prescriptions for the maximum dose of Adderall" to a patient with a history of high blood pressure, as well as Adderall for individuals who admitted they would use it for non-medical purposes. *See id.* As with Lee and Taylor, this press release was available for Defendant He to review at the very beginning of the illegal conspiracy at Done.

Still other courts have imposed sentences well over 100 months for defendants convicted of illegally distributing controlled substances including Adderall, even if not strictly within the Guidelines range. *See, e.g.*, *United States v. Allingham*, Case No. 25-CR-002, at ECF No. 62 (E.D. Va. Sept. 10, 2025) (imposing sentence of 156 months' imprisonment for conspiracy to distribute Schedule II substances including amphetamines and opioids). If the Court expands its analysis beyond cases including amphetamines, the number of cases including other drugs with a medical purpose are too many to count. Even in those cases, courts have regularly imposed sentences ranging from 87 months to 20 years, with 10 years a common benchmark. *E.g., United States v. Adelglass*, 20-CR-605 (S.D.N.Y.) (Rakoff, J.) (10-year sentence for physician who prescribed more than 1.3 million oxycodone pills); *United States v. Talbot*, 21-CR-00111 (E.D. La.) (Milazzo, J.) (87-month sentence for physician who illegally distributed over 1.8 million doses of controlled substances like oxycodone, hydrocodone, and morphine); *United States v. Sherman*, 21-CR-20393 (Levy, J.) (E.D. Mich. 2024) (13-year sentence for 75-year-old physician who issued more than 270,000 doses of opioids).

Defendants simply adapted this traditional clinic model to the modern age, using the power of social media and the internet to distribute drugs on a nationwide scale. Their core offense conduct — directly or indirectly causing the illegal distribution of controlled substances under the guise of medicine — is directly within the heartland, whether or not Congress and the Sentencing Commission explicitly envisioned fraudulent telehealth platforms like Done. *See Stevens*, 197 F.3d at 1271 ("[I]t was erroneous as a matter of law to rely on Congress' intent in creating the offense, instead of on a comparison of offenders' conduct.").

### 2.    Defendant He Misrepresents the Guidelines' Approach to "Harm"

Throughout her sentencing submissions, Defendant He has framed this case as involving only a

"potential" or "risk" of harm, treating deaths and overdoses as the bar for the "typical" case under Section 2D1.1. *See, e.g.*, ECF No. 612 at 13 (claiming that "unlike most drug trafficking cases applying § 2D1.1 as the primary guideline, the negative social consequence of the offense conduct here is the "risk" of harm as opposed to *actual* harm to patients"); *id.* at 14 (suggesting the typical cases are doctors whose patients fatally overdosed or members of the Sinaloa cartel).

The Court should reject this misleading framing, which has no basis in the Guidelines themselves. It is not the absence of death or serious injury that justifies a below-Guidelines sentence; the presence of that degree of harm justifies an above-Guidelines sentence. The 2D1.1 heartland certainly does not presume that drug use results in, or is likely to cause, a fatal overdose. On the contrary, Section 2D1.1 explicitly provides for enhancement of the base offense level where death results. For example, U.S.S.G. §2D1.1(a)(2) requires a base offense level of 38 whenever the use of a controlled substance results in death or serious bodily injury as defined in 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or (b)(1)(C). *See* U.S.S.G. § 2D1.1(a)(2); Application Note 2. Since Section 2D1.1 provides that a single death or serious injury alone can result in a base offense level of 38, regardless of drug quantity, that degree of harm is plainly not a *sine qua non* when calculating the base offense level more generally. Indeed, Section 2D1.1 also provides for enhancing the base level based upon a "substantial risk of harm," whether "potential" or actualized. *See, e.g.*, U.S.S.G. § 2D1.1(b)(14)(C) and (D) (providing for increased offense level where manufacture of an amphetamine "created a substantial risk of harm" to human life or the environment). Defendant He's suggestion that a "risk" of harm does not matter is simply wrong, both morally and as a matter of law. *See United States v. Simpson*, No. 24-5535, 2025 WL 353700, at *3 (6th Cir. Aug. 4, 2025) (affirming 27-month upward variance from guidelines range because after the fentanyl overdose death accounted for under Section 2D1.1(a)(2), the defendant continued to sell fentanyl and posed for photographs with large stacks of cash).

