Roberto Escobar, CABN 217352
201 N. Brand Blvd., Suite 200
Glendale, CA 91203
(818)281-0541
bobby@elaw.business

Attorney for Defendant, David Brody, M.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 3:24-cr-00329-CRB |
| Plaintiff, | ) |
| v. | ) DEFENDANT DAVID BRODY'S ) SUPPLEMENTAL SENTENCING BRIEF |
| RUTHIA HE, a/k/a RUJIA HE, and | ) ) Sentencing Date: July 7, 2026 |
| DAVID BRODY, | ) Time: 10:00am |
| Defendants. | ) Courtroom: 6, 17th Floor ) Hon. Charles R. Breyer |

- 1 -

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................3
SUMMARY OF ARGUMENT .........................................................................................4
I. INTRODUCTION .........................................................................................................5
II. THIS CASE FALLS OUTSIDE THE HEARTLAND OF
U.S.S.G. § 2D1.1...............................................................................................................7
III. THE GOVERNMENT CANNOT RELIABLY QUANTIFY DRUG QUANTITY
BEYOND THE FIVE COUNTS ......................................................................................11
IV. THE PROBATION OFFICE'S INDEPENDENT ASSESSMENT
CONFIRMS THAT A DRUG-TABLE SENTENCE WOULD
OVERSTATE CULPABILITY ........................................................................................16
V. KELLER AND OTHER COMPARATORS SUPPORT
A MAJOR VARIANCE....................................................................................................17
VI. THE § 3553(a) FACTORS STRONGLY SUPPORT
A NON-CUSTODIAL SENTENCE..................................................................................18
   A. Nature and Circumstances of the Offense...............................................................19
   B. History and Characteristics of the Defendant..........................................................20
   C. Medical Condition and Effective Care ....................................................................21
   D. Deterrence, Protection of the Public, and Recidivism ............................................22
   E. Avoiding Unwarranted Disparity and Parsimony ....................................................23
   F. Any Variance from Level 12 Should Be Downward, Not Upward...........................23
VII. THE APPROPRIATE SENTENCE ..........................................................................25
CONCLUSION .................................................................................................................25

EXHIBITS

Exhibit A – Declaration of David Brody, M.D.

Exhibit B – Declaration of Lawrence S. Mayer, M.D., M.S., Ph.D.

Appendix 1 to Exhibit B – Curriculum Vitae of Dr. Lawrence S. Mayer

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

TABLE OF AUTHORITIES

CASES ................................................................................................................Page(s)

Gall v. United States, 552 U.S. 38 (2007).............................................................9, 20, 22, 23, 24
Kimbrough v. United States, 552 U.S. 85 (2007) ...........................................................................9
United States v. Booker, 543 U.S. 220 (2005).................................................................................9
United States v. Carty, 520 F.3d 984 (9th Cir. 2008) ...................................................................23
United States v. Keller, 142 F.4th 645 (9th Cir. 2025)
(cert. petition pending, No. 25-7141 (U.S. filed Mar. 24, 2026)) ...............10, 15, 16, 18, 23, 25, 26
United States v. Ressam, 679 F.3d 1069 (9th Cir. 2012)...............................................................22

STATUTES, RULES, AND GUIDELINES

18 U.S.C. § 3553(a) ....................................................................4, 5, 7, 10, 11, 16, 18, 19, 21–27
18 U.S.C. § 3661 ..................................................................................................................6, 13, 21
Fed. R. Evid. 1101(d)(3) .....................................................................................................6, 13, 21
U.S.S.G. § 1B1.3 ...........................................................................................................................15
U.S.S.G. § 1B1.4.......................................................................................................................6, 13
U.S.S.G. § 2D1.1 .............................................................................................................4, 7, 10, 11
U.S.S.G. § 6A1.3(a) .........................................................................................................................7
U.S.S.G. § 6A1.3 cmt.......................................................................................................................7

OTHER AUTHORITIES
Non-Prosecution Agreement, United States v. Cerebral, Inc. (Nov. 4, 2024) ...............................11

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

**SUMMARY OF ARGUMENT**

This supplemental brief responds to the three questions the Court identified on April 28: whether this case falls outside the heartland of U.S.S.G. § 2D1.1; how the Court should approach drug quantity beyond the five counts of conviction; and what variance is appropriate under 18 U.S.C. § 3553(a). The Court's own analysis at the April 28 hearing, together with the declarations of Dr. David Brody and Dr. Lawrence S. Mayer, point in the same direction: this case cannot be sentenced through aggregate arithmetic alone, and a sentence centered on probation with home confinement is sufficient, but not greater than necessary.

The Court has already recognized two central features of this case. First, the Government's effort to treat the entire universe of Done prescriptions as relevant conduct cannot be accepted wholesale, because the patient population was not homogeneous and the existing methodologies do not reliably distinguish among lawful prescribing, questionable prescribing, and clearly unsupported prescribing. Second, this case does not fit comfortably within the conventional narcotics-trafficking assumptions built into § 2D1.1. Dr. Mayer's declaration confirms why quantity is an especially poor proxy for culpability in a self-selected ADHD-treatment population, while Dr. Brody's declaration explains that all medication refills he performed at Done were continuity-of-care bridge refills. All of Dr. Brody's prescribing activity at Done was confined to patients who had already been evaluated by Done clinicians other than Dr. Brody. Dr. Brody's prescribing activity at Done consisted only of urgent bridge refills performed with the intention of maintenance of continuity of care.

