CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

LORINDA I. LARYEA (DCBN 99769)
Chief, Fraud Section

JACOB FOSTER (CABN 250785)
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS (VABN 85973)
Assistant Chief, Fraud Section
ARUN BODAPATI (NYBN 5581137)
Trial Attorney, Fraud Section

      U.S. Department of Justice, Fraud Section
      1400 New York Avenue NW
      Washington, DC 20005
      Telephone: 202-514-2000
      Jacob.Foster@usdoj.gov
      Emily.Gurskis@usdoj.gov
      Arun.Bodapati@usdoj.gov

KRISTINA GREEN (NYBN 5226204)
Assistant United States Attorney

      450 Golden Gate Avenue, Box 36055
      San Francisco, CA 94102-3495
      Telephone: (415) 436-7200
      Kristina.Green@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 24-CR-00329 CRB |
| Plaintiff, | **UNITED STATES' SUPPLEMENTAL SENTENCING RESPONSE** |
| v. | Hearing Date:  July 7, 2026 |
| RUTHIA HE, A/K/A RUJIA HE, and | Time:  10:00 AM |
| DAVID BRODY, | |
| Defendants. | |

Gov. Supplemental Sentencing Response
24-CR-00329 CRB

To reach a base offense level of 38, the Court must make only a limited, straightforward finding: (1) that Defendant He was convicted of conspiracy, so she is thus responsible for a quantity greater than the substantive counts alone, and (2) that the unauthorized pills distributed in the scope of the conspiracy exceeded 1% of the prescriptions issued by Done, under a preponderance standard. The evidence is overwhelming that the unauthorized prescriptions far exceeded that amount, whether based on witness testimony that Done operated as a "pill mill," or the six specified categories that the Government has previously set forth. As the Court observed at the hearing, Defendant is "liable, criminally liable" for the conduct of Defendant Brody and other practitioners because "she knowingly and intentionally set up the platform to operate a certain way," and it was "foreseeable." Hr'g Tr. 47–49. Indeed, her Chief Medical Officer told her she would face legal consequences for not following-up with patients, which is precisely one of the categories that would lead to a Level 38 here — a category Defendant barely even mentions. Trial Ex. 219. Whether Done was engaged in a medical exercise, whether patients were diagnosed with ADHD by other providers (as a number of the count beneficiaries were), or whether telemedicine was used are all irrelevant to the Guidelines calculation: as the Court correctly observed, the Controlled Substances Act is not a slot machine, and the record evidence here is overwhelming that both Defendants repeatedly told providers not to follow the Controlled Substances Act.

At the April 28 hearing, this Court supplied the analytical framework that Defendant He now pretends does not exist: it sorted Done members into buckets (1) those who "should not have received the medication," (2) those who received an "inadequate medical examination," and (3) those legitimately refilled after a proper diagnosis. Hr'g Tr. at 10-11. The government's six quantification categories are nothing more than that same framework, filled in with reliable, patient-specific trial proof – exactly what the law requires, and what Defendants falsely claim is missing.

None of Defendants' filings support their argument that their base offense level is 12, or that their case is outside the heartland of Guidelines Section 2D1.1. Defendant He's latest argument depends on the fiction that "what makes [her] entirely unlike the garden-variety drug dealer is that Done was in fact engaged in a medical exercise." ECF No. 647 at 1. That is decidedly untrue. The jury would not have convicted Defendants on every drug distribution charge against them if they were simply "engaged in a medical exercise." Defense counsel even argued that the jury could not convict unless it concluded

Gov. Supplemental Sentencing Response          1
24-CR-0329 CRB

that Defendant He and her coconspirators were "writing criminal prescriptions for no legitimate medical purpose," or that it had evidence that she "agreed . . . to hand out drugs to people who did not need it." Trial Tr. 5598, 5603.  But the trial record established beyond any reasonable doubt that Defendant Brody and coconspirators like Elizabeth Shapard, Erin Kim, and Yina Cruz all rubber-stamped prescriptions for addictive amphetamines, as fast as thirty seconds at a time.  These blind prescriptions plainly "didn't employ any medical judgment," and the Court got it exactly right when it observed, "that's not practicing medicine, all that is[,] is practicing distribution."  Hr'g Tr. at 27.  Defendants' own medical leadership characterized Done on multiple occasions as a "pill mill," and the Court need find only, under a preponderance standard, that 1% of the pills that were prescribed were unauthorized in order to reach an offense level 38.  *See* Trial Ex. 330 (medical director Zoe Martinez calling Done a "pill mill"); Trial Ex. 355 (Chief Medical Officer Jayaram Brindala saying the same).  Based on the overwhelming evidence at trial, that is self-evidently the case.  The pills prescribed by Defendant Brody alone satisfy that bar, as do even 14% of Shapard's or 12% of Kim's.