Looking beyond Section 2D1.1, courts have repeatedly issued above-Guidelines sentences in cases involving substantial physical harm, as under 18 U.S.C. § 3553(a) and until November of last year, as departures under Section 5K2.2. [1] As the Second Circuit clearly explained, "permanent physical

---

[1] "In 2025, the [Sentencing] Commission amended the Guidelines manual to remove departures and policy statements relating to personal characteristics . . . The Commission envisioned and framed this 2025 amendment to be outcome neutral. As such, the removal of departures from the Guidelines

Gov. Supplemental Sentencing Memorandum        22
24-CR-0329 CRB

injury takes [a drug distribution] case out of the 'heartland.'" *United States v. Rodriguez*, 774 F. App'x 712, 714 (2d Cir. 2019). And as the First Circuit persuasively reasoned, "an upward departure may be appropriate under Section 5K2.2 with respect to a defendant who, although not directly responsible for a significant physical injury and although not harboring an intent to harm, sets into motion a chain of events that risks serious harm to others." *United States v. Pacheco*, 489 F.3d 40, 47 (1st Cir. 2007). Even if the Court credits Defendants' claim that they never intended to harm Done members, the record amply established that they caused numerous chains of events that risked serious harm to Done's many members. And, yet again, that "risk" of harm is itself enough to warrant an *upward* departure. Defendant He's framing of the "harm" analysis is backwards, and it would be error to adopt it.

Defendant He is also wrong to claim that "the government has admitted . . . that the offense conduct was not the cause of any harm to any patient." ECF No. 612 at 2. This is not even close to accurate. The only two transcript portions she cites simply stated that the government didn't allege that Done prescriptions caused H.B.'s overdose, or N.C. and C.C.'s psychosis. *See* Trial Tr. 2265:25-2266:6, 5030:1–8. That is a far cry from saying that Done did not harm H.B., N.C., and C.C. more broadly, and it is certainly not an admission that Defendants' egregious conduct did not cause "any harm to any patient." At this point, Defendant is shamelessly ignoring the extensive evidence of the harm that she is responsible for.

"Harm" takes many forms beyond an opioid or cocaine overdose. At the simplest level, convincing a patient to receive unnecessary medical treatment is itself a kind of harm. *See, e.g.*, *United States v. Rainford*, 110 F.4th 455, 484 (2d Cir. 2024) ("A defendant who commits an offense that causes harm to others —including others who are exploited as participants in the conspiracy —is more culpable than a defendant who commits the same offense without such harm to others. In this case, the

---

Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure is no longer informative or that a court should no longer consider such facts for purposes of determining an appropriate sentence. . . it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G. app. B, pt. III, Compilation of Deleted Departure Provisions at 133 (citing U.S.S.G. App. C., amend. 836 (effective Nov. 1, 2025) (May 1, 2025). *See also* U.S.S.G. § 5K2.2 ("If significant physical injury resulted, the court may increase the sentence above the authorized guideline range.").

Gov. Supplemental Sentencing Memorandum       23
24-CR-0329 CRB

defendants profited by recruiting economically desperate people to undergo unnecessary surgeries."). There are many reasons that this is true. For one, it is harmful to deceive patients into thinking that a stimulant pill is the cure to all their mental health problems. As Dr. Goodman explained, even patients who do not need Adderall may temporarily believe it has cured their underlying conditions because of its short-term boosts to mood and energy, only to eventually learn that they were mistaken. 11/3/25 Trial Tr. at 3925:6–10, along with other controlled substances. That kind of deception is an actual psychological harm, and harms of that kind can support an above-Guidelines sentence. *See, e.g.*, *United States v. Jacobson*, 4 F.3d 987 (4th Cir. 1993) (affirming upward departure under then-Guidelines Section 5K2.3 where a defendant deceived patients of his fertility clinic into believing they had become pregnant, as his injections of the hormone HCG temporarily resulted in symptoms commonly associated with pregnancy).

That is not the only harm posed by unnecessary stimulant prescriptions. While patients operate under the misconception that they are receiving proper treatment, the amphetamine pills alter their brain chemistry, risking a range of side effects that would not have to be treated otherwise – cardiovascular risks, agitation, suspicion, paranoia, psychosis, and aggression included. 11/3/25 Trial Tr. at 3925:6–10, 3954:14-19. And as already described above, comorbid conditions like anxiety, depression and bipolar disorder may fester in the meantime, compounding the degree of treatment that misguided members may need in the future. *See* 11/3/25 Trial Tr. at 3914:14–22, 3927:5–23; 3954:12–19. That, too, is often viewed as the kind of harm that traditionally justified an upward departure. *See United States v. Ada*, 700 F. App'x 689, 691 (9th Cir. 2017) (affirming grant of an upward departure under Section 5K2.14 where a defendant's healthcare fraud "endangered the public health by forcing patients to undergo more serious treatment" than they would have had to absent his crimes).

And as already noted above, unnecessary stimulants pills pose a high danger of addiction for individuals at risk of substance use disorder. 11/3/25 Trial Tr. at 3920:3–23. Addiction is the harm that is at the very heart of Section 2D1.1. That high risk of addiction is precisely why amphetamines like Adderall are classified as Schedule II controlled substances despite their acknowledged medical uses. *See, e.g.*, *United States v. McAllister*, 491 F. App'x 569, 572–73 (6th Cir. 2012) (rejecting defendant's argument that he was "outside the heartland" of methamphetamine cases in light of "the addictive nature

Gov. Supplemental Sentencing Memorandum        24
24-CR-0329 CRB

of methamphetamine" and "social harms caused by methamphetamine offenders"). Adderall treatment comes with many potential harms, and its medical uses do not take it outside of the heartland.