That individualized judgment strongly supports a sentence centered on probation with home confinement. Dr. Brody did not establish or found Done, did not own Done, did not control Done's business model, and did not receive compensation tied to prescription volume, patient acquisition, or

company growth. As he explains in his declaration, he joined as a salaried physician and understood that a substantial part of his work involved existing ADHD patients needing continuity of care during a period of operational disruption. The Probation Office reviewed the same record and, even after adopting the Government's broader quantity methodology, still concluded that a Guidelines sentence would be excessive and overly punitive and recommended 72 months rather than the 120 months the Government seeks.

The statutory sentencing factors reinforce that result. Dr. Brody is a 70-year-old physician with no criminal history, no realistic prospect of returning to medicine, serious medical conditions, and no risk of recidivism. His declaration details the destruction of his career, finances, and reputation, as well as the impact of the prosecution on his health and family. A sentence centered on supervision and home confinement would provide meaningful punishment without imposing a prison term greater than necessary.

**I. INTRODUCTION**

The issue before the Court is no longer guilt. The jury has rendered its verdict, and the Court has resolved the post-trial motions. The question now is what sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

That determination should begin where the Court itself began on April 28. The Court recognized that this case is not an ordinary drug-trafficking prosecution, that the Done patient population was mixed rather than homogeneous, and that the Government's quantity methodologies do not supply a reliable basis for treating every prescription as equivalent for sentencing purposes. The Court also recognized a middle ground between the five charged counts alone and the Government's effort to transform this

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

case into a top-of-the-table drug-distribution prosecution. Apr. 28, 2026 Hr'g Tr. at 10:12–12:23, 17:13–18:18.

During the April 28 hearing, the court recognized that the patient population fell into distinct categories: some patients received their prescriptions entirely appropriately, and others would have appropriately received the medication but underwent an inadequate evaluation — while acknowledging that the size of each group remains unknown. Apr. 28 Tr. at 10:12–13:25.

The declarations submitted with this brief reinforce those same points. Dr. Mayer explains why aggregate platform data, diagnosis rates, age bands, prior-medication history, and similar population-level proxies cannot be converted into a reliable individualized drug-quantity finding in a heterogeneous telemedicine ADHD practice. Dr. Brody, in turn, explains his own limited role at Done, his understanding that he was handling continuity-of-care and bridge refills for already-diagnosed patients, and the personal, professional, and medical consequences he now faces.

The Court may fully consider both declarations in imposing sentence. The Federal Rules of Evidence do not apply to sentencing proceedings. Fed. R. Evid. 1101(d)(3). And 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

The Sentencing Guidelines confirm the point, directing that the Court "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. The Guidelines impose only a modest reliability threshold on the information the Court considers in resolving any disputed sentencing

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

factor: the information must bear "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); see also U.S.S.G. § 6A1.3 cmt. The sworn declarations of Dr. Brody and Dr. Mayer, a qualified expert, easily satisfy that standard and are properly before the Court.

This brief is organized around the three questions the Court posed. First, this case falls outside the heartland of § 2D1.1. Second, the Government cannot reliably quantify drug quantity beyond the five counts through aggregate extrapolation and categorical proxies, particularly in a medically heterogeneous telemedicine setting. Third, the appropriate variance under § 3553(a) is substantial and should result in a non-custodial sentence with home confinement.

**II. THIS CASE FALLS OUTSIDE THE HEARTLAND OF U.S.S.G. § 2D1.1**

The Court has already identified the central point: this case does not fit the ordinary drug-trafficking paradigm that U.S.S.G. § 2D1.1 was designed to address. After reviewing seven weeks of trial testimony, the Court concluded that this case is "way out of the heartland of cases in which the sentencing guidelines were intended to address," contrasting it with the street-level trafficking cases involving pills, pounds, and kilos that regularly appear on the Court's calendar. Apr. 28 Tr. at 13:10–22. That conclusion should do real work in the sentencing analysis.

Section 2D1.1 generally assumes drugs moving through illicit channels, where quantity can function as a rough proxy for culpability. Here, by contrast, the conduct arose in a licensed medical setting, involved prescriptions issued to patients seeking ADHD treatment, and occurred during an unusual telemedicine period in which emergency-era federal rules altered the ordinary prescribing environment. Dr. Mayer's declaration confirms why those differences matter analytically: in a self-selected ADHD-treatment population, high diagnosis rates and high prescribing rates do not, standing

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

alone, distinguish lawful treatment from inadequate treatment or clearly unlawful treatment. *See* Mayer Decl. at 7–9 (Questions 7.B–C, 9).