Indeed, this Court found that Dr. Goodman was "enormously credible" and "actually one of the best experts I've ever seen in a proceeding," Hr'g Tr. at 25.  Defendants do not, and cannot, challenge that credibility finding.  Instead, Defendants try to cherry-pick records suggesting certain of the patients he reviewed were diagnosed with ADHD by other prescribers, but Dr. Goodman's credible testimony was uncontested that Done was not engaged in a medical exercise.  Even a blind pig finds a nut, and that some patients had ADHD does not mean that Done's act of distribution was lawful.  Nor does it mean it was safe, because Dr. Goodman's testimony was that a medical exercise also requires ongoing monitoring patients for addiction and harmful side-effects of Schedule II drugs like Adderall.

Defendants' arguments about these categories are largely a rehash of the defense they set forth at trial.  But the Government's theory for why the prescriptions to the substantive count patients were unauthorized was based on policies and procedures issued by the Defendants rather than an idiosyncratic theory of responsibility specific to each individual patient.  Therefore, the jury necessarily rejected the arguments that Defendants repeat here, such as about the propriety of bridge refills. And Defendants can hardly argue that the Government failed to prove that the policies and procedures led to unauthorized prescriptions, not only for the count beneficiaries but for the other specified categories as well.

Gov. Supplemental Sentencing Response        2
24-CR-0329 CRB

Defendants cannot establish that this case is outside of the heartland, either. This Court's statement that the case was way out of the heartland addressed the heartland of street-level narcotics dealing – "pills, a few pills to pounds, kilos . . . for distribution for sales throughout the Tenderloin." Hr'g Tr. 13. That is indeed not the heartland of Section 2D1.1 as applied to compensated prescribers who mass-distribute Schedule II stimulants without adequate evaluation. But the fact that it's not the heartland of street-level dealing, does not mean that medical prescribing is not in the heartland of what Section 2D1.1 prohibits. Defendant does not (1) address the text of the Guidelines, which explicitly addresses stimulant pills, the use of online services to mass market drugs, and the actions of doctors in participating in drug trafficking schemes; (2) engage with Controlled Substance regulations, which classify both amphetamines and opioids in Schedule II because they pose comparable risks of addiction and abuse; or (3) cite any judicial precedents suggesting that medical prescriptions, telemedicine, or Adderall distribution are outside of the Guidelines. Indeed, Defendant urges the Court to create unwarranted sentencing disparities with the scores of defendants who have been convicted and sentenced for the medical exercise of distributing illegal pills.

Defendant's argument ignores a fundamental fact: Adderall is addictive and it has harmful side effects. That is why, as Dr. Goodman testified, it is unauthorized to just continually prescribe Adderall and not see patients again, as Done did for enough patients that such a group alone would lead to a Level 38. The consequences are significant: patients can abuse the drugs and they also can face harmful side effects, such as cardiac abnormalities, insomnia and resulting depression, severe anxiety, or even manic episodes if bipolar. When Defendant He argues at length that multiple Done members fatally overdosed on drugs besides Adderall, ECF No. 647 at 7–8, she misses the broader point: the lack of physical harm does not take this case out of the heartland, and the existence and risk of harm is an aggravating factor, not a mitigating one; even if Adderall did not cause these members' deaths, providing them with an easily abused, addictive amphetamine increased the likelihood of negative health consequences. *See, e.g.*, *United States v. Pacheco*, 489 F.3d 40, 47 (1st Cir. 2007) (noting that "an upward departure may be appropriate under Section 5K2.2 with respect to a defendant who, although not directly responsible for a significant physical injury and although not harboring an intent to harm, sets into motion a chain of events that risks serious harm to others."). The Court's own observation that opioids are a "more

Gov. Supplemental Sentencing Response                    3
24-CR-0329 CRB

dangerous drug," Tr. at 51, was not a ruling that amphetamine distribution falls outside the heartland, nor could it be given that amphetamines are specifically accounted for in the drug conversion table of the Guideline itself.