### C.     The Guidelines Account for Telehealth and Technological Platforms

#### 1.     The Guidelines Account for Telehealth and Online Drug Distribution

Defendants' use of a telehealth platform to distribute drugs is not enough to take this case outside of the heartland either. Drug traffickers have been using social media and the internet to distribute controlled substances illegally for over twenty years now. That is why Section 2D1.1 explicitly provides for enhancement of the offense level where "the defendant, or a person for whose conduct the defendant is accountable . . . distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7). Courts have thus applied this provision and imposed Guidelines sentences to address schemes that utilize online marketplaces and platforms to distribute controlled substances with medical uses, including Adderall, its closely related cousin methamphetamine, and other classes of drugs like benzodiazepines.

Criminal enterprises have used the guise of online healthcare businesses to illegally distribute controlled substances at least as early as 2007, before Done or even *Napoli*. *See generally United States v. Hanny*, 509 F.3d 916 (8th Cir. 2007). Hanny, like Defendant Brody, was a physician who began working for two companies called Pharmacom and Jive towards the end of his career. *See id.* at 917. Both companies advertised themselves as an online source for prescription medications falling within Schedules III and IV of the Controlled Substances Act, subject to the authorization of physicians like Hanny. *See id.* And much like Defendant He's business model at Done, Pharmacom and Jive did not require participating physicians to examine patients or even review medical records before signing off on the prescription medication orders, instead allowing them to rely on brief questionnaires self-reported by the prospective drug purchasers. *See id.* Hanny was thus convicted of conspiring to distribute controlled substances outside the usual course of professional practice, and the Eighth Circuit affirmed the district court's imposition of a Guidelines sentence of 33 months imprisonment for his conduct. *Id.* at 918. In affirming, the Eighth Circuit quoted Sentencing Commission commentary indicating that online services like Pharmacom and Jive "provide[d] criminals an easier method to market their products and [made] it more difficult for law enforcement to uncover the crime and punish the

Gov. Supplemental Sentencing Memorandum     25
24-CR-0329 CRB

offenders." *Id.* at 920.

Done is not the only criminal enterprise to target individuals who might have needed, or simply wanted to abuse, Adderall, either. For example, the Sixth Circuit recently affirmed a 210-month Guidelines sentence imposed for a defendant's use of a dark web marketplace to sell counterfeit Adderall (which testing later showed to be its cousin methamphetamine, rather than amphetamine-dextroamphetamine). *See United States v. Ombisi,* Case No. 24-5012, 2024 WL 3278156, at *1 (6th Cir. June 18, 2024). The Sixth Circuit affirmed the procedural and substantive reasonableness of this Guidelines sentence, noting that the Guidelines were properly applied to this digital scheme targeting Adderall seekers. *See id.* at *3. And the Sixth Circuit affirmed even while acknowledging Adderall could have medical uses, noting that the defendant "had put children who needed Adderall at risk of consuming what was actually methamphetamine." *Id.* Defendant He specifically targeted the same clientele that Ombisi serviced, explaining to investors in Done's early days that her "target users [were] those who are already taking medications like Adderall . . . probably not legally." Trial Ex. 19. She simply steered them from the dark web to her platform by paying millions of dollars for Google to display Done's website in response to searches for terms like "buy Adderall" and "get adderall online." Trial Ex. 4000 at 15, 16, 44. Nor was Defendant He averse to providing Done members with methamphetamine if they wanted it; as reflected above in Section I.B.6, Defendants illegally distributed at least 2,000 methamphetamine pills to Done members. Accordingly, it would be erroneous to conclude that this case falls outside of the heartland simply because of Defendants' reliance on the internet and social media to target individuals seeking Adderall, whether for legitimate or illegitimate purposes. *See Stevens,* 197 F.3d at 1271 ("[I]t was erroneous as a matter of law to depart downward based on factors inherent in the use of a computer, for which the Guidelines actually require enhancement of the sentence.").