That difference is substantive, not semantic. In a conventional trafficking case, aggregate quantity may correlate tolerably with blameworthiness. In a physician-prescribing case involving a mixed patient population, disputed methodology, and varying levels of physician involvement, that correlation weakens substantially. The Court recognized exactly that on April 28, identifying several different categories within the Done population: some patients who should not have received medication; some who may have received medication after inadequate examinations; and others for whom the medication may have been appropriate, particularly among refill or continuity-of-care patients. Apr. 28 Tr. at 10:12–11:24. Once those categories are acknowledged, quantity ceases to operate as a reliable stand-in for culpability.

While Dr. Mayer's declaration is deliberately even-handed, he confirms two points especially relevant here. First, professional guidance and emerging empirical data recognize telepsychiatry and telehealth ADHD care as widely used and potentially beneficial, not categorically illegitimate. Mayer Decl. at 7 (Question 6.A–B). Second, the pandemic-era legal changes that enabled large-scale telemedicine platforms created a prescribing environment that differs in kind from traditional solo practice, making it inappropriate to equate a high absolute number of prescriptions with trafficking-level culpability without careful attention to denominators and patient mix. Mayer Decl. at 7–9 (Questions 7.A–C, 9).

Dr. Brody's declaration underscores why that point matters here. He explains that he did not found Done, did not control its business model, and did not profit from prescription volume. He further explains that he understood much of the work presented to him to involve continuity-of-care and bridge refills for patients who had already been evaluated and diagnosed by other providers, including

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

patients affected by provider turnover and operational disruptions. Those sworn facts are consistent with the Court's observation that some patients "did receive the medication, and actually if you look at their individual case, it was appropriate that they received the medication," especially among patients receiving refills or emergency refills. Apr. 28 Tr. at 11:11–16.

As Dr. Mayer explains, the fact that stimulant therapy requires diagnostic support, assessment of functional impairment, comorbidity review, cardiovascular assessment, medication review, dose rationale, adverse-effect monitoring, and diversion-risk evaluation does not mean that every one of those tasks must be performed at the moment of a short-term continuity prescription in order for that prescription to be clinically supportable. *See* Mayer Decl. at 4–6 (Questions 3.B, 4.A–D, 5.A–C). In a system like Done, many of those functions occurred upstream — through intake screening, exclusion of high-risk patients, and prior evaluations by the primary clinician — and Dr. Mayer is explicit that the clinical question is whether, in context, a prescription was supported by patient-specific information and continuity of care, not whether a bridge prescriber personally re-performed every element of the original diagnostic workup. Mayer Decl. at 5–8 (Questions 4.D, 5.A–B, 7.B–D).

That is why the heartland finding is not merely introductory. It is the analytic premise for variance. The Supreme Court has made clear that where the Guidelines do not fit the real conduct before the Court, a variance is not only permissible but part of the sentencing court's duty to impose a sentence sufficient, but not greater than necessary. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *United States v. Booker*, 543 U.S. 220, 245-46, 264 (2005). That principle applies with special force here because the Government's proposed severity is driven by a guideline framework whose principal metric—aggregate drug quantity—does not map cleanly onto a medically heterogeneous telemedicine record.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

The Court's authority to proceed in that manner is reinforced by the 2025 Guidelines amendment. As the Court observed at the April 28 hearing, the Sentencing Commission's elimination of formal departures was expressly outcome-neutral and preserved the court's authority to vary under § 3553(a) based on circumstances previously treated as departure grounds. Apr. 28 Tr. at 14:10–16:25. In other words, the question is not whether the Court may account for the mismatch between this case and the assumptions of § 2D1.1; it is how much weight that mismatch should carry in determining a just sentence.

The most important benchmark is United States v. Keller, 142 F.4th 645 (9th Cir. 2025) (cert. petition pending, No. 25-7141 (U.S. filed Mar. 24, 2026)), because it reflects recent Ninth Circuit sentencing practice in a materially more aggravated physician-prescribing case. Keller prescribed Schedule II opioids—including oxycodone and OxyContin—and was, over the relevant period, in the 99th percentile of pain specialists in opioids prescribed per patient per day. Id. at 650–51. He continued to prescribe thousands of opioid pills to a patient over four years despite knowing of her prior suicide attempt, a pharmacy refused to fill his prescriptions, and that patient ultimately died of a prescription-drug overdose. Id. at 651. Keller was separately tried in state court for second-degree murder arising from that death and was acquitted. Id. Even on those facts, the district court calculated a Guidelines range of 51 to 63 months, varied downward, and imposed a 30-month sentence, which the Ninth Circuit affirmed. Id. at 652. Here, by contrast, no patient death has been attributed to Dr. Brody's conduct, and no additional patient harm has been identified or quantified for Guidelines purposes. Keller does not mechanically control this case, but it strongly confirms that physician-prescribing cases are not sentenced as though the Drug Quantity Table were self-executing.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