Defendant He intentionally preyed on addiction: she wrote that "[m]ost successful consumer companies usually profit out of addiction." Trial Ex. 897 at 151. Claiming that Done was a "medical exercise" is inconsistent with the record evidence: in her own words, that she "brainwashed so many people, including psychiatrists, to do this drug thing." *Id.* at 158. And her motive was greed, plain and simple: "Right now I just want to be a billionaire." *Id.* at 143. Guidelines Section 2D1.1 was designed to punish those who would profit from addiction. That Defendant He used telemedicine to engage in drug-distribution on a massive scale is an aggravating factor, not a mitigating one. If she is not a "garden-variety" drug trafficker, that is only because her offenses are more serious—taking place on a nationwide scale through systematic deception of pharmacies, insurers, and investors, as well as a campaign of obstruction including the destruction of evidence, fraudulent transfers to shell companies like MakeBelieve, and lies to this Court so that she could evade justice from abroad.

## I.    DEFENDANTS' BASE OFFENSE LEVEL IS 38

### A.    Rubber Stamping Prescriptions Is Not a "Medical Exercise"

The jury thoroughly rejected Defendants' claim that Done was engaged in a "medical exercise" when it voted to convict on every drug distribution count charged. *See* ECF No. 526 at 19, 23 (Court instructing the jury that it could convict on distribution counts only if it found defendants acted "without a legitimate medical purpose and outside the usual course of professional practice"). And Defendants' claims that they were simply engaged in a "medical exercise" cannot be squared with their arguments that the jury could not convict if Done was prescribing for a legitimate medical purpose. *See, e.g.*, Trial Tr. 5558 (arguing in closing that the government had "to show that [Defendant He] knew that the plan was . . . that there would be doctors and nurses who themselves are going to be issuing criminal prescriptions, meaning that they are issued with the doctor knowing that they have no legitimate medical purpose"). As detailed in prior submissions, Defendant He restricted practitioners' ability to engage in the actual medical exercise of proper evaluation and follow up so that Done members could obtain addictive stimulants with minimal friction. *See, e.g.*, Trial Ex. 343 ("What patients care about is simply

Gov. Supplemental Sentencing Response          4
24-CR-0329 CRB

to get their refill. For us the only goal is to help them get it."). If any Done members were properly evaluated and prescribed, that was in spite of, rather than due to, her business model.

In truth, Defendant He knows Done was not a "medical exercise." That is why she claims this was "a case about the knowing deviation from medical process, not the knowing distribution of medically unnecessary ADHD prescriptions." ECF No. 647 at 1. That is a false dichotomy; the validity of a prescription depends upon the validity of the medical judgment behind it. Without following the "medical process," there is no way to confirm whether a prescription is medically necessary or not. *See* Trial Tr. 3985 (Dr. Goodman explaining that "[w]ithout a comprehensive psychiatric evaluation, you don't fulfill the five criteria necessary to make a diagnosis . . . That is the basis for a legitimate medical purpose in prescribing any medication and especially given the vigilance that you need when prescribing potentially addictive drugs."). Even Defendants' authorities support this baseline principle. As Defendant Brody's supporting affiant concedes, even a so-called "bridge prescription for a controlled stimulant is not a purely ministerial signature. The clinical concept assumes some patient-specific basis for continuing the medication, including information about the prior regimen, indication, duration of treatment, evidence of benefits, comorbidities, cardiovascular risk, current medications, misuse or diversion concerns, recent clinical contact, and the plan for follow-up." ECF No. 639-2 at 6.