A variety of other telehealth schemes have proliferated in recent years, in fields of healthcare ranging from durable medical equipment like orthotic braces to genetic testing. Courts have not hesitated to impose substantial sentences in response to such schemes. *See, e.g., United States v. Young,* 21-CR-00417 (N.D. Tex. 2025) (Starr, J.) (10-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $70 million in

fraudulent billing to Medicare); *United States v. Canchola*, 19-CR-00473 (N.D. Tex. 2024) (Brown, J.) (10-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $54 million in fraudulent billing to Medicare); *United States v. Baldonado*, 21-CR-430 (D.N.J. 2025) (Wigenton, J.) (7-year sentence for physician who signed orders for orthotic braces and genetic tests for patients he did not see, speak to, or otherwise treat, causing $24 million in fraudulent billing to Medicare); *United States v. Waxman and Zusmer*, et al., 21-CR-60253 (S.D. Fla. 2023) (Moore, J.) (8-year sentence for DME company owner that acquired patient referrals and signed doctors' orders by paying kickbacks to marketers who used overseas call centers to solicit patients and telemedicine companies to procure the sham doctors' orders; defendant was responsible for over $2 million in fraudulent Medicare billing and received obstruction of justice and mass marketing enhancements; 15-year sentence for DME company owner and mastermind who was responsible for $31 million in fraudulent billing).  Bearing in mind that these braces and testing do not nearly pose the same harms as unnecessary amphetamines, the government's requested sentences for Defendants are both appropriate and necessary.

### 2.    Defendants' "Access to Care" Claims Do Not Justify a Downward Departure

Defendants have consistently sought to spin their use of technology as a mitigating factor, claiming that they used Done to increase "access to care."  But that idealistic claim cannot be squared with the reality that Done's widespread reach endangered the public health.  As the trial record established, Done did not operate in the way that Defendant He portrayed to investors, healthcare insurers, pharmacies, her own employees, or this Court at sentencing.  "Access to care" is a superficial euphemism, gilding the cruder reality that Done funneled millions of stimulants to people who should not have them.  Defendants' use of a technological platform certainly does not warrant a downward departure.  On the contrary, it would have been another basis for an upward departure under the traditional regime.  *See* 5K2.14 ("If national security, public health, or safety was significantly endangered, the court may depart upward to reflect the nature and circumstances of the offense.").

Despite Defendants' claimed benevolent intentions to increase access to care, the reality is that Done's nationwide distribution model endangered public health and safety.  Nearly every employee and practitioner testified that Done was misdiagnosing patients and providing them with drugs that had

Gov. Supplemental Sentencing Memorandum        27
24-CR-0329 CRB

dangerous side effects, and that Defendant He positively removed any controls that would have assured those drugs only went to qualified patients.  Defendants do not contest that over 34,000 Done users had medication changes or dosage increases with no appointment, which, based on Dr. Goodman's uncontested testimony, would have led to concrete, systematic harm even without individualized proof of injury.  The jury evidently rejected Defendants' access to care rationale when voting to convict.

Indeed, Courts applying then-Guidelines Section 5K2.14 rejected substantially the same arguments that Defendant He presses about the mere "risk" of harm here.  Consider *United States v. Contris*, 125 F.3d 849 (4th Cir. 1997), in which the Fourth Circuit affirmed an upward departure for endangering the public health under § 5K2.14.  There, the owner of a food distributor selling tainted meat argued "there was no evidence his conduct actually caused harm to anyone and because USDA regulations which require multiple inspections before meat reaches the consumer reduced the risk to public health."  *Id.*  The Fourth Circuit flatly disagreed, observing that Contris "routinely did all within his power to evade the regulations which applied to his meat-packing operation," and ultimately "the full effect of his conduct [was] not known."  *Id.*  Defendant He likewise sought to evade and frustrate Controlled Substance regulations at every turn, and there can be little doubt that her nationwide conduct systematically endangered the public.

The public health is not to be gambled with, no matter the presence or absence of harm.  *See, e.g.*, *United States v. Reichard*, 151 F. App'x 200 (3d Cir. 2005) (affirming upward departure where a defendant "intentionally played Russian roulette with the health and safety of any member of the public," even without evidence of actual harm from a destructive device he placed in the mail).  That is exactly the point that the Court made when remarking that "the Controlled Substances Act is not a slot machine."  11/10/25 Trial Tr. at 4308:20–4309:3 ("You're gambling. That's the point. The prohibition is against the gambling not against the result.").  Defendants' arguments about "actual harm" and "access to care" affirmatively flip controlling law on its head, and they are fundamentally inconsistent with the Guidelines' approach to sentencing.  To "remain cognizant of [the Guidelines] throughout the sentencing process," as the Supreme Court requires, the Court must reject Defendants' misleading framing of the Guidelines' approach.  *Gall*, 552 U.S. at 50 n.6.  The Guidelines fully account for Defendants' conduct, and to the extent that Defendants' conduct even remotely falls outside of the

Gov. Supplemental Sentencing Memorandum          28
24-CR-0329 CRB

heartland, it would have traditionally warranted an upward departure. But the government does not seek such a departure, considering that the Guidelines term of imprisonment amounts to a life sentence already. Ultimately, the just sentence in this case should not turn upon a finding that Defendants' conduct was outside of the heartland of the Guidelines.