One additional data point, though not a sentencing decision, is the Department of Justice's non-prosecution agreement with Cerebral, Inc., a large telemedicine platform that prescribed ADHD stimulants — including Adderall — at scale, set internal targets to drive prescription rates toward 100%, and exploited COVID-19 telemedicine flexibilities to boost patient retention and revenue. *See* Non-Prosecution Agreement, *United States v. Cerebral, Inc.*, U.S. Attorney's Office, E.D.N.Y. (Nov. 4, 2024), *available at* https://www.justice.gov/usao-edny/pr/telehealth-company-cerebral-agrees-pay-over-36-million-connection-business-practices. That investigation was resolved through a civil financial remedy — $3.65 million in forfeiture — with no criminal drug-quantity sentencing posture whatsoever. That resolution does not control this case, but it underscores that even in broadly comparable telemedicine ADHD settings, federal enforcement has not treated platform-wide prescribing volume as warranting the kind of top-of-the-table § 2D1.1 sentence the Government seeks here. *See* 18 U.S.C. § 3553(a)(6) (directing courts to avoid unwarranted sentencing disparities).

In the end, the heartland question and the variance question converge. Once the Court recognizes that this case does not fit the ordinary assumptions of § 2D1.1, the remaining task is not to force it back into a trafficking template. It is to impose a sentence that reflects individualized culpability, methodological uncertainty, and the actual purposes of sentencing under 18 U.S.C. § 3553(a).

## III. THE GOVERNMENT CANNOT RELIABLY QUANTIFY DRUG QUANTITY BEYOND THE FIVE COUNTS

The Government's quantity theory depends on the premise that broad platform-wide prescription data can be converted into a reliable estimate of unlawfully prescribed medication attributable to Dr. Brody. The Court has already identified the central problem with that premise: the Done population was not homogeneous. Some patients received appropriate treatment. Some patients should not have

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

received medication. Some may have received medication that may have been an appropriate treatment for their condition, but their evaluations were inadequate. Apr. 28 Tr. at 10:12–13:25.

That mixed-population problem is not abstract. It goes directly to the Government's methodology. On April 28, the Government argued that it needed to prove only that more than a tiny fraction of Done prescriptions was unauthorized to reach level 38, emphasizing that only 321,000 pills out of more than 37 million would be enough. Apr. 28 Tr. at 19:1–20. But the Court immediately identified the conceptual weakness in translating generalized prevalence assumptions into sentencing factfinding, questioning whether comparisons between general-population ADHD rates and rates in a self-selected ADHD clinic were an "apples and oranges thing" and asking what evidence actually established what the prescribing rate should have been in this population. Apr. 28 Tr. at 20:12–22:21.

Dr. Mayer's declaration confirms why the Court's skepticism is sound. As he explains, population-level data points such as diagnosis rates, age, absence of prior stimulant history, diagnosis timing, or gaps in follow-up do not reliably sort lawful from unlawful prescribing in a self-selected ADHD-treatment population. At best, such variables may identify categories for further review; they do not yield a defensible estimate of criminally unlawful prescriptions attributable to a particular physician. In that respect, Dr. Mayer's declaration supports the Court's concern that broad statistical categories create false precision rather than reliable individualized sentencing findings.

The same is true of the Government's Brody-specific theory. The Government argued that every prescription attributed to Dr. Brody, which he explains as bridge refills, was unlawful because there was "no appointment whatsoever," that the scripts were "patient specific," and that therefore "there's no extrapolation, there's no Napoli issue." Apr. 28 Tr. at 26:1–13. But the Court did not accept that proposition as self-proving for sentencing purposes. Instead, the Court recognized the distinction

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

between guilt and magnitude, observing that the sentencing question is not simply whether there was a violation but "what is the magnitude of that violation" and whether all of the pills attributed to Dr. Brody can fairly be counted toward the base offense level. Apr. 28 Tr. at 28:4–25.

Dr. Brody's declaration is directly relevant here. He explains that he was not the architect of Done's business model, compensation system, or patient-acquisition strategy; that he worked for a salary; and that he understood the prescriptions presented to him to involve continuity-of-care and bridge refills for patients already diagnosed elsewhere. He further explains the context in which those prescriptions were routed to him, including disruptions in provider coverage and his understanding that all of the patients had already undergone prior evaluations.

Because the rules of evidence do not apply at sentencing and § 3661 forbids any limitation on the information the Court may consider, the Court may rely on the Mayer and Brody declarations for this purpose without regard to trial admissibility. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3661; U.S.S.G. § 1B1.4.

Dr. Mayer defines a bridge refill as "a short-duration continuity prescription intended to maintain an established treatment regimen during a temporary interruption in usual care," and he notes that such prescribing can be "medically understandable, and in some circumstances clinically supportable," when the patient has already been evaluated, is already maintained on the medication, and faces an interruption due to provider unavailability, coverage disruption, pharmacy problems, or workflow disruption. Mayer Decl. at 6 (Questions 5.A–B). That is precisely the context here. By design, the prescriptions routed to Dr. Brody involved patients who had already been evaluated and maintained on stimulants, and the interruptions triggering his prescriptions included provider turnover and platform transitions — exactly the scenarios Dr. Mayer identifies. *Id.*; *see also* Brody Decl. ¶ 7, Ex. A

- 13 -

at 2. Those facts do not relitigate the verdict. They do, however, reinforce the narrower sentencing point that the Government has not offered a reliable method for converting a mixed universe of prescriptions into a precise quantity finding attributable to Dr. Brody personally.