Defendant Brody's purported "bridge refills" were "purely ministerial signature[s]," made every thirty seconds because he admittedly never checked the medical records to establish a "patient-specific basis for continuing the medication." *See* Trial Ex. 689, 4000 at 72. They are also explicitly prohibited by the Controlled Substances Act, which provides that "[n]o prescription for a controlled substance in schedule II may be refilled." 21 U.S.C. § 829(a). These blind refills were not a "medical exercise," in any sense. They were positively anti-medical actions taken at the direction of Defendant He, who told him "you don't even need to see patient at all just click buttons on e-prescribing too[l]." Trial Ex. 127 at 3. That is "practicing distribution," rather than medicine, and the nearly 400,000 pills prescribed by Defendant Brody pursuant to the conspiracy establish an offense level of 38 on their own.

Defendant Brody was not the only Done provider to rubber stamp prescriptions. Defendants established a business model that pressured providers into blind prescribing more broadly. As detailed in prior briefing, even a fraction of the pills prescribed by Defendants' coconspirators would establish a

Gov. Supplemental Sentencing Response          5
24-CR-0329 CRB

base offense level of 38 by the same logic.  *See* ECF No. 638 at 11–12.  Elizabeth Shapard testified that she rubber-stamped prescriptions without medical care for a panel of roughly 2,500 Done members.  *See* Trial Tr. 2327, 2346–47.  Her prescriptions would support a base offense level of 38 even if only 14% of the pills were illegal.  Yina Cruz told the Wall Street Journal that "virtually all [of her 2,300 Done members] were on stimulants," and that she signed prescriptions as fast as thirty seconds too.  Trial Ex. 2861 at 9–10.  Defendant He kept prescribers like Cruz and Erin Kim on the Done platform even when other employees highlighted these practices and pushed for their firing.  As the Court correctly reasoned at sentencing, these illegal prescriptions were all "the natural and probable consequence[,] or a foreseeable result of[,] the conspiracy. . . . She knowingly and intentionally set up the platform to operate [that] way."  Hr'g Tr. 47–48.  Defendants designed Done to limit genuine medical exercise.

The Court need not rely on inference alone: it tested this exact theory against defense counsel at the hearing and rejected it from the bench.  When defense counsel argued that Defendant Brody could have conceivably signed a refill based solely on another provider's prior diagnosis, the Court asked how many prescriptions were at issue and, on learning that the number ran into the hundreds or thousands, concluded: "it's just inconceivable to me that Dr. Brody in 20 seconds knows that it's from Dr. X whom he knows to follow the proper procedure."  *Id.* at 50.  Defendant Brody also argues that *United States v. Collazo* places limits on attributing one co-conspirator's conduct to another, but it imposes no limits on Defendants' liability here: Defendant He personally designed the policies and Defendant Brody, as the Clinical President of Done Health, issued them to providers despite knowing that they were wrongful.  Indeed, Brody himself wrote in seeking greater compensation that he was taking risks that the vast-majority of other physicians would not take, and told Done prescribers that they should not worry about going to jail and prescribe to patients with substance abuse issues.  Trial Ex. 504, 546.  Having specifically contemplated these consequences, he cannot credibly argue that they were not foreseeable.

### B. Defendants Cannot Distinguish the 16 Patients Reviewed by Dr. Goodman

Defendants have also failed to establish a basis to exclude the pills distributed to the 16 Done members whose records Dr. Goodman evaluated.  As noted previously, Dr. Goodman did not lightly conclude that these records reflected the most egregious deviations from medical practice that he had seen in forty years as a practitioner.  Trial Tr. 3900:24-3901:2 ("I actually found it sad that patients were

being treated this way").  Faced with overwhelming evidence that these pills were illegally distributed, Defendant He identifies only three factors that purportedly establish the medical necessity of the prescriptions: (1) that some of the 16 members had been diagnosed with ADHD either before or after joining Done; (2) that Done's prescriptions were within FDA limits, including a so-called "child dose"; and (3) that three of the sixteen members had their prescription dosage reduced while on the Done platform.  ECF No. 647 at 6.  None of these factors render the prescriptions legitimate.