## III.    THE GOVERNMENT'S PROPOSED SENTENCES SERVE THE PURPOSES SET FORTH IN SECTION 3553(A)(2)

To be clear, the government does not seek a Guidelines sentence. The 240-month sentence that the government seeks for Defendant He is only 15% of her advisory Guidelines term, and the 120-month sentence that it seeks for Defendant Brody is not even 10 % of his advisory Guidelines term.

While the sentencing factors in Section 3553(a)(2) do not require a life sentence, they do not remotely support a sentence as lenient as 84 months' imprisonment, let alone the lower sentences that Defendants seek. As to factor (A), Defendants have repeatedly disrespected the law from the very beginning of the conspiracy, encouraging Done providers to keep prescribing without worrying about going to jail, and even promising a Tesla to the first employee who landed in jail. That cavalier disregard for the law amounted to a disregard for Done members' safety, leading multiple subscribers down a road of destabilization, paranoia, psychosis, and drug abuse. As to factor (B), general deterrence is critical. Telehealth platforms are the future of medicine in the United States, and the industry is closely watching this sentencing to gauge the risks of willfully violating federal healthcare laws. A lenient sentence will only validate Defendant He's repeated sentiment that breaking the law is merely a cost of business for any company that wants to reach the scale of an Uber or Lyft. And as to factor (C), a significant sentence is certainly needed to protect the public from further crimes by Defendants. Defendant He has not expressed even the slightest remorse since being convicted. Even now, she denies she harmed anyone at all, and she has already proven that she can run Done from abroad. That is exactly why she tried to flee the country and concealed her Chinese Travel Document from this Court. The sooner she is deported, the sooner she can resume criminal conduct beyond the reach of the American legal system.[2]

---

[2] Section (D) is immaterial. Defendants do not need educational or vocational training; they committed their crimes despite graduating with prestigious degrees and working at established, reputable clinics and companies like Facebook.

Gov. Supplemental Sentencing Memorandum        29
24-CR-0329 CRB

## A.    The Seriousness of the Offense and Respect for the Law

Defendant He did not found Done because she was passionate about expanding access to care. She simply began it after her music startup failed, and she saw that she could capitalize on an underground market for drugs like Adderall. *See, e.g.*, Trial Ex. 19 (describing her "target users [as] those who are already taking medications like Adderall . . . probably not legally"). That is precisely why she constantly referred to Done as her "drug biz" in private conversations with her closest confidantes, from the very start. *See, e.g.*, Trial Ex. 897 at 158 (explaining to Aakash Prasad that she had "brainwashed so many people, including psychiatrists, to do this drug thing"); *id.* at 172 (describing Done as her "drug startup"); *id.* at 174 (alluding to Done as "selling drugs"); *id.* at 182 (describing Done as "[her] drug biz"). When a Done member later wrote to complain that Done was "legal drug dealers profiting off of addiction," Defendant He simply remarked that "Most successful companies usually profit out of addiction." *Id.* at 151. And she explained precisely why she was willing to profit off of others' substance abuse: "Right now I just want to be a billionaire." *Id*. at 143.

And Defendant He repeatedly told others that laws were merely an obstacle to making her "drug biz" profitable. As she bluntly put it, "regulation makes no biz make money." *Id.* at 83. She also made it perfectly clear that she prioritized money over those regulations, explaining that "for the drug startup [Done] right now the legal situation is very tricky . . . Honestly I don't care about these at the early stage like Uber and Lyft were all illegal." *Id.* at 172. She practically made disregard for the law an ethos at Done. As multiple former employees testified, she regularly dismissed concerns that Done was violating the law and even promised that she would buy a Tesla for the first person who went to jail for Done. 9/30/25 Trial Tr. at 494:24–495:20 (Menesini); 10/7/25 Trial Tr. at 1327:4–17 (Bowen); 10/30/25 Trial Tr. at 3433:4–16 (Hill-Alvarez).

Defendant Brody discouraged Defendant He from hiring employees with law enforcement backgrounds, explaining that he disliked people who were "really into the law." Trial Ex. 139 at 2. He repeatedly told Done employees that getting sued was "no big deal," and that Done's providers should prescribe stimulants to patients "no matter what and not worry about going to jail." Trial Ex. 546 at 2. And when others like Chief Medical Officer Jayaram Brindala spelled out precisely how serious the legal risks were, Defendant Brody simply focused on whether those reports would be "evidence to be

used against" him, rather than how to address those concerns. Trial Ex. 230. At times, Defendant Brody's disregard for the law was so blatant that even Defendant He remarked on it, as Aakash Prasad noted when he reminded her that Defendant Brody said he would keep prescribing Adderall even if it led to his execution. Trial Ex. 897 at 22.