Consistent with this, Dr. Mayer cautions that a pattern of one-time, short-duration prescriptions "may be compatible with a bridge-prescribing process, but it is not dispositive" of either propriety or impropriety; it is a contextual marker, not a validated proxy for culpability. Mayer Decl. at 6 (Question 5.E). That opinion underscores why the Court should resist the Government's effort to convert the existence of short-duration prescriptions into conclusive evidence of criminal prescribing, much less into a reliable drug-quantity estimate for level-38 purposes.

Properly read, Dr. Mayer's observation that a bridge refill is not "purely ministerial" cuts against, not in favor of, the Government's theory. Mayer Decl. at 6 (Question 5.C). It confirms that Dr. Brody's continuity-of-care prescriptions involved clinical judgment within an existing treatment plan, rather than ministerial authorizations divorced from patient-specific information.

The Court's own colloquy makes that point especially clear. In response to the Government's assertion that Dr. Brody's "click and sign" conduct made all of those refills countable as unlawful drug quantity, the court recognized that even accepting the Government's procedural theory, a clinically appropriate continuity refill for a legitimate patient cannot fairly be measured as trafficking-level drug quantity for base offense level purposes — because the sentencing inquiry must focus on the *magnitude* of the harm, not merely the fact of a procedural violation. Apr. 28 Tr. at 26:14–28:25.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

That is precisely the zone in which Dr. Brody's declaration and Dr. Mayer's declaration matter. The former supplies individualized context; the latter explains why the Government's categorical proxies cannot answer the question with statistical rigor.

Nor does the Government's reliance on Dr. Goodman's review solve the broader problem. As the Government noted, Dr. Goodman identified 16 reviewed patients, including the five counts of conviction, and argued that those charts would support a level 32 calculation. Apr. 28 Tr. at 24:8–25:20. Even assuming Dr. Goodman's case-specific opinions are accepted as to the charts he reviewed, they do not establish the prevalence of unlawful prescribing across the much broader population of Done prescriptions, much less the quantity fairly attributable to Dr. Brody under § 1B1.3.

Dr. Mayer explains that aggregate counts and small, selected chart reviews — including Dr. Goodman's — cannot be converted into a reliable estimate of "clinically unsupported" prescribing across a large, heterogeneous platform and that the Goodman samples "say nothing about the prescribing landscape at Done Global." Mayer Decl. at 7–9 (Questions 7.A–D, 8.A–E, 9). That methodological limitation is exactly why the Sentencing Guidelines' focus on raw quantity produces false precision in this case and why the Court's base offense level finding should remain anchored to the five counts proved at trial.

Keller should serve as one of the principal anchors of the variance analysis because it offers a recent, Ninth Circuit-approved benchmark in a physician-prescribing case materially more aggravated than this one. In Keller, the physician prescribed Schedule II opioids at the 99th percentile of pain specialists per patient per day, continued prescribing thousands of pills to a patient he knew had previously attempted suicide, and that patient died of a prescription-drug overdose; a pharmacy had

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

refused to fill his prescriptions. *United States v. Keller*, 142 F.4th 645, 650–51 (9th Cir. 2025) (cert. petition pending, No. 25-7141 (U.S. filed Mar. 24, 2026)). The district court calculated a range of 51 to 63 months, varied downward, and imposed 30 months, and the Ninth Circuit affirmed. Id. at 652; ECF No. 609 at 7–8.

The proper way to address any broader concerns the Court may have is not false precision under the Drug Quantity Table, but qualitative judgment under 3553(a). The court made express guidelines finding that the base offense level is 12, anchored to the five counts proven beyond a reasonable doubt at trial — thereby rejecting the government's position that the entire platform's prescription volume should drive the guidelines calculation. While the Court referred to concerns beyond the five prescriptions, it did not identify or quantify additional patient harm sufficient to increase the base offense level.  It declined to quantify that broader harm with any precision, finding that the unidentified and unquantified nature of any additional harm cannot properly support a higher base offense level. Apr. 28 Tr. at 17:13–18:18.

That is the correct framework: reject the Government's effort to convert uncertainty into an enormous quantity finding, then address the broader seriousness of the case through a reasoned variance analysis rather than pseudo-mathematical certainty.

**IV. THE PROBATION OFFICE'S INDEPENDENT ASSESSMENT CONFIRMS THAT A DRUG-TABLE SENTENCE WOULD OVERSTATE CULPABILITY**

The Probation Office's recommendation deserves substantial weight because it reflects the judgment of the Court's neutral sentencing advisor after review of the same core record now before the Court. That recommendation is powerful precisely because Probation did not minimize the case. At first,

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

Probation limited the quantity analysis to the charged prescriptions. After the Government objected, Probation adopted the Government's broader quantity methodology and associated enhancements. Yet, after doing so, the U.S. Probation Office — the court's own independent sentencing resource — determined that strict adherence to the Guidelines would produce an excessive and unduly punitive result, and recommended a sentence of just 72 months, a conclusion that itself reflects the profound disconnect between the Guidelines calculation and a just outcome in this case. *See* Presentence Report (Brody).