As detailed in prior briefing, a prescription is not legitimate just because a member may have had ADHD.  Stimulants are just one of many treatments for ADHD, and the choice of treatment must factor in the risks that stimulants pose for patients with physical conditions like cardiac issues, and mental health conditions like bipolar disorder and substance abuse disorder.  *See* Trial Tr. 3914:14–22, 3927:5–23, 3954:12–19.  Consider H.B., whose mother testified at trial.  She acknowledged that he was diagnosed with ADHD as a child, but she added that he had been struggling with severe substance abuse issues by the time he became a Done member as an adult.  *See* Trial Tr. 2268, 2290 ("I couldn't understand how anyone would give [H.B] a prescription for Adderall[, i]f they had looked at the database and seen his drug use").  Defendants ignored not only the prescription drug database and this mother's warnings, but Dr. Brindala's risk mitigation reports that specifically cited H.B.'s case as an example of improper practices.  *See, e.g.*, Trial Ex. 364.  The jury conclusively found the prescription for H.B. was illegitimate when it voted to convict Defendants on Count Two, regardless of whether he had an ADHD diagnosis at other times.  Accordingly, there is no logical basis to conclude that an ADHD diagnosis alone rendered the prescriptions for these 16 members legitimate.

The argument about FDA limits is also easily dismissed.  If a prescription is invalid, it is irrelevant that the drug's dosage was within FDA limits.  No one would argue that a 5mg Oxycodone prescription handed to a drug addict was legitimate just because the FDA approved 5mg pills generally.  The jury rejected this same argument at trial.  *See* Trial Tr. 4476:9-4477:5 ("[Dosage level] doesn't matter.  It doesn't matter if I steal a shirt or I steal a hundred million dollars, I'm a thief.").

Finally, Defendant He's claim that Done prescribers reduced dosages for three of the Done members is misleading.  A.L. is a clear example.  Defendant He's claim turns on the notion that Done provider Jonathan Decker initially prescribed A.L. a 10mg dose of Adderall, though she reported having

Gov. Supplemental Sentencing Response          7
24-CR-0329 CRB

a higher dosage before.  But Defendant He fails to mention that A.L. was receiving treatment for opioid addiction and was transferred to Decker only after her first Done provider refused to prescribe Adderall.  Trial Ex. 1927, Trial Tr. 3946–47.  Decker then prescribed Adderall to A.L. after an evaluation of less than ten minutes.  Trial Tr. 3946–47.  Defendant He also omits that Decker increased A.L.'s Adderall dosage just three days later, prescribed her methamphetamine on top of it, and went over 17 months without conducting a follow-up appointment.  Trial Ex. 2687, Trial Tr. 3947.  Defendant He's reductive claims about dosage reduction are baseless.

### C.    Defendants Offer No Rebuttal to the Follow-Up Categories

Defendant's latest submissions barely engage with two of the Government's six independent quantification categories at all – the pills dispensed to members who never had a single follow-up appointment, and the pills dispensed to members who went six or more months without one.

Dr. Goodman testified without contradiction that the standard of care requires a follow-up within the first month and roughly every four months thereafter, precisely so a provider can assess how a stimulant is affecting a patient and the risks of cardiac issues, substance use disorder, or bipolar disorder.  Trial Tr. 3929-3930.  This is squarely the second bucket this Court identified at the hearing – members who received "an inadequate medical examination to make the determination that . . . it would be appropriate for them to receive that medication."  Hr'g Tr. at 10-11.

The second category – over 6.6 million pills dispensed to members who went 180 days or more without any follow-up – rests on the same kind of patient-specific records, not an extrapolation.  Dr. Brindala repeatedly warned Defendants in writing that this practice would lead to "legal consequences", and numerous Done providers resigned because of it.  *See, e.g.*, Trial Ex. 219 at 2–3.  Goodman testified, without contradiction, that patients left unmonitored this long "suffered," "decompensated," and, in some cases, were "hospitalized."  This category, standing alone, establishes a Level 38.

### II.    Defendants Profited Off of Addiction, No Less Than Pill Mills at Medical Clinics

Defendants cannot establish that the illegal distribution of Schedule II amphetamines like Adderall is outside the heartland of the Guidelines, either.  They fail to even mention Section 2D1.1's explicit guidance on how to address amphetamine stimulants, as well as the use of online media to target drug seekers.  *See* U.S.S.G. § 2D1.1(c)(1) (providing for a base offense level of 38 in any case involving

45KG or more of Amphetamine); App. Note 9 (noting how to determine drug quantities for "doses, pills, or capsules," with specific guidance for "stimulants"); U.S.S.G. § 2D1.1(b)(7) (enhancing offense level where "the defendant, or a person for whose conduct the defendant is accountable . . . distributed a controlled substance through mass-marketing by means of an interactive computer service."). Section 2D1.1 plainly contemplated the distribution of stimulant pills by means of an interactive online service.