This disregard for the law was a disregard for others. Through their crimes at Done, Defendants harmed Done members, those members' families, Done employees, Done's investors, the pharmacies and insurers that Done deceived, and our public healthcare system more broadly. The Court heard from three mothers of Done members at trial, and their testimony represents only a selection of the concerns and damage felt by the families of Done members who should not have had Adderall. For example, K.C. and D.C. repeatedly reached out to Done after their children were hospitalized with symptoms including Adderall psychosis. *See, e.g.*, Trial Exs. 2499, 410, 450, 471; 10/7/25 Trial Tr. at 1186:13–1212:19, 1217:11–20 (D.C.). Anyone who saw N.C. or C.C., or bothered to look at their medical records, would have quickly understood that Done's medications were amplifying the harm. *See, e.g.*, Trial Ex. 1844 (medical records for N.C. noting that "client was placed on a 5150 and has symptoms characteristic of bipolar disorder. Client should not add meds for ADD/ADHD."); 10/7/25 Trial Tr. at 1218:25–1219:25 (D.C.). Not only did Defendants not take action to address these harms, they prolonged them by transferring members like N.C. to Done providers who would be willing to keep prescribing them stimulants.

Done's lies about expanding "access to care" did not just harm Done's members. Defendants perpetuated their fraud by deceiving well-meaning employees, including many who had ADHD themselves. At trial, employees including Menesini, Bowen, Jahi Jones, Levy, Christina Hill-Alvarez, and Trevor Granger all testified that they joined Done because they either had ADHD themselves or were inspired by the idea of expanding access to ADHD care for others who needed it. *See, e.g.*, Trial Tr. 451:7–14 (Menesini), 1316:18–20 (Bowen), 2757:6–12 (Jones). Working at Done revealed to these employees that Defendant He's marketing was simply a cover for a pervasively illegal operation. And even after these employees gave Defendant He the chance to bring Done's model into compliance, and realize the promises of care that she had made, she disregarded them to keep Done's member base growing at all costs. As Jones explained, anyone who resisted Defendant He would be "forced out and

Gov. Supplemental Sentencing Memorandum        31
24-CR-0329 CRB

shunned." Trial Tr. at 2759:11–24. Menesini quit without having any job lined up after realizing that "all of [his] concerns . . . were never going to be addressed." Trial Tr. at 608:5–11. Trevor Granger was fired after he voiced his concerns about Done's illegal practices, which led him to conclude that Done was "actually doing as much or more harm than any good." Trial Tr. at 4701:13–24. And Hill-Alvarez aptly described "the death of [her] idealism" once it became clear that Done was about profit. Trial Tr. at 3674:24; 3675:5–6.

Defendant He's concealment of Done's illegality also harmed the investors who supported her as she worked towards her goal of an IPO. As investor Kelly Graziadei testified, her fund wrote the largest check that it ever had based on Defendant He's false representation that Done was a "managed marketplace" where independent clinicians exercised their own professional judgment to provide real ongoing care to patients who needed it. Trial Tr. at 3757–66; Trial Ex. 3041; *see also* United States' Supplemental Submission of Victim Statements at 3 (letter to Court from Graziadei). And to perpetuate the illegal drug distribution and fraud at Done, Defendant He lied to pharmacies and insurers who never would have reimbursed or dispensed drugs based on invalid prescriptions for Done members.

Defendants grew Done into a $91 million company based on their pervasive disregard for the legal safeguards designed to ensure that patients receive safe, meaningful, and effective care. They disrespected not only the law, but the many people and entities that helped grow Done in reliance on their lies. And at every turn, Defendant He took every opportunity to perpetuate the illegal scheme rather than correcting course, doubling down in lies to the media and obstructing justice to ensure she could continue the scheme from outside the United States if she had to. A sentence of 240 months is no greater than necessary to reflect the seriousness of her offenses, and to impress upon the public that respect for the law matters.

### B.    The Need for General Deterrence

A substantial sentence is also critical to serve the purpose of deterrence. Defendant He's philosophy at Done was founded on her belief that any fines she might have to pay, or any jail time her employees might face, were a cost of business that a billion-dollar unicorn could easily cover. As she saw it, highly successful tech companies like Uber and Airbnb reached their status not in spite of, but because of, legal violations. As telehealth companies continue to proliferate, their executives will watch

this sentence to gauge the risks of breaking the law themselves.  Defendant He specifically contemplated facing a 240-month sentence for her crimes, and she should face a commensurate punishment.  *See* Trial Ex. 769 (remarking that "if the government checks on us and we have no way of proving that the prescription has a medical basis, the doctor may be subject to a 20-year imprisonment").  The 41-month sentence that she seeks, as well as the 84-month sentence recommended by Probation, would only send the message that crime does pay.  *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that an overly lenient sentence sends the message "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty").