That institutional judgment matters. It shows that even a neutral officer who accepted the Government's arithmetic did not accept the Government's punitive conclusion. It also tracks the Court's own discomfort with both ends of the range. On April 28, the Court stated that it had, in its own mind, rejected both a level-40-style sentence of hundreds of months and a much lower guideline outcome at the other end, making clear that the court was looking for a sentence driven by fit rather than rote guideline mechanics. Apr. 28 Tr. at 52:1–53:3.

Probation also declined to endorse one of the Government's key aggravating theories by rejecting the vulnerable-victim enhancement, and the Court likewise overruled that objection. Apr. 28 Tr. at 8:7-16. That too supports a substantial variance. The Government offers no persuasive reason why the Court should credit Probation's methodology only up to the point that it helps the Government, while disregarding Probation's separate and independent conclusion that the resulting sentence would be far too severe.

**V. KELLER AND OTHER COMPARATORS SUPPORT A MAJOR VARIANCE**

- 17 -

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

Keller should serve as one of the principal anchors of the variance analysis because it offers a recent, Ninth Circuit-approved benchmark in a physician-prescribing case materially more aggravated than this one. In Keller, the physician prescribed Schedule II opioids at the 99th percentile of pain specialists per patient per day, continued prescribing thousands of pills to a patient he knew had previously attempted suicide, and that patient died of a prescription-drug overdose; a pharmacy had refused to fill his prescriptions. *United States v. Keller*, 142 F.4th 645, 650–51 (9th Cir. 2025) (cert. petition pending, No. 25-7141 (U.S. filed Mar. 24, 2026)). The district court calculated a range of 51 to 63 months, varied downward, and imposed 30 months, and the Ninth Circuit affirmed. Id. at 652; ECF No. 609 at 7–8.

Every major comparative factor cut in Dr. Brody's favor. *Keller* involved opioids rather than ADHD stimulants, a patient death rather than no identified patient death, stronger warning evidence, and a more direct prescribing framework. The April 28 hearing also reflected the Court's own instinct that the Government's opioid-centered comparators were materially different. When defense counsel noted that the Government's cited cases were OxyContin cases with far more dangerous drugs and very different facts, the Court commented: "It's a much more dangerous drug." Apr. 28 Tr. at 51:4–10.

That does not mechanically set a ceiling. But it does show the disproportionality of the Government's 120-month request and strongly supports the conclusion that a home-confinement-centered sentence here would not create unwarranted disparity. The other comparator authorities support the same point more generally: physician-prescribing cases are sentenced through individualized culpability analysis, not by mechanically importing the most punitive readings of the Drug Quantity Table.

**VI. THE § 3553(a) FACTORS STRONGLY SUPPORT A NON-CUSTODIAL SENTENCE**

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

The § 3553(a) analysis must be the center of the Court's sentencing judgment. The defense respects the jury's verdict and does not ask the Court to disregard it. But the verdict answers only the question of liability — not the question of sentence. The statute requires a sentence *sufficient, but not greater than necessary*, to achieve punishment, deterrence, protection of the public, and respect for the law. That standard has independent force, and it is not satisfied by a sentence calibrated to the theoretical maximum of the Guidelines range rather than to the actual conduct, the actual harm, and the actual person before the Court.

**A. Nature and Circumstances of the Offense**

The offense conduct here differs in important respects from a conventional trafficking case. This was a physician-prescribing case in a licensed medical setting, involving a mixed patient population, in a telemedicine environment shaped by emergency-era regulatory flexibilities. Those features do not ask the Court to disregard the verdict, but they bear directly on culpability and on whether a conventional drug-table sentence would exaggerate the seriousness of the offense. The Court's own April 28 analysis recognized precisely that distinction. Apr. 28 Tr. at 13:10–22.

The declarations add important nuance to that analysis. Dr. Mayer explains why the record does not support the conversion of platform-wide data into a reliable individualized quantity finding. Dr. Brody explains his limited role, his understanding that he was dealing with already-diagnosed patients in continuity-of-care settings, and the absence of any ownership or volume-based financial incentive.

Dr. Mayer further explains that telemedicine "does not validate a prescription that lacks meaningful patient-specific review," but he is equally clear that telemedicine is a modality of care, not a proxy for

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

illegitimacy. Mayer Decl. at 7 (Questions 6.A–C). The question, as he frames it, is whether the prescriber had sufficient patient-specific information to make a reasoned continuity-of-care decision. *Id.* Here, Dr. Brody's prescriptions were limited to short-duration bridge refills for patients already maintained on stimulants, and he relied on concrete patient-specific data — prior fills, dosing instructions, and recorded medication lists on the e-prescribing platform — in deciding whether a brief continuity prescription was appropriate until the primary clinician could see the patient again. Brody Decl. ¶¶ 5, 8–9, Ex. A at 2–3. That is the kind of "meaningful patient-specific review" Dr. Mayer describes, even if it occurred quickly and without duplicating the primary clinician's assessment.