Instead, Defendant He's argument hinges almost entirely on a false distinction between amphetamines and opioids. As she vainly puts it, the authorities cited by the government are distinguishable because Done was "engaged in a medical exercise," while the defendants in the cases cited by the government "supplied addicts and dealers with medically unnecessary Oxycodone[.]" ECF No. 647 at 3. But she does not cite a single statute, regulation, Guidelines provision, judicial opinion, or sentencing transcript drawing a distinction between opioids and amphetamines. In fact, she relies on nothing more than the Court's passing observation that opioids are a "much more dangerous drug." *Id.* at 3. That passing reference was clearly not a declaration that amphetamine cases are outside of the heartland; otherwise, the Court would not have requested supplemental briefing on the issue.

This Court has already recognized the closer, structurally apt comparator, and it is not an opioid clinic at all: the Court excluded evidence where Defendant was warned that her situation echoed Elizabeth Holmes and Sam Bankman-Fried as unfairly prejudicial while noting the aptness of the comparison. Those principals received sentences of 12 and 25 years, respectively, for analogous large-scale, technology-enabled deception. Unlike those defendants, the Defendant here engage in worse conduct – she used her deception to flood the country with 37 million addictive stimulant pills. The sentences the government requests are, if anything, conservative, by that benchmark.

The Guidelines, controlled substance regulations, the trial record, and past prosecutions all establish that there is no principled distinction between amphetamines and opioids for Guidelines purposes. Section 2D1.1 explicitly addresses both types of drugs. Controlled substance regulations place both Adderall and Oxycodone in Schedule II because they pose similar risks of addiction. Trial Tr. 3908–3909 (Schedule II covers "potentially addictive medication that can lead to abuse, and when using, has the high likelihood of potentially severe psychiatric and physical dependence."). And the only medical expert to testify at trial explicitly rejected Defendants' categorical distinctions: "Some

Gov. Supplemental Sentencing Response          9
24-CR-0329 CRB

people get addicted to stimulants and they don't get addicted to opioids. . . . it depends on the brain of the addict and the drug of choice. <u>To make these categorical distinctions between cocaine[, opioids, or benzodiazepines] and psychostimulants is not medically legitimate.</u>" Trial Tr. 4017–4018.

Defendant He cannot distinguish the cases cited by the government, either. On the contrary, she concedes that they "fall squarely within the heartland of physician traffickers who abuse their license to distribute drugs without a medical purpose or exercise." ECF No. 647 at 2. As previously noted, Defendant He specifically saved press releases for cases to her MacBook, including the case of nonclinical professional Chia Jean Lee and her physician coconspirator Theodore Taylor. *See* ECF No. 638, Sentencing Ex. 8. She personally considered this case a useful comparator for her own illegal practices at Done, and with good reason: just like her, Lee was a non-medical professional who set her medical clinic's pricing, tracked patient volumes, and prioritize the distribution of controlled substances so that the clinic's monthly revenues would grow fivefold in just over a year. *See* ECF No. 638 at 18–19. And just like Defendant He does now, Lee played herself off as an "innocent office manager" without prescribing authority, even though she was aware of numerous red flags of illegal prescribing and even pre-wrote prescriptions for her physician coconspirator to sign. *See id.* And while Defendant He now reductively characterizes the case as an "oxycodone" one, she omits that a jury explicitly convicted Lee and Taylor of illegally distributing five times more Adderall than Oxycodone. *See United States v. Lee*, 966 F.3d 310, 326 (5th Cir. 2020) (noting the jury attributed 114 grams of oxycodone and 580 grams of Adderall to the conspiracy).

The remainder of the government cases are not distinguishable simply because the defendants distributed *both* amphetamines and opioids at their medical clinics, either. Instead, they show that stimulant and opioid abuse often go hand in hand.[1] Done's members did not draw a distinction between abusing Adderall and opioids, either. No less than five of the 16 members evaluated by Dr. Goodman had documented narcotic use, and Done's failure to account for that allowed these members to "secure another controlled substance drug that they could abuse." Trial Tr. 3920. There is ample evidence that Defendants and their coconspirators disregarded red flags of substance abuse to keep Done members on

---

[1] For example, five out of the six counts to which doctor Bajwa pleaded guilty were for Adderall distribution, rather than opioids. *See* ECF No. 638, Sentencing Ex. 9.