Corporate crimes are precisely the type of case where general deterrence has maximum effect. They are the product of calculated decision making rather than impulse, and corporate executives are precisely the kinds of rational actors who will weigh the risks of incarceration against the rewards of growing a multimillion or billion-dollar company.  *See, e.g.*, *United States v. Thompson*, 130 F.4th 1158, 1167 (9th Cir. 2025) ("Fraud crimes like those at issue here are typically calculated, and, as a result, are particularly amenable to general deterrence."); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence").  As the Court well knows, Done is just one of the many technology companies that can impact the world from the Bay Area.  Even now, the present artificial intelligence boom is simply the latest wave of start-up innovation in this District, and many of these companies' founders may face the temptation to follow Defendant He's lead by pursuing growth at the expense of compliance, honesty, and the public welfare more generally.  If the risks of criminal conviction are low, founders will naturally be incentivized to break the law.  A sentence of 84 months or less risks this exact outcome, especially considering Defendant He has been detained for roughly 24 months already.

A substantial sentence is not needed simply to deter tech companies in general, either.  A stiff sentence is critical in the burgeoning telehealth industry, where unscrupulous executives may wager their customers' health in a bid to make billions.  When Done was charged, it was the top Adderall prescriber in this country.  That illustrates the vast impact that telehealth can, and will have, in the future.  Telehealth executives must understand that no profit incentive is worth jeopardizing the health of their customer base, and the best way to ensure access to quality healthcare is to impose a sentence

Gov. Supplemental Sentencing Memorandum       33
24-CR-0329 CRB

that ensures telehealth companies operate in compliance with medical standards of care.

General deterrence also requires sending a message that physicians cannot trade their Hippocratic oath for a cut of the massive profits that telehealth companies stand to make in the future. By acting as Clinical President of Done, Defendant Brody cloaked criminal drug distribution under a veil of legitimacy. He concededly used his credentials as an experienced psychiatrist to influence Done providers to take the "risks" of illegal prescribing that they would never seriously consider otherwise. *See, e.g.*, Trial Ex. 504. The nationwide scope of telehealth platforms presents the risk that profit-minded executives could corrupt medical decision-making on a nationwide scale too. In this case alone, six medical practitioners pleaded guilty to joining Defendants' illegal scheme. That number will undoubtedly balloon if the Court does not send the message that the downsides of committing these crimes heavily outweigh the profits to be gained. As already noted above, courts have regularly imposed sentences of ten years or more to deter physicians from such conduct. The Court should follow suit by imposing a 120-month sentence for Defendant Brody in this case.

### C.    Protecting the Public from Further Crimes of the Defendants

The Court must also ensure that any sentence imposed is substantial enough to protect the public from further crimes by Defendants. *See* 18 U.S.C. § 3553(a)(2)(C). While a life sentence is greater than necessary, Defendants' track records leave no doubt that they would readily resume their illegal practices in the absence of a serious punishment. A lengthy term is particularly critical for Defendant He, given her proven ability to run Done's operations from China. If she is deported after a brief spell, while Done remains solvent and subject to her near-complete ownership, she will have the opportunity to resume the illegal distribution of controlled substances with the added benefit of staying beyond the reach of U.S. law enforcement. That would utterly defeat the purposes of sentencing.

The trial record, and the broader record of this case, have proven beyond any reasonable doubt that Defendant He sought to flee this country and run her scheme from abroad. She actively researched countries without extradition treaties. *See, e.g.*, Trial Exs. 2372, 2375. She funneled money out of the country to shell companies like MakeBelieve Asia. *See, e.g.*, Trial Exs. 1400, 1401, 1501. She shifted Done's marketing team and other employees to China. *See, e.g.*, Trial Ex. 577. Even after her arrest, she repeatedly lied to this Court and hid a Chinese travel document in the home to which she would be

released on bond, allowing her to flee at the first opportunity. *See* Trial Ex. 2646. And she refused to relinquish control of Done, allowing coconspirators like Yue Wang to keep Done operating from abroad. Through her persistent pattern of bad-faith obstruction, she has firmly established the infrastructure she needs to operate a telehealth scheme from outside of the United States.

There is no reason to believe she will turn over a new leaf once she leaves jail, either. She repeatedly disregarded warnings and well-meaning advice to bring Done into compliance, from the earliest days of the scheme. She was not discouraged by the countless resignations of Done's providers, the negative health consequences or even deaths of patients like H.B., or Dr. Brindala's risk mitigation reports. When the press raised questions about Done's illegal practices, she lied that those practices never existed. Trial Exs. 553, 554, 582. When Done's competitors came under investigation, she tried to poach the executives most responsible for those unethical practices. *See* Trial Tr. 2762–66. And when the government finally served Done with a grand jury subpoena, she tried to cover up her involvement in the scheme by deleting evidence and installing Hayley Zhu as a puppet CEO. Trial Exs. 577, 2361, 2362; He PSR ¶ 41; Trial Tr. at 1932:12–18, 3022:2–6; Trial Ex. 768; Trial Exs. 840, 843. To this day, Defendant He refuses to acknowledge that she has done anything wrong at all. She is entirely remorseless, and her lack of reflection betrays a lack of willingness to change her ways upon her inevitable release from jail.