Those facts do not undo the verdict, but they do bear directly on the nature and circumstances of the offense as to Dr. Brody personally.

**B. History and Characteristics of the Defendant**

Dr. Brody is 70 years and eight months old, has no prior criminal history, and has already suffered extraordinary collateral consequences. His declaration explains that this conviction has effectively ended his medical career, destroyed his professional reputation, imposed severe financial and emotional burdens, and ensured that he will never again practice medicine. Dr. Brody acknowledges that his conduct has already had substantial collateral consequences on innocent members of his family — a reality that, far from minimizing the jury's verdict, reflects the real collateral consequences this prosecution and conviction have imposed on innocent family members, and one the Court may properly weigh against the need for additional punitive severity. See *Gall v. United States*, 552 U.S. 38, 49–50 (2007). These consequences are not abstract. They are real punishment already imposed.

- 20 -

The record also shows that Dr. Brody was not a founder, not an owner, and not compensated based on prescription output. His declaration describes how he entered Done late in his career as a salaried physician rather than an entrepreneur, and how the prosecution has left him professionally ruined and personally diminished. Brody Decl. ¶ 3, Ex. A at 1. Those sworn facts make clear that he is not a typical profit-driven narcotics defendant and that enterprise-level punishment would overstate his personal blameworthiness.

**C. Medical Condition and Effective Care**

Section 3553(a)(2)(D) independently supports leniency. Dr. Brody suffers from significant medical conditions, including recurrent diverticulitis with life-threatening intestinal perforation risk, a serious umbilical hernia that will eventually require surgery, degenerative spinal issues with pain and weakness, glaucoma, hearing loss, severely enlarged prostate with concomitant bladder complications, and depression and anxiety exacerbated by the trial process. See Decl. of Elizabeth Etemad, D.O. (Apr. 22, 2026), Ex. B (ECF No. 618-2) at 1–5; Def.'s Suppl. Resp. to Gov't Sentencing Mem. (ECF No. 618-1) at 8–10. Dr. Etemad, Dr. Brody's treating physician of more than twenty years, and the previously submitted treating-physician materials describe specific functional limitations and explain why alternatives to incarceration would permit more effective management of those conditions. See Ex. B (ECF No. 618-2) at 1–5; ECF No. 618-1 at 8–10.

The same authorities that permit consideration of the Mayer and Brody declarations—Fed. R. Evid. 1101(d)(3) and 18 U.S.C. § 3661—equally permit the Court to consider Dr. Etemad's treating-physician declaration regarding Dr. Brody's medical condition.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

Those medical concerns do not exempt him from punishment. They do, however, materially affect what form of punishment is sufficient. For a medically fragile septuagenarian who no longer practices medicine and poses minimal risk of recidivism, home confinement and supervision would serve the statutory goals more effectively than a lengthy prison term.

**D. Deterrence, Protection of the Public, and Recidivism**

General deterrence does not require a decade in prison to be meaningful here. *See* 18 U.S.C. § 3553(a)(2)(B) (requiring only that the sentence "afford adequate deterrence"). This prosecution itself — a seven-week federal trial resulting in conviction — has already sent a powerful message to physicians and telemedicine companies about controlled-substance prescribing and federal enforcement priorities. *See Gall v. United States*, 552 U.S. 38, 47–48 (2007) (district court has broad discretion to weigh deterrence value of a non-custodial sentence). Specific deterrence is even weaker as a justification for incarceration: Dr. Brody is elderly, medically compromised, has no criminal history, no longer practices medicine, and no longer occupies any role from which similar conduct could recur. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(B); *United States v. Ressam*, 679 F.3d 1069, 1090 (9th Cir. 2012) (en banc) (specific deterrence depends on individualized assessment of recidivism risk).

The same facts sharply reduce any incapacitation concern under § 3553(a)(2)(C). Dr. Brody's declaration makes clear that he will never return to clinical practice, and the conviction has permanently stripped him of the professional standing from which similar conduct could recur. Where incapacitation adds little, home confinement and supervision provide meaningful accountability

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

without imposing custodial harm that serves no corresponding penological purpose. *See Gall*, 552 U.S. at 59–60; *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

**E. Avoiding Unwarranted Disparity and Parsimony**

The disparity analysis points strongly away from the Government's request. Keller provides the clearest external benchmark, and Probation's recommendation confirms only that even a methodology favorable to the Government does not justify 120 months. Both point to a sentence dramatically below 120 months. The Court's own comments at the April 28 hearing similarly reflect discomfort with treating this case as though the Drug Quantity Table were self-executing. Apr. 28 Tr. at 17:13–18:18, 52:1–53:3.

The parsimony clause therefore does decisive work. 18 U.S.C. § 3553(a). On this record, a sentence of probation with a substantial period of home confinement is sufficient to impose punishment, promote respect for the law, and protect the public without imposing incarceration greater than necessary.