Gov. Supplemental Sentencing Response          10
24-CR-0329 CRB

the platform.  Apart from the examples of H.B. and A.L. above, B.H. provides yet another example. Provider Andrey Shalomov highlighted that B.H. was a "61-year-old with opioid abuse problem on Vicodin three times a day for a very very long time, and also getting Adderall . . . I will not contribute to her addiction problems, therefore do not feel comfortable signing off" on prescriptions for her.  Trial Ex. 789.  Shalomov also highlighted that this was a systemic problem:  "I do not understand why there is a preference specifically for Adderall, a substance that is so addictive, that [has] a high risk of diversion, high risk for misuse. . . . ADHD prescribing is a science, not just a '[here] is your Adderall.'"  *Id.* Rather than acknowledging these concerns, Done routed B.H. to another provider who prescribed her the Adderall.  Trial Tr. 3943–3945.

It is also telling that Defendant He dedicates multiple pages of her latest response to explaining that Adderall didn't cause the deaths of multiple members who passed either during or shortly after their time on the Done platform.  *See* ECF No. 647 at 7–8.  To be clear, the government does not argue that Adderall was the but for cause of any Done member's death.  But Defendant He is wrong to suggest that Done's mistreatment of these members had no adverse effect on their health at all.  These Done members struggled with health issues that went unaddressed, precisely because Defendants' model restricted practitioners' ability to conduct legitimate medical evaluations.  Rather than receiving proper care, these Done members received addictive amphetamines that exacerbated the risks of suffering adverse health consequences, including by fueling addictions and misconceptions that Adderall had solved these members' underlying issues.[2]  *See, e.g.*, Trial Tr. 2625–26 (Dr. Todd Hill noting "stimulants are amphetamines, and people who are manic already are stimulated . . . you don't want to give . . . speed to someone who's already sped up").  The trial record and victim statements readily support this inference of broader harm:

- **H.B.**  Defendant He tersely claims that H.B. died of a fentanyl overdose, not Adderall.  ECF No.

---

[2] That is another similarity between this case and *Allingham*, which Defendant He describes as "squarely within the heartland of physician traffickers."  ECF No. 647 at 4.  While Defendant He cites the government's sentencing brief in *Allingham* for the proposition that his prescriptions "contribut[ed] to at least seven fatal drug overdoses," ECF No. 647 at 3, the government did not argue his prescriptions caused any deaths either.  *See United States v. Allingham*, Case No. 25-CR-2, ECF No. 45 at 31 (E.D Va. Aug. 8, 2025) ("[I]t's not, to be clear, the government's position that these overdoses were all caused by the defendant, but he certainly contributed to the addiction that led to them.").

647 at 8. But H.B.'s prescription drug monitoring records demonstrated a history of substance abuse that Done prescribers failed to evaluate before prescribing him addictive stimulants. Trial Tr. 3976–77. After H.B.'s overdose less than two months later, his mother emailed Done to ask "if any part of [Done's] work [was] assessing whether or not you're dealing with an addict." Trial Tr. 2289. Despite this email, and Dr. Brindala's risk mitigation reports flagging the issue, Defendants continued to run Done in a way that enabled this drug abuse.

- **A.R.** For example, after H.B.'s death, Defendant He took steps that made drug abuse *more likely*, such as instituting an "auto-renewal" program that allowed Done members to keep receiving stimulant refills without a follow-up appointment. Trial Ex. 326. This led to the absurd result of Done member A.R. continuing to receive stimulant prescriptions for four months after he had already died. Trial Tr. 3934–35.

- **K.D.** was another of the 16 patients. While Defendant He claims that K.D. had ADHD as a child and died of an unrelated fentanyl overdose, ECF No. 647 at 7, she ignores that coconspirator Erin Kim prescribed stimulants for K.D. after an appointment of less than seven minutes, despite evidence that K.D. had prior prescriptions for hydrocone, oxycodone, tramadol, and more. Trial Tr. 3919–3920. K.D.'s sister submitted a statement to the Court, wondering "if [K.D.] had been treated by a medical professional who genuinely cared and upheld the appropriate standard of care, she might still be alive today." Supplemental Victim Statements at 5.