Defendant He's suggestion that deportation is a punishment is simply her latest effort to deceive this Court and get out of the country as soon as possible. If Defendant He sincerely viewed a return to China as a negative consequence, she would not have secretly messaged Yue Wang about going there to avoid arrest just two months after the Good Morning America video laid bare the obvious criminality of Done's practices. *See, e.g.*, Trial Exs. 766, 794. She would not have booked a one-way ticket out of the country, desisting only after law enforcement seized her phone en route to the airport. *See* Trial Ex. 2346. And she would not have gone to the Chinese embassy, secretly obtained another travel document, and then concealed it until the Court finally released her on bond. Deportation after her period of imprisonment would simply put her beyond the reach of law enforcement. Protecting the public requires a sentence long enough to place the prospect of deportation far into the future.

Defendant Brody is similarly recalcitrant. After weeks of testimony regarding the harm suffered

by Done members, culminating in a verdict of guilty on every count, Defendant Brody's first reaction was to tell this Court he had "never hurt a fly" and storm out of the courtroom.  11/18/25 Hr'g Tr. at 4. While a trial of this magnitude would cause most people to reflect on his wrongdoing, Defendant Brody told the Probation Department that he was musing about writing a book about the experience.  Brody PSR ¶ 71.  In a recent filing, he described himself as "the opposite of a fraudster or a criminal."  ECF No. 596 at 21.   These are the actions of a man who believes he has done nothing wrong and does not expect to receive any meaningful punishment.  Bearing in mind that he told Defendant He that he would be willing to prescribe Adderall even if he was executed, there can be no serious doubt that he would readily encourage others to take up his illegal cause at the first opportunity.  The best way to protect the public from these dangers is a term of 120 months' imprisonment.

**D.     A 240 Month Sentence is Appropriate for Defendant He, and a 120 Month Sentence Is Appropriate for Defendant Brody**

As the government explained before, this 240-month term is simply the median sentence imposed for defendants with the same offense level, criminal history category, and class of drugs distributed in recent memory.  As Probation highlighted, the JSIN data compiled by the United States Sentencing Commission reveals that there were 16 defendants whose primary guideline was § 2D1.1, with a total offense level of 43 and a criminal history category of I, within the past five years.  He PSR ¶¶ 110–111.  These 16 defendants were specifically sentenced based upon drugs that do not fall within the typical categories of "street drugs" that Defendant He emphasizes in her sentencing submissions, like marijuana, cocaine, heroin, fentanyl, and methamphetamine.  Given the identical Guidelines provision, offense level, criminal history category, and the similar types of drugs involved, there is no principled basis to disregard this data.

And as noted above, courts have imposed substantial sentences for the distribution of controlled substances including amphetamines in much smaller-scale settings than Defendant He, who distributed drugs to literally thousands of people across all fifty states through the systematic deception of pharmacies, insurers, investors, and her own employees, grossing over $90 million in revenues in the process.  Accounting for the substantially more serious aspects of her offense, like her pervasive efforts to obstruct justice and evade accountability for her crimes, a sentence of 240 months is necessary to

Gov. Supplemental Sentencing Memorandum          36
24-CR-0329 CRB

avoid sentencing disparities and serve the goals of federal criminal sentencing. Imposing a lower sentence would send a message that the largest-scale telehealth drug distribution conspiracy ever prosecuted was less egregious than a traditional brick-and-mortar pill mill. That cannot be true.

The government's requested 120-month sentence for Defendant Brody is common for physician defendants convicted of prescribing controlled substances without a legitimate medical purpose outside the usual course of professional practice, or even for those who prescribe durable medical equipment. The 120-month sentence recommended for Defendant Brody would thus avoid significant sentencing disparities, and it is certainly not "greater than necessary" to ensure a just sentence in this case.

## CONCLUSION

For the reasons set forth herein, as well as in the government's prior sentencing memoranda, the Court should sentence Defendant He to 240 months' imprisonment, forfeiture in the amount of $91,311,290, restitution in the amount of $12,397,160 and a fine of $24,794,320, and Defendant Brody to 120 months' imprisonment, forfeiture in the amount of $730,892, restitution in the amount of $12,397,160, and a fine in the amount of $50,000.

DATED: June 23, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

LORINDA I. LARYEA
Chief, Fraud Section

_/s/_____
JACOB FOSTER
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS
Assistant Chief
ARUN BODAPATI
Trial Attorney
Fraud Section, U.S. Department of Justice

_/s/_____
KRISTINA GREEN
Assistant United States Attorney