**F. Any Variance from Level 12 Should Be Downward, Not Upward**

The defense recognizes that, having set the base offense level at 12, the Court observed that this level "doesn't merely reflect the scope of the harm" caused by the platform and indicated it "would consider an upward variance." Apr. 28 Tr. at 17:13–18:18. The defense does not dispute the Court's authority to vary in either direction under § 3553(a). See Gall v. United States, 552 U.S. 38, 49–50 (2007). But as to Dr. Brody individually, the § 3553(a) factors point downward from level 12, not upward.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

First, the broader harm the Court identified attaches to the platform Ms. He created and controlled, not to Dr. Brody. The Court's harm findings described a "system... created by the defendant... Ruthia He." Apr. 28 Tr. at 10:1–14. Dr. Brody neither founded, owned, nor controlled Done; he joined late, worked for a salary, received no compensation tied to prescription volume, and confined his prescribing to short-duration continuity refills for already-diagnosed patients. Brody Decl. ¶¶ 3, 5, 7–9, Ex. A. An upward variance that swept enterprise-level harm onto a peripheral, salaried physician would overstate his culpability and create the unwarranted disparity § 3553(a)(6) forbids.

Second, the Court expressly found the broader harm "not identified" and "not quantified," and incapable of being assigned to any "particular individual who received an unauthorized prescription." Apr. 28 Tr. at 17:13–18:18. Unidentified, unquantified harm cannot justify adding custody to a defendant whose proven conduct supports level 12; to hold otherwise would reintroduce through variance the very platform-wide quantity the Court already declined to attribute.

Third, the mitigating § 3553(a) factors—Dr. Brody's age, serious medical conditions, absence of any criminal history, the destruction of his career and reputation, and his negligible risk of recidivism—are concrete and individualized, while the asserted aggravating harm as to him is neither. Weighed honestly, those factors warrant a downward variance toward a sentence centered on probation and home confinement, which is sufficient but not greater than necessary. 18 U.S.C. § 3553(a); see Gall, 552 U.S. at 49–50.

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

## VII. THE APPROPRIATE SENTENCE

For these reasons, Dr. Brody respectfully requests a sentence of probation with a substantial period of home confinement — a sentence that is sufficient, but not greater than necessary, to achieve the purposes of § 3553(a), and that accounts for his age, his medical conditions, his thirty-year record of service to underserved patients, and the two independent benchmarks — *Keller* and Probation — that converge well below the Government's request. Such a sentence would provide real punishment, accountability, and ongoing supervision while recognizing the unusual features of the case, the limits of the Government's quantity methodology, the force of *Keller*, the Probation Office's independent assessment, and Dr. Brody's age, medical fragility, lack of criminal history, and no recidivism risk.

That sentence also gives full effect to the Court's own findings: that the Guidelines cannot be reliably driven by an unproven global quantity methodology. To the extent the Court has referred to harm beyond the five counts, the record does not identify or quantify any additional patient harm, and any broader concern therefore cannot support a drug-quantity-driven prison sentence — precisely the kind of acknowledged-but-unmeasured harm that home confinement and supervision can appropriately address without the blunt instrument of years of incarceration. Apr. 28 Tr. at 17:13–18:18.

A probationary sentence with stringent home confinement conditions addresses both concerns. It accounts for the Court's concerns without forcing the case into a trafficking template that the Court has already found does not fit.

## CONCLUSION

The Court's April 28 findings establish the framework for this sentence. The Court has already rejected the Government's global quantity methodology, set the base offense level at 12 limited to the

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

five proven counts, and recognized that the patient population was genuinely mixed — a conclusion Dr. Mayer's declaration confirms cannot be resolved through categorical proxies or population-level statistics, and that Dr. Brody's declaration reinforces through his sworn account of a limited, salary-based role confined to continuity-of-care bridge refills for already-diagnosed patients. Apr. 28 Tr. at 12:8–18:18. Every independent institutional voice points the same direction: the Probation Office, after accepting the Government's entire methodology, still found a Guidelines sentence excessive and recommended 72 months; and the Ninth Circuit in Keller confirms the point: a physician whose far more aggravated opioid prescribing was linked to a patient's overdose death received a 30-month sentence after a downward variance from a 51-to-63-month range. 42 F.4th at 645.

The § 3553(a) factors compel a downward variance to probation with home confinement. Dr. Brody is 70 years and eight months old and suffers acute-risk medical conditions that his treating physician, Dr. Elizabeth Etemad, has concluded would be difficult to manage safely in custody, leading her to recommend that the Court consider alternatives to confinement. See Ex. B (ECF No. 618-2) at 1–5. His license is permanently revoked, his recidivism risk is effectively zero, and this prosecution has already destroyed a thirty-year medical career and imposed devastating consequences on innocent family members who bore no criminal responsibility. General and specific deterrence do not require a decade in prison when every penological purpose identified in § 3553(a) is fully served by supervision and home confinement. The parsimony clause does the decisive work: a sentence of probation with a substantial period of home confinement is sufficient, but not greater than necessary. 18 U.S.C. § 3553(a).

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF

Respectfully submitted,

/s/ Roberto Escobar

Roberto Escobar, Esq.

Counsel for Defendant, Dr. David Brody

DEFENDANT DAVID BRODY'S SUPPLEMENTAL SENTENCING BRIEF