- **R.H.** was another of the 16 patients. Defendant He has almost no explanation for his case, except that a screening questionnaire suggested he might have ADHD and that he was prescribed a dose within FDA limits. ECF No. 647 at 8. But R.H.'s father submitted a letter explaining that R.H. "had a longstanding struggle with prescription drug misuse," and while his "cause of death was not the Adderall," it "certainly could have fed the problem" by "enabl[ing] or worsen[ing] an already dangerous pattern." Supplemental Victim Statements at 6.

- **J.L.** J.L. was not one of the 16 patients addressed at trial, but her parents submitted victim letters ahead of sentencing. *See* Victim Statements at 6–10. Defendant He claims only that J.L.'s heart conditions were not a counterindication for Adderall. ECF No. 647 at 8. But she completely fails to address other concerning aspects of J.L.'s case, such as her parents'

Gov. Supplemental Sentencing Response          12
24-CR-0329 CRB

observations that she was "changing doctors if they did not prescribe Adderall or tried to limit it," and that she "stopped taking all of her [other] medications . . . possibly due to being accepted into the Done Health program where she could get the Adderall." Victim Statements at 7.

- **M.A.** M.A. is another Done member who was not addressed at trial, but whose sister submitted a victim statement for the Court's consideration. As his sister explained, M.A. was "given a false diagnosis of ADHD and prescribed Adderall despite his past addiction and serious mental health history being the real issues that should have been carefully considered." Victim Statements at 3. M.A. overdosed on another drug while still on the Done platform, with his sister observing that "for up to three months after [M.A.]'s passing, he was still being prescribed Adderall medication without any follow-ups or evaluation from a doctor." *Id.* at 4. This was yet another foreseeable consequence of Defendant He's illegitimate auto-refill policy.

Defendant He knew that her business model fueled addiction, and she affirmatively believed "[m]ost successful companies usually profit out of addiction." Trial Ex. 897 at 151.

Defendant He engaged in fundamentally the same misconduct that Section 2D1.1 was designed to punish. That is why she saved press releases for clinic cases like *Lee* and *Taylor* on her MacBook. *See* ECF No. 638, Sentencing Ex. 8. Defendants' own medical directors recognized that Done was simply the modern-day form of drug distribution, with Zoe Martinez telling others that she was "recently hired on for a pill mill" and Les Tsang remarking that he "no longer fear[ed] hell after working at Done." Trial Exs. 238, 330. Chief Medical Officer Jayaram Brindala spelled out all the ways that Defendants hid behind "excuses to prescribe," telling Defendant He in no uncertain terms that "If we simply try to find a way for every patient to get the stimulant they want, we will truly be a pill mill." Trial Ex. 355. Defendant He ignored these crystal-clear warnings because she affirmatively planned to "profit out of addiction." She knew the heartland of drug distribution cases and chose to stay within it.

## CONCLUSION

This Court recognized that Defendant is 100 percent a flight risk and the record since only has sharpened the concern that Defendant is seeking a sentence to allow her to resume her conduct from a jurisdiction beyond the reach of American law enforcement. The Court should sentence Defendant He to 240 months' imprisonment, forfeiture in the amount of $91,311,290, restitution in the amount of

$12,397,160 and a fine of $24,794,320, and Defendant Brody to 120 months' imprisonment, forfeiture in the amount of $730,892, restitution in the amount of $12,397,160, and a fine in the amount of $50,000.  Other telehealth executives are watching this case to see whether the calculated choice to "profit off addiction" carries real consequences.  The Court should tell them it does.

DATED: July 6, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

LORINDA I. LARYEA
Chief, Fraud Section

_/s/_____
JACOB FOSTER
Acting Chief, Health Care Fraud Unit
EMILY GURSKIS
Assistant Chief
ARUN BODAPATI
Trial Attorney
Fraud Section, U.S. Department of Justice

_/s/_____
KRISTINA GREEN
Assistant United States Attorney

Gov. Supplemental Sentencing Response          14
24-CR-0329 CRB